FILED
DALLAS COUNTY
1/24/2018 6:40 AM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-17-15244

| | | |
|---|---|---|
| JOSHUA N. TERRY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | |
| Defendants. | § | 44th JUDICIAL DISTRICT |

## PLAINTIFF'S APPLICATION
## FOR TEMPORARY RESTRAINING ORDER

Plaintiff Joshua N. Terry ("Mr. Terry") files this Application for Temporary Restraining Order against Defendants Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP") (collectively "Acis"), and shows the Court as follows:

### SUMMARY OF APPLICATION

Acis is in the midst of an audacious scheme to transfer *all* of its assets to Cayman affiliates to avoid satisfaction of Mr. Terry's judgment. Acis fought hard to avoid post-judgment discovery because it had something big and bad to hide. Starting shortly after the $8 million arbitration award was entered against it, Acis has **fraudulently transferred assets in excess of $16.6 million** to several affiliated entities in the Cayman Islands, including:

- A $10 million promissory note from an affiliate, Highland Capital Management, L.P. ("Highland"), to a Cayman affiliate (14 days after the Final Award);

- An interest in several entities worth in excess of $6.6 million (the day after the Court entered the Judgment).

Based on documents produced two days ago by Acis pursuant to Court order, it is clear that Acis is poised to fraudulently transfer its most significant assets: management contracts worth well in excess of $30 million, again to another Cayman affiliate. If that transfer occurs, Acis will

Exhibit A
Page 1 of 65

have few, if any, assets. Mr. Terry requests the Court enter a temporary restraining order restraining Acis from taking any further action to transfer the management contracts, or any of Acis' other assets.

### RELEVANT FACTS

1.      From September 6-15, 2017, an arbitration panel consisting of Hon. Harlan Martin (former), Hon. Glen M. Ashworth (Ret.), and Hon. Mark Whittington (Ret.) (the "Arbitration Panel") held a final hearing in Dallas County.

2.      On October 20, 2017, the Arbitration Panel issued its Final Award in the Arbitration (the "Final Award") against Acis.

3.      On October 24, 2017 (4 days after the Panel issued the Final Award), an employee of Highland and representative of Acis, Frank Waterhouse, executed an agreement for Acis which reflects a sale of Acis' interest in its risk retention vehicle, Acis Loan Funding, Ltd. ("Acis Loan Funding"). A true and correct copy of that agreement is attached hereto as **Exhibit 1**.

4.      On October 27, 2017 (7 days after the Panel issued the Final Award), James Dondero signed an agreement transferring management of Acis Loan Funding from Acis to Highland HCF Advisor Ltd., a Cayman entity ("Highland Cayman 1") for *no consideration*. That transfer deprived Acis of the value to which it was entitled. A true and correct copy of that agreement is attached hereto as **Exhibit 2**. When Mr. Terry was a partner in Acis, Acis was the portfolio manager of Acis Loan Funding. That contractual arrangement between Acis and Acis Loan Funding was a valuable asset of Acis, as was Acis' ownership interest in Acis Loan Funding.

5.      On October 31, 2017, counsel for Acis, Jamie Welton, called Rogge Dunn on the telephone. *See* Declaration of Rogge Dunn attached hereto as **Exhibit 3**. In that call, Mr. Welton stated that Acis is "judgment proof."

6.      On the same day, October 31, 2017 (11 days after the Panel issued the Final Award), Dondero caused a filing in the Registry of the island nation of Guernsey (one of the Channel

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** – Page 2
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Application for TRO.docx

Exhibit A
Page 2 of 65

Islands in the English Channel). In that filing, Acis Loan Funding was renamed "Highland CLO Funding, Ltd."

7. On November 3, 2017, Acis, Highland, and Highland CLO Management Ltd., another Cayman entity ("Highland Cayman 2"), entered into an Agreement for Assignment and Transfer of Promissory Note (the "Note Transfer"), a true and correct copy of which is attached hereto as **Exhibit 4**. The Note Transfer affected a $10 million promissory note by Highland in favor of Acis, a true and correct copy of which is attached hereto as **Exhibit 5** (the "Highland Note"). Among other things, the Note Transfer transferred the Highland Note, for *no consideration*, from Acis to Highland Cayman 2.

8. Significantly, the Note Transfer also purports to initiate the transfer of management contracts to Highland Cayman 2 for the CLOs listed on Schedule A to a prior agreement, a true and correct copy of which is attached as **Exhibit 6** (the "Management Contracts"). Acis is to receive *no* consideration for transferring its most significant assets, the Management Contracts.

9. On November 6, 2017, Terry filed this action to confirm the Final Award.

10. When Terry was a partner in Acis a year and a half ago, Acis had assets in excess of $40 million, and *no* liabilities or liens against its property.

11. On November 22, 2017, Mr. Terry filed his Motion for Expedited Discovery.

12. On December 18, 2017, the Court entered its (i) Order Confirming Arbitration Award, (ii) Final Judgment, and (iii) Order Granting Expedited Discovery.

13. On December 19, 2017, Acis transferred $6.6 million of additional assets to Highland CLO Holdings, Ltd., another Cayman entity ("Highland Cayman 3"), purportedly in exchange for forgiveness of a receivable. A true and correct copy of that agreement is attached hereto as **Exhibit 7**.

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** – Page 3
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Application for TRO.docx

Exhibit A
Page 3 of 65

14. Also on December 19, 2017, the partners of Acis transferred their partnership interest to yet another Cayman entity, Neutra, Ltd. ("Highland Cayman 4"). A true and correct copy of that agreement is attached hereto as **Exhibit 8**.

15. On January 22, 2018, Acis produced documents and answered discovery that revealed much of the foregoing.

### ARGUMENT & AUTHORITY

Post-judgment injunctive relief is provided for in the Texas Civil Practices and Remedies Code and the Texas Rules of Appellate Procedure. TEX. CIV. PRAC. & REM. CODE § 52.006(e); TEX. R. APP. P. 24.2(d).

The standard for post-judgment injunctive relief is simple: a determination of "whether the judgment debtor is likely to dissipate or transfer its assets to avoid satisfaction of the judgment." *Emeritus Corp. v. Ofczarzak*, 198 S.W.3d 222, 227 (Tex. App.—San Antonio 2006, no pet.); *Sargeant v. Al Saleh*, 512 S.W.3d 399, 409 (Tex. App.—Corpus Christi 2016, no pet.) ("In the post-judgment context, the question is only whether the judgment debtor is likely to dissipate or transfer its assets to avoid satisfaction of the judgment.") (internal quotations omitted). "Evidence of the actual dissipation or transfer of assets is *not* necessary to meet this standard." *Sargeant,* 512 S.W.3d at 409 (emphasis added); *Miga v. Jensen*, 02-11-00074-CV, 2012 WL 745329, at *11 (Tex. App.—Fort Worth Mar. 8, 2012, no pet.).

Attached as **Exhibit 9** is the Declaration of Joshua N. Terry, which details the following, among other things:

- Mr. Terry ran Acis' day-to-day operations from 2011 until he was wrongfully terminated in June 2016;

- Mr. Terry is well-versed in the CLO industry, where he worked since 2005. Mr. Terry has earned the right to use the Chartered Financial Analyst designation. From my experience, education, and training, I became familiar with the common and legitimate business practices of CLO managers in the industry, as well as the value of CLO management contracts.

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** – Page 4
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Application for TRO.docx

Exhibit A
Page 4 of 65

- In 2015, Mr. Terry valued Acis in excess of $70 million, a conclusion that was accepted by David Klos, a Highland employee;

- On February 28, 2012, Highland sold four European CLO management contracts to The Carlyle Group for $43.6 million in an arms-length transaction. Those four CLO management contracts are *less* valuable than the five Management Contracts Acis owns and which it now seeks to transfer for *no* consideration;

- The Management Contracts are the most substantial asset of Acis and are valued in excess of $30 million;

- There is no legitimate business purpose for Acis to transfer the Management Contracts for no consideration;

- There is no legitimate business purpose for Acis to transfer the Highland Note for no consideration;

- It is not in the normal course of Acis' business to transfer all of its Management Contracts for no consideration, or to transfer the Highland Note for no consideration;

- If Acis transfers the Management Contracts, Acis will not have assets adequate to satisfy the Judgment.[1]

The standard for post-judgment injunctive relief is not only met in this case, but is far exceeded. Indeed, there is direct and compelling evidence that Acis *actually* transferred and dissipated assets, and intends to transfer more. Consequently, Mr. Terry clearly met his burden to show transfers or dissipation is "likely." The Court should enter a temporary restraining order pending a hearing on a temporary injunction.

## CONCLUSION

Counsel for Acis represented to the Court and to counsel for Mr. Terry that Acis had not, and was not, transferring assets. The documents Acis produced two days ago—which they fought so hard to withhold—tell a very different story. This Court has the "inherent power to enforce its judgments." *Harleaux v. Harleaux*, 154 S.W.3d 925, 928 (Tex. App.—Dallas 2005, no pet.). One

---

[1] If and when Acis attempts to supersede the Judgment, Terry will request the Court include all of the fraudulently-transferred assets in any calculation of Acis' net worth.

PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER – Page 5
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Application for TRO.docx

Exhibit A
Page 5 of 65

means by which a Court can enforce its judgment is through injunctive relief, and injunctive relief is certainly appropriate under the circumstances. Mr. Terry requests the Court enter a temporary restraining order prohibiting Acis from taking any further action to transfer the Management Contracts and any other assets, set a hearing on a preliminary injunction, and for such other relief to which Mr. Terry is entitled.

Respectfully submitted,

_____
ROGGE DUNN
State Bar No. 06249500
dunn@clousedunn.com

BRIAN P. SHAW
State Bar No. 24053473
shaw@clousedunn.com

CLOUSE DUNN LLP
1201 Elm Street, Suite 5200
Dallas, Texas 75270-2142
Telephone: (214) 220-3888
Facsimile: (214) 220-3833

**ATTORNEYS FOR PLAINTIFF
JOSHUA N. TERRY**

### L.R. 2.02 CERTIFICATION

I hereby certify that at or near the time I file this Application, I am notifying Defendants via ECF that Mr. Terry intends to present his Application for Temporary Restraining Order and Proposed Order at least 2 hours before they are to be presented to the Court. I also certify that to the best of my knowledge, this case is not subject to transfer under Local Rule 1.06.

_____
BRIAN P. SHAW

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** – Page 6
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Application for TRO.docx

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument was served on all counsel of record on the __24th__ day of __January__, 20__18__ as follows:

Gary Cruciani
Michael P. Fritz
Nicholas Mathews
Carson D. Young
MCKOOL SMITH
300 Crescent Court
Suite 1500
Dallas, Texas 75201

☒ VIA ECF
☐ VIA OVERNIGHT
☐ VIA REGULAR MAIL
☐ VIA HAND DELIVERY
☐ VIA FAX:
☐ VIA EMAIL:


_____
**BRIAN P. SHAW**
**ROGGE DUNN**

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** – *Page* 7
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Application for TRO.docx

Exhibit A
Page 7 of 65

EXHIBIT
1

**Acis Loan Funding, Ltd. (the Company)**

**Registration number 60120**

**Written resolutions of the shareholders of the Company passed in accordance with section 175(2)(b) of the Companies (Guernsey) Law, 2008 (the Law)**

**PLEASE READ THE NOTES AT THE END OF THIS DOCUMENT BEFORE SIGNING YOUR APPROVAL OF THE RESOLUTIONS SET OUT BELOW.**

Pursuant to section 182 of the Law, the directors of the Company propose that the resolutions set out below be passed as **special resolutions** of the Company and, accordingly, we resolve that:

1.    **THAT**, in accordance with section 314(2) of the Companies (Guernsey) Law, 2008, as amended, the Company be and is hereby specifically empowered, authorised and directed to acquire 966,679 ordinary shares of no par value in the capital of the Company for an aggregate sum of USD 991,180.13, pursuant to the terms of the contract (a copy of which is attached to this resolution) (the **Contract**) to be entered into between the Company and Acis Capital management, L.P. acting by its general partner Acis Capital Management GP, LLC following the passing of this special resolution, the form of which Contract be and is hereby approved.  The authority conferred by this special resolution shall expire on 30 October 2017.

The following definitions apply in, and form part of, the above resolutions.

**Circulation Date** means the date on which copies of these written resolutions are sent to shareholders (or, if copies are sent to shareholders on different days, the first of those days).

8032669/71447029/4

We are the shareholders of the Company on the Circulation Date.

**Signatures**

......................................................................

Grant Scott, Director, for and on behalf of
**CLO HoldCo, Ltd.**

Shares voted in favour: ALL

Date: 24 October 2017

Location: Raleigh, NC

......................................................................

Frank Waterhouse, Treasurer, for and on behalf of
**Acis Capital Management, L.P.**
acting by its general partner,
Acis Capital Management GP, LLC

Shares voted in favour: ALL

Date: .....................................................................

Location: .....................................................................

8032669/71447029/4

2

We are the shareholders of the Company on the Circulation Date.

**Signatures**

.......................................................     .......................................................

Grant Scott, Director, for and on behalf of     Frank Waterhouse, Treasurer, for and on behalf of
**CLO HoldCo, Ltd.**     **Acis Capital Management, L.P.**
    acting by its general partner,
    Acis Capital Management GP, LLC

Shares voted in favour: ALL     Shares voted in favour: ALL

Date: ...........................................................     Date: 24 October 2017

Location: .....................................................     Location: Dallas, Tx

8032669/71447029/4

2

**Notes to the written resolutions**

1.      If you agree to the above resolutions, please signify your agreement by signing and dating this document where indicated above, indicating either the number of shares that you vote in favour of the above resolutions or that you vote all shares in favour of the above resolutions, and returning it to the Company within 28 days from the Circulation Date, as follows:

   (a)     by delivering it by hand or by posting it to First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ marked for the attention of Mr Timothy Wilson; and

   (b)     by sending it as an attachment to an e-mail at tim.wilson@ais.statestreet.com.

   A shareholder's agreement to a written resolution, once signified, may not be revoked.

2.      If you do not agree to the above resolutions you do not need to do anything.

3.      A written resolution is passed when the requisite majority of eligible shareholders have signified their agreement to it and will lapse if it is not passed by the end of the 28 day period from and including the Circulation Date.

4.      In the case of joint holders of shares, only the vote of the holder whose name appears first in the register of members will be counted by the Company.

5.      These written resolutions may be signed in counterpart.

8032669/71447029/4

3

EXHIBIT

2

## PORTFOLIO MANAGEMENT AGREEMENT

THIS PORTFOLIO MANAGEMENT AGREEMENT (this "*Agreement*"), dated to be effective from 27 October 2017 (the "*Effective Date*") is entered into by and between **Acis Loan Funding, Ltd.**, a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120, (the "*Company*") and **Highland HCF Advisor, Ltd.**, a company organized under the laws of the Cayman Islands (the "*Portfolio Manager*" or "*Highland*"). Acis Capital Management, L.P., a limited partnership organized under the laws of the State of Delaware (the "*Predecessor Portfolio Manager*"), joins in the execution and delivery of this Agreement solely for the purpose of consenting and agreeing to Section 1 hereof.

## RECITALS

WHEREAS, the Company and the Predecessor Portfolio Manager entered into that certain Portfolio Management Agreement, dated to be effective from December 22, 2016 (the "**Predecessor Portfolio Management Agreement**"); and

WHEREAS, the Company desires to supersede and replace the Predecessor Portfolio Management Agreement in its entirety with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Termination of the Portfolio Services Agreement.  Effective as of the Effective Date. (x) the Predecessor Portfolio Management Agreement is hereby cancelled and terminated in its entirety and shall have no further force or effect, (y) each party thereto releases the other party from all claims, suits or causes of action arising out of or relating to the Predecessor Portfolio Management Agreement and (z) each party hereby ratifies all prior transactions effected in accordance with the Predecessor Portfolio Management Agreement.

2.      Appointment of the Portfolio Manager.  The Portfolio Manager shall act as the investment manager to the Company and shall manage the investment and reinvestment of the

– 1–

cash, Financial Instruments (as defined in Section 5 below) and other properties comprising the assets and liabilities of the Company, in each case, subject to and in accordance with the investment policy of the Company (the "***Investment Policy***").

3. <u>Additional Portfolio Services</u>. The Portfolio Manager shall discuss with the directors of the Company (the "***Directors***") the investment objectives of the Company and assist the Directors to develop, monitor and update the Company's Investment Policy; shall identify and present information to the Directors with respect to potential investments available to the Company in furtherance of the Investment Policy, including (without limitation) credit and market research and analysis in connection with the origination or acquisition of such investments; shall provide such assistance with respect to the administration and valuation of the Company's investment portfolio as the Directors shall reasonably require; and shall make available to the Company such personnel and resources as are necessary in connection with the foregoing services.

4. <u>Custody</u>. The Financial Instruments (as defined in Section 5 below) shall be held in the custody of State Street Custodial Services (Ireland) Limited or one or more banks selected by the Company (each such bank, a "***Custodian***"). The Company will notify the Portfolio Manager promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the Company. At no time shall the Portfolio Manager have possession of or maintain custody over any of the Financial Instruments. The Portfolio Manager shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

5. <u>Authority of the Portfolio Manager</u>. Subject at all times to (i) provisions of applicable law, and (ii) the Investment Policy, the Portfolio Manager shall have the authority for and in the name of the Company to:

(a) invest, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded

- 2 -

or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) senior secured loans, (ii) notes representing tranches of debt (*"CLO Notes"*) issued by a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans (which may be represented by a debt or equity security) (a *"CLO"*), (iii) preference shares, income notes or other equity instruments issued by CLO issuers, (iv) equity interests or loans in asset management companies, (v) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (vi) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (vii) spot and forward currency transactions and (viii) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, *"**Financial Instruments**"*), and the sale of Financial Instruments short and covering such sales;

- 3 -

(b)     engage in such other lawful Financial Instruments transactions as the Portfolio Manager may from time to time determine;

(c)     provide credit and market research and analysis in connection with the investments and ongoing management of the Company and direct the formulation of investment policies and strategies for the Company;

(d)     purchase Financial Instruments and hold them for investment;

(e)     enter into contracts for or in connection with investments in Financial Instruments;

(f)     invest in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)     possess, transfer, mortgage, pledge or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Company and/or its subsidiaries;

(h)     lend, either with or without security, any Financial Instruments, funds or other properties of the Company, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Company;

(i)     open, maintain and close accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)     open, maintain and close accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)     combine purchase or sale orders on behalf of the Company with orders for other accounts to which the Portfolio Manager or any of its affiliates provides investment services ("*Other Accounts*") and allocate the Financial Instruments or other assets so purchased

- 4 -

or sold, on an average-price basis or in any other manner deemed fair and equitable to the Portfolio Manager in its sole discretion, among such accounts;

        (l)    enter into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Company and Other Accounts and are allocated among such accounts using an average price;

        (m)    organize one or more corporations and other entities formed to hold record title, as nominee for the Company (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Company;

        (n)    cause the Company to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Portfolio Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

        (o)    engage and/or provide personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants, investment bankers and any human resources as may be necessary for the Company to conduct any matters related to its portfolio of assets on behalf of or for the Company);

        (p)    provide certain support and assistance (including back office and middle office functions) to the Company; and

        (q)    vote Financial Instruments, participate in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

        6.    <u>Policies of the Company</u>.   The activities engaged in by the Portfolio Manager shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy.

        The Portfolio Manager shall submit such periodic reports, recommendations, research and analytic material to the Company regarding the Investment Policy, the Company's investment portfolio and the Portfolio Manager's activities hereunder as the Company may

- 5-

reasonably request and a representative of the Portfolio Manager shall be available to meet with the Company (whether in person or by telephone) as reasonably requested by the Company.

In furtherance of the foregoing, the Company hereby appoints the Portfolio Manager as the Company's attorney-in-fact, with full power of authority to act in the Company's name and on its behalf with respect to the matters set forth in Section 5 above.

7.    Status of the Portfolio Manager.  The Portfolio Manager shall, for all purposes, be an independent contractor and not an employee of the Company, and nothing herein shall be construed as making the Company a partner, member or co-venturer with the Portfolio Manager or any of its affiliates or clients.  The Portfolio Manager shall have no authority to act for, represent, bind or obligate the Company except as specifically provided herein.

8.    Reimbursement by the Company.  The Portfolio Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Company with respect to the Company and/or its subsidiaries (any such appointee, a "**Sub-Services Provider**"), including, but not limited to, any affiliate of the Portfolio Manager, but payment for any such services shall be assumed by the Portfolio Manager, and the Company shall not have any liability therefor; *provided, however*, that the Portfolio Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Company, and the Company shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom, including any irrecoverable VAT arising on such costs and expenses.

9.    Expenses.

(a)    The Company shall pay or reimburse the Portfolio Manager and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-

- 6-

related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes imposed upon the Company (including, but not limited to, any irrecoverable VAT arising on such costs and expenses), fees relating to valuing the Financial Instruments, and extraordinary expenses. In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Portfolio Manager. For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)    To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any Sub-Services Provider, the Company shall reimburse the Portfolio Manager (or the relevant Sub-Services Provider, as applicable) for such expenses so long as such expenses are determined on an arm's length basis.

10.    Exculpation: Indemnification.

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Portfolio Manager, its managers, directors, officers, partners, shareholders, agents and employees, or any of their respective affiliates and their respective managers, directors, officers, partners, shareholders, agents and employees (including parties acting as agents for the execution of transactions) (each, a "*Covered Person*" and collectively, "*Covered Persons*") shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Company or any of its subsidiaries or anyone for liabilities incurred by the Company as a result of or arising out of or in connection with the performance by the Portfolio Manager under this Agreement, or for any

- 7 -

losses or damages resulting from any failure to satisfy the Standard of Care (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any such liabilities were incurred by reasons of acts or omissions constituting bad faith, fraud, willful misconduct or gross negligence (with such term given its meaning under New York law) or reckless disregard of the duties and obligations of the Portfolio Manager (as determined by a non-appealable judgment of a court of competent jurisdiction), (a "*Portfolio Manager Breach*").

(c)     Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the Company shall indemnify and hold harmless Covered Persons, from and against any and all claims, liabilities, damages, losses, costs and expenses ("*Losses*"), including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Covered Person and arise out of or in connection with the business of the Company, any investment made under or in connection with this Agreement, or the performance by the Covered Person of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person in connection with the Company, provided that a Covered Person shall not be entitled to indemnification hereunder to the extent the Covered Person's conduct constitutes a Portfolio

-8-

Manager Breach. The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Covered Person's conduct constituted a Portfolio Manager Breach.

(e)     Expenses incurred by an Covered Person in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately that the Covered Person is not entitled to be indemnified hereunder.

(f)     The right of any Covered Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Portfolio Manager and each Covered Person will generally not be liable to the Company for any act or omission (or alleged act or omission), absent a Portfolio Manager Breach, and the Company will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the Company, absent a Portfolio Manager Breach. As a result of these provisions, the Company (not the Portfolio Manager or any other Covered Person) will be responsible for any Losses resulting

- 9 -

from trading errors and similar human errors, absent a Portfolio Manager Breach or the inability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Portfolio Manager and its affiliates on behalf of the Company, the Company acknowledges that trading errors (and similar errors) will occur and that the Company will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Portfolio Manager or its affiliates.

11. <u>Activities of the Portfolio Manager and Others</u>. The Portfolio Manager, and its affiliates may engage, simultaneously with their portfolio servicing and management activities on behalf of the Company, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Company. Notwithstanding the foregoing, the Portfolio Manager and its affiliates shall devote as much time and resources to the performance of its obligations hereunder as the Portfolio Manager deems necessary and appropriate. In addition, the Portfolio Manager or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, any guidance provided by the Portfolio Manager to the Company. The Portfolio Manager may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from guidance given to, or securities recommended for, the Company, even though their investment objectives may be the same or similar. The Portfolio Manager may recommend transactions in securities and other assets in which the Portfolio Manager has an interest, including securities or other assets issued by affiliates of the Portfolio Manager. The Company acknowledges that it has received a copy of Part 2 of the Portfolio Manager's Form ADV, which further describes conflicts of interest, including the Portfolio Manager, its affiliates and their respective advised accounts.

12. <u>Standard of Care</u>. Under this Agreement, the Portfolio Manager agrees to perform its obligations hereunder, with reasonable care (a) using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets

- 10-

that it manages for itself and others having similar investment objectives and restrictions, and (b) to the extent not inconsistent with the foregoing, in a manner consistent with the Portfolio Manager's customary standards, policies and procedures (the "*Standard of Care*"); provided that the Portfolio Manager shall not be liable for any loss or damages resulting from any failure to satisfy the Standard of Care except to the extent any act or omission of the Portfolio Manager constitutes a Portfolio Manager Breach. The Standard of Care may change from time to time to reflect changes by the Portfolio Manager to its customary standards, policies and procedures provided that such customary standards, policies and procedures are at least as rigorous as the foregoing.

13. Term; Termination.

(a) This Agreement shall remain in effect through an initial term concluding August 10, 2018 and shall be automatically extended for additional three-year terms thereafter, *provided, however,* this Agreement may be terminated in the event of: (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act of 1940, as amended (the "*Investment Company Act*") (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full, (C) such other date as agreed between the Company and the Portfolio Manager and (D) under subsection (b) of this Section 13 or Section 14 of this Agreement.

(b) Notwithstanding any other provision hereof to the contrary but subject to the provisions of clause (d) below, this Agreement may be terminated without cause by the Portfolio Manager, and the Portfolio Manager may resign, upon at least ninety (90) days' (or such shorter notice as is acceptable to the Company) written notice to the Company. The resignation shall not be effective until the date as of which a successor adviser has been appointed. The Portfolio Manager may immediately resign by providing written notice to the Company upon the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a willful breach or knowing violation by the Company

- 11-

of a material provision of this Agreement or the occurrence of insolvency proceedings in respect of the Company.

(c) Notwithstanding the provisions of clause (b) above, no resignation or removal of the Portfolio Manager or termination of this Agreement pursuant to such clause shall be effective until the date as of which a successor Portfolio Manager shall have been appointed and approved in accordance with Section 13(d) and has accepted all of the Portfolio Manager's duties and obligations pursuant to this Agreement in writing and has assumed such duties and obligations.

(d) Any termination, removal or resignation of the Portfolio Manager shall be effective only upon (a) the appointment by the Company of a successor Portfolio Manager that is an established institution which (i) has demonstrated an ability to professionally and competently perform duties reasonably comparable to those imposed upon the Portfolio Manager hereunder, (ii) is legally qualified and has the capacity to act as successor to the Portfolio Manager under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager hereunder and under the terms of the offering memorandum dated August 10, 2015 (as amended from time to time, the "*Offering Memorandum*") applicable to the Portfolio Manager, (iii) shall not cause the Company to become required to register under the provisions of the Investment Company Act and (iv) shall not result in the imposition of any entity-level or withholding tax on the Company or cause any other material adverse tax consequences to the Company and (b) written acceptance of appointment by such successor Portfolio Manager. The Company shall use its commercially reasonable efforts to appoint a successor Portfolio Manager to assume the duties and obligations of the removed or resigning Portfolio Manager. The Company, the Custodians and the successor Portfolio Manager shall take such action (or cause the outgoing Portfolio Manager to take such action) consistent with this Agreement and the terms of the Offering Memorandum applicable to the Portfolio Manager, as shall be necessary to effectuate any such succession. In the event that a successor has not been appointed or has not assumed the duties of the Portfolio Manager in writing within a 60-day period ,the Portfolio Manager or the Company may petition a court of competent jurisdiction for the appointment of a successor Portfolio Manager, which appointment will not require the consent of, or be subject to the approval or

- 12-

disapproval of, the Company (so long as such court appointed successor meets the requirements of clauses (a)(i) through (iv) above).

(e) In the event of removal of the Portfolio Manager pursuant to this Agreement, the Company shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Company may by notice in writing to the Portfolio Manager as provided under this Agreement terminate all the rights and obligations of the Portfolio Manager under this Agreement (except those that survive termination pursuant to Section 13(d) above). Upon resignation or removal of the Portfolio Manager in accordance with this Section 13 or Section 14 of this Agreement, as applicable, and upon acceptance by a successor Portfolio Manager of appointment, all authority and power of the Portfolio Manager under this Agreement and the Offering Memorandum, shall automatically and without further action pass to and be vested in the successor Portfolio Manager.

(f) For so long as Highland HCF Advisor, Ltd. or an Affiliate thereof is the Portfolio Manager, the Company shall be permitted to use the "Highland" name; provided that, if the Portfolio Manager ceases to be Highland HCF Advisor, Ltd. or an Affiliate thereof, the Company shall use commercially reasonable efforts to change its name to remove all reference to the name "Highland" therefrom. In addition, the Portfolio Manager, without the consent of the Company, may change the name of the Portfolio Manager.

14.    Termination by the Company for Cause. This Agreement may be terminated, and the Portfolio Manager may be removed for Cause (as defined below) by the Company upon ten (10) days' prior written notice to the Portfolio Manager. No such termination or removal shall be effective until the date as of which a successor Portfolio Manager shall have agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to this Agreement and as specified in the Offering Memorandum. "Cause" shall mean any one of the following events:

(a) the Portfolio Manager willfully violates, or takes any action that it knows breaches any material provision of this Agreement or the Offering Memorandum applicable

- 13-

to it in bad faith (not including a willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions);

(b) the Portfolio Manager breaches in any respect any provision of this Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Company receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Company receives notice thereof;

(c) the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for sixty (60) days;

- 14-

(d) the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or

(e) any senior executive officer of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

If any of the events specified in the definition of "Cause" in this Section 14 shall occur, the Portfolio Manager shall give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event. The Company may waive any event described in (a), (b), (d), or (e) above as a basis for termination of this Agreement and removal of the Portfolio Manager under this Section 14.

15. Miscellaneous.

(a) Notices. Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

If to the Portfolio Manager, to:

Highland HCF Advisor, Ltd.
Maples Corporate Services Limited
PO Box 309
Ugland House
Grand Cayman, KY1-1104
Cayman Islands

If to the Company, to:
Acis Loan Funding, Ltd.

- 15-

1st Floor
Dorey Court Admiral Park St Peter Port
Channel Islands
Guernsey
GY1 3BG
Attention: Sharon Wrench
Telephone Number: +44 (0) 1481 704543
Facsimile Number: +44 (0) 1481 715602

(b)  Entire Agreement. This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)  Amendments and Waivers. No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties. No amendment to this Agreement may be made without first obtaining the required approval from the Company. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)  Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Company, the Portfolio Manager, each Covered Person and their respective successors and permitted assigns. Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (e.g., officers, partners and personnel of the Portfolio Manager and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent. No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided, however, that the Portfolio Manager may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

- 16-

(c)     Governing Law.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws the Cayman Islands that are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.  Each party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against any other party in any way arising from or relating to this Agreement and all contemplated transactions, in any forum other than the courts sitting in the Cayman Islands, and any appellate court from any thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in such courts.

(g)     Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)     Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)     Survival.  The provisions of Sections 8, 9, 10 and 15 hereof shall survive the termination of this Agreement.

(j)     Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)     Arm's-Length Agreement.     The Company has approved this Agreement and reviewed the activities described in Section 11 and in Highland Capital Management, L.P.'s Form ADV and the risks related thereto.

*[Signature Page to Follow]*

- 17-

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

ACIS LOAN FUNDING, LTD.

By: _____
Name: _____
Title: Director

HIGHLAND HCF ADVISOR, LTD.

By: _____
Name: Summit Management Limited
Title: Director

CONSENTED AND AGREED:

ACIS CAPITAL MANAGEMENT, L.P.

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title: President

- 18-

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

ACIS LOAN FUNDING, LTD.

By:_____
Name:
Title: Director

HIGHLAND HCF ADVISOR, LTD.

By:_____
Name: Summit Management Limited
Title: Director

CONSENTED AND AGREED:

ACIS CAPITAL MANAGEMENT, L.P.

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title: President

- 18-

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

ACIS LOAN FUNDING, LTD.

By:_____

Name:

Title:  Director

HIGHLAND HCF ADVISOR, LTD.

By:_____

Name: Summit Management Limited

Title: Director

CONSENTED AND AGREED:

ACIS CAPITAL MANAGEMENT, L.P.

By: Acis Capital Management GP, LLC, its General Partner

By: _____

Name: James Dondero

Title: President

-18-

**EXHIBIT**

**3**

CAUSE NO. DC-17-15244

| | | |
|---|---|---|
| JOSHUA N. TERRY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | |
| Defendants. | § | 44th JUDICIAL DISTRICT |

## DECLARATION OF ROGGE DUNN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1.    My name is Rogge Dunn.

2.    I am both qualified and competent to give this declaration, and I have personal knowledge of the facts stated herein based upon my experience, as well as my personal involvement in the matters discussed herein.  I have never been convicted of a felony.

3.    I am counsel for Plaintiff in the above-referenced matter.[1]

4.    On October 31, 2017, counsel for Acis, Jamie Welton, called me on the telephone.

In that call, Mr. Welton stated that Acis is "judgment proof."

## JURAT

My name is Rogge Dunn. My date of birth is 1/22/57, and my address is 1201 Elm St., Suite 5200, Dallas, Teas 75270. I declare under penalty of perjury that the foregoing is true and correct. This declaration is being executed pursuant to Tex. Civ. Prac. & Rem. Code § 132.001, and any other applicable law authorizing use of an unsworn declaration.

Executed in Dallas County, State of Texas, on the _22nd_ day of November 2017.

_____
Rogge Dunn, Declarant

---

[1] Plaintiff incorporates by reference the defined terms in his Motion for Expedited Discovery.

**DECLARATION OF ROGGE DUNN** – Page 1
R:\1\1675\55555\SubPldgs\Confirmation of Arb Award\Dunn declaration.docx

EXHIBIT
4

## ASSIGNMENT AND TRANSFER AGREEMENT

THIS AGREEMENT FOR ASSIGNMENT AND TRANSFER OF PROMISSORY NOTE (this *"Agreement"*), dated as of November 3, 2017, is entered into by and between ACIS CAPITAL MANAGEMENT, L.P., a Delaware limited partnership (*"Acis"*), HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership (*"HCM"*) and HIGHLAND CLO MANAGEMENT, LTD., a Cayman Islands exempted company (*"HCLOM"*, and together with HCM and Acis, the *"Parties"*). Capitalized terms used herein but not defined have the meanings ascribed thereto in the Agreement for Purchase and Sale of CLO Participation Interests between Acis and HCM dated as of October 7, 2016 (the *"Purchase Agreement"* and the promissory note therein, the *"Note"*).

## RECITALS

Whereas, Acis is portfolio manager to certain collateralized loan obligations listed in Schedule A of the Purchase Agreement and is entitled to fee compensation in connection therewith as set forth therein (the *"CLOs"*, the governing documents thereof, the *"CLO Documents"* and such fees, the *"Servicer Fees"*):

Whereas, Acis and HCM entered into the Purchase Agreement, whereby Acis sold a portion of its future Servicer Fees to HCM in exchange for cash flows from HCM, in each case as set forth in the Note (such future Servicer Fees identified to be paid to HCM pursuant to the Purchase Agreement, the *"HCM Stabilization Fees"* and such cash flows from HCM, the *"Stabilization Payments"*):

Whereas, HCM has notified Acis that HCM is unwilling to continue to provide support personnel and other critical services to Acis with respect to the CLOs (the *"Notification"*);

Whereas, Acis has determined that the effect of the Notification is that it cannot fulfill its duties as portfolio manager of the CLOs, and in order to ensure the continued operation of such CLOs and protection for its stakeholders, it must assign its rights as portfolio manager in the CLOs to a qualified successor portfolio manager pursuant to the CLO Documents (a *"Successor Manager"*);

Whereas, HCLOM, a qualified Successor Manager, irrevocably commits to be appointed as Successor Manager in consideration of Acis assigning to it the Note, subject to the conditions set forth in the CLO Documents and pursuant to the terms herein;

Whereas, Acis is expected to incur significant costs and expenses related to ongoing claims and litigation to which Acis is either a party or is otherwise obligated with respect to such costs and expenses (the "Acis Legal Expenses"); and

Whereas, Acis also is expected to have ongoing accounting and administrative expenses (the "Acis Administrative Expenses" and together with the Acis Legal Expenses, the "Acis Expenses").

## AGREEMENT

Now, therefore, in consideration of the promises and mutual agreements set forth herein, and in consideration of the mutual representations, warranties and covenants herein, and intending to be legally bound hereby, the Parties agree as follows:

1. **Succession**. Acis shall promptly provide the Controlling Class (as defined in each of the CLO Indentures) with notice requesting the appointment of HCLOM as Portfolio Manager pursuant to the requirements of the CLO Documents (each, a "*Notice*" and the period between the Notice and an Appointment (as such term is defined below), the "*Post-Notice Period*").

2. **Successor Manager**. Subsequent to the Notices, each of Acis and HCLOM shall promptly pursue Successor Manager appointment of HCLOM in respect of each CLO, including but not limited to achieving all conditions precedent required by the CLO Documents in such respect (consummation of HCLOM's appointment as Portfolio Manager of a given CLO, an "*Appointment*").

3. **Assignment and Transfer of the Promissory Note; Stabilization Payments.**

   a. Effective immediately upon execution of this Agreement by the Parties, all right, title and interest of Acis under the Note, including the right to any and all Stabilization Payments not yet paid to Acis, are hereby irrevocably assigned and transferred by Acis to HCLOM, it being understood that from the date of such assignment, HCLOM shall become the "Payee" thereunder.

   b. For so long as Acis shall receive Servicer Fees following the date hereof, Acis shall remit to HCM the HCM Stabilization Fees pursuant to the Note Purchase Agreement.

   c. For so long as HCLOM receives any Servicer Fees following any Appointment, then HCLOM shall remit to HCM any portion of such fees that would otherwise have constituted HCM Stabilization Fees pursuant to the Note Purchase Agreement if Acis was the recipient of such fees.

   d. HCLOM shall sign a joinder to Note Purchase Agreement upon HCM's written notice thereof.

4. **Expense Support**. In the event Acis delivers written notice to HCLOM that Acis is unable to pay when due any Acis Expenses, then HCLOM shall promptly pay to Acis, or at Acis' written request, to Acis' creditors, the amount of such shortfall, provided that in no event shall HCOLM's obligations under this paragraph exceed greater than $2 million of Acis Legal Expenses in the aggregate, or greater than $1 million of Acis Administrative Expenses in the aggregate.

5. **Indemnity**. Acis shall and hereby does, to the fullest extent permitted by applicable law, advance, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or

2

unliquidated ("*Claims*"), that my accrue to or be incurred by any Covered Person, or in which any Covered Person may be threatened, relating to this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties. and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "*Proceeding*"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "*Damages*"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from fraud, bad faith or willful misconduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from fraud, bad faith or willful misconduct of any Covered Persons. "*Covered Person*" means each of HCLOM and HCM, as well as each and every one of their affiliates (other than Acis), and all of HCLOM's and HCM's respective managers, members. principals, partners, directors, officers, shareholders, employees and agents.

6. **Miscellaneous**.

   a. <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties, provided however that no party hereto may assign or transfer any of its rights or obligation hereunder without the prior written consent of the other parties hereto.

   b. <u>No Third Party Beneficiaries</u>. For the avoidance of doubt, this Agreement is not intended to and does not confer any right to any person or entity other than the Parties hereto.

   c. <u>Terms Confidential</u>. The Parties agree that they will keep the terms, amounts, and facts of this Agreement completely confidential, and that they will not hereafter disclose any information concerning this Agreement to anyone except their respective attorneys or accountants. Notwithstanding the foregoing prohibition, the Parties shall not be prohibited from disclosing the terms, amounts and facts of this Agreement or this Agreement itself as may be requested by governmental entities or required by law.

   d. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the Cayman Islands, with exclusive jurisdiction in the courts of George Town, Grand Cayman.

3

e. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

f. Headings. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to articles, sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to articles, sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by reference.

g. Notices. All notices, demands and requests required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by telecopy (with confirmed transmission), or sent, postage prepaid, by registered, certified or express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand, or confirmed after telecopying, or if mailed, three (3) business days after mailing (one (1) business day in the case of express mail or overnight courier service), as follows (or to such other address or telecopy number as a party shall specify by notice as provided herein to the other party hereto):

   i. If to Acis:

   Acis Capital Management, LP
   300 Crescent Court, Suite 700
   Dallas, Texas 75201
   Facsimile: 972-628-4147

   ii. If to HCM:

   Highland Capital Management, LP
   300 Crescent Court, Suite 700
   Dallas, Texas 75201
   Facsimile: 972-628-4147

   iii. If to HCLOM:

   Highland CLO Management, Ltd.
   PO Box 309
   Ugland House
   Grand Cayman KY1-1104
   Cayman Islands

h. Specific Performance. The Parties agree that the rights created by this Agreement are unique and that the loss of any such rights is not susceptible to monetary quantification. Consequently, the Parties agree that an action for specific performance, including for temporary and/or injunctive relief) of the obligations created by this Agreement is a proper remedy for the breach of the provisions of this Agreement, and HCM shall be

4

entitled to such relief without the necessity of proving actual damages or posting a bond.

i. Costs, Expenses. The Parties shall each pay their own costs, fees and expenses in connection

j. Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Seller and the Purchaser.

k. Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

l. Entire Agreement. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

m. Further Assurances. From and after the date of this Agreement, upon the reasonable request of the Purchaser, the Seller shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

[Signature page follows]

5

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of November 3, 2017.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By: _____

Name: James Dondero

Title: President

ACIS CAPITAL MANAGEMENT, L.P.

By: Acis Capital Management GP, LLC, its General Partner

By: _____

Name: James Dondero

Title: President

HIGHLAND CLO MANAGEMENT, LTD.

For and on behalf of Summit Management, Limited

Director

6



**EXHIBIT**
**5**

### Exhibit 1

### PROMISSORY NOTE

$12,666,446                                                                    October ___, 2016

FOR VALUE RECEIVED, the undersigned, Highland Capital Management, L.P., a Delaware limited partnership ("Maker"), hereby promises to pay to the order of Acis Capital Management, L.P., a Delaware limited partnership ("Payee"), at its office at 300 Crescent Court, Suite 700, Dallas, Texas 75201 in lawful money of the United States of America, the principal sum of TWELVE MILLION SIX HUNDRED SIXTY-SIX THOUSAND FOUR HUNDRED FORTY-SIX DOLLARS ($12,666,446), together with interest on the outstanding principal balance thereof from day to day remaining at the rate of three percent (3%) per annum, as provided herein.

### Payments

THE UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, ACCORDING TO THE AMORTIZATION TABLE ATTACHED HERETO AS EXHIBIT A.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be. If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date. "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)        this Note executed by Maker;

(b)        the Agreement for Purchase and Sale of CLO Participation Interests dated of even date herewith (the "Purchase Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Purchase Agreement have been or will be fulfilled contemporaneously with the initial advance under this Note;

(c)        evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker; and

PROMISSORY NOTE, Page 1
SWDocIDLocation

R018140

(d)     such other agreements, documents, information, and other assurances as Payee may reasonably request.

## Events of Default

Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

(a)     the failure of Maker to make any payment required to be made under this Note when such payment becomes due;

(b)     Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document;

(c)     any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is false or misleading in any material respect when made;

(d)     Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

(e)     any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property, in each case, that results in the entry of an order for any such relief or appointment that has not been vacated, discharged or stayed or bonded pending appeal within 60 days from the entry thereof;

(f)     any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee;

(g)     any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time, or both) the holder of such indebtedness to cause any of such indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; or

(h)     the validity or enforceability of this Note shall be contested or challenged by Maker.

PROMISSORY NOTE, Page 2
SWDocIDLocation

R018141

## Remedies

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the advances hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) terminate Payee's commitment to make any advances under this Note; (b) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (e) of the definition of "Event of Default", such indebtedness shall become immediately due and payable in full without demand or acceleration); (c) reduce any claim to judgment; (d) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (e) may cure any Event of Default, or event of nonperformance under this Note and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

## Miscellaneous

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full, refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder to or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS,

PROMISSORY NOTE, Page 3
SWDocIDLocation

R018142

BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. ANY ACTION OR PROCEEDING UNDER OR IN CONNECTION WITH THIS NOTE AGAINST MAKER OR ANY OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN DALLAS COUNTY, TEXAS. MAKER AND EACH SUCH OTHER PARTY HEREBY IRREVOCABLY (I) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS AND (II) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN SUCH COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION. ANY ACTION OR PROCEEDING BY MAKER OR ANY OTHER PARTY LIABLE HEREUNDER AGAINST PAYEE SHALL BE BROUGHT ONLY IN A COURT LOCATED IN DALLAS COUNTY, TEXAS.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

Signed effective as of the date of this Note.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:    _____
Name:    _____
Title:    _____

Maker's address for notice:

HIGHLAND CAPITAL MANAGEMENT, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201
Attention:  Frank Waterhouse
Fax:  972-628-4147

PROMISSORY NOTE, Page 5
SWDocIDLocation

R018144

EXHIBIT A

Amortization Schedule

| Interest Rate | 3.0% | | | | |
|---|---|---|---|---|---|
| Payment Date | Beg Principal | Interest | Principal | Payment | End Principal |
| 10/7/2016 | 12,666,446 | | | | 12,666,446 |
| 5/31/2017 | 12,666,446 | 245,694 | 3,125,000 | 3,370,694 | 9,541,446 |
| 5/31/2018 | 9,541,446 | 286,243 | 5,000,000 | 5,286,243 | 4,541,446 |
| 5/31/2019 | 4,541,446 | 136,243 | 4,541,446 | 4,677,690 | - |

PROMISSORY NOTE, Page 6
SWDocIDLocation

R018145

EXHIBIT
6

## Schedule A

## Participation Interests

| CLO Issuer | Total Servicer Fee | Servicer Fee Retention Amount | Acis Participation Interests |
|---|---|---|---|
| Acis CLO 2013-1, Ltd. | 50 bps | 20 bps | 30 bps |
| Acis CLO 2014-3, Ltd. | 40 bps | 20 bps | 20 bps |
| Acis CLO 2014-4, Ltd. | 40 bps | 20 bps | 20 bps |
| Acis CLO 2014-5, Ltd. | 40 bps | 20 bps | 20 bps |
| Acis CLO 2015-6, Ltd. | 40 bps | 20 bps | 20 bps |

R018139

EXHIBIT

7

## ASSIGNMENT AND TRANSFER AGREEMENT

THIS AGREEMENT FOR ASSIGNMENT AND TRANSFER OF INTERESTS (this "*Agreement*"), dated as of December 19, 2017 (the "*Effective Date*"), is entered into by and between ACIS CAPITAL MANAGEMENT, L.P., a Delaware limited partnership ("*Acis*"), and HIGHLAND CLO HOLDINGS, LTD., a Cayman Islands exempted company, ("*HCLOH*", and together with Acis, the "*Parties*"). ACIS CLO MANAGEMENT, LLC, a Delaware series limited liability company ("*C-Moa*") joins in the execution and delivery of this Agreement for the sole limited purpose set forth in Section 1.b., ACIS CLO Management, GP, LLC, a Delaware limited liability company ("*Holdings LP GP*"), joins in the execution and delivery of this Agreement for the sole limited purpose set forth in Sections 1.c., 3.b.ii, and Acis CLO Management Intermediate Holdings II, LLC, a Delaware limited liability company ("*Acis Intermediate II*"), joins in the execution and delivery of this Agreement for the sole limited purpose set forth in Section 3.b.iii.

## RECITALS

Whereas, each of Acis and Highland Capital Management, L.P., a Delaware limited partnership ("*HCM*") are parties to that certain (i) Fourth Amended and Restated Shared Services Agreement dated March 17, 2017 (the "*Shared Services Agreement*") pursuant to which HCM provides certain back- and middle-office services as well as administrative, infrastructure and other services and (ii) Third Amended and Restated Sub-Advisory Agreement dated March 17, 2017 (the "*Sub-Advisory Agreement*") pursuant to which HCM provides certain services to assist Acis in performing its obligations under portfolio management agreements, investment management agreements and the like; in each case with respect to Acis' investment management business;

Whereas, pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, there is a total of $3,814,186 in outstanding and unreimbursed amounts owing from Acis to HCM (the "*Outstanding Receivable*");

Whereas, in connection with HCM and HCLOH entering into a shared services agreement and sub-advisor agreement, attached hereto as Exhibits A and B, respectively, HCM has transferred and assigned to HCLOH $2,804,870 of the Outstanding Receivable (the "*Transferred Receivable*");

Whereas, in satisfaction of the Transferred Receivable, Acis proposes to transfer to HCLOH 100% of Acis' ownership interest in the assets listed in Schedule A hereto (the "*Interests*") as payment-in-kind to HCLOH to satisfy Acis' Transferred Receivable liability (the "*Interests Transfer*");

Whereas, as a result of the Interests Transfer, and in connection with HCM having notified Acis that HCM is unwilling to continue to provide support personnel and other critical services to Acis in each case with respect to Acis CLO 2017-7, Ltd. ("*Acis CLO-7*"), and in order to ensure the continued management of Acis CLO-7, Acis desires to transfer to HCLOH, simultaneous with the Interests Transfer, all of Acis' right, title and interest in each of the (i) Master Sub-Advisory Agreement and (ii) Staff and Services Agreement; in each case dated Mach 17, 2017 by and between C-Moa and Acis (the "*Acis Sub-Advisory Agreement*" and "*Acis Shared Services Agreement*", respectively, and together, the "*Acis Contracts*", and the Acis Contracts together with the Interests, the "*Assets*" and the transfer of such Assets to HCLOH as contemplated herein, the "*Assets Transfer*"); and

Whereas, HCLOH agrees to accept the Assets hereunder in satisfaction of the Transferred Receivable pursuant to the terms herein.

I

## AGREEMENT

Now, therefore, in consideration of the promises and mutual agreements set forth herein, and in consideration of the mutual representations, warranties and covenants herein, and intending to be legally bound hereby, the Parties agree as follows:

1. **Transfer of Assets; Approvals**. As of the Effective Date:
   a. Acis hereby transfers 100% of Acis' right, title and interest in and to the Assets to HCLOH, and HCLOH hereby accepts all of Acis' right, title and interest in such Assets, and assumes of all of Acis' obligations, responsibilities and undertakings as specified therein as of the Effective Date;
   b. C-Moa hereby approves the transfer of all of Acis' right, title and interest to HCLOH of the:
      i. Acis Sub-Advisory Agreement; and
      ii. Acis Shared Services Agreement;
   c. Holdings LP GP, as general partner of Acis CLO Management Holdings, L.P., a Cayman Islands exempted limited partnership (*"Holdings LP"*), hereby approves transfer of all of Acis' right, title and interest in the limited partnership interest of Holdings, LP owned by Acis; and
   d. the Parties agree to take all subsequent steps necessary, including but not limited to executing supporting and/or ancillary documents such as transfer confirmations and joinder agreements, in connection with the transfer of the Assets, it being understood, however, that irrespective of such subsequent actions, each of the Parties' undertakings herein are irrevocable and constitute a fully enforceable agreement.

2. **Agreement to be Bound**. HCLOH hereby acknowledges that it has received and reviewed a complete copy of each of the following agreements, and as of the Effective Date shall be fully bound by, and subject to, all of the covenants, terms and conditions set forth in the following agreements, in each case, as amended, modified or supplemented from time to time, as though it were an original party thereto:
   a. Limited Liability Company Agreement of Acis CLO Management GP, LLC;
   b. First Amended and Restated Exempted Limited Partnership Agreement of Acis CLO Management Holdings, L.P.; and
   c. Limited Liability Company Agreement of Acis CLO Management Intermediate Holdings I, LLC, a Delaware limited liability company (*"Acis Intermediate I"*).

3. **Withdrawals and Admissions**.
   a. As of the Effective Date, Acis hereby withdraws as a:
      i. Member and managing member of Holdings LP GP;
      ii. Limited partner of Holdings LP; and
      iii. Member and managing member of Acis Intermediate 1.
   b. As of the Effective Date, HCLOH is hereby admitted as:
      i. The sole member and managing member of Holdings LP GP;
      ii. A substitute limited partner of Holdings LP, and Holdings LP GP, in its capacity as the general partner of Holdings LP, hereby consents to such admission; and

2

iii. A substitute member and the managing member of Acis Intermediate I, and Acis Intermediate II, in its capacity as a member of Acis Intermediate I, hereby consents to such admission.

4. **Representations and Warranties of Acis.** As of the Effective Date, Acis represents and warrants as follows:

    a. It has all requisite power, authority and capacity, corporate, limited partnership or otherwise, to execute, deliver and perform under this Agreement. Its execution, delivery and performance of this Agreement have been duly authorized by all necessary action. This Agreement has been duly executed and delivered by Acis. This Agreement is a legal, valid and binding agreement of such party, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer or conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity.

    b. The Assets are owned of record and beneficially by Acis, free and clear of any obligation, lien, claim, pledge, security interest, liability, charge, contingency or other encumbrance or claim of any nature. Acis has not assigned, pledged or otherwise in any manner whatsoever sold or transferred either by instrument in writing or otherwise, any right, title, interest or claim which it has or may have in the Assets or any matters arising out of, related thereto, or in connection therewith.

    c. Acis has had access to all information as it deems necessary and appropriate in connection with its decision to enter into this Agreement.

5. **Representation and Warranties of HCLOH**. As of the Effective Date, HCLOH represents and warrants as follows:

    a. HCLOH has all requisite power, authority and capacity, corporate, individual or otherwise, to execute, deliver and perform under this Agreement. The execution, delivery and performance by HCLOH of this Agreement have been duly authorized by all necessary action. This Agreement has been duly executed and delivered by HCLOH. This Agreement is a legal, valid and binding agreement of HCLOH, enforceable against each in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer or conveyance or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity.

    b. HCLOH has had access to all information as it deems necessary and appropriate in connection with its decision to enter into this Agreement.

6. **Indemnity.** Acis shall and hereby does, to the fullest extent permitted by applicable law, advance, indemnify and hold harmless any Covered Person (as defined below) from and against any and all claims, demands, liabilities, costs, expenses, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("**Claims**"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may be threatened, relating to this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "**Proceeding**"), whether civil or criminal (all of such Claims, amounts and expenses referred to

3

therein are referred to collectively as "**Damages**"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from fraud, bad faith or willful misconduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from fraud, bad faith or willful misconduct of any Covered Persons. "**Covered Person**" means each of HCLOH, C-Moa, Holdings LP GP, Holdings LP, Acis Intermediate II and Acis Intermediate I, as well as each and every one of their current and future affiliates (other than Acis), including all of such Covered Person's respective current and future managers, members, principals, partners, directors, officers, shareholders, employees, agents and successors in interest (other than Acis).

7. **Miscellaneous**.

   a. Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties, provided however that no party hereto may assign or transfer any of its rights or obligation hereunder without the prior written consent of the other parties hereto.

   b. No Third Party Beneficiaries. Except for the Covered Persons, which shall be express third party beneficiaries for purposes of Section 6, and except as expressly set forth in Sections 7.h. and 7.m., for the avoidance of doubt, this Agreement is not intended to and does not confer any right to any person or entity other than the Parties hereto.

   c. Terms Confidential. The Parties agree that they will keep the terms, amounts, and facts of this Agreement completely confidential, and that they will not hereafter disclose any information concerning this Agreement to anyone except their respective attorneys or accountants. Notwithstanding the foregoing prohibition, the Parties shall not be prohibited from disclosing the terms, amounts and facts of this Agreement or this Agreement itself as may be requested by governmental entities or required by law.

   d. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Cayman Islands, with exclusive jurisdiction in the courts of George Town, Grand Cayman.

   e. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

   f. Headings. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to articles, sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to articles, sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by reference.

4

g. <u>Notices</u>. All notices, demands and requests required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by telecopy (with confirmed transmission), or sent, postage prepaid, by registered, certified or express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand, or confirmed after telecopying, or if mailed, three (3) business days after mailing (one (1) business day in the case of express mail or overnight courier service), as follows (or to such other address or telecopy number as a party shall specify by notice as provided herein to the other party hereto):

    i. If to Acis:
       Acis Capital Management, LP
       300 Crescent Court, Suite 700
       Dallas, Texas 75201
       Facsimile: 972-628-4147

    ii. If to HCLOH:
       Highland CLO Holdings, Ltd.
       PO Box 309
       Ugland House
       Grand Cayman KY1-1104
       Cayman Islands

h. <u>Specific Performance</u>. The Parties agree that the rights created by this Agreement are unique and that the loss of any such rights is not susceptible to monetary quantification. Consequently, the Parties agree that an action for specific performance, including for temporary and/or injunctive relief) of the obligations created by this Agreement is a proper remedy for the breach of the provisions of this Agreement, and each of HCLOH, C-Moa, Holdings LP, Holdings LP GP, Acis Intermediate II and Acis Intermediate I shall be entitled to such relief without the necessity of proving actual damages or posting a bond.

i. <u>Costs, Expenses</u>. The Parties shall each pay their own costs, fees and expenses in connection with this Agreement and the transactions contemplated hereby.

j. <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Parties.

k. <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

l. <u>Entire Agreement</u>. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

m. <u>Further Assurances.</u> From and after the date of this Agreement, upon the reasonable request of HCLOH, Holdings LP, C-Moa, Holdings LP GP, Acis Intermediate II or Acis Intermediate I, Acis shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

[Signature page follows]

6

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

ACIS CAPITAL MANAGEMENT, L.P.

By:  Acis Capital Management GP, LLC, its
General Partner

By: _____

Name: James Dondero

Title: President

HIGHLAND CLO HOLDINGS, LTD.

_____

For and on behalf of Summit Management,
Limited

Director

CONSENTED AND AGREED, solely for the purposes
set forth in Section 1.b.:

ACIS CLO MANAGEMENT, LLC

By: Acis CLO Management Holdings, L.P., its
Managing Member

By: Acis CLO Management GP, LLC, its General
Partner

By: Acis Capital Management, L.P., its Sole Member

By: Acis Capital Management GP, LLC, its General
Partner

By: _____
Name: James Dondero
Title: President

SIGNATURE PAGE TO ASSIGNMENT AND TRANSFER AGREEMENT

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

ACIS CAPITAL MANAGEMENT, L.P.

By: Acis Capital Management GP, LLC, its General Partner

By:_____

Name: James Dondero

Title: President

HIGHLAND CLO HOLDINGS, LTD.

For and on behalf of Summit Management, Limited

Director

CONSENTED AND AGREED, solely for the purposes set forth in Section 1.b.:

ACIS CLO MANAGEMENT, LLC

By: Acis CLO Management Holdings, L.P., its Managing Member

By: Acis CLO Management GP, LLC, its General Partner

By: Acis Capital Management, L.P., its Sole Member

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title: President

SIGNATURE PAGE TO ASSIGNMENT AND TRANSFER AGREEMENT

CONSENTED AND AGREED, solely for the purposes set forth in Sections 1.c. and 3.b.ii.:

ACIS CLO MANAGEMENT GP, LLC

By: Acis Capital Management, L.P., its Sole Member

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title: President


CONSENTED AND AGREED, solely for the purposes set forth in Section 3.b.iii.:

ACIS CLO MANAGEMENT INTERMEDIATE HOLDINGS II, LLC

By: Acis CLO Management Holdings, L.P., its Managing Member

By: Acis CLO Management GP, LLC, its General Partner

By: Acis Capital Management, L.P., its Sole Member

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title: President

SIGNATURE PAGE TO ASSIGNMENT AND TRANSFER AGREEMENT

## SCHEDULE A

1. Limited liability company interest in:
   a. Acis CLO Management Intermediate Holdings 1, LLC
   b. Acis CLO Management GP, LLC

2. Limited partnership interest in Acis CLO Management Holdings, L.P.

10

EXHIBIT
8

## ASSIGNMENT, TRANSFER AND AMENDMENT AGREEMENT

THIS ASSIGNMENT AND TRANSFER Agreement (this "*Agreement*"), dated as of December 19, 2017 (the "*Effective Date*"), is entered into by and among The Dugaboy Investment Trust, a Delaware trust ("*Dugaboy*"), Mark K. Okada, an individual ("*Mr. Okada*"), Neutra, Ltd., a Cayman Islands exempted company ("*Neutra*"), and Acis Capital Management GP, LLC, a Delaware limited liability company ("*Acis GP*", and together with Dugaboy, Mr. Okada and Neutra, the "*Parties*"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in (i) that certain Amended and Restated Agreement of Limited Partnership of Acis Capital Management, L.P., a Delaware limited partnership ("*Acis*"), dated to be effective as of January 21, 2011 (as amended, modified or supplemented from time to time, the "*LPA*"), or (ii) that certain Amended and Restated Limited Liability Company Agreement of Acis GP, dated to be effective as of January 21, 2011 (as amended, modified or supplemented from time to time, the "*LLC Agreement*"), as applicable.

## RECITALS

WHEREAS, Dugaboy is the (i) sole member and holder of all outstanding membership interests of Acis GP (the "*Acis GP Interest*"), and (ii) the holder of a 74.9% Partnership Interest of Acis (the "*Dugaboy Acis Interest*");

WHEREAS, Mr. Okada is the holder of a 25.0% Partnership Interest of Acis (the "*Okada Acis Interest*"); and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, (i) Dugaboy desires to sell, transfer, assign and convey to Neutra, and Neutra desires to accept and assume from Dugaboy, the Acis GP Interest and the Dugaboy Acis Interest, and (ii) Mr. Okada desires to sell, transfer, assign and convey to Neutra, and Neutra desires to accept and assume from Mr. Okada, the Okada Acis Interest.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth herein, and in consideration of the mutual representations, warranties and covenants herein, intending the by legally bound hereby, the Parties agree as follows:

## AGREEMENT

1. **Assignments and Transfers**. Effective as of the Effective Date:

   a. Dugaboy hereby irrevocably sells, transfers, assigns and conveys to Neutra, and Neutra hereby accepts and assumes from Dugaboy, all right, title and interest in, to and under the Acis GP Interest and the Dugaboy Acis Interest.

   b. Mr. Okada hereby irrevocably sells, transfers, assigns and conveys to Neutra, and Neutra hereby accepts and assumes from Mr. Okada, all right, title and interest in, to and under the Okada Acis Interest.

1

2. **Withdrawals and Admissions**.  Effective as of the Effective Date:

    a.  Dugaboy hereby irrevocably withdraws as a Member of Acis GP and Limited Partner of Acis.

    b.  Mr. Okada hereby irrevocably withdraws as a Limited Partner of Acis.

    c.  Neutra is hereby admitted as the sole Member and Managing Member of Acis GP and a Limited Partner of Acis.

3. **Agreement to be Bound**.  Neutra hereby acknowledges that it has received and reviewed a complete copy of the LPA and the LLC Agreement, and shall be fully bound by, and subject to, all of the covenants, terms and conditions of LPA and LLC Agreement as though it were an original party thereto.

4. **Amendments**.  Effective as of the Effective Date:

    a.  Exhibit A of the LPA is hereby amended and replaced in its entirety with <u>Exhibit A</u> attached hereto.

    b.  The definition of "Member" set forth in Article 11 of the LLC Agreement is hereby amended and replaced in its entirety as follows:

        "***Member***" means Neutra, Ltd., a Cayman Islands exempted company.

5. **Consent to Transactions**.  In accordance with the LPA, Acis GP hereby consents to each of the transaction contemplated hereby.

6. **Miscellaneous**.

    a.  <u>Successors and Assigns</u>.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties, provided however that no party hereto may assign or transfer any of its rights or obligation hereunder without the prior written consent of the other parties hereto.

    b.  <u>No Third Party Beneficiaries</u>.  For the avoidance of doubt, this Agreement is not intended to and does not confer any right to any person or entity other than the Parties hereto.

    c.  <u>Terms Confidential</u>. The Parties agree that they will keep the terms, amounts, and facts of this Agreement completely confidential, and that they will not hereafter disclose any information concerning this Agreement to anyone except their respective attorneys or accountants. Notwithstanding the foregoing prohibition, the Parties shall not be prohibited from disclosing the terms, amounts and facts of this Agreement or this Agreement itself as may be requested by governmental entities or required by law.

    d.  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the Cayman Islands, with exclusive jurisdiction in the courts of George Town, Grand Cayman.

2

e. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

f. <u>Headings</u>. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to articles, sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to articles, sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by reference.

g. <u>Specific Performance</u>. The Parties agree that the rights created by this Agreement are unique and that the loss of any such rights is not susceptible to monetary quantification. Consequently, the Parties agree that an action for specific performance, including for temporary and/or injunctive relief) of the obligations created by this Agreement is a proper remedy for the breach of the provisions of this Agreement, and Parties shall be entitled to such relief without the necessity of proving actual damages or posting a bond.

h. <u>Costs, Expenses</u>.  The Parties shall each pay their own costs, fees and expenses in connection

i. <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Seller and the Purchaser.

j. <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

k. <u>Entire Agreement</u>. This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

l. <u>Further Assurances</u>. From and after the date of this Agreement, upon the reasonable request of the Purchaser, the Seller shall execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

3

[Signature page follows]

4

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Marie Dondero
Title: Family Trustee

_____
Mark K. Okada

NEUTRA, LTD.

By: _____
Name: Maples Corporate Services, Ltd.
Title: Director

ACIS CAPITAL MANAGEMENT GP, LLC

By: _____
Name: James Dondero
Title: President

5

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

THE DUGABOY INVESTMENT TRUST

By:_____
Name: Nancy Marie Dondero
Title: Family Trustee

_____
Mark K. Okada

NEUTRA, LTD.

By:_____
Name: Maples Corporate Services, Ltd.
Title: Director

ACIS CAPITAL MANAGEMENT GP, LLC

By:_____
Name: James Dondero
Title: President

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

THE DUGABOY INVESTMENT TRUST

By:_____
Name: Nancy Marie Dondero
Title: Family Trustee

_____
Mark K. Okada

NEUTRA LTD.                                    Peter Huber
                                               Authorised Signatory
By:_____
Name: MaplesFS Directors Limited
Title: Director

ACIS CAPITAL MANAGEMENT GP, LLC

By: _____
Name: James Dondero
Title: President

5

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Marie Dondero
Title: Family Trustee

_____
Mark K. Okada

NEUTRA, LTD.

By: _____
Name: Maples Corporate Services, Ltd.
Title: Director

ACIS CAPITAL MANAGEMENT GP, LLC

By: _____
Name: James Dondero
Title: President

SIGNATURE PAGE TO ASSIGNMENT, TRANSFER AND AMENDMENT AGREEMENT

EXHIBIT
9

CAUSE NO. DC-17-15244

| | | |
|---|---|---|
| JOSHUA N. TERRY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | |
| Defendants. | § | 44th JUDICIAL DISTRICT |

## DECLARATION OF JOSHUA N. TERRY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

1.     My name is Joshua N. Terry.

2.     I am both qualified and competent to give this declaration, and I have personal knowledge of the facts stated herein based upon my extensive experience as a partner in Acis Capital Management, L.P. ("Acis"), as well as my personal involvement in the matters discussed herein. I have never been convicted of a felony or crime of moral turpitude.

3.     I give this declaration in conjunction with the filing of Plaintiff's Application for Temporary Restraining Order (the "Application"), and all defined terms in the Application are incorporated herein.

4.     Attached as Exhibits 1-2 and 4-8 are true and correct copies of documents produced by Acis pursuant to Court order or in the underlying arbitration proceeding.

5.     I ran Acis' day-to-day operations from 2011 until I was wrongfully terminated in June 2016. In my capacity as portfolio manager of Acis, I had involvement in all facets of Acis' business operations, strategy, and finances.

6.     I am well-versed in the CLO industry, where I have worked since 2005. I have earned the right to use the Chartered Financial Analyst designation. From my experience, education, and training, I became very familiar with the common and legitimate business practices of CLO managers in the industry, as well as the value of CLO management contracts.

7.     In 2015, I valued Acis in excess of $70 million, a conclusion that was accepted by David Klos, a Highland employee.

8.     On February 28, 2012, Highland sold four European CLO management contracts to The Carlyle Group for $43.6 million in an arms-length transaction. Those four CLO management

DECLARATION OF JOSHUA N. TERRY – Page 1

contracts are less valuable than the five Management Contracts Acis owns and which it now seeks to transfer for no consideration;

9. The Management Contracts are the most substantial asset of Acis and are valued in excess of $30 million.

10. There is no legitimate business purpose for Acis to transfer the Management Contracts for no consideration. This transaction makes no business sense. Typically, CLO management contracts like these in the CLO industry would be transferred only for a significant amount of cash or other valuable consideration.

11. There is no legitimate business purpose for Acis to transfer the Highland Note for no consideration.

12. It is not in the normal course of Acis' business to transfer all of its Management Contracts for no consideration, or to transfer the Highland Note for no consideration.

13. If Acis transfers the Management Contracts, Acis will not have assets adequate to satisfy the Judgment.

## JURAT

My name is Joshua N. Terry. My date of birth is 1/16/81, and my address is 25 Highland Park Village, Suite 100-848, Dallas Texas 75205. I declare under penalty of perjury that the foregoing is true and correct. This declaration is being executed pursuant to Tex. Civ. Prac. & Rem. Code § 132.001, and any other applicable law authorizing use of an unsworn declaration.

Executed in Dallas County, State of Texas, on the 23rd day of January 2018.

Joshua N. Terry, Declarant