Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P. AND HIGHLAND CLO FUNDING, LTD**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | Case No. 18-30265-SGJ-11 |
| | § | (Jointly Administered Under |
| Debtors. | § | Case No. 18-30264-SGJ-11) |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| | § | |
| HIGHLAND CLO FUNDING LTD, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adversary No. 18- |
| | § | |
| v. | § | |
| | § | |
| | § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, | § | |
| | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**                    **PAGE 1 OF 27**

4829-4748-6310.5

# I.
## INTRODUCTION

1.    Investment advisor Acis Capital Management, L.P. ("**Acis LP**") and its general partner Acis Capital Management GP, LLC ("**Acis GP**") were put into an involuntary bankruptcy by a purported creditor, Josh Terry.[1]  Because of the pending involuntary bankruptcy of Acis LP and Acis GP (the "**Debtors**"), certain structured funds (which, in the aggregate, hold assets with an aggregate value of approximately $2 billion) managed by Acis LP were unable to complete reset transactions that would prevent $20 million in lost profits every year to the investors of the funds.

2.    Under the funds' governing documents, the investors have the right to have their money returned upon demand.  Consequently, to mitigate their on-going losses, the investors have instructed the Indenture Trustee and Acis LP, as the putative portfolio manager of the funds,[2] to sell the funds' assets through a redemption process provided for in the Indenture, and return the investors' money to be invested elsewhere with higher yields.  This instruction was issued on April 30, 2018, with a redemption date of June 14, 2018.  The Debtors, which are controlled by a Chapter 11 Trustee, have refused to authorize the necessary processes to effectuate a redemption of the funds to allow the return of the investors' money so that the Debtors can "earn" management fees for management services the investors do not want.  The investors are suffering daily losses because of the Chapter 11 Trustee's inaction.  The structured funds' assets are not the property of the bankruptcy estates nor are they in the possession of the

---

[1] Mr. Terry received an arbitration award, which was subsequently confirmed by the 44th District Court of Dallas County.  The Debtors have moved to appeal the award, but that action was stayed by the filing of the involuntary petitions by Mr. Terry.

[2] Acis LP is a pass-through entity, with no employees and few assets other than some cash and contracts.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**          **PAGE 2 OF 27**

4829-4748-6310.5

Debtors.   The Chapter 11 Trustee's/Debtors' improper actions contravene the applicable agreements.   The Plaintiffs file this Complaint to protect their interests and urge the Court to promptly enter a preliminary injunction  enjoining the Chapter 11 Trustee from interfering with the redemption process and allowing the investors to have their money returned before they incur further losses.

## II.
## PARTIES

3.     Plaintiff Highland CLO Funding, Ltd. (f/k/a Acis Loan Funding, Ltd.) ("**HCLOF**") is an exempted company incorporated with limited liability under the laws of Guernsey, with its registered office located at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands.

4.     Plaintiff Highland Capital Management, L.P. ("**Highland**") is a Delaware limited partnership with its principal place of business located at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

5.     Defendant is the Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("**Chapter 11 Trustee**").   The Chapter 11 Trustee is Robin Phelan, whose principal place of business is located at 4214 Woodfin Drive, Dallas, Texas 75220.

6.     Non-Party Acis CLO 2013-1, Ltd. ("**Acis-1**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Clifton House, 75 Fort Street, P.O. Box, 1350, Grand Cayman, KY1-1108, Cayman Islands.

7.      Non-Party Acis CLO 2014-3, Ltd. ("**Acis-3**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

8.      Non-Party Acis CLO 2014-4, Ltd. ("**Acis-4**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

9.      Non-Party Acis CLO 2014-5, Ltd. ("**Acis-5**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

10.     Non-Party Acis CLO 2015-6, Ltd. ("**Acis-6**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

11.     Collectively Non-Parties Acis-1, 3, 4, 5, and 6 are "**the CLOs**."

### III.
### JURISDICTION AND VENUE

12.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(d) and Rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**").

13.     This is a non-core proceeding. The Plaintiffs do not consent to entry of final orders or judgment by the Bankruptcy Court.

14.     Venue is proper in this Court under 28 U.S.C. § 1409.

15.     The predicates for the relief sought herein are 22 U.S.C. § 2201, 28 U.S.C. § 157(d) and Bankruptcy Rules 3007(b), 5011, 7001(2) and (9), 7003, and 7008.

16.     A real and justiciable controversy presently exists between the parties, and speedy relief is necessary to preserve the parties' respective rights.

## IV.
## FACTS

17.     Prior to the 2008 financial crisis, Highland was one of the largest managers of collateralized loan obligations in the world.  Collateralized loan obligations are securitized packages of syndicated business loans. After the financial crisis, the securities markets for collateralized loan obligations recovered slowly.

18.     To create separation from the Highland brand that had suffered during the financial crisis, Highland created two special purpose entities:  (1) Acis LP as an affiliated investment advisor to newly launched post-crisis collateral loan obligations funds; and (2) Acis GP to serve as Acis LP's general partner. Formed in 2011, Acis LP now serves as the putative portfolio manager of the five CLOs launched between 2012 to 2016.

19.     Acis LP does not now, nor has it ever had, the employees necessary to provide the services of a portfolio manager.  Rather, starting at its inception in 2011, Acis LP signed two agreements with Highland. The first is a Shared Services Agreement[3] for Highland employees to

---

[3] Ex. 1, Fourth Amended and Restated Shared Services Agreement by and between Acis Capital Management, L.P. and Highland Capital Management, L.P. dated March 17, 2017.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF**
**HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT**
**AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P.**
**AND ACIS CAPITAL MANAGEMENT GP, LLC**                              **PAGE 5 OF 27**
4829-4748-6310.5

provide Acis LP with back- and middle-office services such as operations, accounting, and legal support. The second agreement is a Sub-Advisory Agreement[4] whereby Highland provides Acis LP with front-office services, namely, the investment management advice necessary to operate the CLOs. Absent these agreements, Acis is unable to perform its obligations to the CLOs.

## A. Structure of the Collateralized Loan Obligations

20. Each CLO is a special purpose vehicle that acquires a portfolio of diversified syndicated leveraged loans through the private placement of rated secured notes and unsecured, equity-like securities, providing investors with differentiating risk and reward profiles.

21. The standard collateralized loan obligation fund structure is designed to provide:

    a. Credit enhancement through portfolio over-collateralization;

    b. Priorities of payments to ensure higher rated securities receive available funds prior to subordinated securities;

    c. A reinvestment period in which principal proceeds are used to acquire additional portfolio assets; and

    d. Mechanisms to protect investors from portfolio deterioration.

22. In a typical collateralized loan obligation structure, the players are:

    a. The CLO fund or "Issuer" – a bankruptcy remote corporate entity with an independent board of directors, that contracts with an Indenture Trustee. The CLO issues the secured and unsecured securities.

    b. Indenture Trustee – maintains custody of the CLO funds' assets (the portfolio assets) and cash flows, and accounts and remits available funds to investors on payment dates. The CLO Indenture is a contract between the Issuer and the Indenture Trustee.

    c. Portfolio Manager – an entity employed by the CLO to manage the trades of the CLO's portfolio of syndicated leveraged loans in compliance with the

---

[4] Ex. 2, Third Amended and Restated Sub-Advisory Agreement by and between Acis Capital Management, L.P. and Highland Capital Management, L.P. dated March 17, 2017.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**     **PAGE 6 OF 27**

4829-4748-6310.5

CLO's indenture criteria. The Indenture Trustee approves, reconciles and funds the actual trades as recommended by the portfolio manager.

d. Collateral Administrator – typically employed by the Indenture Trustee to act as the CLOs bookkeeper.

e. Investors –these are the equity holders of the CLO Fund, whose interests are reflected in subordinated notes that receive the residual yields from the CLO's investments, after satisfaction of the fixed obligations.

23. The Indenture is the primary contract that establishes the rights of the investors and the indenture investment criteria. It is a contract solely between the CLO and the Indenture Trustee, in this case US Bank National Association ("**USB**"). Through the Indentures, the CLOs pledged various collateral debt obligations and other assets to USB as security for the secured notes issued by the CLOs.[5]

24. USB also acts as the CLOs' Collateral Administrator pursuant to the Collateral Administration Agreements ("**CMAs**"). The CMAs require USB to perform certain administrative services over the collateral on the CLOs' behalf, including bookkeeping services.[6]

25. The CLOs also engaged Acis LP as their portfolio manager. Through a Portfolio Management Agreement ("**PMA**") for each CLO, Acis LP agreed, among other things, to manage the assets securing the secured notes issued by the CLOs according to the criteria specified in the respective Indentures. Under the PMAs, which are governed by New York law,

---

[5] Ex. 3A, Acis CLO 2013-1 Ltd Indenture at 1-2; Ex. 3B, Acis CLO 2014-3, Ltd. Indenture at 1-2; Ex. 3C, Acis CLO 2014-4, Ltd. Indenture at 1-2; Ex. 3D, Acis CLO 2014-5, Ltd. Indenture at 1-2; Ex. 3E, Acis CLO 2015-6, Ltd. Indenture at 1-2.

[6] Ex. 4A, Collateral Administration Agreement between Acis CLO 2013-1, Ltd. and US Bank National Association at 1-5; Ex. 4B, Collateral Administration Agreement between Acis CLO 2014-3, Ltd. and US Bank National Association at 1-5; Ex. 4C, Collateral Administration Agreement between Acis CLO 2014-4, Ltd. and US Bank National Association at 1-5; Ex. 4D, Collateral Administration Agreement between Acis CLO 2014-5, Ltd. and US Bank National Association at 1-5; Ex. 4E, Collateral Administration Agreement between Acis CLO 2015-6, Ltd. and US Bank National Association at 1-5.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC** **PAGE 7 OF 27**

4829-4748-6310.5

Acis LP represented that it is, and will act as, an "Investment Adviser" within the meaning of the Investment Advisers Act of 1940, as amended.[7]

26.     Under the PMAs, Acis LP earns a management fee, which is approximately 0.4% of the total assets under management, paid quarterly. Currently, Acis LP's management fee amounts to approximately $9 million per year.  In turn, it is obligated to pay Highland approximately 90% of its revenue in exchange for performance of the services under the Shared Services and Sub-Advisory Agreements with Highland, leaving Acis LP with net annual revenue of around $900,000 per year.

**B.     The Economics of the Collateralized Loan Obligations**

27.     As independent corporate entities, the CLOs issue secured notes ("**Secured Notes**" purchased by "**Secured Noteholders**") and unsecured, equity-like notes ("**Subordinated Notes**" purchased by "**Subordinated Noteholders**").  The CLOs issue the Secured Notes in various tranches at varying rates of interest based on the Secured Noteholders' desired rate of return and risk tolerance.  Plaintiff HCLOF purchased the Subordinated Notes for each CLO. Plaintiff HCLOF holds a supermajority of the Aggregate Outstanding Amount of Subordinated Notes for each CLO.[8]

28.     The CLOs generate income by loaning capital to third parties and receiving the interest income from those loans.  Currently, the CLOs have approximately $2 billion in loans,

---

[7] Ex. 5A, Portfolio Management Agreement between Acis CLO 2013-1, Ltd. and Acis Capital Management, LP at 4-8, 29; Ex. 5B, Portfolio Management Agreement between Acis CLO 2014-3, Ltd. and Acis Capital Management, LP at 5-8, 31; Ex. 5C, Portfolio Management Agreement between Acis CLO 2014-4, Ltd. and Acis Capital Management, LP at 4-8, 30; Ex. 5D, Portfolio Management Agreement between Acis CLO 2014-5, Ltd. and Acis Capital Management, LP at 5-9, 31; Ex. 5E, at Portfolio Management Agreement between Acis CLO 2015-6, Ltd. and Acis Capital Management, LP 5-9, 31.

[8] There is one exception: HCLOF does not hold a supermajority of the Subordinated Notes for Acis-1, but acted collectively with other Subordinated Noteholders in Acis-1 in relation to the facts stated *infra*.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**                          **PAGE 8 OF 27**

4829-4748-6310.5

bonds, and other assets. The CLOs accumulate profits when their portfolio income exceeds their fixed interest obligations to the Secured Noteholders.

29. The Secured Noteholders earn a specified rate of return based on the terms of their notes, and are paid first out of the income received by the CLOs. The Subordinated Noteholders receive what income is left after the Secured Notes are paid. Therefore, the Subordinated Notes only are paid when the CLOs' income exceeds their fixed obligations to the Secured Noteholders. For this reason, the Subordinated Noteholders bear substantially more risk than the Secured Noteholders. As consideration for this risk, the Subordinated Noteholders bargained for the right to, among other things, withdraw their investments under certain conditions specified in the CLOs' Indentures.

30. Pursuant to the terms of the Indentures, the Subordinated Noteholders can redeem the Secured Notes under certain conditions, including "at the written direction of 66 2/3% of the Subordinated Notes."[9] Through this right of redemption, the Subordinated Noteholders have the absolute right to windup the CLOs and get their money back, in their discretion, when the CLOs no longer meet their investment objectives. This is the typical secured financing structure of collateralized loan obligations.

31. Acis LP is not a party to the Indenture, but it must comply with certain aspects of the Indenture in its capacity as the Portfolio Manager of the CLOs. As relevant here, the Indentures require that Acis LP, "[u]pon receipt of a notice of a redemption of the Secured

---

[9] Acis-1, 4, 5, and 6 require 66 2/3% of Subordinated Noteholders to effectuate an optional redemption. Acis-3 requires only a simple majority.

Notes," to "direct the sale of all or part of the Collateral Obligations and other Assets" to effect redemption.[10]

### C. To stop on-going losses, the CLOs' investors directed the CLOs to pursue "resets" prior to the filing of the involuntary bankruptcies

32. The amount of money paid to the Subordinated Noteholders in a given quarter will depend on the amount of cash paid *into* the CLO by the borrowers, less the amount that has to be paid *out* to the CLO's Secured Noteholders for that quarter. When loan interest rates are high in the market, the borrowers pay more cash into the CLO and the Subordinated Noteholders receive a good return each quarter. The CLOs were created in calendar years 2012 – 2016, when interest rates were higher than they are presently. Given these lower interest rates, borrowers have refinanced their loans to lower interest rates.[11] As a result, the borrowers pay less into the CLOs each quarter than the prior quarter. This is what is currently happening with the CLOs.

33. Importantly, as structured, the amounts owed to the Secured Noteholders are basically fixed and do not change with interest rates. Therefore, as interest rates fall, there is less, and potentially no money left for the Subordinated Noteholders at the end of each quarter. The CLO industry has solved this problem through the process of refinancing currently-existing collateral loan obligations, called a "reset." Once refinanced, the reset CLO will pay lower interest rates to the CLO's Secured Noteholders and, thus, maintaining or improving the yield to

---

[10] Ex. 3A, at 164; Ex. 3B, at 168; Ex. 3C, at 159; Ex. 3D, at 157; Ex. 3E, at 152.

[11] This is no different than a homeowner taking advantage of lower interest rates to refinance their home, which would result in the lender receiving reduced interest payments.

the Subordinated Noteholders. As loan interest rates fall, a CLO must reset or its Subordinated Noteholders will receive declining or no return on their investment.[12]

34.     Just like many other CLO investors, by the spring of 2017, the Subordinated Noteholders—Plaintiff HCLOF—had suffered significantly reduced returns. Therefore, HCLOF directed the CLOs to undergo reset transactions to refinance their Secured Notes to reduce the fixed payments required to be made to the Secured Noteholders.

35.     Specifically, with respect to CLO-3, Highland determined that CLO-3 would increase its net income payable to the Subordinated Noteholders by over $1 million *every quarter* by refinancing its fixed debt obligations. Highland projected similar increased payments for the CLO-1, 4, 5, and 6. At $1 million per CLO per quarter, the "resets" stood to increase the CLOs' aggregate net income by $20 million per year. Because the CLOs' annual net income has been decreasing due to the interest rates over the past year, these increased annual payments would be closer to those received by the Subordinated Noteholders when they originally purchased their notes, rather than the reduced payments created by today's interest rate environment.

36.     The CLOs hired an investment bank, Mizuho, in November 2017, to complete the reset transactions. The same month, Highland and Mizuho identified an equity investor with sufficient capital to allow the CLOs to reset. The CLOs were scheduled to reset in the following order: CLO-3, then 4, then 5, then 1 and 6. Once investors were located for one reset and it was completed, the next reset would begin. Each transaction was expected to take between three and six weeks to complete.

---

[12] Last year, 125 CLOs reissued for a total of $62 billion, and in 2018 at least 19 more CLOs reset for a total of $10 billion in transactions. *See* Ex. 6, January 29, 2018 CLO Weekly New Issue Data Sheet provided by JP Morgan.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**                                        **PAGE 11 OF 27**

4829-4748-6310.5

37.    By January 2018, Highland had identified sufficient third-party investors to effectuate a reset of CLO-3 on February 1. Although Highland had trade commitments and was otherwise ready to complete the reset transaction, the transaction never closed. At midnight on January 30, 2018, former Highland employee Joshua Terry ("**Terry**") filed the involuntary bankruptcy petitions against the Debtors, which prevented the CLOs from moving forward with these planned transactions in the markets.

### D.    Bankruptcy Procedural History

38.    On January 30, 2018 (the "**Petition Date**"), Terry filed involuntary petitions (the "**Involuntary Petitions**") for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against the Debtors.

39.    On January 31, 2018, the Debtors filed the Joint Motion of Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages ("**Motion to Dismiss**") [Docket No. 8].

40.    The Bankruptcy Court thereafter held a trial over a 7-day time period[13] on the Motion to Dismiss.  On April 13, 2018, the Bankruptcy Court entered (i) Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions ("**FF&CL**") [Case No. 18-30265, Docket No. 113; Case No. 18-30264, Docket No. 119] and (ii) *Orders for Relief in an Involuntary Case* (the "**Orders for Relief**") [Case No. 18-30265, Docket No. 114; Case No. 18-30264, Docket No. 118].[14]

---

[13] March 21, 22, 23, 27 and 29, 2018.

[14] On April 23, 2018, Neutra, Ltd, Highland CLO Funding, Ltd., and CLO Holdco, Ltd. appealed the Orders for Relief [Case No. 18-30265, Docket No. 135; Case No. 18-30264, Docket No. 145], which are pending before the United States District Court for the Northern District of Texas.

41. On April 13, 2018, the Bankruptcy Court appointed Diane G. Reed (the "**Chapter 7 Trustee**") as the Chapter 7 Trustee for the Debtors.

42. On April 17, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Operate the Debtors' Businesses in Chapter 7* (the "**Operating Motion**") [Docket No. 127]. On April 18, 2018, the Bankruptcy Court entered its *Interim Order Granting Trustee's Expedited Motion to Operate the Debtors' Businesses in Chapter 7* [Docket No. 130], authorizing the Chapter 7 Trustee to temporarily operate the Debtors' businesses.

43. On April 19, 2018, the Bankruptcy Court entered an Order Directing Joint Administration of the Debtors' bankruptcy cases [Docket No. 137].

44. On April 23, 2018, the Bankruptcy Court held a hearing on the Operating Motion, and on May 6, 2018 the Bankruptcy Court granted the Operating Motion [Docket No. 178]. The Chapter 7 Trustee thereafter proceeded to operate the Debtors in the ordinary course of business, yet failed to effectuate the resets of the CLOs.

45. After only a couple of weeks of operating the Debtors, on May 04, 2018, the Chapter 7 Trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**"). Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

46. On May 11, 2018, after a hearing on the matter, the Bankruptcy Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206] in the Acis LP bankruptcy case. Also on May 11, 2018, the Bankruptcy

Court entered an order granting the Motion to Convert [Doc. No. 167] in the Acis GP bankruptcy case.

47. On May 14, 2018, the Office of the U.S. Trustee filed a Notice of Appointment of Trustee and Amount of Bond [Doc. No. 213] (the "**Notice of Appointment**") in the Acis L. bankruptcy case. Pursuant to the Notice of Appointment, Robin Phelan was named as Chapter 11 Trustee for Acis LP's estate (the "**Chapter 11 Trustee**").

48. On May 16, 2018, the Bankruptcy Court entered a supplemental order [Doc. No. 219] making clear that the Bankruptcy Court was directing the U.S. Trustee to appoint one Chapter 11 Trustee for the two bankruptcy estates.

49. On May 17, 2018, the Bankruptcy Court entered an order [Doc. No. 221] approving Robin Phelan's appointment as Chapter 11 Trustee in the Acis GP case as well.

**E.      The Subordinated Noteholders issue redemption instructions, and the CLOs issue notices of redemption.**

50. Irrespective of the Acis bankruptcies, the Subordinated Noteholders including Plaintiff HCLOF continued to lose money due to the CLOs' above-market fixed debt obligations.

51. With the bankruptcies pending, there is no prospect that the CLOs can effectuate a reset within a reasonably certain time-frame. Plaintiff HCLOF determined it should get its money back by initiating an "Optional Redemption" as allowed by the Indentures.

52. The Indentures prescribe the following procedure for the CLOs to effect an Optional Redemption:

> a.  Step 1: the Subordinated Noteholders must provide their written direction concerning the redemption to the Indenture Trustee, the applicable CLO, and

Acis LP at least 30 days, and in one case 45 days, prior to the proposed redemption date.[15]

b.  Step 2: the CLO, upon receiving instructions from Holders of 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes, must provide a notice of redemption to the Indenture Trustee that, contains the redemption date and redemption price, among other details, at least 20 days prior to the proposed redemption date.[16]

c.  Step 3: the CLO must provide a notice of redemption to each noteholder not later than 10 days prior to the redemption date.[17]

53.     Upon receipt of a notice of redemption, Acis LP, as portfolio manager, must "direct the sale of all or part of the Collateral Obligations and other Assets."[18]  While the Indentures give Acis LP, as the portfolio manager, discretion to determine the best method for selling the assets, they require the portfolio manager to effect the sale.

54.     On April 30, 2018, in accordance with the Indentures, HCLOF directed each CLO, the Indenture Trustee, and Acis LP to effect an "Optional Redemption of all Secured Notes and the Subordinated Notes in full on June 14, 2018."[19]

55.     On May 21, 2018, Highland, in its role as subadvisor to Acis LP, advised the Chapter 11 Trustee to begin selling the CLOs' assets to effectuate HCLOF's redemption instructions.[20]     Although HCLOF gave the CLOs until June 14, 2018 to complete the

---

[15] Ex. 3A, at 167 (30 days); Ex. 3B, at 171 (45 days); Ex. 3C, at 161 (30 days); Ex. 3D, at 157 (30 days); Ex. 3E, at 152 (30 days).

[16] Ex. 3A, at 164; Ex. 3B, at 168; Ex. 3C, at 158-59; Ex. 3D, at 157; Ex. 3E, at 152.

[17] Ex. 3A, at 167 (10 days); Ex. 3B, at 171 (9 days); Ex. 3C, at 161 (10 days); Ex. 3D, at 160 (10 days); Ex. 3E, at 155 (10 days).

[18] Exs, 3A, 3B, 3C, 3D, and 3E at § 9.2.

[19] Ex. 7A, Redemption Instruction Acis CLO 2013-1 Ltd.; Ex. 7B, Redemption Instruction Acis CLO 2014-3 Ltd.; Ex. 7C, Redemption Instruction Acis CLO 2014-4, Ltd.; Ex. 7D, Redemption Instruction Acis CLO 2014-5 Ltd.; Ex. 7E, Redemption Instruction Acis CLO 2015-6 Ltd.

[20] Ex. 8 May 21, 2018 email from Isaac Leventon to Robin Phelan.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF**
**HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT**
**AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P.**
**AND ACIS CAPITAL MANAGEMENT GP, LLC**                              **PAGE 15 OF 27**
4829-4748-6310.5

redemption, Highland determined it was in the best interests of all noteholders to liquidate the CLOs' assets systematically and over time rather than dumping $2 billion in securities onto the market in a shortened period of time.

56.     The next day, and in violation of the Indentures and the PMAs, the Chapter 11 Trustee responded that he would prevent Acis LP from effecting any redemption. As justification, and referring to HCLOF's redemption instructions, the Chapter 11 Trustee averred that "[i]t does not appear that the Redemption Notice[s were] sent by properly authorized parties," and that "[t]he Redemption Notice[s themselves] fail[] to comply with the Indenture[s]."[21]

57.     On May 24, 2018, as prescribed by the Indentures, the CLOs issued Notices of Redemption (the "**Issuers Order**") that included the redemption date and redemption price, among other information.[22]  On that same date, the Issuers Orders were provided to the Chapter 11 Trustee.

58.     Thereafter, on May 25, 2018, the Indenture Trustee issued letters acknowledging receipt of the Issuers Orders, but stating that the Chapter 11 Trustee objected to the Optional Redemption.[23]

---

[21] Ex. 9, Chapter 11 Trustee's Response to Redemption Notices Letter dated May 22, 2018.

[22] Ex. 10A, Acis CLO 2013-1, Ltd. Notice of Optional Redemption; Ex. 10B, Acis CLO 2014-3, Ltd. Notice of Optional Redemption; Ex. 10C, Acis CLO 2014-4, Ltd. Notice of Optional Redemption; Ex. 10D, Acis CLO 2014-5, Ltd. Notice of Optional Redemption; Ex. 10E, Acis CLO 2015-6, Ltd. Notice of Optional Redemption.

[23] Ex. 11A, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2013-1, Ltd. redemption notice; Ex. 11B, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2014-3, Ltd. redemption notice; Ex. 11C, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2014-4, Ltd. redemption notice; Ex. 11D, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2014-5, Ltd. redemption notice; Ex. 11E, May 25, 2018 letter from Mark Kotwick concerning Acis CLO 2015-6, Ltd. redemption notice.

59.     On May 27, 2018, the Chapter 11 Trustee further asserted that the May 24, 2018 Issuer Orders "do not comply with the relevant Indentures and Portfolio Management Agreements" and that the orders therefore are ineffective.[24] The Chapter 11 Trustee provided no justification for his conclusion. As of the filing of this Complaint, the Chapter 11 Trustee has refused to comply with his obligations under both the Indentures and the PMAs to effectuate the redemptions.

60.     With each passing day, Plaintiff HCLOF loses money, while Acis LP purports to "earn" management fees arising from providing "management" of assets its clients have directed it to sell.

61.     The Chapter 11 Trustee has also stated that the exercise of the Optional Redemptions "seemingly" violates 11 U.S.C. § 362(a)(3).  Section 362(a)(3) of the Bankruptcy Code states:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
>
> **(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.**

11 U.S.C. § 362(a)(3) (emphasis added).

62.     The Subordinated Noteholders' rights to exercise the Optional Redemption arise directly from the respective CLO Indentures.  In exercising their unilateral rights to compel the redemption and liquidate their investments in the CLOs, there are no assets of the Debtors' estates involved because the Debtors have no property rights in the CLOs.

---

[24] Ex. 12, May 27, 2018 email from Robin Phelan.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**      **PAGE 17 OF 27**

4829-4748-6310.5

63.      Simply stated, the automatic stay of 11 U.S.C. § 362(a) is not implicated because estate property is not at issue. That is, there is no property of the estate that the Subordinated Noteholders are attempting to take possession of or that the Subordinated Noteholders are exercising control over.  Any assertion that the Optional Redemption may have a secondary effect on the Debtors' estates is not relevant.  Such a "butterfly effect" argument – requiring an analysis of how lawful acts relating to non-estate property may have some effect on property debtor's estate – stretches the automatic stay far beyond the statute's text and its intended purpose of protecting assets belonging to a debtor.

64.      In the daily investment function of the CLOs, the Debtors provide accounting and investment advisory services indirectly through Highland.  They are not in a position to consummate trades because the CLOs funds are not in their possession or control.  To the contrary, the Indenture Trustee is responsible for that function.  As such, the Debtors cannot argue custodial control over the funds even assuming that was persuasive.

65.      As previously stated, the structure of the CLOs is specifically designed to protect investors from portfolio deterioration.  This is exactly why the Subordinated Noteholders have the unilateral right to exercise the Optional Redemption and likewise why the Chapter 11 Trustee's attempts to thwart the exercise of that right must fail.

66.      In the alternative, assuming arguendo that the Court determines that the automatic stay is implicated in these circumstances, Congress established a broad safe-harbor for financial markets contracts, such as these CLO Indentures.  *See* 11 U.S.C. § 555.   Section 555 was enacted precisely to prevent the operation of the automatic stay from sparking a chain reaction which interferes with security market participants responding to market fluctuations.  Moreover,

a successful automatic stay argument by the Debtors would require a wildly broad interpretation of section 362 (ignoring that no estate property is involved), while simultaneously engaging in an exceedingly narrow interpretation of section 555 (ignoring the language and public policy underpinnings of the statute). The Debtors cannot have it both ways. Consequently, any contention that the automatic stay is applicable is a red herring.

**V.**
**CLAIMS FOR RELIEF**

A.     **Count 1 – Breach of Contract (ACIS 2013-1 PMA)**

67.     The ACIS 2013-1 Portfolio Management Agreement is valid and enforceable contract between Acis CLO 2013-1, Ltd. and Acis LP.

68.     Under the PMA, Acis LP provides investment advisory services to the CLO. Plaintiff HCLOF, who holds an equity position in the CLO, is a third-party beneficiary of the PMA.

69.     The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA.

70.     The Chapter 11 Trustee's breach has caused damage to HCLOF.

71.     HCLOF and Acis CLO 2013-1 have substantially performed their contractual obligations and both are ready, willing, and able to perform those obligations not yet performed.

72.     Further, any remedies at law are incomplete and inadequate to accomplish substantial justice.

73.     Accordingly, the Court should grant HCLOF specific performance under the PMAs.

**B.** **Count 2 – Breach of Contract (ACIS 2014-3 PMA)**

74.     The ACIS 2014-3 Portfolio Management Agreement is valid and enforceable contract between Acis CLO 2014-3, Ltd. and Acis LP.

75.     Under the PMA, Acis LP provides investment advisory services to the CLO. Plaintiff HCLOF, who holds an equity position in the CLO, is a third-party beneficiary of the PMA.

76.     The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA.

77.     The Chapter 11 Trustee's breach has caused damage to HCLOF.

78.     HCLOF and Acis CLO 2014-3 have substantially performed their contractual obligations and both are ready, willing, and able to perform those obligations not yet performed.

79.     Further, any remedies at law are incomplete and inadequate to accomplish substantial justice.

80.     Accordingly, the Court should grant HCLOF specific performance under the PMAs.

**C.** **Count 3 – Breach of Contract (ACIS 2014-4 PMA)**

81.     The ACIS 2014-4 Portfolio Management Agreement is valid and enforceable contract between Acis CLO 2014-4, Ltd. and Acis LP.

82.     Under the PMA, Acis LP provides investment advisory services to the CLO. Plaintiff HCLOF, who holds an equity position in the CLO, is a third-party beneficiary of the PMA.

83.     The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA.

84.     The Chapter 11 Trustee's breach has caused damage to HCLOF.

85.     HCLOF and Acis CLO 2014-4 have substantially performed their contractual obligations and both are ready, willing, and able to perform those obligations not yet performed.

86.     Further, any remedies at law are incomplete and inadequate to accomplish substantial justice.

87.     Accordingly, the Court should grant HCLOF specific performance under the PMAs.

**D.     Count 4 – Breach of Contract (ACIS 2014-5 PMA)**

88.     The ACIS 2014-5 Portfolio Management Agreement is valid and enforceable contract between Acis CLO 2014-5, Ltd. and Acis LP.

89.     Under the PMA, Acis LP provides investment advisory services to the CLO. Plaintiff HCLOF, who holds an equity position in the CLO, is a third-party beneficiary of the PMA.

90.     The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA.

91.     The Chapter 11 Trustee's breach has caused damage to HCLOF.

92.     HCLOF and Acis CLO 2015-5 have substantially performed their contractual obligations and both are ready, willing, and able to perform those obligations not yet performed.

93.     Further, any remedies at law are incomplete and inadequate to accomplish substantial justice.

94.     Accordingly, the Court should grant HCLOF specific performance under the PMAs.

**E.     Count 5 – Breach of Contract (ACIS 2015-6 PMA)**

95.     The ACIS 2015-6 Portfolio Management Agreement is valid and enforceable contract between Acis CLO 2015-6, Ltd. and Acis LP.

96.     Under the PMA, Acis LP provides investment advisory services to the CLO. Plaintiff HCLOF, who holds an equity position in the CLO, is a third-party beneficiary of the PMA.

97.     The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA.

98.     The Chapter 11 Trustee's breach has caused damage to HCLOF.

99.     HCLOF and Acis CLO 2015-6 have substantially performed their contractual obligations and both are ready, willing, and able to perform those obligations not yet performed.

100.     Further, any remedies at law are incomplete and inadequate to accomplish substantial justice.

101.     Accordingly, the Court should grant HCLOF specific performance under the PMAs.

**F.      Count 7 – Declaratory Judgment (by HCLOF)**

102.     Under the PMAs and Indentures, HCLOF has a contractual right to redeem the Secured Notes issued by the CLOs.

103.     HCLOF properly directed the CLOs as "Issuers" under the Indentures to redeem the Secured Notes.

104.     In response to HCLOF's written direction, the CLOs issued Notices of Redemption.

105.     Under Article 8 of the PMA, Acis LP has a duty to liquidate (or direct the liquidation of) assets necessary to carry out the redemptions.

106.     The Chapter 11 Trustee, acting on behalf of Acis LP, has indicated that he will refuse to honor the Notices of Redemption.

107.     Thus, an actual controversy exists over Acis LP's contractual obligations under the PMAs and Indentures.

108.     Pursuant to 22 U.S.C. § 2201, HCLOF seeks a declaration that (1) HCLOF and the CLOs have fully complied with the optional redemption process set forth under the Indentures and (2) Acis LP (and thus the Chapter 11 Trustee) has a duty to sell (or permit the sale of ) assets necessary to allow the requested redemptions to take place.

**G.      Count 7 – Declaratory Judgment (by Highland)**

109.     Highland hereby repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

110.     HCLOF properly directed the CLOs as "Issuers" under the Indentures to redeem the Secured Notes.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF
HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT
AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P.
AND ACIS CAPITAL MANAGEMENT GP, LLC**                         **PAGE 23 OF 27**

4829-4748-6310.5

111.    In response to HCLOF's written direction, the CLOs issued Notices of Redemption.

112.    Under Article 8 of the PMA, Acis LP has a duty to liquidate (or direct the liquidation of) assets necessary to carry out the redemptions.

113.    Acis LP delegated its advisory obligations to Highland under the Third Amended and Restated Sub-Advisory Agreement dated March 17, 2017 (the "Sub-Advisory Agreement") by and between Acis LP and Highland.

114.    The Sub-Advisory Agreement requires certain consents from Acis LP to sell assets.

115.    The Chapter 11 Trustee, acting on behalf of Acis LP, has indicated that he will not consent to the sale of assets that are required to carry out the Notices of Redemption.

116.    Thus, an actual controversy exists over Acis LP's (and thus the Chapter 11 Trustee's) contractual obligations under the Sub-Advisory Agreement.

117.    Pursuant to 22 U.S.C. § 2201, Highland seeks a declaration that it has the right and obligation to sell the assets necessary to redeem the Secured Notes described in the Notices of Redemption.

## VI.

## <u>REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>

118.    HCLOF and Highland are entitled to preliminary injunctive relief that enjoins Acis LP from interfering with the sale of assets necessary to redeem the Secured Notes issued by the CLOs, including the withholding of consent.

119.    As described above, HCLOF and Highland have demonstrated a substantial likelihood of success on merits on their claims.

120.    HCLOF and Highland have also shown they will suffer irreparable harm. Monetary damages are inadequate because, to the extent Plaintiffs prevail, they will hold a claim against an insolvent entity, Acis LP. With each passing day, Plaintiff HCLOF loses money, while Acis LP continues to accrue management fees arising from providing "management" of assets its clients have directed it to sell.

121.    Finally, the weight of the equities favors entry of an injunction in HCLOF's and Highland's favor, and such an injunction will not disserve the public interest.

122.    HCLOF and Highland are also entitled to permanent injunctive relief that enjoins Acis LP from interfering with the sale of the CLO's securities  necessary to redeem the Secured Notes issued by the CLOs, including the withholding of consent.

123.    HCLOF and Highland respectfully request that the Court set a hearing on their request and enter an expedited briefing schedule.

## VII.
## PRAYER

124.    For the foregoing reasons, HCLOF and Highland respectfully asks the Court to enter judgment against the Chapter 11 Trustee for declaratory judgment, specific performance, court costs, and for any such other relief it deems appropriate.

**ORIGINAL COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION OF HIGHLAND CLO FUNDING, LTD AND HIGHLAND CAPITAL MANAGEMENT AGAINST CHAPTER 11 TRUSTEE OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC                              PAGE 25 OF 27**

4829-4748-6310.5

Dated: May 30, 2018                Respectfully submitted,

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P. AND HIGHLAND CLO**
**FUNDING, LTD**

<u>**VERIFICATION**</u>

STATE OF TEXAS              §
DALLAS COUNTY              §

 I verify under penalty of perjury that the foregoing is true and correct:

 My name is Isaac Leventon. I have read the Original Complaint and Request for Preliminary Injunction of Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC. The facts stated in it are within my personal knowledge and are true and correct.

      */s/ Isaac Leventon*
      Isaac Leventon

      *on behalf of Plaintiffs Highland CLO Funding, Ltd.*
      *and Highland Capital Management, LP*