# **Exhibit 3A**

EXECUTION COPY

ACIS CLO 2013-1 LTD.
Issuer,

ACIS CLO 2013-1 LLC
Co-Issuer,

AND

U.S. BANK NATIONAL ASSOCIATION
as Trustee

INDENTURE

Dated as of March 18, 2013

COLLATERALIZED LOAN OBLIGATIONS

Table of Contents

Page

ARTICLE 1 Definitions.............................................................................................2

Section 1.1.     Definitions...........................................................................2
Section 1.2.     Assumptions as to Pledged Obligations.........................................74

ARTICLE 2 The Notes ...........................................................................................77

Section 2.1.     Forms Generally....................................................................77
Section 2.2.     Forms of Notes.....................................................................78
Section 2.3.     Authorized Amount; Stated Maturity; Denominations....................79
Section 2.4.     Additional Notes...................................................................81
Section 2.5.     Execution, Authentication, Delivery and Dating...........................82
Section 2.6.     Registration, Registration of Transfer and Exchange ......................83
Section 2.7.     Mutilated, Defaced, Destroyed, Lost or Stolen Note......................95
Section 2.8.     Payment of Principal and Interest and Other Amounts; Principal and
                 Interest Rights Preserved .......................................................95
Section 2.9.     Persons Deemed Owners .........................................................98
Section 2.10.    Cancellation .......................................................................99
Section 2.11.    Certificated Notes ................................................................99
Section 2.12.    Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of
                 ERISA Representations ........................................................100
Section 2.13.    Tax Purposes.....................................................................102
Section 2.14.    No Gross Up ......................................................................103

ARTICLE 3 Conditions Precedent ........................................................................103

Section 3.1.     Conditions to Issuance of Notes on Closing Date .........................103
Section 3.2.     Conditions to Issuance of Additional Notes ................................106
Section 3.3.     Custodianship; Delivery of Collateral Obligations and Eligible
                 Investments ......................................................................109

ARTICLE 4 Satisfaction and Discharge..................................................................110

Section 4.1.     Satisfaction and Discharge of Indenture ....................................110
Section 4.2.     Application of Trust Money.....................................................111
Section 4.3.     Repayment of Monies Held by Paying Agent ...............................112

ARTICLE 5 Remedies ..........................................................................................112

Section 5.1.     Events of Default ................................................................112
Section 5.2.     Acceleration of Maturity; Rescission and Annulment.....................114
Section 5.3.     Collection of Indebtedness and Suits for Enforcement by Trustee...............115

<u>Table of Contents</u>
(continued)

<u>Page</u>

Section 5.4.    Remedies .................................................................................117
Section 5.5.    Optional Preservation of Assets ....................................................119
Section 5.6.    Trustee May Enforce Claims Without Possession of Notes .........................120
Section 5.7.    Application of Money Collected .....................................................121
Section 5.8.    Limitation on Suits .................................................................121
Section 5.9.    Unconditional Rights of Holders to Receive Principal and Interest ..............122
Section 5.10.   Restoration of Rights and Remedies .................................................122
Section 5.11.   Rights and Remedies Cumulative .....................................................122
Section 5.12.   Delay or Omission Not Waiver .......................................................122
Section 5.13.   Control by Majority of Controlling Class ...........................................122
Section 5.14.   Waiver of Past Defaults ............................................................123
Section 5.15.   Undertaking for Costs ..............................................................124
Section 5.16.   Waiver of Stay or Extension Laws ...................................................124
Section 5.17.   Sale of Assets .....................................................................124
Section 5.18.   Action on the Notes ................................................................125

ARTICLE 6 The Trustee .................................................................................125

Section 6.1.    Certain Duties and Responsibilities of the Trustee .................................125
Section 6.2.    Representations and Warranties of the Bank .........................................127
Section 6.3.    Certain Rights of the Trustee ......................................................127
Section 6.4.    Trustee Not Responsible for Recitals or Issuance of Notes ..........................130
Section 6.5.    Trustee May Hold Notes .............................................................130
Section 6.6.    Money Held in Trust by the Trustee .................................................131
Section 6.7.    Trustee Compensation and Reimbursement .............................................131
Section 6.8.    Corporate Trustee Required; Eligibility ............................................132
Section 6.9.    Resignation and Removal of the Trustee; Appointment of Successor
                Trustee ............................................................................132
Section 6.10.   Acceptance of Appointment by Successor Trustee .....................................134
Section 6.11.   Merger, Conversion, Consolidation or Succession to Business of the
                Trustee ............................................................................134
Section 6.12.   Co-Trustees ........................................................................134
Section 6.13.   Withholding by the Trustee .........................................................135
Section 6.14.   Authenticating Agents ..............................................................136
Section 6.15.   Notice of Default by the Trustee ...................................................136
Section 6.16.   Certain Duties of the Trustee Related to Delayed Payment of Proceeds ...............137
Section 6.17.   Trustee Fiduciary for Secured Noteholders Only; Agent for each
                Hedge Counterparty and the Holders of the Subordinated Notes .......................137

ARTICLE 7 Covenants ...................................................................................137

Section 7.1.    Payment of Principal and Interest ..................................................137
Section 7.2.    Maintenance of Office or Agency ....................................................138
Section 7.3.    Money for Note Payments to be Held in Trust ........................................138
Section 7.4.    Existence of Co-Issuers ............................................................140

Table of Contents
(continued)

Page

Section 7.5.     Protection of Assets ...................................................................142
Section 7.6.     Opinions as to Assets .................................................................143
Section 7.7.     Performance of Obligations ........................................................143
Section 7.8.     Negative Covenants ....................................................................143
Section 7.9.     Statement as to Compliance .......................................................146
Section 7.10.    Co-Issuers May Consolidate, etc., Only on Certain Terms .........147
Section 7.11.    Successor Substituted..................................................................148
Section 7.12.    No Other Business ......................................................................148
Section 7.13.    Maintenance of Listing ...............................................................149
Section 7.14.    Annual Rating Review ................................................................149
Section 7.15.    Reporting.....................................................................................150
Section 7.16.    Calculation Agent .......................................................................150
Section 7.17.    Certain Tax Matters ....................................................................151
Section 7.18.    Ramp-up Period; Purchase of Additional Collateral Obligations..................152
Section 7.19.    Representations Relating to Security Interests in the Assets .........154
Section 7.20.    Pre-funded Letters of Credit .......................................................156
Section 7.21.    Objection to Bankruptcy Proceeding ..........................................157

ARTICLE 8 Supplemental Indentures ...............................................................157

Section 8.1.     Supplemental Indentures Without Consent of Holders of Offered
                 Securities....................................................................................157
Section 8.2.     Supplemental Indentures With Consent of Holders of Offered
                 Securities....................................................................................160
Section 8.3.     Execution of Supplemental Indentures .......................................163
Section 8.4.     Effect of Supplemental Indentures .............................................163
Section 8.5.     Reference in Notes to Supplemental Indentures ..........................163

ARTICLE 9 Redemption of Notes .....................................................................164

Section 9.1.     Mandatory Redemption ..............................................................164
Section 9.2.     Optional Redemption and Refinancing........................................164
Section 9.3.     Redemption Procedures ..............................................................167
Section 9.4.     Notes Payable on Redemption Date ............................................168
Section 9.5.     Special Redemption ....................................................................169
Section 9.6.     Clean-up Call Redemption ..........................................................170

ARTICLE 10 Accounts, Accountings and Releases............................................172

Section 10.1.    Collection of Money ...................................................................172
Section 10.2.    Collection Account .....................................................................172
Section 10.3.    Payment Account; Custodial Account; Ramp-up Account; Expense
                 Reserve Account; Interest Reserve Account.................................174
Section 10.4.    The Revolver Funding Account....................................................176
Section 10.5.    Hedge Accounts ..........................................................................177

Table of Contents
(continued)

Page

Section 10.6. Reinvestment of Funds in Accounts; Reports by Trustee ............................ 178
Section 10.7. Accountings ..................................................................................... 179
Section 10.8. Release of Securities ......................................................................... 188
Section 10.9. Reports by Independent Accountants .................................................... 189
Section 10.10. Reports to Rating Agencies and Additional Recipients; Rule 17g-5
Procedures ..................................................................................... 191
Section 10.11. Procedures Relating to the Establishment of Accounts Controlled by
the Trustee ..................................................................................... 192

ARTICLE 11 Application of Monies ........................................................................ 193

Section 11.1. Disbursements of Monies from Payment Account ........................................ 193
Section 11.2. Payments on the Class A-2 Notes and the Combination Notes .................... 201

ARTICLE 12 Sale of Collateral Obligations; Purchase of Additional Collateral
Obligations .................................................................................... 201

Section 12.1. Sales of Collateral Obligations ............................................................ 201
Section 12.2. Purchase of Additional Collateral Obligations .......................................... 203
Section 12.3. Conditions Applicable to All Sale and Purchase Transactions .................... 205
Section 12.4. Post-Reinvestment Period Amendment Proceeds ........................................ 205

ARTICLE 13 Noteholders' Relations ........................................................................ 206

Section 13.1. Subordination; Non-Petition ............................................................... 206
Section 13.2. Standard of Conduct ......................................................................... 207
Section 13.3. Voting Rights of Holders of Combination Notes ........................................ 207
Section 13.4. Sales and Exchanges of Combination Notes .............................................. 207

ARTICLE 14 Miscellaneous ..................................................................................... 208

Section 14.1. Form of Documents Delivered to Trustee ................................................. 208
Section 14.2. Acts of Holders ................................................................................ 209
Section 14.3. Notices, etc., to the Trustee, the Co-Issuers, the Collateral
Administrator, the Portfolio Manager, the Placement Agents, the
Hedge Counterparty, the Paying Agent, the Administrator and each
Rating Agency ................................................................................ 210
Section 14.4. Notices to Holders; Waiver ................................................................. 212
Section 14.5. Effect of Headings and Table of Contents ............................................... 213
Section 14.6. Successors and Assigns ...................................................................... 213
Section 14.7. Separability .................................................................................... 213
Section 14.8. Benefits of Indenture ........................................................................ 213
Section 14.9. Governing Law ................................................................................ 213
Section 14.10. Submission to Jurisdiction and Waiver of Jury Trial .................................. 213
Section 14.11. Counterparts ................................................................................... 214

Table of Contents
(continued)

Page

Section 14.12.   Acts of Issuer ............................................................214
Section 14.13.   Confidential Information ...........................................214
Section 14.14.   Liability of Co-Issuers .............................................216

ARTICLE 15 Assignment of Certain Agreements ....................................216

Section 15.1.   Assignment of Portfolio Management Agreement .......................216
Section 15.2.   Assignment of Hedge Agreement ...............................................217

## SCHEDULES

| | | |
|---|---|---|
| Schedule 1 | -- | List of Collateral Obligations |
| Schedule 2 | -- | Moody's Industry Classification Group List |
| Schedule 3 | -- | S&P Industry Classifications |
| Schedule 4 | -- | Diversity Score Calculation |
| Schedule 5 | -- | Moody's Rating Definitions |
| Schedule 6 | -- | Certificate of Issuer Regarding Accountants' Reports and Certificates |
| Schedule 7 | - | Additional Report Recipients |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | -- | Forms of Notes |
| Exhibit A1 | -- | Form of Global Note |
| Exhibit A2 | -- | Form of Regulation S Global Subordinated Note |
| Exhibit A3 | -- | Form of Certificated Subordinated Note |
| Exhibit A4 | -- | Form of Certificated Secured Note |
| Exhibit A5 | -- | Form of Combination Note |
| Exhibit B | -- | Forms of Transfer and Exchange Certificates |
| Exhibit B1 | -- | Form of Transferor Certificate for Transfer of Rule 144A Global Note to Regulation S Global Secured Note |
| Exhibit B2 | -- | Form of Transferor Certificate for Transfer of Regulation S Global Secured Note to Rule 144A Global Note |
| Exhibit B3 | -- | Form of Transferee Certificate for Transfer of Certificated Secured Note |
| Exhibit B4 | -- | Form of Subordinated Note ERISA Certificate |
| Exhibit B5 | -- | Form of Transferor Certificate for Transfer to Regulation S Global Subordinated Note |
| Exhibit B6 | -- | Form of Transferee Certificate for Transfer of Certificated Subordinated Note |
| Exhibit B7 | -- | Form of Exchange Notice |
| Exhibit C | -- | Forms of White & Case LLP Opinions |
| Exhibit D | -- | Form of Dechert LLP Opinion |
| Exhibit E | -- | Form of Seward & Kissel LLP Opinion |
| Exhibit F | -- | Form of Appleby (Cayman) Ltd. Opinion |
| Exhibit G | -- | Calculation of LIBOR |
| Exhibit H | -- | Form of Securities Account Control Agreement |
| Exhibit I | -- | Form of Note Owner Certificate |

INDENTURE, dated as of March 18, 2013, among Acis CLO 2013-1 Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "Issuer"), Acis CLO 2013-1 LLC, a limited-liability company organized under the laws of the State of Delaware (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, a national banking association, as trustee (herein, together with its permitted successors in the trusts hereunder, the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable and governed by this Indenture and to secure the Secured Notes and other obligations secured under this Indenture.  Except as otherwise provided herein, all covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee.  The Co-Issuers are entering into this Indenture and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Secured Notes, the Holders of the Combination Notes, the Trustee, each Hedge Counterparty, the Collateral Administrator and the Portfolio Manager (collectively, the "Secured Parties"), all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture) which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired, by the Issuer in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Issuer's interest in each of the Accounts, each Hedge Account (to the extent permitted by the applicable Hedge Agreement), any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein, (c) the Issuer's rights under the Portfolio Management Agreement as set forth in Article 15 hereof, the Hedge Agreements (provided, that there is no such Grant to the Trustee on behalf of any Hedge Counterparty in respect of its related Hedge Agreement), the Collateral Administration Agreement and the Placement Agency Agreement, (d) all Cash or Money delivered to the Trustee (or its bailee), (e) all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing, (f) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities)), (g) the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary and (h) all proceeds with respect to the foregoing; provided, that such Grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's

membership interests or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto) (the assets referred to in (a) through (h) are collectively referred to as the "Assets").  Such Grants are made, however, to secure, in accordance with the priorities set forth in the Priority of Payments, the Secured Notes equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance, documentation governing the incurrence or otherwise, except as expressly provided in this Indenture, and to secure, in accordance with the priorities set forth in the Priority of Payments of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture (together, the "Secured Obligations"), all as provided in this Indenture.  The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not such securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments," as the case may be.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof.

ARTICLE 1

Definitions

Section 1.1.    Definitions.   Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms.  The word "including" shall mean "including without limitation."  All references in this Indenture to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated articles, sections, subsections and other subdivisions of this Indenture.  The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, subsection or other subdivision.

"17g-5 Site":  The meaning specified in Section 10.10(f) (Reports to Rating Agencies and Additional Recipients; Rule 17g-5 Procedures).

"25% Limitation":  The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Acceleration Event":  The meaning specified in Section 11.1(a)(iii) (Disbursements of Monies from Payment Account).

"Acceleration Priority of Payments":  The meaning specified in Section 11.1(a)(iii) (Disbursement of Monies from Payment Account).

"Accountants' Report":  A certificate of the firm or firms appointed by the Issuer pursuant to Section 10.9 (Reports by Independent Accountants).

-2-

"<u>Accounts</u>": (i) the Payment Account; (ii) the Collection Account; (iii) the Ramp-up Account; (iv) the Revolver Funding Account; (v) the Expense Reserve Account; (vi) the Custodial Account; (vii) the Interest Reserve Account; and (viii) each Hedge Account.

"<u>Accredited Investor</u>": An accredited investor as defined in Regulation D under the Securities Act.

"<u>Act</u>" and "<u>Act of Holders</u>": The meanings specified in <u>Section 14.2</u> (Acts of Holders).

"<u>Additional Notes Closing Date</u>": The closing date for the issuance of any Additional Subordinated Notes pursuant to <u>Section 2.4</u> (Additional Notes) as set forth in an indenture supplemental to this Indenture pursuant to <u>Section 8.2(b)</u> (Supplemental Indentures With Consent of Holders of Offered Securities).

"<u>Additional Subordinated Notes</u>": Any Subordinated Notes issued pursuant to <u>Section 2.4</u> (Additional Notes).

"<u>Adjusted Collateral Principal Amount</u>": As of any date of determination:

(a)      the Aggregate Principal Balance of the Collateral Obligations (other than (i) Defaulted Obligations, (ii) Deferring Securities and (iii) Discount Obligations) <u>plus</u> any Principal Financed Accrued Interest; <u>plus</u>

(b)      without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds; <u>plus</u>

(c)      the lesser of the (i) S&P Collateral Value of each Deferring Security and (ii) Moody's Collateral Value of each Deferring Security; <u>plus</u>

(d)      the lesser of (x) the Market Value of each Defaulted Obligation and (y) the lesser of (i) the S&P Recovery Amount for each Defaulted Obligation and (ii) the Moody's Recovery Amount for each Defaulted Obligation; <u>provided</u> that Defaulted Obligations that have constituted Defaulted Obligations for a period of at least 3 years shall be deemed to have a value of 0; <u>plus</u>

(e)      the original purchase price (expressed as a percentage of par) multiplied by the current Principal Balance, excluding accrued interest, expressed as a dollar amount, of all Discount Obligations; <u>minus</u>

(f)      the Excess CCC/Caa Adjustment Amount;

<u>provided</u>, that with respect to any Collateral Obligation that would be subject to more than one of clauses (c) through (f) of this definition of "Adjusted Collateral Principal Amount", such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the category of Collateral Obligations which results in the lowest Adjusted Collateral Principal Amount on any date of determination; <u>provided</u>, <u>further</u>, that the Aggregate

NEWYORK 8715474 (2K)

Principal Balance of any Deferring Security shall not include any deferred or capitalized interest for purposes of calculating the Adjusted Collateral Principal Amount. For the purposes of clause (a) above, Current Pay Obligations representing up to 5% of the Collateral Principal Amount shall be included in the calculation of the Aggregate Principal Balance of the Collateral Obligations.

"Administration Agreement": An agreement between the Administrator and the Issuer relating to the various administrative functions the Administrator will perform on behalf of the Issuer, including communications with shareholders and the general public, and the provision of certain clerical, administrative and other corporate services in the Cayman Islands, as amended from time to time.

"Administrative Expense Cap": An amount equal on any Payment Date (when taken together with any Administrative Expenses paid during the period since the preceding Payment Date or, in the case of the first Payment Date, the Closing Date (excluding Administrative Expenses paid by amounts in the Expense Reserve Account)) equal to the sum of (a) 0.035% per annum (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount, on the related Determination Date and (b) $175,000 per annum (prorated for the related Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months); provided, however, that, if the amount of Administrative Expenses paid under the Administrative Expense Cap (including any excess applied in accordance with this proviso) on the three immediately preceding Payment Dates or during the related Collection Periods is less than the stated Administrative Expense Cap (without regard to any excess applied in accordance with this proviso) in the aggregate for such three preceding Payment Dates, the excess may be applied to the Administrative Expense Cap with respect to the then-current Payment Date; provided, further, that in respect of the first three Payment Dates from the Closing Date, such excess amount shall be calculated based on the Payment Dates preceding such Payment Date; provided further, that the Administrative Expense Cap shall not apply to the Petition Expense Amount or Petition Expenses (except as set forth in the Priority of Payments).

"Administrative Expenses": Fees, expenses (including indemnities) and other amounts due or accrued with respect to any Payment Date and payable in the following order by the Issuer, the Co-Issuer or any ETB Subsidiary: first pro rata to the Trustee pursuant to Section 6.7 (Trustee Compensation and Reimbursement) in each of its capacities hereunder and the Collateral Administrator for its fees and expenses under the Collateral Administration Agreement and then pro rata to (i) the Independent accountants, agents (other than the Portfolio Manager) and counsel of the Issuer and any ETB Subsidiary for fees and expenses and any taxes or government fees of any ETB Subsidiary; (ii) the Rating Agencies for fees and expenses (including surveillance fees) in connection with any rating of the Secured Notes or any Collateral Obligations; (iii) any Person in respect of Petition Expenses; (iv) the Portfolio Manager under this Indenture and the Portfolio Management Agreement, including, without limitation, reasonable expenses of the Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Collateral Obligations (including amounts owed to any Independent Review Party (as defined in the Portfolio Management Agreement)), any other expenses incurred in connection with the Collateral Obligations and amounts payable pursuant to Sections 9(c) and 11 of the Portfolio Management

-4-

Agreement but excluding the Management Fees; (v) the Administrator pursuant to the Administration Agreement; and (vi) any other Person in respect of any other fees or expenses permitted under this Indenture and the documents delivered pursuant to or in connection with this Indenture (including the payment of facility rating fees and all legal and other fees and expenses incurred in connection with the purchase or sale of any Collateral Obligations and any other expenses incurred in connection with the Collateral Obligations) and the Offered Securities, including but not limited to, amounts owed to the Co-Issuer pursuant to <u>Section 7.1</u> (Payment of Principal and Interest), any amounts due in respect of the listing of the Offered Securities on any stock exchange or trading system, any costs associated with producing Certificated Notes, any fees, taxes and expenses incurred in connection with complying with FATCA or the establishment and maintenance of any ETB Subsidiary (other than those amounts paid under clause (i)); <u>provided</u>, that amounts due in respect of actions taken on or before the Closing Date (or, at the Portfolio Manager's discretion, expenses incurred in connection with the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date) shall not be payable as Administrative Expenses but shall be payable only from the Expense Reserve Account pursuant to <u>Section 10.3(d)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"<u>Administrator</u>":  Appleby Trust (Cayman) Ltd. and any successor thereto.

"<u>Affected</u>":  Any Class of Notes which becomes subject to a tax as a result of a Tax Event.

"<u>Affiliate</u>" or "<u>Affiliated</u>":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, Officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"<u>Agent Members</u>":  Members of, or participants in, DTC, Euroclear or Clearstream.

"<u>Aggregate Excess Spread</u>":  As of any date of determination, an amount equal to the product of:

(a)    LIBOR applicable to the Secured Notes during the Interest Accrual Period in which such date of determination occurs; <u>multiplied by</u>

(b)     the amount (not less than zero) equal to (i) the Aggregate Principal Balance of the Collateral Obligations (excluding any non-cash interest) as of such date of determination <u>minus</u> (ii) the Target Initial Par Amount.

"<u>Aggregate Maximum Notional Amount</u>": The Class A-1 Maximum Notional Amount <u>plus</u> the Class B Maximum Notional Amount <u>plus</u> the Class C Maximum Notional Amount.

"<u>Aggregate Outstanding Amount</u>":  With respect to any of the Notes as of any date, the aggregate unpaid principal amount of such Notes Outstanding (including any Deferred Interest previously added to the principal amount of any Class of Deferred Interest Notes that remains unpaid) on such date. Payments received on the Subordinated Notes shall not reduce the Aggregate Outstanding Amount of the Subordinated Notes prior to the Stated Maturity.

"<u>Aggregate Principal Balance</u>":  When used with respect to all or a portion of the Collateral Obligations or the Pledged Obligations, the sum of the Principal Balances of all or of such portion of the Collateral Obligations or Pledged Obligations, respectively.

"<u>Aggregate Weighted Average Life</u>" : With respect to all Collateral Obligations as of any date of determination is a date equal to (A) the number of years following such date obtained by (i) summing the products obtained by multiplying the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance of such Collateral Obligation and (ii) *dividing* such sum by the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination.

"<u>Applicable Issuer</u>" or "<u>Applicable Issuers</u>":  With respect to the Co-Issued Notes of any Class, the Issuer or each of the Co-Issuers, as specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations) and with respect to the Issuer Notes, the Issuer only.

 "<u>Asset-Backed Commercial Paper</u>":  Commercial paper or other short-term obligations of a program that primarily issues externally rated commercial paper backed by assets or exposures held in a bankruptcy-remote, special purpose entity.

"<u>Assets</u>":  The meaning assigned in the Granting Clauses hereof.

"<u>Assumed Reinvestment Rate</u>":   LIBOR (as determined on the most recent Interest Determination Date relating to an Interest Accrual Period beginning on a Payment Date or the Closing Date, as applicable) <u>minus</u> 0.50% per annum; <u>provided</u>, that, if the calculation above results in an interest rate of less than zero, the Assumed Reinvestment Rate will be deemed to be zero for purposes of such calculation.

"<u>Authenticating Agent</u>":  With respect to the Notes or a Class of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to <u>Section 6.14</u> (Authenticating Agents) hereof.

"<u>Authorized Officer</u>":  With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer.  With respect to the Portfolio Manager,

any Officer, employee, partner, member or agent of the Portfolio Manager or any other Person who is authorized to act for the Portfolio Manager in matters relating to, and binding upon, the Portfolio Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Collateral Administrator, any Officer, employee or agent of the Collateral Administrator who is authorized to act for the Collateral Administrator in matters relating to, and binding upon, the Collateral Administrator with respect to the subject matter of the request or certificate in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Bank Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt from such other party of written notice to the contrary.

"Balance": On any date, with respect to Cash or Eligible Investments in any account, the aggregate (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank": U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee, Collateral Administrator or any successor thereto.

"Bank Officer": When used with respect to the Trustee, any officer within the Corporate Office (or any successor group of the Trustee) including any vice president, assistant vice president or officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Office because of his knowledge of and familiarity with the particular subject and in each case having direct responsibility for the administration of this Indenture.

"Bankruptcy Law": The federal Bankruptcy Code, Title 11 of the United States Code, as amended from time to time, the Companies Winding Up Rules and Part V of the Companies Law (2004 Revision) of the Cayman Islands, as amended from time to time.

"Benefit Plan Investor": Means (a) an employee benefit plan (as defined in Section 3(3) of Title I of ERISA) that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, (c) any entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity and (d) a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA.

"Break-even Rate Case": The cases the Portfolio Manager may select in connection with the definition of S&P Test Matrix, including the additional "Break-even Rate Cases" not included in the definition of S&P Test Matrix that the Portfolio Manager obtains from S&P as set forth in the definition of S&P CDO Monitor.

NEWYORK 8715474 (2K)

"Board of Directors": With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or the board of directors of the Issuer, and with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the members of the Co-Issuer.

"Board Resolution": With respect to the Issuer, a resolution of the Board of Directors of the Issuer and, with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"Bond": A debt security (that is not a loan) that is issued by a corporation, limited liability company, partnership or trust.

"Bond Yield Change": The change in implied yield spread relative to the Merrill Lynch US High Yield Master II Index (Bloomberg Ticker: H0A0) or any other index based upon a nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"Break Funding Amount": In the case of an Optional Redemption or Refinancing where the Redemption Date is not a Payment Date, an amount for each Secured Note being redeemed, if any, equal to the product of (x) the excess, if any, of (1) LIBOR for the current Interest Accrual Period over (2) LIBOR calculated as if the Redemption Date was a Payment Date beginning a new Interest Accrual Period; (y) the Outstanding principal amount of the Secured Note being redeemed and (z) times the number of days remaining in the current Interest Accrual Period as of the Redemption Date over 360.

"Bridge Loan": Any loan or other obligation that (x) is incurred in connection with a merger, acquisition, consolidation, or sale of all or substantially all of the assets of a Person or similar transaction and (y) by its terms, is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (it being understood that any such loan or debt security that has a nominal maturity date of one year or less from the incurrence thereof but has a term-out or other provision whereby (automatically or at the sole option of the obligor thereof) the maturity of the indebtedness thereunder may be extended to a later date is not a Bridge Loan).

"Business Day": Any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks are authorized or required by applicable law, regulation or executive order to close in New York, New York, London, England or in the city in which the Corporate Office of the Trustee is located or, for any final payment of principal, in the relevant place of presentation.

"Caa Collateral Obligation": A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with a Moody's Rating of "Caa1" or lower.

"Calculation Agent": The meaning specified in Section 7.16 (Calculation Agent).

"Cash": Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

-8-

"<u>CCC Collateral Obligation</u>": A Collateral Obligation (other than a Defaulted Obligation or a Deferring Security) with an S&P Rating of "<u>CCC+</u>" or lower.

"<u>CCC/Caa Calculated Amount</u>": With respect to any Collateral Obligation included in the CCC/Caa Excess, the lower of (x) an amount equal to 75% of the outstanding principal balance of such Collateral Obligation and (y) the Market Value of such Collateral Obligation (assuming such Market Value is expressed as a percentage of the principal balance of such Collateral Obligation as of the related Determination Date).

"<u>CCC/Caa Par Reduction Amount</u>": At any time, an amount equal to the excess, if any, of: (a) the Aggregate Principal Balance of all Collateral Obligations included in the CCC/Caa Excess at such time; *over* (b) the sum of the CCC/Caa Calculated Amounts of all Collateral Obligations included in the CCC/Caa Excess at such time.

"<u>CCC/Caa Excess</u>": The greater of: (i) the excess, if any, by which the Aggregate Principal Balance of Caa Collateral Obligations *exceeds* 7.5% of the Collateral Principal Amount <u>and</u> (ii) the excess, if any, by which the Aggregate Principal Balance of CCC Collateral Obligations *exceeds* 7.5% of the Collateral Principal Amount; <u>provided</u>, <u>that</u>, in determining which of the CCC Collateral Obligations and the Caa Collateral Obligations shall be included in the CCC/Caa Excess, the CCC Collateral Obligations and the Caa Collateral Obligations with the lowest Market Value (expressed as a percentage of par) shall be deemed to constitute such CCC/Caa Excess; <u>provided</u>, <u>further</u>, that, if the greater of clause (i) or (ii) above does not result in the larger Excess CCC/Caa Adjustment Amount, then the lesser of clause (i) or (ii) shall be applicable for purposes of this definition.

"<u>CDO Liability Rating</u>": The rating corresponding to the case or table selected in connection with the Weighted Average S&P Recovery Rate.

"<u>Certificate of Authentication</u>": The meaning specified in <u>Section 2.1</u> (Forms Generally).

"<u>Certificated Note</u>": The meaning specified in <u>Section 2.11(b)</u> (Certificated Notes).

"<u>Certificated Secured Notes</u>": The meaning specified in <u>Section 2.11(b)</u> (Certificated Notes).

"<u>Certificated Security</u>": The meaning specified in Section 8-102(a)(4) of the UCC.

"<u>Certificated Subordinated Note</u>": The meaning specified in <u>Section 2.2(b)</u> (Forms of Notes) and <u>Section 2.11(b)</u> (Certificated Notes).

"<u>CFTC</u>": The Commodity Futures Trading Commission.

"<u>Class</u>": In the case of (1) the Class A Notes, all of the Class A-1 Notes and the Class A-2 Notes together as a single Class (except, in the case of a Refinancing, the Class A-1 Notes and the Class A-2 Notes shall be treated as separate classes), (2) the Class A-2 Notes, all

NEWYORK 8715474 (2K)

of the Class A-2A Notes and the Class A-2B Notes together as a single Class (except, in the case of a Refinancing, the Class A-2A Notes and the Class A-2B Notes shall be treated as separate Classes), (3) the Class X Notes, the Class A-1 Notes, the Class A-2A Notes, the Class A-2B Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, all of the Secured Notes having the same Note Interest Rate, Stated Maturity and designation, (4) the Subordinated Notes, all of the Subordinated Notes and (5) the Combination Notes, all of the Combination Notes. Unless otherwise stated in this Indenture, the Class A Notes shall be treated as a single Class for voting and consent purposes. With respect to any exercise of voting rights, any Combination Notes that are entitled to vote on a matter shall vote with each Underlying Class except in connection with any supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes shall vote only as a separate class.

"Class A Notes": Collectively, all of the Class A-1 Notes and the Class A-2 Notes together as a single Class (except, in the case of a Refinancing, the Class A-1 Notes and the Class A-2 Notes shall be treated as separate Classes).

"Class A-1 Maximum Notional Amount": Components of the Combination Notes representing up to $190,750,000 Class A-1 Notes.

"Class A-1 Notes": The Class A-1 Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class A-2 Notes": Collectively, all of the Class A-2A Notes and the Class A2-B Notes together as a single Class (except, in the case of a Refinancing, the Class A-2A Notes and the Class A-2B Notes shall be treated as separate Classes).

"Class A-2A Notes": The Class A-2A Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class A-2B Notes": The Class A-2B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class A/B Coverage Tests": The Overcollateralization Ratio Test and the Interest Coverage Test applied respectively to the Class A Notes and the Class B Notes, collectively.

"Class B Maximum Notional Amount": Components of the Combination Notes representing up to $37,638,121 Class B Notes.

"Class B Notes": The Class B Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Break-even Default Rate": With respect to each Class of Secured Notes, the maximum percentage of defaults, at any time, that the Current Portfolio or the Proposed

Portfolio, as applicable, can sustain, from time to time, through application of the S&P CDO Monitor, which, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments, will result in sufficient funds remaining for the payment of such Class of Notes in full.  For purposes of determining the Class Break-even Default Rates on any date of determination, the Portfolio Manager will inform S&P which combination of cases from the S&P Test Matrix will be used, and the corresponding set of Class Break-even Default Rates from S&P will apply.

"Class C Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"Class C Maximum Notional Amount": Components of the Combination Notes representing up to $23,787,293 Class C Notes.

"Class C Notes":  The Class C Mezzanine Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class D Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"Class D Notes":  The Class D Mezzanine Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Default Differential":  With respect to each Class of Secured Notes, at any time, the rate calculated by subtracting the Class Scenario Default Rate for such Class of Notes at such time from the Class Break-even Default Rate for such Class of Notes at such time.

"Class E Coverage Tests":  The Overcollateralization Ratio Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"Class E Notes":  The Class E Junior Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class F Notes":  The Class F Junior Secured Deferrable Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Class Scenario Default Rate":  With respect to each Class of Secured Notes, at any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's Initial Rating of such Class of Secured Notes, determined by application by the Portfolio Manager and the Collateral Administrator of the S&P CDO Monitor at such time.

"Class X Note Payment Amount":  An amount equal to 25% of the original principal amount of the Class X Notes issued on the Closing Date, which shall be payable on

each Payment Date in accordance with <u>Section 11.1(a)(i)</u> (Disbursements of Monies from Payment Account).

"<u>Class X Notes</u>": The Class X Senior Secured Floating Rate Notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Clean-up Call Redemption</u>": A redemption of the Notes in accordance with <u>Section 9.6</u> (Clean-up Call Redemption).

"<u>Clean-up Call Redemption Date</u>": The meaning specified in <u>Section 9.6</u> (Clean-up Call Redemption).

"<u>Clean-up Call Redemption Price</u>": A purchase price in Cash at least equal to the sum of (a) the Aggregate Outstanding Amount of the Secured Notes, <u>plus</u> (b) all unpaid interest on the Secured Notes accrued to the date of such redemption (including any interest accrued on Deferred Interest), <u>plus</u> (c) the aggregate of all other amounts owing by the Issuer on the date of such redemption that are payable in accordance with the Priority of Payments prior to distributions in respect of the Subordinated Notes, including any amounts payable in respect of any Hedge Agreement and all expenses incurred in connection with effecting the Clean-up Call Redemption; <u>provided</u> that, in connection with any Clean-Up Call Redemption of the Notes, Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes may elect to receive less than 100% of the Clean-up Call Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes.

"<u>Clearing Agency</u>": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"<u>Clearing Corporation</u>": As the context may require, any or all of (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under Section 8-102(a)(5) of the UCC.

"<u>Clearing Corporation Security</u>": Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"<u>Clearstream</u>": Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"<u>Closing Date</u>": March 18, 2013.

"<u>Code</u>": The U.S. Internal Revenue Code of 1986, as amended.

"<u>Co-Issued Notes</u>": The Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes.

-12-

"Co-Issuer":  The Person named as such on the first page of this Indenture until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral Administration Agreement":  An agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as amended from time to time.

"Collateral Administrator":  U.S. Bank National Association, in its capacity as such under the Collateral Administration Agreement, and any successor thereto.

"Collateral Interest Amount":  As of any date of determination, without duplication, the sum of (i) the aggregate amount of Interest Proceeds in the Interest Collection Subaccount that have been received or that are expected to be received (other than Interest Proceeds expected to be received from Defaulted Obligations and Deferring Securities, but including Interest Proceeds actually received from Defaulted Obligations and Deferring Securities) during the Collection Period (and, if such Collection Period does not end on a Business Day, the next succeeding Business Day) in which such date of determination occurs and (ii) in the case of the Hedge Agreements, any net payments expected to be received by the Issuer on or before the immediately following Payment Date (other than any payments that would be classified as Principal Proceeds).

"Collateral Obligation":  A debt obligation (including, but not limited to, interests in bank loans acquired by way of a sale or assignment, and high-yield debt securities), Participation Interest or Pre-funded Letter of Credit that as of the date of acquisition by the Issuer:

(i)      is U.S. Dollar denominated and is neither convertible by the issuer thereof into, nor payable in, any other currency;

(ii)      is not a Defaulted Obligation, Current Pay Obligation or a Credit Risk Obligation;

(iii)      is not a lease;

(iv)      has not deferred payment of any accrued, unpaid interest which would have otherwise been due and continues to remain unpaid and is not a Deferrable Security or a Partial Deferrable Security;

(v)      provides for a fixed amount of principal payable in Cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price of less than par;

(vi)      does not constitute Margin Stock;

(vii)      is not a Margin Loan;

-13-

(viii) has payments that do not subject the Issuer to withholding tax unless (i) the related obligor is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after tax basis (for the avoidance of doubt, this clause shall not apply to commitment fees, letter of credit fees, Pre-funded Letter of Credit fees or similar fees) or (ii) such withholding is the result of the failure of Noteholders to provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and such withholding is allocated amongst such non-complying Noteholders;

(ix) has a Moody's Rating and an S&P Rating and does not have an S&P Rating that is below "CCC-" or a Moody's Default Probability Rating that is below "Caa3";

(x) is not a debt obligation whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xi) except for Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations, is not an obligation pursuant to which any future advances or payments, other than Excepted Advances, to the borrower or the obligor thereof may be required to be made by the Issuer;

(xii) does not have an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P;

(xiii) is not a Related Obligation;

(xiv) is not subject to an Offer other than (a) an offer of publicly traded registered securities with equal or greater face value and similar terms issued in exchange for securities issued under Rule 144A or a loan or security that would otherwise qualify for purchase under the Investment Criteria or (b) a Permitted Offer;

(xv) is not a Structured Finance Obligation;

(xvi) is not a Synthetic Security;

(xvii) will not consist of a debt obligation of a single obligor where the total potential indebtedness of such obligor under all of its loan agreements, indentures and other underlying instruments is less than $250,000,000;

(xviii) will not require the Issuer, the Co-Issuer or the pool of Assets to be registered as an investment company under the Investment Company Act;

(xix) is not an Equity Security or attached with a warrant to purchase Equity Securities and does not provide for mandatory or optional conversion for Equity Securities; provided that a Collateral Obligation may be by its terms convertible into or exchangeable for an Equity Security if the convertible or exchangeable portion of such Collateral Obligation constitutes less than or equal to 2% of the portion of the Collateral Principal Amount represented by such Collateral Obligation;

(xx) is not a Bridge Loan;

-14-

(xxi)    is not a Zero Coupon Obligation;

(xxii)   is not a Step-up Obligation or a Step-down Obligation;

(xxiii)  is not an Interest Only Security; and

(xxiv)   it does not mature after the Stated Maturity of the Notes.

"Collateral Principal Amount":  As of any date of determination, the sum of (a) the Aggregate Principal Balance of the Collateral Obligations (other than Defaulted Obligations) and (b) without duplication, the amounts on deposit in the Accounts, excluding the Revolver Funding Account, (including Eligible Investments in such Accounts) representing Principal Proceeds.

"Collateral Quality Test":  A test satisfied if, as of any date of determination at, or subsequent to, the end of the Ramp-up Period (or, with respect to the test set forth in clause (v) below, as of or subsequent to any date of determination immediately succeeding receipt by the Issuer of written confirmation of S&P's Initial Ratings of the Secured Notes and which occurs during the Reinvestment Period), in the aggregate, the Collateral Obligations owned (or in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy each of the tests set forth below, calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

(i)      the Minimum Fixed Coupon Test;

(ii)     the Minimum Floating Spread Test;

(iii)    the Maximum Moody's Rating Factor Test;

(iv)     the Moody's Diversity Test;

(v)      the S&P CDO Monitor Test;

(vi)     the Minimum Weighted Average Moody's Recovery Rate Test;

(vii)    the Minimum Weighted Average S&P Recovery Rate Test; and

(viii)   the Weighted Average Life Test.

"Collection Account":  The non-interest bearing segregated trust account established pursuant to Section 10.2 (Collection Account), which includes the Principal Collection Subaccount and the Interest Collection Subaccount.

"Collection Period":  With respect to any Payment Date, the period commencing immediately following the prior Collection Period (or on the Closing Date, in the case of the Collection Period relating to the first Payment Date) and ending on the 10th day of the month in which such Payment Date occurs or, in the case of (x) the final Collection Period preceding the latest Stated Maturity of any Class of Notes, (y) the final Collection Period preceding an

-15-

Optional Redemption or Clean-up Call Redemption or (z) the final Collection Period preceding final payment on the Notes following the liquidation of the Assets following an Event of Default, ending on the day preceding such Stated Maturity, Redemption Date or final payment, respectively.

"Combination Notes": The Senior Secured Deferrable Combination Notes composed of Components representing Class A-1 Notes, Class B Notes and Class C Notes (each such Class of Notes, an "Underlying Class").

"Combination Notes Table": The meaning specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Components": The Class A-1 Notes, the Class B Notes and the Class C Notes that represent the Underlying Classes of the Combination Notes.

"Concentration Limitations": Limitations satisfied, if as of any date of determination at or subsequent to, the end of the Ramp-up Period, in the aggregate, the Collateral Obligations owned (or in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer comply with all of the requirements set forth below, calculated in each case as required by Section 1.2 (Assumptions as to Pledged Obligations) herein:

(i) all of the Collateral Obligations must be issued by Non-Emerging Market Obligors and the country of organization of such Obligor must either (x) be the United States or (y) have a country ceiling for foreign currency bonds rating of at least "Aa2" by Moody's;

(ii) no more than the percentage listed below of the Collateral Principal Amount may be issued by obligors Domiciled in the country or countries set forth opposite such percentage:

| % Limit | Country or Countries |
|---------|----------------------|
| 10.0% | All countries (in the aggregate) other than the United States; |
| 10.0% | Canada; |
| 10.0% | Any Tax Jurisdiction; |
| 0% | All countries (in the aggregate) other than the United States, Canada and any Tax Jurisdiction; |

(iii) the sum of the aggregate unfunded commitments under Delayed Drawdown Collateral Obligations that are available to be funded and the Aggregate Principal

Balance of Revolving Collateral Obligations may not be more than 15% of the Collateral Principal Amount;

(iv)     the Moody's Counterparty Criteria are met;

(v)     not less than 95% of the Collateral Principal Amount may consist of Senior Secured Loans;

(vi)     not less than 95% of the Collateral Principal Amount may consist of floating rate Collateral Obligations;

(vii)     not more than 10% of the Collateral Principal Amount may consist of Participation Interests;

(viii)     not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are Second Lien Loans;

(ix)     [Reserved];

(x)     [Reserved];

(xi)     not more than 7.5% of the Collateral Principal Amount may consist of DIP Collateral Obligations and not more than 2% of the Collateral Principal Amount may consist of DIP Collateral Obligations issued by a single obligor;

(xii)     [Reserved];

(xiii)     not more than 2.0% of the Collateral Principal Amount may consist of obligations issued by a single obligor, except that up to 2.5% of the Collateral Principal Amount may consist of obligations issued by each of up to five other obligors (so long as Moody's has issued a non-credit estimate rating for such obligor);

(xiv)     (a) not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating of "Caa1" or below and (b) not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating of "CCC+" or below;

(xv)     the Third Party Credit Exposure may not exceed 20% of the Collateral Principal Amount and the Third Party Credit Exposure with counterparties with a rating below "AA" by S&P may not exceed 5% of the Collateral Principal Amount; provided that no Third Party Credit Exposure is permitted with counterparties that do not have a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P (or a long-term debt rating of at least "A+" by S&P);

(xvi)     not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with an S&P Rating derived from a Moody's Rating as set forth in clause (ii)(a) of the definition of the term "S&P Rating";

-17-

(xvii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations with a Moody's Rating derived from an S&P Rating as provided in clauses (iv)(A)(1), (2) or (3) of the definition of the term "Moody's Derived Rating";

(xviii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are issued by obligors that belong to any single S&P Industry Classification, except that up to two other S&P Industry Classifications may each represent up to 12% of the Collateral Principal Amount;

(xix)   not more than 3% of the Collateral Principal Amount may consist of Pre-funded Letters of Credit;

(xx)   [Reserved];

(xxi)   not more than 50% of the Collateral Principal Amount may consist of Cov-Lite Loans;

(xxii)   not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are High Yield Bonds;

(xxiii)   not more than 10% of the Collateral Principal Amount may consist of Collateral Obligations that are Discount Obligations;

(xxiv)   not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations that are Non-Quarterly Assets; and

(xxv)   not more than 5% of the Collateral Principal Amount may consist of Collateral Obligations with warrants to purchase Equity Securities attached thereto.

"Confidential Information":  The meaning specified in Section 14.13(b).

"Consenting Holder of the Subordinated Notes":  With respect to any Payment Date, a Holder of Subordinated Notes that has consented by delivering an irrevocable written notice to the Paying Agent to a distribution of Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"Controlling Class":  The Class A Notes (voting as a single class), so long as any Class A Notes are Outstanding; then the Class B Notes, if there are no Class A Notes Outstanding; then the Class C Notes, if there are no Class A Notes or Class B Notes Outstanding; then the Class D Notes, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding; then the Class E Notes, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding; then the Class F Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding; and then the Subordinated Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes, Class E Notes or Class F Notes Outstanding.  For the avoidance of doubt, the Class X Notes shall not be the Controlling Class.

-18-

"Controlling Person":   The meaning specified in Section 2.6(c) (Registration, Registration of Transfer and Exchange).

"Corporate Office":  With respect to the Trustee, (x) for Note transfer purposes and presentment of the Notes, the corporate office of the Trustee located at 60 Livingston Avenue, St. Paul, MN 55107, Attn: Corporate Trust Services – Acis CLO 2013-1 and (y) for all other purposes, the corporate office of the Trustee located at 190 South LaSalle Street, 10th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2013-1, Fax: 312-332-8030, e-mail: ACIS.CLO.2013.01@usbank.com; and at or such other address as the Trustee may designate from time to time by notice to the Holders, the Portfolio Manager, any Hedge Counterparty and the Issuer or the principal corporate office of any successor Trustee.

"Coverage Tests":  The Class A/B Coverage Tests, the Class C Coverage Tests, the Class D Coverage Tests and the Class E Coverage Tests.

"Cov-Lite Loan":  A loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture (such covenant, an "Incurrence Covenant"), but contains no covenants requiring the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action (such covenant, a "Maintenance Covenant"); provided, that for all purposes other than the determination of the S&P Recovery Rate for such loan, a loan described in clause (i) or (ii) above which either contains a cross default provision to, or is pari passu with, another loan of the underlying obligor that requires the underlying obligor to comply with both an Incurrence Covenant and a Maintenance Covenant will be deemed not to be a Cov-Lite Loan.

"CPO":  A Commodity Pool Operator.

"Credit Improved Criteria":  The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been decreased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such decrease) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such decrease) greater than 4.00%) due, in each case, to an improvement in the related borrower's financial ratios or financial results, (iii) if such Collateral Obligation is a bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes divided by cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation that is expected to be more than 1.15 times the current year's projected cash flow interest coverage ratio.

"<u>Credit Improved Obligation</u>": Any Collateral Obligation which, in the Portfolio Manager's reasonable commercial judgment, has significantly improved in credit quality after it was acquired by the Issuer, which improvement may (but need not) be evidenced by one of the following: (a) such Collateral Obligation satisfies at least one of the Credit Improved Criteria, (b) such Collateral Obligation has been upgraded at least one rating sub-category by either Rating Agency or has been placed and remains on credit watch with positive implication by either Rating Agency, (c) the issuer of such Collateral Obligation has raised equity capital or other capital subordinated to the Collateral Obligation or (d) the issuer of such Collateral Obligation has, in the Portfolio Manager's reasonable commercial judgment, shown improved results or possesses less credit risk, in each case since such Collateral Obligation was acquired by the Issuer; <u>provided</u>, <u>however</u>, that during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Improved Obligation only if (i) it has been upgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with positive implication by Moody's since it was acquired by the Issuer, (ii) at least one of the Credit Improved Criteria are satisfied with respect to such Collateral Obligation or (iii) at least a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Improved Obligation.

"<u>Credit Risk Criteria</u>": The criteria that will be met with respect to any Collateral Obligation (i) if such Collateral Obligation is a loan, the Loan Pricing Change since the date of purchase by the Issuer has been a percentage point decrease of 0.50% or more, (ii) if such Collateral Obligation is a loan, the spread over the applicable reference rate for such Collateral Obligation has been increased in accordance with the Underlying Instruments with respect to such Collateral Obligation since the date of acquisition by (a) 0.25% or more (in the case of a loan with a spread (prior to such increase) less than or equal to 2.00%), (b) 0.375% or more (in the case of a loan with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00%) or (c) 0.50% or more (in the case of a loan with a spread (prior to such increase) greater than 4.00%) due, in each case, to a deterioration in the related borrower's financial ratios or financial results, (iii) in the case of a bond, the Bond Yield Change since the date of purchase by the Issuer has been a percentage point increase of 0.50% or more or (iv) if it has a projected cash flow interest coverage ratio (earnings before interest and taxes divided by cash interest expense as estimated by the Portfolio Manager) of the underlying borrower or other obligor of such Collateral Obligation of less than 1.00 or that is expected to be less than 0.85 times the current year's projected cash flow interest coverage ratio.

"<u>Credit Risk Obligation</u>": Any Collateral Obligation that, in the Portfolio Manager's reasonable commercial judgment, has a significant risk of declining in credit quality or price unrelated to general market conditions; <u>provided</u>, <u>however</u>, that during a Restricted Trading Period, a Collateral Obligation will qualify as a Credit Risk Obligation only if, (i) such Collateral Obligation has been downgraded by any Rating Agency at least one rating sub category or has been placed and remains on a credit watch with negative implication by Moody's since it was acquired by the Issuer, (ii) at least one of the Credit Risk Criteria are satisfied with respect to such Collateral Obligation or (iii) at least a Majority of the Controlling Class vote to treat such Collateral Obligation as a Credit Risk Obligation.

"<u>Current Pay Obligation</u>": A Collateral Obligation that would be a Defaulted Obligation but as to which (i) if the issuer of such Collateral Obligation is not subject to a

NEWYORK 8715474 (2K)

bankruptcy proceeding, all scheduled payments contractually due, including interest and principal payments (if any), were paid in cash and the Portfolio Manager reasonably expects that the next interest and contractual principal payment (if any) due will be paid in cash, (ii) if the issuer of such Collateral Obligation is subject to a bankruptcy proceeding, a bankruptcy court has authorized payment of all scheduled amounts due (other than principal amounts due as a result of any automatic acceleration of such Collateral Obligation pursuant to the Underlying Instruments because of the bankruptcy, receivership or similar proceeding of such obligor) on account of such Collateral Obligation and all such scheduled payments have been paid on a current basis in Cash, to the knowledge of the Portfolio Manager, (iii) for so long as Moody's is rating the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes, either (x) the Moody's Rating of such Collateral Obligation is at least "B3", (y) the Moody's Rating of such Collateral Obligation is at least "Caa1," and the Market Value of such Collateral Obligation is at least 80% of the par value thereof or (z) the Moody's Rating of such Collateral Obligation is at least "Caa2," and the Market Value of such Collateral Obligation is at least 85% of the par value thereof and (iv) the Market Value of such Collateral Obligation is at least 80% of the par value thereof; provided that the Aggregate Principal Balance of all Collateral Obligations which constitute "Current Pay Obligations" may not exceed 5.0% of the Collateral Principal Amount; provided further, that in determining which of the Collateral Obligations will be included in the preceding proviso as Current Pay Obligations, the Collateral Obligations with the highest Market Value expressed as a percentage will be deemed to constitute Current Pay Obligations. If the Market Value of a Collateral Obligation is determined pursuant to clause (E) of the definition of Market Value, such Collateral Obligation cannot be a Current Pay Obligation.

"Current Portfolio": At any time, the then current portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds (determined in accordance with Section 1.2 (Assumptions as to Pledged Obligations) to the extent applicable), then held by the Issuer.

"Custodial Account": The non-interest bearing segregated custodial account established in the name of the Trustee pursuant to Section 10.3(b) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Custodian": The meaning specified in the first sentence of Section 3.3(a) (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"Default": Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulted Obligation": Any debt obligation included in the Assets shall constitute a "Defaulted Obligation" if:

(a) a default as to the payment of principal and/or interest has occurred and is continuing with respect to such debt obligation (without regard to any grace period applicable thereto, or waiver thereof, after the passage (in the case of a default that in the Portfolio

Manager's judgment, as certified to the Trustee in writing, is not due to credit-related causes) of a three Business Day grace period);

(b)  a default known to a Responsible Officer of the Portfolio Manager as to the payment of principal and/or interest has occurred and is continuing on another debt obligation of the same issuer which is senior or pari passu in right of payment to such debt obligation (without regard to any grace period applicable thereto, or waiver or forbearance thereof, after the passage (in the case of a default in the Portfolio Manager's judgment that is not due to credit-related causes) of five Business Days or seven calendar days, whichever is greater, but in no case beyond the passage of any grace period applicable thereto; provided, that both debt obligations are full recourse obligations);

(c)  the issuer or others have instituted proceedings to have the issuer adjudicated as bankrupt or insolvent or placed into receivership and such proceedings have not been stayed or dismissed or such issuer has filed for protection under Chapter 11 of the United States Bankruptcy Code;

(d)  (x) such Collateral Obligation has an S&P Rating of "CC" or lower or "SD" or had such rating before such rating was withdrawn or (y) the obligor of such debt obligation has a Moody's probability default rating (as published by Moody's) of "D" or "LD" or had such rating before such rating was withdrawn;

(e)  the Portfolio Manager has in its reasonable commercial judgment otherwise declared such debt obligation to be a "Defaulted Obligation";

(f)  such Collateral Obligation is a Participation Interest and (1) the related Selling Institution fails in any material respect in the performance of any of its payment obligations in accordance with the terms of such Participation Interest and such failure continues for seven Business Days or (2) the Selling Institution has an S&P rating of "CC" or lower or "SD" or a Moody's rating of "D" or "LD" or had either such rating before such rating was withdrawn;

(g)  such debt obligation is pari passu in right of payment as to the payment of principal and/or interest to another debt obligation of the same issuer that would constitute a Defaulted Obligation under clause (d) above were such other debt obligation owned by the Issuer; provided, that both the debt obligation and such other debt obligation are full recourse obligations of the applicable issuer;

(h)  such obligation is a Deferring Security; or

(i) the excess, if any, of Current Pay Obligations the Aggregate Principal Balance of which exceeds 5.0% of the Collateral Principal Amount;

provided, that a Collateral Obligation will not constitute a Defaulted Obligation pursuant to clauses (b) or (c) above if such Collateral Obligation is a DIP Collateral Obligation;

"Deferrable Cash-Pay Interest":  As to any Partial Deferrable Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such

Partial Deferrable Security or otherwise deferred and accrued) thereon pursuant to the terms of the related underlying instruments.

"Deferrable Security": A Collateral Obligation which by its terms permits the deferral of payment of any accrued or unpaid interest; provided that such loan or obligation shall not be a Partial Deferrable Security.

"Deferred Interest": With respect to any specified Class of Deferred Interest Notes, the meaning specified in Section 2.8(a) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

"Deferred Interest Notes": The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Deferring Security": A Deferrable Security that is deferring the payment of interest due thereon and has been so deferring the payment of interest due thereon (i) with respect to Collateral Obligations that have a Moody's Rating of at least "Baa3," for the shorter of two consecutive accrual periods or one year and (ii) with respect to Collateral Obligations that have a Moody's Rating of "Ba1" or below, for the shorter of one accrual period or six consecutive months, which deferred capitalized interest has not, as of the date of determination, been paid in Cash.

"Delayed Drawdown Collateral Obligation": A Collateral Obligation that (a) requires the Issuer to make one or more future advances to the borrower under the Underlying Instruments relating thereto, (b) specifies a maximum amount that can be borrowed on one or more borrowing dates and (c) does not permit the re-borrowing of any amount previously repaid by the borrower thereunder; but any such Collateral Obligation will be a Delayed Drawdown Collateral Obligation only until all commitments by the Issuer to make advances to the borrower expire or are terminated or reduced to zero. If a portion of a Pre-funded Letter of Credit is unfunded, such Pre-funded Letter of Credit will also constitute a Delayed Drawdown Collateral Obligation (to the extent of the unfunded amount) until the Issuer's obligations under such Pre-funded Letter of Credit are fully funded.

"Deliver" or "Delivered" or "Delivery": The taking of the following steps:

(i) in the case of each Certificated Security (other than a Clearing Corporation Security), Instrument or Participation Interest in which the underlying loan or Participation Interest is represented by an Instrument,

(a) causing the delivery of such Certificated Security or Instrument to the Custodian registered in the name of the Custodian or its affiliated nominee or endorsed to the Custodian or in blank,

(b) causing the Custodian to continuously indicate on its books and records that such Certificated Security or Instrument is credited to the applicable Account, and

(c) causing the Custodian to maintain continuous possession of such Certificated Security or Instrument;

-23-

(ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(a)    causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

(b)    causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

(a)    causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian or a nominee, and

(b)    causing the Custodian to continuously indicate on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("FRB") (each such security, a "Government Security"),

(a)    causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

(b)    causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)    in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(a)    causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or to acquire the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(b)    causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

(c)    causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

-24-

(vi)     in the case of Cash or Money,

(a)     causing the delivery of such Cash or Money to the Custodian,

(b)     causing the Custodian to treat such Cash or Money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of <u>Article 8</u> of the UCC, and

(c)     causing the Custodian to continuously indicate on its books and records that such Cash or Money is credited to the applicable Account; and

(vii)     in the case of each general intangible (including any loan or Participation Interest in which neither the Participation Interest nor the loan is represented by an Instrument) or any other Asset the security interest in respect of which may be perfected under the UCC by filing a Financing Statement,

(a)     causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(b)     causing the registration of the security interests granted under this Indenture in the Register of Mortgages and Charges of the Issuer at the Issuer's registered office in the Cayman Islands.

In addition, the Issuer will obtain any and all consents required by the underlying instruments relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

"<u>Designated Principal Proceeds</u>":   A one time designation by the Portfolio Manager of up to $5,000,000 in Principal Proceeds as Interest Proceeds after the Effective Date and on or prior to the second Determination Date (but only if the Effective Date Overcollateralization Test would be satisfied after such designation).

"<u>Determination Date</u>":  The last day of each Collection Period.

"<u>DIP Collateral Obligation</u>":  A loan paying interest on a current basis made to a debtor-in-possession pursuant to Section 364 of the U.S. Bankruptcy Code having the priority allowed by either Section 364(c) or 364(d) of the U.S. Bankruptcy Code and secured by senior liens.

"<u>Discount Obligation</u>":   Any Collateral Obligation that was purchased (as determined without averaging prices of purchases on different dates and treating each portion of a Collateral Obligation purchased on different dates as a separate Collateral Obligation) for less than (1) 85% of its Principal Balance, if such Collateral Obligation has a Moody's Rating lower than "B3," or (2) 80% of its Principal Balance, if such Collateral Obligation has a Moody's Rating of "B3" or higher; *provided* that

(i)     such Collateral Obligation will cease to be a Discount Obligation at such time as the Market Value (expressed as a percentage of the par amount of such Collateral Obligation) determined for such Collateral Obligation on each day during any period of 30 consecutive days since the acquisition by the Issuer of such Collateral Obligation, equals or exceeds 90% of the Principal Balance of such Collateral Obligation;

(ii)     any Collateral Obligation that would otherwise be considered a Discount Obligation, but that is purchased in accordance with the Eligibility Criteria with the proceeds of sale of a Collateral Obligation that was not a Discount Obligation at the time of its purchase, so long as such purchased Collateral Obligation:

(A)     is purchased or committed to be purchased within 20 Business Days of such sale,

(B)     is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) equal to or greater than the sale price of the sold Collateral Obligation,

(C)     is purchased at a purchase price (expressed as a percentage of the par amount of such Collateral Obligation) not less than 65%; and

(D)     has a Moody's Default Probability Rating equal to or greater than the Moody's Default Probability Rating of the sold Collateral Obligation.

Any Collateral Obligations described in clauses (A) through (D) above will not be considered to be Discount Obligations.

(iii)     clause (ii) above in this proviso shall not apply to any such Collateral Obligation at any time on or after the acquisition by the Issuer of such Collateral Obligation if, as determined at the time of such acquisition, such application would result in:

(A)     more than 5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied (or more than 2.5% of the Collateral Principal Amount consisting of Collateral Obligations to which such clause (ii) has been applied if the purchase price of the Collateral Obligation is less than 75% of the principal balance thereof) or

(B)     the Aggregate Principal Balance of all Collateral Obligations to which such clause (ii) has been applied since the Closing Date being more than 10% of the Target Initial Par Amount.

"<u>Distribution Report</u>":  The meaning specified in <u>Section 10.7(b)</u> (Accountings).

"<u>Diversity Score</u>":  A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in <u>Schedule 4</u> hereto.

"<u>Dollar</u>" or "<u>$</u>":  A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"Domicile":  With respect to any issuer of, or obligor with respect to, a Collateral Obligation, its country of organization.

"DTC":  The Depository Trust Company, its nominees, and their respective successors.

"Due Date":  Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"Effective Date":  The date on which each of the Effective Date Conditions are met.

"Effective Date Conditions":  Means conditions that will be satisfied if the S&P Effective Date Rating Condition has been satisfied and the Initial Ratings of the Class X Notes and the Class A Notes are confirmed by Moody's (including by means of a deemed confirmation as set forth in the definition of Moody's Rating Condition or Section 7.18(c) (Ramp-up Period; Purchase of Additional Collateral Obligations), after the end of the Ramp-up Period.

"Effective Date Overcollateralization Test":  A test that is satisfied if, on any date of determination, the ratio of (x) the Adjusted Collateral Principal Amount *divided* by (y) the Aggregate Outstanding Amount of all Notes is equal to or greater than the Target Initial Par Ratio.

"Effective Date Report":  A report, compiled by the Collateral Administrator and provided to each Rating Agency, determined as of the end of the Ramp-up Period, containing (A) the information required in a Monthly Report and (B) a calculation with respect to whether the Target Initial Par Condition is satisfied.

"Eligible Investment Required Ratings":  (a) With respect to Moody's, (i) a long-term credit rating of "Aa3" (not on credit watch for possible downgrade) or higher and a short-term credit rating of "P-1" (not on credit watch for possible downgrade) or (ii) if only a long-term credit rating from Moody's, such rating is "Aaa" or (iii) if only a short-term credit rating from Moody's is available, such rating is "P-1" (not on credit watch for possible downgrade) and (b) with respect to S&P, a long-term credit rating of "A" or higher and a short-term credit rating of "A-1" or higher (or, in the case of (x) an applicable obligation that does not have a short-term credit rating from S&P or does not have a short-term credit rating from S&P of "A-1" or higher, a long-term credit rating from S&P of at least "A+" and (y) any Eligible Investment with a maturity of longer than 91 days, a long-term credit rating of "AAA" from S&P).

"Eligible Investments":  Any United States dollar denominated investment that, at the time it is Delivered to the Trustee (directly or through an intermediary or bailee), is one or more of the following obligations or securities:

(i)  direct obligations of, and obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are expressly

NEWYORK 8715474 (2K)

backed by the full faith and credit of the United States of America and such obligations meet the criteria set forth in clause (b) of the definition of Eligible Investment Required Ratings;

(ii)    demand and time deposits in, certificates of deposit of, trust accounts with, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have the Eligible Investment Required Ratings;

(iii)    unleveraged repurchase obligations with respect to (a) any security described in clause (i) above or (b) any other security issued or unconditionally guaranteed by an agency or instrumentality of the United States of America, in either case entered into with a depository institution or trust company (acting as principal) described in clause (ii) above or entered into with an entity (acting as principal) with, or whose parent company has, the Eligible Investment Required Ratings;

(iv)    securities bearing interest or sold at a discount issued by any entity formed under the laws of the United States of America or any State thereof that have a credit rating of "Aaa" from Moody's and "AAA" from S&P at the time of such investment or contractual commitment providing for such investment;

(v)    commercial paper or other short-term obligations (other than Asset-Backed Commercial Paper) with the Eligible Investment Required Ratings and that either bear interest or are sold at a discount from the face amount thereof and have a maturity of not more than 183 days from their date of issuance and such maturity is not extendable;

(vi)    a Reinvestment Agreement issued by any bank (if treated as a deposit by such bank), or a Reinvestment Agreement issued by any insurance company or other corporation or entity, in each case with the Eligible Investment Required Ratings; and

(vii)    non-U.S. money market funds which funds have, at all times, credit ratings of "Aaa-mf" by Moody's and "AAAm" or "AAAm-G" by S&P, respectively;

provided, that Eligible Investments purchased with funds in the Collection Account shall be held until maturity except as otherwise specifically provided herein and shall include only such obligations or securities, other than those referred to in clause (vii) above, as mature (or are putable at par to the issuer thereof) no later than the Business Day prior to the next Payment Date, unless such Eligible Investments are issued by the Bank in its capacity as a banking institution, in which event such Eligible Investments may mature on such Payment Date; and provided, however, that none of the foregoing obligations or securities shall constitute Eligible Investments if (a) such obligation or security has an "f," "r," "p," "pi," "q," "t" or "sf" subscript assigned by S&P, (b) all, or substantially all, of the remaining amounts payable thereunder consist of interest and not principal payments, (c) such obligation or security is subject to withholding tax unless (i) the issuer of the security is required to make "gross-up"

payments for the full amount of such foreign withholding tax or (ii) such withholding is solely the result of the failure of Noteholders to provide the Issuer (or its authorized agents) with the Holder FATCA Information and such withholding is allocated amongst such non-complying Noteholders, (d) such obligation or security is secured by real property or subject to an Offer (other than an Eligible Investments Permitted Offer), (e) such obligation or security is purchased at a price greater than 100% of the principal or face amount thereof, (f) in the Portfolio Manager's judgment, such obligation or security is subject to material non-credit related risks or (g) such obligation is a Structured Finance Obligation or Synthetic Security; provided, further, that each Eligible Investment, other than those referred to in clause (vii) above, must mature on the earlier of (A) 60 days following its acquisition or (B) the Business Day prior to the next Payment Date (subject to the limited exception set forth in the first proviso of this paragraph above). Eligible Investments may include, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services and receives compensation.

"Eligible Investments Permitted Offer": An offer (i) pursuant to the terms of which the offeror offers to acquire Eligible Investments in exchange for consideration consisting solely of Cash and/or other Eligible Investments in an amount equal to or greater than the full face or principal amount of such Eligible Investment plus any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Entitlement Order": The meaning specified in Section 8-102(a)(8) of the UCC.

"Equity Security": Any security or debt obligation which at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and is not an Eligible Investment.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Limited Notes": The Notes specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"ETB Subsidiary": The meaning specified in Section 7.4(b) (Existence of Co-Issuers).

"Euroclear": Euroclear Clearance System.

"Event of Default": The meaning specified in Section 5.1 (Events of Default).

"Excepted Advances": Customary advances made to protect or preserve rights against the borrower of or obligor under a Collateral Obligation or to indemnify an agent or representative for lenders pursuant to the Underlying Instrument.

"Excess CCC/Caa Adjustment Amount": As of any date of determination, an amount equal to the excess, if any, of (i) the Aggregate Principal Balance of all Collateral Obligations included in the CCC/Caa Excess, over (ii) the sum of the Market Values of all Collateral Obligations included in the CCC/Caa Excess.

"Excess Weighted Average Fixed Coupon": As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Fixed Coupon over the Minimum Fixed Coupon multiplied by (b) an amount equal to (i) the Aggregate Principal Balance of all fixed rate Collateral Obligations divided by (ii) the Aggregate Principal Balance of all floating rate Collateral Obligations.

"Excess Weighted Average Floating Spread": As of any date of determination, an amount equal to: (a) the excess, if any, of the Weighted Average Floating Spread over the Minimum Floating Spread multiplied by an amount equal to the Aggregate Principal Balance of all floating rate Collateral Obligations as of such date of determination *divided by* (b) the Aggregate Principal Balance of all fixed rate Collateral Obligations.

"Exchange": The meaning specified in Section 13.4 (Exchange of Combination Notes).

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Notice": The meaning specified in Section 13.4 (Exchange of Combination Notes).

"Expense Reserve Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"FATCA": Sections 1471 through 1474 of the Code and any current or future regulations, published guidance or official interpretations thereof.

"Federal Reserve Board": The Board of Governors of the Federal Reserve System.

"Fee Basis Amount": As of any date of determination, the sum of (a) the Collateral Principal Amount (including all Collateral Obligations held by an ETB Subsidiary) and (b) the Aggregate Principal Amount of all Defaulted Obligations.

"Financial Asset": The meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statements": The meaning specified in Section 9-102(a)(39) of the UCC.

"Foreign Financial Institution": A non-U.S. entity that (i) accepts deposits in the ordinary course of a banking or similar business; (ii) as a substantial portion of its business, holds financial assets for the accounts of others; or (iii) is engaged (or holds itself out as being engaged) primarily in the business of investing, reinvesting, or trading in securities, partnership interests, commodities, or any interest (including a futures or forward contract or option) in such securities, partnership interests, or commodities.

"GAAP": The meaning specified in Section 6.3(j) (Certain Rights of the Trustee).

-30-

"Global Notes":  Any Regulation S Global Notes or Rule 144A Global Notes.

"Global Rating Agency Condition":  With respect to any action taken or to be taken by or on behalf of the Issuer, satisfaction of both the Moody's Rating Condition (to the extent applicable) and the S&P Rating Condition (to the extent applicable).

"Grant":  To grant, bargain, sell, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over and confirm.  A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including, the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Pledged Obligations, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Hedge Account":  Any trust account established pursuant to Section 10.5 (Hedge Accounts).

"Hedge Agreements":  Any interest rate cap, interest rate swap or similar swap agreement between the Issuer and any Hedge Counterparty, as amended from time to time, and any replacement agreement entered into pursuant to Section 15.2 (Assignment of Hedge Agreement).

"Hedge Counterparty":  Any one or more institutions entering into or guaranteeing a Hedge Agreement with the Issuer.

"High-Yield Bonds":  Below investment-grade corporate high-yield debt securities issued by Non-Emerging Market Obligors.

"Holder":  With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"Holder FATCA Information":  Information and documentation requested by the Issuer (or an authorized agent acting on behalf of the Issuer) to be provided by the Noteholder to the Issuer (or an authorized agent acting on behalf of the Issuer) that is required to enable the Issuer to comply with FATCA.

"Incentive Management Fee":  A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in amount equal to (1) 20% of the remaining Interest Proceeds, if any, available for payment pursuant to Section 11.1(a)(i)(Z) (Disbursements of Monies from Payment Account), (2) 20% of the remaining Principal Proceeds, if any, available for payment pursuant to Section 11.1(a)(ii)(N) (Disbursements of Monies from Payment Account) and (3) 20% of the remaining amounts, if any, available for payment pursuant to Section 11.1(a)(iii)(T) (Disbursements of Monies from Payment Account).

"Incentive Management Fee Threshold":  The threshold that will be satisfied on any Payment Date if the Subordinated Notes have received an annualized internal rate of return (computed using the "XIRR" function in Microsoft® Excel or an equivalent function in another software package) of at least 12.0% on the Subordinated Notes Invested Amount (as defined in the Portfolio Management Agreement) as of the current Payment Date (after giving effect to all payments made or to be made on such Payment Date).  The annualized rate of return will be calculated based on the distributions made on the Subordinated Notes issued on the Closing Date, and without taking into account distributions made on any additional Subordinated Notes issued after the Closing Date.

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent":  As to any Person, any other Person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member thereof, or an investment bank and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person and (ii) is not connected with such Person as an Officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions.  "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

"Index Maturity":  With respect to any Class of Secured Notes, the period indicated with respect to such Class in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Information Agent":  The Collateral Administrator.

"Initial Rating":  With respect to any Class of Secured Notes, the rating or ratings, if any, indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).  The Initial Rating by S&P of the Combination Note is with respect to the ultimate repayment of principal and interest at a rate of LIBOR plus 1.227% per annum by the Stated Maturity.

"Institutional Accredited Investor":  An Accredited Investor under Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"Instrument":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Accrual Period":  The period from and including the Closing Date to but excluding the first Payment Date, and each succeeding period from and including each Payment Date to but excluding the following Payment Date until the principal of the Secured Notes is paid or made available for payment.

"Interest Collection Subaccount":  The meaning specified in Section 10.2(a) (Collection Account).

-32-

"Interest Coverage Ratio":  With respect to any designated Class or Classes of Secured Notes, as of any date of determination, an amount, expressed as a percentage, equal to:

(a)    (i) the Collateral Interest Amount as of such date of determination minus (ii) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clauses (A) through (C) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account); divided by

(b)    (i) amounts payable (or expected as of the date of determination to be payable) on the following Payment Date as set forth in clause (D) and, with respect to the Deferred Interest Notes, clause (H) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) plus (ii) interest due and payable on the Secured Notes of such Class or Classes and each Priority Class and Pari Passu Class (excluding any Deferred Interest but including any interest on Deferred Interest with respect to any such Classes) on such Payment Date.

"Interest Coverage Test":  A test that is satisfied with respect to any specified Class or Classes of Secured Notes if, as of any date of determination at, or subsequent to, the Determination Date with respect to the second Payment Date, the Interest Coverage Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes.

"Interest Determination Date":  The second London Banking Day preceding the first day of each Interest Accrual Period.

"Interest Only Security":  Any obligation or security that does not provide in the related Underlying Instruments for the payment or repayment of a stated principal amount in one or more installments on or prior to its stated maturity.

"Interest Proceeds":  With respect to any Collection Period or Determination Date, without duplication, the sum of: (i) all payments of interest received by the Issuer during the related Collection Period on the Collateral Obligations and Eligible Investments, including the accrued interest received in connection with a sale thereof during the related Collection Period, less (x) any such amount that represents Principal Financed Accrued Interest and (y) an amount designated by the Portfolio Manager in writing up to the amount of unpaid interest on the Collateral Obligations that accrued prior to the Closing Date and is owing to the Issuer and remains unpaid as of the Closing Date; (ii) all principal and interest payments on Eligible Investments purchased with Interest Proceeds; (iii) excluding amounts that comprise the Turbo Payment Amount, all amendment and waiver fees, late payment fees and other fees, except for any fee in connection with (a) the lengthening of the maturity of the related Collateral Obligation or (b) the reduction of the par of the related Collateral Obligation; (iv) any amounts deposited in the Interest Collection Subaccount of the Collection Account from the Expense Reserve Account pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (v) commitment fees and other similar fees actually received by the Issuer during such Collection Period in respect of Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations; (vi) any payment received with respect to any Hedge Agreement other than an upfront payment received upon entering into such

Hedge Agreement or a payment received as a result of the termination of such Hedge Agreement (for this purpose, any such payment received or to be received on a Payment Date will be deemed received in respect of the preceding Collection Period and included in the calculation of Interest Proceeds received in such Collection Period); (vii) any funds transferred from the Ramp-up Account to the Interest Collection Subaccount of the Collection Account designated as Interest Proceeds by the Portfolio Manager to the Trustee in writing pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account); (viii) Principal Proceeds designated by the Portfolio Manager, on one occasion only, as Designated Principal Proceeds to be treated as Interest Proceeds after the Effective Date and on or prior to the second Determination Date and (ix) any amount deposited in the Interest Collection Subaccount of the Collection Account from the Interest Reserve Account pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account);

provided that any amounts received in respect of any Defaulted Obligation will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Defaulted Obligation since it became a Defaulted Obligation equals the outstanding Principal Balance of such Collateral Obligation when it became a Defaulted Obligation; provided, further, that any amounts received in respect of any Deferring Security will constitute Principal Proceeds (and not Interest Proceeds) until the aggregate of all collections in respect of such Deferring Security since it became a Deferring Security equals the outstanding Principal Balance of such Collateral Obligation (including any deferred or capitalized interest) when it became a Deferring Security, and thereafter any amounts received shall constitute Interest Proceeds. Any amounts received that comprise the Turbo Payment Amount shall constitute Principal Proceeds (and not Interest Proceeds).

With respect to any Payment Date, an amount equal to the Interest Proceeds due to the Consenting Holders of the Subordinated Notes that are paid in the form of Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) (Application of Moneys) will be treated for all purposes by the Issuer and the Trustee as Principal Proceeds.

"Interest Reinvestment Test": A test that will be satisfied on any Determination Date during the Reinvestment Period if the Adjusted Collateral Principal Amount *divided by* the Aggregate Outstanding Amount of the Secured Notes equals or exceeds 103.9%.

"Interest Reserve Account": The non-interest bearing segregated trust account established pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Investment Company Act": The Investment Company Act of 1940, as amended from time to time.

"Investment Criteria": The criteria specified in Section 12.2(a) (Purchase of Additional Collateral Obligations).

NEWYORK 8715474 (2K)

"Investment Criteria Adjusted Balance": With respect to each Collateral Obligation, the Principal Balance of such Collateral Obligation; provided that for all purposes the Investment Criteria Adjusted Balance of any:

(i)     Deferring Security will be the lesser of the (x) S&P Collateral Value of such Deferring Security and (y) Moody's Collateral Value of such Deferring Security;

(ii)     Discount Obligation will be the original purchase price (expressed as a percentage of par) multiplied by the current principal balance, excluding accrued interest, expressed as a dollar amount;

(iii)     CCC Collateral Obligations and Caa Collateral Obligations included in the CCC/Caa Excess will be the Market Value of such Collateral Obligation; and

(iv)     Defaulted Obligation will be the lesser of (x) the Moody's Collateral Value of such Defaulted Obligations and (y) the S&P Collateral Value for such Defaulted Obligations; provided, that any such Defaulted Obligation that has constituted a Defaulted Obligation for a period of at least 3 years shall be deemed to have an Investment Criteria Adjusted Balance of zero;

provided further, that if any Collateral Obligation would be subject to more than one of clauses (i) through (iv) of this definition of "Investment Criteria Adjusted Balance," such Collateral Obligation shall, for the purposes of this definition, be treated as belonging to the clause that results in the lowest Investment Criteria Adjusted Balance.

"Irish Listing Agent": The meaning specified in Section 7.2 (Maintenance of Office or Agency).

"IRS": The U.S. Internal Revenue Service.

"IRS Agreement": An agreement entered into by a Foreign Financial Institution and the IRS pursuant to FATCA.

"Issuer": The Person named as such on the first page of this Indenture until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Notes": The Class E Notes, the Class F Notes and the Subordinated Notes.

"Issuer Order" and "Issuer Request": A written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer thereof, on behalf of the Issuer.

"Junior Class": With respect to a particular Class of Notes, each Class of Notes that is subordinated to such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Knowledgeable Employee":  The meaning set forth in Rule 3c-5 promulgated under the Investment Company Act.

"LIBOR":  The meaning set forth in Exhibit G hereto, provided, that LIBOR for the Interest Accrual Period beginning on the Closing Date shall be 0.33110% for each Class of Notes.

"LIBOR Floor Obligation":  As of any date of determination, a floating rate Collateral Obligation (a) the interest in respect of which is paid based on a London interbank offered rate and (b) that provides that such London interbank offered rate is (in effect) calculated as the greater of (i) a specified "floor" rate per annum and (ii) the London interbank offered rate for the applicable interest period for such Collateral Obligation.

"Loan Pricing Change":  With respect to a loan, the change in price of such loan (expressed as a percentage of par) relative to the S&P/LSTA U.S. Leveraged Loan 100 Index or any other nationally recognized index as calculated by the Portfolio Manager in its reasonable commercial judgment.

"London Banking Day":  A day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Majority":  With respect to any Class of Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Notes of such Class.

"Management Fees":  The Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee.

"Margin Loan":  An extension of credit that is "purpose credit" within the meaning of Regulation U issued by the Federal Reserve Board.

"Margin Stock":  "Margin Stock" as defined under Regulation U issued by the Federal Reserve Board, including any debt security which is by its terms convertible into "Margin Stock."

"Market Value":  As of any date of determination for any Collateral Obligation and as determined by the Portfolio Manager in the following manner: (A) the average bid price value determined by an Independent pricing service; (B) if the price described in clause (A) is not available, the average of the bid side prices determined by three Independent broker-dealers active in the trading of such Collateral Obligation; (C) if a price or bid described in clause (A) or (B) is not available, the lowest of the bid side prices determined by two Independent broker-dealers active in the trading of such Collateral Obligation; (D) if a price or bid described in clause (A), (B) or (C) is not available and the Portfolio Manager is a Registered Investment Advisor, the bid side price determined by one Independent broker-dealer active in the trading of such Collateral Obligation; or (E) if a price or bid described in clause (A), (B), (C) or (D) is not available, then the lower of (a) the bid side price of such Collateral Obligation determined by the Portfolio Manager in a manner consistent with reasonable and customary market practice and (b) the greater of (i) 70% of the par value of such Collateral Obligation and (ii) the S&P Recovery Rate; provided, however, that (x) if the Market Value of any Collateral Obligation is

determined pursuant to clause (E) above, the Portfolio Manager will use commercially reasonable efforts to obtain the Market Value of such Collateral Obligation in accordance with subclauses (A) through (D) above and (y) if the Portfolio Manager is not a Registered Investment Adviser, the Market Value of any Collateral Obligation that cannot be obtained in accordance with subclauses (A) through (D) above within 30 days of the date on which its Market Value was determined pursuant to clause (E) above shall be deemed to be zero until determined in accordance with subclauses (A) through (D) above; provided, further, that any bid side price determined by the Portfolio Manager pursuant to clause (E)(a) above shall be used by the Portfolio Manager as the market value of such Collateral Obligation in all other portfolios it manages.

"Material Change": With respect to clause (ii)(b) of the definition of S&P Rating and Schedule 5, an event that occurs with respect to a Collateral Obligation upon the occurrence of any of the following (a) non-payment of interest or principal, (b) the rescheduling of any interest or principal, (c) any material covenant breach, (d) any restructuring of debt with respect to the obligor of such Collateral Obligation, (e) the addition of payment-in-kind terms, change in maturity date or any change in coupon rates and (f) the occurrence of the significant sale or acquisition of assets by the obligor.

"Maturity": With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"Maturity Amendment": As defined in Section 12.4 (Post-Reinvestment Period Amendment Proceeds).

"Maximum Moody's Rating Factor Test": A test that will be satisfied on any date of determination if the Weighted Average Moody's Rating Factor of the Collateral Obligations is less than or equal to the "Maximum Weighted Average Moody's Rating Factor" as determined in the applicable Minimum Diversity/Maximum Rating/Minimum Spread Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations) plus the Rating Factor Adjustment Amount.

"Measurement Date": Means (i) any day on which a sale, a purchase or a default of a Collateral Obligation occurs, (ii) any Determination Date, (iii) the date as of which the information in any Monthly Report is calculated, (iv) with five Business Days prior notice, any Business Day requested by either Rating Agency and (v) the last day of the Ramp-up Period.

"Memorandum and Articles": The Issuer's Memorandum and Articles of Association, as they may be amended, revised or restated from time to time.

"Merging Entity": As defined in Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms).

"Minimum Diversity/Maximum Rating/Minimum Spread Matrix": The following chart is used to determine which of the tables and "row/column combinations" are applicable for

purposes of determining compliance with the Moody's Diversity Test, the Maximum Moody's Rating Factor Test and the Minimum Floating Spread Test, as set forth in Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations). The number obtained for the applicable table and "row/column combinations" shall be the "Maximum Weighted Average Moody's Rating Factor".

| Matrix | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Minimum Diversity Score** | | | | | | |
| **Minimum Weighted Average Spread** | **40** | **45** | **50** | **55** | **60** | **65** | **70** |
| 3.05% | 2265 | 2335 | 2395 | 2480 | 2575 | 2645 | 2705 |
| 3.15% | 2295 | 2355 | 2420 | 2510 | 2600 | 2680 | 2740 |
| 3.25% | 2325 | 2385 | 2450 | 2545 | 2630 | 2710 | 2770 |
| 3.35% | 2350 | 2420 | 2480 | 2570 | 2660 | 2740 | 2800 |
| 3.45% | 2380 | 2450 | 2510 | 2600 | 2690 | 2770 | 2830 |
| 3.55% | 2410 | 2475 | 2540 | 2630 | 2720 | 2800 | 2855 |
| 3.65% | 2440 | 2500 | 2565 | 2660 | 2755 | 2825 | 2885 |
| 3.75% | 2465 | 2530 | 2585 | 2690 | 2780 | 2855 | 2915 |
| 3.85% | 2490 | 2560 | 2600 | 2720 | 2805 | 2885 | 2945 |
| 3.95% | 2520 | 2590 | 2640 | 2750 | 2835 | 2915 | 2975 |
| 4.05% | 2550 | 2610 | 2680 | 2780 | 2865 | 2940 | 3005 |
| 4.15% | 2580 | 2635 | 2705 | 2800 | 2890 | 2970 | 3035 |
| 4.25% | 2605 | 2665 | 2735 | 2825 | 2920 | 2995 | 3060 |
| 4.35% | 2630 | 2700 | 2765 | 2855 | 2950 | 3025 | 3090 |
| 4.45% | 2655 | 2730 | 2795 | 2885 | 2975 | 3055 | 3115 |
| 4.55% | 2680 | 2750 | 2815 | 2910 | 3000 | 3080 | 3140 |
| 4.65% | 2700 | 2775 | 2840 | 2940 | 3025 | 3105 | 3170 |
| 4.75% | 2730 | 2800 | 2870 | 2965 | 3055 | 3130 | 3195 |
| 4.85% | 2760 | 2830 | 2900 | 2995 | 3080 | 3160 | 3220 |
| 4.95% | 2785 | 2860 | 2925 | 3020 | 3105 | 3185 | 3250 |
| 5.05% | 2815 | 2890 | 2945 | 3040 | 3130 | 3210 | 3275 |

"Minimum Fixed Coupon": 7.25%.

"Minimum Fixed Coupon Test": A test that is satisfied on any date of determination if the Weighted Average Fixed Coupon plus the Excess Weighted Average Floating Spread equals or exceeds the Minimum Fixed Coupon.

"Minimum Floating Spread": As of any date of determination, the greater of (i) the number set forth in the column entitled "Minimum Weighted Average Spread" in the applicable table within the definition of Minimum Diversity/Maximum Rating/Minimum Spread Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations) and (ii) the number set forth in the column entitled "Minimum Weighted Average Floating Spread" in the applicable S&P Test Matrix, in each case, as applicable on such date of determination.

"Minimum Floating Spread Test": A test that is satisfied on any date of determination if (a) the sum of (i) the Weighted Average Floating Spread and (ii) the Excess Weighted Average Fixed Coupon equals or exceeds (b) the Minimum Floating Spread.

-38-

"Minimum Weighted Average Moody's Recovery Rate": Means 44.0%.

"Minimum Weighted Average Moody's Recovery Rate Test": The test that will be satisfied on any date of determination if the Weighted Average Moody's Recovery Rate equals or exceeds the Minimum Weighted Average Moody's Recovery Rate.

"Minimum Weighted Average S&P Recovery Rate Test": For each Class of Secured Notes then Outstanding, a test that will be satisfied as of any Measurement Date if the Weighted Average S&P Recovery Rate equals or exceeds the S&P Recovery Rate determined by reference to the S&P Test Matrix based upon the applicable row/column combination chosen by the Portfolio Manager.

"Money": The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report": The meaning specified in Section 10.7(a) (Accountings).

"Moody's": Moody's Investors Service, Inc., and its successors in interest.

"Moody's Collateral Value": As of any date of determination, with respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the Moody's Recovery Amount of such Defaulted Obligation or Deferring Security as of such date and (ii) the Market Value of such Defaulted Obligation or Deferring Security as of such date.

"Moody's Counterparty Criteria": With respect to any Participation Interest proposed to be acquired by the Issuer or any Pre-funded Letter of Credit, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with Selling Institutions that have the same or a lower Moody's credit rating does not exceed the "Aggregate Percentage Limit" set forth below for such Moody's credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with any single Selling Institution that has the same or lower Moody's credit rating does not exceed the "Individual Percentage Limit" set forth below for such Moody's credit rating:

| Moody's Credit Rating of Selling Institution (at or below) | Aggregate Percentage Limit | Individual Percentage Limit |
|---|---|---|
| Aaa | 20% | 20% |
| Aa1 | 20% | 10% |
| Aa2 | 20% | 10% |
| Aa3 | 15% | 10% |
| A1 | 10% | 5% |

-39-

| A2* and "P-1"<br><br>* and not on Watch for Possible Downgrade. | 5% | 5% |
|---|---|---|
| A2 but not "P-1"; Less than A2; or A2 and "P-1," but on Watch for Possible Downgrade | 0% | 0% |

provided, that the Moody's Counterparty Criteria will be deemed satisfied in connection with the Issuer's acquisition of a Participation Interest or a Pre-funded Letter of Credit from a Selling Institution that meets the criteria in the last row of the table above if the Moody's Rating Condition has been satisfied.

"Moody's Default Probability Rating"": With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Derived Rating"": With respect to any Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating cannot otherwise be determined pursuant to the definitions thereof, the rating determined for such Collateral Obligation as set forth in Schedule 5 hereto.

"Moody's Diversity Test"": A test that will be satisfied on any date of determination if the Diversity Score (rounded up to the nearest whole number) equals or exceeds the number set forth in the column entitled "Minimum Diversity Score" in the applicable Minimum Diversity/Maximum Rating/Minimum Spread Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (with notice to the Collateral Administrator) (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) in accordance with Section 7.18(f) (Ramp-up Period; Purchase of Additional Collateral Obligations).

"Moody's Industry Classification"": The industry classifications set forth in Schedule 2 hereto, as such industry classifications shall be updated at the option of the Portfolio Manager (with notice to the Collateral Administrator) if Moody's publishes revised industry classifications.

"Moody's Non-Senior Secured Loan"": Any assignment of or Participation Interest in or other interest in a loan that is not a Moody's Senior Secured Loan.

"Moody's Outlook/Review Rules"": For any Collateral Obligation that is placed on negative outlook or on review for upgrade or downgrade (A) the rating otherwise determined in accordance with the definition of Moody's Default Probability Rating, Moody's Derived Rating or Moody's Rating for the purposes of calculating Moody's Weighted Average Rating Factor shall be adjusted as follows: (i) for any Collateral Obligation that is placed on negative outlook, such rating shall be adjusted downward one notch, (ii) for any Collateral Obligation that is placed on review for possible downgrade, such rating shall be adjusted downward two notches and (iii) for any Collateral Obligation that is placed on review for possible upgrade, such rating

-40-

shall be adjusted upward one notch and (B) the rating otherwise determined in accordance with the definition of Moody's Default Probability Rating, Moody's Derived Rating or Moody's Rating for all other purposes shall be adjusted as follows: (i) for any Collateral Obligation that is placed on review for possible downgrade, such rating shall be adjusted downward one notch and (ii) for any Collateral Obligation that is placed on review for possible upgrade, such rating shall be adjusted upward one notch.

"Moody's Rating": With respect to any Collateral Obligation, the rating determined pursuant to Schedule 5 hereto.

"Moody's Rating Condition": With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if Moody's has confirmed in writing (which confirmation may be in the form of a press release) to the Issuer, the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by Moody's of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes will occur as a result of such action; *provided, that* the Moody's Rating Condition will (x) be satisfied if any Class of Secured Notes that receives a solicited rating requested by the Issuer from Moody's are not Outstanding or rated by Moody's or (y) not be required if Moody's makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the Moody's Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

"Moody's Rating Factor": For each Collateral Obligation, the "Moody's Rating Factor" is the number set forth in the table below opposite the Moody's Default Probability Rating of such Collateral Obligation.

| Moody's Default Probability Rating | Moody's Rating Factor | Moody's Default Probability Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

For purposes of the Maximum Moody's Rating Factor Test, any Collateral Obligation issued or guaranteed by the United States government or any agency or instrumentality thereof is assigned a Moody's Rating Factor set forth opposite the then-current rating of full faith and credit obligations of the federal government of the United States.

"Moody's Recovery Amount": With respect to any Collateral Obligation which is a Defaulted Obligation or a Deferring Security, the amount equal to the product of (i) the

NEWYORK 8715474 (2K)

applicable Moody's Recovery Rate and (ii) the principal balance of such Defaulted Obligation or Deferring Security.

"Moody's Recovery Rate":  With respect to any loan or Bond, as of any date of determination, will be the recovery rate determined in accordance with the following, in the following order of priority:

(a)      if the loan or Bond has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate;

(b)      if the preceding clause does not apply to the loan or Bond (other than a DIP Collateral Obligation), as the case may be, and the loan is a Moody's Senior Secured Loan or a Moody's Non-Senior Secured Loan or, in the case of a Bond, the rate determined pursuant to the table below based on the number of rating subcategories difference between the loan's or Bond's Moody's Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Ratings Subcategories Difference Between the Moody's Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non-Senior Secured Loans | Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 35.0% | 35.0% |
| +1 | 50.0% | 30.0% | 30.0% |
| 0 | 45.0% | 25.0% | 25.0% |
| -1 | 40.0% | 10.0% | 10.0% |
| -2 | 30.0% | 5.0% | 5.0% |
| -3 or less | 20.0% | 0.0% | 0.0% |

(c)      if the loan is a DIP Collateral Obligation, 50%.

"Moody's Senior Secured Loan":  The meaning specified in Schedule 5.

"Moody's Weighted Average Fixed Coupon":  As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), equal to: (i) the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Securities), of an amount equal to the product of (a) the interest coupon of such Collateral Obligation multiplied by (b) the Principal Balance of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

"Moody's Weighted Average Floating Spread":  As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), obtained by

-42-

calculating the sum of: (w) in the case of each floating rate Collateral Obligation (excluding Deferring Securities, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations), the aggregate interest on such Collateral Obligation over LIBOR <u>multiplied by</u> the outstanding Principal Balance of such Collateral Obligation as of such date, (x) in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (i) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation <u>multiplied by</u> the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (ii) the aggregate interest on such Collateral Obligation over LIBOR <u>multiplied by</u> the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (<u>provided</u> that letter of credit fees shall be excluded for all purposes), and (y) the Aggregate Excess Spread; and <u>dividing</u> such sum by the lesser of (i) the Target Initial Par Amount <u>minus</u> the Aggregate Principal Balance of all fixed rate Collateral Obligations as of such date of determination and (ii) the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination. For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index (or, in the case of a Pre-funded Letter of Credit, the applicable rate of interest on the deposited amount) over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the Underlying Instruments relating to such Step-down Obligation and (4) with respect to any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date.

"<u>Non-Call Period</u>": The period from the Closing Date to but excluding the Payment Date in April 2015.

"<u>Non-Compliant FFI</u>": A Foreign Financial Institution that holds a debt or equity interest in the Issuer and that may be subject to U.S. federal income tax, including withholding tax, under FATCA as a result of not entering into an IRS Agreement.

"<u>Non-Emerging Market Obligor</u>": An Obligor that is Domiciled either in (x) the United States or (y) any country that has a country ceiling for foreign currency bonds of at least "<u>Aa2</u>" by Moody's and a foreign currency issuer credit rating of at least "<u>AA</u>" by S&P.

"<u>Non-Permitted ERISA Holder</u>": As defined in <u>Section 2.12(d)</u> (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Permitted Holder":  As defined in Section 2.12(b) (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations).

"Non-Quarterly Assets":  Collateral Obligations (other than Deferrable Securities) that pay interest less frequently than quarterly, but no less frequently than annually.

"Note Interest Amount":  With respect to any specified Class of Secured Notes and any Payment Date, the amount of interest for the next Interest Accrual Period payable in respect of each U.S. $100,000 principal amount of such Class of Secured Notes.

"Note Interest Rate":  With respect to any specified Class of Secured Notes, the per annum interest rate payable on the Secured Notes of such Class with respect to each Interest Accrual Period equal to LIBOR for such Interest Accrual Period plus the spread specified in Section 2.3 (Authorized Amount; Stated Maturity; Denominations) with respect to such Notes. The Combination Notes will bear interest at the Note Interest Rates of the Underlying Classes.

"Note Payment Sequence":  The application, in accordance with the Priority of Payments, of Interest Proceeds or Principal Proceeds, as applicable, in the following order:

(i)    to the payment, *pro rata* based upon amounts due, of (1) principal of the Class X Notes, (2) principal of the Class A-1 Notes and (3) subject to Section 11.2 (Payments on the Class A-2 Notes and the Combination Notes), principal of the Class A-2 Notes until each is paid in full;

(ii)    [RESERVED];

(iii)    to the payment of principal of the Class B Notes until the Class B Notes have been paid in full;

(iv)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(v)    to the payment of principal of the Class C Notes until the Class C Notes have been paid in full;

(vi)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(vii)    to the payment of principal of the Class D Notes until the Class D Notes have been paid in full;

(viii)    to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(ix)    to the payment of principal of the Class E Notes until the Class E Notes have been paid in full;

-44-

(x)     to the payment of accrued and unpaid interest and any Deferred Interest on the Class F Notes until such amounts have been paid in full; and

(xi)     to the payment of principal of the Class F Notes until the Class F Notes have been paid in full.

"<u>Noteholder</u>":  With respect to any Note, the Person whose name appears on the Register as the registered holder of such Note.

"<u>Noteholder Reporting Obligations</u>":  The meaning specified in <u>Section 2.13(c)</u> (Tax Purposes).

"<u>Notes</u>":  Collectively, the Secured Notes and the Subordinated Notes authorized by, and authenticated and delivered under, this Indenture (as specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations)) or any supplemental indenture (and including any Additional Subordinated Notes issued hereunder pursuant to <u>Section 2.4</u> (Additional Notes)).

"<u>Obligor</u>":  The issuer of a Bond or the obligor or guarantor under a loan, as the case may be.

"<u>Offer</u>":  As defined in <u>Section 10.8(c)</u> (Release of Securities).

"<u>Offered Securities</u>":  The Notes.

"<u>Offering</u>":  The offering of the Offered Securities pursuant to the Offering Circular.

"<u>Offering Circular</u>":  The offering circular, dated March 12, 2013 relating to the Offered Securities, including the supplements thereto.

"<u>Officer</u>":  With respect to the Issuer, the Co-Issuer and any corporation, any director, the Chairman of the Board of Directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity or any Person authorized by such entity; with respect to any partnership, any general partner thereof or any Person authorized by such entity; with respect to a limited liability company, any member thereof or any Person authorized by such entity; and with respect to the Trustee, any Bank Officer.

"<u>offshore transaction</u>":  The meaning specified in Regulation S.

"<u>Opinion of Counsel</u>":  A written opinion addressed to the Trustee and any Rating Agency requesting such opinion, in form and substance reasonably satisfactory to the Trustee and such Rating Agency, of a nationally recognized law firm (or, in the case of an opinion relating to the laws of the Cayman Islands, an attorney at law admitted to practice before the highest court of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer or the Co-Issuer, as the case may be, and which firm or attorney, as the case may be, shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on

opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee and any Rating Agency requesting such opinion or shall state that the Trustee and such Rating Agency shall be entitled to rely thereon.

"Optional Redemption":  A redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing).

"Outstanding":  With respect to the Notes of any specified Class, as of any date of determination, all of the Notes or all of the Notes of such Class, as the case may be, theretofore authenticated and delivered under this Indenture, except:

(i)     Notes theretofore canceled by the Registrar or delivered to the Registrar for cancellation in accordance with Section 2.10 (Cancellation);

(ii)     Notes or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes pursuant to Section 4.1(a)(ii) (Satisfaction and Discharge of Indenture); provided, that if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a "protected purchaser" (within the meaning of Section 8-303 of the UCC); and

(iv)     Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note);

provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, (I)  Notes owned by the Issuer, the Co-Issuer or any other obligor upon the Notes shall be disregarded and deemed not to be Outstanding and (only in the case of a vote to remove or replace the Portfolio Manager and not, for the avoidance of doubt, in the case of a vote to propose or approve a successor Portfolio Manager), Notes owned by the Portfolio Manager, any Affiliate of the Portfolio Manager or any accounts or funds managed by the Portfolio Manager or its Affiliates, shall be disregarded and deemed not to be Outstanding (it being understood that Notes owned by a fund or an account managed by the Portfolio Manager or its Affiliates will not be disregarded and will be deemed to be Outstanding if the voting rights with respect to such Notes are exercised by the fund or account or client or beneficiary of such fund or account and not by the Portfolio Manager or its Affiliate), except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded and (II) Notes so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the

-46-

satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Issuer, the Co-Issuer, any other obligor upon the Notes, the Portfolio Manager or any Affiliate of the Portfolio Manager.

"Overcollateralization Ratio": With respect to any specified Class or Classes of Secured Notes (excluding the Class X Notes) as of any Measurement Date, an amount, expressed as a percentage, equal to: (i) the Adjusted Collateral Principal Amount divided by (ii) the Aggregate Outstanding Amount of the Secured Notes of such Class or Classes, and each Priority Class of Secured Notes (excluding the Class X Notes) and each Pari Passu Class of Secured Notes (other than the Class X Notes) (including all applicable Deferred Interest), in each case, if applicable.

"Overcollateralization Ratio Test": A test that is satisfied with respect to any Class or Classes of Secured Notes as of any date of determination at, or subsequent to, the Effective Date, if (i) the Overcollateralization Ratio for such Class or Classes is at least equal to the applicable Required Coverage Ratio for such Class or Classes or (ii) such Class or Classes of Secured Notes are no longer Outstanding. For the avoidance of doubt, the Class X Notes shall not be included for the purposes of calculating any Overcollateralization Ratio Test.

"Pari Passu Class": With respect to each Class of Notes, each Class of Notes that ranks pari passu with such Class, as indicated in Section 2.3 (Authorized Amount; Stated Maturity; Denominations).

"Partial Deferrable Security": Any Collateral Obligation with respect to which under the related Underlying Instruments (i) a portion of the interest due thereon is required to be paid in Cash on each payment date therefor and is not permitted to be deferred or capitalized (which portion will at least be equal to (A) in the case of floating rate assets, (x) LIBOR plus (y) 0.50% and (B) in the case of fixed rate assets, 4.00%) and (ii) the issuer thereof or obligor thereon may defer or capitalize the remaining portion of the interest due thereon. Any component of a Partial Deferrable Security that is paid "in kind" shall not be included for purposes of calculations related to the Minimum Floating Spread Test, the Weighted Average Fixed Coupon or the Weighted Average Floating Spread.

"Participation Interest": A participation interest in a loan that at the time of acquisition is represented by a contractual obligation of a Selling Institution that has at the time of acquisition (i) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or (ii) a long-term debt rating of at least "A+" by S&P. Such Selling Institution must directly hold or own the relevant portion of the loan underlying such participation interest, and the Issuer may not acquire a participation interest in a participation.

"Paying Agent": Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2 (Maintenance of Office or Agency).

"Payment Account": The non-interest bearing segregated payment account established pursuant to Section 10.3(a) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Payment Date":  The 18th day of January, April, July and October of each year, commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day).

"PBGC":  The United States Pension Benefit Guaranty Corporation.

"Permissible Ratio":  The ratio set forth under the heading "Permissible Ratio" in the Combination Notes Table; provided that, a Holder may round any of the fractional percentages set forth in this definition either up or down to the extent necessary to cause an Exchange to comply with the $1 integral multiple requirement.

"Permitted Offer":  An offer (i) pursuant to the terms of which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange for consideration consisting solely of Cash, other Eligible Investments and/or other Collateral Obligations in an amount equal to or greater than the full face amount of such debt obligation plus any accrued and unpaid interest and (ii) as to which the Portfolio Manager has determined in its judgment that the offeror has sufficient access to financing to consummate the offer.

"Person":  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"Petition Expense Amount":  An aggregate sum (until the Notes are paid in full or until this Indenture is otherwise terminated, in which case it will equal zero) of $1,000,000.

"Petition Expenses":  The costs and expenses (including, without limitation, fees and expenses of counsel to the Issuer) incurred by the Issuer in connection with its obligations described in Section 7.21 (Objection to Bankruptcy Proceeding); provided, that such amounts will be payable in accordance with the Priority of Payments as Administrative Expenses, applied first as Petition Expense Amount, and then subject to the Administrative Expense Cap as set forth in the Priority of Payments.  Such Petition Expenses may only be paid to the extent such payment would not directly result in the failure to pay any principal or interest due on the Class X Notes, the Class A Notes, the Class B Notes or the Class C Notes.

"Placement Agency Agreement":  The agreement dated as of March 18, 2013 by and among the Co-Issuers and the Placement Agents relating to the initial placement of the Notes.

"Placement Agents":  GreensLedge Capital Markets LLC and Cantor Fitzgerald & Co. in their capacity as a placement agent under the Placement Agency Agreement.

"Plan":  An employee benefit plan (as defined in Section 3(3) of ERISA that is subject to Title I of ERISA or a plan as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

"Pledged Obligations":  As of any date of determination, the Collateral Obligations, the Eligible Investments and any Equity Security which forms part of the Assets that have been Granted to the Trustee.

"Portfolio Management Agreement":  The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager relating to the Notes and the Assets, as amended from time to time, in accordance with the terms hereof and thereof.

"Portfolio Manager":  Acis Capital Management, L.P., a Delaware limited partnership, until a successor Person shall have become the Portfolio Manager pursuant to the provisions of the Portfolio Management Agreement, and thereafter "Portfolio Manager" shall mean such successor Person.

"Post-Reinvestment Period Amendment Proceeds": As defined in Section 12.4 (Post-Reinvestment Period Amendment Proceeds).

"Pre-funded Letter of Credit":  Any letter of credit facility that requires a lender party thereto to pre-fund in full its obligations thereunder, provided that any such lender (a) shall have no further funding obligation thereunder and (b) shall have a right to be reimbursed or repaid by the borrower its pro rata share of any draws on a letter of credit issued thereunder; provided, that the account into which the pre-funded amounts in respect of a letter of credit facility shall be deposited shall be a Pre-funded Letter of Credit Eligible Account at the time of such deposit.

"Pre-funded Letter of Credit Eligible Account":  Either (a) a segregated trust account maintained with the corporate trust department of a federal depository institution or state-chartered depository institution subject to regulation regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations Section 9.10(b), which, in either case, has corporate trust power, acting in its fiduciary capacity, which depository institution (x) has a long term senior unsecured debt rating of at least "Baa3" by Moody's and (y) to the extent any related trust account is holding cash, satisfies the ratings requirements specified in clause (b) or (b) an account maintained with an institution or trust company with (x) a long-term debt rating by S&P is at least "A" and whose short-term debt rating by S&P is at least "A-1" (or whose long-term debt rating is at least "A+" by S&P) and (y) a long-term senior unsecured debt rating of at least "A2" or a short-term credit rating of "P-1" by Moody's. If, in the case of clause (a) or (b), such institution's long-term debt rating or short-term credit rating falls below any such required rating, the assets held in the Pre-funded Letter of Credit Eligible Account shall be transferred within (x) 30 calendar days in the case of a failure to meet the required Moody's rating and (y) 60 calendar days in the case of a failure to meet the required S&P rating, in each case, to another institution that satisfies such rating requirements.

"Principal Balance":  Subject to Section 1.2 (Assumptions as to Pledged Obligations), with respect to (a) any Pledged Obligation other than a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Pledged Obligation (excluding any capitalized interest) and (b) any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, as of any date of determination, the outstanding principal amount of such Revolving Collateral Obligation

or Delayed Drawdown Collateral Obligation, <u>plus</u> (except as expressly set forth in this Indenture) any undrawn commitments that have not been irrevocably reduced with respect to such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation; <u>provided</u>, that for all purposes the Principal Balance of any Equity Security or Interest Only Security shall be deemed to be zero.

"<u>Principal Collection Subaccount</u>":  The meaning specified in <u>Section 10.2(a)</u> (Collection Account).

"<u>Principal Financed Accrued Interest</u>":  With respect to any Collateral Obligation purchased during and after the Ramp-up Period, an amount equal to the amount of Principal Proceeds, if any, applied towards the purchase of accrued interest on such Collateral Obligation.

"<u>Principal Proceeds</u>":  With respect to any Collection Period or Determination Date, all amounts received by the Issuer during the related Collection Period that do not constitute Interest Proceeds. For the avoidance of doubt, the proceeds from the issuance of Notes deposited in the Ramp-up Account and all Turbo Payment Amounts will be considered Principal Proceeds.

"<u>Priority Class</u>":  With respect to any specified Class of Notes, each Class of Notes that ranks senior to such Class, as indicated in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Priority Hedge Termination Event</u>":  The occurrence of (i) the Issuer's failure to make required payments or deliveries pursuant to a Hedge Agreement, (ii) certain events of bankruptcy, dissolution or insolvency with respect to the Issuer, (iii) the merger of the Issuer with or into another entity where such surviving entity fails to assume all obligations of the Issuer, (iv) a change in law after the Closing Date which makes it unlawful for the Issuer to perform its obligations under a Hedge Agreement, (v) an "Additional Termination Event" (as defined in such Hedge Agreement) with respect to the Issuer, (vi) the liquidation of the Assets due to an Event of Default under this Indenture or (vii) any termination described in <u>Section 15.2(b)</u> (Assignment of Hedge Agreement) hereof.

"<u>Priority of Payments</u>":  The meaning specified in <u>Section 11.1(a)</u> (Disbursements of Monies from Payment Account).

"<u>Proceeding</u>":  Any suit in equity, action at law or other judicial or administrative proceeding.

"<u>Proposed Portfolio</u>":  The portfolio of Collateral Obligations and Eligible Investments representing Principal Proceeds resulting from the proposed purchase, sale, maturity or other disposition of a Collateral Obligation or a proposed reinvestment in an additional Collateral Obligation, as the case may be.

"<u>QIB/QP</u>":  Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

"Qualified Institutional Buyer": The meaning specified in Rule 144A under the Securities Act.

"Qualified Purchaser": The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act.

"Quarterly Report": As defined in Section 10.7(d) (Accountings).

"Ramp-up Account": The non-interest bearing segregated account established pursuant to Section 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

"Ramp-up Period": The period commencing on the Closing Date and ending upon the earlier to occur of (a) July 18, 2013 and (b) the date selected by the Portfolio Manager and upon which the Issuer has satisfied the Target Initial Par Condition.

"Rating": The Moody's Rating and/or S&P Rating, as applicable.

"Rating Agency": Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to debt obligations, any other nationally recognized investment rating agency selected by the Issuer (or the Portfolio Manager on behalf of the Issuer) and reasonably satisfactory to at least a Majority of each Class rated by Moody's and/or S&P, as applicable; provided, that in either case, each of Moody's and S&P shall be a Rating Agency for purposes of this Indenture for only so long as an Outstanding Class of Secured Notes is rated by it. In the event that at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's published ratings for the type of obligation in respect of which such alternative rating agency is used; provided, that the S&P Rating Condition shall be satisfied in order to refer to equivalent categories of any such alternative rating agency whose published ratings for the type of obligation are required. In the event that at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and S&P published ratings for the type of obligation in respect of which such alternative rating agency is used.

"Rating Factor Adjustment Amount": As of any date of determination, an amount equal to the product of (i) the Recovery Rate Excess Amount and (ii) 60.

"Recalcitrant Holder": A beneficial owner of Notes that fails to comply with the Noteholder Reporting Obligations and is thereafter designated by the Issuer or the Portfolio Manager on behalf of the Issuer (in either case in its sole discretion) as a Recalcitrant Holder.

"Record Date": As to any Payment Date, (x) the 15th day (whether or not a Business Day) in the case of Certificated Notes and (y) two Business Days in the case of Global Notes, in each case, prior to such Payment Date.

"Recovery Rate Excess Amount": As of any date of determination, an amount equal to the product of (I) the greater of (a) zero and (b) (i) the Weighted Average Moody's Recovery Rate as of such date of determination minus (ii) 44% and (II) 100; provided, that if as of such date of determination the Weighted Average Moody's Recovery Rate is (x) greater than or equal to 60%, then solely for the purpose of calculating the Recovery Rate Excess Amount, the Weighted Average Moody's Recovery Rate shall be deemed to equal 60% or (y) less than the Minimum Weighted Average Moody's Recovery Rate, then solely for the purpose of calculating the Recovery Rate Excess Amount, the Weighted Average Moody's Recovery Rate shall be deemed to equal the Minimum Weighted Average Moody's Recovery Rate.

"Redemption Date": The Business Day specified for the redemption of Notes pursuant to Sections 9.2 (Optional Redemption), 9.3 (Redemption Procedures), 9.4 (Notes Payable on Redemption Date) or 9.6 (Clean-up Call Redemption).

"Redemption Price": When used with respect to (i) any Class of Secured Notes, an amount equal to (a) 100% of the Aggregate Outstanding Amount of the Secured Notes to be redeemed *plus* (b) accrued and unpaid interest thereon (including, if applicable, interest on any accrued and unpaid Deferred Interest with respect to such Deferred Interest Notes) to the Redemption Date, provided that, if the date of such redemption is not on a Payment Date, any Secured Notes being redeemed shall receive the Break Funding Amount, if any and (ii) any Subordinated Note, its proportional share of the amount of the proceeds of the Assets (including proceeds created when the lien of this Indenture is released) remaining after giving effect to the redemption of the Secured Notes and payment in full of all expenses of the Co-Issuers; provided further, the Holders of 100% of the Aggregate Outstanding Amount of any Class of Secured Notes to be redeemed may elect to receive less than 100% of the Redemption Price that would otherwise be payable to the Holders of such Class of Secured Notes. With respect to any Combination Note, "Redemption Price" means an amount equal to its allocation of the Redemption Price for each Underlying Class.

"Reference Banks": The meaning specified in Exhibit G hereto.

"Refinancing": The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Refinancing Proceeds": The meaning specified in Section 9.2 (Optional Redemption and Refinancing).

"Register" and "Registrar": The respective meanings specified in Section 2.6(a) (Registration, Registration of Transfer and Exchange).

"Registered Investment Adviser": An investment adviser registered under the Investment Advisers Act of 1940, as amended.

"Regulation S": Regulation S, as amended, under the Securities Act.

"Regulation S Global Note": The meaning specified in Section 2.2(b)(i) (Forms of Notes).

-52-

"Regulation S Global Secured Note": A Secured Note issued in the form of a Regulation S Global Note.

"Regulation S Global Subordinated Note": A Subordinated Note issued in the form of a Regulation S Global Note.

"Reinvestment Agreement": A guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity; provided, however, that such agreement provides that it is terminable by the purchaser, without penalty, in the event that the rating assigned to such agreement by either Rating Agency is at any time lower than such agreement's Eligible Investment Required Rating.

"Reinvestment Period": The period from and including the Closing Date to and including the earliest of (i) the Payment Date in April 2017 or (ii) the date of the acceleration of the Maturity of any Class of Secured Notes pursuant to Section 5.2 (Acceleration of Maturity; Rescission and Annulment).

"Related Obligation": An obligation issued by the Portfolio Manager, any of its Affiliates that are investment funds or any other Person that is an investment fund whose investments are primarily managed by the Portfolio Manager or any such Affiliate.

"Required Coverage Ratio": With respect to a specified Class or Classes of Secured Notes and the related Interest Coverage Test or Overcollateralization Ratio Test as the case may be, as of any date of determination (with respect to the Interest Coverage Test, on and after the Determination Date with respect to the third Payment Date), the applicable percentage indicated below opposite such specified Class:

| Class | Overcollateralization Ratio Test | Interest Coverage Ratio Test |
|-------|--------------------------------|------------------------------|
| A/B | 122.5% | 120.0% |
| C | 112.3% | 115.0% |
| D | 108.0% | 110.0% |
| E | 105.1% | 105.0% |

"Responsible Officer": Any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee, which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"Restricted Trading Period": means each day during any period in which either (i) the Moody's rating of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes are one or more sub-categories below its Initial Rating thereof or (ii) the Moody's rating of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes then Outstanding has been withdrawn and not reinstated; provided, that such period will not be a Restricted Trading Period (so long as the Moody's rating of the Class X Notes, the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes has not been further

downgraded, withdrawn or put on watch) upon the direction of the holders of at least a Majority of the Controlling Class.

"Revolver Funding Account":  The non-interest bearing segregated account established pursuant to Section 10.4 (The Revolver Funding Account).

"Revolving Collateral Obligation":  Any Collateral Obligation (other than a Delayed Drawdown Collateral Obligation) that is a loan (including, without limitation, revolving loans, including funded and unfunded portions of revolving credit lines and letter of credit facilities, unfunded commitments under specific facilities and other similar loans and investments) that by its terms may require one or more future advances to be made to the borrower by the Issuer; provided, that any such Collateral Obligation will be a Revolving Collateral Obligation only until all commitments to make advances to the borrower expire or are terminated or irrevocably reduced to zero.

"Rule 144A":  Rule 144A, as amended, under the Securities Act.

"Rule 144A Global Note":  The meaning specified in Section 2.2(b)(ii) (Forms of Notes).

"Rule 144A Information":  The meaning specified in Section 7.15 (Reporting).

"S&P":  Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business and any successor or successors thereto.

"S&P CDO Monitor":  The dynamic, analytical computer model available at www.structuredfinanceinterface.com with written instructions and assumptions to be applied when running such computer model, for the purpose of estimating the default risk of the Collateral Obligations, as the same may be modified by S&P from time to time.  S&P will provide nine separate "Break-even Rate Cases" as described in the definition of the term "S&P Test Matrix" at the end of the Ramp-up Period.  The Portfolio Manager may request additional input files for the S&P CDO Monitor with respect to additional Minimum Weighted Average Floating Spreads and "Break-even Rate Cases" not included in the definition of "S&P Test Matrix."  Following receipt, the Portfolio Manager shall furnish to the Collateral Administrator such additional input files for the S&P CDO Monitor.

"S&P CDO Monitor Test":  A test that will be satisfied on any date of determination following receipt by the Portfolio Manager and the Collateral Administrator of the input files for the S&P CDO Monitor if, with respect to each Class of Secured Notes, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, as the case may be, either (x) the Class Default Differential  with respect to such Class of Secured Notes is positive or (y) the Class Default Differential  with respect to such Class of Secured Notes of the Proposed Portfolio is equal to or greater than the Class Default Differential  with respect to such Class of Secured Notes of the Current Portfolio.

"S&P Collateral Value":  With respect to any Defaulted Obligation or Deferring Security, the lesser of (i) the S&P Recovery Amount of such Defaulted Obligation or Deferring

Security as of the relevant Measurement Date and (ii) the Market Value of such Defaulted Obligation or Deferring Security as of the relevant Measurement Date.

"S&P Effective Date Rating Condition": A condition that is satisfied if, after the end of the Ramp-up Period, S&P has confirmed in writing to the Issuer (which confirmation may be in the form of an email to the Issuer or the Portfolio Manager or a press release), the Trustee and/or the Portfolio Manager its Initial Rating of each Class of Secured Notes; provided, that the S&P Effective Date Rating Condition will be deemed to be satisfied if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee in writing (including by means of email notification or a press release) that (i) it believes satisfaction of the S&P Effective Date Rating Condition is not required or (ii) its practice is not to give such confirmation.

"S&P Excel Default Model Input File": An electronic spreadsheet file in Microsoft Excel format to be provided to S&P by the Portfolio Manager or by the Collateral Administrator at the direction of the Portfolio Manager, which file shall include the balance of Cash and Eligible Investments in each Account and the following information (to the extent such information is available and is not confidential, unless the terms of such Collateral Obligation allow disclosure of such confidential information to S&P) with respect to each Collateral Obligation: (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP, LoanX ID and/or other applicable identification number associated with such Collateral Obligation, (c) the par value of such Collateral Obligation, (d) the type of issue (including, by way of example, whether such Collateral Obligation is a bond, loan, a Cov-Lite Loan or a First-Lien Last-Out Loan), using such abbreviations as may be selected by the Collateral Administrator, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR) and, in the case of a LIBOR Floor Obligation, the specified "floor" rate per annum, (f) the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Collateral Obligation, (h) the stated maturity date of such Collateral Obligation, (i) the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable, (j) the priority category of such Collateral Obligation used to determine the S&P Recovery Rate, if available, (k) the balance in Cash and Eligible Investments for each Account of the Issuer, (l) such other information as the Portfolio Manager may determine to include in such file and (m) the settlement date (or, if not yet settled, the anticipated settlement date and purchase price).

"S&P Industry Classification": The S&P Industry Classifications set forth in Schedule 3 hereto, and such industry classifications shall be updated at the option of the Portfolio Manager if S&P publishes revised industry classifications.

"S&P Rating": The S&P Rating of any Collateral Obligation, as of any date of determination, will be determined as follows:

(i)      (a) if there is an issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which meets the applicable S&P criteria and unconditionally and irrevocably guarantees such Collateral Obligation then the S&P

-55-

Rating shall be such rating (regardless of whether there is a published rating by S&P on the Collateral Obligations of such issuer held by the Issuer); <u>provided</u>, that private ratings (that is, ratings provided at the request of the obligor) may be used for purposes of this definition if the related obligor has consented to the disclosure thereof and a copy of such consent has been provided to S&P) or (b) if there is no issuer credit rating of the issuer by S&P but (i) there is a senior secured rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category below such rating; (ii) if clause (i) above does not apply but there is a senior unsecured rating on any obligation or security of the issuer, the S&P Rating of such Collateral Obligation shall equal such rating; and (iii) if neither clause (i) or (ii) above applies but there is a subordinated rating on any obligation or security of the issuer, then the S&P Rating of such Collateral Obligation shall be one sub-category above such rating if such rating is higher than "<u>BB+</u>," and shall be two sub-categories above such rating if such rating is "<u>BB+</u>" or lower;

(ii)     if there is not a rating by S&P on the issuer or on an obligation of the issuer, then the S&P Rating may be determined pursuant to clauses (a) through (c) below:

(a)     if an obligation of the issuer is not a DIP Collateral Obligation and is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above except that the S&P Rating of such obligation will be (1) one sub-category below the S&P equivalent of the Moody's Rating if such Moody's Rating is "<u>Baa3</u>" or higher and (2) two sub-categories below the S&P equivalent of the Moody's Rating if such Moody's Rating is "<u>Ba1</u>" or lower;

(b)     the Issuer or the Portfolio Manager on behalf of the Issuer (or an affiliate of the Portfolio Manager at the direction of the Portfolio Manager) may apply to S&P at CreditEstimates@standardandpoors.com on or prior to the acquisition of a Collateral Obligation for a credit estimate which shall be its S&P Rating and all "<u>information</u>" reasonably available to the Portfolio Manager must be submitted within 30 days of such acquisition; <u>provided</u>, that for a period of up to 90 days from the date of such acquisition, pending receipt from S&P of such estimate, such Collateral Obligation shall be deemed to have the S&P Rating that the Portfolio Manager reasonably believes (as certified in writing by the Portfolio Manager to the Trustee and the Collateral Administrator) will be the S&P credit estimate; <u>provided</u>, <u>further</u>, that, if no credit estimate is received by the Issuer or the Portfolio Manager within 90 days of such acquisition, the Portfolio Manager shall notify S&P and shall make a request for an extension to such credit assessment process.  As used in this clause (ii)(b), "<u>information</u>" means S&P's "Credit Estimate Information Requirements" dated April 2011 and any other information S&P reasonably requests in order to produce a credit estimate for a particular asset.  Upon the receipt of written consent from S&P to such extension, such Collateral Obligation shall continue to be deemed to have the S&P Rating that the Portfolio Manager reasonably believes (as certified in writing by the Portfolio Manager to the Trustee and the Collateral Administrator) will be the S&P credit estimate; <u>provided</u>, <u>further</u>, that if the Portfolio Manager fails to request an extension or if written consent from S&P to extend the credit assessment process past such 90-day period is not obtained, the S&P Rating of such Collateral Obligation shall be "CCC-"; <u>provided</u>, <u>further</u>, that such credit estimate shall

expire 12 months after the acquisition of such Collateral Obligation, following which such Collateral Obligation shall have an S&P Rating of "CCC-" unless, during such 12-month period, the Issuer applies for renewal thereof in accordance with Section 7.14(b) (Annual Rating Review), in which case such credit estimate shall continue to be the S&P Rating of such Collateral Obligation until S&P has confirmed or revised such credit estimate, upon which such confirmed or revised credit estimate shall be the S&P Rating of such Collateral Obligation; provided further that such confirmed or revised credit estimate shall expire on the next succeeding 12-month anniversary of the date of the acquisition of such Collateral Obligation and (when application is made for annual renewal in accordance with Section 7.14(b) (Annual Rating Review)) on each 12-month anniversary thereafter; or

(c)     with respect to a Collateral Obligation that is not a Defaulted Obligation, the S&P Rating of such Collateral Obligation will at the election of the Issuer (at the direction of the Portfolio Manager) be "CCC-"; provided, that, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall still provide the "information" with respect to such Collateral Obligation annually; provided, further, that the Issuer (at the direction of the Portfolio Manager) may only elect a "CCC-" rating if (w) the issuer of such Collateral Obligation and/or its affiliates are not subject to bankruptcy proceedings, (x) the issuer of such Collateral Obligation has not defaulted on any material obligation within the previous two years, (y) the issuer of such Collateral Obligation is current on interest and principal due on all material obligations and the Portfolio Manager believes it will remain current and (z) such Collateral Obligation is being paid current interest and principal and the Portfolio Manager believes that such payments will remain current; or

(iii)     with respect to a DIP Collateral Obligation that has no issue rating by S&P or a Current Pay Obligation that is rated "CC," "D" or "SD" by S&P, the S&P Rating of such DIP Collateral Obligation or Current Pay Obligation, as applicable, will be, at the election of the Issuer (at the direction of the Portfolio Manager), "CCC-" or the S&P Rating determined pursuant to clause (ii)(b) above;

provided, that for purposes of the determination of the S&P Rating, (x) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch positive" by S&P, such rating will be treated as being one sub-category above such assigned rating and (y) if the applicable rating assigned by S&P to an obligor or its obligations is on "credit watch negative" by S&P, such rating will be treated as being one sub-category below such assigned rating.

"S&P Rating Condition":  With respect to any action taken or to be taken by or on behalf of the Issuer, a condition that is satisfied if S&P has confirmed in writing to the Issuer (which confirmation may be in the form of a press release), the Trustee and/or the Portfolio Manager that no immediate withdrawal or reduction with respect to its then-current rating by S&P of any Class of Secured Notes will occur as a result of such action; provided, that the S&P Rating Condition will be deemed to be satisfied if (x) no Class of Secured Notes Outstanding is rated by S&P or (y) if S&P makes a public announcement or informs the Issuer, the Portfolio Manager or the Trustee that (i) it believes satisfaction of the S&P Rating Condition is not required with respect to the applicable action or (ii) its practice is not to give such confirmations.

-57-

"<u>S&P Recovery Amount</u>": With respect to any Collateral Obligation which is a Defaulted Obligation or a Deferring Security, the amount equal to the product of (i) the recovery rate set forth in the column corresponding to the most senior Class of Notes then Outstanding of the applicable table for the relevant Collateral Obligation category under the definition of "<u>Weighted Average S&P Recovery Rate</u>" and (ii) the principal balance of such Defaulted Obligation or Deferring Security.

"<u>S&P Recovery Rate</u>": With respect to any category of Collateral Obligation, the corresponding "<u>S&P Recovery Rate</u>" designated in accordance with the methodology specified in the definition of the term "<u>Weighted Average S&P Recovery Rate</u>."

"<u>S&P Selling Institution Percentage</u>": With respect to any Participation Interest proposed to be entered into by the Issuer or any Pre-funded Letter of Credit, criteria that will be met if immediately after giving effect to such acquisition, (x) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with Selling Institutions that have the same or a lower S&P credit rating does not exceed the "<u>Aggregate Selling Institution Percentage</u>" set forth below for such S&P credit rating and (y) the percentage of the Collateral Principal Amount that consists in the aggregate of Participation Interests and Pre-funded Letters of Credit with any single Selling Institution that have the same or a lower S&P credit rating does not exceed the "<u>Individual Selling Institution Percentage</u>" set forth below for such S&P credit rating:

| Long-Term Senior Unsecured Debt Rating of Selling Institution S&P | Individual Selling Institution Percentage | Aggregate Selling Institution Percentage |
|---|---|---|
| AAA | 20% | 20% |
| AA+ | 10% | 10% |
| AA | 10% | 10% |
| AA- | 10% | 10% |
| A+ | 5% | 5% |
| A* | 5% | 5% |
| Below A** | 0% | 0% |

_____

\* Applies only so long as the S&P short-term unsecured debt rating is "<u>A-1</u>."

\*\* Also applies to institutions with an S&P long-term senior unsecured debt rating of "A" that do not also have an S&P short-term unsecured debt rating of at least "<u>A-1</u>."

"<u>S&P Test Matrix</u>": On the Closing Date, the Portfolio Manager, on behalf of the Issuer, shall elect and notify the Collateral Administrator which Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread and which "<u>Break-even Rate Case</u>" shall apply initially. Thereafter, the Portfolio Manager may elect to have a different case apply, <u>provided</u> that the Minimum Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread and a different "<u>Break-even Rate Case</u>" applicable to the case to which the Portfolio Manager wishes to change (with notice to the Collateral Administrator), are satisfied or, in the case of any tests that are not satisfied, will be closer to being satisfied. In no event will the Issuer or the Portfolio Manager be obliged to elect to have a different Minimum

-58-

Weighted Average S&P Recovery Rate, Minimum Weighted Average Floating Spread or "Break-even Rate Case" apply. For the avoidance of doubt, (i) once a Minimum Weighted Average Floating Spread and "Break-even Rate Case" have been elected by the Portfolio Manager (with notice to the Collateral Administrator), such elections shall apply in all cases to each table comprising this S&P Test Matrix unless and until changed as specified above, (ii) each table comprising this S&P Test Matrix shall apply only for so long as such Class of Notes remains Outstanding and (iii) the S&P Weighted Average Floating Spread must be used in calculating whether or not the Minimum Floating Spread Test per the tables below is passing.

### Class A Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.05% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% | 49.0% | 50.0% | 51.0% |
| 3.15% | 42.7% | 43.7% | 44.7% | 45.7% | 46.7% | 47.7% | 48.7% | 49.7% | 50.7% |
| 3.25% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% | 48.3% | 49.3% | 50.3% |
| 3.35% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% | 49.0% | 50.0% |
| 3.45% | 41.7% | 42.7% | 43.7% | 44.7% | 45.7% | 46.7% | 47.7% | 48.7% | 49.7% |
| 3.55% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% | 48.3% | 49.3% |
| 3.65% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% | 49.0% |
| 3.75% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% | 46.6% | 47.6% | 48.6% |
| 3.85% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% | 48.3% |
| 3.95% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% | 48.0% |
| 4.05% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% | 46.6% | 47.6% |
| 4.15% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% | 47.3% |
| 4.25% | 39.0% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% | 47.0% |
| 4.35% | 38.6% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% | 46.6% |
| 4.45% | 38.3% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% | 46.3% |
| 4.55% | 38.0% | 39.0% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% | 46.0% |
| 4.65% | 37.6% | 38.6% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% | 45.6% |
| 4.75% | 37.3% | 38.3% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% | 45.3% |
| 4.85% | 37.0% | 38.0% | 39.0% | 40.0% | 41.0% | 42.0% | 43.0% | 44.0% | 45.0% |
| 4.95% | 36.6% | 37.6% | 38.6% | 39.6% | 40.6% | 41.6% | 42.6% | 43.6% | 44.6% |
| 5.05% | 36.3% | 37.3% | 38.3% | 39.3% | 40.3% | 41.3% | 42.3% | 43.3% | 44.3% |

### Class B Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.05% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% |
| 3.15% | 51.7% | 52.7% | 53.7% | 54.7% | 55.7% | 56.7% | 57.7% | 58.7% | 59.7% |
| 3.25% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% | 57.3% | 58.3% | 59.3% |
| 3.35% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% |
| 3.45% | 50.7% | 51.7% | 52.7% | 53.7% | 54.7% | 55.7% | 56.7% | 57.7% | 58.7% |
| 3.55% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% | 57.3% | 58.3% |
| 3.65% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% |
| 3.75% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% | 55.6% | 56.6% | 57.6% |

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.85% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% | 57.3% |
| 3.95% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% |
| 4.05% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% | 55.6% | 56.6% |
| 4.15% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% | 56.3% |
| 4.25% | 48.0% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% |
| 4.35% | 47.6% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% | 55.6% |
| 4.45% | 47.3% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% | 55.3% |
| 4.55% | 47.0% | 48.0% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% |
| 4.65% | 46.6% | 47.6% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% | 54.6% |
| 4.75% | 46.3% | 47.3% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% | 54.3% |
| 4.85% | 46.0% | 47.0% | 48.0% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% |
| 4.95% | 45.6% | 46.6% | 47.6% | 48.6% | 49.6% | 50.6% | 51.6% | 52.6% | 53.6% |
| 5.05% | 45.3% | 46.3% | 47.3% | 48.3% | 49.3% | 50.3% | 51.3% | 52.3% | 53.3% |

## Class C Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.05% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% |
| 3.15% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% |
| 3.25% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% |
| 3.35% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.0% | 65.5% |
| 3.45% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% |
| 3.55% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.5% |
| 3.65% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% | 64.0% |
| 3.75% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% |
| 3.85% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% |
| 3.95% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% |
| 4.05% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% |
| 4.15% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% |
| 4.25% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% |
| 4.35% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% |
| 4.45% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% |
| 4.55% | 51.5% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% |
| 4.65% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% |
| 4.75% | 50.5% | 51.5% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% | 58.5% |
| 4.85% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% | 58.0% |
| 4.95% | 49.5% | 50.5% | 51.5% | 52.5% | 53.5% | 54.5% | 55.5% | 56.5% | 57.5% |
| 5.05% | 49.0% | 50.0% | 51.0% | 52.0% | 53.0% | 54.0% | 55.0% | 56.0% | 57.0% |

## Class D Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.05% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% |

NEWYORK 8715474 (2K)

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.15% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% |
| 3.25% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% |
| 3.35% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% |
| 3.45% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% |
| 3.55% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% |
| 3.65% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% |
| 3.75% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% |
| 3.85% | 61.5% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% |
| 3.95% | 61.0% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% |
| 4.05% | 60.4% | 61.4% | 62.4% | 63.4% | 64.4% | 65.4% | 66.4% | 67.4% | 68.4% |
| 4.15% | 59.9% | 60.9% | 61.9% | 62.9% | 63.9% | 64.9% | 65.9% | 66.9% | 67.9% |
| 4.25% | 59.3% | 60.3% | 61.3% | 62.3% | 63.3% | 64.3% | 65.3% | 66.3% | 67.3% |
| 4.35% | 58.8% | 59.8% | 60.8% | 61.8% | 62.8% | 63.8% | 64.8% | 65.8% | 66.8% |
| 4.45% | 58.3% | 59.3% | 60.3% | 61.3% | 62.3% | 63.3% | 64.3% | 65.3% | 66.3% |
| 4.55% | 57.7% | 58.7% | 59.7% | 60.7% | 61.7% | 62.7% | 63.7% | 64.7% | 65.7% |
| 4.65% | 57.2% | 58.2% | 59.2% | 60.2% | 61.2% | 62.2% | 63.2% | 64.2% | 65.2% |
| 4.75% | 56.6% | 57.6% | 58.6% | 59.6% | 60.6% | 61.6% | 62.6% | 63.6% | 64.6% |
| 4.85% | 56.1% | 57.1% | 58.1% | 59.1% | 60.1% | 61.1% | 62.1% | 63.1% | 64.1% |
| 4.95% | 55.5% | 56.5% | 57.5% | 58.5% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% |
| 5.05% | 55.0% | 56.0% | 57.0% | 58.0% | 59.0% | 60.0% | 61.0% | 62.0% | 63.0% |

## Class E Notes

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| | Minimum Weighted Average S&P Recovery Rate | | | | | | | | |
| 3.05% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% | 78.0% | 79.0% | 80.0% |
| 3.15% | 71.4% | 72.4% | 73.4% | 74.4% | 75.4% | 76.4% | 77.4% | 78.4% | 79.4% |
| 3.25% | 70.8% | 71.8% | 72.8% | 73.8% | 74.8% | 75.8% | 76.8% | 77.8% | 78.8% |
| 3.35% | 70.1% | 71.1% | 72.1% | 73.1% | 74.1% | 75.1% | 76.1% | 77.1% | 78.1% |
| 3.45% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% | 77.5% |
| 3.55% | 68.9% | 69.9% | 70.9% | 71.9% | 72.9% | 73.9% | 74.9% | 75.9% | 76.9% |
| 3.65% | 68.3% | 69.3% | 70.3% | 71.3% | 72.3% | 73.3% | 74.3% | 75.3% | 76.3% |
| 3.75% | 67.6% | 68.6% | 69.6% | 70.6% | 71.6% | 72.6% | 73.6% | 74.6% | 75.6% |
| 3.85% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% |
| 3.95% | 66.4% | 67.4% | 68.4% | 69.4% | 70.4% | 71.4% | 72.4% | 73.4% | 74.4% |
| 4.05% | 65.8% | 66.8% | 67.8% | 68.8% | 69.8% | 70.8% | 71.8% | 72.8% | 73.8% |
| 4.15% | 65.1% | 66.1% | 67.1% | 68.1% | 69.1% | 70.1% | 71.1% | 72.1% | 73.1% |
| 4.25% | 64.5% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% |
| 4.35% | 63.9% | 64.9% | 65.9% | 66.9% | 67.9% | 68.9% | 69.9% | 70.9% | 71.9% |
| 4.45% | 63.3% | 64.3% | 65.3% | 66.3% | 67.3% | 68.3% | 69.3% | 70.3% | 71.3% |
| 4.55% | 62.6% | 63.6% | 64.6% | 65.6% | 66.6% | 67.6% | 68.6% | 69.6% | 70.6% |
| 4.65% | 62.0% | 63.0% | 64.0% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% |
| 4.75% | 61.4% | 62.4% | 63.4% | 64.4% | 65.4% | 66.4% | 67.4% | 68.4% | 69.4% |
| 4.85% | 60.8% | 61.8% | 62.8% | 63.8% | 64.8% | 65.8% | 66.8% | 67.8% | 68.8% |
| 4.95% | 60.1% | 61.1% | 62.1% | 63.1% | 64.1% | 65.1% | 66.1% | 67.1% | 68.1% |
| 5.05% | 59.5% | 60.5% | 61.5% | 62.5% | 63.5% | 64.5% | 65.5% | 66.5% | 67.5% |

## Class F Notes

NEWYORK 8715474 (2K)

| Minimum Weighted Average Floating Spread | Break-Even Rate Case 1 | Break-Even Rate Case 2 | Break-Even Rate Case 3 | Break-Even Rate Case 4 | Break-Even Rate Case 5 | Break-Even Rate Case 6 | Break-Even Rate Case 7 | Break-Even Rate Case 8 | Break-Even Rate Case 9 |
|---|---|---|---|---|---|---|---|---|---|
| Minimum Weighted Average S&P Recovery Rate | | | | | | | | | |
| 3.05% | 75.5% | 76.5% | 77.5% | 78.5% | 79.5% | 80.5% | 81.5% | 82.5% | 83.5% |
| 3.15% | 74.9% | 75.9% | 76.9% | 77.9% | 78.9% | 79.9% | 80.9% | 81.9% | 82.9% |
| 3.25% | 74.4% | 75.4% | 76.4% | 77.4% | 78.4% | 79.4% | 80.4% | 81.4% | 82.4% |
| 3.35% | 73.8% | 74.8% | 75.8% | 76.8% | 77.8% | 78.8% | 79.8% | 80.8% | 81.8% |
| 3.45% | 73.3% | 74.3% | 75.3% | 76.3% | 77.3% | 78.3% | 79.3% | 80.3% | 81.3% |
| 3.55% | 72.7% | 73.7% | 74.7% | 75.7% | 76.7% | 77.7% | 78.7% | 79.7% | 80.7% |
| 3.65% | 72.1% | 73.1% | 74.1% | 75.1% | 76.1% | 77.1% | 78.1% | 79.1% | 80.1% |
| 3.75% | 71.6% | 72.6% | 73.6% | 74.6% | 75.6% | 76.6% | 77.6% | 78.6% | 79.6% |
| 3.85% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% | 78.0% | 79.0% |
| 3.95% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% | 77.5% | 78.5% |
| 4.05% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% | 78.0% |
| 4.15% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% | 77.5% |
| 4.25% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% | 77.0% |
| 4.35% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% | 76.5% |
| 4.45% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% | 76.0% |
| 4.55% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% | 75.5% |
| 4.65% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% | 75.0% |
| 4.75% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% | 74.5% |
| 4.85% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% | 74.0% |
| 4.95% | 65.5% | 66.5% | 67.5% | 68.5% | 69.5% | 70.5% | 71.5% | 72.5% | 73.5% |
| 5.05% | 65.0% | 66.0% | 67.0% | 68.0% | 69.0% | 70.0% | 71.0% | 72.0% | 73.0% |

"S&P Weighted Average Fixed Coupon": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), equal to: (i) the aggregate sum, in respect of each fixed rate Collateral Obligation (excluding Deferring Securities), of an amount equal to the product of (a) the interest coupon of such Collateral Obligation multiplied by (b) the Principal Balance of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such fixed rate Collateral Obligations.

"S&P Weighted Average Floating Spread": As of any date of determination, the number, expressed as a percentage (rounded up to the nearest 0.01%), obtained by calculating the sum of: (w) in the case of each floating rate Collateral Obligation (excluding Deferring Securities, Revolving Collateral Obligations and Delayed Drawdown Collateral Obligations), the aggregate interest on such Collateral Obligation over LIBOR multiplied by the outstanding Principal Balance of such Collateral Obligation as of such date and (x) in the case of each Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation, (i) the commitment fee for such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation multiplied by the undrawn commitments of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation and (ii) the aggregate interest on such Collateral Obligation over LIBOR multiplied by the outstanding principal amount of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation (provided that letter of credit fees shall be excluded for all purposes), and dividing such sum by the Aggregate Principal Balance of all such floating rate Collateral Obligations as of such date of determination. For purposes of the foregoing, (1) in the case of each floating rate Collateral Obligation that bears interest at a spread over an index other than a London interbank offered rate based index, the interest over LIBOR for such Collateral Obligation shall be equal to the excess of the sum of such spread and such index (or, in the case of a Pre-funded Letter of Credit, the applicable rate of

-62-

interest on the deposited amount) over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date (which spread or excess may be expressed as a negative number), (2) LIBOR with respect to any floating rate Collateral Obligation that bears interest based on a spread over LIBOR shall be calculated in the same manner as it is calculated for payments on such Collateral Obligation, (3) with respect to any LIBOR Floor Obligation, the interest over LIBOR for such Collateral Obligation shall be equal to the sum of (a) the applicable spread over LIBOR and (b) the excess, if any, of the specified "floor" rate relating to such Collateral Obligation over LIBOR calculated for the Secured Notes for the immediately preceding Interest Determination Date and (4) the interest over the applicable index in respect of a floating rate Step-up Obligation shall be deemed to be its current interest spread over such index and the interest over the applicable index in respect of a floating rate Step-down Obligation shall be deemed to be the lowest possible interest spread over such index under the Underlying Instruments relating to such Step-down Obligation.

"Sale": The meaning specified in Section 5.17(a) (Sale of Assets).

"Sale Proceeds": All proceeds (excluding accrued interest, if any) received with respect to Assets as a result of sales of such Assets less any reasonable expenses incurred by the Portfolio Manager or the Trustee (other than amounts payable as Administrative Expenses) in connection with such sales. Sale Proceeds will include Principal Financed Accrued Interest received in respect of such sale.

"Schedule of Collateral Obligations": The schedule of Collateral Obligations attached as Schedule 1 hereto, which schedule shall include the issuer, principal balance, coupon/spread, the Stated Maturity, the Moody's Rating and the S&P Rating for each Collateral Obligation and the percentage of the aggregate commitment under each Revolving Collateral Obligation and Delayed Drawdown Collateral Obligation that is funded, as amended from time to time (without the consent of or any action on the part of any Person) to reflect the release of Collateral Obligations pursuant to Article 10 hereof, the inclusion of additional Collateral Obligations pursuant to Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) hereof and the inclusion of additional Collateral Obligations as provided in Section 12.2 (Purchase of Additional Collateral Obligations) hereof.

"Scheduled Distribution": With respect to any Pledged Obligation, for each Due Date, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Obligation, determined in accordance with the assumptions specified in Section 1.2 (Assumptions as to Pledged Obligations) hereof.

"Second Lien Loan": Any assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected second priority pledge of collateral (which (i) pledge may be subject to customary permitted liens, such as, but not limited to, tax liens and (ii) collateral is not secured solely by common stock or equity) and which has a senior (or, solely with respect to any related first lien indebtedness, subordinated) pre-petition priority (including pari passu with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings and (y) with respect to which the Portfolio Manager determines in good faith that the value of the collateral securing the loan on or about the time of acquisition by the Issuer together with other

attributes of the issuer of such loan (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the principal balance of the loan in accordance with its terms and to repay the principal balance of all other loans of equal or greater seniority secured by a security interest in the same collateral.

"Secured Notes": The Class X Notes, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Combination Notes.

"Secured Obligations": The meaning specified in the Granting Clauses.

"Secured Parties": The meaning specified in the Granting Clauses.

"Securities Account Control Agreement": An agreement in substantially the form of Exhibit H hereto.

"Securities Act": The United States Securities Act of 1933, as amended.

"Securities Intermediary": As defined in Section 8-102(a)(14) of the UCC.

"Security Entitlement": The meaning specified in Section 8-102(a)(17) of the UCC.

"Selling Institution": The entity obligated to make payments to the Issuer under the terms of a Participation Interest (or the agent bank in connection with a Pre-funded Letter of Credit, as the context shall require) and, as to which the S&P Selling Institution Percentage Criteria and the Moody's Counterparty Criteria are met.

"Senior Management Fee": A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and Section 11.1 (Disbursements of Monies from Payment Account) in an amount equal to 0.20% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date.

"Senior Notes": The Class X Notes, the Class A Notes and the Class B Notes.

"Senior Secured Bond": Any fixed interest rate bond that is secured by the pledge of collateral and has the most senior pre-petition priority (including *pari passu* with other obligations of the obligor, but subject to customary permitted liens, such as, but not limited to, any tax liens) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings.

"Senior Secured Loan": An assignment of or Participation Interest in or other interest in a loan (x) that is required to be secured by a valid and perfected, first priority pledge of collateral (which (i) pledge may be subject to customary permitted liens, such as, but not limited to, tax liens and (ii) collateral is not secured solely by common stock or equity) and

-64-

which has a senior pre-petition priority (including pari passu with other obligations of the obligor) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, (y) solely for purposes of calculating the Weighted Average S&P Recovery Rate, such loan cannot, by its terms, be subordinated to another obligation of the Obligor and the value of the collateral securing such loan, as determined by the Portfolio Manager in good faith, on or about the time of acquisition by the Issuer together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service, refinancing ability and other demands for that cash flow) is adequate to repay the Principal Balance of the loan in accordance with its terms and to repay the Principal Balance of all other loans of equal seniority secured by a security interest in the same collateral and (z) is not a First-Lien Last-Out Loan.

"Senior Secured Note":  Any assignment of or Participation Interest in or other interest in a floating interest rate note (that is not in the form of an assignment or participation interest in a loan) issued pursuant to an indenture or equivalent document by a corporation, partnership, limited liability company, trust or other person that is required to be secured by either a first or second priority perfected security interest or lien in or on specified collateral securing the Obligor's obligations under such note.

"Senior Unsecured Bond":  Any bond (other than a Senior Secured Bond) that has the most senior pre-petition priority (including *pari passu* with other obligations of the obligor, but subject to customary permitted liens, such as, but not limited to, any tax liens) in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings.

"Special Redemption":  As defined in Section 9.5 (Special Redemption).

"Special Redemption Amount":  As defined in Section 9.5 (Special Redemption).

"Special Redemption Date":  As defined in Section 9.5 (Special Redemption).

"Standby Investment":  The US Bank National Association Money Market Fund.

"Stated Maturity":  With respect to any security, the maturity date specified in such security or applicable Underlying Instrument; and with respect to the Notes of any Class, the date specified as such in Section 2.3 (Authorized Amount; Stated Maturity; Denominations). The Combination Notes will mature when the Underlying Classes are repaid in full in accordance with this Indenture.

"Step-down Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for a decrease in the per annum interest rate on such obligation or security (other than by reason of any change in the applicable index or benchmark rate used to determine such interest rate) or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; provided, that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-down Obligation.

"Step-up Obligation":  An obligation or security which by the terms of the related Underlying Instruments provides for an increase in the per annum interest rate on such obligation

or security, or in the spread over the applicable index or benchmark rate, solely as a function of the passage of time; <u>provided</u>, that an obligation or security providing for payment of a constant rate of interest at all times after the date of acquisition by the Issuer shall not constitute a Step-up Obligation.

"<u>Structured Finance Obligation</u>": A non-recourse or limited-recourse debt obligation issued by a special purpose vehicle and secured solely by the assets thereof that is a mortgage backed security, an asset backed security, a collateralized bond obligation, a collateralized loan obligation, a repackaging of a bond (or a pool of bonds) of any of the foregoing or any similar securitization of an asset or a pool of assets (or any combination thereof).

"<u>Subordinated Management Fee</u>": A fee payable to the Portfolio Manager in arrears on each Payment Date (prorated for the related Interest Accrual Period) pursuant to Section 9 of the Portfolio Management Agreement and <u>Section 11.1</u> (Disbursements of Monies from Payment Account) of this Indenture in an amount equal to 0.30% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount at the beginning of the Collection Period relating to such Payment Date. The Subordinated Management Fee is payable on each Payment Date only to the extent that sufficient Interest Proceeds or Principal Proceeds are available, and, to the extent any such Subordinated Management Fee is not paid on any Payment Date for any reason, such payment will be deferred and will accrue interest at LIBOR, compounded quarterly (calculated on the basis of a 360-day year consisting of twelve 30-day months).

"<u>Subordinated Notes</u>": The subordinated notes issued pursuant to this Indenture and having the characteristics specified in <u>Section 2.3</u> (Authorized Amount; Stated Maturity; Denominations).

"<u>Subsequent Delivery Date</u>": A date fixed by the Portfolio Manager on behalf of the Issuer for the delivery of a Collateral Obligation to be pledged to the Trustee after the Closing Date.

"<u>Successor Entity</u>": As defined in <u>Section 7.10</u> (Co-Issuers May Consolidate, <u>etc.</u>, Only on Certain Terms).

"<u>Synthetic Security</u>": A security or swap transaction other than a Participation Interest or a Pre-funded Letter of Credit that has payments associated with either payments of interest and/or principal on a reference obligation or the credit performance of a reference obligation or payments on, or the return of, an equity interest.

"<u>Target Balance</u>": An amount equal to (a) the Target Initial Par Amount, <u>minus</u> (b) the amount of any principal payments made on the Notes of any Class, <u>plus</u> (c) the aggregate amount of Principal Proceeds that result from any additional issuance of Subordinated Notes.

"<u>Target Initial Par Amount</u>": With respect to the Collateral Obligations purchased by the Issuer or subject of binding agreements to purchase at the end of the Ramp-up Period, $500,000,000 in Aggregate Principal Balance of such Collateral Obligations.

"Target Initial Par Condition": A condition satisfied as of the end of the Ramp-up Period if the Issuer has purchased, or entered into binding commitments to purchase, Collateral Obligations, including Collateral Obligations acquired by the Issuer on or prior to the Closing Date, the Aggregate Principal Balance of which equals or exceeds the Target Initial Par Amount (not including the reduction in the Aggregate Principal Balance of any Collateral Obligation after the Closing Date as a result of prepayments, maturities or redemptions, unless such amounts have been reinvested in Collateral Obligations).

"Target Initial Par Ratio": A ratio that is determined by dividing (x) Target Initial Par Amount *by* (y) $469,750,000.

"Tax": Any present or future tax, levy, impost, duty, charge, assessment, deduction, withholding or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority other than a stamp, registration, documentation or similar tax.

"Tax Event": Any (1) new, or change to (a) a U.S. or non-U.S. tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation which results in any portion of any payment due from any issuer or obligor under any Collateral Obligation becoming properly subject to the imposition of U.S. or non-U.S. tax, which in the case of withholding tax is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation or (b) a Cayman Islands law that results in Holders becoming properly subject to the imposition of Cayman Islands withholding tax unless the Issuer has changed its governing jurisdiction to a jurisdiction that does not impose withholding tax on holders of the Secured Notes within 90 days of becoming aware of such change in law and (2) tax arising under or as a result of FATCA as a result of or with respect to any payment due from any issuer or obligor under any Collateral Obligation, which is not compensated for by a "gross-up" provision under the terms of the Collateral Obligation, but only, in each case, (1) or (2), if such tax or taxes amount, in the aggregate, to at least $1,000,000, during any 12 month period.

"Tax Jurisdiction": The Bahamas, Bermuda, the British Virgin Islands, the Cayman Islands or the Channel Islands and any other tax advantaged jurisdiction as may be notified by Moody's to the Portfolio Manager from time to time; provided, that, in the case of each such tax jurisdiction, in the Portfolio Manager's good faith business judgment, a majority of the assets, revenues or operations supporting the related Collateral Obligation are directly or through subsidiaries located in the United States of America.

"Third Party Credit Exposure": As of any date of determination, the sum (without duplication) of the Principal Balance (or such lesser amount as may be determined by S&P) of each Collateral Obligation that consists of a Participation Interest or a Pre-funded Letter of Credit.

"Trading Plan": The meaning specified in Section 1.2(k) (Assumptions as to Pledged Obligations).

"Trading Plan Period": The meaning specified in Section 1.2(k) (Assumptions as to Pledged Obligations).

"Transfer Agent": The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Trustee": As defined in the first sentence of this Indenture.

"Turbo Payment Amount": After the Reinvestment Period, and for so long as any Class C Notes remain Outstanding, as of any date of determination, the aggregate Post-Reinvestment Period Amendment Proceeds accumulated during the related Collection Period.

"UCC": The Uniform Commercial Code as in effect in the State of New York or, if different, the state of the United States that governs the perfection of the relevant security interest as amended from time to time.

"Uncertificated Security": The meaning specified in Section 8-102(a)(18) of the UCC.

"Underlying Instrument": The indenture or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Obligation or of which the holders of such Pledged Obligation are the beneficiaries.

"United States owned foreign entity": The meaning specified in Section 2.13(c) (Tax Purposes).

"Unregistered Securities": The meaning specified in Section 5.17(c) (Sale of Assets).

"U.S. Person": The meaning specified in Section 7701(a)(30) of the Code.

"U.S. person": The meaning specified in Regulation S.

"USD" and "$": The legal currency of the United States of America.

"Weighted Average Fixed Coupon": Each of the Moody's Weighted Average Fixed Coupon and the S&P Weighted Average Fixed Coupon, as applicable. In connection with the use of the defined term "Weighted Average Fixed Coupon" in any calculation, test or definition hereof, such calculation, test or definition shall be determined by reference to the definition of each of the Moody's Weighted Average Fixed Coupon and S&P Weighted Average Fixed Coupon separately.

"Weighted Average Floating Spread": Each of the Moody's Weighted Average Floating Spread and the S&P Weighted Average Floating Spread, as applicable. In connection with the use of the defined term "Weighted Average Floating Spread" in any calculation, test or definition hereof, such calculation, test or definition shall be determined by reference to the definition of each of the Moody's Weighted Average Floating Spread and S&P Weighted Average Floating Spread separately.

NEWYORK 8715474 (2K)

"<u>Weighted Average Life</u>": With respect to each Collateral Obligation as of any date of determination is an amount equal to (i) the sum of the products obtained by multiplying (A) the actual number of years (rounded to the nearest one hundredth thereof) from such date of determination to the respective dates of each successive scheduled distribution of principal of such Collateral Obligation and (B) the related amounts of the principal of such scheduled distribution; divided by (ii) the sum of the aggregate amount of all such scheduled distributions of principal of such Collateral Obligation.

"<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life on such date of determination is not later than March 14, 2021.

"<u>Weighted Average Moody's Rating Factor</u>": The number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) <u>multiplied by</u> (b) its Moody's Rating Factor, <u>divided by</u> (ii) the outstanding Principal Balance of all such Collateral Obligations.

"<u>Weighted Average Moody's Recovery Rate</u>": As of any date of determination, the number, expressed as a percentage, obtained by summing the product of the Moody's Recovery Rate on such date of determination of each Collateral Obligation and the Principal Balance of such Collateral Obligation, dividing such sum by the Aggregate Principal Balance of all such Collateral Obligations and rounding up to the first decimal place.

"<u>Weighted Average S&P Recovery Rate</u>": As of any date of determination, with respect to each Class of Notes then Outstanding with an Initial Rating corresponding to the rating in the applicable tables below, the fraction (expressed as a percentage) obtained by (a) summing the products obtained by multiplying (i) the Principal Balance of each Collateral Obligation by (ii) the S&P Recovery Rate as set forth in either the column corresponding to the Initial Rating of the relevant Class of Notes using the Tiered Recovery Rate Method table below or the column corresponding to the Initial Rating of the relevant Class of Notes using the Asset Assigned Recovery Rate Method table below, as applicable, (b) dividing such sum by the Aggregate Principal Balance of all Collateral Obligations and (c) rounding up to the nearest hundredth of a percent. For purposes of determining the Weighted Average S&P Recovery Rate, the S&P Recovery Rate for all Collateral Obligations will be determined by using the Asset Assigned Recovery Rate Method tables or, if the Asset Assigned Recovery Rate Method tables do not apply to such Collateral Obligation, the Tiered Recovery Rate Method tables; <u>provided</u>, <u>however</u>, that any other recovery rate proposed by the Portfolio Manager and consented to by S&P in writing or by email may be utilized on a case-by-case basis. The "<u>Tiered Recovery Rate Method</u>" means determining the Weighted Average S&P Recovery Rate by using the Tiered Recovery Rate Method tables. The "<u>Asset Assigned Recovery Rate Method</u>" means determining the Weighted Average S&P Recovery Rate by using the Asset Assigned Recovery Rate Method tables, except in the limited circumstances described below.

NEWYORK 8715474 (2K)

Tiered Recovery Rate Method

| Table 1:  S&P Tiered Recovery Rate Method Table (by Asset Class and CDO Liability Rating)[1] | | | | | |
|---|---|---|---|---|---|
| **CDO Liability Rating** | | | | | |
| | AAA | AA | A | BBB | BB | B |
| Senior Secured Loans[2] | | | | | |
| Group 1 | 50 | 55 | 59 | 63 | 75 | 79 |
| Group 2 | 45 | 49 | 53 | 58 | 70 | 74 |
| Group 3 | 39 | 42 | 46 | 49 | 60 | 63 |
| Group 4 | 17 | 19 | 27 | 29 | 31 | 34 |
| Senior secured Cov-Lite Loans/Senior Secured Bonds | | | | | |
| Group 1 | 41 | 46 | 49 | 53 | 63 | 67 |
| Group 2 | 37 | 41 | 44 | 49 | 59 | 62 |
| Group 3 | 32 | 35 | 39 | 41 | 50 | 53 |
| Group 4 | 17 | 19 | 27 | 29 | 31 | 34 |
| Mezzanine/Second-Lien Loans or Senior Secured Notes/Senior Unsecured Loans/Senior Unsecured Bonds/First-Lien Last-Out Loans[3] | | | | | |
| Group 1 | 18 | 20 | 23 | 26 | 29 | 31 |
| Group 2 | 16 | 18 | 21 | 24 | 27 | 29 |
| Group 3 | 13 | 16 | 18 | 21 | 23 | 25 |
| Group 4 | 10 | 12 | 14 | 16 | 18 | 20 |
| Subordinated loans/subordinated bonds | | | | | |
| Group 1 | 8 | 8 | 8 | 8 | 8 | 8 |
| Group 2 | 10 | 10 | 10 | 10 | 10 | 10 |
| Group 3 | 9 | 9 | 9 | 9 | 9 | 9 |
| Group 4 | 5 | 5 | 5 | 5 | 5 | 5 |

--------

[1]  Or, at the election of the Portfolio Manager, such higher rates as provided by S&P.

[2]  DIP Collateral Obligations to be treated as Senior Secured Loans.

[3]  In the case of second lien loans and First-Lien Last-Out Loans, the first 15% of the Collateral Principal Amount will be treated as senior unsecured loans and the excess over 15% as subordinated loans.  Obligations secured primarily by equity or common stock not to be treated as Senior Secured Loans, but rather as senior unsecured loans.  First-Lien Last-Out Loans not to be treated as Senior Secured Loans.  "First-Lien Last-Out Loan" means a Senior Secured Loan that, prior to a default with respect to such loan, is entitled to receive payments *pari passu* with other Senior Secured Loans of the same obligor, but following a default becomes fully subordinated to other Senior Secured Loans of the same obligor and is not entitled to any payments until such other Senior Secured Loans are paid in full.

NEWYORK 8715474 (2K)

| Table 2: S&P Country Groupings for S&P Recovery Rate | | | |
|---|---|---|---|
| **Group 1** | **Group 2** | **Group 3** | **Group 4** |
| Australia | Austria | Argentina | Kazakhstan |
| Denmark | Belgium | Brazil | Russia |
| Finland | Canada | Chile | Ukraine |
| Hong Kong | Germany | France | Others |
| Ireland | Israel | Greece | |
| The Netherlands | Japan | Italy | |
| New Zealand | Luxembourg | Mexico | |
| Norway | Portugal | South Korea | |
| Singapore | South Africa | Spain | |
| Sweden | Switzerland | Taiwan | |
| U.K. | U.S. | Turkey | |
| | | United Arab Emirates | |

<u>Asset Assigned Recovery Rate Method</u>

If available, the S&P Recovery Rate for Collateral Obligations shall be determined by reference to the table below and a list of debt securities with asset-by-asset current recovery ratings (each such recovery rate, an "<u>Asset Assigned Recovery Rating</u>") listed on the S&P website at "<u>www.standardandpoors.com</u>" or such other website address designated by S&P. For the avoidance of doubt, Asset Assigned Recovery Ratings are determined by reference to the recovery rating of the security and without regard to its characterization as senior secured, senior unsecured, mezzanine or subordinated (or any other designation of seniority or Domicile).

| Table 3: S&P Recovery Rates for Collateral Obligations with S&P Asset Assigned Recovery Ratings | | | | | | |
|---|---|---|---|---|---|---|
| **CDO Liability Rating** | **AAA** | **AA** | **A** | **BBB** | **BB** | **B** |
| **Asset Assigned Recovery Rating** | **S&P Recovery Rates (%)** | | | | | |
| 1+ | 75 | 85 | 88 | 90 | 92 | 95 |
| 1 | 65 | 75 | 80 | 85 | 90 | 95 |
| 2 | 50 | 60 | 66 | 73 | 79 | 85 |
| 3 | 30 | 40 | 46 | 53 | 59 | 65 |
| 4 | 20 | 26 | 33 | 39 | 43 | 45 |
| 5 | 5 | 10 | 15 | 20 | 23 | 25 |
| 6 | 2 | 4 | 6 | 8 | 10 | 10 |

If the relevant Collateral Obligation has no Asset Assigned Recovery Rating from S&P, the S&P Recovery Rate of such Collateral Obligation shall be determined by reference to

the "Tiered Recovery Rate Method" tables; provided that, if the Collateral Obligation is either a senior unsecured debt security or a subordinated debt security with no Asset Assigned Recovery Rating designated but the issuer of such Collateral Obligation has an Asset Assigned Recovery Rating on senior secured debt obligations issued by it, the S&P Recovery Rate for such Collateral Obligation shall be derived from the Asset Assigned Recovery Rating of such senior secured debt obligations by reference to the tables set forth below or such other table(s) as directed by S&P upon request by the Portfolio Manager; provided further, that, if on any date of determination a Collateral Obligation does not have an Asset Assigned Recovery Rating, if on such date of determination S&P provides an Asset Assigned Recovery Rating estimate service, the Portfolio Manager may request from S&P such an estimate for such Collateral Obligation and, upon receipt of such credit estimate, the S&P Recovery Rate for such Collateral Obligation shall be derived by reference to such estimate.

| Table 4: S&P Recovery Rates for Group 1 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating of senior secured asset | S&P Recovery Rates (%) | | | | | |
| 1+ | 18 | 20 | 23 | 26 | 29 | 31 |
| 1 | 18 | 20 | 23 | 26 | 29 | 31 |
| 2 | 18 | 20 | 23 | 26 | 29 | 31 |
| 3 | 12 | 15 | 18 | 21 | 22 | 23 |
| 4 | 5 | 8 | 11 | 13 | 14 | 15 |
| 5 | 2 | 4 | 6 | 8 | 9 | 10 |
| 6 | - | - | - | - | - | - |

| Table 5: S&P Recovery Rates for Group 2 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating of senior secured asset | S&P Recovery Rates (%) | | | | | |
| 1+ | 16 | 18 | 21 | 24 | 27 | 29 |

NEWYORK 8715474 (2K)

| 1 | 16 | 18 | 21 | 24 | 27 | 29 |
| 2 | 16 | 18 | 21 | 24 | 27 | 29 |
| 3 | 10 | 13 | 15 | 18 | 19 | 20 |
| 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| 5 | 2 | 2 | 2 | 2 | 2 | 2 |
| 6 | - | - | - | - | - | - |

| Table 6:  S&P Recovery Rates for Group 3 senior unsecured assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating of senior secured asset | S&P Recovery Rates (%) | | | | | |
| 1+ | 13 | 16 | 18 | 21 | 23 | 25 |
| 1 | 13 | 16 | 18 | 21 | 23 | 25 |
| 2 | 13 | 16 | 18 | 21 | 23 | 25 |
| 3 | 8 | 11 | 13 | 15 | 16 | 17 |
| 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| 5 | 2 | 2 | 2 | 2 | 2 | 2 |
| 6 | - | - | - | - | - | - |

| Table 7:  S&P Recovery Rates for Groups 1, 2 and 3 subordinated assets if senior secured asset has an Asset Assigned Recovery Rating | | | | | | |
|---|---|---|---|---|---|---|
| CDO Liability Rating | AAA | AA | A | BBB | BB | B |
| Asset Assigned Recovery Rating of senior secured asset | S&P Recovery Rates (%) | | | | | |
| 1+ | 8 | 8 | 8 | 8 | 8 | 8 |

-73-

| 1 | 8 | 8 | 8 | 8 | 8 | 8 |
| 2 | 8 | 8 | 8 | 8 | 8 | 8 |
| 3 | 5 | 5 | 5 | 5 | 5 | 5 |
| 4 | 2 | 2 | 2 | 2 | 2 | 2 |
| 5 | - | - | - | - | - | - |
| 6 | - | - | - | - | - | - |

"<u>Zero Coupon Security</u>":  Any Collateral Obligation that at the time of purchase does not by its terms provide for the payment of cash interest; <u>provided</u>, that if, after such purchase, such Collateral Obligation provides for the payment of cash interest it shall cease to be a Zero Coupon Security.

Section 1.2.    <u>Assumptions as to Pledged Obligations</u>.  In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Obligation, or any payments on any other assets included in the Assets, with respect to the sale of and reinvestment in Collateral Obligations, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this <u>Section 1.2</u> (Assumptions as to Pledged Obligations) shall be applied.  The provisions of this <u>Section 1.2</u> shall be applicable to any determination or calculation, whether or not reference is specifically made to <u>Section 1.2</u>, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)    All calculations with respect to Scheduled Distributions on the Pledged Obligations securing the Notes shall be made on the basis of information as to the terms of each such Pledged Obligation and upon report of payments, if any, received on such Pledged Obligation that are furnished by or on behalf of the issuer of such Pledged Obligation and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(b)    For purposes of calculating the Coverage Tests and the Interest Reinvestment Test, except as otherwise specified in the Coverage Tests or the Interest Reinvestment Test, as applicable, such calculations will not include scheduled interest and principal payments on Defaulted Obligations or payments (including under any Hedge Agreement) as to which the Portfolio Manager or the Issuer has actual knowledge that such payments will not be made unless or until such payments are actually made.

(c)    For each Collection Period and as of any date of determination, the Scheduled Distribution on any Pledged Obligation (other than a Defaulted Obligation, which, except as otherwise provided herein, shall be assumed to have a Scheduled Distribution of zero) shall be the sum of (i) the total amount of payments and collections to be received during such Collection Period in respect of such Pledged Obligation (including the proceeds of the sale of

-74-

such Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Collection Period and not reinvested in additional Collateral Obligations or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2 (Purchase of Additional Collateral Obligations)) that, if paid as scheduled, will be available in the Collection Account at the end of the Collection Period and (ii) any such amounts received in prior Collection Periods that were not disbursed on a previous Payment Date.

(d)     Each Scheduled Distribution receivable with respect to a Pledged Obligation shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account to earn interest at the Assumed Reinvestment Rate.  All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.  For purposes of the applicable determinations required by Section 10.7(b)(iii) (Accountings), Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Secured Notes and floating rate Collateral Obligations will be calculated using the then-current interest rates applicable thereto.

(e)     References in Section 11.1(a) (Disbursements of Monies from Payment Account) to calculations made on a "pro forma basis" shall mean such calculations after giving effect to all payments, in accordance with the Priority of Payments described herein, that precede (in priority of payment) or include the clause in which such calculation is made.

(f)     For purposes of determining whether the Effective Date Overcollateralization Test has been satisfied, all calculations shall be made on a "pro forma basis" giving effect to any purchases and sales, and, for purposes of determining whether any Coverage Test or the Interest Reinvestment Test has been satisfied on any Determination Date for purposes of the Priority of Payments, all calculations shall be made on a "pro forma" basis after giving effect to any payments made through the applicable clause of the Priority of Payments.

(g)     For purposes of calculating all Concentration Limitations, in both the numerator and the denominator of any component of the Concentration Limitations, Defaulted Obligations will be treated as having a Principal Balance equal to zero.

(h)     If one or more Collateral Obligations included in the Assets would be deemed Current Pay Obligations but for the applicable percentage limitation in the definition thereof, the Portfolio Manager shall determine which such Collateral Obligations have the lowest Market Value expressed as a percentage and such Collateral Obligations with the lowest Market Value expressed as a percentage will be deemed Defaulted Obligations.  Each such Defaulted Obligation will be treated as a Defaulted Obligation for all purposes until such time as the Aggregate Principal Balance of Current Pay Obligations would not exceed, on a pro forma basis including such Defaulted Obligation, the applicable percentage of the Collateral Principal Amount.

(i)      Except as otherwise provided herein, Defaulted Obligations will not be included in the calculation of the Collateral Quality Test. Solely, for purposes of determining whether a Collateral Obligation satisfies the S&P CDO Monitor Test with respect to a purchase, additional Collateral Obligations purchased with proceeds from the sale of a Credit Risk Obligation, a Defaulted Obligation or an Equity Security shall not be included in the calculation of the S&P CDO Monitor Test.

(j)      For purposes of calculating the Collateral Quality Test, DIP Collateral Obligations will be treated as having an S&P Recovery Rate equal to the recovery rate for Senior Secured Loans set forth in the definition of "Weighted Average S&P Recovery Rate."

(k)      For purposes of calculating compliance with the Investment Criteria, the Portfolio Manager may elect to execute one or more Trading Plans (with notice to the Collateral Administrator, which notice shall include the identity of all sales and purchases forming part of such Trading Plan); provided that if a previous Trading Plan failed to comply with the Investment Criteria, the Portfolio Manager may not execute any further Trading Plans until the S&P Rating Condition is satisfied (and, following the satisfaction of the S&P Rating Condition, any number of additional Trading Plans may be executed subject to the other limitations in this Section 1.2(k) (Assumptions as to Pledged Obligations)). "Trading Plan" means, with respect to any proposed investment, a plan under which compliance with the Investment Criteria will be evaluated after giving effect to all sales and purchases proposed to be entered into within ten Business Days following the date of determination of such compliance (such period, the "Trading Plan Period"); provided that (i) the execution of a Trading Plan will not result in the averaging of the purchase price of a Collateral Obligation or Collateral Obligations purchased at separate times for purposes of any calculation made in connection with the Investment Criteria; (ii) no Trading Plan may be executed over a time period that includes a Determination Date; (iii) no Trading Plan may relate to the purchase of Collateral Obligations having an Aggregate Principal Balance in excess of 5.0% of the Collateral Principal Amount; (iv) only one Trading Plan may be outstanding at any time; (v) so long as the Investment Criteria are satisfied upon the expiry of the applicable Trading Plan Period, the failure of all of the terms and assumptions specified in such Trading Plan to be satisfied shall not be deemed to constitute a failure of such Trading Plan and (vi) the difference between the Collateral Obligation with the highest Weighted Average Life and the Collateral Obligation with the lowest Weighted Average Life, in each case, purchased in connection with a Trading Plan may not be greater than two years.

(l)      For purposes of calculating the sale proceeds of a Collateral Obligation in purchase and sale transactions, sales proceeds will include any Principal Financed Accrued Interest received in respect of such sale.

(m)      For purposes of calculating clauses (v) and (vi) of the Concentration Limitations, without duplication, the amounts on deposit in the Collection Account and the Ramp-up Account (including Eligible Investments therein) representing Principal Proceeds shall each be deemed to be a floating rate Collateral Obligation that is a Senior Secured Loan.

(n)      Notwithstanding any other provision of this Indenture to the contrary, all monetary calculations under this Indenture shall be in U.S. Dollars.

(o)    For all purposes of this Indenture, (i) a Senior Secured Note shall be deemed to be a Moody's Senior Secured Loan if such Senior Secured Note, if it were a loan, would meet the definition of Moody's Senior Secured Loan and (ii) a Senior Secured Note shall be deemed to be a Moody's Non-Senior Secured Loan if such Senior Secured Note, if it were a loan, would meet the definition of Moody's Non-Senior Secured Loan.

(p)    If the Issuer (or the Portfolio Manager on behalf of the Issuer) is notified by the administrative agent or other withholding agent or otherwise for the syndicate of lenders in respect of any Revolving Collateral Obligation, Delayed Drawdown Collateral Obligation or Pre-funded Letter of Credit or other letter of credit that amounts associated therewith are subject to withholding tax imposed by any jurisdiction, the applicable Collateral Quality Test, the Coverage Tests and the Interest Reinvestment Test shall be calculated thereafter net of the full amount of such withholding tax unless the related obligor is required to make "gross-up" payments to the Issuer that cover the full amount of any such withholding tax on an after-tax basis pursuant to the underlying instruments with respect thereto.

(q)    For all purposes (including calculation of the Coverage Tests, and the Interest Reinvestment Test), the Principal Balance of a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation will include all unfunded commitments that have not been irrevocably reduced or withdrawn.

(r)    For purposes of calculating compliance with any tests, ratios, or calculations under this Indenture, the trade date (and not the settlement date) with respect to any acquisition or disposition of a Collateral Obligation or Eligible Investment shall be used to determine whether and when such acquisition or disposition has occurred.

(s)    For reporting purposes and for purposes of calculating the Coverage Tests, the Investment Criteria and the requirements of Section 12.2(b) (Purchase of Additional Collateral Obligations), assets held by any ETB Subsidiary shall be treated as Equity Securities owned by the Issuer (and the equity interest in such ETB Subsidiary shall not be included in such calculation).

(t)    For purposes of calculating the Weighted Average Fixed Coupon and Weighted Average Floating Spread, only the interest payable in cash, including Deferrable Cash-Pay Interest with respect to a Partial Deferrable Security, shall be included in such calculation.

ARTICLE 2

The Notes

Section 2.1.    Forms Generally.  The Notes and the Trustee's or Authenticating Agent's certificate of authentication thereon (the "Certificate of Authentication") shall be in substantially the forms required by this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Applicable Issuers executing such Notes as evidenced by their execution of such Notes.  Any portion of the

NEWYORK 8715474 (2K)

text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2. <u>Forms of Notes</u>. (a) The forms of the Notes, including the forms of Certificated Secured Notes, Certificated Subordinated Notes, Regulation S Global Notes and Rule 144A Global Notes, shall be as set forth in the applicable part of <u>Exhibit A</u> hereto.

(b) <u>Regulation S Global Notes and Rule 144A Global Notes</u>. (i) The Secured Notes of each Class and the Subordinated Note sold to persons who are not U.S. persons in offshore transactions in reliance on Regulation S shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of <u>Exhibit A1</u> or <u>Exhibit A2</u> hereto (each, a "<u>Regulation S Global Note</u>") and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.

(ii) The Secured Notes of each Class sold to persons that are QIB/QPs shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the applicable form of <u>Exhibit A1</u> hereto (each, a "<u>Rule 144A Global Note</u>"), which shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, DTC, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The Class E Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of <u>Exhibit A4</u> (each, a "<u>Certificated Class E Note</u>") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Class F Notes sold to Institutional Accredited Investors shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of <u>Exhibit A4</u> (each, a "<u>Certificated Class F Note</u>") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Subordinated Notes (other than Regulation S Global Subordinated Notes) shall be issued in the form of definitive, fully registered notes without coupons substantially in the form of <u>Exhibit A3</u> (each, a "<u>Certificated Subordinated Note</u>") which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(iii) The Aggregate Outstanding Amount of the Regulation S Global Notes and the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or DTC or its nominee, as the case may be, as hereinafter provided.

(c) <u>Book Entry Provisions</u>. This <u>Section 2.2(c)</u> (Forms of Notes) shall apply only to Global Notes deposited with or on behalf of DTC.

The provisions of the "<u>Operating Procedures of the Euroclear System</u>" of Euroclear and the "<u>Terms and Conditions Governing Use of Participants</u>" of Clearstream, respectively, will be applicable to the Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Notes held on their behalf by the Trustee, as custodian for DTC and DTC may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(d) <u>Certificated Securities</u>. Except as provided in <u>Section 2.11</u> (Certificated Notes) hereof, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Section 2.3. <u>Authorized Amount; Stated Maturity; Denominations</u>. The Aggregate Outstanding Amount of Secured Notes and the Subordinated Notes that may be authenticated and delivered under this Indenture is limited to $525,500,000 Aggregate Outstanding Amount of Notes, except for Deferred Interest with respect to the Deferred Interest Notes, Additional Subordinated Notes issued pursuant to <u>Section 2.4</u> (Additional Notes) and Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in <u>lieu</u> of, other Notes pursuant to <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange), <u>2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) or <u>8.5</u> (Reference in Notes to Supplemental Indentures) and Notes issued pursuant to supplemental indentures in accordance with <u>Article 8</u>. The Aggregate Outstanding Amount of the Combination Notes may not exceed the Aggregate Maximum Notional Amount. The principal amount of each Underlying Class of a Combination Note is included in (and is not in addition to) the Aggregate Outstanding Amount of the related Class of Notes.

Such Notes shall be divided into the Classes, having the designations, original principal amounts and other characteristics as follows:

## Offered Securities

| Class Designation | X | A-1 | A-2A | A-2B | B | C | D | E | F | Combination Notes[1] | Subordinated Notes[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuer(s) | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer | Co-Issuers | Issuer |
| Original Principal Amount | $4,000,000 | $190,750,000 | $115,750,000 | $10,250,000 | $62,500,000 | $39,500,000 | $21,500,000 | $19,500,000 | $10,000,000 | $193,000,000 | $51,750,000 |
| Stated Maturity | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024 | April 18, 2024[6] | April 18, 2024 |
| Floating Rate Debt | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Index[2] | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR | LIBOR[6] | N/A |
| Index Maturity | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month | 3 month[6] | N/A |
| Spread | 1.00% | 0.87% | 1.25% | 1.65% | 1.95% | 2.95% | 4.50% | 5.60% | 6.50% | 1.227%[6] | N/A |
| Initial Rating(s)[3] | | | | | | | | | | | |
| Moody's | Aaa (sf) | Aaa (sf) | Aaa (sf) | Aaa (sf) | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| S&P | AAA (sf) | AAA (sf) | AAA (sf) | AAA (sf) | AA (sf) | A (sf) | BBB (sf) | BB (sf) | B (sf) | A (sf) | N/A |
| Ranking: | | | | | | | | | | | |
| Priority Classes | None | None[5] | None[5] | A-2B[5] | X, A-1, A-2 | X, A-1, A-2, B | X, A-1, A-2, B, C | X, A-1, A-2, B, C, D | X, A-1, A-2, B, C, D, E | | X, A-1, A-2, B, C, D, E, F |
| Pari Passu Classes | A-1, A-2 | X, A-2 | X, A-1 | X, A-1 | None | None | None | None | None | N/A | None |
| Junior Classes | B, C, D, E, F, Subordinated Notes | B, C, D, E, F, Subordinated Notes | A-2B, B, C, D, E, F, Subordinated Notes | B, C, D, E, F, Subordinated Notes | C, D, E, F, Subordinated Notes | D, E, F, Subordinated Notes | E, F, Subordinated Notes | Subordinated Notes, F | Subordinated Notes | N/A | None |
| Deferred Interest Notes | No | No | No | No | No | Yes | Yes | Yes | Yes | Yes | N/A |
| ERISA Limited Notes | No | No | No | No | No | No | No | Yes | Yes | No | Yes |

(1)     The Co-Issuers will issue Combination Notes with a maximum aggregate principal amount of up to U.S.$252,175,414 which maximum amount will be composed of Components representing up to U.S.$190,750,000 aggregate principal amount of Class A-1 Notes, up to U.S.$37,638,121 aggregate principal amount of Class B Notes and up to U.S.$23,787,293 aggregate principal amount of Class C Notes. The Combination Note will not bear interest at a stated rate, but will be entitled to receive interest with respect to the Underlying Classes. The ranking of the Combination Notes is determined by reference to the Underlying Classes. The Stated Maturity of the Combination Note is determined by reference to the Underlying Classes. Reference must be made to the Underlying Classes to determine whether a particular Component of the Combination Notes is a Deferrable Interest Note.

(2)     For the definition of LIBOR, see Exhibit G.

(3)     The Issuer will obtain initial ratings for the Class X Notes, the Class A-1 Notes and the Class A-2 Notes from both Moody's and S&P, and will obtain initial ratings for all Secured Notes from S&P.

(4)     The Subordinated Notes do not bear interest at a stated rate but will receive distributions on each Payment Date in accordance with the Priority of Payments.

(5)     The Class X Notes will be *pari passu* to the Class A-1 Notes and the Class A-2 Notes interest payments and in certain circumstances will be senior in right of principal payment to the Class A-1 Notes and the Class A-2 Notes. The Class A-1 Notes will be *pari passu* to the Class A-2 Notes. Interest payments on the Class A-2B Notes will be subordinated in all respects to interest payments on the Class A-2A Notes. Principal payments of the Class A-2B Notes will be subordinated in all respects to principal payments of the Class A-2A Notes.

-80-

(6) These represent the expected stated maturity, index, index maturity and interest to be paid on the Combination Note based on the stated maturity, index, index maturity and interest rates of the Underlying Classes. The Initial Rating by S&P of the Combination Note is with respect to the ultimate repayment of principal and interest at a rate of LIBOR plus 1.227% per annum by the Stated Maturity.

## Combination Notes Table

| Class | Aggregate Principal Amount (as of the Closing Date) | Permissible Ratio[1] | Aggregate Maximum Notional Amount |
|---|---|---|---|
| "Combination Notes" | $193,000,000 (representing Components of U.S.$145,988,657 Aggregate Outstanding Amount of Class A-1 Notes, U.S.$28,805,970 Aggregate Outstanding Amount of Class B Notes and U.S.$18,205,373 Aggregate Outstanding Amount of Class C Notes) | The Permissible Ratio on any date shall be the ratio of the then-current Aggregate Outstanding Amount of the Class A Notes: then-current Aggregate Outstanding Amount of the Class B Notes: and then-current Aggregate Outstanding Amount of the Class C Notes, respectively, divided by the sum of the then-current Aggregate Outstanding Amount of the Class A Notes, the Class B Notes and the Class C Notes.<br><br>As of the Closing Date, the Permissible Ratio shall be 75.64179%: 14.92537%: 9.43284% | $252,175,414 (representing Components of up to U.S.$190,750,000 Aggregate Outstanding Amount of Class A-1 Notes, up to U.S.$37,638,121 Aggregate Outstanding Amount of Class B Notes and up to U.S.$ 23,787,293 Aggregate Outstanding Amount of Class C Notes) |

[1] A Holder may round any of the fractional percentages set forth in this definition of Permissible Ratio either up or down to the extent necessary to cause an Exchange to comply with the $1 integral multiple requirement

The Notes (other than the Class A-1 Notes, the Class B Notes, the Class C Notes, the Class F Notes and the Combination Notes) shall be issuable in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000). The Class A-1 Notes, the Class B Notes, the Class C Notes, the Class F Notes and the Combination Notes shall be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof. Notes shall only be transferred or resold in compliance with the terms of the representation letter delivered by the initial purchaser of such Notes.

Section 2.4. Additional Notes. (a) At any time, the Applicable Issuers may issue Additional Subordinated Notes; provided, that the following conditions are met as certified to the Trustee by the Issuer:

(i) such issuance is approved by (x) the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Subordinated Notes, (y) the Portfolio Manager and (z) after the Effective Date only, at least a Majority of the Controlling Class;

-81-

(ii)     such issuance may not exceed 100% of the original outstanding amount of the Subordinated Notes;

(iii)     the terms of the Subordinated Notes issued must be identical to the respective terms of previously issued Subordinated Notes;

(iv)     an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that (1) such issuance will not result in the Issuer becoming subject to U.S. federal income taxation with respect to its net income, (2) such issuance would not cause the holders or beneficial owners of Secured Notes previously issued to be deemed to have sold or exchanged such Notes under Section 1001 of the Code and (3) such issuance would not adversely affect the tax characterization of any Outstanding Notes that was characterized as debt at the time of issuance; provided, that such opinions described in clauses (2) and (3) shall not be required with respect to any Class if 100% of the Holders of such Class have consented to a waiver of such requirement; and

(v)     after giving effect to the issuance of Additional Subordinated Notes, each Overcollateralization Ratio Test for each Class of Notes is satisfied.

(b)     The Additional Subordinated Notes will rank pari passu in all respects with the initial Subordinated Notes.

(c)     Any Additional Subordinated Notes issued pursuant to this Section 2.4 (Additional Notes) will, to the extent reasonably practicable, be offered first to Holders of the Subordinated Notes, in such amounts as are necessary to preserve their pro rata holdings of Subordinated Notes.

(d)     Any Additional Subordinated Notes may be offered at prices that differ from the applicable initial offering price.

(e)     The net proceeds of any Additional Subordinated Notes may be designated as Interest Proceeds or Principal Proceeds by the Portfolio Manager.

Section 2.5.     Execution, Authentication, Delivery and Dating.  The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers.  The signature of such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating

NEWYORK 8715474 (2K)

Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Outstanding principal amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original aggregate principal amount of such subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.6.     Registration, Registration of Transfer and Exchange. (a) The Issuer shall cause to be kept a register (the "Register") at the office of the Trustee in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "Registrar" for the purpose of registering Notes and transfers of such Notes with respect to the Register maintained in the United States as herein provided. Upon any resignation or removal of the Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Registrar.

If a Person other than the Trustee is appointed by the Issuer as Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Registrar and of the location, and any change in the location, of the Register, and the Trustee shall have the right to inspect the Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon a certificate executed on behalf of the Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal or face amounts and numbers of such Notes. Upon request at any time the Registrar shall provide to the Issuer, the Portfolio Manager, the Placement Agents or any Holder of Notes a current list of Holders as reflected in the Register.

Subject to this Section 2.6 (Registration, Registration of Transfer and Exchange), upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency), the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the

designated transferee or transferees, one or more new Notes of any authorized denomination and of a like aggregate principal or face amount. The Trustee shall provide notice of any such transfer to the Placement Agents.

At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal or face amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Issuer and, solely in the case of the Co-Issued Notes, the Co-Issuer, evidencing the same debt (to the extent they evidence debt), and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Registrar duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Trustee shall be permitted to request such evidence reasonably satisfactory to it documenting the identity and/or signature of the transferor and the transferee, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Exchange Act.

(b)      No Note may be sold or transferred (including, without limitation, by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act.

(c)      (i)      No transfer of any ERISA Limited Note will be effective, and the Trustee will not recognize any such transfer, if it would result in 25% or more of the value of any Class of ERISA Limited Notes being held by Benefit Plan Investors (the "25% Limitation"). For purposes of these calculations and all other calculations required by this subsection, any ERISA Limited Notes held by a Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Co-Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a Person (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) (a "Controlling Person"), the Trustee, the Portfolio Manager, the Placement Agents and their respective affiliates shall be disregarded and not treated as being Outstanding. In addition, if any Holder of ERISA Limited Notes (a) informs the Trustee that as a result of a proposed transfer of interests in, or securities issued by, such

-84-

Holder, all or a specified portion of the ERISA Limited Notes owned by such Holder would be deemed to be held by a Benefit Plan Investor and (b) requests the Trustee to determine and notify such Holder whether the 25% Limitation would be exceeded after giving effect to such transfer, then the Trustee shall make such determination, subject to the last sentence of this clause (i), and notify such Holder accordingly. Each Holder of ERISA Limited Notes shall be required to covenant that it will inform the Trustee of any such transfer, will not permit any such transfer that would cause the 25% Limitation to be exceeded to become effective, and will notify the Trustee of the effectiveness of any transfer that is not prohibited by this paragraph. After it is notified of the effectiveness of any transfer pursuant to the foregoing sentence, the Trustee shall regard the ERISA Limited Notes held by such Holder (or specified portion thereof) as being held by a Benefit Plan Investor in future calculations of the 25% Limitation made pursuant to this Indenture unless subsequently notified by such Holder that such Notes (or specified portion thereof) would no longer be deemed to be held by Benefit Plan Investors. The Trustee shall be entitled to rely exclusively upon the information set forth in the face of the transfer certificates received pursuant to the terms of this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) and only Notes that a Bank Officer of the Trustee actually knows to be so held shall be so disregarded.

(d)     The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) to be provided to the Trustee by a prospective transferor or transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange).

(e)     For so long as any of the Notes are Outstanding, the Issuer shall not issue or permit the transfer of any shares of the Issuer to U.S. Persons and the Co-Issuer shall not issue or permit the transfer of any membership interests of the Co-Issuer to U.S. Persons.

(f)     So long as a Global Note remains Outstanding and is held by or on behalf of DTC, transfers of such Global Note, in whole or in part, shall only be made in accordance with <u>Section 2.2(b)</u> (Forms of Notes) and this <u>Section 2.6(f)</u> (Registration, Registration of Transfer and Exchange). Subject to clauses (i), (ii) and (iii) of this <u>Section 2.6(f)</u> (Registration, Registration of Transfer and Exchange), transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of DTC or to a successor DTC or such successor's nominee.

(i)     <u>Rule 144A Global Note to Regulation S Global Secured Note</u>. If a holder of a beneficial interest in a Rule 144A Global Note deposited with DTC wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Regulation S Global Secured Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Secured Note, such holder, provided such holder or, in the case of a transfer, the transferee is not a U.S. person and is acquiring such interest in an offshore transaction, may, subject to the immediately

-85-

succeeding sentence and the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Regulation S Global Secured Note. Upon receipt by the Trustee or Registrar of (A) instructions given in accordance with DTC's procedures from an Agent Member directing the Trustee or Registrar to credit or cause to be credited a beneficial interest in the corresponding Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, (B) a written order given in accordance with DTC's procedures containing information regarding the participant account of DTC and the Euroclear or Clearstream account to be credited with such increase and (C) a certificate in the form of <u>Exhibit B1</u> attached hereto given by the holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the holder or the transferee, as applicable, is not a U.S. person, and in an offshore transaction pursuant to and in accordance with Regulation S, then the Trustee or Registrar shall instruct DTC to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, and to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Regulation S Global Secured Note equal to the reduction in the principal amount of the Rule 144A Global Note.

(ii) <u>Regulation S Global Secured Note to Rule 144A Global Note</u>. If a holder of a beneficial interest in a Regulation S Global Secured Note deposited with DTC wishes at any time to exchange its interest in such Regulation S Global Secured Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in such Regulation S Global Secured Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note. Upon receipt by the Trustee or Registrar of (A) instructions from Euroclear, Clearstream and/or DTC, as the case may be, directing the Trustee or Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Regulation S Global Secured Note, but not less than the minimum denomination applicable to such holder's Notes to be exchanged or transferred, such instructions to contain information regarding the participant account with DTC to be credited with such increase and (B) a certificate in the form of <u>Exhibit B2</u> attached hereto given by the holder of such beneficial interest and stating, among other things, that, in the case of a transfer, the Person transferring such interest in such Regulation S Global Secured Note reasonably believes that the Person acquiring such interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser, then the Trustee or Registrar will instruct DTC to reduce, or cause to be reduced, the

-86-

Regulation S Global Secured Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Secured Note to be transferred or exchanged and the Trustee or Registrar shall instruct DTC, concurrently with such reduction, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Secured Note.

(iii) <u>Regulation S Global Subordinated Note to Certificated Subordinated Note</u>. If a holder of a beneficial interest in a Regulation S Global Subordinated Note deposited with DTC wishes at any time to transfer its interest in such Regulation S Global Subordinated Note to a Person who wishes to take delivery thereof in the form of a Certificated Subordinated Note, such holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, transfer, or cause the transfer of, such interest for a Certificated Subordinated Note. Upon receipt by the Registrar of (A) certificates substantially in the form of <u>Exhibits B4</u> and <u>B6</u> attached hereto executed by the transferee and (B) appropriate instructions from DTC, if required, the Registrar will approve the instructions at DTC to reduce, or cause to be reduced, the Regulation S Global Subordinated Note by the Aggregate Outstanding Amount of the beneficial interest in the Regulation S Global Subordinated Note to be transferred, record the transfer in the Register in accordance with <u>Section 2.6(a)</u> (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer and authentication and delivery by the Trustee, one or more corresponding Certificated Subordinated Notes, registered in the names specified in the instructions in clause (B) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the Aggregate Outstanding Amount of the interest in such Regulation S Global Subordinated Notes transferred by the transferor), and in authorized denominations.

(iv) <u>Other Exchanges</u>. In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to <u>Section 2.11</u> (Certificated Notes) hereof, such Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers and comply with Rule 144A or are to persons who are not U.S. persons who are non-U.S. residents (as determined for purposes of the Investment Company Act), and otherwise comply with Regulation S under the Securities Act, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g) So long as a Certificated Note remains Outstanding, transfers of a Certificated Note, in whole or in part, shall only be made in accordance with this <u>Section 2.6(g)</u> (Registration, Registration of Transfer and Exchange).

(i) <u>Transfer and Exchange of Certificated Secured Note to Certificated Secured Note</u>. If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the

-87-

form of one or more Certificated Secured Notes of the same Class, such Holder may transfer or cause the transfer of such Note as provided below. Upon receipt by the Trustee or the Registrar of (A) such Holder's Certificated Secured Note properly endorsed for assignment to the transferee and (B) a certificate in the form of Exhibit B3 attached hereto given by the transferee of such Certificated Secured Note, then the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Secured Notes bearing the same designation as the Certificated Secured Notes endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal or face amounts designated by the transferee (the aggregate of such principal or face amounts being equal to the Aggregate Outstanding Amount of the Certificated Secured Notes surrendered by the transferor), and in authorized denominations. Certificated Secured Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(ii)     Transfer and Exchange of Certificated Subordinated Note to Certificated Subordinated Note. Upon receipt by the Registrar of (A) a Holder's Certificated Subordinated Note properly endorsed for assignment to the transferee and (B) certificates substantially in the form of Exhibits B4 and B6 attached hereto (which may be in the form of a subscription agreement containing substantially the representations in Exhibits B4 and B6) given by the transferee of such Certificated Subordinated Note, then the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Issuer authenticate and deliver one or more Certificated Subordinated Notes bearing the same designation as the Certificated Subordinated Note endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Subordinated Note surrendered by the transferor), and in authorized denominations. Certificated Subordinated Notes may be exchanged in the manner set forth in Section 2.6(g)(iv) (Registration, Registration of Transfer and Exchange).

(iii)     Transfer of Certificated Subordinated Note to Regulation S Global Subordinated Note. If a holder of a Certificated Subordinated Note wishes at any time to transfer such Certificated Subordinated Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Subordinated Note, such holder may, subject to the rules and procedures of Euroclear, Clearstream and/or DTC, as the case may be, exchange or transfer, or cause the exchange or transfer of, such Certificated Subordinated Note for a beneficial interest in a Regulation S Global Subordinated Note. Upon receipt by the Registrar of (A) a holder's Certificated Subordinated Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of Exhibit B5 attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a

beneficial interest in the Regulation S Global Subordinated Note in an amount equal to the Certificated Subordinated Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream to be credited with such increase, the Registrar shall cancel such Certificated Subordinated Note in accordance with Section 2.10 (Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Subordinated Note equal to the principal amount of the Certificated Subordinated Note transferred or exchanged.

(iv)     Exchange of Certificated Notes.  If a Holder of one or more Certificated Notes wishes at any time to exchange such Certificated Notes for one or more Certificated Notes of the same Class of different principal amounts, such holder may exchange or cause the exchange of such Certificated Note for Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange.  Upon receipt by the Applicable Issuers and the Trustee or the Registrar of (x) such Holder's Certificated Notes properly endorsed for such exchange and (y) written instructions from such Holder designating the number and principal or face amounts of the Certificated Notes to be issued (the aggregate of such principal or face amounts being equal to the aggregate principal or face amount of the Certificated Notes surrendered for exchange), then the Registrar shall cancel such Certificated Notes in accordance with Section 2.10 (Cancellation), record the exchange in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Notes bearing the same designation as the Certificated Notes endorsed for exchange, registered in the same names as the Certificated Notes surrendered by such Holder, in different principal or face amounts designated by such Holder, and in authorized denominations.

(v)     Transfer of Certificated Secured Notes to Regulation S Global Note or Rule 144A Global Note.  If a Holder of a Certificated Secured Note wishes at any time to transfer such Certificated Secured Note to a Person who wishes to take delivery thereof in the form of a beneficial interest in a Regulation S Global Note or Rule 144A Global Note, such Holder may, subject to the rules and procedures of DTC, exchange or transfer, or cause the exchange or transfer of, such Certificated Secured Note for a beneficial interest in a Regulation S Global Note or Rule 144A Global Note, as applicable.  Upon receipt by the Registrar of (A) a Holder's Certificated Secured Note properly endorsed for assignment to the transferee, (B) a certificate substantially in the form of Exhibit B3 attached hereto executed by the transferor, (C) instructions given in accordance with Euroclear, Clearstream or DTC's procedures, as the case may be, from an Agent Member to instruct DTC to cause to be credited a beneficial interest in the Regulation S Global Note or Rule 144A Global Note, as applicable, in an amount equal to the Certificated Secured Note to be transferred or exchanged and (D) a written order given in accordance with DTC's procedures containing information regarding the participant's account at DTC and/or Euroclear or Clearstream, as applicable, to be credited with such increase, the Registrar shall cancel such Certificated Secured Note in accordance with Section 2.10

NEWYORK 8715474 (2K)

(Cancellation), record the transfer in the Register in accordance with Section 2.6(a) (Registration, Registration of Transfer and Exchange) and approve the instructions at DTC, concurrently with such cancellation, to credit or cause to be credited to the securities account of the Person specified in such instructions a beneficial interest in the Regulation S Global Note or Rule 144A Global Note, as applicable, equal to the principal amount of the Certificated Secured Note transferred or exchanged

(h)     If Notes are issued upon the transfer, exchange or replacement of Notes bearing the applicable legends set forth in the applicable part of Exhibit A hereto, and if a request is made to remove such applicable legend on such Notes, the Notes so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the case may be, unless there is delivered to the Trustee and the Applicable Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA or the Code. Upon provision of such satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear such applicable legend.

(i)     Each Person who becomes a beneficial owner of Notes of a Class represented by an interest in a Global Note will be deemed to have represented and agreed as follows:

(i)     In connection with the purchase of such Notes: (A) none of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator, the Placement Agents or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Placement Agents other than any statements in the final offering circular for such Notes, and such beneficial owner has read and understands such final offering circular; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to this Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Trustee, the Collateral Administrator or the Placement Agents; (D) such beneficial owner is either (1) (except in the case of the Subordinated Notes) both (x) a Qualified Institutional Buyer that is not a broker-dealer which owns and invests on a discretionary basis less than $25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (y) either (i) a Qualified Purchaser or (ii) (in the case of the Subordinated Notes

only) a Knowledgeable Employee with respect to the Issuer; or corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser or (2) not a U.S. person and is acquiring the Notes in an offshore transaction in reliance on the exemption from registration provided by Regulation S; (E) such beneficial owner is acquiring its interest in such Notes for its own account; (F) such beneficial owner was not formed for the purpose of investing in such Notes; (G) such beneficial owner understands that the Issuer may receive a list of participants holding interests in the Notes from one or more book-entry depositories; and (H) such beneficial owner will hold and transfer at least the minimum denomination of such Notes and provide notice of the relevant transfer restrictions to subsequent transferees; provided, that in the case of clauses (A), (B) and (C) above, the Portfolio Manager or an Affiliate of the Portfolio Manager has acted as financial and investment advisor to certain accounts for the benefit of certain beneficial owners of Notes managed by the Portfolio Manager or such Affiliate of the Portfolio Manager and in that capacity has provided, and in the future may provide, advice to such beneficial owners of Notes.

(ii)    (a)  In the case of the Secured Notes other than the Class E Notes and Class F Notes, on each day from the date on which such beneficial owner acquires its interest in such Secured Notes through and including the date on which such beneficial owner disposes of its interest in such Secured Notes that either (x) it is neither a Benefit Plan Investor nor a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of such Secured Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law) and (b) in the case of Class E Notes and Class F Notes, on each day from the date on which such beneficial owner acquires its interest in such Class E Note or Class F Note through and including the date on which such beneficial owner disposes of its interest in such Class E Note or Class F Note, that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Class E Note or Class F Note will not constitute or result in a non-exempt violation under any such substantially similar law.  Any purported transfer of a Secured Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the applicable documents will be of no force and effect and shall be null and void ab initio.

Each purchaser of Regulation S Global Subordinated Notes from the Issuer in the initial offering will be required to represent and warrant, with certificates substantially in the form of Exhibit B4 hereto, with respect to each day it holds such Regulation S Global Subordinated Note or any beneficial interest therein, (1) whether or not the purchaser or transferee is a Benefit Plan Investor, (2) whether or not the purchaser or transferee is a Controlling Person and (3) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a

-91-

non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law. Each purchaser from the Issuer in the initial offering of a Regulation S Global Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Regulation S Global Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law. Such purchaser or transferee, as applicable, acknowledges that no Regulation S Global Subordinated Notes may be acquired by any purchaser or transferee, as applicable, that is a Benefit Plan Investor or Controlling Person if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors. Each purchaser or transferee of Regulation S Global Subordinated Notes from persons other than from the Issuer in the initial offering will be deemed to have represented and warranted, with respect to each day it holds such Regulation S Global Subordinated Note or any beneficial interest therein, that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law. No Regulation S Global Subordinated Notes may be acquired from persons other than from the Issuer in the initial offering by Benefit Plan Investors or Controlling Persons. Any purported transfer of the Regulation S Global Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements of this paragraph will be of no force and effect, shall be null and void ab initio and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

(iii)     Such beneficial owner understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, such Notes have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of this Indenture and the legend on such Notes. Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes. Such beneficial owner understands that neither of the Co-Issuers has been registered under the Investment Company Act, and that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act.

NEWYORK 8715474 (2K)

(iv)    It is aware that, except as otherwise provided in this Indenture, the Notes being sold to it, if any, in reliance on Regulation S will be represented by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(v)    The holder will provide notice to each Person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange), including the Exhibits referenced herein.

(j)    Each Person who becomes an owner of a Certificated Subordinated Note will be required to make the representations and agreements set forth in <u>Exhibit B4</u> and <u>Exhibit B6</u>.

(k)    Any purported transfer of a Note not in accordance with this <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) shall be null and void and shall not be given effect for any purpose whatsoever.

(l)    To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon written notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

(m)    Each purchaser has read the summary of the U.S. federal income tax considerations under the heading "*Certain Tax Considerations*" in the Offering Circular. Each purchaser will treat the characterization of the Notes as debt or equity for U.S. tax purposes in a manner consistent with the treatment of such Notes by the Issuer as described under the heading "*Certain Tax Considerations*" in the Offering Circular and will take no action inconsistent with such treatment.

(n)    Each purchaser understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  Each purchaser agrees to provide any such certification that is requested by the Issuer.

(o)    Each Holder and beneficial owner of a Note that is not a U.S. Person will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code) or (ii) it is a Person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it

is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

(p)     Any holder may assign its voting rights to one or more assignees pursuant to agreements entered into between such holder and the assignees.  Holders shall not assign voting rights to a person that has no right to cashflows from the applicable Notes (directly or indirectly) or retain voting rights when such holders have no remaining right to cashflow from the applicable Notes (directly or indirectly).

(q)     Each purchaser has read the summary of the provisions related to no petitions for bankruptcy in "*Description of the Offered Securities – No Petitions for Bankruptcy*" in the Offering Circular.  Each purchaser will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes.  Each purchaser understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Trustee to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture and that any holder or beneficial owner of a Note, the Trustee, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

(r)     Each Holder and beneficial owner of a Note (including a Holder or beneficial owner of a Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of such Note if such holder or beneficial owner fails to sell such Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to this Indenture to enable the Issuer to comply with FATCA.  A clearing organization that holds a Note on behalf of a beneficial owner may convert such Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the Holder of such Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of such Note.

(s)     Each purchaser, beneficial owner and subsequent transferee of a Combination Note or interest therein, by acceptance of such Combination Note or an interest in such Combination Note, will be deemed to have agreed that before any interest in a Combination Note may be exchanged for its ratable share of the Class A-1 Notes, the Class B Notes or the Class C Notes that comprise its Components, the Holder will be required to provide the Trustee with an Exchange Notice in the form of <u>Exhibit B7</u>.

-94-

Section 2.7.     Mutilated, Defaced, Destroyed, Lost or Stolen Note.  If (a) any mutilated or defaced Note is surrendered to a Transfer Agent, or if there shall be delivered to the Applicable Issuers, the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note and (b) there is delivered to the Applicable Issuers, the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement delivered to the Trustee by an institutional investor with a net worth of at least $200,000,000 being deemed sufficient to satisfy such security or indemnity requirement), then, in the absence of notice to the Applicable Issuers, the Trustee or such Transfer Agent that such Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and, upon Issuer Order, the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note, of like tenor (including the same date of issuance) and equal principal or face amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Applicable Issuers, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Applicable Issuers, the Trustee and the Transfer Agent in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated or defaced Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note), the Applicable Issuers may require the payment by the Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Applicable Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note), to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.8.     Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved.  (a)  Each Class of Secured Notes shall accrue interest during each

Interest Accrual Period at the applicable Note Interest Rate and such interest will be payable in arrears on each Payment Date on the Aggregate Outstanding Amount thereof on the first day of the related Interest Accrual Period (after giving effect to payments of principal thereof on such date), except as otherwise set forth below. Payment of interest on each Class of Secured Notes (and payments of Interest Proceeds to the Holders of the Subordinated Notes) will be subordinated to the payments of interest on the related Priority Classes. So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on such Class of Deferred Interest Notes which is not available to be paid ("Deferred Interest" with respect thereto) in accordance with the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1(a) (Events of Default) (and the failure to pay such interest shall not be an Event of Default) until the earliest of the Payment Date (i) on which such interest is available to be paid in accordance with the Priority of Payments, (ii) which is a Redemption Date with respect to such Class of Deferred Interest Notes and (iii) which is the Stated Maturity of such Class of Deferred Interest Notes. Deferred Interest on any Class of Deferred Interest Notes shall be added to the principal balance of such Class of Deferred Interest Notes and payable on the first Payment Date on which funds are available to be used for such purpose in accordance with the Priority of Payments, but in any event no later than the earlier of the Payment Date (i) which is the Redemption Date with respect to such Class of Deferred Interest Notes and (ii) which is the Stated Maturity of such Class of Deferred Interest Notes. Interest will cease to accrue on each Secured Note, or in the case of a partial repayment, on such part, from the date of repayment or the respective Stated Maturity, unless payment of principal is improperly withheld or unless default is otherwise made with respect to such payments of principal. To the extent lawful and enforceable, (x) interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for such Class until paid as provided herein and (y) interest on the interest on any Class X Notes, the Class A-1 Notes, the Class A-2 Notes or the Class B Notes or, if no Class X Notes, Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding, any Class C Note or, if no Class C Notes are Outstanding, any Class D Note or, if no Class D Notes are Outstanding, any Class E Notes or, if no Class E Notes are Outstanding, any Class F Notes that is not paid when due shall accrue at the Note Interest Rate for such Class until paid as provided herein.

(b)     The principal of each Secured Note of each Class matures at par and is due and payable on the Payment Date which is the Stated Maturity for such Class of Secured Notes, unless the unpaid principal of such Secured Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Secured Notes (and payments of Principal Proceeds to the Holders of the Subordinated Notes) may only occur (other than amounts constituting Deferred Interest thereon which will be payable from Interest Proceeds pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account)) after principal on each Class of Notes that constitutes a Priority Class with respect to such Class has been paid in full and is subordinated to the payment on each Payment Date of the principal and interest due and payable on such Priority Class(es), and other amounts in accordance with the Priority of Payments, and any payment of principal of any Class of Secured Notes which is not paid, in accordance with the Priority of Payments, on any Payment Date (other than the Payment Date which is the Stated Maturity of such Class or any Redemption Date), shall not be considered "due and payable" for purposes of Section 5.1(a) (Events of Default) until the Payment Date on which such principal may be paid

in accordance with the Priority of Payments or all of the Priority Classes with respect to such Class have been paid in full.

(c)     Principal payments on the Notes will be made in accordance with the Priority of Payments and <u>Section 9.1</u> (Mandatory Redemption) hereof.

(d)     As a condition to the payment of principal of and interest on any Secured Note or any payment on any Subordinated Note, without the imposition of withholding tax, the Paying Agent may require certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments in respect of such Note under any present or future law or regulation of the United States and any other applicable jurisdiction, or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)     Payments in respect of interest on and principal of any Secured Note and any payment with respect to any Subordinated Note shall be made by the Trustee in United States dollars to DTC or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Certificated Note, by wire transfer, as directed by the Holder, in immediately available funds to a United States dollar account, as the case may be, maintained by DTC or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Certificated Note; <u>provided</u>, that in the case of a Certificated Note, the Holder thereof shall have provided written wiring instructions to the Trustee on or before the related Record Date; and <u>provided</u>, <u>further</u>, that if appropriate instructions for any such wire transfer are not received by the related Record Date, then such payment shall be made by check drawn on a U.S. bank mailed to the address of the Holder specified in the Register.  Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Office of the Trustee or at the office of any Paying Agent on or prior to such Maturity; <u>provided</u>, <u>however</u>, that if the Trustee and the Applicable Issuers shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender.  None of the Co-Issuers, the Trustee, the Portfolio Manager, the Collateral Administrator nor any Paying Agent will have any responsibility or liability for any aspects of the records maintained by DTC, Euroclear, Clearstream or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.  In the case where any final payment of principal and interest is to be made on any Secured Note (other than on the Stated Maturity thereof) or any final payment is to be made on any Subordinated Note (other than on the Stated Maturity thereof), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail (by first class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Register a notice which shall specify the date on which such payment will be made, the amount of such payment per $100,000 original principal amount of Secured Notes, original principal amount of Subordinated Notes and the place where such Notes may be presented and surrendered for such payment.

(f) Payments of principal to Holders of the Secured Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Debt of such Class registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date. Payments to the Holders of the Subordinated Notes from Interest Proceeds and Principal Proceeds shall be made in the proportion that the Aggregate Outstanding Amount of the Subordinated Notes registered in the name of each such Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Subordinated Notes on such Record Date.

(g) Interest accrued with respect to the Secured Notes shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.

(h) All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i) Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets and following realization of the Assets, and application of the proceeds thereof in accordance with this Indenture, all obligations of and any claims against the Co-Issuers hereunder or in connection herewith after such realization shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, director, partner, employee, shareholder, member, manager or incorporator of either the Co-Issuers, the Portfolio Manager or their respective successors or assigns for any amounts payable under the Notes or (except as otherwise provided herein or in the Portfolio Management Agreement) this Indenture. It is understood that the foregoing provisions of this paragraph (i) shall not (i) prevent recourse to the Assets for the sums due or to become due under any security, instrument or agreement which is part of the Assets or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Assets have been realized. It is further understood that the foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. The Subordinated Notes are not secured hereunder.

(j) Subject to the foregoing provisions of this Section 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), each Note delivered and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal (or other applicable amount) that were carried by such other Note.

Section 2.9. Persons Deemed Owners. The Issuer, the Co-Issuer, the Trustee and any agent of the Co-Issuers or the Trustee may treat as the owner of such Note the Person in

whose name any Note is registered on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer, the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuers or the Trustee shall be affected by notice to the contrary.

Section 2.10.    <u>Cancellation</u>.  All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold.  No Note may be surrendered (including any surrender in connection with any abandonment) except for payment as provided herein, or for registration of transfer, exchange or redemption in accordance with Article 9 hereof, or for replacement in connection with any Note deemed lost or stolen.  Any such Notes shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10 (Cancellation), except as expressly permitted hereunder.  All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Co-Issuers shall direct by an Issuer Order that they be returned to it.  Neither of the Co-Issuers may acquire or purchase any Notes (including any Notes surrendered or abandoned). The previous sentence shall not limit any Optional Redemption, Clean-up Call Redemption, Special Redemption or Mandatory Redemption pursuant to the terms of this Indenture.

Section 2.11.    <u>Certificated Notes</u>.  (a)  A Global Note deposited with DTC pursuant to <u>Section 2.2</u> (Forms of Notes) shall be transferred in the form of a Certificated Note to the beneficial owners thereof only if such transfer complies with <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) and either (i) DTC notifies the Co-Issuers that it is unwilling or unable to continue as depository for such Global Note or (ii) if at any time DTC ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after such notice.  In addition, the owner of a beneficial interest in a Global Note will be entitled to receive a Certificated Note in exchange for such interest if an Event of Default has occurred and is continuing.

(b)    Any Global Note that is transferable in the form of a Certificated Note to the beneficial owners thereof pursuant to this <u>Section 2.11</u> (Certificated Notes) shall be surrendered by DTC to the Trustee's office located in the Borough of Manhattan, the City of New York to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of DTC) substantially in the form of <u>Exhibit A3</u> or <u>Exhibit A4</u> (each such Secured Note (including a Certificated Class E Note or a Certificated Class F Note) issued in definitive form, a "<u>Certificated Secured Note</u>" and, each such Subordinated Note issued in definitive form, a "<u>Certificated Subordinated Note</u>" and, collectively, the "<u>Certificated Notes</u>") in authorized denominations.  Any Certificated Note delivered in exchange for an interest in a Global Note shall, except as otherwise provided by <u>Section 2.6(h)</u> (Registration, Registration of Transfer and Exchange), bear the legends set forth in the applicable <u>Exhibit A</u> and shall be subject to the transfer restrictions referred to in such legends.

(c)     Subject to the provisions of paragraph (b) of this <u>Section 2.11</u> (Certificated Notes), the Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)     In the event of the occurrence of either of the events specified in subclauses (i) and (ii) of subsection (a) of this <u>Section 2.11</u> (Certificated Notes), the Co-Issuers will promptly make available to the Trustee a reasonable supply of Certificated Notes in definitive, fully registered form without interest coupons.

(e)     The Certificated Subordinated Notes issued pursuant to this <u>Section 2.11</u> (Certificated Notes) shall be in substantially the same form as the Certificated Subordinated Notes issued pursuant to <u>Section 2.2(b)</u> (Forms of Notes) with such changes therein as the Issuer and Trustee shall agree.

(f)     In the event that Certificated Notes are not so issued by the Issuer to such beneficial owners of interests in Global Notes as required by <u>Section 2.11(a)</u> (Certificated Notes), the Issuer expressly acknowledges that the beneficial owners shall be entitled to pursue any remedy that the Holders of a Global Note would be entitled to pursue in accordance with <u>Article 5</u> of this Indenture (but only to the extent of such beneficial owner's interest in the Global Note) as if Certificated Notes had been issued.

Section 2.12.    <u>Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations</u>.  (a) Notwithstanding anything to the contrary elsewhere in this Indenture, (x) any transfer of a beneficial interest in any Secured Note (other than the Class E Notes and Class F Notes) to a U.S. person that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act, (y) any transfer of a beneficial interest in any Class E Note or Class F Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Institutional Accredited Investor and (ii) a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act and (z) any transfer of a beneficial interest in any Subordinated Note to a U.S. person that is not (i) a Qualified Institutional Buyer or an Accredited Investor and (ii) a Qualified Purchaser, a Knowledgeable Employee or a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser and that is not made pursuant to an applicable exemption under the Securities Act and the Investment Company Act shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)     If (A) (x) any U.S. person that is not a QIB/QP shall become the beneficial owner of an interest in any Secured Note (other than the Class E Notes and Class F Notes), (y) any U.S. person that is not (i) a Qualified Institutional Buyer or an Institutional Accredited Investor and (ii) a Qualified Purchaser shall become the beneficial owner of an interest in a Class E Note or a Class F Note and (z) any person that is not a Qualified Purchaser, a Knowledgeable Employee or a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a

-100-

Knowledgeable Employee or a Qualified Purchaser shall become the beneficial owner of an interest in any Subordinated Note (any such person a "Non-Permitted Holder") or (B) any beneficial owner of an interest in any Note is designated as a Recalcitrant Holder or Non-Compliant FFI, the Issuer may (in its sole discretion), promptly after discovery (or after designation as a Recalcitrant Holder or Non-Compliant FFI) that such person is a Non-Permitted Holder, a Recalcitrant Holder or a Non-Compliant FFI by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI demanding that such Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI transfer its interest in the Notes held by such person to a Person that is not a Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI within 30 days of the date of such notice. If such Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI fails to so transfer such Notes, the Issuer shall (1) have the right to compel such Holder to sell its interest in the Notes, (2) assign such Notes a separate CUSIP number or numbers and (3) have the right, without further notice to the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI, to sell such Notes or interest in such Notes to a purchaser selected by the Issuer that is a not a Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI on such terms as the Issuer may choose. The Issuer, or the Portfolio Manager acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes to the highest such bidder. However, the Issuer or the Portfolio Manager acting on behalf of the Issuer may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI and each other Person in the chain of title from the Holder to the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted Holder, Recalcitrant Holder or Non-Compliant FFI. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

(c)     Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any ERISA Limited Note to a Person who has made or is deemed to have made an ERISA-related representation required by Section 2.6 (Registration, Registration of Transfer and Exchange) that is subsequently shown to be false or misleading shall be null and void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(d)     If any Person shall become the beneficial owner of an interest in any ERISA Limited Note who has made or is deemed to have made an ERISA-related representation required by Section 2.6 (Registration, Registration of Transfer and Exchange) that is subsequently shown to be false or misleading or whose beneficial ownership otherwise causes a violation of the 25% Limitation (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery by the Issuer that such person is a Non-Permitted ERISA Holder (or upon notice by the Trustee to the Issuer if it makes the discovery), send notice to such

Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all or any portion of the ERISA Limited Notes held by such Person to a Person that is not a Non-Permitted ERISA Holder within 14 days of the date of such notice. If such Non-Permitted ERISA Holder fails to so transfer its ERISA Limited Notes the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Limited Notes or interest in such ERISA Limited Notes to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose. The Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the ERISA Limited Notes and selling such ERISA Limited Notes to the highest such bidder. However, the Issuer may select a purchaser by any other means determined by it in its sole discretion. The Holder of each ERISA Limited Note, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Limited Notes agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the ERISA Limited Notes sold as a result of any such sale or the exercise of such discretion.

Section 2.13.    <u>Tax Purposes</u>.  (a)  Each Holder and each beneficial owner of a Secured Note by acceptance of such Secured Note, or its interest in such Secured Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Secured Note as debt of the Issuer for U.S. federal income tax purposes except as otherwise required by law. Each Holder and each beneficial owner of a Subordinated Note by acceptance of such Subordinated Note or its interest in such Subordinated Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Subordinated Note as equity in the Issuer for U.S. federal income tax purposes except as otherwise required by law.

(b)    Each Holder and beneficial owner of a Note, by acceptance of such Note or its interest in such Note, shall be deemed to understand and acknowledge that failure to provide the Issuer, the Trustee or any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a U.S. Person or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a U.S. Person or the failure to meet its Noteholder Reporting Obligations may result in U.S. federal withholding (including back-up withholding) from payments in respect of such Note.

(c)    Each purchaser, beneficial owner and subsequent transferee of a Note or interest therein, by acceptance of such Note or an interest in such Note, shall be deemed to have agreed (1) to provide the Issuer and Trustee (i) any information as is necessary (in the sole determination of the Issuer or the Trustee, as applicable) for the Issuer and the Trustee to determine whether such purchaser, beneficial owner or transferee is a United States person or a United States owned foreign entity (as described in Section 1471(d)(3) of the Code) ("United States owned foreign entity") and (ii) any additional information that the Issuer or its agent requests in connection with FATCA and (2) if it is a United States person or a United States owned foreign entity that is a Holder or beneficial owner of Notes or an interest therein (x) to

provide the Issuer and Trustee its name, address, U.S. taxpayer identification number and any other information requested (in connection with FATCA) by the Issuer or its agent upon request and (y) to update any such information provided in clause (x) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required (such obligation, the "Noteholder Reporting Obligations"). Each purchaser and subsequent transferee of Notes will be required or deemed to acknowledge that the Issuer may provide such information and any other information concerning its investment in the Notes to the IRS. Each purchaser and subsequent transferee of Notes will be required or deemed to understand and acknowledge that the Issuer has the right, hereunder, to compel any beneficial owner of an interest in a Note that fails to comply with the foregoing requirements to sell its interest in such Note, or may sell such interest on behalf of such owner following the procedures and timeframe relating to Non-Permitted Holders specified in Section 2.12 (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations). In addition, each purchaser and subsequent transferee of Notes will be required or deemed to understand and acknowledge that the Issuer has the right, hereunder, to withhold (without any gross-up) on any beneficial owner of an interest in a Note that fails to comply with the foregoing requirements.

Section 2.14. No Gross Up. The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges imposed on payments in respect of the Notes.

ARTICLE 3

Conditions Precedent

Section 3.1. Conditions to Issuance of Notes on Closing Date. (a) The Notes to be issued on the Closing Date may be executed by the Applicable Issuers and delivered to the Trustee for authentication upon Issuer Order and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee (or, with respect to the Accountants' Report specified in clause (xiv) below, the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants)) of the following:

(i) Officers' Certificates of the Co-Issuers Regarding Corporate Matters. An Officer's certificate of each of the Co-Issuers (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, and, in the case of the Issuer, the Portfolio Management Agreement, the Securities Account Control Agreement, the Placement Agency Agreement, the Collateral Administration Agreement, any Hedge Agreements and related transaction documents and in each case the execution, authentication and delivery of the Notes applied for by it and specifying the Stated Maturity, principal amount and Note Interest Rate of each Class of Secured Notes to be authenticated and delivered, the Stated Maturity and principal amount of Subordinated Notes to be authenticated and delivered and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)    Governmental Approvals.  From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes applied for by it or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as have been given.

(iii)    U.S. Counsel Opinions.  Opinions of White & Case LLP, special U.S. counsel to the Co-Issuers, Dechert LLP, counsel to the Portfolio Manager, and Seward & Kissel LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit C, Exhibit D, and Exhibit E attached hereto.

(iv)    Cayman Counsel Opinion.  An opinion of Appleby (Cayman) Ltd., Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit F attached hereto.

(v)    Officers' Certificates of Co-Issuers Regarding Indenture.  An Officer's certificate of each of the Co-Issuers stating that the Applicable Issuer is not in default under this Indenture and that the issuance of the Offered Securities applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Offered Securities applied for by it have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.  The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Closing Date.

(vi)    Hedge Agreements.  Executed copies of any Hedge Agreement entered into by the Issuer.

(vii)    Portfolio Management Agreement and Collateral Administration Agreement.  An executed counterpart of the Portfolio Management Agreement and the Collateral Administration Agreement.

(viii)    Grant of Collateral Obligations.  The Grant pursuant to the Granting Clause of this Indenture of all of the Issuer's right, title and interest in and to the Collateral Obligations pledged to the Trustee for inclusion in the Assets on the Closing Date securing the Notes and Delivery of such Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent

-104-

received by the Issuer) as contemplated by Section 3.3 (Custodianship; Delivery of Collateral Obligations and Eligible Investments).

(ix) Certificate of the Issuer Regarding Assets. A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets, on the Closing Date and immediately prior to the Delivery thereof on the Closing Date:

(A) the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Closing Date and (ii) those Granted pursuant to this Indenture;

(B) the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C) the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(D) the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

(E) the information set forth with respect to such Collateral Obligation in the Schedule of Collateral Obligations is correct;

(F) each Collateral Obligation included in the Assets satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(a)(viii) (Conditions to Issuance of Notes on Closing Date); and

(G) upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and other Assets, except as permitted by this Indenture.

(x) Rating Letters. An Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of a letter signed by each Rating Agency, as applicable, and confirming that each Class of Secured Notes has been assigned the applicable Initial Rating and that such ratings are in full force and effect on the Closing Date.

(xi) Accounts. A certificate evidencing the establishment of each of the Accounts.

(xii) Issuer Order for Deposit of Funds into Accounts. (a) An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $502,631,025 from the proceeds of the issuance

of the Notes into the Ramp-up Account for use pursuant to Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) and 10.3(c) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account), (b) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $2,100,000 from the proceeds of the issuance of the Notes into the Expense Reserve Account for use pursuant to Section 10.3(d) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account) and (c) an Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of $4,000,000 from the proceeds of the issuance of the Notes into the Interest Reserve Account for use pursuant to Section 10.3(f) (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

(xiii)    Irish Listing.    An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Notes to the Official List and to trade on the Global Exchange Market.

(xiv)    Accountants' Report.    An Accountants' Report (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation set forth on the Schedule of Collateral Obligations attached hereto as Schedule 1 and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, (B) confirming that the Aggregate Principal Balance of the Collateral Obligations which the Issuer has purchased or entered into binding agreements to purchase on or about the Closing Date is at least $250,000,000 and (C) specifying the procedures undertaken by them to review data and computations relating to the foregoing statement.

(xv)    Other Documents.    Such other documents as the Trustee may reasonably require; provided, that nothing in this clause (xv) shall imply or impose a duty on the part of the Trustee to require any other documents.

Section 3.2.    Conditions to Issuance of Additional Notes.    Additional Subordinated Notes to be issued on an Additional Notes Closing Date pursuant to Section 2.4 (Additional Notes) may be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee upon Issuer Order and upon receipt by the Trustee (or, with respect to the Accountants' Report specified in clause (vi) below, the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants)) of the following:

(i)    Officers' Certificates of the Co-Issuers Regarding Corporate Matters.    An Officer's certificate of each of the Co-Issuers (1) evidencing the authorization by Board Resolution of the execution and delivery of a supplemental indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities) and the execution, authentication and delivery of the Additional Subordinated Notes applied for by it specifying the Stated Maturity and principal amount of the Subordinated

-106-

Notes to be authenticated and delivered and (2) certifying that (a) the attached copy of such Board Resolution is a true and complete copy thereof, (b) such resolutions have not been rescinded and are in full force and effect on and as of the Additional Notes Closing Date and (c) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon.

(ii)     Governmental Approvals.   From each of the Co-Issuers either (A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of such Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of such Additional Subordinated Notes or (B) an Opinion of Counsel of the Applicable Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Additional Subordinated Notes except as have been given.

(iii)    U.S. Counsel Opinions.   Opinions of White & Case LLP, special U.S. counsel to the Co-Issuers, or other counsel acceptable to the Trustee, dated the Additional Notes Closing Date, substantially in the form of Exhibit C attached hereto, each with additions or deletions reflecting the additional issuance.

(iv)    Cayman Counsel Opinion.   An opinion of Appleby (Cayman) Ltd., Cayman Islands counsel to the Issuer, or other counsel acceptable to the Trustee, dated the Additional Notes Closing Date, substantially in the form of Exhibit F attached hereto.

(v)     Officers' Certificates of Co-Issuers Regarding Indenture.   An Officer's certificate of each Co-Issuer stating that the Applicable Issuer is not in default under this Indenture and that the issuance of the Additional Subordinated Notes applied for by it will not result in a default or a breach of any of the terms, conditions or provisions of, or constitute a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture and the supplemental indenture pursuant to Section 8.2(b) (Supplemental Indentures With Consent of Holders of Offered Securities) relating to the authentication and delivery of the Additional Subordinated Notes applied for have been complied with; and that all expenses due or accrued with respect to the Offering of the Additional Subordinated Notes or relating to actions taken on or in connection with the Additional Notes Closing Date have been paid or reserved.   The Officer's certificate of the Issuer shall also state that all of its representations and warranties contained herein are true and correct as of the Additional Notes Closing Date.

(vi)    Accountants' Report.   An Accountants' Report (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation pledged in connection with the issuance of such Additional Subordinated Notes and the information provided by the Issuer with respect to every other asset

-107-

included in the Assets, by reference to such sources as shall be specified therein, (B) provided, that any such issuance of Additional Subordinated Notes occurs after the Ramp-up Period, confirming that after giving effect to such pledge and the issuance of such Additional Subordinated Notes (1) the Coverage Tests are met, (2) in the aggregate, the Collateral Obligations comply with all of the requirements set forth in the Concentration Limitations and (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) is met and (C) specifying the procedures undertaken by them to review data and computations relating to the foregoing statement.

(vii)    Grant of Collateral Obligations.    The Grant pursuant to the Granting clause of this Indenture of all of the Issuer's right, title and interest in and to the additional Collateral Obligations pledged to the Trustee for inclusion in the Assets on the Additional Notes Closing Date, and Delivery of such additional Collateral Obligations (including any promissory note and all other Underlying Instruments related thereto to the extent received by the Issuer) as contemplated by Section 3.3 (Custodianship; Delivery of Collateral Obligations and Eligible Investments).

(viii)    Certificate of the Issuer Regarding Assets.    A certificate of an Authorized Officer of the Issuer, dated as of the Additional Notes Closing Date, to the effect that, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Assets on the Additional Notes Closing Date and immediately prior to the Delivery thereof on the Additional Notes Closing Date:

(A)    the Issuer is the owner of such Collateral Obligation free and clear of any liens, claims or encumbrances of any nature whatsoever except for (i) those which are being released on the Additional Notes Closing Date or (ii) those Granted pursuant to this Indenture;

(B)    the Issuer has acquired its ownership in such Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Obligation (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(D)    the Issuer has full right to Grant a security interest in and assign and pledge such Collateral Obligation to the Trustee;

(E)    the information set forth with respect to such Collateral Obligation in the Schedule of Collateral Obligations is correct;

(F)    the Collateral Obligations included in the Assets satisfy the requirements of the definition of "Collateral Obligations" and of Section 3.2(vii) (Conditions to Issuance of Additional Notes) and, if the Additional Notes Closing Date is subsequent to the Ramp-up Period, each component of the Concentration Limitations and the Collateral Quality Test; and

NEWYORK 8715474 (2K)

(G)     upon Grant by the Issuer, the Trustee has a first priority perfected security interest in such Collateral Obligations and other Assets, except as permitted by this Indenture.

(ix)     <u>Rating Letters</u>.  An Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of a letter signed by each Rating Agency, as applicable, and confirming that such Rating Agency's rating of the Secured Notes has not been lowered from the Initial Ratings and will not be lowered as a result of the issuance of the Additional Subordinated Notes.

(x)     <u>Irish Listing</u>.  If the Additional Subordinated Notes are of a Class of Notes listed on the Irish Stock Exchange, an Officer's certificate of the Issuer to the effect that attached thereto is a true and correct copy of written confirmation from the Irish Stock Exchange that such Additional Subordinated Notes have been admitted to listing on the Irish Stock Exchange.

(xi)     <u>Other Documents</u>.  Such other documents as the Trustee may reasonably require; <u>provided</u>, that nothing in this clause (xi) shall imply or impose a duty on the Trustee to so require any other documents.

Section 3.3.     <u>Custodianship; Delivery of Collateral Obligations and Eligible Investments</u>.  (a)  The Issuer shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "<u>Custodian</u>"), all Assets in accordance with the definition of "<u>Deliver</u>."  Initially, the Custodian shall be U.S. Bank National Association. Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary and shall be subject to the requirements of <u>Section 10.1</u> (Collection of Money).  Subject to the limited right to relocate Pledged Obligations as provided in <u>Section 7.5(b)</u> (Protection of Assets), the Trustee or the Custodian, as applicable, shall hold (i) all Collateral Obligations, Eligible Investments, Cash and other investments purchased in accordance with this Indenture and (ii) any other property of the Issuer otherwise Delivered to the Trustee or the Custodian, as applicable, by or on behalf of the Issuer, in the relevant Account, established and maintained pursuant to <u>Article 10</u>; as to which in each case the Trustee shall have entered into an Agreement with the Custodian substantially in the form of <u>Exhibit H</u> providing, <u>inter alia</u>, that the establishment and maintenance of such Account will be governed by a law of a jurisdiction satisfactory to the Issuer and the Trustee.

(b)     Each time that the Portfolio Manager on behalf of the Issuer directs or causes the acquisition of any Collateral Obligation, Eligible Investment, or other investments, the Portfolio Manager (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment, or other investment is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment, or other investment to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such investment that is not a Collateral Obligation, in the Account in which the funds used to purchase the investment are held in accordance with <u>Article 10</u>) for the benefit of the Trustee in accordance with this Indenture.  The security interest of the Trustee in the funds or other property used in connection with such acquisition shall, immediately and without further action

on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment, or other investment so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments, or other investments.

ARTICLE 4

Satisfaction and Discharge

Section 4.1.     Satisfaction and Discharge of Indenture.  This Indenture shall be discharged and shall cease to be of further effect except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Notes, (iii) rights of Holders to receive payments of principal thereof and interest thereon, (iv) the rights and immunities of the Trustee hereunder and those obligations of the Trustee set forth in Section 4.2 (Application of Trust Money), (v) the rights, obligations and immunities of the Portfolio Manager hereunder and under the Portfolio Management Agreement, the rights, obligations and immunities of the Collateral Administrator under the Collateral Administration Agreement and (vi) the rights of Holders of Notes as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture) when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered to Holders (other than (A) Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7 (Mutilated, Defaced, Destroyed, Lost or Stolen Note) and (B) Notes for whose payment Money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3 (Money for Note Payments to be Held in Trust), have been delivered to the Trustee for cancellation; or

(ii)     all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year or (C) are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3 (Redemption Procedures), Section 9.6 (Clean-up Call Redemption) and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or non-callable direct obligations of the United States of America; provided, that the obligations are entitled to the full faith and credit of the United States of America or are debt obligations which are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of

Notes which have become due and payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority or free of any adverse claim, as applicable, and shall have furnished an Opinion of Counsel with respect thereto; provided, however, that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) (Optional Preservation of Assets) shall have been made and not rescinded;

(b)　　the Issuer has paid or caused to be paid all other sums then due and payable hereunder (including any amounts then due and payable pursuant to the Hedge Agreements, the Collateral Administration Agreement and the Portfolio Management Agreement without regard to the Administrative Expense Cap) by the Issuer and no other amounts are scheduled to be due and payable by the Issuer; and

(c)　　the Co-Issuers have delivered to the Trustee Officers' certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with;

provided, however, that in the case of clause (a)(ii) above, the Issuer has delivered to the Trustee an Opinion of Counsel of Independent U.S. tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Holders of Secured Notes would recognize no income gain or loss for U.S. federal income tax purposes as a result of such deposit and satisfaction and discharge of this Indenture; provided, further, that, upon the final distribution of all proceeds of any liquidation of the Collateral Obligations, the Equity Securities and the Eligible Investments effected pursuant to Article 5, the requirements of clauses (a) and (b) above shall be deemed satisfied for the purposes of discharging this Indenture.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Portfolio Manager and, if applicable, the Holders, as the case may be, under Sections 2.8 (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), 4.2 (Application of Trust Money), 5.4(d) (Remedies), 5.9 (Unconditional Rights of Holders to Receive Principal and Interest), 5.18 (Action on the Notes), 6.6 (Money Held in Trust), 6.7(c) (Trustee Compensation and Reimbursement), 7.1 (Payment of Principal and Interest), 7.3 (Money for Note Payments to be Held in Trust), 13.1 (Subordination; Non-Petition), 14.13 (Confidential Information) and 14.14 (Liability of Co-Issuers) hereof shall survive.

Section 4.2.　　Application of Trust Money.　All Monies deposited with the Trustee pursuant to Section 4.1 (Satisfaction and Discharge of Indenture) shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including, without limitation, the Priority of Payments, to the payment of principal and interest (or other amounts with respect to the Subordinated Notes), either directly or through any Paying Agent, as the Trustee may determine; and such Money shall be held in a segregated account identified as being held in trust for the benefit of the Secured Parties.

-111-

Section 4.3.     Repayment of Monies Held by Paying Agent.   In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all Monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 (Money for Note Payments to be Held in Trust) hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such Monies.

## ARTICLE 5

## Remedies

Section 5.1.     Events of Default.   "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     a default in the payment, when due and payable, of (i) any Class X Note Payment Amount or any interest on any Class X Note, Class A-1 Note, Class A-2 Note or Class B Note or, if there are no Class X Notes, Class A-1 Notes, Class A-2 Notes or Class B Notes Outstanding, any Class C Note or, if there are no Senior Notes or Class C Notes Outstanding, any Class D Note or, if there are no Co-Issued Notes Outstanding, any Class E Note or, if there are no Co-Issued Notes or Class E Notes Outstanding, any Class F Note, and the continuation of any such default for five Business Days or (ii) any principal, interest, or Deferred Interest on, or any Redemption Price in respect of, any Secured Note at its Stated Maturity or any Redemption Date; provided that, in each case, if such failure resulted solely from an administrative error or omission by the Trustee, the continuation of any such default for an additional five Business Days;

(b)     unless legally required or permitted to withhold such amounts, the failure by the Issuer on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments (other than as provided in clause (a) above), which failure is incapable of remedy or, if capable of remedy, is not remedied within 30 days after notice of such failure has been given to the Issuer by the Trustee or to the Issuer, the Trustee and the Portfolio Manager by at least a Majority of the Controlling Class (or, if such failure can only be remedied on a Payment Date, is not remedied by the later of the 30 day period specified above and the next Payment Date); provided that, if such failure has not been remedied within the period specified above (or before the next Payment Date, as applicable) it shall not constitute an Event of Default if corrective action is instituted within such specified period (or before the next Payment Date, as applicable) and is diligently pursued until the failure has been remedied;

(c)     either of the Co-Issuers or the Assets becomes an investment company required to be registered under the Investment Company Act;

NEWYORK 8715474 (2K)

(d)     except as otherwise provided in this <u>Section 5.1</u> (Events of Default), a default, in a material respect, in the performance, or breach, in a material respect, of any other material covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (it being understood, without limiting the generality of the foregoing, that any failure to meet any Concentration Limitation, Collateral Quality Test or Coverage Test is not an Event of Default), or the failure of any material representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all material respects when the same shall have been made, and the continuation of such default, breach or failure for a period of 30 days after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier, by the Trustee, or to the Applicable Issuers, the Portfolio Manager and the Trustee by at least a Majority of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "<u>Notice of Default</u>" hereunder; <u>provided</u>, that if the Issuer or the Co-Issuer, as applicable (as notified to the Trustee by the Portfolio Manager in writing) has commenced curing such default, breach or failure during the 30 day period specified above, such default, breach or failure shall not constitute an Event of Default under this clause (d) unless it continues for a period of 45 days (rather than, and not in addition to, such 30 day period specified above) after notice to the Applicable Issuers and the Portfolio Manager by registered or certified mail or overnight courier;

(e)     the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(f)     the institution by the shareholders or members, as applicable, of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders or members, as applicable, of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action;

(g)     on any Measurement Date prior to payment in full of the Class A Notes, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to (1) the Collateral Principal Amount *plus* (2) the aggregate Market Value of all Defaulted

Obligations on such date and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A Notes, to equal or exceed 102.5%; or

(h) on any Measurement Date prior to payment in full of the Class A Notes, failure of the percentage equivalent of a fraction, (i) the numerator of which is equal to (1) the Collateral Principal Amount *plus* (2) the aggregate Market Value of all Defaulted Obligations on such date *minus* (3) the CCC/Caa Par Reduction Amount and (ii) the denominator of which is equal to the Aggregate Outstanding Amount of the Class A Notes, to equal or exceed 102.5%.

Upon obtaining knowledge of the occurrence of an Event of Default (in the case of the Trustee, subject to <u>Section 6.1(d)</u> (Certain Duties and Responsibilities of the Trustee) hereof), each of (i) the Co-Issuers, (ii) the Trustee and (iii) the Portfolio Manager shall notify each other of such Event of Default. Upon the occurrence of an Event of Default actually known to a Bank Officer of the Trustee, the Trustee shall promptly notify each Hedge Counterparty, the Noteholders (as their names appear on the Register), each Paying Agent, DTC, each of the Rating Agencies and the Irish Stock Exchange (for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require) of such Event of Default in writing (unless such Event of Default has been waived as provided in <u>Section 5.14</u> (Waiver of Past Defaults)).

Section 5.2.     <u>Acceleration of Maturity; Rescission and Annulment</u>.  (a)  If an Event of Default occurs and is continuing (other than an Event of Default specified in <u>Section 5.1(e)</u>, <u>(f)</u> or <u>(h)</u> (Events of Default)), the Trustee may, and shall, upon the written direction of at least a Majority of the Controlling Class, by notice to the Co-Issuers and each Rating Agency, declare the principal of all the Secured Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable.  If an Event of Default specified in <u>Section 5.1(e)</u> or <u>(f)</u> (Events of Default) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Secured Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Noteholder. If an Event of Default specified in <u>Section 5.1(h)</u> (Events of Default) occurs and is continuing, the Trustee may, and shall, upon the written direction of the Holders of at least a Majority of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes (voting separately by Class) by notice to the Co-Issuers and each Rating Agency, declare the principal of all the Secured Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable.

(b)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Money due has been obtained by the Trustee as hereinafter provided in this <u>Article 5</u>, at least a Majority of the Controlling Class (or in the case of an acceleration as a result of an Event of Default specified in <u>Section 5.1(h)</u> (Events of Default), the Holders of at least a Majority of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes (voting separately by Class)) by written notice to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

(i)        The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)        all unpaid installments of interest and principal then due on the Secured Notes (other than as a result of such acceleration);

(B)        to the extent that the payment of such interest is lawful, interest upon any Deferred Interest at the applicable Note Interest Rates; and

(C)        all unpaid taxes and Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee hereunder and any other amounts then payable by the Co-Issuers hereunder prior to such Administrative Expenses; and

(ii)        The Trustee has determined (based upon the information available to it) that all Events of Default, other than the nonpayment of the interest on or principal of the Secured Notes that have become due solely by such acceleration, have (A) been cured, and at least a Majority of the Controlling Class (or in the case of an acceleration as a result of an Event of Default specified in <u>Section 5.1(h)</u> (Events of Default), the Holders of at least a Majority of Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes (voting separately by Class)) by written notice to the Trustee has agreed with such determination (which agreement shall not be unreasonably withheld) or (B) been waived as provided in <u>Section 5.14</u> (Waiver of Past Defaults).

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3.        <u>Collection of Indebtedness and Suits for Enforcement by Trustee</u>. The Applicable Issuers covenant that if a Default shall occur in respect of the payment of any principal of or interest when due and payable on any Secured Notes, the Applicable Issuers will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holder of such Secured Note, the whole amount, if any, then due and payable on such Secured Note for principal and interest with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

If the Issuer or the Co-Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as agent for the Secured Parties, may, and shall upon written direction of at least a Majority of the Controlling Class, institute a Proceeding for the collection of the sums so due and unpaid, prosecute such Proceeding to judgment or final decree, and enforce the same against the Applicable Issuers or any other obligor upon the Secured Notes and collect the Monies adjudged or decreed to be payable in the manner provided by law out of the Assets.

If an Event of Default occurs and is continuing, the Trustee may in its discretion, and shall upon written direction of at least a Majority of the Controlling Class (and, if the action

-115-

of the Applicable Issuers pursuant to such written direction would have a material adverse effect on any Hedge Counterparty as determined by the Applicable Issuers, with the consent of such Hedge Counterparty), proceed to protect and enforce its rights and the rights of Holders of the Secured Notes by such appropriate Proceedings as the Trustee shall deem most effectual (if no such direction is received by the Trustee) or as the Trustee may be directed by at least a Majority of the Controlling Class, to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer or any other obligor upon the Secured Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Secured Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee), shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Secured Notes upon direction by at least a Majority of the Controlling Class, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or willful misconduct) and of the Holders of the Secured Notes allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Secured Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

(b)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Secured Notes, upon the direction of at least a Majority of the Controlling Class, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c)     to collect and receive any Monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Holders of the Secured Notes to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders of the Secured Notes, to

-116-

pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or willful misconduct.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder of the Secured Notes, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder of the Secured Notes in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders of the Secured Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of the Secured Notes.

Notwithstanding anything in this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee) to the contrary, neither the Trustee nor any Holder may sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.3 (Collection of Indebtedness and Suits for Enforcement by Trustee) except according to the provisions specified in Section 5.5(a) (Optional Preservation of Assets).

Section 5.4.    Remedies.  (a)  If an Event of Default shall have occurred and be continuing, and the Secured Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may, and shall, upon written direction of at least a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Secured Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Assets any Monies adjudged due;

(ii)    sell or cause the sale of all or a portion of the Assets or rights or interests therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 (Sale of Assets) hereof;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture for the benefit of all Secured Parties with respect to the Assets;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee and the Holders of the Secured Notes hereunder; and

NEWYORK 8715474 (2K)

(v)      exercise any other rights and remedies that may be available at law or in equity;

provided, however, that the Trustee may not sell or liquidate the Assets or institute Proceedings in furtherance thereof pursuant to this Section 5.4 (Remedies) except according to the provisions specified in Section 5.5(a) (Optional Preservation of Assets).

The Trustee may, but need not, obtain (at the expense of the Co-Issuers) and rely upon an opinion of an Independent investment banking firm of national reputation with demonstrated capabilities in structuring and distributing securities similar to the Secured Notes, which may be either of the Placement Agents, as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 (Remedies) and as to the sufficiency of the proceeds and other amounts receivable with respect to the Assets to make the required payments of principal of and interest on the Secured Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)      If an Event of Default as described in Section 5.1(d) (Events of Default) hereof shall have occurred and be continuing the Trustee may, and at the direction of the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such Proceeding.

(c)      Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, any Holder of Secured Notes may bid for and purchase the Assets or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability; and any purchaser at any such sale may, in paying the purchase Money, deliver to the Trustee for cancellation any of the Class A Notes in lieu of Cash equal to the amount which shall, upon distribution of the net proceeds of such sale, be payable on the Class A Notes so delivered by such Holder (taking into account the Priority of Payments and Article 13). Said Notes, in case the amounts payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after proper notation has been made thereon to show partial payment.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase Money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Holders of the Secured Notes, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

-118-

(d)     Notwithstanding any other provision of this Indenture, the Trustee may not, prior to the date which is one year plus one day (or if longer, any applicable preference period) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer, the Co-Issuer or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under Cayman Islands, U.S. federal or State bankruptcy or similar laws. Nothing in this Section 5.4 (Remedies) shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or any ETB Subsidiary or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Trustee or (ii) from commencing against the Issuer, the Co-Issuer or any ETB Subsidiary or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

Section 5.5.     Optional Preservation of Assets.  (a)  Notwithstanding anything to the contrary herein, if an Event of Default shall have occurred and be continuing, the Trustee shall retain the Assets securing the Secured Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Assets and the Notes in accordance with the Priority of Payments and the provisions of Article 10 and Article 12 unless:

(i)     the Trustee, in consultation with the Portfolio Manager (so long as no "cause" (as defined in the Portfolio Management Agreement) for the termination of the Portfolio Manager has occurred under the Portfolio Management Agreement) determines that the anticipated proceeds of a sale or liquidation of the Assets (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to discharge in full the amounts then due (or, in the case of interest, accrued) and unpaid on the Secured Notes for principal and interest (including Deferred Interest), and all amounts payable prior to payment of principal on such Secured Notes (including amounts payable to any Hedge Counterparty upon liquidation of the Assets and all Administrative Expenses);

(ii)     if an Event of Default described in Section 5.1(a), (d) or (g) has occurred and is continuing, the Holders of at least a Majority of the Controlling Class (without consent of any other Class of Notes) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation; provided, that, this clause (ii) shall not apply in the case of an Event of Default described in Section 5.1(a) that arises solely from an acceleration of the Secured Notes due to an Event of Default in Section 5.1(b), (c), (e), (f) or (h);

(iii)     if an Event of Default described in Section 5.1(b), (c), (e) or (f) has occurred and is continuing, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of each Class of Secured Notes (voting separately by Class) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation of the Assets;

(iv)     if an Event of Default described in  Section 5.1(h) has occurred and is continuing, the Holders of at least a Majority of each Class of Secured Notes (voting

-119-

separately by Class) direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation of the Assets; or

(v) if an Event of Default described in <u>Section 5.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u> or <u>(h)</u> has occurred and is continuing and all of the Secured Notes has been repaid in full, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes direct, subject to the provisions of this Indenture and in compliance with applicable law, such sale and liquidation.

The Trustee shall give written notice of the retention of the Assets to the Issuer with a copy to the Co-Issuer and the Portfolio Manager. So long as such Event of Default is continuing, any such retention pursuant to this <u>Section 5.5(a)</u> (Optional Preservation of Assets) may be rescinded at any time when the conditions specified in clause (i), (ii), (iii), (iv) or (v) exist.

(b) Nothing contained in <u>Section 5.5(a)</u> (Optional Preservation of Assets) shall be construed to require the Trustee to sell the Assets securing the Secured Notes if the conditions set forth in any of clauses (i) through (iv) of <u>Section 5.5(a)</u> (Optional Preservation of Assets) are not satisfied. Nothing contained in <u>Section 5.5(a)</u> (Optional Preservation of Assets) shall be construed to require the Trustee to preserve the Assets securing the Notes if prohibited by applicable law.

(c) In determining whether the condition specified in <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) exists, the Trustee shall obtain bid prices with respect to each security contained in the Assets from two nationally recognized dealers (as specified by the Portfolio Manager in writing) at the time making a market in such securities and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security. For the purposes of making the determinations required pursuant to <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets), the Trustee shall apply the standards set forth in <u>Section 6.3(c)(i)</u> or <u>(ii)</u> (Certain Rights of the Trustee). In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Assets and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) exists, the Trustee may retain (at the Co-Issuers' expense) and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, the Issuer and the Portfolio Manager a report stating the results of any determination required pursuant to <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) no later than 10 days after such determination is made. The Trustee shall make the determinations required by <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets) at the request of at least a Majority of the Controlling Class at any time after the occurrence of an Event of Default during which the Trustee retains the Assets pursuant to <u>Section 5.5(a)(i)</u> (Optional Preservation of Assets); <u>provided</u>, that any such request made more frequently than once in any 90 day period shall be at the expense of such requesting party or parties.

Section 5.6.    <u>Trustee May Enforce Claims Without Possession of Notes</u>. All rights of action and claims under this Indenture or under any of the Secured Notes may be

NEWYORK 8715474 (2K)

prosecuted and enforced by the Trustee without the possession of any of the Secured Notes or the production thereof in any trial or other Proceeding relating thereto, and any such action or Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in <u>Section 5.7</u> (Application of Money Collected) hereof.

Section 5.7.  <u>Application of Money Collected</u>.  Any Money collected by the Trustee with respect to the Notes pursuant to this <u>Article 5</u> and any Money that may then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied in accordance with the provisions of <u>Section 11.1</u> (Disbursements of Monies from Payment Account), at the date or dates fixed by the Trustee.

Section 5.8.  <u>Limitation on Suits</u>.  No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)     such Holder has previously given to the Trustee written notice of an Event of Default;

(b)     the Holders of not less than 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)     the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d)     no direction inconsistent with such written request has been given to the Trustee during such 30 day period by at least a Majority of the Controlling Class; it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with the Priority of Payments.

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall act at the direction of the group of Holders representing a greater percentage of the Controlling Class.  If both groups represent the same percentage, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.  Notwithstanding anything to the contrary contained herein, Holders and beneficial owners of Notes may enforce the obligations

-121-

of other Holders and beneficial owners described in <u>Section 13.1(d)</u> (Subordination; Non-Petition).

Section 5.9. <u>Unconditional Rights of Holders to Receive Principal and Interest</u>. Subject to <u>Section 2.8(i)</u> (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved), but notwithstanding any other provision in this Indenture, the Holders of any Secured Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Secured Note as such principal and interest become due and payable in accordance with the Priority of Payments and <u>Section 13.1</u> (Subordination; Non-Petition), and, subject to the provisions of <u>Section 5.8</u> (Limitation on Suits), to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Holders of Secured Notes ranking junior to Notes still Outstanding shall have no right to institute proceedings for the enforcement of any such payment until such time as no Secured Note ranking senior to such Secured Note remains Outstanding, which right shall be subject to the provisions of <u>Section 5.8</u> (Limitation on Suits), and shall not be impaired without the consent of any such Holder.

Section 5.10. <u>Restoration of Rights and Remedies</u>. If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or such Noteholder, then and in every such case the Co-Issuers, the Trustee or Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Secured Parties shall continue as though no such Proceeding had been instituted.

Section 5.11. <u>Rights and Remedies Cumulative</u>. No right or remedy herein conferred upon or reserved to the Trustee or any Secured Party is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12. <u>Delay or Omission Not Waiver</u>. No delay or omission of the Trustee or any Holder of Secured Notes to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein or of a subsequent Event of Default. Every right and remedy given by this <u>Article 5</u> or by law to the Trustee or to the Holders of Secured Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of the Secured Notes, as the case may be.

Section 5.13. <u>Control by Majority of Controlling Class</u>. Notwithstanding any other provision of this Indenture, at least a Majority of the Controlling Class shall have the right following the occurrence, and during the continuance of, an Event of Default to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee; <u>provided</u>, that:

(a)     such direction shall not conflict with any rule of law or with any express provision of this Indenture;

(b)     the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; provided, however, that subject to Section 6.1 (Certain Duties and Responsibilities of the Trustee), the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received the indemnity as set forth in (c) below);

(c)     the Trustee shall have been provided with indemnity reasonably satisfactory to it; and

(d)     notwithstanding the foregoing, any direction to the Trustee to undertake a Sale of the Assets shall be by the Holders of Notes secured thereby representing the requisite percentage of the Aggregate Outstanding Amount of Notes specified in Section 5.4 (Remedies) and/or 5.5 (Optional Preservation of Assets).

Section 5.14.     Waiver of Past Defaults.  Prior to the time a judgment or decree for payment of the Money due has been obtained by the Trustee, as provided in this Article 5, at least a Majority of the Controlling Class may on behalf of the Holders of all the Notes waive any past Default and its consequences, except a Default:

(a)     in the payment of the principal of any Secured Note (which may be waived with the consent of each Holder of such Secured Note);

(b)     in the payment of interest on the Notes of the Controlling Class (which may be waived with the consent of the Holders of 100% of the Controlling Class);

(c)     in respect of a covenant or provision hereof that under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected thereby (which may be waived with the consent of each such Holder); or

(d)     in respect of a representation contained in Section 7.19 (Representations and Warranties Relating to Security Interests in the Assets) (which may be waived by at least a Majority of the Controlling Class if the S&P Rating Condition is satisfied).

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to S&P, Moody's, the Portfolio Manager and each Noteholder.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15.    Undertaking for Costs.  All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as the Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 (Undertaking for Costs) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the applicable Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date).  Such waiver shall not affect the rights of any Hedge Counterparty, which rights shall be governed by its respective Hedge Agreements.

Section 5.16.    Waiver of Stay or Extension Laws.  The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law or rights, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted or rights created.

Section 5.17.    Sale of Assets.  (a)  The power to effect any sale (a "Sale") of any portion of the Assets pursuant to Sections 5.4 (Remedies) and 5.5 (Optional Preservation of Assets) shall not be exhausted by any one or more Sales as to any portion of such Assets remaining unsold, but shall continue unimpaired until the entire Assets shall have been sold or all amounts secured by the Assets shall have been paid.  The Trustee may upon notice to the Noteholders and the Portfolio Manager, and shall, upon direction of at least a Majority of the Controlling Class, from time to time postpone any Sale by public announcement made at the time and place of such Sale.  The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; provided, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7 (Trustee Compensation and Reimbursement) hereof.

(b)    The Trustee and the Portfolio Manager (and/or any of its Affiliates) may bid for and acquire any portion of the Assets in connection with a public Sale thereof, and the Trustee may pay all or part of the purchase price by crediting against amounts owing on the Secured Notes or other amounts secured by the Assets, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 (Trustee Compensation and Reimbursement) hereof.  The Holder(s) of Subordinated Notes may bid for and acquire any

-124-

portion of the Assets in connection with a public or private Sale thereof. The Secured Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Assets consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel.

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Assets in connection with a Sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney in fact of the Issuer to transfer and convey its interest in any portion of the Assets in connection with a Sale thereof, and to take all action necessary to effect such Sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any Monies.

Section 5.18.     Action on the Notes. The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Assets or upon any of the assets of the Issuer or the Co-Issuer.

ARTICLE 6

The Trustee

Section 6.1.     Certain Duties and Responsibilities of the Trustee. (a) Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not, on their face, they substantially conform to the requirements of this Indenture and shall promptly in the case of an Officer's certificate furnished by the Portfolio Manager, notify the Portfolio Manager if such certificate or opinion does not conform.

-125-

(b)      In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Majority of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)      No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)      this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1 (Certain Duties and Responsibilities of the Trustee);

(ii)      the Trustee shall not be liable for any error of judgment made in good faith by a Bank Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)      the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Portfolio Manager in accordance with this Indenture and/or a Majority (or such other percentage as may be required by the terms hereof) of the Controlling Class (or other Class if required or permitted by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)      no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or indemnity reasonably satisfactory to it against such risk or liability is not reasonably assured to it unless such risk or liability relates to incidental costs in connection with the performance of its ordinary services, under this Indenture; and

(v)      in no event shall the Trustee be liable for special, punitive, indirect or consequential loss or damage (including lost profits) even if the Trustee has been advised of the likelihood of such damages and regardless of such action.

(d)      For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Sections 5.1(c), (d), (e) or (f) (Events of Default) unless a Bank Officer assigned to and working in the Corporate Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by a Bank Officer at the Corporate Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Assets or this Indenture.  For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section 6.1 (Certain Duties and Responsibilities of the Trustee).

NEWYORK 8715474 (2K)

(e)      Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 (Certain Duties and Responsibilities of the Trustee) and Section 6.3 (Certain Rights of the Trustee).

Section 6.2.      Representations and Warranties of the Bank.  The Bank hereby represents and warrants as follows:

(a)      Organization.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)      Authorization; Binding Obligations.  The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  Upon execution and delivery by the Bank, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights and remedies of creditors generally.

(c)      Eligibility.  The Bank is eligible under Section 6.8 (Corporate Trustee Required; Eligibility) hereof to serve as Trustee hereunder.

(d)      No Conflict.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any material agreement to which the Bank is a party.

(e)      Other Capacities. To the extent that the Bank is acting as Registrar, Calculation Agent, Paying Agent, Authenticating Agent, Securities Intermediary or Custodian, the rights, privileges and indemnities set forth in this Article VI shall also apply to the Bank acting in each such capacity and shall be in addition to any other right, privilege and indemnities the Bank may have in such capacity.

Section 6.3.      Certain Rights of the Trustee.  Except as otherwise provided in Section 6.1 (Certain Duties and Responsibilities of the Trustee):

(a)      the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report (including, without limitation, an Accountants Report), notice, request, direction, consent, order, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

NEWYORK 8715474 (2K)

(b)     any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, request and rely upon an Officer's certificate or (ii) be required to determine the value of any Assets or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report (including any Accountants' Report), notice, request, direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of at least a Majority of the Controlling Class shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Portfolio Manager, to examine the books and records relating to the Notes and the Assets, personally or by agent or attorney, during the Co-Issuers' or the Portfolio Manager's normal business hours; provided, that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory or administrative authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians or attorneys; provided, that the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent or non-Affiliated attorney appointed with due care by it hereunder;

-128-

(h)    the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(i)    nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer or Portfolio Manager (unless and except to the extent otherwise expressly set forth herein);

(j)    to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles (as in effect in the United States) ("GAAP"), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants identified in the Accountants' Report (and in the absence of its receipt of timely instruction therefrom, shall be entitled to obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP in such connection, in any instance;

(k)    to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(l)    the Trustee shall not be deemed to have notice or knowledge of any matter unless a Bank Officer has actual knowledge thereof or unless written notice thereof is received by a Bank Officer at the Corporate Office and such notice references the Notes generally, the Issuer or this Indenture.  Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(m)    the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(n)    the Trustee shall not be responsible for delays or failures in performance resulting from acts or circumstances beyond its control (such circumstances include but are not limited to acts of God, strikes, lockouts, riots, acts of war, loss or malfunctions of utilities, computer (hardware or software) or communications services);

(o)    the Trustee shall have no liability for the acts or omissions of the Portfolio Manager, the Collateral Administrator, the Issuer or the Co-Issuer, any Paying Agent (other than the Trustee) or any Authenticating Agent (other than the Trustee) appointed under or pursuant to this Indenture;

(p)    the Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Eligible Investments, (ii) using Affiliates to

effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments;

(q)  the Trustee is not responsible or liable for the preparation, filing, continuation or correctness of financing statements or the validity or perfection of any lien or security interest;

(r)  in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder;

(s)  in order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering, the Trustee is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Trustee.  Accordingly, each of the parties agrees to provide to the Trustee upon its request from time to time such party's complete name, address, tax identification number and such other identifying information together with copies of such party's constituting documentation, securities disclosure documentation and such other identifying documentation as may be available for such party; and

(t)  <u>Other Capacities</u>. To the extent that the Trustee is acting as Registrar, Calculation Agent, Paying Agent, Authenticating Agent, Securities Intermediary, or Custodian, the rights, privileges and indemnities set forth in this <u>Article VI</u> shall also apply to the Trustee acting in each such capacity and shall be in addition to any other right, privilege and indemnities the Trustee may have in such capacity.

Section 6.4.  <u>Trustee Not Responsible for Recitals or Issuance of Notes</u>.  The recitals contained herein and in the Debt, other than the Certificate of Authentication thereon, shall be taken as the statements of the Applicable Issuers; and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), the Assets or the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or the proceeds thereof or any Money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5.  <u>Trustee May Hold Notes</u>.  The Trustee, any Paying Agent, Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Registrar or such other agent.

NEWYORK 8715474 (2K)

Section 6.6.    Money Held in Trust by the Trustee.  Money held by the Trustee hereunder shall be held in trust to the extent required herein.  The Trustee shall be under no liability for interest on any Money received or invested by it hereunder.

Section 6.7.    Trustee Compensation and Reimbursement.    (a)   The Issuer agrees:

(i)    to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it hereunder as set forth in the fee letter dated June 19, 2012 (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)    to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including, without limitation, securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to any term of this Indenture, except any such expense, disbursement or advance as may be attributable to its negligence or willful misconduct) but with respect to securities transaction charges, only to the extent any such charges have not been waived during a Collection Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Portfolio Manager; and

(iii)    to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred without negligence or willful misconduct on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder and under any other transaction document.

(b)    The Trustee shall receive amounts pursuant to this Section 6.7 (Trustee Compensation and Reimbursement) as provided in Sections 11.1(a)(i), (ii) and (iii) (Disbursements of Monies from Payment Account) but only to the extent that funds are available for the payment thereof.   Subject to Section 6.9 (Resignation and Removal of the Trustee; Appointment of Successor), the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder.  No direction by the Noteholders or the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.  If on any date when a fee shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable on such later date on which a fee shall be payable and sufficient funds are available therefor.

(c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this Section 6.7 (Trustee Compensation and Reimbursement) until at least one year and one day, or if longer the

NEWYORK 8715474 (2K)

applicable preference period then in effect, after the payment in full of all Notes issued under this Indenture.

(d)    When the Trustee incurs expenses after the occurrence of a Default or an Event of Default under <u>Sections 5.1(e)</u> or <u>(f)</u> (Events of Default) the expenses are intended to constitute expenses of administration under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law; <u>provided that</u>, without limiting the Trustee's rights under the Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or similar law, such expenses shall be subject to and payable only to the extent allowed under the Priority of Payments.

Section 6.8.    <u>Corporate Trustee Required; Eligibility</u>.  There shall at all times be a Trustee hereunder which shall be an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "<u>Baa1</u>" by Moody's and at least "<u>BBB+</u>" by S&P and having an office within the United States.  If such organization or entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this <u>Section 6.8</u> (Corporate Trustee Required; Eligibility), the combined capital and surplus of such organization or entity shall be deemed to be its combined capital and surplus as set forth in its most recent published report of condition.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this <u>Section 6.8</u> (Corporate Trustee Required; Eligibility), it shall resign immediately in the manner and with the effect hereinafter specified in this <u>Article 6</u>.

Section 6.9.    <u>Resignation and Removal of the Trustee; Appointment of Successor Trustee</u>.  (a)  No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this <u>Article 6</u> shall become effective until the acceptance of appointment by the successor Trustee under <u>Section 6.10</u> (Acceptance of Appointment by Successor Trustee).

(b)    The Trustee may resign at any time by giving not less than 30 days written notice thereof to the Co-Issuers, the Portfolio Manager, the Holders of the Notes and each Rating Agency.  Upon receiving such notice of resignation, the Co-Issuers shall promptly appoint a successor trustee or trustees satisfying the requirements of <u>Section 6.8</u> (Corporate Trustee Required; Eligibility) by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees, together with a copy to each Holder and the Portfolio Manager; <u>provided</u>, that such successor Trustee shall be appointed only upon the written consent of at least a Majority of the Controlling Class and the Portfolio Manager (such consent, in the case of the Portfolio Manager, not to be unreasonably withheld).  If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of

a successor Trustee satisfying the requirements of Section 6.8 (Corporate Trustee Required; Eligibility).

(c)     The Trustee may be removed at any time by written consent of the Portfolio Manager and Act of at least a Majority of the Controlling Class or, at any time when an Event of Default shall have occurred and be continuing by an Act of at least a Majority of the Controlling Class, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee shall cease to be eligible under Section 6.8 (Corporate Trustee Required; Eligibility) and shall fail to resign after written request therefor by the Co-Issuers or at least a Majority of the Controlling Class; or

(ii)     the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to Section 6.9(a) (Resignation and Removal of the Trustee; Appointment of Successor)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee or (B) subject to Section 5.15 (Undertaking for Costs), any Holder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee shall be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order, shall promptly appoint a successor Trustee.  If the Co-Issuers shall fail to appoint a successor Trustee within 30 days after such removal or incapability or the occurrence of such vacancy, a successor Trustee may be appointed by at least a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee shall have been so appointed by the Co-Issuers or at least a Majority of the Controlling Class and shall have accepted appointment in the manner hereinafter provided, subject to Section 5.15 (Undertaking for Costs), the Trustee or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to the Portfolio Manager, to each Rating Agency and to the Holders of the Notes as their names and addresses appear in the Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Office.  If the Co-Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

-133-

Section 6.10.    Acceptance of Appointment by Successor Trustee.    Every successor Trustee appointed hereunder shall meet the requirements of Section 6.8 (Corporate Trustee Required; Eligibility) and shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers or at least a Majority of any Class of Secured Notes or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and Money held by such retiring Trustee hereunder.  Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Section 6.11.    Merger, Conversion, Consolidation or Succession to Business of the Trustee.  Any organization or entity into which the Trustee may be merged or converted or with which it may be consolidated, or any organization or entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any organization or entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such organization or entity shall be otherwise qualified and eligible under this Article 6, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any of the Notes has been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12.    Co-Trustees.  At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Assets may at the time be located, the Co-Issuers and the Trustee shall have power to appoint one or more Persons to act as co-trustee (subject to the written approval of the Rating Agencies), jointly with the Trustee, of all or any part of the Assets, with the power to file proofs of claims and take such other actions pursuant to Section 5.6 (Trustee May Enforce Claims Without Possession of Notes) herein and to make such claims and enforce such rights of action on behalf of the Holders, as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12 (Co-Trustees).

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have the power to make such appointment.

Should any written instrument from the Co-Issuers be required by any co trustee so appointed, more fully confirming to such co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay (but only from and to the extent of the Assets), to the

-134-

extent funds are available therefor under Section 11.1(a)(i)(B) (Disbursements of Monies from Payment Account), for any reasonable fees and expenses in connection with such appointment.

Every co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)     the Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)     the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee jointly as shall be provided in the instrument appointing such co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12 (Co-Trustees), and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12 (Co-Trustees);

(d)     no co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee hereunder;

(e)     the Trustee shall not be liable by reason of any act or omission of a co-trustee; and

(f)     any Act of Holders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13.     Withholding by the Trustee.  If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Holder, such tax shall reduce the amount otherwise distributable to such Holder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Holder sufficient funds for the payment of any tax that is legally owed by the Issuer (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings) or may be withheld because of a failure by a Holder to provide any information required under FATCA or as a result of such Holder's status as a Non-Compliant FFI and to timely remit such amounts to the appropriate taxing authority. The amount of any withholding tax imposed with respect to any Holder shall be treated as cash distributed to such Holder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.13 (Withholding). If any Holder wishes to apply for a

NEWYORK 8715474 (2K)

refund of any such withholding tax, the Trustee shall reasonably cooperate with such Holder in making such claim so long as such Holder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

Section 6.14. <u>Authenticating Agents</u>. Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Subordinated Notes in connection with issuance, transfers and exchanges under <u>Sections 2.4</u> (Additional Notes), <u>2.5</u> (Execution, Authentication, Delivery and Dating), <u>2.6</u> (Registration, Registration of Transfer and Exchange), <u>2.7</u> (Mutilated, Defaced, Destroyed, Lost or Stolen Note) and <u>8.5</u> (Reference in Notes to Supplemental Indentures), as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by such Sections to authenticate such Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this <u>Section 6.14</u> (Authenticating Agents) shall be deemed to be the authentication of Notes by the Trustee.

Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers. Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers.

The Co-Issuers (or the Trustee if the Trustee shall have appointed the Authenticating Agent) agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto, and the Trustee if it shall have paid such amounts shall be entitled to be reimbursed for such payments. The provisions of <u>Sections 2.9</u> (Persons Deemed Owners), <u>6.4</u> (Not Responsible for Recitals or Issuance of Notes) and <u>6.5</u> (Trustee May Hold Notes) shall be applicable to any Authenticating Agent.

Section 6.15. <u>Notice of Default by the Trustee</u>. Promptly (and in no event later than five Business Days) after the occurrence of any Default actually known to a Bank Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to <u>Section 5.2</u> (Acceleration of Maturity; Rescission and Annulment), the Trustee shall provide to the Portfolio Manager, each Rating Agency, and all Noteholders, as their names and addresses appear on the Register, and the Irish Stock Exchange, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require,

NEWYORK 8715474 (2K)

notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

Section 6.16. <u>Certain Duties of the Trustee Related to Delayed Payment of Proceeds</u>. In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Obligation on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Portfolio Manager in writing or electronically and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, or the Issuer, in its absolute discretion (but only to the extent permitted by <u>Section 10.2(a)</u> (Collection Account)), shall have made provision for such payment satisfactory to the Trustee in accordance with <u>Section 10.2(a)</u> (Collection Account), the Trustee shall request the issuer of such Pledged Obligation, the Trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of <u>Section 6.1(c)</u> (Certain Duties and Responsibilities of the Trustee), shall take such action as the Portfolio Manager shall direct in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. In the event that the Issuer or the Portfolio Manager requests a release of a Pledged Obligation and/or delivers an additional Collateral Obligation in connection with any such action under the Portfolio Management Agreement, such release and/or substitution shall be subject to <u>Section 10.6</u> (Reinvestment of Funds in Accounts; Reports by Trustee) and <u>Article 12</u> of this Indenture, as the case may be.

Section 6.17. <u>Trustee Fiduciary for Secured Noteholders Only; Agent for each Hedge Counterparty and the Holders of the Subordinated Notes</u>. With respect to the security interest created hereunder, the delivery of any item of Pledged Obligation to the Trustee is to the Trustee as representative of the Secured Noteholders and agent for each Hedge Counterparty and the Holders of the Subordinated Notes, in furtherance of the foregoing, the possession by the Trustee of any item of Pledged Obligation, the endorsement to or registration in the name of the Trustee of any item of Pledged Obligation (including, without limitation, as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Secured Noteholders and agent for each Hedge Counterparty and the Holders of the Subordinated Notes.

ARTICLE 7
Covenants

Section 7.1. <u>Payment of Principal and Interest</u>. The Applicable Issuers will duly and punctually pay the principal of and interest on the Secured Notes, in accordance with the terms of such Notes and this Indenture pursuant to the Priority of Payments. The Issuer will, to the extent legally permitted and to the extent funds are available pursuant to the Priority of Payments, duly and punctually pay all required distributions on the Subordinated Notes, in accordance with the Subordinated Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the terms of the Notes or this Indenture. The

Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the terms of the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to such Holder for all purposes of this Indenture.

Section 7.2.    <u>Maintenance of Office or Agency</u>.    The Co-Issuers hereby appoint the Trustee as a Paying Agent for payments on the Notes.  Notes may be surrendered for registration of transfer or exchange at the Corporate Office of the Trustee or its agent designated for purposes of surrender, transfer or exchange.  As of the Closing Date, the Trustee designates the Corporate Office for such purpose, as the place where Notes may be surrendered for transfer and exchange.  The Co-Issuers hereby appoint CT Corporation System, as agent upon whom process or demands may be served in any action arising out of or based on this Indenture or the transactions contemplated hereby.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; <u>provided</u>, <u>however</u>, that the Co-Issuers will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Co-Issuers in respect of such Notes and this Indenture may be served and, subject to any laws or regulations applicable thereto, an office or agency outside of the United States where Notes may be presented and surrendered for payment; and <u>provided</u>, <u>further</u>, that no paying agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax solely by reason of the location of the paying agent in such jurisdiction.  The Co-Issuers hereby appoint, for so long as any Class of Notes is listed on the Irish Stock Exchange, McCann FitzGerald Listing Services Limited (the "<u>Irish Listing Agent</u>") as listing agent in Ireland with respect to the Notes.  In the event that the Irish Listing Agent is replaced at any time during such period, notice of the appointment of any replacement will be published in the Companies Announcements Office of the Irish Stock Exchange as promptly as practicable after such appointment.  The Co-Issuers shall at all times maintain a duplicate copy of the Register at the Corporate Office of the Trustee. The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency and the Holders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the appropriate Paying Agent at its main office, and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands.

Section 7.3.    <u>Money for Note Payments to be Held in Trust</u>.  All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

-138-

When the Applicable Issuers shall have a Paying Agent that is not also the Registrar, they shall furnish, or cause the Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

Whenever the Applicable Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any Monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article 10.

The initial Paying Agent shall be as set forth in Section 7.2 (Maintenance of Office or Agency). Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; provided, however, that so long as the Notes of any Class is rated by a Rating Agency, with respect to any additional or successor Paying Agent, either (i) such Paying Agent an Independent organization or entity organized and doing business under the laws of the United States of America or of any state thereof, having a combined capital and surplus of at least $200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's and at least "BBB+" by S&P and having an office within the United States or (ii) the Global Rating Agency Condition is satisfied. In the event that such successor Paying Agent ceases to have the required ratings specified above, the Co-Issuers shall promptly remove such Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3 (Money for Note Payments to be Held in Trust), that such Paying Agent will:

(a)     allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and any Redemption Date among such Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

(b)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

-139-

(c) immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment;

(d) immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor upon the Notes) in the making of any payment required to be made; and

(e) during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Co-Issuers or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such Money.

Except as otherwise required by applicable law, any Money deposited with the Trustee or any Paying Agent in trust for any payment on any Note and remaining unclaimed for two years after such amount has become due and payable shall be paid to the Applicable Issuers on Issuer Order; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Applicable Issuers for payment of such amounts and all liability of the Trustee or such Paying Agent with respect to such trust Money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or such Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of such release of payment, including, but not limited to, mailing notice of such release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in Monies due and payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each such Holder.

Section 7.4. <u>Existence of Co-Issuers</u>. (a) The Issuer and the Co-Issuer shall, to the maximum extent permitted by applicable law, maintain in full force and effect their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Assets; <u>provided</u>, <u>however</u>, that the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as (i) the Issuer has received a legal opinion to the effect that such change is not disadvantageous in any material respect to the Holders, (ii) written notice of such change shall have been given by the Issuer to the Trustee (which shall provide notice to the Noteholders), the Portfolio Manager and each Rating Agency and (iii) on or prior to the 15th Business Day following receipt of such notice the Trustee shall not have received written notice from at least a

NEWYORK 8715474 (2K)

Majority of the Controlling Class objecting to such change; and _provided_, _further_, that the Issuer shall be entitled to take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States so long as prior to taking any such action the Issuer receives a legal opinion from nationally recognized legal counsel to the effect that it is not necessary to take such action outside of the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to U.S. federal, state or local income taxes on a net income basis or any material other taxes to which the Issuer would not otherwise be subject.

(b)     The Issuer and the Co-Issuer shall (i) ensure that all corporate or other formalities regarding their respective existences (including, if required, holding regular board of directors' and shareholders' or members', or other similar, meetings) are followed, (ii) maintain their books and records separate from any other Person, (iii) maintain their accounts separate from those of any other Person, (iv) not commingle any of their assets with those of another Person, (v) maintain an arm's length relationship with their Affiliates, (vi) each maintain separate financial statements from those of any other Person, (vii) pay their liabilities out of their respective funds, (viii) each hold themselves out as a separate entity and (ix) take affirmative steps to correct any misunderstanding regarding their separate identity.  Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries (other than the Co-Issuer and any subsidiary that (x) meets the then-current general criteria of the Rating Agencies for bankruptcy remote entities and (y) is formed for the sole purpose of holding equity interests in "partnerships" (within the meaning of Section 7701(a)(2) of the Code), "grantor trusts" (within the meaning of the Code) or entities that are disregarded as separate from their owners for U.S. federal income tax purposes that are or may be engaged or deemed to be engaged in a trade or business in the United States (excluding, for the avoidance of doubt, any interest that is treated as a real property interest), in each case, promptly following the receipt thereof in a workout of a Defaulted Obligation or otherwise promptly after the acquisition thereof in connection with a workout of a Collateral Obligation (an "ETB Subsidiary")); (ii) the Co-Issuer shall not have any subsidiaries; and (iii) except to the extent contemplated in the Administration Agreement or the declaration of trust dated March 18, 2013, by Appleby Trust (Cayman) Ltd., the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective directors), (B) except as contemplated by the Portfolio Management Agreement, the Memorandum and Articles or the Administration Agreement, engage in any transaction with any shareholder that would constitute a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture and the Memorandum and Articles.

(c)     The Issuer shall ensure that any ETB Subsidiary (i) is wholly owned by the Issuer, (ii) will not sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of its assets, except in compliance with the Issuer's rights and obligations under this Indenture and with such subsidiary's constituent documents, (iii) will not have any subsidiaries, (iv) will comply with the restrictions set forth in Section 7.8(a)(ix) and (x) (Negative Covenants), (v) will not incur or guarantee any indebtedness except indebtedness with respect to which the Issuer is the sole creditor and will not hold itself out as being liable of the debts of any other Person, (vi)

will include in its constituent documents a limitation on its business such that it may only engage in the acquisition of Equity Securities and the disposition of Equity Securities and the proceeds thereof to the Issuer (and activities ancillary thereto), (vii) will have at least one director that is Independent from the Portfolio Manager, (viii) will distribute (including by way of interest payment) 100% of the proceeds of the assets acquired by it (net of applicable taxes and expenses payable by such subsidiary) to the Issuer, (ix) will be treated as a corporation for U.S. federal income tax purposes and (x) will not acquire any real property or any ownership interest in real property.  The Issuer shall provide prior notice to Moody's and S&P of the formation of any ETB Subsidiary and of the transfer of any Equity Security to an ETB Subsidiary.

Section 7.5.    Protection of Assets.  (a)  The Portfolio Manager on behalf of the Issuer will cause the taking of such action within the Portfolio Manager's control as is reasonably necessary in order to maintain the perfection and priority of the security interest of the Trustee in the Assets.  The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Holders of the Secured Notes hereunder and to:

(i)    Grant more effectively all or any portion of the Assets;

(ii)    maintain, preserve and perfect any Grant made or to be made by this Indenture including, without limitation, the first priority nature of the lien or carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)    enforce any of the Pledged Obligations or other instruments or property included in the Assets;

(v)    preserve and defend title to the Assets and the rights therein of the Trustee and the Holders of the Secured Notes against the claims of all Persons and parties; or

(vi)    pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Assets.

The Issuer hereby designates the Trustee as its agent and attorney in fact to prepare, execute and file any Financing Statement, continuation statement and all other instruments, and take all other actions, required pursuant to this Section 7.5 (Protection of Assets); provided that such designation shall not impose upon the Trustee any obligations under this Section 7.5 (Protection of Assets).  The Issuer further authorizes the Trustee to file without the Issuer's signature a Financing Statement that names the Issuer as debtor and the Bank as secured party and that describes "all assets in which the debtor now or hereafter has rights" as the Assets in which the Trustee has a Grant.

NEWYORK 8715474 (2K)

(b)    The Trustee shall not, except in accordance with <u>Section 10.6</u> (Reinvestment of Funds in Accounts; Reports by Trustee) and <u>Section 10.8</u> (Release of Securities) permit the removal of any portion of the Assets or transfer any such Assets from the Account to which it is credited, or cause or permit any change in the Delivery made pursuant to <u>Section 3.3</u> (Custodianship; Delivery of Collateral Obligations and Eligible Investments) with respect to any Assets, if, after giving effect thereto, the jurisdiction governing the perfection of the Trustee's security interest in such Assets is different from the jurisdiction governing the perfection at the time of delivery of the most recent Opinion of Counsel pursuant to <u>Section 7.6</u> (Opinions as to Assets) (or, if no Opinion of Counsel has yet been delivered pursuant to <u>Section 7.6</u>, the Opinion of Counsel delivered at the Closing Date pursuant to <u>Section 3.1 (a)(iii)</u>) (Conditions to Issuance of Notes on Closing Date) unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property and the priority thereof will continue to be maintained after giving effect to such action or actions.

Section 7.6.    <u>Opinions as to Assets</u>.  On or before the 5th anniversary of the Closing Date and every 5th anniversary thereafter, the Issuer shall furnish to the Trustee, Moody's (so long as the Class X Notes, Class A-1 Notes or Class A-2 Notes are rated by Moody's) and S&P an Opinion of Counsel relating to the security interest granted by the Issuer to the Trustee , which opinion may be substantially in the form of <u>Exhibit C</u> attached hereto.

Section 7.7.    <u>Performance of Obligations</u>.  (a)  The Co-Issuers, each as to itself, shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Assets, except in the case of enforcement action taken with respect to any Defaulted Obligation in accordance with the provisions hereof and actions by the Portfolio Manager under the Portfolio Management Agreement and in conformity with this Indenture or as otherwise required hereby.

(b)    The Applicable Issuers may, with the prior written consent of at least a Majority of each Class of Secured Notes (except in the case of the Portfolio Management Agreement and the Collateral Administration Agreement, in which case no consent shall be required), contract with other Persons, including the Portfolio Manager, the Trustee and the Collateral Administrator for the performance of actions and obligations to be performed by the Applicable Issuers hereunder and under the Portfolio Management Agreement by such Persons. Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable with respect thereto.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Applicable Issuers; and the Applicable Issuers will punctually perform, and use their best efforts to cause the Portfolio Manager, the Trustee, the Collateral Administrator and such other Person to perform, all of their obligations and agreements contained in the Portfolio Management Agreement, this Indenture, the Collateral Administration Agreement or any such other agreement.

Section 7.8.    <u>Negative Covenants</u>.  (a)  The Issuer will not and, with respect to clauses (ii), (iii), (iv), (vi), (vii), (viii), (ix) and (x) the Co-Issuer will not, in each case from and after the Closing Date:

(i)      sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Assets, except as expressly permitted by this Indenture and the Portfolio Management Agreement;

(ii)      claim any credit on, make any deduction from, or dispute the enforceability of payment of the principal or interest payable (or any other amount) in respect of the Notes (other than amounts withheld in accordance with the Code or in order to comply with FATCA or any applicable laws of the Cayman Islands or other applicable jurisdiction) or assert any claim against any present or future Holder of Notes, by reason of the payment of any taxes levied or assessed upon any part of the Assets;

(iii)      (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated hereby (including, without limitation, as a result of a Refinancing) or (B)(1) issue any additional class of securities (except as provided in Section 2.4 (Additional Notes) and Article 8 (Supplemental Indentures) or (2) issue any additional shares, member interests or limited liability company interests, as the case may be;

(iv)      (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be permitted hereby or by the Portfolio Management Agreement, (B) except as permitted by this Indenture, permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Assets or any part thereof, any interest therein or the proceeds thereof or (C) except as permitted by this Indenture, take any action that would permit the lien of this Indenture not to constitute a valid first priority security interest in the Assets;

(v)      amend the Portfolio Management Agreement except pursuant to the terms thereof and Article 15;

(vi)      dissolve or liquidate in whole or in part, except as permitted hereunder or required by applicable law;

(vii)      pay any distributions other than in accordance with the Priority of Payments;

(viii)      permit the formation of any subsidiaries (other than the Co-Issuer and any ETB Subsidiary);

(ix)      conduct business under any name other than its own;

(x)      have any employees (other than directors to the extent they are employees);

-144-

(xi)    sell, transfer, exchange or otherwise dispose of Assets, or enter into an agreement or commitment to do so or enter into or engage in any business with respect to any part of the Assets, except as expressly permitted by this Indenture or the Portfolio Management Agreement; and

(xii)    at any time during or after the Reinvestment Period, execute, enter into, agree to or vote in favor of any amendment or modification extending or having the effect of extending the maturity of a Collateral Obligation if (x) (1) during the Reinvestment Period, either (A) the Weighted Average Life Test will not be satisfied immediately after giving effect to such amendment or modification or (B) if the Weighted Average Life Test was not satisfied immediately prior to giving effect to such amendment or modification, the level of compliance with the Weighted Average Life Test will not be maintained or improved after giving effect to such amendment or modification or (2) after the Reinvestment Period, the Weighted Average Life Test will not be satisfied after giving effect to such amendment or modification (y) such amendment or modification would cause such Collateral Obligation to mature after the Stated Maturity of the Notes or (z) unless waived in writing by the Holders of at least a Majority of the Controlling Class, the then-current rating by Moody's of the Class A-1 Notes, the Class A-2A Notes or the Class A-2B Notes is below "Aa3".

(b)    The Co-Issuer will not invest any of its assets in "securities" as such term is defined in the Investment Company Act, and will keep all of its assets in Cash.

(c)    Notwithstanding anything to the contrary contained herein, the Issuer shall not, and shall use its best efforts to ensure that the Portfolio Manager acting on the Issuer's behalf does not, acquire any asset, conduct any activity or take any action if the acquisition or ownership of such asset, the conduct of such activity or the taking of such action, as the case may be, would cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis or income tax on a net income basis in any other jurisdiction.  The requirements of this Section 7.8(c) (Negative Covenants) will be deemed to be satisfied if the requirements of Section 7.8(d) (Negative Covenants) below are satisfied.

(d)    Notwithstanding anything to the contrary contained herein, the Issuer shall comply with all of the provisions set forth in Schedule 1 to the Portfolio Management Agreement, unless, with respect to a particular transaction, the Issuer, the Portfolio Manager and the Trustee shall have received an opinion or advice of White & Case LLP, Dechert LLP or other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that, under the relevant facts and circumstances with respect to such transaction, taking into account the Issuer's failure to comply with one or more of such provisions and assuming compliance with this Indenture and all other provisions in Schedule 1 to the Portfolio Management Agreement, the Issuer's contemplated activities will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis. The provisions set forth in Schedule 1 to the Portfolio Management Agreement may be waived, amended, eliminated, modified or supplemented (without execution of a supplemental indenture) if the Issuer, the Portfolio Manager and the Trustee shall have received an opinion of White &

-145-

Case LLP, Dechert LLP or other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that, assuming compliance with this Indenture and taking into account the Issuer's compliance with such amended provisions or supplemental provisions or the Issuer's failure to comply with such provisions proposed to be waived, amended, eliminated, modified or supplemented, as the case may be, the Issuer's contemplated activities will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis; provided, however, that written notice of any such amendment, elimination or supplementation of or to the provisions of Schedule 1 to the Portfolio Management Agreement pursuant to this clause (d) shall be provided to each Rating Agency then rating any Outstanding Class of Secured Notes within 60 days of any such amendment, elimination or supplementation. For the avoidance of doubt, in the event an opinion of White & Case LLP, Dechert LLP or other tax counsel as described above has been obtained in accordance with the terms hereof, no consent of any Noteholder or any other Person or satisfaction of any Global Rating Agency Condition shall be required in order to comply with this Section 7.8(d) (Negative Covenants) in connection with the failure to comply with or waiver, amendment, elimination, modification or supplementation of any provision of Schedule 1 to the Portfolio Management Agreement contemplated by such opinion of tax counsel. The Issuer shall only be liable (or otherwise held accountable pursuant to this Section 7.8(d)) for the failure to comply with the provisions set forth in Schedule 1 to the Portfolio Management Agreement to the extent that such non-compliance causes the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis.

(e)     The Issuer, Co-Issuer and any ETB Subsidiary shall not be party to any agreements that provide for a future financial obligation on the part of the Issuer (including Hedge Agreements) without including customary "non-petition" and "limited recourse" provisions therein (and shall not amend or eliminate such provisions in any agreement to which it is party) without satisfaction of the Global Rating Agency Condition, except for (i) any agreements related to the purchase and sale of any Collateral Obligations or Eligible Investments which contain customary (as determined by the Portfolio Manager) purchase or sale terms or which are documented using customary (as determined by the Portfolio Manager) loan trading documentation and (ii) any IRS Agreement.

(f)     The Issuer shall not acquire or hold any Collateral Obligation or Eligible Investment that is a debt obligation in bearer form unless the Collateral Obligation or Eligible Investment is not a "registration required obligation" under Section 163(f)(2)(A) of the Code.

Section 7.9.     Statement as to Compliance.  On or before March 14th in each calendar year commencing in 2014, or immediately if there has been a Default under this Indenture and prior to the issuance of any Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes), the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to each Noteholder making a written request therefor), the Portfolio Manager and each Rating Agency an Officer's certificate of the Issuer that, having made reasonable inquiries of the Portfolio Manager, and to the best of the knowledge, information and belief of the Issuer, there did not exist, as at a date not more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (if any), any Default hereunder or, if

-146-

such Default did then exist or had existed, specifying the same and the nature and status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture or, if such is not the case, specifying those obligations with which it has not complied.

Section 7.10.    <u>Co-Issuers May Consolidate, etc., Only on Certain Terms</u>. Neither the Issuer nor the Co-Issuer (the "<u>Merging Entity</u>") shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)    the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by such consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "<u>Successor Entity</u>") (A) if the Merging Entity is the Issuer, shall be a company organized and existing under the laws of the Cayman Islands or any other similar jurisdiction (e.g., having no entity-level tax) and (B) in any case shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee and each Holder, the due and punctual payment of the principal of and interest on all Secured Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided herein;

(b)    each Rating Agency shall have been notified in writing of such consolidation or merger and the Global Rating Agency Condition is satisfied with respect to the consummation of such transaction;

(c)    if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee (i) to observe the same legal requirements for the recognition of such formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates and (ii) not to consolidate or merge with or into any other Person or transfer or convey the Assets or all or substantially all of its assets to any other Person except in accordance with the provisions of this <u>Section 7.10</u> (Co-Issuers May Consolidate, etc., Only on Certain Terms);

(d)    if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in subsection (a) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless

-147-

of whether such enforceability is considered in a proceeding in equity or at law); if the Merging Entity is the Issuer, that, immediately following the event which causes such Successor Entity to become the successor to the Issuer, (i) such Successor Entity has title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Assets securing all of the Secured Notes and (ii) the Trustee continues to have a valid perfected first priority security interest in the Assets securing all of the Secured Notes; and in each case as to such other matters as the Trustee or any Noteholder may reasonably require;

(e)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(f)     the Merging Entity shall have notified each Rating Agency of such consolidation, merger, transfer or conveyance and shall have delivered to the Trustee and each Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Holders of the Notes (as compared to the tax consequences of not effecting the transaction);

(g)     the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act; and

(h)     after giving effect to such transaction, the outstanding stock (other than the Subordinated Notes) of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

Section 7.11.     Successor Substituted.  Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 (Co-Issuers May Consolidate, etc., Only on Certain Terms) hereof in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right and power of, the Merging Entity under this Indenture with the same effect as if such Person had been named as the Issuer or the Co-Issuer, as the case may be, herein.  In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article 7 may be dissolved, wound up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12.     No Other Business.  From and after the Closing Date, the Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and acquiring, owning, holding, selling, lending, exchanging, redeeming,

pledging, contracting for the management of and otherwise dealing with Collateral Obligations and the other Assets in connection therewith (including, without limitation, establishing and maintaining any ETB Subsidiary) and entering into Hedge Agreements, the Collateral Administration Agreement, the Securities Account Control Agreement, the Portfolio Management Agreement and other agreements specifically contemplated by this Indenture and shall not engage in any activity that would cause the Issuer to be subject to U.S. federal or state income tax on a net income basis, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith or ancillary thereto. The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles and Certificate of Incorporation or By-laws, respectively, only if such amendment would satisfy the Global Rating Agency Condition; provided, that, without satisfying the Global Rating Agency Condition, the Issuer and Co-Issuer shall each change their names at the direction of the Portfolio Manager only if prior notice of such change is provided to each Hedge Counterparty and Moody's. Notwithstanding anything to the contrary in this Section 7.12 (No Other Business), the Issuer may take all actions necessary or advisable to comply with FATCA.

Section 7.13. <u>Maintenance of Listing</u>. To the extent such listing is not obtained on the Closing Date, the Issuer shall continue to use all reasonable efforts to obtain the listing of the Notes on the Irish Stock Exchange. Following such listing, so long as any Class of Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to maintain the listing of such Notes on the Irish Stock Exchange; provided, however, the Issuer will be permitted pursuant to a supplemental indenture under <u>Section 8.1(xii)</u> (Supplemental Indentures Without Consent of Holders of Offered Securities) to cause the Subordinated Notes (and any other Class of Notes that reasonably could be characterized as equity in the Issuer) to be de-listed from such exchange (and to not be listed on any other exchange) if the listing of such Class of Notes could reasonably be expected to cause the Issuer to be treated as a domestic corporation for U.S. federal income tax purposes.

Section 7.14. <u>Annual Rating Review</u>. (a) So long as any of the Secured Notes of any Class remain Outstanding, on or before March 14th in each year commencing in 2014, the Applicable Issuers shall obtain and pay for an annual review of the rating of each such Class of Secured Notes from each Rating Agency, as applicable. The Applicable Issuers shall promptly notify the Trustee and the Portfolio Manager in writing (and the Trustee shall promptly provide the Holders with a copy of such notice) if at any time the rating of any such Class of Secured Notes have been, or is known will be, changed or withdrawn.

(b) With respect to any Collateral Obligation which has a Moody's Rating derived as set forth in clause (i)(B) of the definition of the term "<u>Moody's Rating</u>," the Issuer shall obtain and pay for an annual review of each such Collateral Obligation. With respect to any Collateral Obligation which has a S&P Rating derived as set forth in clause (ii)(b) of the part of the definition of the term "<u>S&P Rating</u>," the Issuer shall obtain and pay for an annual review of each such Collateral Obligation.

Section 7.15. <u>Reporting</u>. At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or beneficial owner of a Note, the Co-Issuers shall promptly furnish or cause to be furnished "<u>Rule 144A Information</u>" to such Holder or beneficial owner, to a prospective purchaser of such Note designated by such Holder, or to the Trustee for delivery to such Holder or beneficial owner or a prospective purchaser designated by such Holder or beneficial owner, as the case may be, in order to permit compliance by such Holder or beneficial owner of such Note with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder or beneficial owner of such Note, respectively. "<u>Rule 144A Information</u>" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

Section 7.16. <u>Calculation Agent</u>. (a) The Issuer hereby agrees that for so long as any Secured Notes remain Outstanding there will at all times be an agent appointed (which does not control or is not controlled or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates) to calculate LIBOR in respect of each Interest Accrual Period in accordance with the terms of <u>Exhibit G</u> hereto (the "<u>Calculation Agent</u>"). The Issuer initially appoints the Trustee as Calculation Agent. The Calculation Agent may be removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or the Portfolio Manager, on behalf of the Issuer, or if the Calculation Agent fails to determine any of the information required to be published in the Companies Announcements Office of the Irish Stock Exchange, as described in subsection (b), in respect of any Interest Accrual Period, the Issuer or the Portfolio Manager, on behalf of the Issuer, will promptly appoint a replacement Calculation Agent which does not control or is not controlled by or under common control with the Issuer or its Affiliates or the Portfolio Manager or its Affiliates. For so long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange so require, notice of the appointment of any replacement Calculation Agent shall be published in the Companies Announcements Office of the Irish Stock Exchange as promptly as practicable after such appointment. The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b) The Calculation Agent shall be required to agree that, as soon as possible after 11:00 a.m. London time on each Interest Determination Date, but in no event later than 11:00 a.m. London time on the London Banking Day immediately following each Interest Determination Date, the Calculation Agent will calculate the Note Interest Rate for each Class of Secured Notes for the next Interest Accrual Period and the Note Interest Amount for each Class of Secured Notes (in each case, rounded to the nearest cent, with half a cent being rounded upward) for the next Interest Accrual Period, on the related Payment Date. At such time the Calculation Agent will communicate such rates and amounts to the Co-Issuers, the Trustee, each Paying Agent, the Portfolio Manager, Euroclear, Clearstream and, so long as any Class of Notes is listed thereon, the Companies Announcements Office of the Irish Stock Exchange by email to rates@ise.ie. In the latter case, such information will be published in the Companies Announcements Office of the Irish Stock Exchange as soon as possible after its determination. The Calculation Agent will also specify to the Co-Issuers the quotations upon which the foregoing rates and amounts are based, and in any event the Calculation Agent shall notify the Co-Issuers before 5:00 p.m. (London time) on every Interest Determination Date that either: (i) it has determined or is in the process of determining the Note Interest Rate and Note Interest

-150-

Amount for each Class of Secured Notes or (ii) it has not determined and is not in the process of determining any such Note Interest Rate or Note Interest Amount together with its reasons therefor. The Calculation Agent's determination of the foregoing rates and amounts for any Interest Accrual Period will (in the absence of manifest error) be final and binding upon all parties.

Section 7.17. <u>Certain Tax Matters</u>. (a) For U.S. federal income tax purposes, the Issuer shall treat the Secured Notes as debt of the Issuer and the Subordinated Notes as equity in the Issuer.

(b) The Issuer has not and shall not elect to be treated as a partnership for U.S. federal, state or local income or franchise tax purposes and shall make any election necessary to avoid classification as a partnership or disregarded entity for U.S. federal, state or local income or franchise tax purposes.

(c) The Issuer shall treat each purchase of Collateral Obligations as a "purchase" for tax accounting and reporting purposes.

(d) The Issuer and Co-Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority.

(e) The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state thereof except with respect to any ETB Subsidiary or a return required by a tax imposed under Section 881 of the Code unless it shall have obtained an Opinion of Counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(f) If required to prevent the withholding and imposition of United States income tax on payments made to the Issuer, the Issuer shall deliver or cause to be delivered a U.S. Internal Revenue Service Form W-8BEN or applicable successor form certifying as to the non-U.S. Person status of the Issuer to each issuer or obligor of or counterparty with respect to an Asset at the time such Asset is purchased or entered into by the Issuer and thereafter prior to the obsolescence or expiration of such form.

(g) Upon the Trustee's receipt of a written request of a Holder of a Note or written request in the form of <u>Exhibit I</u> of a Person certifying that it is an owner of a beneficial interest in a Note for the information described in U.S. Treasury Regulations section 1.1275-3(b)(1)(i) that is applicable to such Note, the Issuer shall cause its Independent accountants to provide promptly to the Trustee and such requesting Holder or owner of a beneficial interest in such a Note all of such information.

(h) The Issuer shall use its reasonable commercial efforts to provide, or cause the Independent accountants to provide, within 180 days after the end of the Issuer's tax year, to each Holder of the Subordinated Notes (or any other Note that is required to be treated as equity for U.S. federal tax purposes) and, upon written request therefor in the form of <u>Exhibit I</u> certifying that it is a holder of a beneficial interest in a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes), to such beneficial owner (or its designee), all information that a U.S. shareholder making a "<u>qualified electing fund</u>"

election (as defined in the Code) with respect to the Subordinated Note (or any other Note treated that is required to be as equity for U.S. federal income tax purposes) is required to obtain from the Issuer for U.S. federal income tax purposes, and a "PFIC Annual Information Statement" as described in U.S. Treasury Regulation Section 1.1295-1(g)(1) (or any successor Treasury Regulation), including all representations and statements required by such statement, and the Issuer will take or cause the accountants to take any other reasonable steps to facilitate such election by a Holder or beneficial owner of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes).

(i)     The Issuer will provide, or cause its Independent accountants to provide, to a Holder of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes) upon written request and, upon written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes), to such beneficial owner (or its designee), any information that such Holder or beneficial owner reasonably requests to assist such Holder or beneficial owner with regard to filing requirements that such Holder or beneficial owner is required to satisfy as a result of the controlled foreign corporation rules under the Code.

(j)     Notwithstanding any contrary agreement or understanding, the Portfolio Manager, the Co-Issuers, the Trustee, the Collateral Administrator and the Holders and beneficial owners of the Notes (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure.  The foregoing provision shall apply from the beginning of discussions between the parties.  For this purpose, the tax treatment of a transaction is the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law.

(k)     If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Holder of a Subordinated Note (or any other Note that is required to be treated as equity for U.S. federal income tax purposes) requests in writing information about any such transactions in which the Issuer is an investor, the Issuer shall provide, or cause its Independent accountants to provide, such information it has reasonably available that is required to be obtained by such Holder under the Code as soon as practicable after such request.

Section 7.18.    Ramp-up Period; Purchase of Additional Collateral Obligations. (a)  The Issuer shall use its commercially reasonable efforts to satisfy the Target Initial Par Condition.

(b)     During the Ramp-up Period, the Issuer shall use the following funds to purchase additional Collateral Obligations in the following order:  (i) to pay for the principal portion of any Collateral Obligation, first, any amounts on deposit in the Ramp-up Account and

second, any Principal Proceeds on deposit in the Collection Account and (ii) to pay for accrued interest on any such Collateral Obligation, first, any amounts on deposit in the Ramp-up Account and second, any Principal Proceeds on deposit in the Collection Account. In addition, the Issuer shall use its commercially reasonable efforts to acquire such Collateral Obligations that will satisfy, as of the end of the Ramp-up Period, the Concentration Limitations, the Collateral Quality Test and each of the Overcollateralization Ratio Tests.

(c)     Within 30 days after the end of the Ramp-up Period: (i) the Issuer shall cause the Collateral Administrator to compile and provide to each Rating Agency an Effective Date Report and, to S&P, the S&P Excel Default Model Input File, (ii) the Issuer shall provide to the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants) an Accountants' Report (A) setting forth the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation as of the end of the Ramp-up Period and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, (B) calculating as of the end of the Ramp-up Period (1) the Overcollateralization Ratio Tests, (2) the Concentration Limitations, (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test), (4) the Effective Date Overcollateralization Test and (5) the Target Initial Par Condition (such items (1) through (5), the "Moody's Specified Tested Items"); and (C) specifying the procedures undertaken by them to review data and computations relating to the Accountants' Report and (iii) the Issuer shall request that S&P (such request shall be made to CDOEffectiveDatePortfolios@sandp.com) confirm that the S&P Effective Date Rating Condition is satisfied. If (x) the Issuer provides an Accountants' Report to the Collateral Administrator with the results of the Moody's Specified Tested Items, and the Collateral Administrator compares such results and based upon such comparison determines that such results are consistent with the results of the Moody's Specified Tested Items set forth in the Effective Date Report (for the avoidance of doubt, results that each indicate compliance with the Moody's Specified Tested Items will be considered consistent, even if the calculations are not identical), and (y) the Issuer causes the Collateral Administrator to provide to Moody's the Effective Date Report and the Effective Date Report confirms satisfaction of the Moody's Specified Tested Items, then a written confirmation from Moody's of its Initial Rating of the Class X Notes and the Class A Notes shall be deemed to have been provided.

(d)     If, after the first Payment Date, the Effective Date Conditions have not been met, the Issuer may, in accordance with Section 10.2(f) (Collection Account), instruct the Trustee to (x) transfer amounts from the Interest Collection Subaccount to the Principal Collection Subaccount in an amount sufficient to satisfy the Effective Date Conditions (provided that the amount of such transfer would not result in the failure to pay interest due on any Senior Notes in accordance with the Priority of Payments) or (y) take such other action, including but not limited to a Special Redemption, sufficient to satisfy the Effective Date Conditions.

(e)     The failure of the Issuer to satisfy the requirements of this Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations) will not constitute an Event of Default unless such failure constitutes an Event of Default under Section 5.1(d) (Events of Default) hereof and the Issuer, or the Portfolio Manager acting on behalf of the Issuer, has acted in bad faith. Of the proceeds of the issuance of the Notes which are not applied to pay for the

-153-

purchase of Collateral Obligations purchased by the Issuer on or before the Closing Date $502,631,025 shall be deposited in the Ramp-up Account on the Closing Date. At the direction of the Issuer (or the Portfolio Manager on behalf of the Issuer), the Trustee shall apply amounts held in the Ramp-up Account to purchase additional Collateral Obligations. If at the end of the Ramp-up Period, any amounts on deposit in the Ramp-up Account have not been applied to purchase Collateral Obligations, such amounts shall be applied as described in <u>Section 10.3(c)</u> (Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account).

(f)     On and after the last day of the Ramp-up Period, the Portfolio Manager shall determine which "row/column combination" of which Minimum Diversity/Maximum Rating/Minimum Spread Matrix shall be applicable for purposes of determining compliance with the Moody's Diversity Test, the Maximum Moody's Rating Factor Test and the Minimum Floating Spread Test, and if such "row/column combination" and/or Minimum Diversity/Maximum Rating/Minimum Spread Matrix differs from the "row/column combination" and/or Minimum Diversity/Maximum Rating/Minimum Spread Matrix chosen to apply as of the Closing Date, the Portfolio Manager will so notify the Issuer, the Collateral Administrator and the Trustee. After the last day of the Ramp-up Period, at any time on written notice to the Issuer, the Trustee and the Collateral Administrator, the Portfolio Manager may elect a different "row/column combination" and/or Minimum Diversity/Maximum Rating/Minimum Spread Matrix to apply to the Collateral Obligations, <u>provided</u> that the Collateral Obligations comply with the Minimum Diversity/Maximum Rating/Minimum Spread Matrix and "row/column combination" to which the Portfolio Manager desires to change. If the Collateral Obligations cease to comply with the Minimum Diversity/Maximum Rating/Minimum Spread Matrix and "row/column combination" which the Portfolio Manager has elected to apply, the Portfolio Manager shall promptly select a Minimum Diversity/Maximum Rating/Minimum Spread Matrix and "row/column combination" with respect to which the Collateral Obligations comply (or which will not cause the Collateral Obligations to be further out of compliance with any Collateral Quality Test measured by reference to the Minimum Diversity/Maximum Rating/Minimum Spread Matrix). Notwithstanding the foregoing, the Portfolio Manager may elect at any time after the last day of the Ramp-up Period, in lieu of selecting a "row/column combination" of the Minimum Diversity/Maximum Rating/Minimum Spread Matrix, to interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

Section 7.19.     <u>Representations Relating to Security Interests in the Assets</u>. (a) The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets:

(i)     The Issuer owns such Asset free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or permitted by, this Indenture.

(ii)     Other than the security interest Granted to the Trustee pursuant to this Indenture, except as permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Assets. The Issuer

-154-

has not authorized the filing of and is not aware of any Financing Statements against the Issuer that include a description of collateral covering the Assets other than any Financing Statement relating to the security interest granted to the Trustee hereunder or that has been terminated; the Issuer is not aware of any judgment, PBGC liens or tax lien filings against the Issuer.

(iii)     All Assets constitute Cash, accounts (as defined in Section 9-102(a)(2) of the UCC), Instruments, general intangibles (as defined in Section 9-102(a)(42) of the UCC), uncertificated securities (as defined in Section 8-102(a)(18) of the UCC), Certificated Securities or security entitlements to financial assets resulting from the crediting of financial assets to a "securities account" (as defined in Section 8-501(a) of the UCC).

(iv)     All Accounts constitute "securities accounts" under Section 8-501(a) of the UCC.

(v)     This Indenture creates a valid and continuing security interest (as defined in Section 1-201(37) of the UCC) in such Assets in favor of the Trustee, for the benefit and security of the Secured Parties, which security interest is prior to all other liens, claims and encumbrances (except as permitted otherwise in this Indenture), and is enforceable as such against creditors of and purchasers from the Issuer.

(b)     The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute Instruments:

(i)     Either (x) the Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Instruments granted to the Trustee, for the benefit and security of the Secured Parties, hereunder or (y)(A) all original executed copies of each promissory note or mortgage note that constitutes or evidences the Instruments have been delivered to the Trustee or the Issuer has received written acknowledgement from a custodian that such custodian is holding the mortgage notes or promissory notes that constitute evidence of the Instruments solely on behalf of the Trustee and for the benefit of the Secured Parties and (B) none of the Instruments that constitute or evidence the Assets has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee, for the benefit of the Secured Parties.

(ii)     The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(c)     The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to the Assets that constitute Security Entitlements:

NEWYORK 8715474 (2K)

(i)        All of such Assets have been and will have been credited to one of the Accounts which are securities accounts within the meaning of Section 8-501(a) of the UCC.  The Custodian for each Account has agreed to treat all assets credited to such Accounts as "<u>financial assets</u>" within the meaning of Section 8-102(a)(9) the UCC.

(ii)        The Issuer has received all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(iii)        Either (x) the Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted to the Trustee, for the benefit and security of the Secured Parties, hereunder or (y)(A) the Issuer has delivered to the Trustee a fully executed Securities Account Control Agreement pursuant to which the Custodian has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer or (B) the Issuer has taken all steps necessary to cause the Custodian to identify in its records the Trustee as the person having a security entitlement against the Custodian in each of the Accounts.

(iv)        The Accounts are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the Custodian to comply with the entitlement order of any person other than the Trustee (and the Issuer prior to a notice of exclusive control being provided by the Trustee).

(d)        The Issuer hereby represents and warrants that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and be deemed to be repeated on each date on which an Asset is Granted to the Trustee hereunder), with respect to Assets that constitute general intangibles:

(i)        The Issuer has caused or shall have caused, within ten days of the Closing Date, the filing of all appropriate Financing Statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Assets granted to the Trustee, for the benefit and security of the Secured Parties, hereunder.

(ii)        The Issuer has received, or shall receive, all consents and approvals required by the terms of the Assets to the pledge hereunder to the Trustee of its interest and rights in the Assets.

(e)        The Co-Issuers agree to notify the Rating Agencies promptly if they become aware of the breach of any of the representations and warranties contained in this <u>Section 7.19</u>.

Section 7.20.    <u>Pre-funded Letters of Credit</u>.  If the Issuer (or the Portfolio Manager on behalf of the Issuer) is notified by an administrative agent or other withholding agent for the syndicate of lenders or otherwise in respect of any Pre-funded Letter of Credit that the fees associated therewith are subject to withholding tax imposed by any jurisdiction, the Issuer shall permit the withholding of the full amount of withholding taxes due on such Pre-

funded Letter of Credit. Under such circumstances, Section 1.2(p) (Assumptions as to Pledged Obligations) shall apply.

Section 7.21. Objection to Bankruptcy Proceeding. So long as any of the Notes are Outstanding, the Issuer shall promptly object to the institution of any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other similar proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar law against it and take all necessary or advisable steps to cause the dismissal of any such proceeding; provided, that such obligation shall be subject to the availability of funds therefor.

ARTICLE 8

Supplemental Indentures

Section 8.1. Supplemental Indentures Without Consent of Holders of Offered Securities. Without the consent of the Holders of any Offered Securities, but with the written consent of the Portfolio Manager, the Co-Issuers, when authorized by Board Resolutions, at any time and from time to time subject to the requirement provided below in this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) with respect to the ratings of any Class of Secured Notes, may enter into one or more indentures supplemental hereto for any of the following purposes:

(i) to evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer herein and in the Notes;

(ii) to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Secured Parties or to surrender any right or power herein conferred upon the Co-Issuers;

(iii) to convey, transfer, assign, mortgage or pledge any property to or with the Trustee or to add to the conditions, limitations or restrictions on the authorized amount, authentication and delivery of the Notes;

(iv) to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Sections 6.9 (Resignation and Removal; Appointment of Successor), 6.10 (Acceptance of Appointment by Successor) and 6.12 (Co-Trustees) hereof;

(v) to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations, whether pursuant to Section 7.5 (Protection of Assets) or otherwise) or to subject to the lien of this Indenture any additional property;

NEWYORK 8715474 (2K)

(vi)     to modify the restrictions on and procedures for resales and other transfers of Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(vii)     at the direction of the Portfolio Manager, to change the name of the Issuer and the Co-Issuer, so long as prior notice of such change is provided to each Hedge Counterparty and Moody's;

(viii)     to make such changes as shall be necessary or advisable in order for a Class of Notes to be listed on an exchange, including the Irish Stock Exchange;

(ix)     subject to the approval of the Holders of at least a Majority of the Controlling Class (if such issuance of Additional Subordinated Notes occurs on or after the Effective Date) and the Portfolio Manager, to make such changes as shall be necessary to permit the Applicable Issuers to issue Additional Subordinated Notes of any one or more new classes, provided, that any such new classes of notes shall be subordinate in payment of principal and interest to all existing Classes of Secured Notes; provided, further, that no amendment to this Indenture that does not relate directly to the issuance of the Additional Subordinated Notes or the terms of such Additional Subordinated Notes may be effected under this clause (ix), but may be effected simultaneously under another clause of this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) or under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), to the extent such other provision is available;

(x)     to conform the provisions of this Indenture to the Offering Circular or, with the consent of the Holders of at least a Majority of the Controlling Class (such consent not to be unreasonably withheld, conditioned or delayed), to correct any inconsistency or cure any ambiguity, omission or errors in this Indenture;

(xi)     with the consent of the Holders of at least a Majority of the Controlling Class, to accommodate, modify or amend existing and/or replacement Hedge Agreements;

(xii)     to (x) take any action advisable to prevent the Co-Issuers, any ETB Subsidiary or the Trustee from becoming subject to withholding or other taxes (other than taxes with respect to the Issuer otherwise permitted under this Indenture and other than taxes imposed on amounts payable or paid to the Trustee as compensation), fees or assessments, to prevent the Co-Issuers from being treated as engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis, (y) take any action to allow the Co-Issuers to comply with FATCA or any rules or regulations promulgated thereunder (including providing for remedies against, or imposing penalties upon, any Noteholder who fails to deliver the Holder FATCA Information or is a Non-Compliant FFI) or (z) (A) issue a new Global Note or Global Notes in respect of, or issue one or more new sub-classes of, any Class of Notes to the

extent that the Issuer determines that one or more beneficial owners of Notes of such Class are Recalcitrant Holders or Non-Compliant FFIs; provided, that any sub-class of a Class of Notes issued pursuant to this clause (z) shall be issued on identical terms as the existing Notes of such Class and (B) provide for procedures under which beneficial owners of such Class that are not Recalcitrant Holders or Non-Compliant FFIs may take an interest in such new Global Note(s) or sub-class(es);

(xiii)    with the consent of the Holders of at least a Majority of the Controlling Class, to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of such Rating Agency set forth herein;

(xiv)    with the consent of the Portfolio Manager and at least a Majority of the Controlling Class to modify the definitions of "Credit Improved Obligation," "Credit Risk Obligation," "Defaulted Obligation" or "Equity Security" or the restrictions on the sales of Collateral Obligations set forth in Section 12.1 (Sales of Collateral Obligations) in a manner not material and adverse to any Holders, subject to the notice and objection provisions set forth in the second succeeding paragraph;

(xv)    to make changes necessary to issue replacement securities or undertake loans in connection with a Refinancing; provided, however, that no amendment to this Indenture that does not relate directly to the issuance of the replacement securities or loans or the terms of such replacement securities or loans may be effected under this clause (xv), but may be effected simultaneously under another clause of this Section 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) or under Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), to the extent such other provision is available.

(xvi)    to modify any provision to facilitate an exchange of one obligation for another obligation of the same Obligor that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(xvii)    to modify or implement procedures necessary to comply with Rule 17g-5;

(xviii) to make such changes as shall be necessary or advisable in order for the Certificated Class E Notes and/or the Certificated Class F Notes to be held electronically through DTC or other clearing agencies in a manner similar to, and subject to the same procedures as, the Rule 144A Global Notes; or

(xix)    to facilitate the issuance of combination notes with components consisting of existing Classes of Notes.

The Trustee shall join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

NEWYORK 8715474 (2K)

In the case of any supplemental indenture entered into pursuant to Section 8.1(xiv) (Supplemental Indentures Without Consent of Holders of Offered Securities), if the Holders of at least a Majority of the Notes of any other Class provide written notice to the Issuer and the Trustee that such Holders will be materially and adversely affected by any such proposed supplemental indenture (which notice shall (i) set forth the basis on which such Holder or Holders are materially and adversely affected thereby and (ii) provide evidence of such Holder's identity, including a guarantee by a member of a signature guarantee program of its signature with respect to such notice), the Co-Issuers and the Trustee shall not enter into such supplemental indenture (it being understood that any Holder that does not object to such proposed supplemental indenture in writing within 15 Business Days of delivery of such proposed supplemental indenture will be deemed to have consented to such proposed supplemental indenture). In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange shall so require, the Issuer shall notify the Irish Stock Exchange of any material modification of this Indenture.

Section 8.2. <u>Supplemental Indentures With Consent of Holders of Offered Securities</u>. (a) With the consent of (i) at least a Majority of each Class of Notes (voting separately by Class) materially and adversely affected thereby and (ii) without limiting clause (i) above, at least a Majority of the Controlling Class, if such supplemental indenture would modify the Weighted Average Life Test or extend the Reinvestment Period, the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Secured Notes or the Holders of the Subordinated Notes, as applicable. Holders of the Combination Notes will vote with each Underlying Class, except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner that is different from the effect of such supplemental indenture on the Notes of any Underlying Class, in which case they will vote only as a separate Class; <u>provided</u>, <u>that</u>, notwithstanding anything in this Indenture to the contrary, no such supplemental indenture shall, without the consent of each Holder of any Class materially and adversely affected thereby:

(i) change the Stated Maturity of the principal of any Class of Note or the due date of any installment of interest on any Secured Note, reduce the principal amount thereof or the rate of interest thereon or the Redemption Price with respect to any Offered Security, or change the earliest date on which Notes of any Class may be redeemed, change the provisions of this Indenture relating to the application of proceeds of any Assets to the payment of principal of or interest on Secured Notes or distributions on the Subordinated Notes or change any place where, or the coin or currency in which, Subordinated Notes or Secured Notes or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date); <u>provided</u> that, the consent of the Controlling Class shall not be required with respect to a supplemental indenture that reduces the rate of interest on a Class of Notes (unless such reduction is with respect to the Notes of the Controlling Class);

(ii) reduce the percentage of the Aggregate Outstanding Amount of Noteholders of each Class whose consent is required for the authorization of any such

-160-

supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder or their consequences provided for in this Indenture;

(iii)    impair or adversely affect the Assets;

(iv)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Assets or terminate such lien on any property at any time subject hereto or deprive the Holder of any Secured Note of the security afforded by the lien of this Indenture;

(v)    reduce the percentage of the Aggregate Outstanding Amount of Noteholders, each Class of Secured Notes whose consent is required to request the Trustee to preserve the Assets or rescind the Trustee's election to preserve the Assets pursuant to Section 5.5 (Optional Preservation of Assets) or to sell or liquidate the Assets pursuant to Section 5.4 (Remedies) or 5.5 (Optional Preservation of Assets);

(vi)    modify any of the provisions of this Article 8 (Supplemental Indentures), except to increase the percentage of Outstanding Secured Notes or Subordinated Notes the consent of the Holders of which is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Secured Note or Subordinated Note Outstanding and affected thereby;

(vii)    modify the definition of the terms "Outstanding", "Controlling Class" or "Majority" or modify the Priority of Payments set forth in Section 11.1(a) (Disbursements of Monies from Payment Account) or the Note Payment Sequence;

(viii)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of the Redemption Price, interest or principal on any Secured Note, or any amount available for distribution to the Subordinated Notes or to affect the rights of the Holders of Secured Notes to the benefit of any provisions for the redemption of such Secured Notes contained herein; or

(ix)    modify the provisions of this Indenture in such a manner as to affect the extent to which payments on the Underlying Class are made to the Holders of the Combination Notes or modifies the voting rights of Holders of the Combination Notes.

(b)    Subject to Section 8.1, with the consent of the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes delivered to the Trustee and the Portfolio Manager, the Trustee and the Co-Issuers may enter into one or more indentures supplemental hereto to accommodate the issuance of Additional Subordinated Notes pursuant to Section 2.4 (Additional Notes).

(c)    Not later than 20 Business Days prior to the execution of any proposed supplemental indenture pursuant to Sections 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) and 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), the Trustee, at the expense of the Co-Issuers, shall deliver to the Noteholders

-161-

(and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, any beneficial owner of a Note) and each Rating Agency (with respect to each Rating Agency, only for so long as any Outstanding Secured Notes are rated by such Rating Agency), a copy of such supplemental indenture.  Unless otherwise notified in writing by at least a Majority of any Class of Notes that such Class would be materially and adversely affected by a supplemental indenture, the Trustee may conclusively rely upon an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates (including certificates delivered by the Portfolio Manager) and/or documents) as to whether the interests of any Holder of Notes would be materially and adversely affected by any supplemental indenture or other modification or amendment of this Indenture.  Except as set forth in the previous sentence, such determination shall be conclusive and binding on all present and future Holders.  The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 8.3 (Execution of Supplemental Indentures) hereof.  If such a determination cannot be made with respect to a Class or Classes of Notes, such Class or Classes of Notes will be treated as if they would be materially and adversely affected by such change.

(d)     It shall not be necessary for any Act of Holders under this Section 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities) to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

(e)     The Issuer shall not enter into any supplemental indenture which materially adversely affects any rights of any Hedge Counterparty under this Indenture without the prior written consent of such Hedge Counterparty.

(f)     Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to Sections 8.1 (Supplemental Indentures Without Consent of Holders of Offered Securities) and 8.2 (Supplemental Indentures With Consent of Holders of Offered Securities), the Trustee at the expense of the Co-Issuers, shall deliver to the Noteholders (and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, any beneficial owner of a Note), the Portfolio Manager and each Rating Agency a copy thereof.  Any failure of the Trustee to deliver a copy of any supplemental indenture as provided herein, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

(g)     With respect to any supplemental indenture that modifies or amends any component of the Minimum Diversity/Maximum Rating/Minimum Spread Matrix or the definitions related thereto, the following requirements must be satisfied prior to the execution of such supplemental indenture: (i) written consent to such supplemental indenture has been obtained from at least a Majority of the Controlling Class, such consent not to be unreasonably withheld, delayed or conditioned and (ii) the Moody's Rating Condition has been satisfied with respect to such supplemental indenture.

(h)     Any supplemental indenture that amends or modifies the definitions of Concentration Limitations, Collateral Quality Tests, Collateral Obligations, Eligible Investments

or Investment Criteria shall be deemed to materially and adversely affect the rights and interests of the Holders of each Class of Notes for the purposes of this Article 8.

Section 8.3.    Execution of Supplemental Indentures.  In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 (Certain Duties and Responsibilities of the Trustee), 6.3 (Certain Rights of Trustee) and Section 8.2(c) (Supplemental Indentures With Consent of Holders of Offered Securities) hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.  The Portfolio Manager will be bound to follow any amendment or supplement to this Indenture of which it has received written notice from the time it has received a copy of such amendment from the Issuer or the Trustee; provided, however, that with respect to any amendment or supplement to this Indenture which would (i) increase the duties or liabilities of, or adversely change the economic consequences to the Portfolio Manager, (ii) modify the restrictions on the purchases or sales of Collateral Obligations described under Article 12 or the Investment Criteria, (iii) expand or restrict the Portfolio Manager's discretion or (iv) modify the restrictions on and procedures for resales and other transfers of Subordinated Notes, except as set forth in Section 8.1(vi) above, the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented thereto in writing, such consent not to be unreasonably withheld or delayed.  The Issuer shall promptly provide the Portfolio Manager with notice of any proposed supplemental indenture that would have the effect of modifying the restrictions on and procedures for resales and other transfers of Subordinated Notes (whether as set forth in Section 8.1(vi) above or otherwise).  For so long as any Class of Notes is listed on the Irish Stock Exchange, the Issuer shall notify the Irish Stock Exchange of any material modification to this Indenture.

Section 8.4.    Effect of Supplemental Indentures.  Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.    Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Issuer shall, bear a notice in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

-163-

ARTICLE 9

Redemption of Notes

Section 9.1.    Mandatory Redemption.  If a Coverage Test is not met on any Determination Date occurring subsequent to the Ramp-up Period (or, in the case of each Interest Coverage Test, at or subsequent to the Determination Date with respect to the second Payment Date), the Issuer shall apply available amounts in the Payment Account on the related Payment Date to make payments in accordance with the Note Payment Sequence to the extent necessary to achieve compliance with such Coverage Test, as applicable.  The Combination Notes will be redeemed on any Payment Date in connection with a Mandatory Redemption to the extent that each Underlying Class is redeemed.

Section 9.2.    Optional Redemption and Refinancing.  The Secured Notes shall be redeemable by the Applicable Issuers, in whole, on any Business Day (x) after the end of the Non-Call Period and (y) during the Non-Call Period, only if a Tax Event has occurred.  No Optional Redemption shall occur unless the Issuer has received written direction from Holders of at least (i) when no Tax Event has occurred or is ongoing, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or (ii) when a Tax Event has occurred and is ongoing, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes or of the Aggregate Outstanding Amount of any Class of Secured Notes Affected by such Tax Event (provided that if the Tax Event that has occurred is with respect to any tax arising under or as a result of FATCA, then Holders that have not provided the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information (to the extent that the failure to provide the Holder FATCA Information was a cause of the tax arising under FATCA) shall not be considered in determining whether the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the applicable Class of Notes have directed a redemption of Secured Notes) provided to the Issuer, the Trustee and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption shall occur.

Upon receipt or delivery of a notice of redemption of the Secured Notes, the Portfolio Manager in its sole discretion will (except in the case of a Refinancing) direct the sale of all or part of the Collateral Obligations and other Assets in order that the proceeds from such sale and all other funds available for such purpose in the Collection Account and the Payment Account will be at least sufficient to pay the Redemption Price on all of the Secured Notes and to pay any applicable Management Fees, all Administrative Expenses (without limitation thereof by the Administrative Expense Cap) and other fees and expenses payable under the Priority of Payments (including, without limitation, any amounts due to the Hedge Counterparties), provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. On the Redemption Date, proceeds available for an Optional Redemption will be applied to redeem the Secured Notes and pay other amounts and expenses in accordance with the Priority of Payments. If such sale, in the sole discretion of the Portfolio Manager, would not be sufficient to redeem all Secured Notes and to pay such applicable Management Fees, Administrative Expenses and other fees and expenses, the Secured Notes may not be redeemed.  The Portfolio Manager, in its

-164-

discretion, may effect the sale of all or any part of the Collateral Obligations or other Assets through the sale of one or more participations in such Assets.

The Combination Notes shall be redeemed on any Redemption Date in connection with an Optional Redemption to the extent that each Underlying Class is redeemed by allocation of the Redemption Price of each Underlying Class. The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.

Any Class or Classes of Secured Notes may be redeemed in whole, but not in part, on any Business Day after the Non-Call Period from Refinancing Proceeds at the written direction of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes delivered to the Issuer and the Portfolio Manager (with a copy to the Trustee and the Rating Agencies). The Co-Issuers shall redeem such Class or Classes of Secured Notes on the applicable Redemption Date following receipt of such direction by obtaining a loan or an issuance of replacement securities, the terms of which loan or issuance will be negotiated by the Portfolio Manager on behalf of the Issuer, from one or more financial institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "Refinancing"). So long as the Combination Notes are Outstanding, the Underlying Classes may only be redeemed in connection with a Refinancing if all of the Underlying Classes will be redeemed on the same Redemption Date. The Combination Notes shall be redeemed on any Redemption Date in connection with a Refinancing to the extent that each Underlying Class is redeemed by allocation of the Redemption Price of each Underlying Class.

The Issuer shall not obtain a Refinancing of less than all Classes of Secured Notes unless the Portfolio Manager determines and certifies to the Trustee and the Issuer that: (i) the Global Rating Agency Condition has been satisfied with respect to any remaining Secured Notes that were not the subject of the Refinancing; (ii) the proceeds from the Refinancing (the "Refinancing Proceeds") (together with Interest Proceeds available in accordance with the Priority of Payments to pay the accrued interest portion of the applicable Redemption Price) will be at least sufficient to pay the Redemption Price of the Class or Classes of Secured Notes subject to Refinancing; (iii) the aggregate principal amount of any obligations providing the Refinancing is equal to the Aggregate Outstanding Amount of the Secured Notes being redeemed with the proceeds of such obligations plus an amount equal to the expenses in connection with such Refinancing (other than expenses to be paid by application of Section 11.1(a)(i)(W) (Disbursements of Monies from Payment Account); (iv) the stated maturity of the obligations providing the Refinancing is no earlier than the Stated Maturity of the Secured Notes being refinanced; (v) the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Secured Notes; (vi) the agreements relating to the Refinancing contain limited-recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth herein; (vii) the obligations providing the Refinancing are not senior in priority of payment, and do not have greater voting rights than, the Class of Secured Notes being redeemed; and (viii) the expenses in connection with the Refinancing have been paid or will be adequately provided for from (x) the proceeds of the Refinancing (except for expenses owed to persons that agree to be paid solely as Administrative Expenses payable in accordance with the

-165-

Priority of Payments) and/or (y) the application of Section 11.1(a)(i)(W) (Disbursements of Monies from Payment Account).

In addition to the foregoing restrictions, no replacement Class of Secured Notes shall be issued in connection with a Refinancing of less than all Classes of Secured Notes unless the Issuer causes to be delivered to the Trustee an Opinion of Counsel in form and substance satisfactory to the Trustee to the effect that the issuance of such Notes would not affect the U.S. Federal income tax treatment of the Secured Notes then Outstanding (including any resulting deemed exchange under Section 1001 of the Code).

In the case of a Refinancing upon a redemption of all Classes of Secured Notes, the Issuer shall not obtain such Refinancing unless (i) the Refinancing Proceeds and all other available funds will be at least sufficient to redeem simultaneously the Secured Notes, in whole but not in part, and to pay the other amounts included in the aggregate Redemption Price and all accrued and unpaid applicable Management Fees, Administrative Expenses (regardless of the Administrative Expense Cap), including the reasonable fees, costs, charges and expenses incurred by the Trustee and the Collateral Administrator (including reasonable attorneys' fees and expenses) in connection with such Refinancing, provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date, (ii) the Refinancing Proceeds and other available funds are used (to the extent necessary) to make such redemption and (iii) the agreements relating to the Refinancing contain limited recourse and non-petition provisions equivalent to those applicable to the Secured Notes being redeemed, as set forth herein.

Refinancing Proceeds shall not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Redemption Date pursuant to this Indenture to redeem the Secured Notes being refinanced without regard to the Priority of Payments; provided, that to the extent that any Refinancing Proceeds are not applied to redeem the Secured Notes being refinanced or to pay expenses in connection with the Refinancing, such Refinancing Proceeds shall be treated as Principal Proceeds.

The Holders of the Notes shall not have any cause of action against any of the Co-Issuers, the Portfolio Manager or the Trustee for any failure to obtain a Refinancing. In the event that a Refinancing is obtained meeting the requirements specified above as certified by the Portfolio Manager, the Issuer and the Trustee shall amend this Indenture to the extent necessary to reflect the terms of the Refinancing and no further consent for such amendments shall be required from the Holders of Notes other than the consent of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes directing or consenting to the redemption.

In the event of any redemption pursuant to this Section 9.2 (Optional Redemption and Refinancing), the Issuer shall, at least 20 days prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee in writing of such Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Redemption Date and the applicable Redemption Price(s).

NEWYORK 8715474 (2K)

Section 9.3.     Redemption Procedures.  (a)  In the event of any redemption pursuant to Section 9.2 (Optional Redemption and Refinancing), the written direction of the Holders of the Subordinated Notes set forth therein shall be provided to the Trustee, the Issuer and the Portfolio Manager not later than 30 days prior to the Business Day on which such redemption is to be made (which date shall be designated in such notice) and a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than 10 Business Days prior to the applicable Redemption Date, to each applicable Holder of Notes, at such Holder's address in the Register and each Rating Agency.  In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of redemption pursuant to Section 9.2 (Optional Redemption and Refinancing) shall also be given to the Noteholders by publication in the Companies Announcements Office of the Irish Stock Exchange.

(b)     All notices of redemption delivered pursuant to Section 9.3(a) (Redemption Procedures) shall state:

(i)     the applicable Redemption Date;

(ii)     the Redemption Price of the Notes to be redeemed;

(iii)     that all of the Secured Notes are to be redeemed in full, in the case of an Optional Redemption, or listing the applicable Class of Notes that are to be redeemed, in the case of a Refinancing, and that interest on the Secured Notes shall cease to accrue on the Business Day specified in the notice;

(iv)     the place or places where Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency); and

(v)     whether the Subordinated Notes are to be redeemed in full on such Redemption Date and, if so, the place or places where the Subordinated Notes are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 (Maintenance of Office or Agency).

The Co-Issuers shall have the option to withdraw any such notice of redemption up to the Business Day immediately prior to the scheduled Redemption Date by written notice to the Trustee and the Portfolio Manager only if the Portfolio Manager shall be unable to deliver the sale agreement or agreements or certifications (described in Section 9.3(c) (Redemption Procedures)), in form satisfactory to the Trustee or is unable to effect the applicable Refinancing. If the Co-Issuers so withdraw any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations and other Assets sold pursuant to Section 9.2 (Optional Redemption and Refinancing) may, during the Reinvestment Period at the Portfolio Manager's discretion, be reinvested in accordance with the Investment Criteria.

Notice of redemption shall be given by the Co-Issuers (so long as the Co-Issuers have received notice thereof) or, upon an Issuer Order, by the Trustee in the name and at the

-167-

expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Notes selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

(c) In the event of any redemption pursuant to Section 9.2 (Optional Redemption and Refinancing), no Notes may be optionally redeemed (other than in connection with a Refinancing) unless (i) at least 10 Business Days before the scheduled Redemption Date the Portfolio Manager shall have furnished to the Trustee evidence, in form satisfactory to the Trustee, that the Portfolio Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial or other institution or institutions to sell to such institution, not later than the second Business Day preceding the scheduled Redemption Date in immediately available funds, all or part of the Collateral Obligations and/or the Hedge Agreements at a purchase price at least equal to an amount sufficient, together with the Eligible Investments maturing, redeemable (or putable to the issuer thereof at par) on or prior to the scheduled Redemption Date and any payments to be received in respect of the Hedge Agreements, to pay any applicable Management Fees, all Administrative Expenses and other fees and expenses payable in accordance with the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the payment of the principal of the Notes to be redeemed and redeem all of the Secured Notes on the scheduled Redemption Date at the applicable Redemption Price, provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date or (ii) prior to selling any Collateral Obligations and/or Eligible Investments, the Portfolio Manager shall certify to the Trustee that, in its judgment, the aggregate sum of (A) expected proceeds from Hedge Agreements and the sale of Eligible Investments and (B) the aggregate Market Value of all Collateral Obligations and other Assets shall exceed the sum of (x) the aggregate Redemption Prices of the Outstanding Secured Notes and (y) any applicable Management Fees, all Administrative Expenses and other fees and expenses payable under the Priority of Payments (without limitation thereof by the Administrative Expense Cap) prior to the redemption of the Notes, provided that, in the event that the Redemption Date is not a Payment Date, any applicable Management Fees, the Administrative Expenses and other fees and expenses payable pursuant to the Priority of Payments shall be calculated as of such Redemption Date. Any certification delivered pursuant to Section 9.3(c)(ii) (Redemption Procedures) shall include (1) the approximate prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments and/or Hedge Agreements and (2) all calculations required by this Section 9.3(c) (Redemption Procedures). The Issuer shall deposit, or cause to be deposited, the funds required for an Optional Redemption in the Payment Account on or prior to the Redemption Date.

Section 9.4. Notes Payable on Redemption Date. (a) Notice of redemption pursuant to Section 9.3 (Redemption Procedures) having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, subject to (i) Section 9.3(c) (Redemption Procedures) and (ii) the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.3(b) (Redemption Procedures), become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) all such Secured Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be so redeemed, each Noteholder shall

present and surrender its Note at the place specified in the notice of redemption on or prior to such Redemption Date; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by any of them to save such party harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender. Payments of interest on Secured Notes so to be redeemed whose Stated Maturity is on or prior to the Redemption Date shall be payable to the Holders of such Secured Note, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.8(e) (Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved).

(b)     If any Secured Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Secured Note remains Outstanding; provided, that the reason for such non-payment is not the fault of such Noteholder.

Section 9.5.     Special Redemption.   The Secured Notes shall be subject to redemption in part on any Payment Date (A) during the Reinvestment Period, if the Portfolio Manager at its discretion notifies the Trustee that it has been unable, for a period of 20 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and would meet the Investment Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account that are to be invested in additional Collateral Obligations or (B) after the Ramp-up Period, if the Portfolio Manager notifies the Trustee that a redemption is required pursuant to Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) (in each case, a "Special Redemption").  On the first Payment Date following the Collection Period in which such notice is given (and, in the case of clause (B) above, any subsequent Payment Date) (a "Special Redemption Date"), the amount in the Principal Collection Subaccount representing Principal Proceeds which (1) the Portfolio Manager has determined cannot be reinvested in additional Collateral Obligations or (2) must be applied to redeem the Secured Notes in accordance with Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) (such amount, a "Special Redemption Amount"), as the case may be, will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii) (Disbursements of Monies from Payment Account).  Notice of payments pursuant to this Section 9.5 (Special Redemption) shall be given by the Trustee first class mail, postage prepaid, mailed not less than three Business Days prior to the applicable Special Redemption Date to each Holder of Notes affected thereby at such Holder's address in the Register and to both Rating Agencies.  Failure to give any such notice, or any defect therein, to any Holder selected for redemption shall not impair or affect the validity of the redemption or any other Notes.  In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Special Redemption shall also be given by publication at the Companies Announcements Office of the Irish Stock Exchange.  The Issuer shall deposit, or cause to be deposited, the funds required for a Special Redemption in the Payment Account on or prior to the Special Redemption Date.  The

-169-

Combination Notes will be redeemed on any Payment Date in connection with a Special Redemption to the extent that each Underlying Class is redeemed.

Section 9.6. <u>Clean-up Call Redemption</u>. (a) The Notes are redeemable at the option of the Applicable Issuer(s) acting at the direction of the Portfolio Manager (which direction shall (x) given so as to be received by the Issuer and the Trustee not later than twenty days prior to the proposed Clean-up Call Redemption Date and (y) include the Clean-up Call Redemption Date and the Clean-up Call Redemption Price of the Notes to be redeemed), in whole but not in part (a "<u>Clean-up Call Redemption</u>"), at the applicable Redemption Price, on any Business Day selected by the Portfolio Manager (such Business Day, the "<u>Clean-up Call Redemption Date</u>") which occurs on or after the Payment Date on which the Aggregate Principal Balance of the Collateral Obligations and Eligible Investments is less than or equal to 15% of the Target Initial Par Amount. In such event a notice of redemption shall be given by first class mail, postage prepaid, mailed not later than six Business Days prior to the applicable Clean-up Call Redemption Date, to each Holder of Notes, at such Holder's address in the Register and to each Rating Agency. Any such Clean-up Call Redemption may only be effected on a Payment Date and only from (a) the disposition proceeds of the Assets and (b) all other funds in the Accounts on the Payment Date relating to such redemption. A Clean-up Call Redemption may not occur unless the proceeds from the liquidation of the Assets and all other funds in the Accounts on the Payment Date relating to such redemption results in an amount at least equal to the Clean-up Call Redemption Price. The Combination Notes will be redeemed on any Clean-up Redemption Date in connection with a Clean-up Call Redemption to the extent that each Underlying Class is redeemed by allocation of the Clean-up Call Redemption Price of each Underlying Class.

(b) All notices of redemption delivered pursuant to <u>Section 9.6(a)</u> (Clean-up Call Redemption) shall state:

(i) the Clean-up Call Redemption Date;

(ii) the Clean-up Call Redemption Price of the Notes to be redeemed; and

(iii) that all of the Notes are to be redeemed in full and that interest on the Secured Notes shall cease to accrue on the Payment Date specified in the notice.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder shall not impair or affect the validity of the redemption of any other Notes. In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the guidelines of such exchange so require, notice of Clean-up Call Redemption shall also be given by publication in the Companies Announcement Office of the Irish Stock Exchange.

(c) Any Clean-up Call Redemption is subject to (i) the purchase of the Assets by any Person(s) from the Issuer, on or prior to the fourth Business Day immediately preceding the Clean-up Call Redemption Date, for a purchase price in Cash at least equal to the Clean-up Call Redemption Price (less the amount of funds in the Accounts that are available to pay the

Clean-up Call Redemption Price) and (ii) the receipt by the Trustee from the Portfolio Manager, prior to such purchase, of a certification from the Portfolio Manager that the sum so received satisfies the requirements of clause (i). Upon receipt by the Trustee of the certification referred to in the preceding sentence, the Trustee (pursuant to written direction from the Portfolio Manager on behalf of the Issuer) and the Portfolio Manager, acting on behalf of the Issuer, shall take all commercially reasonable actions necessary to sell, assign and transfer the Assets to such Person(s) (which may be the Portfolio Manager or any of its Affiliates) upon payment in immediately available funds of the purchase price for such Assets. The Issuer shall deposit, or cause to be deposited, the funds required for a Clean-up Call Redemption in the Payment Account on or prior to the Clean-up Call Redemption Date. The Trustee shall deposit such payment into the Collection Account.

(d) Any notice of Clean-up Call Redemption may be withdrawn by the Issuer (or the Portfolio Manager on its behalf) up to the fourth Business Day prior to the scheduled Clean-up Call Redemption Date by written notice to the Trustee, the Rating Agencies and (if applicable) the Portfolio Manager only if amounts equal to the Clean-up Call Redemption Price (including funds in the Accounts available to pay the Clean-up Call Redemption Price) are not received in full in immediately available funds by the fourth Business Day immediately preceding the Clean-up Call Redemption Date. Notice of any such withdrawal of a notice of Clean-up Call Redemption shall be given by the Trustee at the expense of the Issuer to each Holder of Notes at such Holder's address in the Note Register by overnight courier guaranteeing next day delivery not later than the second Business Day prior to the scheduled Clean-up Call Redemption Date. The Trustee shall also arrange for notice of such withdrawal to be delivered to the Irish Stock Exchange so long as any Class of Notes is listed thereon and so long as the guidelines of such exchange so require.

(e) On the Clean-up Call Redemption Date, the Clean-up Call Redemption Price shall be distributed pursuant to the Priority of Payments.

(f) Notice of redemption pursuant to Section 9.6 (Clean-up Call Redemption) having been given as aforesaid, the Notes to be redeemed shall, on the Clean-up Call Redemption Date, subject to Section 9.6(c) (Clean-up Call Redemption) and the Co-Issuers' right to withdraw any notice of redemption pursuant to Section 9.6(d) (Clean-up Call Redemption), become due and payable at the Clean-up Call Redemption Price therein specified, and from and after the Clean-up Call Redemption Date (unless the Issuer shall default in the payment of the Clean-up Call Redemption Price and accrued interest) all the Secured Notes shall cease to bear interest on the Clean-up Call Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and surrender such Notes at the place specified in the notice of redemption on or prior to such Clean-up Call Redemption Date; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by any of them to save such party harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender.

If any Secured Note called for redemption pursuant to Section 9.6 (Clean-up Call Redemption) shall not be paid upon surrender thereof for redemption, the principal thereof shall,

until paid, bear interest from the Clean-up Call Redemption Date at the applicable Note Interest Rate for each successive Interest Accrual Period the Secured Note remains Outstanding; provided that the reason for such non-payment is not the fault of the Holder of such Secured Note.

## ARTICLE 10

### Accounts, Accountings and Releases

Section 10.1. Collection of Money. Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms and conditions of such Pledged Obligations. The Trustee shall segregate and hold all such Money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.

Each Account shall be established and maintained with (a) a federal or state-chartered depository institution with (x) a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P or a long-term debt rating of at least "A+" by S&P and if such institution's long-term debt rating falls below "A" by S&P or its short-term rating falls below "A-1" by S&P (or its long-term rating falls below "A+" by S&P), the assets held in such Account shall be transferred within 60 calendar days to another institution that has a long-term debt rating of at least "A" by S&P and a short-term debt rating of at least "A-1" by S&P (or a long-term debt rating of at least "A+" by S&P) and (y) a long-term senior unsecured debt rating of at least "A2" or a short-term credit rating of "P-1" by Moody's or (b) in segregated non-interest bearing trust accounts with the corporate trust department of a federal or state-chartered deposit institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulation Section 9.10(b), which depository institution (x) has a long term senior unsecured debt rating of at least "Baa3" by Moody's and (y) to the extent any related trust account is holding cash, satisfies the ratings requirements specified in clause (a). If, in the case of either clause (a) or (b) above, such institution's long-term debt rating or short-term credit rating by Moody's falls below any such required rating, the assets held in the related Accounts shall be transferred within 30 calendar days to another institution that satisfies such rating requirements. The Trustee shall have the right to open subaccounts of any such Account as it deems necessary or appropriate for convenience of administration.

Section 10.2. Collection Account. (a) In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Collection Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. In addition, the Trustee shall maintain two segregated subaccounts within the Collection Account, one of which will be designated the "Interest Collection Subaccount," and one of which will be designated the "Principal Collection Subaccount." The Trustee shall from time to time deposit into the Interest Collection Subaccount, in addition to the deposits required pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee),

NEWYORK 8715474 (2K)

immediately upon receipt thereof (except for income earned on amounts deposited in the Ramp-up Account and, to the extent provided in Section 10.4(a) (the Revolver Funding Account), the subaccount of the Revolver Funding Account relating to Permitted Currencies) (i) any funds received by the Issuer after the Closing Date and deemed by the Portfolio Manager to be Interest Proceeds and (ii) all Interest Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12) received by the Trustee. The Trustee shall deposit immediately upon receipt thereof all other amounts remitted to the Collection Account into the Principal Collection Subaccount, including in addition to the deposits required pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee), (i) any funds received by the Issuer after the Closing Date and deemed by the Portfolio Manager to be Principal Proceeds, (ii) all Principal Proceeds (unless simultaneously reinvested in additional Collateral Obligations in accordance with Article 12 or in Eligible Investments) received by the Trustee, and (iii) all other funds received by the Trustee. All Monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Assets and shall be applied to the purposes herein provided. Subject to Section 10.2(d) (Collection Account), amounts in the Collection Account shall be reinvested pursuant to Section 10.6(a) (Reinvestment of Funds in Accounts; Reports by Trustee).

(b)     The Trustee, within one Business Day after receipt of any distribution or other proceeds in respect of the Assets which are not Cash, shall so notify or cause to notify the Issuer and the Issuer shall, use its commercially reasonable efforts to, within five Business Days of receipt of such notice from the Trustee (or as soon as practicable thereafter), sell such distribution or other proceeds for Cash in an arm's length transaction to a Person which is not the Portfolio Manager or an Affiliate of the Issuer or the Portfolio Manager and deposit the proceeds thereof in the Collection Account; provided, however, that the Issuer (i) need not sell such distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee certifying that such distributions or other proceeds constitute Collateral Obligations or Eligible Investments or (ii) may otherwise retain such distribution or other proceeds for up to two years from the date of receipt thereof if it delivers an Officer's certificate to the Trustee certifying that (x) it will sell such distribution within such two-year period and (y) retaining such distribution is not otherwise prohibited by this Indenture.

(c)     At any time when reinvestment is permitted pursuant to Article 12, the Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, (x) withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds (together with accrued interest received with regard to any Collateral Obligation and Interest Proceeds but only to the extent used to pay for accrued interest on an additional Collateral Obligation) and reinvest (or invest, in the case of funds referred to in Section 7.18 (Ramp-up Period; Purchase of Additional Collateral Obligations)) such funds in additional Collateral Obligations or (y) withdraw funds in the Interest Collection Subaccount to exercise a warrant held in the Assets, in each case in accordance with the requirements of Article 12 and such Issuer Order; provided that, in the case of clause (y) above (i) funds on deposit in the Principal Collection Subaccount may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (ii) proceeds from the sale of securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio

Manager. At any time, the Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, withdraw funds on deposit in the Principal Collection Subaccount representing Principal Proceeds and transfer such funds to the Revolver Funding Account, to be used in accordance with Section 10.4 (The Revolver Funding Account).

(d)     The Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Accrual Period (i) from Interest Proceeds only, any amount required to exercise a warrant held in the Assets or right to acquire securities in accordance with the requirements of Article 12 and such Issuer Order; provided that, (x) Principal Proceeds may be used to exercise warrants in Assets if the Effective Date Overcollateralization Test is satisfied as of the date such warrant is exercised and (y) proceeds from the sale of securities obtained upon the exercise of such warrant may be treated as Interest Proceeds (up to the amount of Interest Proceeds used to exercise such warrant) or Principal Proceeds at the election of the Portfolio Manager and (ii) from Interest Proceeds only, any Administrative Expenses; provided, that the aggregate Administrative Expenses paid pursuant to this Section 10.2(d) (Collection Account) during any Collection Period shall not exceed the Administrative Expense Cap for the related Payment Date.

(e)     The Trustee shall transfer to the Payment Account as applicable, from the Collection Account, for application pursuant to Section 11.1(a) (Disbursements of Monies from Payment Account), on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Distribution Report for such Payment Date.

(f)     The Portfolio Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon receipt of such Issuer Order the Trustee shall, transfer from amounts on deposit in the Interest Collection Subaccount on any Business Day during any Interest Accrual Period to the Principal Collection Subaccount, amounts necessary for application pursuant to Section 7.18(d) (Ramp-up Period; Purchase of Additional Collateral Obligations) if, as of the end of the Ramp-up Period, any of the Effective Date Conditions have not been met.

Section 10.3.     Payment Account; Custodial Account; Ramp-up Account; Expense Reserve Account; Interest Reserve Account.

(a)     Payment Account. In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Payment Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. Except as provided in Section 11.1(a) (Disbursements of Monies from Payment Account), the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified herein, each in accordance with the Priority of Payments. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(b)    <u>Custodial Account</u>.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Custodial Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. The only permitted withdrawals from the Custodial Account shall be in accordance with the provisions of this Indenture.  The Trustee agrees to give the Co-Issuers immediate notice if (to the Trustee's actual knowledge) the Custodial Account or any assets or securities on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(c)    <u>Ramp-up Account</u>.  The Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Ramp-up Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  The Issuer shall direct the Trustee to deposit the amount specified in <u>Section 3.1(a)(xii)</u> (Conditions to Issuance of Notes on Closing Date) in the Ramp-up Account. In connection with any purchase of an additional Collateral Obligation, the Trustee will apply amounts held in the Ramp-up Account as provided by <u>Section 7.18(b)</u> (Ramp-up Period; Purchase of Additional Collateral Obligations).  After the Effective Date, but prior to the second Determination Date, and after taking into account amounts to be transferred, up to $5,000,000 in Designated Principal Proceeds may be designated, on one occasion only, by the Portfolio Manager as Interest Proceeds (but only if the Effective Date Overcollateralization Test would be satisfied after such designation). Such Designated Principal Proceeds will be withdrawn from the Ramp-up Account and deposited into the Interest Collection Subaccount.  On the first day after the end of the Ramp-up Period or upon the occurrence of an Event of Default (and excluding any proceeds that will be used to settle binding commitments entered into prior to that date), the Trustee will deposit any remaining amounts in the Ramp-up Account into the Principal Collection Subaccount as Principal Proceeds.  Any income earned on amounts deposited in the Ramp-up Account will be deposited in the Ramp-up Account as it is paid.

(d)    <u>Expense Reserve Account</u>.  In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Expense Reserve Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement.  On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee shall apply funds from the Expense Reserve Account, as directed by the Portfolio Manager, to pay expenses of the Co-Issuers incurred in connection with the establishment of the Co-Issuers, the structuring and consummation of the Offering, the issuance of the Offered Securities or the acquisition of the initial portfolio of Collateral Obligations prior to the fourth Payment Date or to the Collection Account as Principal Proceeds.  By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Expense Reserve Account (after deducting any expenses paid on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Expense Reserve Account will be closed.  Amounts in the

Expense Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments and any income earned on amounts deposited in the Expense Reserve Account will be deposited in the Interest Collection Subaccount as Interest Proceeds as it is paid.

(e) [RESERVED].

(f) Interest Reserve Account. In accordance with this Indenture and the Securities Account Control Agreement, the Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated non-interest bearing trust account in the name "ACIS CLO 2013-1 Ltd., subject to the lien of the Trustee", which shall be designated as the Interest Reserve Account, which shall be held by the Custodian in accordance with the Securities Account Control Agreement. The Issuer shall direct the Trustee to deposit the amount specified in Section 3.1(a)(xii) (Conditions to Issuance of Notes on Closing Date) in the Interest Reserve Account. On any Business Day from the Closing Date to and including the Determination Date relating to the fourth Payment Date, the Trustee shall transfer funds from the Interest Reserve Account, as directed by the Portfolio Manager, to the Interest Collection Subaccount as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion). By the Determination Date relating to the fourth Payment Date following the Closing Date, all funds in the Interest Reserve Account (after deducting any transfer made on such Determination Date) will be deposited in the Collection Account as Interest Proceeds and/or Principal Proceeds (in the respective amounts directed by the Portfolio Manager in its discretion) and the Interest Reserve Account will be closed. Amounts in the Interest Reserve Account may be invested at the direction of the Portfolio Manager in Eligible Investments and any income earned on amounts deposited in the Interest Reserve Account will be deposited in the Interest Collection Subaccount as Interest Proceeds as it is paid.

Section 10.4.    The Revolver Funding Account.

(a) Revolver Funding Account. Upon the purchase of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds may be withdrawn first from the Ramp-up Account and then from the Collection Account, and deposited by the Trustee in a single, segregated non-interest bearing trust account maintained by the Issuer with the Custodian (the "Revolver Funding Account") subject to the lien of the Trustee. Upon initial purchase, funds deposited in the Revolver Funding Account in respect of any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation will be treated as part of the purchase price therefor. Amounts in each subaccount of the Revolver Funding Account shall be invested in overnight funds that are Eligible Investments selected by the Portfolio Manager and earnings from all such investments will be deposited in the Interest Collection Subaccount as Interest Proceeds.

With respect to any Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, upon the purchase of any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, funds shall be deposited in the Revolver Funding Account such that the sum of the amount of funds on deposit in such account shall be equal to or greater than the sum of the unfunded funding obligations under all such Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations then included in the Assets. If the Issuer receives proceeds with respect to any Delayed Drawdown Collateral Obligation or Revolving

-176-

Collateral Obligation that have any remaining unfunded obligations, the Issuer shall deposit all such proceeds into the Revolver Funding Account in an amount up to such unfunded obligations.

Any funds in the Revolver Funding Account (other than earnings from Eligible Investments therein) shall be available solely to cover any drawdowns on the Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations; provided, that any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded funding obligations under all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets may be transferred by the Trustee (at the direction of the Portfolio Manager) from time to time as Principal Proceeds to the Principal Collection Subaccount.

Upon (a) the sale or maturity of a Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or (b) the occurrence of an event of default with respect to any such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation or any other event or circumstance which results in the irrevocable reduction of the undrawn commitments under such Delayed Drawdown Collateral Obligation or Revolving Collateral Obligation, any excess of (A) the amounts on deposit in the Revolver Funding Account over (B) the sum of the unfunded amounts of all Delayed Drawdown Collateral Obligations and Revolving Collateral Obligations that are included in the Assets shall be transferred (at the direction of the Portfolio Manager) by the Trustee as Principal Proceeds to the Principal Collection Subaccount.

Section 10.5.    Hedge Accounts.  If and to the extent that any Hedge Agreement requires the related Hedge Counterparty to secure its obligations thereunder, the Issuer shall, on or prior to the date such Hedge Agreement is entered into, establish a segregated, non-interest bearing trust account which shall be designated as a Hedge Account (each, a "Hedge Account"). The Trustee (as directed by the Portfolio Manager on behalf of the Issuer) shall deposit into each Hedge Account all amounts or collateral which are required to secure the obligations of the Hedge Counterparty in accordance with the terms of the related Hedge Agreement.  Amounts or collateral in the Hedge Account shall be released to the Issuer or the related Hedge Counterparty only in accordance with this Section 10.5(c) (Hedge Accounts), the applicable Hedge Agreement and applicable law.

As directed by the Portfolio Manager in writing, in accordance with the applicable Hedge Agreement, amounts on deposit in a Hedge Account may be invested in Eligible Investments.  Income received on amounts or collateral on deposit in each Hedge Account shall be applied, as directed by the Portfolio Manager, to the payment of any periodic amounts owed by the Hedge Counterparty to the Issuer on the date any such amounts are due.  After application of any such amounts, any income then contained in such Hedge Account shall be withdrawn from such account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement as directed by the Portfolio Manager on behalf of the Issuer.

Upon the occurrence of any "event of default" or "termination event" (each as defined in the applicable Hedge Agreement) under the related Hedge Agreement, amounts contained in the related Hedge Account shall, as directed by the Portfolio Manager in writing, be withdrawn by the Trustee and applied toward the payment of any amounts payable by the related Hedge Counterparty to the Issuer in accordance with the terms of such Hedge Agreement.  Any

-177-

excess amounts held in a Hedge Account after payment of all amounts owing from the related Hedge Counterparty to the Issuer shall be withdrawn from such Hedge Account and paid to the related Hedge Counterparty in accordance with the applicable Hedge Agreement, as directed by the Portfolio Manager on behalf of the Issuer.

Section 10.6.    Reinvestment of Funds in Accounts; Reports by Trustee.    (a) By Issuer Order (which may be in the form of standing instructions), the Issuer (or the Portfolio Manager on behalf of the Issuer) shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds on deposit in the Accounts and the Hedge Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day preceding the next Payment Date (or such shorter maturities expressly provided herein).  If prior to the occurrence of an Event of Default, the Issuer shall not have given any such investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to such accounts.  If the Trustee does not thereafter receive written instructions from the Portfolio Manager within five Business Days after transfer of such funds to such accounts, it shall invest and reinvest the funds held in such accounts, as fully as practicable, in the Standby Investment maturing no later than the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein).  If after the occurrence of an Event of Default, the Issuer shall not have given such investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest such Monies as fully as practicable in the Standby Investment maturing not later than the earlier of (i) 30 days after the date of such investment (unless putable at par to the issuer thereof) or (ii) the Business Day immediately preceding the next Payment Date (or such shorter maturities expressly provided herein).  Except to the extent expressly provided otherwise herein, all interest and other income from such investments shall be deposited in the Interest Collection Subaccount, any gain realized from such investments shall be credited to the Principal Collection Subaccount upon receipt, and any loss resulting from such investments shall be charged to the Principal Collection Subaccount.  The Trustee shall not in any way be held liable by reason of any insufficiency of such accounts which results from any loss relating to any such investment, except with respect to investments in obligations of the Bank or any Affiliate thereof (if the Bank is then the Trustee).

(b)    The Trustee agrees to give the Issuer immediate notice if any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.  All Accounts shall remain at all times with the Trustee or a financial institution having a long-term debt rating of at least equal to "Baa1" by Moody's and having combined capital and surplus of at least $200,000,000 and shall be subject to the requirements of Section 10.1 (Collection of Money).

(c)    The Trustee shall supply, in a timely fashion, to the Co-Issuers, each Rating Agency and the Portfolio Manager any information regularly maintained by the Trustee that the Co-Issuers, the Rating Agencies or the Portfolio Manager may from time to time request with respect to the Pledged Obligations, the Accounts and the other Assets and provide any other requested information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.7 (Accountings) or to permit the Portfolio Manager to perform its obligations under the Portfolio Management Agreement.  The Trustee

-178-

shall promptly forward to the Portfolio Manager copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.7. Accountings.

(a) Monthly. Not later than the 18th day of each month (or, if such day is not a Business Day on the next succeeding Business Day) beginning with April 2013, the Issuer shall compile and provide (or cause to be compiled and provided) (including, at the election of the Issuer, via appropriate electronic means acceptable to the recipient) to each Rating Agency, the Trustee, the Portfolio Manager, Intex Solutions, Inc. and the Placement Agents (upon receipt of written request therefor) a monthly report (each a "Monthly Report"). The Monthly Report shall contain the following information with respect to the Collateral Obligations and Eligible Investments included in the Assets, determined as of the close of business on the 10th day of the current month (for which purpose only, assets of any ETB Subsidiary in which the Issuer has a first priority perfected security interest shall be included as if such assets were owned by the Issuer):

(i) Aggregate Principal Balance of Collateral Obligations and Eligible Investments representing Principal Proceeds.

(ii) Adjusted Collateral Principal Amount of Collateral Obligations.

(iii) Collateral Principal Amount of Collateral Obligations.

(iv) A list of Collateral Obligations, including, with respect to each such Collateral Obligation, the following detailed information:

(A) The obligor thereon (including the issuer ticker, if any);

(B) The CUSIP or security identifier thereof;

(C) The Principal Balance thereof (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest));

(D) The percentage of the aggregate Collateral Principal Amount represented by such Collateral Obligation;

(E) The related interest rate or spread (in the case of a LIBOR Floor Obligation, indicating the spread both with and without giving effect to modifications relating to LIBOR Floor Obligations and the specified "floor" rate per annum for such LIBOR Floor Obligation);

(F) The stated maturity thereof;

-179-

(G)     The related Moody's Industry;

(H)     The related S&P Industry;

(I)     The Moody's Rating, unless such rating is based on a credit estimate unpublished by Moody's (and, in the event of a downgrade or withdrawal of the applicable Moody's Rating, the prior rating and the date such Moody's Rating was changed);

(J)     The Moody's Default Probability Rating;

(K)     The S&P Rating, unless such rating is based on a credit estimate unpublished by S&P;

(L)     The country of Domicile;

(M)     An indication as to whether each such Collateral Obligation is (1) a Defaulted Obligation, (2) a Delayed Drawdown Collateral Obligation (including an indication of the principal amount of unfunded funding obligations thereunder), (3) a Revolving Collateral Obligation (including an indication of the principal amount of unfunded funding obligations thereunder), (4) a Senior Secured Loan, (5) a floating rate Collateral Obligation, (6) a Participation Interest (indicating the related Selling Institution and its ratings by each Rating Agency), (7) a Deferrable Security, (8) a Zero Coupon Security, (9) a Current Pay Obligation, (10) a DIP Collateral Obligation, (11) convertible into or exchangeable for equity securities, (12) a Discount Obligation (including its purchase price), (13) a Cov-Lite Loan, (14) a Pre-funded Letter of Credit, (15) a Bridge Loan, (16) a Non-Quarterly Asset or (17) a First-Lien Last-Out Loan;

(N)     The Moody's Recovery Rate; and

(O)     The S&P Recovery Rate.

(v)     For each of the limitations and tests specified in the definitions of Concentration Limitations and Collateral Quality Test, (1) the result, (2) the related minimum or maximum test level and any calculation of such amount (calculated with and without the Rating Factor Adjustment Amount, the Excess Weighted Average Fixed Coupon, the Excess Weighted Average Floating Spread and the modifications to the Weighted Average Floating Spread calculation relating to LIBOR Floor Obligations (which calculation, with respect to the Minimum Floating Spread Test, will consist of the test level and the calculation of (x) the Weighted Average Floating Spread without giving effect to modifications relating to LIBOR Floor Obligations, (y) the Weighted Average Floating Spread giving effect to modifications relating to LIBOR Floor Obligations and (z) the calculated amount of the modifications relating to LIBOR Floor Obligations), as applicable) and (3) a determination as to whether such result satisfies the related test.

(vi)     The calculation of each of the following:

-180-

(A)     Each Interest Coverage Ratio (and setting forth each related Required Coverage Ratio); and

(B)     Each Overcollateralization Ratio (and setting forth each related Required Coverage Ratio and the Overcollateralization Ratio required to pass the Interest Reinvestment Test).

(vii)     For each Account, a schedule showing the beginning balance, each credit or debit specifying the nature, source and amount, and the ending balance.

(viii)     A schedule showing for each of the following the beginning balance, the amount of Interest Proceeds received from the date of determination of the immediately preceding Monthly Report, and the ending balance for the current Measurement Date:

(A)     Interest Proceeds from Collateral Obligations; and

(B)     Interest Proceeds from Eligible Investments.

(ix)     Purchases, prepayments, and sales:

(A)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), Principal Proceeds and Interest Proceeds received, and date for (X) each Collateral Obligation that was released for sale or disposition pursuant to Section 12.1 (Sales of Collateral Obligations) during such month and (Y) for each prepayment or redemption of a Collateral Obligation, and in the case of (X), whether such Collateral Obligation was a Credit Risk Obligation or a Credit Improved Obligation, whether the sale of such Collateral Obligation was a discretionary sale and whether such sale of a Collateral Obligation was to an affiliate of the Portfolio Manager; and

(B)     The identity, Principal Balance (other than any accrued interest that was purchased with Principal Proceeds (but excluding any capitalized interest)), and Principal Proceeds and Interest Proceeds expended to acquire each Collateral Obligation acquired pursuant to Section 12.2 (Purchase of Additional Collateral Obligations) during such month and whether such Collateral Obligation was obtained through a purchase from an affiliate of the Portfolio Manager.

(x)     The identity of each Defaulted Obligation, the Moody's and S&P Collateral Value and Market Value of each such Defaulted Obligation and date of default thereof.

(xi)     The identity of each Collateral Obligation with an S&P Rating of "CCC+" or below and/or a Moody's Rating of "Caa1" or below and the Market Value of each such Collateral Obligation included in the Excess CCC/Caa Adjustment Amount.

-181-

(xii)    The identity of each Deferring Security, the Moody's and S&P Collateral Value and Market Value of each Deferring Security, and the date on which interest was last paid in full in cash thereon.

(xiii)    For any Collateral Obligation, whether the rating of such Collateral Obligation has been upgraded, downgraded or put on credit watch by any Rating Agency since the date of the immediately preceding Monthly Report and such old and new rating or the implication of such credit watch.

(xiv)    Whether the Issuer has been notified that the Class Break-even Default Rate has been modified.

(xv)    The results of the S&P CDO Monitor Test, including the Class Default Differentials and the characteristics of the current portfolio.

(xvi)    The identity of each Current Pay Obligation, the Market Value of each such Current Pay Obligation, the percentage of the Collateral Principal Amount comprised of Current Pay Obligations, the portfolio limitation for Current Pay Obligations expressed as a percentage of the Collateral Principal Amount and whether such limitation is satisfied.

(xvii)    For each Hedge Agreement, a schedule showing (x) the notional balance thereof and (y) any amounts due to or from the Hedge Counterparty for such Hedge Agreement.

(xviii)    Such other information as the Trustee, any Hedge Counterparty, any Rating Agency or the Portfolio Manager may reasonably request.

(xix)    With respect to each Trading Plan commenced or completed since the date of determination of the immediately preceding Monthly Report or Distribution Report, as applicable, the obligor, rating, maturity, trade date and settlement status of each Collateral Obligation sold (or to be sold) and purchased (or to be purchased) pursuant thereto.

(xx)    The identity of each ETB Subsidiary and the identity of each Equity Security, if any, held by each such ETB Subsidiary and the amount of Cash, if any, held by each such ETB Subsidiary.

(xxi)    A list of the Eligible Investments, including, with respect to each such Eligible Investment, the obligor thereon, the stated maturity thereof and the S&P Rating thereof (unless such rating is based on a credit estimate unpublished by S&P).

(xxii)    The S&P Weighted Average Floating Spread as of such date of determination.

(xxiii)    Following the end of the Reinvestment Period, a schedule of all Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred.

-182-

Upon receipt of each Monthly Report, the Portfolio Manager shall (a) notify the Issuer (who shall notify S&P) if such Monthly Report indicates that the S&P CDO Monitor Test has not been satisfied as of the relevant Measurement Date and (b) compare the information contained in such Monthly Report to the information contained in its records with respect to the Assets and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Collateral Administrator, the Rating Agencies and the Trustee if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Assets.  In the event that any discrepancy exists, the Trustee and the Issuer, or the Portfolio Manager on behalf of the Issuer, shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.9 (Reports by Independent Accountants) to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of such report.  In addition, the Portfolio Manager or the Collateral Administrator at the direction of the Portfolio Manager shall deliver to S&P the S&P Excel Default Model Input File with each Monthly Report.

(b)    Payment Date Accounting.  The Issuer shall prepare or cause to be prepared a report (each a "Distribution Report"), determined as of the close of business on each Determination Date preceding a Payment Date, and shall deliver such Distribution Report (including, at the election of the Issuer, via appropriate electronic means acceptable to the recipient) to the Trustee, the Portfolio Manager, the Placement Agents, Intex Solutions, Inc., the Irish Listing Agent (so long as any Notes are listed on the Irish Stock Exchange) and each Rating Agency not later than the Business Day preceding the related Payment Date.  The Distribution Report shall contain the following information:

(i)    (a) the Aggregate Outstanding Amount of the Secured Notes of each Class at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class, the amount of principal payments to be made on the Secured Notes of each Class on the next Payment Date, the amount of any Deferred Interest on each Class of Deferred Interest Notes, and the Aggregate Outstanding Amount of the Secured Notes of each Class after giving effect to the principal payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Secured Notes of such Class and (b) the Aggregate Outstanding Amount of the Subordinated Notes at the beginning of the Interest Accrual Period and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes, the amount of payments to be made on the Subordinated Notes in respect of Subordinated Note Redemption Price on the next Payment Date, and the Aggregate Outstanding Amount of the Subordinated Notes after giving effect to such payments, if any, on the next Payment Date and such amount as a percentage of the original Aggregate Outstanding Amount of the Subordinated Notes;

-183-

(ii)     the Note Interest Rate and accrued interest for each applicable Class of Secured Notes for such Payment Date, the Aggregate Outstanding Amount of the Combination Notes and the Aggregate Outstanding Amount of the Components of the Combination Notes;

(iii)     the amounts payable pursuant to each clause of Section 11.1(a)(i) (Disbursements of Monies from Payment Account), each clause of Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and, if applicable, each clause of Section 11.1(a)(iii) (Disbursements of Monies from Payment Account) on the related Payment Date;

(iv)     for the Collection Account:

(A)     the Balance on deposit in the Collection Account at the end of the related Collection Period (or, with respect to the Interest Collection Subaccount, the next Business Day);

(B)     the amounts payable from the Collection Account to the Payment Account, in order to make payments pursuant to Section 11.1(a)(i) (Disbursements of Monies from Payment Account), Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and, if applicable, Section 11.1(a)(iii) (Disbursements of Monies from Payment Account) on the next Payment Date (net of amounts which the Portfolio Manager intends to re-invest in additional Collateral Obligations pursuant to Article 12); and

(C)     the Balance remaining in the Collection Account immediately after all payments and deposits to be made on such Payment Date; and

(v)     such other information as the Trustee, any Hedge Counterparty or the Portfolio Manager may reasonably request.

Each Distribution Report shall constitute instructions to the Trustee to withdraw funds from the Payment Account and pay or transfer such amounts set forth in such Distribution Report in the manner specified and in accordance with the priorities established in Section 11.1 (Disbursements of Monies from Payment Account).

(c)     Interest Rate Notice.  The Trustee shall deliver to each Holder of Secured Notes, no later than the sixth day after each Payment Date, a notice setting forth the Note Interest Rate for such Notes for the Interest Accrual Period preceding the next Payment Date.  The Trustee shall also deliver to the Issuer and each Holder of Notes, no later than the sixth day after each Interest Determination Date, a notice setting forth LIBOR for the Interest Accrual Period following such Interest Determination Date.

(d)     Quarterly Report.  Forty-five days after the Determination Date relating to Monthly Reports occurring in March, June, September and December commencing in September 2013, respectively, the Portfolio Manager shall send to the Trustee, each Rating Agency and the Placement Agents a quarterly report describing such events as the Portfolio Manager deems significant relating to the Assets and the performance thereof (each a "Quarterly Report").

-184-

(e)     Failure to Provide Accounting.  If the Trustee shall not have received any accounting provided for in this Section 10.7 (Accountings) on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use all reasonable efforts to cause such accounting to be made by the applicable Payment Date.  To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.7 (Accountings) as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.7 (Trustee Compensation and Reimbursement).

(f)     Required Content of Certain Reports.  Each Monthly Report and each Distribution Report sent to any Holder or beneficial owner of an interest in a Note shall contain, or be accompanied by, the following notices:

The Notes may be held or beneficially owned, as applicable, only by Persons that (a)(i) are not U.S. persons (within the meaning of Regulation S under the United States Securities Act of 1933, as amended) and are purchasing their beneficial interest in an offshore transaction or (ii) are either (A) Qualified Purchasers (as defined for purposes of Section 3(c)(7) of the Investment Company Act) ("Qualified Purchasers") or (B) (in the case of the Subordinated Notes only) Knowledgeable Employees (as defined in Rule 3c-5 under the Investment Company Act) ("Knowledgeable Employees") with respect to the Issuer or corporations, partnerships, limited liability companies or other entities (other than trusts) each shareholder, partner, member or other equity owner of which is either (x) a Knowledgeable Employee with respect to the Issuer or (y) a Qualified Purchaser that in the case of (A) and (B) are either (1) "institutional" accredited investors ("Accredited Investors") (in the case of the Class E Notes, the Class F Notes and the Subordinated Notes only) meeting the requirements of Rule 501(a)(1), (2), (3) or (7) under the Securities Act,  who, in the case of Subordinated Notes only, if "individual" Accredited Investors, are also Knowledgeable Employees with respect to the Issuer or (2) qualified institutional buyers ("Qualified Institutional Buyers") within the meaning of Rule 144A under the Securities Act and (b) can make the representations set forth in Section 2.6 (Registration, Registration of Transfer and Exchange) of the Indenture or the appropriate Exhibit to the Indenture.  Beneficial ownership interests in the Rule 144A Global Notes may be transferred only to a Person that is both a Qualified Institutional Buyer and a Qualified Purchaser and that can make the representations referred to in clause (b) of the preceding sentence.  The Issuer has the right to compel any beneficial owner of an interest in Rule 144A Global Notes that does not meet the qualifications set forth in such clauses to sell its interest in such Notes, or may sell such interest on behalf of such owner, pursuant to Section 2.12 (Notes Beneficially Owned by Persons Not QIB/QPs or in Violation of ERISA Representations) of the Indenture.

Each Holder or beneficial owner receiving this report agrees to keep all non-public information herein confidential and not to use such information for any purpose other than its evaluation of its investment in the Offered Securities, provided, that any Holder or beneficial owner may provide such information on a confidential basis to any prospective purchaser of such Holder or beneficial owner's Offered Securities that is permitted by the terms of the Indenture to acquire such Holder or beneficial owner's Offered Securities and that agrees to keep such information confidential in accordance with the terms of the Indenture.

In addition, the Trustee shall deliver the foregoing notice under the name of the Issuer to DTC for forwarding to its participants on at least an annual basis with the heading "Important Reminder Notice."

(g)     Irish Stock Exchange.  So long as any Class of Notes is listed on the Irish Stock Exchange:  (i) the Trustee will communicate to the Irish Stock Exchange the Aggregate Outstanding Amount of each such Class following each Payment Date and inform the Irish Stock Exchange if any such Class did not receive scheduled payments of principal or interest on such Payment Date; (ii) the Trustee will inform the Irish Stock Exchange if the Ratings assigned to such Secured Notes are reduced or withdrawn and such information will be published in the Companies Announcements Office of the Irish Stock Exchange and (iii) the Trustee will inform the Irish Stock Exchange, in advance, of the Note Interest Rate for each such Class (as applicable), as well as the exact date of the following Payment Date.

(h)     Placement Agents Information.  The Issuer and the Placement Agents, or any successor to the Placement Agents, may post the information contained in a Monthly Report, Quarterly Report or Distribution Report to a password-protected internet site accessible only to the Holders of the Notes and to the Portfolio Manager.

(i)     Availability of Reports.  The Trustee will make the Monthly Report, the Quarterly Report and the Distribution Report available via its internet website initially located at http://trustinvestorreporting.usbank.com on a password protected basis.  The Trustee shall separately post the information required under Section 10.7(a)(xix) (Accountings) to its internet website promptly upon knowledge of the Issuer entering into a Trading Plan.  Parties that are unable to use the above distribution option are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such.  The Trustee shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes.  As a condition to access to the Trustee's internet website, the Trustee may require registration and the acceptance of a disclaimer.  The Trustee will not be liable for the dissemination of information in accordance with this Indenture.  The Trustee shall be entitled to rely on but shall not be responsible for the content or accuracy of any information provided in the information set forth in the Monthly Report, the Quarterly Report and the Distribution Report and may affix thereto any disclaimer it deems appropriate in its reasonable discretion.  Each Noteholder that has previously provided evidence that it is the holder of a Note may at any time be requested by the Trustee or the Portfolio Manager to reconfirm that it continues to be the holder of a Note.  If such evidence has not been provided by a Noteholder to the reasonable satisfaction of the Portfolio Manager within 45 days of any such request, such Noteholder will have no further right to obtain either the Monthly Report, the Distribution Report or the associated commentary. The Trustee shall provide each Rating Agency, the Portfolio Manager, the Placement Agents, each Holder (and, upon receipt of a written request therefor in the form of Exhibit I certifying that it is a holder of a beneficial interest in a Note, to any beneficial owner of a Note) and Intex Solutions, Inc. access to its internet website.

(j)     Required Actions.

(i)    <u>DTC Actions</u>.  The Issuer will direct DTC to take the following steps in connection with the Global Notes:

(A)    The Issuer will direct DTC to include the marker "3c7" in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes in order to indicate that sales are limited to Qualified Purchasers.

(B)    The Issuer will direct DTC to cause each physical deliver order ticket that is delivered by DTC to purchasers to contain the 20-character security descriptor.  The Issuer will direct DTC to cause each deliver order ticket that is delivered by DTC to purchasers in electronic form to contain a "3c7" indicator and a related user manual for participants.  Such user manual will contain a description of the relevant restrictions imposed by <u>Section 3(c)(7)</u>.

(C)    On or prior to the Closing Date, the Issuer will instruct DTC to send a <u>Section 3(c)(7)</u> Notice to all DTC participants in connection with the offering of the Rule 144A Global Notes.

(D)    In addition to the obligations of the Registrar set forth in <u>Section 2.5</u> (Execution, Authentication, Delivery and Dating), the Issuer will from time to time (upon the request of the Trustee) make a request to DTC to deliver to the Issuer a list of all DTC participants holding an interest in the Rule 144A Global Notes.

(E)    The Issuer will cause each CUSIP number obtained for a Global Note to have a fixed field containing "3c7" and "144A" indicators, as applicable, attached to such CUSIP number.

(ii)    <u>Bloomberg Screens, Etc</u>.  The Issuer will from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) under the Investment Company Act restrictions on the Global Notes.  Without limiting the foregoing, the Issuer will cause the Placement Agents to request that each third-party vendor include the following legends on each screen containing information about the Notes :

(A)    <u>Bloomberg</u>.

(w)    "Iss'd Under 144A/3c7," to be stated in the "Note Box" on the bottom of the "Security Display" page describing the Global Notes;

(x)    a flashing red indicator stating "See Other Available Information" located on the "Security Display" page;

(y)    a link to an "Additional Security Information" page on such indicator stating that the Rule 144A Global Notes are being offered in reliance on the exception from registration under Rule 144A of the Securities Act of 1933 to persons that are both (i) "<u>Qualified Institutional</u>

-187-

<u>Buyers</u>" as defined in Rule 144A under the Securities Act and (ii) "<u>Qualified Purchasers</u>" as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended; and

(z) a statement on the "<u>Disclaimer</u>" page for the Global Notes that the Notes will not be and have not been registered under the Securities Act of 1933, as amended, that the Issuer has not been registered under the Investment Company Act of 1940, as amended, and that the Rule 144A Global Notes may only be offered or sold in accordance with Section 3(c)(7) of the Investment Company Act of 1940, as amended.

(B)     <u>Reuters</u>.

(x) a "<u>144A – 3c7</u>" notation included in the security name field at the top of the Reuters Instrument Code screen;

(y) a <144A3c7Disclaimer> indicator appearing on the right side of the Reuters Instrument Code screen; and

(z) a link from such <144A3c7Disclaimer> indicator to a disclaimer screen containing the following language: "These Notes may be sold or transferred only to Persons who are both (i) Qualified Institutional Buyers, as defined in Rule 144A under the Securities Act and (ii) Qualified Purchasers, as defined under Section 3(c)(7) under the U.S. Investment Company Act of 1940."

(k)     <u>Trading Plans</u>. Following notice or knowledge of such failure, the Issuer shall provide notice of any failed Trading Plan to Moody's and S&P.

Section 10.8.     <u>Release of Securities</u>. (a) The Issuer may, by Issuer Order executed by an Authorized Officer of the Portfolio Manager, delivered to the Trustee at least two Business Days prior to the settlement date for any sale of a security certifying that the sale of such security is being made in accordance with <u>Section 12.1</u> (Sales of Collateral Obligations) hereof and such sale complies with all applicable requirements of <u>Section 12.1</u> (Sales of Collateral Obligations), direct the Trustee to release or cause to be released such security from the lien of this Indenture and, upon receipt of such Issuer Order, the Trustee shall deliver any such security, if in physical form, duly endorsed to the broker or purchaser designated in such Issuer Order or, if such security is a Clearing Corporation Security, cause an appropriate transfer thereof to be made, in each case against receipt of the sales price therefor as specified by the Portfolio Manager in such Issuer Order; <u>provided</u>, <u>however</u>, that the Trustee may deliver any such security in physical form for examination in accordance with street delivery custom. The Trustee shall, upon receipt of an Issuer Order, release from the lien of this Indenture any Collateral Obligation or other Asset being transferred to an ETB Subsidiary and deliver such Asset to be held by the ETB Subsidiary in exchange for the pledge of the equity interest in such ETB Subsidiary. Such Issuer Order shall be executed by an Authorized Officer of the Portfolio Manager, request release of a Collateral Obligation or other Asset, certify that such release is

-188-

permitted under this Indenture and request that the Trustee execute the agreements, releases or other documents releasing such Asset as presented to it by the Portfolio Manager.

(b) Subject to <u>Article 12</u> hereof, the Trustee shall upon an Issuer Order (i) deliver any Pledged Obligation, and release or cause to be released such security from the lien of this Indenture, which is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for such call, redemption or payment, in each case against receipt of the call or redemption price or payment in full thereof and (ii) provide notice thereof to the Portfolio Manager.

(c) Upon receiving actual notice of any Offer (as defined below) or any request for a waiver, consent, amendment or other modification with respect to any Collateral Obligation, the Trustee on behalf of the Issuer shall notify the Portfolio Manager of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "<u>Offer</u>") or such request. Unless the Notes have been accelerated following an Event of Default, the Portfolio Manager may direct (x) the Trustee to accept or participate in or decline or refuse to participate in such Offer and, in the case of acceptance or participation, to release from the lien of this Indenture such Collateral Obligation in accordance with the terms of the Offer against receipt of payment therefor or (y) the Issuer or the Trustee to agree to or otherwise act with respect to such consent, waiver, amendment or modification.

(d) As provided in <u>Section 10.2(a)</u> (Collection Account), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the applicable subaccount of the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations or Eligible Investments as permitted under and in accordance with the requirements of this <u>Article 10</u> and <u>Article 12</u>.

(e) The Trustee shall, upon receipt of an Issuer Order at such time as there are no Secured Notes Outstanding and all obligations of the Co-Issuers hereunder in favor of the Holders of the Secured Notes and the Trustee have been satisfied, release any remaining Assets from the lien of this Indenture.

(f) Any security, Collateral Obligation or amounts that are released pursuant to <u>Section 10.8(a)</u>, <u>(b)</u> or <u>(c)</u> (Release of Securities) shall be released from the lien of this Indenture.

Section 10.9. <u>Reports by Independent Accountants</u>. (a) At the Closing Date, the Issuer shall appoint one or more firms of Independent certified public accountants of recognized international reputation for purposes of reviewing and delivering the reports or certificates of such accountants required by this Indenture, which may be the firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager. The Issuer may remove any firm of Independent certified public accountants at any time without the consent of any Holder of Notes. Upon any resignation by such firm or removal of such firm by the Issuer, the Issuer (or the Portfolio Manager on behalf of the Issuer) shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor thereto that shall also be a firm of Independent certified public accountants of recognized

-189-

international reputation, which may be a firm of Independent certified public accountants that performs accounting services for the Issuer or the Portfolio Manager. If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing. If the Issuer shall not have appointed a successor within ten days thereafter, the Portfolio Manager shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. The fees of such Independent certified public accountants and its successor shall be payable by the Issuer. By acceptance of their Notes, the Noteholders acknowledge and agree that: (i) neither the firm of Independent certified public accountants appointed by the Issuer hereunder nor the Trustee shall be liable for any claims, liabilities, and expenses arising out of or relating to such accountant's engagement, agreed-upon procedures or any report issued by such accountants under any such engagement and (ii) any report issued by such accountants under this Section 10.9(a) cannot be disseminated without the express consent of such accountants.

(b)     On or before March 14th of each year commencing in 2014, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall cause to be delivered to the Collateral Administrator (upon its execution of an acknowledgement letter satisfactory to such accountants), the Portfolio Manager and each Holder of the Notes (upon the Holder's (x) written request therefor and (y) execution of an acknowledgement letter satisfactory to such accountants), a statement from a firm of Independent certified public accountants for each Distribution Report received since the last statement (i) indicating that the calculations within those Distribution Reports (excluding the S&P CDO Monitor Test) have been performed in accordance with the applicable provisions of this Indenture and (ii) listing the Aggregate Principal Balance of the Pledged Obligations and the Aggregate Principal Balance of the Collateral Obligations securing the Secured Notes as of the immediately preceding Determination Dates; provided, however, that in the event of a conflict between such firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.9 (Reports by Independent Accountants), the determination by such firm of Independent public accountants shall be conclusive. The reports by Independent certified public accountants referenced in this Section 10.9 (Reports by Independent Accountants) shall only be provided to parties (excluding the Issuer and Portfolio Manager) that have executed an acknowledgement letter satisfactory to the firm of Independent certified public accountants.

(c)     Upon the written request of the Trustee, or any Holder or beneficial owner, the Issuer will use commercially reasonable efforts to cause the firm of Independent certified public accountants appointed pursuant to Section 10.9(a) (Reports by Independent Accountants) to provide such Holder or beneficial owner with all of the information required to be provided by the Issuer pursuant to Section 7.17(g), (h) or (i) (Certain Tax Matters) or assist the Issuer in the preparation thereof.

(d)     Notwithstanding any provision of this Indenture to the contrary, each Person that does not sign and deliver to the Issuer's firm of Independent certified public accountants a written confirmation in the form provided by such firm of Independent certified public accountants indicating the procedures employed by such firm of Independent certified public accountants in connection with each report specified in Section 10.9(b) (Reports by Independent Accountants) and 12.1(e) (Sale of Collateral Obligations) and the Accountants'

Reports specified in 3.1(a)(xiv) (Conditions to Issuance of Notes on Closing Date), 3.2(vi) (Conditions to Issuance of Additional Notes) and 7.18(c) (Ramp-up Period; Purchase of Additional Collateral Obligations) are acceptable for its purposes and that it has taken responsibility for the sufficiency of such procedures will not be entitled to receive any such report or Accountants' Report and shall receive, to the extent it is otherwise entitled to receive any such report or Accountants' Report pursuant to this Indenture, a certificate of the Issuer in the form of Schedule 6 hereto in lieu thereof. In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Issuer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Issuer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

(e)     The Trustee and the Collateral Administrator shall have no responsibility to the Issuer or the Secured Parties hereunder to make any inquiry or investigation as to, and shall have no obligation in respect of, the terms of any engagement of Independent accountants by the Issuer (or the Portfolio Manager on behalf of the Issuer); provided, however that the Trustee and the Collateral Administrator shall be authorized, upon receipt of an Issuer Order directing the same, to execute any acknowledgment or other agreement with the Independent accountants required for the Trustee and the Collateral Administrator to receive any of the reports or instructions provided for herein, which acknowledgment or agreement may include, among other things, (i) acknowledgements with respect to the sufficiency of the agreed upon procedures to be performed by the Independent accountants by the Issuer, (ii) releases of claims (on behalf of itself and the Noteholders) and other acknowledgments of limitations of liability in favor of the Independent accountants and (iii) restrictions or prohibitions on the disclosure of information or documents provided to it by such firm of Independent accountants (including to the Holders). It is understood and agreed that the Trustee and the Collateral Administrator will deliver such acknowledgement or other agreement in conclusive reliance on the foregoing direction of the Issuer, and the Trustee shall make no inquiry or investigation as to, and shall have no obligation in respect of, the sufficiency, validity or correctness of such procedures. Notwithstanding the foregoing, in no event shall the Trustee or the Collateral Administrator be required to execute any agreement in respect of the Independent accountants that the Trustee or the Collateral Administrator determines adversely affects it in its individual capacity.

Section 10.10.    Reports to Rating Agencies and Additional Recipients; Rule 17g-5 Procedures. (a)  In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to the terms of this Indenture, the Issuer shall provide each Rating Agency with all information or reports delivered to the Trustee hereunder, and such additional information as either Rating Agency may from time to time reasonably request (including notification to Moody's and S&P of any modification of any loan document relating to a DIP Collateral Obligation or any release of collateral thereunder not permitted by such loan documentation and notification to S&P of any amendment with respect to any Collateral Obligation that is the subject of a rating estimate by S&P).

(b)     The Trustee (without assuming any obligations to any such person, including for its failure to do so) shall make available to the persons identified on Schedule 7 (if any) (including by access to its password protected website) duplicate copies of all reports,

notices and statements that the Trustee is required to deliver to any Noteholder, at the address specified in <u>Schedule 7</u>.

(c)      The Trustee shall, upon the written request of the Portfolio Manager, provide the Portfolio Manager with a list of all registered Holders of Notes. In addition, if so requested by the Portfolio Manager in writing, the Trustee shall request that DTC request the identity of its participants.

(d)      The Issuer shall submit, or shall cause the Portfolio Manager to submit on its behalf, at least every twelve months (from the date of the last such credit estimate), a request to Moody's to perform a credit estimate on each Collateral Obligation with a credit estimate, together with the information reasonably required by Moody's to perform such credit estimate.

(e)      If the Trustee or the Issuer receives confirmation of the S&P Rating Condition and/or the Moody's Rating Condition in connection with this Indenture or the transactions contemplated hereby, such Person shall promptly forward such confirmation to the other such Person and to the Portfolio Manager.

(f)      (i)  The Trustee shall notify the Portfolio Manager of the internet address of the website to which the Trustee posts Monthly Reports, Distribution Reports and any other reports relating to this Indenture, the Notes or the transactions contemplated hereby and thereby from time to time. The Information Agent shall maintain a password-protected website required pursuant to Rule 17g-5 (the "<u>17g-5 Site</u>") in accordance with the Collateral Administration Agreement.

(ii)      If the Trustee responds to requests for information by or otherwise communicates with the Rating Agencies in relation to this Indenture, the Trustee agrees to (x) notify the Portfolio Manager of such communication within a reasonable time and (y) use commercially reasonable efforts to assist the Portfolio Manager in complying with Rule 17g-5 (including, but not limited to, providing copies of such communications and/or information provided to the Rating Agencies). The Trustee may, but shall not be obligated to engage in, or respond to, any oral communications from the Rating Agencies.

(g)      If there is a Material Change with respect to a Collateral Obligation described in clause (ii)(b) of the definition of S&P Rating, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall, upon notice or knowledge thereof, notify S&P and provide available information with respect thereto. S&P may, in its sole discretion, update its credit estimate of such Collateral Obligation; <u>provided</u>, <u>that</u>, such update shall not, unless so requested by the Issuer, be considered (x) a request for a credit estimate by the Issuer in accordance with or (y) in determining whether or not the Issuer has complied with, in each case, the annual credit estimate requirements set forth in this Indenture.

Section 10.11.   <u>Procedures Relating to the Establishment of Accounts Controlled by the Trustee</u>.  Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Accounts and any Hedge Account, it will cause each Securities

Intermediary establishing such accounts to enter into a securities account control agreement and, if the Securities Intermediary is the Bank, in connection with the Accounts, cause the Bank to comply with the provisions of the Securities Account Control Agreement.

ARTICLE 11

Application of Monies

Section 11.1.    Disbursements of Monies from Payment Account.    (a) Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 (Disbursements of Monies from Payment Account), on each Payment Date, the Trustee shall disburse amounts transferred from the Collection Account to the Payment Account pursuant to Section 10.2 (Collection Account) in accordance with the following priorities (the "Priority of Payments"); provided, that, unless an Acceleration Event has occurred and is continuing, (x) amounts transferred from the Interest Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account); and (y) amounts transferred from the Principal Collection Subaccount shall be applied solely in accordance with Section 11.1(a)(ii) (Disbursements of Monies from Payment Account).

(i)    On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Interest Proceeds on deposit in the Collection Account, to the extent received on or before the related Determination Date (or if such Determination Date is not a Business Day, the next succeeding Business Day) and that are transferred into the Payment Account, and, in the case of any Hedge Agreements, payments received on or before such Payment Date, shall be applied in the following order of priority:

(A)    to the payment of taxes and governmental fees owing by the Issuer or the Co-Issuer if any;

(B)    to the payment of the accrued and unpaid Administrative Expenses up to the Administrative Expense Cap in the order set forth in the definition of Administrative Expenses; provided, that the Petition Expense Amount may be applied pursuant to this clause (B) to the payment of Petition Expenses at the time that such Petition Expenses are incurred without regard to the Administrative Expense Cap and, if (but only after) the Petition Expense Amount is applied to the payment of Petition Expenses in full, Petition Expenses shall be paid together with other Administrative Expenses subject to the Administrative Expense Cap above; provided further, that the Petition Expenses paid pursuant to this clause (B) shall be paid in the order set forth in the definition of Administrative Expenses;

(C)    to the payment of the Senior Management Fee to the Portfolio Manager;

(D)     to the payment, *pro rata*, of any amounts due to any Hedge Counterparty under any Hedge Agreement other than amounts due as a result of the termination (or partial termination) of such Hedge Agreement;

(E)     to the payment, *pro rata* based upon amounts due, of (1) accrued and unpaid interest on the Class X Notes, (2) the Class X Note Payment Amount, (3) accrued and unpaid interest on the Class A-1 Notes and (4) subject to <u>Section 11.2</u> (Payments on the Class A-2 Notes and the Combination Notes), accrued and unpaid interest on the Class A-2 Notes, in each case, until such amounts have been paid in full;

(F)     [RESERVED];

(G)     to the payment of accrued and unpaid interest on the Class B Notes;

(H)     to the payment, *pro rata*, of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(I)     if either of the Class A/B Coverage Tests is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class A/B Coverage Tests to be met;

(J)     to the payment of accrued and unpaid interest on the Class C Notes;

(K)     if either of the Class C Coverage Tests is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class C Coverage Tests to be met;

(L)     to the payment of any Deferred Interest on the Class C Notes (and interest accrued thereon);

(M)     to the payment of accrued and unpaid interest on the Class D Notes;

(N)     if either of the Class D Coverage Tests is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class D Coverage Tests to be met;

(O)     to the payment of any Deferred Interest on the Class D Notes (and interest accrued thereon);

NEWYORK 8715474 (2K)

(P)     to the payment of accrued and unpaid interest on the Class E Notes;

(Q)     if either Class E Coverage Test is not satisfied on the related Determination Date, to make payments in accordance with the Note Payment Sequence to the extent necessary to cause both Class E Coverage Tests to be met;

(R)     to the payment of any Deferred Interest on the Class E Notes (and interest accrued thereon);

(S)     to the payment of accrued and unpaid interest on the Class F Notes;

(T)     to the payment of any Deferred Interest on the Class F Notes (and interest accrued thereon);

(U)     if the Effective Date Conditions have not been satisfied on or prior to such Payment Date, at the election of the Portfolio Manager, to (x) the payment of principal of the Secured Notes in accordance with the Note Payment Sequence or (y) purchase Collateral Obligations, in each case, in the amount necessary so that each Rating Agency will be able to confirm its Initial Rating on the Secured Notes (including by means of a deemed confirmation as set forth in the definitions of S&P Rating Condition or Moody's Rating Condition) or the Secured Notes are paid in full, as applicable;

(V)     during the Reinvestment Period only, if the Interest Reinvestment Test is not satisfied on the related Determination Date, an amount equal to the lesser of (i) 75% of the Interest Proceeds remaining as of such Payment Date and (ii) an amount which would cause the Interest Reinvestment Test to be satisfied to the Collection Account as Principal Proceeds to purchase additional Collateral Obligations;

(W)     (1) *first*, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon, (2) *second*, to the payment of any Administrative Expenses not paid in full pursuant to clause (B) above due to the limitation contained therein and (3) *third*, to the payment of any expenses incurred in connection with a Refinancing;

(X)     to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement not otherwise paid pursuant to clause (H) above;

(Y)     to (1) *first*, unless each of the Effective Date Conditions has been satisfied, all remaining Interest Proceeds to the Interest Collection Subaccount as Interest Proceeds for distribution on the next subsequent Payment Date and (2) *second,* the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of the Subordinated Notes on prior

-195-

Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(Z)     any remaining Interest Proceeds shall be paid as follows: (i) 20% of such remaining Interest Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 80% of such remaining Interest Proceeds to the Holders of the Subordinated Notes.

provided that, in lieu of the payment of Interest Proceeds referred to under clause (Z) above, in whole or in part on any Payment Date, the Portfolio Manager, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Equity Securities pro rata to the Consenting Holders of the Subordinated Notes with respect to such Payment Date to the extent that the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Subordinated Notes. Interest Proceeds in an amount equal to or greater than the Market Value of such Equity Securities (determined by the Portfolio Manager as of the relevant Determination Date) distributed to the Consenting Holders of the Subordinated Notes with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Trustee as Principal Proceeds available for distribution in accordance with the Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased accordingly.

(ii)     On each Payment Date (other than Payment Dates on which the Acceleration Priority of Payments is applicable) and on each Redemption Date (to the extent such Redemption Date is not a Payment Date), Principal Proceeds on deposit in the Collection Account that are received on or before the related Determination Date and that are transferred to the Payment Account shall be applied, except for any Principal Proceeds that will be used to settle binding commitments (entered into prior to the Determination Date) for the purchase of Collateral Obligations, in the following order of priority:

(A)     to pay the amounts referred to in clauses (A) through (G) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (in the priority stated therein), but (a) only to the extent not paid in full thereunder and (b) subject to any applicable cap set forth therein; provided that, if the Senior Notes have been repaid in full, to pay the amounts referred to in Section 11.1(a)(i) (Disbursements of Monies from Payment Account) above, through and including full payment of accrued and unpaid interest on the Controlling Class;

(B)     if any Overcollateralization Ratio Test or Interest Coverage Test is not satisfied as of the related Determination Date after giving effect to the application of the amounts referred to in clauses (H) through (Q) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to make payments in accordance with the Note Payment Sequence to the extent necessary to cause each such test to be met;

(C)     to make payments in accordance with the Note Payment Sequence in the amount of the Special Redemption Amount, if any;

(D)     on any Redemption Date (other than a Redemption Date relating to a Refinancing), (1) *first*, to pay the Redemption Price of the Secured Notes in accordance with the Note Payment Sequence and (2) *second*, to the payments under clauses (W) and (X) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) (in the same order of priority specified thereunder, but only to the extent not paid in full thereunder and without regard to any cap thereunder);

(E)     to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class C Notes and (2) *second*, any Deferred Interest on the Class C Notes (and interest thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(F)     to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class D Notes and (2) *second*, any Deferred Interest on the Class D Notes (and interest thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(G)     to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class E Notes and (2) *second*, any Deferred Interest on the Class E Notes (and interest accrued thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(H)     to the extent not paid in full after application of the amounts referred to under Section 11.1(a)(i) (Disbursements of Monies from Payment Account), to the payment of (1) *first*, accrued and unpaid interest on the Class F Notes and (2) *second*, any Deferred Interest on the Class F Notes (and interest accrued thereon); provided, that after giving effect to such payments, each Overcollateralization Ratio Test and Interest Coverage Test will be satisfied on a pro forma basis;

(I)     during the Reinvestment Period, at the discretion of the Portfolio Manager, to the Collection Account as Principal Proceeds to invest in Eligible Investments and/or additional Collateral Obligations; provided, however, if the then-current rating by Moody's of the Class A-1 Notes, the Class A-2A Notes or

the Class A-2B Notes is below "Aa3" such Principal Proceeds shall be used to make payments in accordance with the Note Payment Sequence;

(J) after the Reinvestment Period, to make payments in accordance with the Note Payment Sequence;

(K) after the Reinvestment Period, to (1) *first*, the payment of accrued but unpaid Subordinated Management Fees, together with accrued interest thereon, and (2) *second*, Administrative Expenses as referred to in Section 11.1(a)(i)(W)(2) (Disbursements of Monies from Payment Account) in the priority stated therein, but only to the extent not paid in full thereunder;

(L) after the Reinvestment Period, to the payment, *pro rata* of any amount due to any Hedge Counterparty as referred to in Section 11.1(a)(i)(X) (Disbursements of Monies from Payment Account), but only to the extent not paid in full thereunder;

(M) to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of Subordinated Notes on prior Payment Dates and all payments made under Section 11.1(a)(i)(Y) (Disbursements of Monies from Payment Account) on such Payment Date) to cause the Incentive Management Fee Threshold to be satisfied; and

(N) any remaining Principal Proceeds shall be paid as follows: (i) 20% of such remaining Principal Proceeds to the Portfolio Manager as the Incentive Management Fee and (ii) 80% of such remaining Principal Proceeds to the Holders of the Subordinated Notes.

(iii) Notwithstanding the provisions of Section 11.l(a)(i) and 11.1(a)(ii) (Disbursements of Monies from Payment Account), if declaration of acceleration of the maturity of the Secured Notes has occurred following an Event of Default and such acceleration has not been rescinded or annulled (an "Acceleration Event"), on each date or dates fixed by the Trustee, all proceeds in respect of the Assets will be applied in the following order of priority (the "Acceleration Priority of Payments"):

(A) to pay all amounts under clauses (A) through (D) of Section 11.1(a)(i) (Disbursements of Monies from Payment Account) above (only if the Trustee has begun liquidating Assets in accordance with Section 5.5 (Optional Preservation of Assets), such payments to be made without regard to the Administrative Expense Cap);

(B) to the payment, *pro rata* based upon interest due, of (1) accrued and unpaid interest on the Class X Notes, (2) accrued and unpaid interest on the Class A-1 Notes and (3) subject to Section 11.2 (Payments on the Class A-2 Notes and the Combination Notes), accrued and unpaid interest on the Class A-2 Notes, in each case, until such amounts have been paid in full;

(C)      to the payment, *pro rata* based upon amounts due, of (1) principal of the Class X Notes, (2) principal of the Class A-1 Notes and (3) subject to Section 11.2 (Payments on the Class A-2 Notes and the Combination Notes), principal of the Class A-2 Notes, in each case, until such amount has been paid in full;

(D)      [RESERVED];

(E)      [RESERVED];

(F)      to the payment of accrued and unpaid interest on the Class B Notes until such amounts have been paid in full;

(G)      to the payment of principal of the Class B Notes until such amount has been paid in full;

(H)      to the payment, *pro rata*, of any amounts due to any Hedge Counterparty or under any Hedge Agreement pursuant to an early termination (or partial termination) of any Hedge Agreement as a result of a Priority Hedge Termination Event;

(I)      to the payment of accrued and unpaid interest and any Deferred Interest on the Class C Notes until such amounts have been paid in full;

(J)      to the payment of principal of the Class C Notes until such amount has been paid in full;

(K)      to the payment of accrued and unpaid interest and any Deferred Interest on the Class D Notes until such amounts have been paid in full;

(L)      to the payment of principal of the Class D Notes until such amount has been paid in full;

(M)      to the payment of accrued and unpaid interest and any Deferred Interest on the Class E Notes until such amounts have been paid in full;

(N)      to the payment of principal of the Class E Notes until such amount has been paid in full;

(O)      to the payment of accrued and unpaid interest and any Deferred Interest on the Class F Notes until such amounts have been paid in full;

(P)      to the payment of principal of the Class F Notes until such amount has been paid in full;

(Q)      (1) *first*, to the payment of any accrued and unpaid Subordinated Management Fee to the Portfolio Manager, together with accrued interest thereon and (2) *second*, to the payment of any Administrative Expenses not paid in full

-199-

pursuant to clause (A) above due to the limitation contained therein (in the priority stated therein);

(R)     to the payment of any amounts due to any Hedge Counterparty under any Hedge Agreement pursuant to an early termination (or partial termination) of such Hedge Agreement not otherwise paid in full pursuant to clause (H) above;

(S)     to the Holders of the Subordinated Notes in an amount necessary (taking into account all payments made to the Holders of Subordinated Notes on prior Payment Dates) to cause the Incentive Management Fee Threshold to be satisfied; and

(T)     any remaining proceeds shall be paid as follows: (i) 20% of such remaining amounts to the Portfolio Manager as the Incentive Management Fee and (ii) 80% of such remaining amounts to the Holders of the Subordinated Notes.

On the Stated Maturity of the Notes, the Trustee shall pay the net proceeds from the liquidation of the Assets and all available Cash, after the payment of all fees, expenses, including the Trustee's fees and other Administrative Expenses, and interest and principal on the Secured Notes, to the Holders of the Subordinated Notes in final payment of such Subordinated Notes.

(b)     If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Distribution Report, the Trustee shall make the disbursements called for in the order and according to the priority set forth under Section 11.1(a) (Disbursements of Monies from Payment Account) above, subject to Section 13.1 (Subordination; Non-Petition), to the extent funds are available therefor.

(c)     In connection with the application of funds to pay Administrative Expenses of the Issuer or the Co-Issuer, as the case may be, in accordance with Section 11.1(a)(i) (Disbursements of Monies from Payment Account), Section 11.1(a)(ii) (Disbursements of Monies from Payment Account) and Section 11.1(a)(iii) (Disbursements of Monies from Payment Account), the Trustee shall remit such funds, to the extent available, as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day prior to each Payment Date.

(d)     In the event that the Hedge Counterparty defaults in the payment of its obligations to the Issuer under any Hedge Agreement on the date on which any payment is due thereunder, the Trustee at the direction of the Portfolio Manager shall make a demand on such Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on such date. The Trustee shall give notice to the Holders of Notes, the Portfolio Manager and each Rating Agency if such Hedge Counterparty continues to fail to perform its obligations for two Business Days following a demand made by the Trustee on such Hedge Counterparty, and shall take such action with respect to such continuing failure as may be directed to be taken pursuant to Section 5.13 (Control by Majority of Controlling Class).

Section 11.2.    <u>Payments on the Class A-2 Notes and the Combination Notes</u>. (a) All payments on the Class A-2 Notes shall be made in the following order of priority, (1) *first*, to the Class A-2A Notes and (2) *second*, to the Class A-2B Notes. Interest payments on the Class A-2B Notes will be subordinated in all respects to interest payments on the Class A-2A Notes. Principal payments of the Class A-2B Notes will be subordinated in all respects to principal payments of the Class A-2A Notes.

(b)    The payment priority of each Component of the Combination Notes shall be in accordance with the priority of the respective Underlying Class in accordance with the Priority of Payments. On each date on which payments are made on any Underlying Class, a portion of such payments will be allocated to the Combination Notes in the proportion that the Aggregate Outstanding Amount of the related Component bears to the Aggregate Outstanding Amount of that Underlying Class as a whole (including the related Components). The Combination Notes will be entitled to no other payments. In particular, interest will not accrue or be payable on the Aggregate Outstanding Amount of the Combination Notes, except to the extent, if any, of interest on the related Component.

ARTICLE 12

Sale of Collateral Obligations;
Purchase of Additional Collateral Obligations

Section 12.1.    <u>Sales of Collateral Obligations</u>.  Subject to the satisfaction of the conditions specified in <u>Section 12.3</u> (Conditions Applicable to All Sale and Purchase Transactions) and <u>provided</u>, that no Event of Default has occurred and is continuing (except for sales pursuant to <u>Sections 12.1(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(g)</u> and <u>(h)</u> (Sales of Collateral Obligations)), the Portfolio Manager on behalf of the Issuer may in writing direct the Trustee to sell and the Trustee (on behalf of the Issuer) shall sell in the manner directed by the Portfolio Manager any Collateral Obligation or Equity Security if such sale meets the requirements of any one of paragraphs (a) through (h) of this <u>Section 12.1</u> (Sales of Collateral Obligations).  For purposes of this <u>Section 12.1</u> (Sales of Collateral Obligations), the Sale Proceeds of a Collateral Obligation sold by the Issuer shall include any Principal Financed Accrued Interest received in respect of such sale.

(a)    <u>Credit Risk Obligations</u>.  The Portfolio Manager may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction.

(b)    <u>Credit Improved Obligations</u>.  The Portfolio Manager may direct the Trustee to sell any Credit Improved Obligation at any time during or after the Reinvestment Period if either:

(i)    during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal

Balance at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation within 20 Business Days of such sale; or

(ii) at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Credit Improved Obligation or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) plus, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance.

(c)     Defaulted Obligations.  The Portfolio Manager may direct the Trustee to sell any Defaulted Obligation at any time during or after the Reinvestment Period without restriction.

(d)     Equity Securities.  The Portfolio Manager may direct the Trustee to sell any Equity Security or any asset held by any ETB Subsidiary at any time during or after the Reinvestment Period without restriction, and shall use its commercially reasonable efforts to effect the sale of any Equity Security within 45 days of receipt if such Equity Security constitutes Margin Stock, unless such sale is prohibited by applicable law, in which case such Equity Security shall be sold as soon as such sale is permitted by applicable law.

(e)     Optional Redemption; Clean-up Call Redemption.  After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Section 9.2 (Optional Redemption and Refinancing) or a Clean-up Call Redemption in accordance with Section 9.6 (Clean-up Call Redemption), the Portfolio Manager shall (except in connection with a Refinancing) direct the Trustee to sell (which sale may be through participation) all or a portion of the Collateral Obligations if (i) the applicable requirements of Article 9 (including the certification requirements of Section 9.3(c)(ii) (Redemption Procedures)) are satisfied.

(f)     Discretionary Sales.  The Portfolio Manager may direct the Trustee to sell any Collateral Obligation at any time if (a) during or after the Reinvestment Period, and after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations sold pursuant to this Section 12.1(f) (Sales of Collateral Obligations) during any 12 calendar month period is not greater than 25% of the Collateral Principal Amount as of the beginning of such 12 calendar month period; and (b) either:

(i) during the Reinvestment Period, the Portfolio Manager reasonably believes prior to such sale that it will be able to enter into binding commitments to reinvest all or a portion of the proceeds of such sale, in compliance with the Investment Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation within 20 Business Days of such sale; or

(ii) at any time, either (1) the Sale Proceeds from such sale are at least equal to the Investment Criteria Adjusted Balance of the sold Collateral Obligation or (2) the Effective Date Overcollateralization Test will be satisfied after giving effect to such sale.

-202-

(g) <u>Mandatory Sales</u>. The Portfolio Manager shall use its commercially reasonable efforts to effect the sale (regardless of price) of any Collateral Obligation that (i) no longer meets the criteria described in clause (viii) of the definition of "<u>Collateral Obligation</u>," within 18 months of the failure of such Collateral Obligation to meet any such criteria (unless (x) the Moody's Rating Condition is satisfied and (y) notice has been provided to S&P of the failure of such Collateral Obligation to meet such criteria) and (ii) no longer meets the criteria described in clause (vi) or (vii) of the definition of "<u>Collateral Obligation</u>," within 45 days of the failure of such Collateral Obligation to meet either such criteria. Notwithstanding anything in this <u>Article 12</u> to the contrary, so long as any Secured Notes are Outstanding on the Stated Maturity of the Notes, the Portfolio Manager shall use its commercially reasonable efforts to effect the sale of all remaining Collateral Obligations, Eligible Investments and Equity Securities (including Equity Securities held by any ETB Subsidiary) upon the Stated Maturity of such Notes.

(h) <u>Pre-funded Letters of Credit</u>. If either the Issuer or the Portfolio Manager has actual knowledge that the account in which the funded amount in respect of a Pre-funded Letter of Credit owned by the Issuer is held has ceased to be a Pre-funded Letter of Credit Eligible Account, the Issuer (or the Portfolio Manager on its behalf) may sell such Pre-funded Letter of Credit within 60 days of the date on which the Issuer or the Portfolio Manager obtained actual knowledge that such account ceased to be a Pre-funded Letter of Credit Eligible Account.

Section 12.2. <u>Purchase of Additional Collateral Obligations</u>. On any date during the Reinvestment Period, the Portfolio Manager on behalf of the Issuer may direct the Trustee to invest Principal Proceeds and accrued interest received with respect to any Collateral Obligation to the extent used to pay for accrued interest on additional Collateral Obligations in additional Collateral Obligations, and the Trustee shall invest such proceeds, if each of the conditions specified in this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations) and <u>Section 12.3</u> (Conditions Applicable to All Sale and Purchase Transactions) are met; <u>provided</u> that, for the avoidance of doubt, with respect to any Collateral Obligations for which the trade date has occurred during the Reinvestment Period and for which Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) are available but which settle after the end of the Reinvestment Period, the purchase of such Collateral Obligations shall be treated as a purchase made during the Reinvestment Period for purposes of this <u>Section 12.2</u> (Purchase of Additional Collateral Obligations).

(a) <u>Investment Criteria</u>. No Collateral Obligation may be purchased unless each of the following conditions are satisfied as of the date the Portfolio Manager commits on behalf of the Issuer to make such purchase, in each case (subject to the provisions of <u>Section 1.2(k)</u> (Assumptions as to Pledged Obligations)) after giving effect to such purchase and all other sales or purchases previously or simultaneously committed to; <u>provided</u> that the conditions set forth in clauses (iii) through (v) below need only be satisfied with respect to purchases of Collateral Obligations occurring after the end of the Ramp-up Period:

(i) such obligation is a Collateral Obligation;

-203-

(ii)    such obligation is not as of such date a Credit Risk Obligation as determined by the Portfolio Manager;

(iii)    (A) each Coverage Test will be satisfied, or if not satisfied such Coverage Test will be maintained or improved and (B) if each Coverage Test is not satisfied, the proceeds of any sale of a Defaulted Obligation pursuant to <u>Section 12.1(c)</u> above shall not be reinvested in additional Collateral Obligations.

(iv)    (A) in the case of an additional Collateral Obligation purchased with the proceeds from the sale of a Credit Risk Obligation or a Defaulted Obligation, either (1) the Aggregate Principal Balance of all additional Collateral Obligations purchased with the proceeds from such sale will at least equal the Sale Proceeds from such sale, (2) the Aggregate Principal Balance of the Collateral Obligations when such Credit Risk Obligation or Defaulted Obligation was sold will be maintained or increased following the purchase of such additional Collateral Obligation or (3) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) <u>plus</u>, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance and (B) in the case of any other purchase of additional Collateral Obligations, either (1) the Aggregate Principal Balance of the Collateral Obligations when such Collateral Obligations were sold will be maintained or increased after giving effect to the purchase of such additional Collateral Obligations or (2) after giving effect to such sale, the Aggregate Principal Balance of all Collateral Obligations (excluding the Collateral Obligation being sold but including, without duplication, the anticipated cash proceeds of such sale) <u>plus</u>, without duplication, the amounts on deposit in the Accounts (including Eligible Investments therein) representing Principal Proceeds, will be greater than (or equal to) the Target Balance;

(v)    either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment; and

(vi)    the then-current rating by Moody's of the Class A-1 Notes, the Class A-2A Notes and the Class A-2B Notes is at least "Aa3", unless waived in writing by the Holders of at least a Majority of the Controlling Class.

(b)    <u>Reinvesting After the Reinvestment Period</u>.  For the avoidance of doubt, after the Reinvestment Period each of the Issuer and the Portfolio Manager may not invest in or purchase additional Collateral Obligations.

(c)    <u>Post-Reinvestment Period Settlement</u>.  Not later than the Business Day immediately following the end of the Reinvestment Period, the Portfolio Manager shall deliver to the Trustee a schedule of Collateral Obligations that the Issuer has purchased on a trade date basis but with respect to which the settlement date has not yet occurred and shall certify to the

-204-

Trustee that sufficient Principal Proceeds are available (including for this purpose, cash on deposit in the Collection Account as well as any Principal Proceeds that will be received by the Issuer from the sale of Collateral Obligations for which the trade date has already occurred but the settlement date has not yet occurred) to effect the settlement of such Collateral Obligations.

(d)     Certification by Portfolio Manager.    Not later than the Subsequent Delivery Date for any Collateral Obligation purchased after the end of the Ramp-up Period, the Portfolio Manager shall deliver to the Trustee an Officer's certificate of the Portfolio Manager certifying that such purchase complies with this Section 12.2 (Purchase of Additional Collateral Obligations) and Section 12.3 (Conditions Applicable to All Sale and Purchase Transactions).

(e)     Purchase Following Sale of Credit Improved Obligations and Discretionary Sales.    Following the sale of any Credit Improved Obligation pursuant to Section 12.1(b)(i) (Sales of Collateral Obligations) or any discretionary sale of a Collateral Obligation pursuant to Section 12.1(f)(i)(B) (Sales of Collateral Obligations), the Portfolio Manager shall use its reasonable efforts to purchase additional Collateral Obligations pursuant to this Section 12.2 (Purchase of Additional Collateral Obligations) within 20 Business Days after such sale.

(f)     Investment in Eligible Investments.    Cash on deposit in any Account or Hedge Account may be invested at any time in Eligible Investments in accordance with Article 10 (or, in the case of Hedge Accounts, collateral required to secure the obligations of the applicable Hedge Counterparty).

Section 12.3.     Conditions Applicable to All Sale and Purchase Transactions. (a)   Any transaction effected under this Article 12 or in connection with the acquisition of additional Collateral Obligations during the Ramp-up Period shall be conducted on an arm's length basis and, if effected with a Person Affiliated with the Portfolio Manager, shall be effected in accordance with the requirements of Section 6 of the Portfolio Management Agreement on terms no less favorable to the Issuer than would be the case if such Person were not so Affiliated, provided, that the Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)     Upon any acquisition of a Collateral Obligation pursuant to this Article 12, all of the Issuer's right, title and interest to the Pledged Obligation or Pledged Obligations shall be Granted to the Trustee pursuant to this Indenture, such Pledged Obligations shall be Delivered to the Trustee, and, if applicable, the Issuer shall receive the Pledged Obligation for which the Pledged Obligation was substituted. The Trustee shall also receive, not later than the Subsequent Delivery Date, an Officer's certificate of the Issuer containing the statements set forth in Section 3.1(a)(ix) (Conditions to Issuance of Notes on Closing Date).

Section 12.4.     Post-Reinvestment Period Amendment Proceeds.    After the Reinvestment Period, with respect to any amendment to a Collateral Obligation that the Issuer (or the Portfolio Manager on the Issuer's behalf) voted in favor of (including any amendment that includes an extension of the stated maturity of such Collateral Obligation (a "Maturity Amendment")), it is understood and agreed that, in accordance with the following sentence, certain of the fees related to such amendment and/or the coupon of such Collateral Obligation

NEWYORK 8715474 (2K)

shall comprise the Post-Reinvestment Period Amendment Proceeds (the "Post-Reinvestment Period Amendment Proceeds"). In the event that a Collateral Obligation is amended but such amendment is not a Maturity Amendment, then any economic benefit (such as a step-up in the coupon, an amendment fee, consent fee or any other related fee) actually received by the Issuer as a result of such amendment will comprise Post-Reinvestment Period Amendment Proceeds (as of the effective date of the related amendment or waiver) as certified in writing by the Portfolio Manager (in its reasonable business judgment) to the Issuer and the Trustee; provided, that, in the event such amendment is a Maturity Amendment, then the entire coupon received in respect of the related Collateral Obligation and any other related amendment fees will comprise Post-Reinvestment Period Amendment Proceeds. Following any amendment to a Collateral Obligation that the Issuer (or the Portfolio Manager on the Issuer's behalf) voted in favor of (including any Maturity Amendment), the Portfolio Manager shall certify to the Issuer and the Trustee (i) whether such amendment gives rise to any Post-Reinvestment Period Amendment Proceeds and (ii) the amount of any such Post-Reinvestment Period Amendment Proceeds. After the Reinvestment Period and for so long as any Class C Notes remain Outstanding, all Post-Reinvestment Period Amendment Proceeds will constitute the Turbo Payment Amount, which will be applied as Principal Proceeds in accordance with the Priority of Payments on the applicable Payment Date.

ARTICLE 13

Noteholders' Relations

Section 13.1. Subordination; Non-Petition. (a) Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that constitute a Junior Class agree for the benefit of the Holders of the Notes of each Priority Class with respect to such Junior Class that such Junior Class shall be subordinate and junior to the Notes of each such Priority Class to the extent and in the manner set forth in this Indenture.

(b) In the event that, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class shall have received any payment or distribution in respect of such Notes contrary to the provisions of this Indenture, then, unless and until each Priority Class with respect thereto shall have been paid in full in Cash or, to the extent a Majority of such Priority Class consents, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Class(es) in accordance with this Indenture; provided, however, that if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Assets and subject in all respects to the provisions of this Indenture, including this Section 13.1 (Subordination; Non-Petition).

(c) Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that such Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture including, without limitation, this Section 13.1 (Subordination; Non-Petition); provided, however, that after a Priority Class has been paid in full, the Holders of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of such Priority

Class.  Nothing in this Section 13.1 (Subordination; Non-Petition) shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(d)  The Holders of each Class of Notes agree, for the benefit of all Holders of each Class of Notes, not to cause the filing of a petition in bankruptcy against the Issuer, the Co-Issuer or any ETB Subsidiary until the payment in full of the Notes and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since such payment. The restrictions set forth in this Section 13.1(d) (Subordination; Non-Petition) are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into this Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of this Indenture.  Any Holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Section 13.2.  Standard of Conduct.  In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Holder under this Indenture, a Holder or Holders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Holder, the Issuer, or any other Person, except for any liability to which such Holder may be subject to the extent the same results from such Holder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

Section 13.3.  Voting Rights of Holders of Combination Notes.  The Holders of the Combination Notes will be treated as Holders of the Underlying Classes for purposes of any voting rights of such Underlying Classes, except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner that is different from the effect of such supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes will vote only as a separate Class.

Section 13.4.  Sales and Exchanges of Combination Notes.  At the written request of the Holder of a Combination Note (i) all or any portion of the Combination Notes may be exchanged for the Underlying Classes represented by such Combination Notes and (ii) all or any portion of the Class A-1 Notes, Class B Notes and Class C Notes representing Underlying Classes may be combined into Combination Notes, in each such case, proportionally in accordance with the Permissible Ratio (each such exchange or combination, an "Exchange"); provided that no Exchange will be permitted during the period commencing on a Record Date and ending on the related Payment Date; provided further that, if the Aggregate Outstanding Amount of the Combination Notes is less than $1,590,190, such Combination Notes will not be eligible to be Exchanged for the Underlying Classes represented by such Combination Notes. The Combination Notes may be sold to a transferee in accordance with this Indenture, proportionally in accordance with the Permissible Ratio.

-207-

If a Holder wishes to make an Exchange, the Holder must notify the Trustee and Collateral Administrator in writing no later than seven Business Days prior to the proposed effective date of such Exchange, which effective date must be at least one Business Day prior to the Record Date. The written notice (the "Exchange Notice") must set forth the following information: the CUSIP and ISIN numbers of each Note to be exchanged and each Note to be received in such Exchange, the calculations of the Permissible Ratio, the Aggregate Outstanding Amount and face amount of each Note to be exchanged and each Note to be received in such Exchange, the Holder's DTC participant number and the proposed effective date of such Exchange. After receiving the Exchange Notice, the Collateral Administrator shall confirm, and the Portfolio Manager shall verify, whether such proposed Exchange satisfies the Permissible Ratio and the requirements set forth above. Within three Business Days after receipt of the Exchange Notice, the Collateral Administrator shall notify the Holder, the Co-Issuers, the Trustee and the Portfolio Manager whether such proposed Exchange satisfies the requirements set forth in the Indenture. If the amounts set forth in the Exchange Notice do not consist of a Permissible Ratio and/or the resulting aggregate amounts of Combination Notes and/or Underlying Classes do not consist of the required minimum denominations and required integral multiples of $1, the Holder agrees to cooperate with the Co-Issuers, the Trustee, the Collateral Administrator and the Portfolio Manager to reallocate such impermissible integral multiples and reach appropriate allocations for each such Exchange. If any such reallocation cannot be promptly achieved, the Collateral Administrator shall within ten (10) Business Days notify the Holder that such Exchange has been rejected. If the Exchange has not been rejected, the holder will utilize the "deposit and withdrawal system" at DTC to effectuate such Exchange. A notice becomes irrevocable on the second Business Day prior to the proposed effective date of such Exchange. Each such Exchange shall be subject to the minimum denomination and integral multiples requirements with respect to the related Class of Notes and the transfer restrictions set forth in this Indenture. The Trustee shall promptly notify S&P upon the occurrence of any Exchange.

## ARTICLE 14

## Miscellaneous

Section 14.1.    Form of Documents Delivered to Trustee.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Portfolio Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Officer of the Issuer, Co-Issuer or the Portfolio Manager or Opinion of Counsel may be based, insofar as it relates to factual matters,

upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Portfolio Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer, the Portfolio Manager or such other Person, unless such Officer of the Issuer, Co-Issuer or the Portfolio Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Portfolio Manager, the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Portfolio Manager, the Issuer or the Co-Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is _provided_ that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to such Co-Issuer's right to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in <u>Section 6.1(d)</u> (Certain Duties and Responsibilities of Trustee).

Section 14.2. <u>Acts of Holders</u>. (a) Any request, demand, authorization, instruction, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in writing or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "<u>Act</u>" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this <u>Section 14.2</u> (Acts of Holders).

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c) The principal amount or face amount, as the case may be, and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of such Note and of every Note issued upon the registration thereof or in exchange therefor or in

-209-

lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note.

Section 14.3. <u>Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency</u>. (a) Any request, demand, authorization, instruction, direction, order, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(i) the Trustee shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Trustee addressed to such party at the Corporate Office, or at any other address previously furnished in writing to the other parties hereto by the Trustee;

(ii) the Co-Issuers shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o Appleby Trust (Cayman) Ltd., Clifton House, 75 Fort Street, PO Box 1350, Grand Cayman KYI-1108, Cayman Islands, Attention: The Directors, facsimile no. (345) 949-4901, or to the Co-Issuer addressed to it at 850 Library Avenue, Suite 204, Newark, Delaware, 19711 or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Portfolio Manager at its address below;

(iii) the Portfolio Manager shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Portfolio Manager addressed to it at Acis Capital Management, L.P., 300 Crescent Court, Dallas, TX 75201 or at any other address previously furnished in writing to the other parties hereto;

(iv) the Placement Agents shall be sufficient for every purpose hereunder if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, addressed to GreensLedge Capital Markets LLC, 520 Madison Avenue, 32nd Floor, New York, New York 10022, facsimile no. 212-792-5270, Attention: CDO Group and Cantor Fitzgerald & Co., 110 East 59th Street, New York, NY 10022, or at any other address previously furnished in writing to the Co-Issuers and the Trustee by the Placement Agents;

(v) a Hedge Counterparty shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to such Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer and the Trustee by such Hedge Counterparty;

(vi)    the Rating Agencies shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service to each Rating Agency addressed to it at Moody's Investors Service, Inc., 7 World Trade Center at 250 Greenwich Street, New York, New York, 10007, Attention: CBO/CLO Monitoring or by email to cdomonitoring@moodys.com and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003 or by facsimile in legible form to facsimile no. (212) 438-2655, Attention: Structured Credit Surveillance or by electronic copy to CDO_Surveillance@sandp.com and, solely with respect to S&P CDO Monitor requests, by email to: CDOMonitor@standardandpoors.com;

(vii)    the Irish Listing Agent shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Irish Listing Agent (or, if to the Companies Announcements Office, by email to announcements@ise.ie (such notices to be sent in Microsoft Word format to the extent possible) addressed to it at McCann FitzGerald Listing Services Limited, Riverside One, Sir John Rogerson's Quay, Dublin 2, Ireland, or at any other address previously furnished in writing to the other parties hereto by the Irish Listing Agent except that notices of the Note Interest Rate for Secured Notes will be by email to rates@ise.ie or as otherwise required by the guidelines of the Irish Stock Exchange; and

(viii)    the Administrator shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Administrator addressed to it at Appleby Trust (Cayman) Ltd., Clifton House, 75 Fort Street, PO Box 1350, Grand Cayman KYI-1108, Cayman Islands, Attention: ACIS CLO 2013-1 Ltd.

(b)    In the event that any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other person or entity, the Trustee's receipt of such notice or document shall entitle the Trustee to assume that such notice or document was delivered to such other person or entity unless otherwise expressly specified herein.

(c)    Notwithstanding any provision of this Section 14.3 (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency) to the contrary, any request, demand, authorization, direction, order, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with any party specified in Section 14.3(a) (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge Counterparty, the Paying Agent, the Administrator and each Rating Agency) above shall be sufficient for every purpose hereunder if made, given or furnished by electronic mail to an e-mail address specified in Section 14.3(a) (Notices, etc., to the Trustee, the Co-Issuers, the Collateral Administrator, the Portfolio Manager, the Placement Agents, the Hedge

Counterparty, the Paying Agent, the Administrator and each Rating Agency) or provided to the notifying party in accordance therewith.

(d)     The Bank (in each of its capacities) agrees to accept and act upon instructions or directions pursuant to this Indenture or any document executed in connection herewith sent by unsecured email, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Bank shall have received an incumbency certificate listing such person as a person designated to provide such instructions or directions, which incumbency certificate may be amended whenever a person is added or deleted from the listing.  If such person elects to give the Bank email or facsimile instructions (or instructions by a similar electronic method) and the Bank in its discretion elects to act upon such instructions, the Bank's reasonable understanding of such instructions shall be deemed controlling.  The Bank shall not be liable for any losses, costs or expenses arising directly or indirectly from the Bank's reliance upon and compliance with such instructions notwithstanding such instructions conflicting with or being inconsistent with a subsequent written instruction.  Any person providing such instructions or directions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Bank, including without limitation the risk of the Bank acting on unauthorized instructions, and the risk of interception and misuse by third parties and acknowledges and agrees that there may be more secure methods of transmitting such instructions than the method(s) selected by it and agrees that the security procedures (if any) to be followed in connection with its transmission of such instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

Section 14.4.    <u>Notices to Holders; Waiver</u>.    Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of any event,

(a)     such notice shall be sufficiently given to Holders if in writing and mailed, first class postage prepaid, to each Holder affected by such event, at the address of such Holder as it appears in the Register not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)     such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

Notwithstanding clause (a) above, a Holder may give the Trustee a written notice in a form acceptable to the Trustee that it is requesting that notices to it be given by facsimile transmissions and stating the facsimile number for such transmission.  Thereafter, the Trustee shall give notices to such Holder by facsimile transmission; <u>provided</u>, that if such notice also requests that notices be given by mail, then such notice shall also be given by mail in accordance with clause (a) above.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  In case by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity or by reason of any other cause it shall be impracticable to give such notice by mail of any event to Holders when such notice is required to be given pursuant to any provision

NEWYORK 8715474 (2K)

of this Indenture, then such notification to Holders as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

So long as any Class of Notes is listed on the Irish Stock Exchange and the guidelines of such exchange so require, all notices to Holders of such Notes will be published at the Companies Announcements Office of the Irish Stock Exchange.

Section 14.5.   Effect of Headings and Table of Contents.   The Article and Section headings herein (including those used in cross-references herein) and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6.   Successors and Assigns.   All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.   Separability.   Except to the extent prohibited by applicable law, in case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8.   Benefits of Indenture.   Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Portfolio Manager, the Holders of the Notes and (to the extent provided herein) the Collateral Administrator and the Administrator (solely in its capacity as such) and the other Secured Parties any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9.   Governing Law.   THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

Section 14.10.   Submission to Jurisdiction and Waiver of Jury Trial.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.

EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS INDENTURE SHALL AFFECT ANY RIGHT THAT THE TRUSTEE OR ANY HOLDER OF NOTES MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS INDENTURE AGAINST THE CO-ISSUERS OR THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE IN ANY COURT REFERRED TO IN THE PREVIOUS PARAGRAPH. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY (OTHER THAN THE CO-ISSUERS) TO THIS INDENTURE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES HEREIN. EACH OF THE CO-ISSUERS IRREVOCABLY APPOINTS CT CORPORATION SYSTEM, AS ITS AUTHORIZED AGENT ON WHICH ANY AND ALL LEGAL PROCESS MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING. NOTHING IN THIS INDENTURE WILL AFFECT THE RIGHT OF ANY PARTY TO THIS INDENTURE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(e)     EACH PARTY TO THIS INDENTURE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING.

Section 14.11.   <u>Counterparts</u>.  This instrument may be executed in any number of counterparts (including by facsimile or pdf), each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.12.   <u>Acts of Issuer</u>.  Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf.

Section 14.13.   <u>Confidential Information</u>.  (a)  The Trustee and each Holder of Notes will maintain the confidentiality of all Confidential Information in accordance with procedures adopted by the Trustee or such Holder in good faith to protect Confidential Information of third parties delivered to such Person; <u>provided</u>, that such Person may deliver or disclose Confidential Information to:  (i) such Person's directors, trustees, officers, employees, agents, auditors, attorneys and affiliates who agree to hold confidential the Confidential Information substantially in accordance with the terms of this <u>Section 14.13</u> (Confidential

Information) and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (ii) such Person's financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this <u>Section 14.13</u> (Confidential Information) and to the extent such disclosure is reasonably required for the administration of this Indenture, the matters contemplated hereby or the investment represented by the Notes; (iii) any other Holder; (iv) any Person of the type that would be, to such Person's knowledge, permitted to acquire Notes in accordance with the requirements of <u>Section 2.6</u> (Registration, Registration of Transfer and Exchange) hereof to which such Person sells or offers to sell any such Note or any part thereof (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this <u>Section 14.13</u> (Confidential Information)); (v) any other Person from which such former Person offers to purchase any security of the Co-Issuers (if such other Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this <u>Section 14.13</u> (Confidential Information)); (vi) any Federal or state or other regulatory, governmental or judicial authority having jurisdiction over such Person; (vii) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agency that requires access to information about the investment portfolio of such Person, reinsurers and liquidity and credit providers that agree to hold confidential the Confidential Information substantially in accordance with this <u>Section 14.13</u> (Confidential Information); (viii) Moody's (so long as any Class X Notes, Class A-1 Notes or Class A-2 Notes are rated by Moody's) or S&P; (ix) any other Person with the consent of the Co-Issuers and the Portfolio Manager; or (x) any other Person to which such delivery or disclosure may be necessary or appropriate (A) to effect compliance with any law, rule, regulation or order applicable to such Person, (B) in response to any subpoena or other legal process upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law), (C) in connection with any litigation to which such Person is a party upon prior notice to the Co-Issuers (unless prohibited by applicable law, rule, order or decree or other requirement having the force of law) or (D) if an Event of Default has occurred and is continuing, to the extent such Person may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Notes or this Indenture; and <u>provided</u>, <u>further</u>, <u>however</u>, that delivery to Holders by the Trustee of any report of information required by the terms of this Indenture to be provided to Holders shall not be a violation of this <u>Section 14.13</u> (Confidential Information). Each Holder of Notes and each person who delivers a note owner certificate in substantially the form of <u>Exhibit I</u> hereto to the Trustee agrees, except as set forth in clauses (vi), (vii) and (x) above, that it shall use the Confidential Information for the sole purpose of making an investment in the Notes or administering its investment in the Notes; and that the Trustee shall neither be required nor authorized to disclose to Holders any Confidential Information in violation of this <u>Section 14.13</u> (Confidential Information). In the event of any required disclosure of the Confidential Information by such Holder, such Holder agrees to use reasonable efforts to protect the confidentiality of the Confidential Information. Each Holder of a Note, by its acceptance of such Note will be deemed to have agreed to be bound by and to be entitled to the benefits of this <u>Section 14.13</u> (Confidential Information). Notwithstanding the foregoing, the Holders and beneficial owners of the Offered Securities (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any

NEWYORK 8715474 (2K)

kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and U.S. federal income tax structure.

(b) For the purposes of this Section 14.13 (Confidential Information), "Confidential Information" means information delivered to the Trustee or any Holder of Notes or on behalf of the Co-Issuers in connection with and relating to the transactions contemplated by or otherwise pursuant to this Indenture; provided, that such term does not include information that: (i) was publicly known or otherwise known to the Trustee or such Holder prior to the time of such disclosure; (ii) subsequently becomes publicly known through no act or omission by the Trustee, any Holder or any person acting on behalf of the Trustee or any Holder; (iii) otherwise is known or becomes known to the Trustee or any Holder other than (x) through disclosure by the Co-Issuers or (y) to the knowledge of the Trustee or a Holder, as the case may be, in each case after reasonable inquiry, as a result of the breach of a fiduciary duty to the Co-Issuers or a contractual duty to the Co-Issuers; or (iv) is allowed to be treated as non-confidential by consent of the Co-Issuers.

Section 14.14.  Liability of Co-Issuers.  Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers.  In particular, neither of the Co-Issuers nor any ETB Subsidiary shall be entitled to petition or take any other steps for the winding up or bankruptcy of the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable, or shall have any claim in respect to any assets of the Issuer, the Co-Issuer or any ETB Subsidiary, as applicable.

ARTICLE 15

Assignment of Certain Agreements

Section 15.1.  Assignment of Portfolio Management Agreement.  (a)  The Issuer hereby acknowledges that its Grant pursuant to the first Granting Clause hereof includes all of the Issuer's estate, right, title and interest in, to and under the Portfolio Management Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Portfolio Manager thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; provided, however, that notwithstanding anything herein to the contrary, the Trustee shall not have the authority to exercise any of the rights set forth in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default hereunder and such authority shall terminate at such time, if any, as such Event of Default is cured or waived.

-216-

(b)     The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Portfolio Management Agreement, nor shall any of the obligations contained in the Portfolio Management Agreement be imposed on the Trustee.

(c)     Upon the retirement of the Notes, the payment of all amounts required to be paid pursuant to the Priority of Payments and the release of the Assets from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Portfolio Management Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)     The Issuer represents that the Issuer has not executed any other assignment of the Portfolio Management Agreement.

(e)     The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith.   The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify.

Section 15.2.     Assignment of Hedge Agreement.   (a)   After the Closing Date, the Issuer may enter into Hedge Agreements from time to time.  Each Hedge Agreement shall be required to (x) satisfy the Global Rating Agency Condition, (y) contain appropriate limited recourse and non-petition provisions equivalent to those contained in this Indenture with respect to the Notes and (z) provide that any amounts payable to the related Hedge Counterparties thereunder will be subject to the Priority of Payments (including, without limitation, the Acceleration Priority of Payments).  The Issuer shall not enter into a Hedge Agreement unless (x) it reasonably determines that such Hedge Agreement would not cause the Issuer or the Portfolio Manager to be required to register with the CFTC or that the Issuer and the Portfolio Manager would be eligible for an exemption to the requirement to register with the CFTC as a CPO or (y) with the consent of at least a Majority of the Subordinated Notes, the Portfolio Manager will register as a CPO and comply with the requirements of the CFTC.  The Issuer shall assign any such Hedge Agreement to the Trustee pursuant to this Indenture.  The Trustee shall, on behalf of the Issuer and in accordance with the Distribution Report, pay amounts due to the Hedge Counterparty under any Hedge Agreements on any Payment Date in accordance with Section 11.1 (Disbursements of Monies from Payment Account).  The Issuer shall not enter into any Hedge Agreement unless such Hedge Agreement provides that any costs attributable to entering into a replacement Hedge Agreement which exceed the sum of the proceeds of the liquidation of any such Hedge Agreement shall be borne solely by the Hedge Counterparty; provided that such liquidation is not the result of a Priority Hedge Termination Event.

(b)     The Trustee shall agree to any reduction in the notional amount of any Hedge Agreement proposed by the related Hedge Counterparty and agreed to by the Portfolio Manager, or any termination, replacement and/or other modification of a Hedge Agreement or any additional Hedge Agreement proposed by the Portfolio Manager; provided, that the Global Rating Agency Condition has been satisfied.

-217-

(c)      If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an event of default or a termination event, the Issuer (or the Portfolio Manager on its behalf) and the Trustee (following an Event of Default) shall notify each Rating Agency and take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee under such Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and may apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty thereunder) to enter into a replacement Hedge Agreement on such terms as satisfy the Global Rating Agency Condition (unless such early termination is due to an additional termination event caused by an Optional Redemption).   No Hedge Agreement entered into by the Issuer may include an additional termination event resulting from an Optional Redemption unless such additional termination event is not effective until the notice of such Optional Redemption given by the Co-Issuers has become irrevocable.

NEWYORK 8715474 (2K)

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Indenture as of the date first written above.

ACIS CLO 2013-1 LTD., as Issuer


By:_____
    Name:
    Title:


ACIS CLO 2013-1 LLC, as Co-Issuer


By:_____
    Name:
    Title:


U.S. BANK NATIONAL ASSOCIATION, as
    Trustee


By: _____
    Name:
    Title:

SCHEDULE 1

LIST OF COLLATERAL OBLIGATIONS

SCHEDULE 2

## MOODY'S INDUSTRY CLASSIFICATION GROUP LIST

| | |
|---|---|
| CORP - Aerospace & Defense | 1 |
| CORP - Automotive | 2 |
| CORP - Banking, Finance, Insurance & Real Estate | 3 |
| CORP - Beverage, Food & Tobacco | 4 |
| CORP - Capital Equipment | 5 |
| CORP - Chemicals, Plastics, & Rubber | 6 |
| CORP - Construction & Building | 7 |
| CORP - Consumer goods: Durable | 8 |
| CORP - Consumer goods: Non-durable | 9 |
| CORP - Containers, Packaging & Glass | 10 |
| CORP - Energy: Electricity | 11 |
| CORP - Energy: Oil & Gas | 12 |
| CORP - Environmental Industries | 13 |
| CORP - Forest Products & Paper | 14 |
| CORP - Healthcare & Pharmaceuticals | 15 |
| CORP - High Tech Industries | 16 |
| CORP - Hotel, Gaming & Leisure | 17 |
| CORP - Media: Advertising, Printing & Publishing | 18 |
| CORP - Media: Broadcasting & Subscription | 19 |
| CORP - Media: Diversified & Production | 20 |
| CORP - Metals & Mining | 21 |
| CORP - Retail | 22 |
| CORP - Services: Business | 23 |
| CORP - Services: Consumer | 24 |
| CORP - Sovereign & Public Finance | 25 |
| CORP - Telecommunications | 26 |
| CORP - Transportation: Cargo | 27 |
| CORP - Transportation: Consumer | 28 |
| CORP - Utilities: Electric | 29 |
| CORP - Utilities: Oil & Gas | 30 |
| CORP - Utilities: Water | 31 |
| CORP - Wholesale | 32 |

## S&P INDUSTRY CLASSIFICATIONS

| | | | | |
|---|---|---|---|---|
| 1. | Aerospace & defense | 39. | Utilities |
| 2. | Air transport | 40. | Mortgage REITs |
| 3. | Automotive | 41. | Equity REITs and REOCs |
| 4. | Beverage & tobacco | 42. | Reserved corporate |
| 5. | Radio & television | 43. | Life insurance |
| 7. | Building & development | 44. | Health insurance |
| 8. | Business equipment & services | 45. | Property & casualty insurance |
| 9. | Cable & satellite television | 46. | Diversified insurance |
| 10. | Chemical & plastics | 47. | Reserved corporate |
| 11. | Clothing/textiles | 48. | Reserved corporate |
| 12. | Conglomerates | 49. | Reserved corporate |
| 13. | Containers & glass products | | |
| 14. | Cosmetics/toiletries | | |
| 15. | Drugs | | |
| 16. | Ecological services & equipment | | |
| 17. | Electronics/electrical | | |
| 18. | Equipment leasing | | |
| 19. | Farming/agriculture | | |
| 20. | Financial intermediaries | | |
| 21. | Food/drug retailers | | |
| 22. | Food products | | |
| 23. | Food service | | |
| 24. | Forest products | | |
| 25. | Health care | | |
| 26. | Home furnishings | | |
| 27. | Lodging & casinos | | |
| 28. | Industrial equipment | | |
| 30. | Leisure goods/activities/movies | | |
| 31. | Nonferrous metals/minerals | | |
| 32. | Oil & gas | | |
| 33. | Publishing | | |
| 34. | Rail industries | | |
| 35. | Retailers (except food & drug) | | |
| 36. | Steel | | |
| 37. | Surface transport | | |
| 38. | Telecommunications | | |

SCHEDULE 4

DIVERSITY SCORE CALCULATION

The Diversity Score is calculated as follows:

(a)　　An "Issuer Par Amount" is calculated for each issuer of a Collateral Obligation, and is equal to the Aggregate Principal Balance of all the Collateral Obligations issued by that issuer and all affiliates.

(b)　　An "Average Par Amount" is calculated by summing the Issuer Par Amounts for all issuers, and dividing by the number of issuers.

(c)　　An "Equivalent Unit Score" is calculated for each issuer, and is equal to the lesser of (x) one and (y) the Issuer Par Amount for such issuer divided by the Average Par Amount.

(d)　　An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's industry classification groups, shown on Schedule 2, and is equal to the sum of the Equivalent Unit Scores for each issuer in such industry classification group.

(e)　　An "Industry Diversity Score" is then established for each Moody's industry classification group, shown on Schedule 2, by reference to the following table for the related Aggregate Industry Equivalent Unit Score, provided, that if any Aggregate Industry Equivalent Unit Score falls between any two such scores, the applicable Industry Diversity Score will be the lower of the two Industry Diversity Scores:

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |

| Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|---|---|---|---|---|
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

(f)     The Diversity Score is then calculated by summing each of the Industry Diversity Scores for each Moody's industry classification group shown on <u>Schedule 2</u>.

(g)     For purposes of calculating the Diversity Score, affiliated issuers in the same Industry are deemed to be a single issuer except as otherwise agreed to by Moody's.

<u>SCHEDULE 5</u>

MOODY'S RATING DEFINITIONS

<u>MOODY'S DEFAULT PROBABILITY RATING</u>

(i)     With respect to a Collateral Obligation that is a Moody's Senior Secured Loan or Participation Interest in a Moody's Senior Secured Loan, if the obligor of such Collateral Obligation has a corporate family rating by Moody's, then such corporate family rating.

(ii)     With respect to a Collateral Obligation that is a Moody's Senior Secured Loan or Participation Interest in a Moody's Senior Secured Loan, if not determined pursuant to clause (i) above, if such Collateral Obligation (A) is publicly rated by Moody's, such public rating or (B) is not publicly rated by Moody's but for which a rating or rating estimate has been assigned by Moody's upon the request of the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager, such rating or the rating estimate, as applicable.

(iii)     With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i) or (ii) above, (A) (x) if such Collateral Obligation is publicly rated by Moody's, such public rating or, (y) if no such rating is available, if a rating or rating estimate has been assigned to such Collateral Obligation by Moody's upon the request of the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager, such rating or, in the case of a rating estimate, the applicable rating estimate for such obligation or (B) if neither clause (A)(x) or (y) is applicable, if the obligor of such Collateral Obligation has one or more senior unsecured obligations publicly rated by Moody's, then the Moody's public rating on any such obligation (or, if the Collateral Obligation is a Moody's Senior Secured Loan, the Moody's rating one subcategory higher than the Moody's public rating on any such senior unsecured obligation) as selected by the Portfolio Manager.

(iv)     With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i), (ii) or (iii) above, the Moody's Derived Rating.

(v)     With respect to a DIP Collateral Obligation, the rating assigned by clause (iv)(F) of the Moody's Derived Rating.

For purposes of calculating a Moody's Default Probability Rating, each applicable rating on credit watch by Moody's with positive or negative implication or on negative outlook at the time of calculation will be adjusted in accordance with the Moody's Outlook/Review Rules.

<u>MOODY'S RATING</u>

(i)     With respect to a Collateral Obligation that (A) is publicly rated by Moody's, such public rating or (B) is not publicly rated by Moody's but for which a rating or rating estimate has been assigned by Moody's upon the request of the Issuer, the Portfolio

Manager or an affiliate of the Portfolio Manager, such rating or, in the case of a rating estimate, the applicable rating estimate for such obligation.

(ii)    With respect to a Collateral Obligation that is a Moody's Senior Secured Loan or Participation Interest in a Moody's Senior Secured Loan, if not determined pursuant to clause (i) above, if the obligor of such Collateral Obligation has a corporate family rating by Moody's, then such corporate family rating.

(iii)    With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i) or (ii) above, if the obligor of such Collateral Obligation has one or more senior unsecured obligations publicly rated by Moody's, then the Moody's public rating on any such obligation (or, if the Collateral Obligation is a Moody's Senior Secured Loan, the Moody's rating one subcategory higher than the Moody's public rating on any such senior unsecured obligation) as selected by the Portfolio Manager.

(iv)    With respect to a Collateral Obligation other than a DIP Collateral Obligation, if not determined pursuant to clause (i), (ii) or (iii) above, the Moody's Derived Rating.

(v)    With respect to a DIP Collateral Obligation, the facility rating (whether public or private) of such DIP Collateral Obligation rated by Moody's.

For purposes of calculating a Moody's Rating, each applicable rating on credit watch by Moody's with positive or negative implication or on negative outlook at the time of calculation will be adjusted in accordance with the Moody's Outlook/Review Rules.

<u>MOODY'S DERIVED RATING</u>

With respect to a Collateral Obligation whose Moody's Rating or Moody's Default Probability Rating cannot otherwise be determined pursuant to the definitions thereof, such Moody's Rating or Moody's Default Probability Rating shall be determined as set forth below.

(i)    If the obligor of such Collateral Obligation has a long-term issuer rating by Moody's, then such long-term issuer rating.

(ii)    If not determined pursuant to clause (i) above, if another obligation of the obligor is rated by Moody's, then by adjusting the rating of the related Moody's rated obligations of the related obligor by the number of rating sub-categories according to the table below:

| Obligation Category of Rated Obligation | Rating of Rated Obligation | Number of Subcategories Relative to Rated Obligation Rating |
|---|---|---|
| Senior secured obligation | greater than or equal to B2 | -1 |
| Senior secured obligation | less than B2 | -2 |
| Subordinated obligation | greater than or equal to B3 | +1 |
| Subordinated obligation | less than B3 | 0 |

(iii)    If not determined pursuant to clause (i) or (ii) above, if the obligor of such Collateral Obligation has a corporate family rating by Moody's, then one subcategory below such corporate family rating.

(iv)    If not determined pursuant to clause (i), (ii) or (iii) above, then by using any one of the methods provided below:

(A)    (1) if such Collateral Obligation is publicly rated by S&P:

| Type of Collateral Obligation | Rating by S&P | Collateral Obligation Rated by S&P | Number of Subcategories Relative to Moody's Equivalent of Rating by S&P |
|---|---|---|---|
| Not Structured Finance Obligation | >BBB- | Not a loan or Participation Interest in loan | -1 |
| Not Structured Finance Obligation | <BB+ | Not a loan or Participation Interest in loan | -2 |
| Not Structured Finance Obligation | | loan or Participation Interest in loan | -2 |

(2)    if such Collateral Obligation is not rated by S&P but another security or obligation of the obligor is publicly rated by S&P (a "parallel security"), then the rating of such parallel security will at the election of the Portfolio Manager be determined in accordance with the table set forth in subclause (A)(1) above, and the Moody's Rating or Moody's Default Probability Rating of such Collateral Obligation will be determined in accordance with the methodology set forth in clause (i) above (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (A)(2)); or

(3)    if such Collateral Obligation is not rated by S&P but there is a public issuer credit rating of the issuer of such Collateral Obligation by S&P as published by S&P, or the guarantor which unconditionally and irrevocably guarantees such Collateral Obligation, then such issuer credit rating will at the election of the Portfolio Manager be determined in

accordance with the table set forth in subclause (A)(1) above, and the Moody's Rating or Moody's Default Probability Rating of such Collateral Obligation will be determined in accordance with the methodology set forth in subclause (i) above; or

(4)     if such Collateral Obligation is a DIP Collateral Obligation, no Moody's Rating or Moody's Default Probability Rating may be determined based on a rating by S&P or any other rating agency;

(B)     if such Collateral Obligation is not rated by Moody's or S&P and no other security or obligation of the issuer of such Collateral Obligation is rated by Moody's or S&P, and if Moody's has been requested by the Issuer, the Portfolio Manager or an affiliate of the Portfolio Manager to assign a rating or rating estimate with respect to such Collateral Obligation but such rating or rating estimate has not been received, pending receipt of such estimate, (1) "B3" if the Portfolio Manager certifies to the Trustee (with a copy to the Collateral Administrator) that the Portfolio Manager believes that such estimate will be at least "B3" and if the Aggregate Principal Balance of Collateral Obligations determined pursuant to this clause (B) does not exceed 5% of the Collateral Principal Amount of all Collateral Obligations or (2) otherwise, "Caa1";

(C)     if the obligor of such Collateral Obligation is a U.S. obligor and if such Collateral Obligation is a senior secured obligation of the obligor and (1) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the obligor are in default, (3) neither the obligor nor any of its Affiliates have defaulted on any debt during the past two years, (4) the obligor has been in existence for the past five years, (5) the obligor is current on any cumulative dividends, (6) the fixed-charge ratio for the obligor exceeds 125% for each of the past two fiscal years and for the most recent quarter, (7) the obligor had a net profit before tax in the past fiscal year and the most recent quarter and (8) the annual financial statements of the obligor are unqualified and certified by a firm of Independent accountants of national reputation, and quarterly statements are unaudited but signed by a corporate officer, "Caa1";

(D)     if the obligor of such Collateral Obligation is a U.S. obligor and if such Collateral Obligation is a senior secured or senior unsecured obligation of the obligor and (1) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the obligor has been in default during the past two years, "Caa3";

(E)     if a debt security or obligation of the obligor has been in default during the past two years, "Ca"; or

(F)     with respect to any DIP Collateral Obligation, one subcategory below the facility rating (whether public or private) of such DIP Collateral Obligation rated by Moody's.

For purposes of calculating a Moody's Derived Rating, each applicable rating calculated pursuant to clause (iv)(A)(1), (2) or (3) above using an S&P rating that is on credit watch by S&P with positive or negative implication or on negative outlook at the time of calculation will be adjusted in accordance with the Moody's Outlook/Review Rules, after giving effect to the determination of the rating in accordance with the provisions above.

With respect to rating estimates in the definition of Moody's Default Probability Rating, Moody's Rating and Moody's Derived Rating, if there is a Material Change with respect to such Collateral Obligation, the Issuer, or the Portfolio Manager on behalf of the Issuer, shall, upon notice or knowledge thereof, notify Moody's and provide available information with respect thereto. Moody's, in its sole discretion, may update its rating estimate of such Collateral Obligation; provided, that, such update shall not, unless so requested by the Issuer, be considered (x) a request for a credit estimate by the Issuer in accordance with or (y) in determining whether or not the Issuer has complied with, in each case, the annual credit estimate requirements set forth in this Indenture.  Subject to the following paragraph, in the event Moody's updates the credit estimate of a Collateral Obligation pursuant to the previous sentence, such credit estimate will be used by the Issuer until such later date that it is updated by Moody's.

For purposes of the definitions of Moody's Default Probability Rating, Moody's Derived Rating and Moody's Rating, any credit estimate assigned by Moody's may be used for thirteen months from the date such estimate was issued by Moody's; provided, that, for purposes of any calculation under this Indenture, if Moody's fails to renew for any reason a credit estimate for a previously acquired Collateral Obligation thereunder on or before such thirteen month anniversary, then (1) before the fifteen month anniversary of such credit estimate, the Issuer shall downgrade such credit estimate by one sub-category, and use such downgraded credit estimate and (2) after the fifteen month anniversary of such credit estimate, such Collateral Obligation will be deemed to have a Moody's Rating of "Caa3".

## MOODY'S SENIOR SECURED LOAN

(a)     A loan that:

(i)     is not (and cannot by its terms become) subordinate in right of payment to any other debt obligation of the Obligor of the loan;

(ii)     is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the Obligor's obligations under the loan; and

(iii)     the value of the collateral securing the loan together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral);

or

(b) a loan that:

  (i) is not (and cannot by its terms become) subordinate in right of payment to any other debt obligation of the Obligor of the loan, except that such loan can be subordinate with respect to the liquidation of such obligor or the collateral for such loan;

  (ii) with respect to such liquidation, is secured by a valid perfected security interest or lien that is not a first priority in, to or on specified collateral securing the Obligor's obligations under the loan;

  (iii) the value of the collateral securing the loan together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the loan in accordance with its terms and to repay all other loans of equal or higher seniority secured in the same collateral); and

  (iv) has a Moody's Rating determined pursuant to clause (i) of the definition thereof and such Moody's Rating is not lower than the loan's Moody's corporate family rating;

(c) and the loan is not:

  (i) a DIP Collateral Obligation; or

  (ii) a loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof.

SCHEDULE 6

CERTIFICATE OF ISSUER REGARDING ACCOUNTANTS' REPORTS AND CERTIFICATES
Section 10.9(d)

Pursuant to Section 10.9(d) of the Indenture, dated as of March 18, 2013 among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee, the undersigned, Acis CLO 2013-1 Ltd. does hereby certify that it has received a statement from a firm of Independent certified public accountants indicating that:

1.     Such firm has reviewed each Distribution Report received since the last review and applicable information from the Trustee, including a complete and accurate electronic data file, a copy of the applicable Distribution Report and any assumptions needed to complete their procedures.

2.     The calculations (other than the S&P CDO Monitor Test) within the Distribution Reports dated [  ], [  ], [  ] and [  ] have been performed in accordance with the applicable provisions of the Indenture, except as noted in Exhibit A to this certificate.

3.     The Aggregate Principal Balance of the Pledged Obligations and the Aggregate Principal Balance of the Collateral Obligations securing the Secured Notes as of [  ], [  ], [  ] and [  ] were as follows:

Aggregate Principal Balance of the Pledged Obligations

[  ]$ XXX,XXX,XXX
[  ]$ XXX,XXX,XXX
[  ]$ XXX,XXX,XXX
[  ]$ XXX,XXX,XXX

Aggregate Principal Balance of the Collateral Obligations

[  ]$ XXX,XXX,XXX
[  ]$ XXX,XXX,XXX
[  ]$ XXX,XXX,XXX
[  ]$ XXX,XXX,XXX

The information and/or procedures not contained in the engagement letter between the Issuer and the firm of Independent certified public accountants are set forth in Exhibit B to this certificate and provided to the firm of Independent certified public accountants by the Portfolio Manager.

Dated: [  ]

ACIS CLO 2013-1 LTD.

By: _____

    Name:
    Title:  Authorized Person

SCHEDULE 7

## ADDITIONAL REPORT RECIPIENTS

N/A.

ACIS CLO 2013-1 LTD.
DISTRIBUTION REPORT EXCEPTIONS

| Description | Report Date | Dist Rpt Value | Accountant Value | Notes |
| --- | --- | --- | --- | --- |

ACIS CLO 2013-1 LTD.
PORTFOLIO MANAGER INFORMATION/PROCEDURES

| **Description** | **Report Date** | **Notes** |
| --- | --- | --- |

<u>CERTIFICATE OF ACIS CLO 2013-1 LTD.</u>
Section [3.1(a)(xiv)][3.2(vi)][7.18(c)][12.1(e)]

Pursuant to <u>Section</u> [<u>3.1(a)(xiv)</u>][<u>3.2(vi)</u>][<u>7.18(c)</u>][<u>12.1(e)</u>] of the Indenture, dated as of March 18, 2013 among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer and U.S. Bank National Association, as Trustee, the undersigned, Acis CLO 2013-1 Ltd., does hereby certify that it has received an [Accountants' Report][report] from a firm of Independent certified public accountants:

[Applicable to <u>Section 3.1(a)(xiv)</u> certificates]

[ (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation set forth on the Schedule of Collateral Obligations attached to the Indenture as <u>Schedule 1</u> and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to the sources specified therein, except as specified in <u>Exhibit A</u> hereto,

(B) confirming that the Aggregate Principal Balance of the Collateral Obligations which the Issuer has purchased or entered into binding agreements to purchase on or about the Closing Date is at least $[        ]; and

(C) specifying the procedures undertaken by them to review data and computations relating to the above referenced statement]

[Applicable to <u>Section 3.2(vi)</u> certificates]

[ (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with respect to each Collateral Obligation pledged in connection with the issuance of the Additional Subordinated Notes and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to the sources specified therein, except as specified in <u>Exhibit A</u> hereto,

(B) [Applicable if the issuance of Additional Subordinated Notes occurs after the Ramp-up Period] confirming that after giving effect to such pledge and the issuance of the Additional Subordinated Notes (1) the Coverage Tests are met, (2) in the aggregate, the Collateral Obligations comply with all of the requirements set forth in the Concentration Limitations and (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) is met, except as specified in <u>Exhibit A</u> hereto; and

(C) specifying the procedures undertaken by them to review data and computations relating to the above referenced statement.]

[Applicable to <u>Section 7.18(c)</u> certificates]

[ (A) confirming the issuer, principal balance, coupon/spread, Stated Maturity, Moody's Default Probability Rating, Moody's Rating, S&P Rating and country of Domicile with

respect to each Collateral Obligation as of the end of the Ramp-up Period and the information provided by the Issuer with respect to every other asset included in the Assets, by reference to such sources as shall be specified therein, except as specified in <u>Exhibit A</u> hereto; ]

[    (B) confirming that as of the end of the Ramp-up Period (1) the Overcollateralization Ratio Tests were met, (2) the Collateral Obligations complied with all of the requirements of the Concentration Limitations, (3) the Collateral Quality Test (excluding the S&P CDO Monitor Test) was met, (4) the Effective Date Overcollateralization Test is satisfied and (5) the Target Initial Par Condition is satisfied, except as specified in <u>Exhibit A</u> hereto; and ]

[    (C) specifying the procedures undertaken by them to review data and computations relating to above referenced Accountants' Report]

[Applicable to <u>Section 12.1(e)</u> certificates]

[confirmed the calculations contained in the certificate furnished by the Portfolio Manager pursuant to <u>Section 9.3(c)</u>, except as otherwise specified in <u>Exhibit A</u> hereto]

[Applicable to all certificates]

The information and/or procedures not contained in the engagement letter between the Issuer and the firm of Independent certified public accountants are set forth in <u>Exhibit B</u> to this certificate and provided to the firm of Independent certified public accountants by the Portfolio Manager.

Dated: [    ], [   ]

ACIS CLO 2013-1 LTD.


By: _____
        Name:
        Title:  Authorized Person

ACIS CLO 2013-1 LTD.
ACCOUNTANTS' CERTIFICATE EXCEPTIONS

| **Description** | **Issuer Value** | **Accountant Value** | **Notes** |
| --- | --- | --- | --- |

ACIS CLO 2013-1 LTD.
PORTFOLIO MANAGER INFORMATION/PROCEDURES

| **Description** | **Report Date** | **Notes** |
| --- | --- | --- |

<u>EXHIBIT A</u>

<u>FORMS OF NOTES</u>

EXHIBIT A1

## FORM OF GLOBAL NOTE

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E][F] [SENIOR][MEZZANINE][JUNIOR]
SECURED
[DEFERRABLE] FLOATING RATE NOTES DUE 2024

[This Note has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (A) to a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (B) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Note that is a U.S. person and is not a Qualified Purchaser and a Qualified Institutional Buyer to sell its interest in the Notes, or may sell such interest on behalf of such owner.][1]

[This Note has not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a) (x) a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such a plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (y) an "institutional" accredited investor (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that is a "Qualified Purchaser" (as defined for purposes of Section 3(c)(7) of the Investment Company Act) or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an

---

[1] Include for Class X, A, B, C and D Notes.

interest in this Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Notes, or may sell such interest on behalf of such owner.][2]

[By its acquisition of Co-Issued Notes (the "ERISA Debt Securities"), each purchaser and subsequent transferee will be deemed to have represented and warranted or required to represent and warrant, as applicable, at the time of its acquisition and throughout the period it holds such ERISA Debt Security, that either (x) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of the ERISA Debt Security will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law). Any purported transfer of an ERISA Debt Security, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][3]

[Each purchaser and each subsequent transferee of this Note will be deemed to have represented and warranted, at the time of its acquisition and throughout the period that it holds such Note or any interest herein, that (1) it is not an "employee benefit plan" (as defined in Section 3(3) of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "benefit plan investors") and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of this Note will not constitute or result in a non-exempt violation under any such substantially similar law. Any purported transfer of this Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][4]

---

[2] Include for Class E Notes and Class F Notes.
[3] Applicable only to the Co-Issued Notes.
[4] Applicable only to the Class E Notes and Class F Notes.

Any transfer, pledge or other use of this Note for value or otherwise by or to any person is wrongful since the registered owner hereof, Cede & Co., has an interest herein, unless the Note is presented by an authorized representative of the Depository Trust Company ("DTC"), New York, New York, to the Co-Issuers or their agent for registration of transfer, exchange or payment and any Note issued is registered in the name of Cede & Co., or of such other entity as is requested by an authorized representative of DTC (and any payment hereon is made to Cede & Co.).

Transfers of this Note shall be limited to transfers in whole, but not in part, to nominees of DTC or to a successor thereof or such successor's nominee and transfers of portions of this Note shall be limited to transfers made in accordance with the restrictions set forth in the Indenture referred to herein.

Principal of this Note is payable as set forth herein. Accordingly, the outstanding principal of this Note at any time may be less than the amount shown on the face hereof. Any person acquiring this Note may ascertain its current principal amount by inquiry of the Trustee.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986 (the "Code") or an appropriate Internal Revenue Service form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or back-up withholding tax upon payments to the holder in respect of this Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the IRS may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as debt for U.S. federal income tax purposes.

[The Class [●] Notes represented by this certificate are being issued with original issue discount ("OID"), the issue price, total amount of OID, Issue Date and yield to maturity may be obtained by contacting the Trustee at 190 South LaSalle, Chicago, Illinois 60603.][5]

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

---

[5] Legend to be included for any Secured Notes treated as issued with OID.

ACIS CLO 2013-1 LTD.
ACIS CLO 2013-1 LLC

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E] [SENIOR] [MEZZANINE] [JUNIOR] SECURED
[DEFERRABLE]
<u>FLOATING RATE NOTES DUE 2024</u>

Up to U.S.$[__]

[R][S]-1
CUSIP No. [__]
[ISIN [__]]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "<u>Issuer</u>")[, and ACIS CLO 2013-1 LLC, a Delaware limited liability company (the "<u>Co-Issuer</u>" and, together with the Issuer, the "<u>Co-Issuers</u>")], for value received, hereby promise[s] to pay to CEDE & CO. or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on <u>Schedule A</u> on the Payment Date in April 2024 (the "<u>Stated Maturity</u>") except as provided below and in the Indenture. The obligations of the [Co-Issuers][Issuer] under this Note and the Indenture are limited recourse obligations of the [Co-Issuers][Issuer] payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.

The [Co-Issuers promise] [Issuer promises] to pay interest, if any, on the 18th day of January, April, July and October in each year; commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day), at the rate equal to LIBOR plus [●]% per annum on the unpaid principal amount hereof until the principal hereof is paid or duly provided for. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

Interest will cease to accrue on each Class [X][A-1][A-2A][A-2B][B][C][D][E][F]Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments. The principal of this Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of each Class [[X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

[Any interest on the Class [C][D][E][F] Notes that is not paid when due by operation of the Priority of Payments will be deferred.  Any interest so deferred will be added to the principal balance of the Class [C][D][E][F] Notes, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class [C][D][E][F] Notes, as so increased.][6]

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Senior][Mezzanine][Junior] Secured [Deferrable] Floating Rate Notes due 2024 (the "Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture).  Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

Transfers of this [Rule 144A Global Note][Regulation S Global Secured Note] shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of DTC or to a successor of DTC or such successor's nominee.

Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] will be transferable in accordance with DTC's rules and procedures in use at such time, as set forth in the Indenture.

In the event Coverage Tests (other than the Interest Reinvestment Test) are not satisfied on any Determination Date occurring subsequent to the Ramp-up Period or the Interest Reinvestment Test is not satisfied on any Determination Date during the Reinvestment Period, or an Optional Redemption, a Refinancing, a Special Redemption or a Clean-Up Call Redemption occurs as set forth in the Indenture, this Note may be redeemed in whole or in part (as applicable) in the manner and with the effect provided in the Indenture.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

---

[6] Applicable only to Class C Notes, Class D Notes, Class E Notes and Class F Notes.

If an Event of Default shall occur and be continuing, the Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S Global Note][Rule 144A Global Note] subject to the restrictions as set forth in the Indenture. This [Rule 144A Global Note][Regulation S Global Secured Note] is subject to mandatory exchange for Certificated Secured Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A Global Note] [Regulation S Global Secured Note], this [Rule 144A Global Note][Regulation S Global Secured Note] shall be endorsed on <u>Schedule A</u> hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

[The Class [X][A-2A][A-2B][D][E] Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof.] [The Class [A-1][B][C][F] Notes will be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof.]

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the [Co-Issuers have][Issuer has] caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.


By:_____
   Name:
   Title:


ACIS CLO 2013-1 LLC


By:_____
   Name:  Donald J. Puglisi
   Title:  President

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee

By:_____
    Authorized Signatory

## SCHEDULE A

### SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this [Rule 144A Global Note][Regulation S Global Secured Note] have been made:

| Date exchange/redemption /increase made | Original principal amount of this Global Note | Part of principal amount of this Global Note exchanged/redeemed /increased | Remaining principal amount of this Global Note following such exchange/redemption /increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [___] | $[  ] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

<u>EXHIBIT A2</u>

<u>FORM OF REGULATION S GLOBAL SUBORDINATED NOTE</u>

REGULATION S GLOBAL SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2024

This Subordinated Note has not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a) (1) to a "<u>Qualified Purchaser</u>" (as defined for purposes of Section 3(c)(7) of the Investment Company Act), a Knowledgeable Employee (as defined in Rule 3c-5 under the Investment Company Act of 1940, as amended) with respect to the Issuer or an entity exclusively owned by Knowledgeable Employees and/or Qualified Purchasers that is (2) (x) a "<u>Qualified Institutional Buyer</u>" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule or (y) an accredited investor (as defined in rule 501(a) under the Securities Act) who, if not an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act), is a Knowledgeable Employee with respect to the Issuer or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Subordinated Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any-beneficial owner of an interest in this Subordinated Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Subordinated Notes, or may sell such interest on behalf of such owner.

Each purchaser of this Subordinated Note from the Issuer in the initial offering will be required to represent and warrant, with respect to each day it holds the Subordinated Note or any beneficial interest therein, in the form specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, (unless otherwise agreed to by the Issuer) (1) whether or not it is (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, any entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "<u>Benefit Plan Investors</u>") or (b) a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person (a "<u>Controlling Person</u>") and (2) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of a Subordinated Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is

subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of a Subordinated Note will not constitute or result in a non-exempt violation under any such substantially similar law.  Each purchaser from the Issuer in the initial offering of a Subordinated Note that fails to provide the certification described in the prior sentence will be deemed to have represented and warranted, with respect to each day it holds such Subordinated Note or any beneficial interest therein, that (1) such purchaser is not a Benefit Plan Investor or Controlling Person and (2) if the purchaser is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law.  No transfer or purchase of this Subordinated Note will be effective if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors.  Each purchaser or transferee of this Subordinated Note from persons other than from the Issuer in the initial offering will be deemed to have represented and warranted with respect to each day it holds such Regulation S Subordinated Global Note or any beneficial interest herein that (1) such purchaser or transferee is not a Benefit Plan Investor or Controlling Person and (2) if such purchaser or transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of Regulation S Global Subordinated Note will not constitute or result in a non-exempt violation under any such substantially similar law.  No Regulation S Global Subordinated Notes may be acquired from persons other than the Issuer or other than in the initial offering by Benefit Plan Investors or Controlling Persons.  Each purchaser and transferee further understands and agrees that any purported transfer of the Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements as specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect, shall be null and void ab initio and the Issuer will have the right to direct the purchaser to transfer the Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

Any transfer, pledge or other use of this Note for value or otherwise by or to any person is wrongful since the registered owner hereof.  Cede & Co., has an interest herein, unless the Note is presented by an authorized representative of the Depository Trust Company ("DTC").  New York, New York, to the Co-Issuers or their agent for registration of transfer, exchange or payment and any Note issued is registered in the name of Cede & Co. or of such other entity as is requested by an authorized representative of DTC (and any payment hereon is made to Cede & Co.)

Transfers of this Note shall be limited to transfers in whole, but not in part, to nominees of DTC or to a successor thereof or such successor's nominee and transfers of portions of this Note shall be limited to transfers made in accordance with the restrictions set forth in the Indenture referred to herein.

Distributions of Principal Proceeds and Interest Proceeds to the holder of the Subordinated Notes represented hereby are subordinate to the payment on each Payment Date of

principal of and interest on the Secured Notes of the Issuer and the payment of certain other amounts, to the extent and as described in the Indenture governing such Secured Notes.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or backup withholding tax upon payments to the holder in respect of this Subordinated Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the IRS may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, and the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as equity for U.S. federal income tax purposes.

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

## ACIS CLO 2013-1 LTD.

REGULATION S GLOBAL SUBORDINATED NOTE
representing
SUBORDINATED NOTES DUE 2024

S-1
CUSIP No. [__]                                                              Up to US.$[__]
ISIN:  [__]
Common Code:  [__]

      ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum as indicated on Schedule A on the Payment Date in April 2024 (the "Stated Maturity") except as provided below and in the Indenture.

      The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.  The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture.

      The principal of each Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

      Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of other classes of Notes as set forth in the Indenture and failure to pay such amounts will not constitute an Event of Default under the Indenture.

      Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

      This Note is one of a duly authorized issue of Subordinated Notes due 2024 (the "Subordinated Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Issuer, Acis CLO 2013-1 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture).  Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes.  In addition, this Note is redeemable at the option of the Co-Issuers acting at the direction of the Portfolio Manager, in whole but not in part, on or after the Payment Date on which the Aggregate Principal Amount of the Collateral Obligations and Eligible Investments has been reduced to 15% or less of the Target Initial Par Amount.

Transfers of this Regulation S Global Subordinated Note shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of the DTC or to a successor of the DTC or such successor's nominee.

Interests in this Regulation S Global Subordinated Note will be transferable in accordance with the DTC's rules and procedures in use at such time, and to transferees acquiring Certificated Subordinated Notes or to a transferee taking an interest in a Regulation S Global Subordinated Note, subject to and in accordance with the restrictions set forth in the Indenture.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

Interests in this Regulation S Global Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding Certificated Subordinated Note, subject to the restrictions as set forth in the Indenture.  This Regulation S Global Subordinated Note is subject to mandatory exchange for Certificated Subordinated Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this Regulation S Global Subordinated Note, this Regulation S Global Subordinated Note shall be endorsed on Schedule A hereto to reflect the reduction of or increase in the principal amount evidenced hereby.

The Subordinated Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000).

Title to Notes shall pass by registration in the Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.

By:_____
   Name:
   Title:

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee


By:_____
   Authorized Signatory

## SCHEDULE A

## SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this Regulation S Global Subordinated Note have been made:

| Date exchange/redemption /increase made | Original principal amount of this Regulation S Global Subordinated Note | Part of principal amount of this Regulation S Global Subordinated Note exchanged/re deemed /increased | Remaining principal amount of this Regulation S Global Subordinated Note following such exchange/redemption /increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [__] | $[__] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT A3

FORM OF CERTIFICATED SUBORDINATED NOTE

CERTIFICATED SUBORDINATED NOTE

representing,

SUBORDINATED NOTES DUE 2024

This Subordinated Note has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a)(1) to a "Qualified Purchaser" (as defined for purposes of Section 3(c)(7) of the Investment Company Act), a Knowledgeable Employee with respect to the Issuer or an entity exclusively owned by Knowledgeable Employees and/or Qualified Purchasers that is (2) (x) a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule or (y) an accredited investor (as defined in rule 501(a) under the Securities Act) who, if not an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act), is a Knowledgeable Employee with respect to the Issuer or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Subordinated Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Subordinated Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Subordinated Notes, or may sell such interest on behalf of such owner.

Each purchaser of a Certificated Subordinated Note and each subsequent transferee will be required to represent and warrant, in the form specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, with respect to each day it holds such Certificated Subordinated Note or any beneficial interest herein, (1) whether or not it is (a) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "Benefit Plan Investors") or (b) a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person (a "Controlling Person") and (2) (a) if it is a Benefit Plan Investor, its acquisition, holding and disposition of a Certificated Subordinated Note will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (b) if it is a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of

Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of a Certificated Subordinated Note will not constitute or result in a non-exempt violation under any such substantially similar law.  No purchase or transfer of a Certificated Subordinated Note will be effective if it would cause 25% or more of the value of the Subordinated Notes to be held by Benefit Plan Investors.  Each purchaser and transferee further understands and agrees that any purported transfer of the Certificated Subordinated Notes, or any interest therein, to a purchaser or transferee that does not comply with the requirements as specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect, shall be null and void <u>ab initio</u>, and the Issuer will have the right to direct the purchaser to transfer the Certificated Subordinated Notes, or any interest therein, as applicable, to a person who meets the foregoing criteria.

Distributions of Principal Proceeds and Interest Proceeds to the holder of the Subordinated Notes represented hereby are subordinate to the payment on each Payment Date of principal of and interest on the Secured Notes of the Issuer and the payment of certain other amounts, to the extent and as described in the Indenture governing such Secured Notes.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or backup withholding tax upon payments to the holder in respect of this Subordinated Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the U.S. Internal Revenue Service may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Certificated Subordinated Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, and the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Certificated Subordinated Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as equity for U.S. federal income tax purposes.

Each holder and beneficial owner of this Certificated Subordinated Note that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code will make, or by acquiring such Certificated Subordinated Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (as defined in Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Certificated Subordinated Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

ACIS CLO 2013-1 LTD.

CERTIFICATED SUBORDINATED NOTE
representing

SUBORDINATED NOTES DUE 2024

C-[__]

CUSIP No. [__]                                                                    U.S.$[__]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promises to pay to [_____], or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$ [_____]) on the Payment Date in April 2024 (the "Stated Maturity") except as provided below and in the Indenture.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive. The Subordinated Notes represent unsecured, subordinated obligations of the Issuer and are not entitled to security under the Indenture.

The principal of each Subordinated Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Payments of Interest Proceeds and Principal Proceeds to the Holders of the Subordinated Notes are subordinated to payments in respect of other classes of Notes as set forth in the Indenture and failure to pay such amounts will not constitute an Event of Default under the Indenture.

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Subordinated Notes due 2024 (the "Subordinated Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Issuer, Acis CLO 2013-1 LLC and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

The Subordinated Notes may be redeemed, in whole but not in part, on any Business Day on or after the redemption or repayment of the Secured Notes, at the written direction of Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes. In addition, this Note is redeemable at the option of the Co-Issuers acting at the direction of the Portfolio Manager, in whole but not in part, on or after the Payment Date on which the aggregate principal balance of the Collateral Obligations and Eligible Investments has been reduced to 15% or less of the Target Initial Par Amount.

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary

Interests in this Certificated Subordinated Note may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding Regulation S Global Subordinated Note, subject to the restrictions as set forth in the Indenture.

The Subordinated Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000).

Title to Notes shall pass by registration in the Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed. Dated as of _____.

ACIS CLO 2013-1 LTD.

By:_____
   Name:
   Title:

<u>CERTIFICATE OF AUTHENTICATION</u>

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION, as
Trustee


By:_____
Authorized Signatory

## ASSIGNMENT FORM

For value received   _____

does hereby sell, assign, and transfer to

                _____

                _____

                Please insert social security or
                other identifying number of assignee

                Please print or type name
                and address, including zip code,
                of assignee:

_____

_____

_____

_____

the within Note and docs hereby irrevocably constitute and appoint
_____ Attorney to transfer the Note on the books of the Trustee with
full power of substitution in the premises.

Date:   _____      Your Signature*   _____

                                                  (Sign exactly as your name appears
                                                  in the security)

* NOTE:  The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular without alteration, enlargement or any change whatsoever.  *Such signature must be guaranteed by an "eligible guarantor institution" "meeting the requirements of the Note Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.*

EXHIBIT A4

## FORM OF CERTIFICATED SECURED NOTE

CERTIFICATED SECURED NOTE
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E][F] [SENIOR][MEZZANINE][JUNIOR]
SECURED
[DEFERRABLE] FLOATING RATE NOTES DUE 2024

[This Note has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (A) to a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (B) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Note that is a U.S. person and is not a Qualified Purchaser and a Qualified Institutional Buyer to sell its interest in the Notes, or may sell such interest on behalf of such owner.][7]

[This Note has not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (a) (x) to a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (y) an "institutional" accredited investor (as defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act) that is a "Qualified Purchaser" (as defined for purposes of Section 3(c)(7) of the Investment Company Act) or (b) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this

---

[7] Include for Class X, A, B, C and D Notes.

Note that is a U.S. person and does not comply with the foregoing restrictions to sell its interest in the Notes, or may sell such interest on behalf of such owner.][8]

[By its acquisition of the Notes (the "ERISA Debt Securities"), each purchaser and subsequent transferee will be deemed to have represented and warranted or required to represent and warrant, as applicable, at the time of its acquisition and throughout the period it holds such ERISA Debt Security, that either (x) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of the ERISA Debt Security will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law). Any purported transfer of an ERISA Debt Security, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][9]

[Each purchaser and each subsequent transferee of this Note will be deemed to have represented and warranted, at the time of its acquisition and throughout the period that it holds such Note or any interest herein, that (1) it is not an "employee benefit plan" (as defined in Section 3(3) of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity or a "benefit plan investor" as such term is otherwise defined in any regulations promulgated by the U.S. Department of Labor or under Section 3(42) of ERISA (collectively, "benefit plan investors") and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of this Note will not constitute or result in a non-exempt violation under any such substantially similar law. Any purported transfer of this Note, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.][10]

---

[8] Include for Class E Notes and Class F Notes.
[9] Applicable only to the Co-Issued Notes.
[10] Applicable only to the Class E Notes and Class F Notes.

Principal of this Note is payable as set forth herein. Accordingly, the outstanding principal of this Note at any time may be less than the amount shown on the face hereof. Any person acquiring this Note may ascertain its current principal amount by inquiry of the Trustee.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986 (the "Code") or an appropriate Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or back-up withholding tax upon payments to the holder in respect of this Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the U.S. Internal Revenue Service may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as debt for U.S. federal income tax purposes.

[The Class [•] Notes represented by this certificate are being issued with original issue discount ("OID"), the issue price, total amount of OID, Issue Date and yield to maturity may be obtained by contacting the Trustee at 190 South LaSalle, Chicago, Illinois 60603.][11]

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the

---

[11] Legend to be included for any Secured Notes treated as issued with OID.

ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

ACIS CLO 2013-1 LTD.
ACIS CLO 2013-1 LLC

CERTIFICATED SECURED NOTE
representing
CLASS [X][A-1][A-2A][A-2B][B][C][D][E][F] [SENIOR][MEZZANINE][JUNIOR]
SECURED
[DEFERRABLE] FLOATING RATE NOTES DUE 2024

U.S.$[__]

C-[__]
CUSIP No. [__]
ISIN[__]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "Issuer")[, and ACIS CLO 2013-1 LLC, a Delaware limited liability company (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers")], for value received, hereby promises] to pay to [_____] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [_____] United States Dollars (U.S.$[____]) in, April 2024 (the "Stated Maturity") except as provided below and in the Indenture.  The obligations of the Co-Issuers][Issuer] under this Note and the Indenture are limited recourse obligations of the [Co-Issuers] [Issuer] payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.

The [Co-Issuers promise] [Issuer promises] to pay interest, if any, on the 18th day of January, April, July and October in each year; commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day), at the rate equal to LIBOR plus [●]% per annum on the unpaid principal amount hereof until the principal hereof is paid or duly provided for.  Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360.  The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

Interest will cease to accrue on each Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments.  The principal of this Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.  The principal of each Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Note shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

[Any interest on the Class [C][D][E][F] Notes that is not paid when due by operation of the Priority of Payments will be deferred. Any interest so deferred will be added to the principal balance of the Class [C][D][E][F] Notes, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class [C][D][E][F] Notes, as so increased.][12]

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Senior][Mezzanine] [Junior] Secured [Deferrable] Floating Rate Notes due 2024 (the "Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

In the event Coverage Tests (other than the Interest Reinvestment Test) are not satisfied on any Determination Date occurring subsequent to the Ramp-up Period or the Interest Reinvestment Test is not satisfied on any Determination Date during the Reinvestment Period, or an Optional Redemption, a Refinancing, a Special Redemption or a Clean-Up Call Redemption occurs as set forth in the Indenture, this Note may be redeemed in whole or in part (as applicable) in the manner and with the effect provided in the Indenture.

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Class [X][A-1][A-2A][A-2B][B][C][D][E][F] Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

[The Class [X][A-2A][A-2B][D][E] Notes will be issued in minimum denominations of $200,000 and integral multiples of $1,000 in excess thereof.] [The Class [A-

---

[12] Applicable only to Class C Notes, Class D Notes, Class E Notes and Class F Notes.

1][B][C][F] Notes will be issued in minimum denominations of $150,000 and integral multiples of $1 in excess thereof.]

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the [Co-Issuers have] [Issuer has] caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.

By:_____
    Name:
    Title:

ACIS CLO 2013-1 LLC

By:_____
    Name:  Donald J. Puglisi
    Title:  President

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee


By:_____
   Authorized Signatory

## ASSIGNMENT FORM

For value received _____

does hereby sell, assign, and transfer to

_____

_____

Please insert social security or
other identifying number of assignee

Please print or type name
and address, including zip code,
of assignee:

_____

_____

_____

_____

the within Note and docs hereby irrevocably constitute and appoint
_____ Attorney to transfer the Note on the books of the Trustee with
full power of substitution in the premises.

Date: _____        Your Signature* _____

(Sign exactly as your name appears
in the security)

*/      NOTE; The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular without alteration, enlargement or any change whatsoever. *Such signature must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may he determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.*

FORM OF COMBINATION NOTE

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
[CERTIFICATED]
representing
COMBINATION NOTES

This Note has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state of the United States, and may be reoffered, resold, pledged or otherwise transferred only (A) to a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from Securities Act registration provided by such rule that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A that holds the assets of such plan, if investment decisions with respect to the plan are made by the beneficiaries of the plan or (B) to a person that is not a "U.S. person" (as defined in Regulation S under the Securities Act) and is acquiring this Note in reliance on the exemption from Securities Act registration provided by such regulation, and in each case in compliance with the certification and other requirements specified in the Indenture referred to herein and in compliance with any applicable securities law of any applicable jurisdiction. The Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in this Note that is a U.S. person and is not a Qualified Purchaser and a Qualified Institutional Buyer to sell its interest in the Notes, or may sell such interest on behalf of such owner.

By its acquisition of Co-Issued Notes (the "ERISA Debt Securities"), each purchaser and subsequent transferee will be deemed to have represented and warranted or required to represent and warrant, as applicable, at the time of its acquisition and throughout the period it holds such ERISA Debt Security, that either (x) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (y) its acquisition, holding and disposition of the ERISA Debt Security will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law). Any purported transfer of an ERISA Debt Security, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, this Note, the Offering Circular and any

applicable transfer certification, as applicable, will be of no force and effect and shall be null and void ab initio.

[Any transfer, pledge or other use of this Note for value or otherwise by or to any person is wrongful since the registered owner hereof, Cede & Co., has an interest herein, unless the Note is presented by an authorized representative of the Depository Trust Company ("DTC"), New York, New York, to the Co-Issuers or their agent for registration of transfer, exchange or payment and any Note issued is registered in the name of Cede & Co., or of such other entity as is requested by an authorized representative of DTC (and any payment hereon is made to Cede & Co.).

Transfers of this Note shall be limited to transfers in whole, but not in part, to nominees of DTC or to a successor thereof or such successor's nominee and transfers of portions of this Note shall be limited to transfers made in accordance with the restrictions set forth in the Indenture referred to herein.][13]

Principal of this Note is payable as set forth herein. Accordingly, the outstanding principal of this Note at any time may be less than the amount shown on the face hereof. Any person acquiring this Note may ascertain its current principal amount by inquiry of the Trustee.

The failure to provide the Issuer, the Trustee and any Paying Agent with the applicable U.S. federal income tax certifications (generally, an Internal Revenue Service form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986 (the "Code") or an appropriate Internal Revenue Service form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code or the Holder FATCA Information) may result in the imposition of U.S. federal withholding tax or back-up withholding tax upon payments to the holder in respect of this Note.

The failure to provide the Issuer, the Trustee and any Paying Agent with any information reasonably requested by the Issuer or the Paying Agent to enable the Issuer or Paying Agent to comply with any reporting agreements with the IRS may result in the imposition of U.S. federal withholding upon payments to the holder in respect of this Note (and may cause the forced sale or transfer of such Note).

Each holder and beneficial owner of this Note (including a holder or beneficial owner of this Note that receives a definitive physical Note pursuant to the succeeding sentence) agrees to (i) provide the Issuer (or an authorized agent acting on behalf of the Issuer) with the Holder FATCA Information and (ii) permit the Issuer, the Portfolio Manager and Trustee (on behalf of the Issuer) to (w) share such information with the IRS or the relevant Cayman Islands tax authority, (x) compel or effect the sale of this Note if such holder or beneficial owner fails to sell its Notes within 30 days of notice from the Issuer, the Portfolio Manager or the Trustee of its failure to comply with the foregoing requirements, (y) assign to such Note a separate CUSIP number or numbers and (z) make other amendments to the Indenture to enable the Issuer to comply with FATCA. A clearing organization that holds this Note on behalf of a beneficial

---

[13] Global Notes only.

owner may convert this Note from a Global Note to a definitive physical Note, upon request from such beneficial owner or the holder of this Note, if it is unable to obtain the Holder FATCA Information from such beneficial owner or the holder of this Note.

Each Holder and beneficial owner of this Note, by acceptance of such Note, or its interest in such Note, as the case may be, shall be deemed to have agreed to treat, and shall treat, such Note as debt for U.S. federal income tax purposes.

[The Class [A-1][B][C] Notes that relate to the Class [A-1][B][C] Note Component represented by this certificate are being issued with original issue discount ("OID"), the issue price, total amount of OID, Issue Date and yield to maturity may be obtained by contacting the Trustee at 190 South LaSalle, Chicago, Illinois 60603.][14]

Each holder and beneficial owner of this Note that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will make, or by acquiring such Note or an interest therein will be deemed to make, a representation to the effect that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(a) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

Each holder and beneficial owner of this Note will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. Each holder and beneficial owner of this Note understands that the foregoing restrictions are a material inducement for each other holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

Each purchaser, beneficial owner and subsequent transferee of this Combination Note or interest therein, by acceptance of this Combination Note or an interest in this Combination Note, will be deemed to have agreed that before any interest in a Combination Note may be exchanged for its ratable share of the Class A-1 Notes, the Class B Notes or the Class C

---

[14] Legend to be included for any Combination Notes comprised of Class A-1 Note Components, Class B Note Components or Class C Note Components consisting of Class A-1 Notes, Class B Notes or Class C Notes treated as issued with OID.

Notes that comprise its Components, the Holder will be required to provide the Trustee with an Exchange Notice in the form attached to the Indenture.

ACIS CLO 2013-1 LTD.
ACIS CLO 2013-1 LLC

[RULE 144A GLOBAL NOTE][REGULATION S GLOBAL SECURED NOTE]
representing
<u>COMBINATION NOTES</u>

Up to U.S.$[__]

[R][S]-1
CUSIP No. [__]
[ISIN [__]]

ACIS CLO 2013-1 LTD., a company incorporated under the laws of the Cayman Islands (the "<u>Issuer</u>"), and ACIS CLO 2013-1 LLC, a Delaware limited liability company (the "<u>Co-Issuer</u>" and, together with the Issuer, the "<u>Co-Issuers</u>"), for value received, hereby promise to pay to [CEDE & CO.][15] [HOLDER][16] or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of [up to][17] $[●] United States Dollars (U.S. $[●]]) comprised of (i) a Class A-1 Note Component consisting of an interest in U.S.$ [●] principal amount of Class A-1 Notes of the Co-Issuers (the "<u>Class A-1 Note Component</u>"), (ii) a Class B Note Component consisting of an interest in U.S.$ [●] principal amount of Class B Notes of the Co-Issuers (the "<u>Class B Note Component</u>") and (iii) a Class C Note Component consisting of an interest in U.S.$ [●] principal amount of Class C Notes of the Co-Issuers (the "<u>Class C Note Component</u>" and, together with the Class A-1 Note Component and the Class B Note Component, the "<u>Components</u>")[, or such other principal sum as is equal to the aggregate principal amount of the Combination Notes identified from time to time on the records of the Trustee and as indicated on <u>Schedule A</u>][18]. The obligations of the Co-Issuers under this Note and the Indenture are limited recourse obligations of the Co-Issuers payable solely from the Assets in accordance with the Indenture, and following realization of the Assets in accordance with the Indenture, all claims of Noteholders shall be extinguished and shall not thereafter revive.

The Combination Notes will not themselves bear interest at a stated rate.  On the 18th day of January, April, July and October in each year; commencing on July 18, 2013 (or if such day is not a Business Day, the next succeeding Business Day) the Co-Issuers promise to allocate a portion of all interest payments on the Aggregate Outstanding Amount of the Class A-1 Notes, the Class B Notes and the Class C Notes, respectively, to the Holders of the Combination Notes, in the proportion that the Aggregate Outstanding Amount of the Class A-1 Note Component bears to the Aggregate Outstanding Amount of the Class A-1 Notes as a whole (including the Class A-1 Note Component), that the Aggregate Outstanding Amount of the Class B Note Component bears to the Aggregate Outstanding Amount of the Class B Notes as a whole (including the Class B Note Component) and that the Aggregate Outstanding Amount of the Class C Note Component bears to the Aggregate Outstanding Amount of the Class C Notes as a

---

[15] Global Notes only.
[16] Certificated Notes only.
[17] Global Notes only.
[18] Global Notes only.

whole (including the Class C Note Component) at the rate equal to, with respect to the Class A-1 Notes, LIBOR plus 0.87% per annum, with respect to the Class B Notes, LIBOR plus 1.95% per annum and, with respect to the Class C Notes, LIBOR plus 2.95% per annum. Interest shall be computed on the basis of the actual number of days elapsed in the applicable Interest Accrual Period divided by 360. The interest so payable on any Payment Date will, as provided in the Indenture, be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest, which shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

Interest will cease to accrue on the Class A-1 Note Component, the Class B Note Component and the Class C Note Component, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a default is otherwise made with respect to such payments. The principal of the Class A-1 Notes that relate to the Class A-1 Note Component, Class B Notes that relate to the Class B Note Component and Class C Notes that relate to the Class C Component shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments. The principal of the Class A-1 Note Component, the Class B Note Component and the Class C Note Component shall be payable no later than the Stated Maturity unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise.

Any interest on the Class C Notes that relate to the Class C Note Component that is not paid when due by operation of the Priority of Payments will be deferred. Any interest so deferred will be added to the principal balance of the Class C Notes that relate to the Class C Note Component, and thereafter, interest will accrue on the aggregate outstanding principal amount of the Class C Notes that relate to the Class C Note Component, as so increased.

The payment priority of each Component of the Combination Notes shall be in accordance with the priority of the respective Underlying Class in accordance with the Priority of Payments. On each date on which payments are made on any Underlying Class, a portion of such payments will be allocated to the Combination Notes in the proportion that the Aggregate Outstanding Amount of the related Component bears to the Aggregate Outstanding Amount of that Underlying Class as a whole (including the related Components). The Combination Notes will be entitled to no other payments. In particular, interest will not accrue or be payable on the Aggregate Outstanding Amount of the Combination Notes, except to the extent, if any, of interest on the related Component.

The Holders of the Combination Notes will be treated as Holders of the Underlying Classes for purposes of any voting rights of such Underlying Classes, except in connection with any supplemental indenture that affects the Combination Notes in a materially adverse manner that is different from the effect of such supplemental indenture on Notes of any Underlying Class, in which case the Combination Notes will vote only as a separate Class.

The Combination Notes will be redeemed (i) on any Payment Date in connection with a Mandatory Redemption or Special Redemption to the extent that each Underlying Class is redeemed, (ii) on any Redemption Date in connection with an Optional Redemption or Refinancing to the extent that each Underlying Class is redeemed by allocation of the

Redemption Price of each Underlying Class, (iii) on any Clean-up Redemption Date in connection with a Clean-up Call Redemption to the extent that each Underlying Class is redeemed by allocation of the Clean-up Call Redemption Price of each Underlying Class and (iv) to the extent the Underlying Classes are redeemed in accordance with the Priority of Payments or the Note Payment Sequence.

At the written request of the Holder of a Combination Note (i) all or any portion of the Combination Notes may be exchanged for the Underlying Classes represented by such Combination Notes and (ii) all or any portion of the Class A-1 Notes, Class B Notes and Class C Notes representing Underlying Classes may be combined into Combination Notes, in each such case, proportionally in accordance with the Permissible Ratio and in accordance with Section 13.4 of the Indenture.

This Combination Notes may be sold to a transferee in accordance with the Indenture, proportionally in accordance with the Permissible Ratio.

Unless the Certificate of Authentication hereon has been executed by the Trustee or the Authenticating Agent by the manual signature of one of their authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Combination Notes (the "Combination Notes" and, together with the other classes of Notes issued under the Indenture, the "Notes") issued and to be issued under an Indenture dated as of March 18, 2013 (the "Indenture") among the Co-Issuers and U.S. Bank National Association, as trustee (the "Trustee", which term includes any successor trustee as permitted under the Indenture). Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.

[Transfers of this [Rule 144A Global Note][Regulation S Global Secured Note] shall be limited to transfers of such Global Note in whole, but not in part, to a nominee of DTC or to a successor of DTC or such successor's nominee.

Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] will be transferable in accordance with DTC's rules and procedures in use at such time, as set forth in the Indenture.][19]

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of

---

[19] Global Notes only.

principal of and interest on such Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.

If an Event of Default shall occur and be continuing, the Combination Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

[Interests in this [Rule 144A Global Note][Regulation S Global Secured Note] may be exchanged for an interest in, or transferred to a transferee taking an interest in, the corresponding [Regulation S Global Note][Rule 144A Global Note] subject to the restrictions as set forth in the Indenture. This [Rule 144A Global Note][Regulation S Global Secured Note] is subject to mandatory exchange for Certificated Secured Notes under the limited circumstances set forth in the Indenture.

Upon redemption, exchange of or increase in any interest represented by this [Rule 144A Global Note] [Regulation S Global Secured Note], this [Rule 144A Global Note][Regulation S Global Secured Note] shall be endorsed on <u>Schedule A</u> hereto to reflect the reduction of or increase in the principal amount evidenced hereby.][20]

The Combination Notes will be issued in minimum denominations of $150,000 and integral multiples of $1,000 in excess thereof.

Title to Notes shall pass by registration in the Note Register kept by the Trustee, acting through its Corporate Office.

No service charge shall be made for registration of transfer or exchange of this Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

AS PROVIDED IN THE INDENTURE, THE INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.

---

[20] Global Notes only.

IN WITNESS WHEREOF, the Co-Issuers have caused this Note to be duly executed.

Dated as of _____.

ACIS CLO 2013-1 LTD.


By:_____
    Name:
    Title:



ACIS CLO 2013-1 LLC


By:_____
    Name:  Donald J. Puglisi
    Title:  President

<u>CERTIFICATE OF AUTHENTICATION</u>

This is one of the Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
   as Trustee


By:_____
   Authorized Signatory

[SCHEDULE A

SCHEDULE OF EXCHANGES OR REDEMPTIONS

The following exchanges, redemptions of or increase in the whole or a part of the Notes represented by this [Rule 144A Global Note][Regulation S Global Secured Note] have been made:

| Date exchange/redemption /increase made | Original principal amount of this Global Note | Part of principal amount of this Global Note exchanged/redeemed /increased | Remaining principal amount of this Global Note following such exchange/redemption /increase | Notation made by or on behalf of the Issuer |
|---|---|---|---|---|
| [___] | $[ ] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

][21]

---

[21] Global Notes only.

FORMS OF TRANSFER AND EXCHANGE CERTIFICATES

## FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF RULE 144A GLOBAL NOTE TO REGULATION S GLOBAL SECURED NOTE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

> Re:   ACIS CLO 2013-1 LTD. and ACIS CLO 2013-1 LLC
>        Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Combination] Notes [due 2024] (the "Notes")

Reference is hereby made to the Indenture dated as of March 18, 2013 (the "Indenture") among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC as Co-Issuer (and together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Notes which are held in the form of a Rule 144A Global Note with the Depository in the name of [___] (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Regulation S Global Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "Transferee") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Notes and that:

(a)    the offer of the Notes was not made to a person in the United States:

(b)    at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

(c)    no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

(d)    the transaction is not part of a plan or scheme to evade the registration requirements of the United States Securities Act of 1933, as amended (the "Securities Act"):

(e)    the Transferee is not a U.S. person:

(f)    solely with respect to the Class X Notes, the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes, either that (1) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975

of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (2) its acquisition, holding and disposition of the Notes will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law; and

(g)    solely with respect to the Class E Notes and Class F Notes, (1) the Transferee is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Class E Note or Class F Note will not constitute or result in a non-exempt violation under any such substantially similar law.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)

By:_____
    Name:
    Title:

Dated: _____, _____

cc:  Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC

EXHIBIT B2

### FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER OF REGULATION S GLOBAL SECURED NOTE TO RULE 144A GLOBAL NOTE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107
Attn: Corporate Trust Services – ACIS CLO 2013-1

> Re: ACIS CLO 2013-1 LTD. and ACIS CLO 2013-1 LLC
> Class [X][A-1][A-2A][A-2B][B][C][D][E][F] [Combination] Notes [due 2024] (the "Notes")

Reference is hereby made to the Indenture dated as of March 18, 2013 (the "Indenture") among Acis CLO 2013-1 Ltd. as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer (and together with the Issuer, the "Co-Issuers") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S. $[_____] aggregate principal amount of Notes which are held in the form of a Regulation S Global Note in the name of [__] (the "Transferor") to effect the transfer of the Notes in exchange for an equivalent beneficial interest in a Rule 144A Global Note.

In connection with such transfer, and in respect of such Notes, the Transferor does hereby certify that such Notes are being transferred to [_____] (the "Transferee") in accordance with (i) the transfer restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Notes and (ii) Rule 144A under the United States Securities Act of 1933, as amended, and it reasonably believes that (a) the Transferee is purchasing the Notes for its own account or an account with respect to which the Transferee exercises sole investment discretion, (b) the Transferee and any such account is a QIB/QP or, solely with respect to the Class E Notes and Class F Notes, a (1) Qualified Purchaser and (2) either (x) a Qualified Institutional Buyer or (y) an Institutional Accredited Investor, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, (c) solely with respect to the Class X Notes, the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Combination Notes, either that (1) the Transferee is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (2) its acquisition, holding and disposition of the Notes will not constitute or result in a non-exempt prohibited

transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation of any substantially similar law and (d) solely with respect to the Class E Notes and Class F Notes, (1) the Transferee is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Class E Notes or Class F Notes will not constitute or result in a non-exempt violation under any such substantially similar law.

The Transferor understands that the Co-Issuers, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)

By:_____
  Name:
  Title:


Dated: _____,_____

cc:  Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC

<u>EXHIBIT B3</u>

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF CERTIFICATED
<u>SECURED NOTE</u>

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

> Re:    Acis CLO 2013-1 Ltd.
>          Class <u>[X][A-1][A-2A][A-2B][B][C][D][E][F]</u> [Combination] Notes

Reference is hereby made to the Indenture, dated as of March 18, 2013, among Acis CLO 2013-1 Ltd., as issuer, Acis CLO 2013-1 LLC, as Co-Issuer, and U.S. Bank National Association, as Trustee (the "<u>Indenture</u>") Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

This letter relates to U.S.$[_____] aggregate principal amount of Notes, which are held in the form of one or more Certificated Secured Notes in the name of _____ (the "<u>Transferor</u>") to effect the transfer of the Certificated Secured Notes to _____ (the "<u>Transferee</u>"),

In connection with such request, and in respect of such Notes, the Transferee does hereby certify that the Certificated Secured Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

> (a)     (PLEASE CHECK ONLY ONE)

_____    a "<u>qualified institutional buyer</u>" as defined in Rule 144A under the Securities Act of 1933, as amended (the "<u>Securities Act</u>");

_____    [an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3), (7) or (8) under the Securities Act; or][22]

_____    a person that is not a "<u>U.S. person</u>" as defined in Regulation S under the Securities Act, and are acquiring the Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

---

[22] Class E Note and Class F Note only.

(d)      acquiring the Certificated Secured Notes for our own account (and not for the account of any other Person) in a minimum denomination of $200,000 and in integral multiples of $1,000 in excess thereof (or (x) in the case of the Class A-1 Notes, the Class B Notes, the Class C Notes and the Class F Notes, $150,000 and in integral multiples of $1 in excess thereof or (y) in such other minimum denominations as the Issuer may agree on a case-by-case basis).

The Transferee further represents and warrants as follows:

1.      It understands that the Certificated Secured Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Certificated Secured Notes, such Certificated Secured Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Certificated Secured Notes, including the requirement for written certifications.  In particular, it understands that the Certificated Secured Notes may be transferred only to a person that is either (1) both (a) [either (x)] a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan [or (y) an "institutional" accredited investor (an entity defined in rule 501(a)(1), (2), (3) or (7) under the Securities Act)][23] and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Certificated Secured Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Certificated Secured Notes.

2.      In connection with its purchase of the Certificated Secured Notes:  (i) none of the Co-Issuers, the Placement Agents, the Trustee, the Collateral Administrator, the Portfolio Manager or any of their respective affiliates are acting as a fiduciary or financial or investment adviser for it; (ii) it is not relying (for purposes of making any investment decision or otherwise) on any written or oral advice, counsel or representations of the Co-Issuers, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates other than any statements in the final offering circular for such Notes; (iii) it has read and understands the final offering circular for such Notes (including, without limitation, the descriptions therein of the structure of the transaction in which the Notes are being issued and the risks to purchasers of the Notes); (iv) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary, and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuer, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of

---

[23] Include for Class E Note and Class F Note only.

their respective affiliates; (v) it will hold and transfer at least the minimum denomination of such Notes; (vi) it was not formed for the purpose of investing in the Notes; and (vii) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

3.      (i) It is either (1) both (a) a qualified institutional buyer (as defined under Rule 144A under the Securities Act) that is not a broker-dealer which owns and invests on a discretionary basis less than U.S.$25 million in securities of issuers that are not affiliated persons of the dealer and is not a plan referred to in paragraph (a)(1)(d) or (a)(1)(e) of Rule 144A under the Securities Act or a trust fund referred to in paragraph (a)(1)(f) of Rule 144A under the Securities Act that holds the assets of such a plan, if investment decisions with respect to the plan are made by beneficiaries of the plan and (b) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act or (2) not a "U.S. person" as defined in Regulation S and is acquiring the Certificated Secured Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Certificated Secured Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made:  (iv) it agrees that it shall not hold any Certificated Secured Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Certificated Secured Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Certificated Secured Notes; and (v) it will hold and transfer at least the minimum denomination of the Certificated Secured Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.      [It acknowledges and agrees that on each day from the date on which it acquires its interest in a Certificated Secured Note through and including the date on which it disposes of its interest in such Note, either that (A) it is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the fiduciary responsibility provisions of Title I of ERISA, a "plan" as defined in Section 4975(e)(l) of the Internal Revenue Code of 1986, as amended (the "Code"), that is subject to Section 4975 of the Code, any entity whose underlying assets are deemed to include "plan assets" by reason of such employee benefit plan's or plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code or (B) its purchase, acquisition and disposition of a Certificated Secured Note, as applicable, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, church, non-U.S. or other plan, a non-exempt violation under any substantially similar law).  It acknowledges that any purported transfer of a Certificated Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Certificated

Secured Note, the Offering Circular or any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void <u>ab initio</u>.][24]

[It acknowledges and agrees that on each day from the date on which it acquires its interest in such [Class E Notes] [Class F Notes] through and including the date on which it disposes of its interest in such [Class E Notes] [Class F Notes], that (1) it is not a Benefit Plan Investor and (2) if it is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such [Class E Notes] [Class F Notes] will not constitute or result in a non-exempt violation under any such substantially similar law.][25]

5. It will treat its Certificated Secured Note as debt of the Issuer for United States federal income tax purposes

6. It is [_____] (check if applicable) a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed Internal Revenue Service Form W-9 (or applicable successor form) is attached hereto; or [_____] (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed applicable Internal Revenue Service Form W-8 (or applicable successor form) is attached hereto. It understands and acknowledges that failure to provide the Issuer or the Trustee with the applicable United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an applicable Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in United States federal back-up withholding from payments to it in respect of the Notes.

7. It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the Holders of the Notes or, if longer, the applicable preference period then in effect.

8. To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "<u>USA Patriot Act</u>") and other similar laws or regulations, including, without limitation, requiring each transferee of a Note to make representations to the Issuer in connection with such compliance.

The Transferee agrees to provide promptly such information and execute and deliver such documents as may be necessary to comply with any and all laws and regulations

---

[24] Applicable only to Co-issued Notes.
[25] Applicable only to Class E Notes and Class F Notes.

(including the USA Patriot Act) to which the Issuer may be subject. The Transferee understands and agrees that, in order to ensure compliance under applicable anti-money laundering laws and regulations, the Issuer may require a detailed verification of the identity of the Transferee. The Issuer reserves the right to request such information as is necessary to verify the identity of a Transferee. In the event of delay or failure by the Transferee to produce any information required for verification purposes, the Issuer may refuse to issue the Notes to the Transferee until proper information has been provided.

The Transferee covenants and agrees that it shall provide the Issuer with such information as the Issuer determines to be necessary or appropriate to (a) verify compliance with the anti-money laundering regulations of any applicable jurisdiction or (b) respond to requests for information concerning the identity of the Transferee from any governmental authority, self-regulatory organization or financial institution in connection with the Issuer's anti-money laundering compliance procedures.

9. The rules and regulations administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac/. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists. The Transferee represents and warrants that, to the best of its knowledge, none of: (a) the Transferee; (b) any Person controlling or controlled by the Transferee; (c) if the Transferee is a privately held entity, any Person having a beneficial interest in the Transferee; (d) if the Transferee is not the beneficial owner of all of the Certificated Secured Notes, any Person having a beneficial interest in the Certificated Secured Notes; or (e) any Person for whom the Transferee is acting as agent or nominee in connection with this investment in the Certificated Secured Notes is a country, territory, individual or entity named on any OFAC list, or is a person or entity prohibited under the OFAC Programs.

10. It hereby agrees to provide the Issuer and Trustee (i) any information as is necessary (in the sole determination of the Issuer or the Trustee, as applicable) for the Issuer and the Trustee to determine whether it is a United States person as defined in Section 7701(a)(30) of the Code (a "United States person") or a United States owned foreign entity as described in Section 1471(d)(3) of the Code (a "United States owned foreign entity") and (ii) any additional information that the Issuer or its agent requests in connection with FATCA. If it is a United States person or a United States owned foreign entity that is a holder or beneficial owner of Notes or an interest therein, it also hereby agrees to be required to (x) provide the Issuer and Trustee its name, address, U.S. taxpayer identification number and any other information requested by the Issuer or its agent upon request and (y) update any such information provided in clause (x) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. It understands and acknowledges that the Issuer may provide such information and any other information concerning its investment in the Notes to the IRS. It understands and acknowledges that the Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in the Notes that fails to comply with the foregoing requirements to sell its interest in such Notes, or may sell such interest on behalf of such owner.

11.    Any funds to be used by it to purchase the Notes shall not directly or indirectly be derived from activities that may contravene applicable laws and regulations, including anti-money laundering laws and regulations

12.    It is not a member of the public in the Cayman Islands.

13.    It understands that the Issuer, the Trustee, the Placement Agents and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

14.    It has read the summary of the U.S. federal income tax considerations under the heading "*Certain Tax Considerations*" in the Offering Circular. It agrees to treat the characterization of the Notes as debt or equity for U.S. tax purposes in a manner consistent with the treatment of such Notes by the Issuer as described under the heading "*Certain Tax Considerations*" in the Offering Circular and will take no action inconsistent with such treatment.

15.    It has read the summary of the provisions related to no petitions for bankruptcy under the heading "*Description of the Offered Securities – No Petitions for Bankruptcy*" in the Offering Circular It will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. It understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

16.    It understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets.  It agrees to provide any such certification that is requested by the Issuer.

17.    If such purchaser is not a "United States person" (as defined in Section 7701(a)(30) of the Code) it makes a representation that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent

establishment in the United States, and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

        18.    The Transferee acknowledges that any purported transfer of a Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Notes, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*

Name of Purchaser:

Dated:


By:_____

    Name:

    Title:


Amount of Notes:  $_____

Taxpayer identification number:

| Address for notices: | Wire transfer information for payments: |
|---|---|
| | Bank: |
| | Address: |
| | Bank ABA#: |
| | Account #: |
| Telephone: | FAO: |
| Facsimile: | Attention: |
| Attention: | |


Denominations of certificates (if more than one):  Registered name:

cc:  Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC

<u>EXHIBIT B4</u>

### FORM OF SUBORDINATED NOTE ERISA CERTIFICATE

The purpose of this ERISA Certificate (this "<u>Certificate</u>") is, among other things, to (i) endeavor to ensure that less than 25% of the value of the Subordinated Notes issued by Acis CLO 2013-1 Ltd. (the "<u>Issuer</u>") is held by (a) an "employee benefit plan" (as defined in Section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("ERISA") that is subject to the fiduciary responsibility provisions of Title I of ERISA, (b) a "plan" as defined in Section 4975(e)(1) of the United States Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), that is subject to Section 4975 of the Code, (e) any entity whose underlying assets include "plan assets" by reason of any such employee benefit plan's or plan's investment in the entity or (d) a "benefit plan investor" as defined in U.S. Department of Labor regulations or under Section 3(42) of ERISA (collectively, "<u>Benefit Plan Investors</u>") so that the Issuer will not be subject to the U.S. federal pension laws contained in ERISA and Section 4975 of the Code, (ii) obtain from you certain representations and agreements and (iii) provide you with certain related information with respect to your acquisition, holding or disposition of the Subordinated Notes. By signing this Certificate, you agree to be bound by its terms.

Please be aware that the information contained in this Certificate is not intended to constitute advice and the examples given below are not intended to be, and are not, comprehensive. You should contact your own counsel if you have any questions in completing this Certificate. Capitalized terms not defined in this Certificate shall have the meanings ascribed to them in the final offering circular of the Issuer or the Indenture.

Please review the information in this Certificate and check the box(es) that are applicable to you.

If a box is not checked, you are agreeing that the applicable Section does not, and will not, apply to you.

1.      <u>Employee Benefit Plans Subject to ERISA or the Code</u>. We, or the entity on whose behalf we are acting, are an "employee benefit plan" within the meaning Section 3(3) of ERISA that is subject to the fiduciary responsibility provisions of Title I of ERISA or a "plan" within the meaning of Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code.

<u>Examples</u>:   (i) tax qualified retirement plans such as pension, profit sharing and section 401 (k) plans, (ii) welfare benefit plans such as accident, life and medical plans, (iii) individual retirement accounts or "IRAs" and "Keogh" plans and (iv) certain tax-qualified educational and savings trusts.

2.      <u>Entity Holding Plan Assets by Reason of Plan Asset Regulations</u>. We, or the entity on whose behalf we are acting, are an entity or fund whose underlying assets include "plan assets" by reason of the investment in such entity by an employee benefit plan or plan described in <u>Section 1</u> above.

Examples:  (i) a hedge fund or other private investment vehicle where 25% or more of the value of any class of its equity is held by Benefit Plan Investors. (ii) an insurance company separate account and (iii) a bank collective trust fund.

ERISA and the regulations promulgated thereunder are technical.  Accordingly, if you have any question regarding whether you may be an entity described in this Section 2, you should consult with your counsel.

If you check Box 2, please also complete Box A.

A.    The maximum percentage of the entity's or fund's assets that we anticipate will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations is:  ____%.

IF YOU CHECKED BOX 2 BUT DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

3.    Insurance Company General Account.  We, or the entity on whose behalf we are acting, are an insurance company purchasing the Subordinated Notes with funds from our or their general account (i.e., the insurance company's corporate investment portfolio), the assets of which, in whole or in part, constitute "plan assets" for purposes of the U.S. Department of Labor's regulations set forth at 29 C.F.R. Section 2510.3-101, as effectively modified by Section 3(42) of ERISA (the "Plan Asset Regulations").

If you check Box 3, please also check either Box A or Box B.

A.    We are not able to determine an exact percentage of the general account that constitutes "plan assets" but the maximum percentage of the general account that constitutes (or will constitute) "plan assets" for purposes of, the Plan Asset Regulations is less than 25%.

B.    The maximum percentage of the insurance company general account that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulations is:  ____%.  IF YOU CHECK THIS BOX B BUT DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

4.    None of Sections (1) Through (3) Above Apply.  We, or the entity on whose behalf we are acting, are a person that does not fall into any of the categories described in Sections (1) through (3) above.

5.    No Prohibited Transaction.  If we checked any of the boxes in Sections (1) through (3) above, we represent, warrant and agree that our acquisition, holding and disposition of the Subordinated Notes do not and will not constitute or give rise to a non-exempt prohibited

transaction under Section 406 of ERISA or Section 4975 of the Code.

6.      No Violation of Similar Law.  If we are a governmental, church, non-U.S. or other plan subject to any federal, state, local or non-U.S. law substantially similar to Title I of ERISA or Section 4975 of the Code, we represent, warrant and agree that our acquisition, holding and disposition of the Subordinated Notes do not and will not constitute or give rise to a non-exempt violation of any such similar federal, state, local or non-U.S. law.

7.      Controlling Person.  We are, or we are acting on behalf of any of: (i) the Trustee, (ii) the Portfolio Manager, (iii) any person that has discretionary authority or control with respect to the assets of the Issuer, (iv) any person who provides financial or investment advice for a fee (direct or indirect) with respect to such assets or (v) any "affiliate" of any of the above persons.  "Affiliate" shall have the meaning set forth in the Plan Asset Regulations.  Any of the persons described in the first sentence of this Section (7) is referred to in this Certificate as a "Controlling Person."

Note:  We understand that, for purposes of determining whether Benefit Plan Investors hold less than 25% of the value of the Subordinated Notes, the value of any Subordinated Notes held by Controlling Persons (other than Benefit Plan Investors) are required to be disregarded.

8.      Compelled Disposition.  We acknowledge and agree that:

(i)      if any representation that we made hereunder is subsequently shown to be false or misleading or our beneficial ownership otherwise causes Benefit Plan Investors to own 25% or more of the value of any class of equity in the Issuer, the Issuer shall, promptly after such discovery (or upon notice from the Trustee if a responsible officer of the Trustee makes the discovery (who, in each case, agrees to notify the Issuer of such discovery, if any)), send notice to us demanding that we transfer our interest to a person that is not a Non-Permitted ERISA Holder within 14 days of the date of such notice;

(ii)      if we fail to transfer our Subordinated Notes, the Issuer shall have the right, without further notice to us, to sell our Subordinated Notes or our interest in the Subordinated Notes, to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose;

(iii)      the Issuer may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Subordinated Notes and selling such securities to the highest such bidder. However, the Issuer may select a purchaser by any other means determined by it in its sole discretion;

(iv)      by our acceptance of an interest in the Subordinated Notes, we agree to cooperate with the Issuer to effect such transfers;

(v)     the proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to us; and

(vi)     the terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to us, as a result of any such sale or the exercise of such discretion.

9.     <u>Required Notification</u>.  We hereby agree that we (a) will inform the Trustee of any proposed transfer by us of all or a specified portion of the Subordinated Notes owned by us to a transferee who would be deemed to be a Benefit Plan Investor or a Controlling Person or of any proposed change in our status under ERISA which would result in all or a portion of the Subordinated Notes owned by us and not previously so characterized being deemed to be held by a Benefit Plan Investor or a Controlling Person and (b) will not permit any such transfer or change of status that would cause Benefit Plan Investors to own 25% or more of the value of any class of equity in the Issuer to be exceeded to become effective.  We hereby agree and acknowledge that after the Trustee effects any permitted transfer of Subordinated Notes owned by us to a Benefit Plan Investor or a Controlling Person or receives notice of any such permitted change of status, the Trustee shall include such Subordinated Notes in future calculations of this 25% limitation made pursuant hereto unless subsequently notified that such Subordinated Notes (or such portion), as applicable, would no longer be deemed to be held by Benefit Plan Investors or Controlling Persons.

10.     <u>Continuing Representation; Reliance</u>.  We acknowledge and agree that the representations contained in this Certificate shall be deemed made on each day from the date we make such representations through and including the date on which we dispose of our interests in the Subordinated Notes.  We understand and agree that the information supplied in this Certificate will be used and relied upon by the Issuer, the trustee to determine that Benefit Plan Investors own or hold less than 25% of the value of the Subordinated Notes upon any subsequent transfer of the Subordinated Notes in accordance with the indenture.

11.     <u>Further Acknowledgement</u>.  We acknowledge and agree that (i) all of the assurances contained in this Certificate are for the benefit of the Issuer, the Trustee, the Placement Agents and the Portfolio Manager as third-party beneficiaries hereof, (ii) copies of this Certificate and any information contained herein may be provided to the Issuer, the Trustee, the Placement Agents, the Portfolio Manager, affiliates of any of the foregoing parties and to each of the foregoing parties' respective counsel for purposes of making the determinations described above and (iii) any acquisition or transfer of the Subordinated Notes by us that is not in accordance with the provisions of this Certificate shall be null and void from the beginning, and of no legal effect.

12.     <u>Future Transfer Requirements</u>.

<u>Transferee Letter and its Delivery</u>.  We acknowledge and agree that we may not transfer any Subordinated Notes to any person unless the Trustee has received a certificate substantially in the form of this Certificate.  Any attempt to transfer in violation of this section will be null and void from the beginning, and of no legal effect.

Note:  Unless you are notified otherwise, the name and address of the Trustee is as follows:

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Certificate.

_____ [Insert Purchaser's Name]
By:
Name:
Title:

Dated:

This Certificate relates to $_____ of Subordinated Notes.

<u>EXHIBIT B5</u>

FORM OF TRANSFEROR CERTIFICATE FOR TRANSFER TO REGULATION S
<u>GLOBAL SUBORDINATED NOTE</u>

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107
Attn: Corporate Trust Services – ACIS CLO 2013-1

  Re: ACIS CLO 2013-1 LTD.
    Subordinated Notes

    Reference is hereby made to the Indenture dated as of March 18, 2013 (the "<u>Indenture</u>") among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

    This letter relates to U.S. $[_____] aggregate principal amount of Subordinated Notes which are held in the form of a Certificated Subordinated Note by [__] (the "<u>Transferor</u>") to effect the transfer of the Subordinated Notes in exchange for an equivalent beneficial interest in a Regulation S Global Subordinated Note.

    In connection with such transfer, and in respect of such Subordinated Notes, the Transferor does hereby certify that such Subordinated Notes are being transferred to _____ (the "<u>Transferee</u>") in accordance with the transfer restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Subordinated Notes and that:

    (a) the offer of the Subordinated Notes was not made to a person in the United States;

    (b) at the time the buy order was originated, the Transferee was outside the United States or the Transferor and any person acting on its behalf reasonably believed that the Transferee was outside the United States;

    (c) no directed selling efforts have been made in contravention of the requirements of Rule 903 or 904 of Regulation S, as applicable;

    (d) the transaction is not part of a plan or scheme to evade the registration requirements of the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>");

    (e) the Transferee is not a U.S. person;

    (f) the Transferee is not a Benefit Plan Investor or Controlling Person; and

(g)      if the Transferee is a governmental, church, non-U.S. or other plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the Code, its acquisition, holding and disposition of such Subordinated Notes will not constitute or result in a non-exempt violation under any such substantially similar law.

The Transferor understands that the Issuer, the Trustee and their counsel will rely upon the accuracy and truth of the foregoing representations, and the Transferor hereby consents to such reliance.

(NAME OF TRANSFEROR)

By:_____
    Name:
    Title:

Dated:  _____, _____

cc:  Acis CLO 2013-1 Ltd.

<u>EXHIBIT B6</u>

FORM OF TRANSFEREE CERTIFICATE FOR TRANSFER OF CERTIFICATED
<u>SUBORDINATED NOTE</u>

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN  55107
Attn:  Corporate Trust Services – ACIS CLO 2013-1

   Re: Acis CLO 2013-1 Ltd.
     Subordinated Notes

   Reference is hereby made to the Indenture, dated as of March 18, 2013, among the Issuer, Acis CLO 2013-1 LLC, as co-issuer of the Co-Issued Notes, and U.S. Bank National Association, as Trustee (the "<u>Indenture</u>").  Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

   This letter relates to _____ Aggregate Outstanding Amount of Subordinated Notes (the "<u>Subordinated Notes</u>"), which are held in the form of one or more certificated Subordinated Notes in the name of _____ (the "<u>Transferor</u>") to effect the transfer of the Certificated Subordinated Notes to _____ (the "<u>Transferee</u>").

   In connection with such request, and in respect of such Subordinated Notes, the Transferee does hereby certify that the Subordinated Notes are being transferred (i) in accordance with the transfer restrictions set forth in the Indenture and (ii) pursuant to an exemption from registration under the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>") and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

   In addition, the Transferee hereby represents, warrants and covenants for the benefit of the Issuer and its counsel that we are:

   (a)  (PLEASE CHECK ONLY ONE)

_____ a "<u>qualified institutional buyer</u>" as defined in Rule 144A under the Securities Act of 1933, as amended (the "<u>Securities Act</u>");

_____ an institutional "<u>accredited investor</u>" as defined in Rule 501 (a)(l), (2), (3) or (7) under the Securities Act;

_____ an individual "<u>accredited investor</u>" as defined in Rule 501(a)(5), (6) or (8) under the Securities Act who, is also a "Knowledgeable Employee" with respect to the Issuer; or

_____ a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and are acquiring the Subordinated Notes in an offshore transaction (as defined in Regulation S) in reliance on the exemption from Securities Act registration provided by Regulation S; and

(b) acquiring the Certificated Subordinated Notes for our own account (and not for the account of any other Person) in a minimum denomination of $200,000 and in integral multiples of $1,000 in excess thereof (except that up to 20 Certificated Subordinated Notes sold to U.S. persons that the Portfolio Manager has determined are Knowledgeable Employees may be issued in minimum denominations of $50,000).

The Transferee further represents and warrants as follows:

1.      It understands that the Certificated Subordinated Notes have not been and will not be registered under the Securities Act, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Certificated Subordinated Notes, such Certificated Subordinated Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Indenture and the legends on such Certificated Subordinated Notes, including the requirement for written certifications.  In particular, it understands that the Certificated Subordinated Notes may be transferred only to a person that is either (a) a "qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")), (b) a "Knowledgeable Employee," as defined in Rule 3c-5 promulgated under the Investment Company Act, with respect to the Issuer or (c) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser; and in the case of (a), (b) and (c) above that is either (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Certificated Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder (or, in the case of the initial investors in the Subordinated Notes, another exemption from the registration requirements of the Securities Act) or (ii) an "accredited investor" as defined in Rule 501(a) under the Securities Act who, if not an "institutional accredited investor" (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) is also a "Knowledgeable Employee" with respect to the Issuer or (d) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and is acquiring the Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Certificated Subordinated Notes.

2.      In connection with its purchase of the Certificated Subordinated Notes:  (i) none of the Co-Issuers, the Placement Agents, the Trustee, the Collateral Administrator, the Portfolio Manager or any of their respective affiliates are acting as a fiduciary or financial or investment adviser for it; (ii) it is not relying (for purposes of making any investment decision or otherwise) on any written or oral advice, counsel or representations of the Co-Issuers, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates other than any statements in the final offering circular for such Subordinated Notes; (iii) it has read and understands the final offering circular for such

Subordinated Notes (including, without limitation, the descriptions therein of the structure of the transaction in which the Certificated Subordinated Notes are being issued and the risks to purchasers of the Certificated Subordinated Notes); (iv) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary, and has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuer, the Placement Agents, the Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates; (v) it will hold and transfer at least the minimum denomination of such Subordinated Notes; (vi) it was not formed for the purpose of investing in the Subordinated Notes; and (vii) it is a sophisticated investor and is purchasing the Certificated Subordinated Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

3.    (i) It is either (A) a "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act, (B) a "Knowledgeable Employee" with respect to the Issuer for purposes of Rule 3c-5 of the Investment Company Act or (C) a corporation, partnership, limited liability company or other entity (other than a trust) each shareholder, partner, member or other equity owner of which is either a Knowledgeable Employee or a Qualified Purchaser and in the case of (A), (B) and (C) above that is either (x) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act who purchases such Certificated Subordinated Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder (or, in the case of the initial investors in the Subordinated Notes, another exemption from the registration requirements of the Securities Act) or (y) an "accredited investor" as defined in Rule 501(a) under the Securities Act who, if not an "institutional accredited investor" (an entity defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) is also a "Knowledgeable Employee" with respect to the Issuer or (D) not a "U.S. person" as defined in Regulation S under the Securities Act and is acquiring the Certificated Subordinated Notes in an offshore transaction (as defined in Regulation S thereunder) in reliance on the exemption from registration provided by Regulation S thereunder; (ii) it is acquiring the Certificated Subordinated Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (iii) it is not a (A) partnership, (B) common trust fund, or (C) special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investments to be made; (iv) it agrees that it shall not hold any Certificated Subordinated Notes for the benefit of any other person, that it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and that it shall not sell participation interests in the Certificated Subordinated Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Certificated Subordinated Notes; (v) it is acquiring its interest in the Certificated Subordinated Notes for its own account; and (vi) it will hold and transfer at least the minimum denomination of the Certificated Subordinated Notes and provide notice of the relevant transfer restrictions to subsequent transferees.

4.    It acknowledges and agrees that all of the assurances given by it in the attached Subordinated Note ERISA Certificate are correct and are for the benefit of the Issuer, the Trustee, the Placement Agents and the Portfolio Manager.  It agrees and acknowledges that

none of Issuer or the Trustee will recognize any transfer of the Subordinated Notes if such transfer may result in 25% or more of the value of the Subordinated Notes being held by Benefit Plan Investors.

5.      It will treat its Certificated Subordinated Notes as equity of the Issuer for United States federal income tax purposes.

6.      It is _____ (check if applicable) a "United States person" within the meaning of Section 770l(a)(30) of the Code, and a properly completed and signed Internal Revenue Service Form W-9 (or applicable successor form) is attached hereto; or _____ (check if applicable) not a "United States person" within the meaning of Section 7701(a)(30) of the Code, and a properly completed and signed applicable Internal Revenue Service Form W-8 (or applicable successor form) is attached hereto.  It understands and acknowledges that failure to provide the Issuer or the Trustee with the applicable United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an applicable Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in United States federal back-up withholding from payments to it in respect of the Subordinated Notes.

7.      It agrees not to seek to commence in respect of the Issuer or the Co-Issuer, or cause the Issuer or Co-Issuer to commence, a bankruptcy proceeding before a year and a day has elapsed since the payment in full to the Holders of the Notes or, if longer, the applicable preference period then in effect.

8.      To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Subordinated Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act") and other similar laws or regulations, including, without limitation, requiring each transferee of a Subordinated Note to make representations to the Issuer in connection with such compliance.

The Transferee agrees to provide promptly such information and execute and deliver such documents as may be necessary to comply with any and all laws and regulations (including the USA Patriot Act) to which the Issuer may be subject.  The Transferee understands and agrees that, in order to ensure compliance under applicable anti-money laundering laws and regulations, the Issuer may require a detailed verification of the identity of the Transferee.  The Issuer reserves the right to request such information as is necessary to verify the identity of a Transferee.  In the event of delay or failure by the Transferee to produce any information required for verification purposes, the Issuer may refuse to issue the Subordinated Notes to the Transferee until proper information has been provided.

The Transferee covenants and agrees that it shall provide the Issuer with such information as the Issuer determines to be necessary or appropriate to (a) verify compliance with the anti-money laundering regulations of any applicable jurisdiction or (b) respond to requests

for information concerning the identity of the Transferee from any governmental authority, self-regulatory organization or financial institution in connection with the Issuer's anti-money laundering compliance procedures.

9.  The rules and regulations administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac/. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists. The Transferee represents and warrants that, to the best of its knowledge, none of: (a) the Transferee; (b) any Person controlling or controlled by the Transferee; (c) if the Transferee is a privately held entity, any Person having a beneficial interest in the Transferee; (d) if the Transferee is not the beneficial owner of all of the Certificated Subordinated Notes, any Person having a beneficial interest in the Certificated Subordinated Notes; or (e) any Person for whom the Transferee is acting as agent or nominee in connection with this investment in the Certificated Subordinated Notes is a country, territory, individual or entity named on any OFAC list, or is a person or entity prohibited under the OFAC Programs.

10.  It hereby agrees to provide the Issuer and Trustee (i) any information as is necessary (in the sole determination of the Issuer or the Trustee, as applicable) for the Issuer and the Trustee to determine whether it is a United States person as defined in Section 7701(a)(30) of the Code (a "United States person") or a United States owned foreign entity as described in Section 1471(d)(3) of the Code (a "United States owned foreign entity") and (ii) any additional information that the Issuer or its agent requests in connection with FATCA. If it is a United States person or a United States owned foreign entity that is a holder or beneficial owner of Subordinated Notes or an interest therein, it also hereby agrees to be required to (x) provide the Issuer and Trustee its name, address, U.S. taxpayer identification number and any other information requested by the Issuer or its agent upon request and (y) update any such information provided in clause (x) promptly upon learning that any such information previously provided has become obsolete or incorrect or is otherwise required. It understands and acknowledges that the Issuer may provide such information and any other information concerning its investment in the Subordinated Notes to the IRS. It understands and acknowledges that the Issuer has the right, under the Indenture, to compel any beneficial owner of an interest in the Subordinated Notes that fails to comply with the foregoing requirements to sell its interest in such Subordinated Notes, or may sell such interest on behalf of such owner.

11.  Any funds to be used by it to purchase the Subordinated Notes shall not directly or indirectly be derived from activities that may contravene applicable laws and regulations, including anti-money laundering laws and regulations

12.  It is not a member of the public in the Cayman Islands.

13.  It understands that the Issuer, the Trustee, the Placement Agents and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

14. It has read the summary of the U.S. federal income tax considerations under the heading "*Certain Tax Considerations*" in the Offering Circular. It agrees to treat the characterization of the Notes as debt or equity for U.S. tax purposes in a manner consistent with the treatment of such Notes by the Issuer as described under the heading "*Certain Tax Considerations*" in the Offering Circular and will take no action inconsistent with such treatment.

15. It has read the summary of the provisions related to no petitions for bankruptcy under the heading "*Description of the Offered Securities – No Petitions for Bankruptcy*" in the Offering Circular. It will not institute against, or join any other person in instituting against, either of the Issuers or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws until the date which is one year plus one day (or, if longer, the applicable preference period then in effect) after the payment in full of all Notes. It understands that the foregoing restrictions are a material inducement for each holder and beneficial owner of the Notes to acquire such Notes and for the Issuer, the Co-Issuer and the Portfolio Manager to enter into the Indenture (in the case of the Issuer and the Co-Issuer) and the other applicable transaction documents and are an essential term of the Indenture and that any holder or beneficial owner of a Note, the Portfolio Manager or either of the Issuers may seek and obtain specific performance of such restrictions (including injunctive relief), including, without limitation, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Cayman Islands law, United States federal or state bankruptcy law or similar laws.

16. It understands that the Issuer may require certification acceptable to it (i) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding or (ii) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. It agrees to provide any such certification that is requested by the Issuer.

17. If such purchaser is not a "United States person" (as defined in Section 7701(a)(30) of the Code) it makes a representation that (a) either (i) it is not a bank (or an affiliate of a bank) extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business (within the meaning of Section 881(c)(3)(A) of the Code), or (ii) it is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States, and (b) it is not purchasing the Note in order to reduce its U.S. federal income tax liability pursuant to a tax avoidance plan.

18. The Transferee acknowledges that any purported transfer of a Secured Note, or any interest therein, to a purchaser or transferee that does not comply with the requirements specified in the Indenture, the Notes, the Offering Circular and any applicable transfer certification, as applicable, will be of no force and effect and shall be null and void *ab initio*

Name of Purchaser:

Dated:


By:_____
    Name:
    Title:

Amount of Subordinated Notes:  $_____

Taxpayer identification number:

| Address for notices: | Wire transfer information for payments: |
|---|---|
| | Bank: |
| | Address: |
| | Bank ABA#: |
| | Account #: |
| Telephone: | FAO: |
| Facsimile: | Attention: |
| Attention: | |

Denominations of certificates (if more than one):
Registered name:

cc:    Acis CLO 2013-1 Ltd.
c/o Appleby Trust (Cayman) Ltd.
Clifton House, 75 Fort Street
PO Box 1350
Grand Cayman KYI-1108, Cayman Islands

<u>EXHIBIT B7</u>

FORM OF EXCHANGE NOTICE

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107
Attn: Corporate Trust Services – ACIS CLO 2013-1

      Re:    ACIS CLO 2013-1 LTD.
             Combination Notes

            Reference is hereby made to the Indenture dated as of March 18, 2013 (the "<u>Indenture</u>") among Acis CLO 2013-1 Ltd., as Issuer, Acis CLO 2013-1 LLC, as Co-Issuer (and together with the Issuer, the "<u>Co-Issuers</u>") and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given them in the Indenture.

            [This letter relates to U.S. $[_____] aggregate principal amount of Combination Notes (the "<u>Combination Notes</u>") which are held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [(CINS)] No._____). The undersigned hereby requests that the Trustee effect the exchange of its interest in such Combination Notes for its ratable share of the Class A-1 Notes, the Class B Notes and the Class C Notes] to be held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [(CINS)] No._____, _____ and _____, respectively)  that are allocated to and represented by the Class A-1 Note Component, the Class B Note Component and the Class C Component, in accordance with Section 13.4 of the Indenture.][26]

            [This letter relates to U.S. $[_____] aggregate principal amount of Class A-1 Notes, U.S. $[_____] aggregate principal amount of Class B Notes and U.S. $[_____] aggregate principal amount of Class C Notes which are held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [(CINS)] No._____, _____ and _____, respectively) and are collectively referred to as the "<u>Exchange Notes</u>".  The undersigned hereby requests that the Trustee effect the exchange of its interest in such Exchange Notes for its ratable share of Combination Notes which to be held in the form of [Rule 144A Global Securities][Regulation S Global Securities] (CUSIP [CINS)] No._____), in accordance with Section 13.4 of the Indenture.][27]

            In connection with such exchange, the undersigned does hereby certify that such Notes are being exchanged in accordance with the exchange restrictions set forth in the Indenture and the Offering Circular dated March 12, 2013, including the supplements thereto, relating to such Notes and further certify that:

---

[26] For exchange of Combination Notes for the Underlying Classes represented by such Notes.
[27] For the combination of  Class A-1 Notes, Class B Notes and Class C Notes representing Underlying Classes into Combination Notes.

      (a)       the Permissible Ratio is [_____];

      (b)       the Aggregate Outstanding Amount and face amount of each Note to be exchanged and each Note to be received in such Exchange is [_____];

      (c)       the Holder's DTC participant number is [_____]; and

      (d)       the proposed effective date of the Exchange is [_____].

IN WITNESS WHEREOF, the undersigned has executed this Exchange Notice on the date set forth below.

(NAME OF HOLDER)


By:_____
    Name:
    Title:


Dated: _____, _____

cc: Acis CLO 2013-1 Ltd.

EXHIBIT C

FORMS OF WHITE & CASE LLP OPINIONS

<u>EXHIBIT D</u>

<u>FORM OF DECHERT LLP OPINION</u>

<u>EXHIBIT E</u>

<u>FORM OF SEWARD & KISSEL LLP OPINION</u>

<u>EXHIBIT F</u>

<u>FORM OF APPLEBY (CAYMAN) LTD. OPINION</u>

EXHIBIT G

## CALCULATION OF LIBOR

LIBOR for any Interest Accrual Period will equal (a) the rate appearing on the Reuters Screen for deposits with a term of three months; provided, that LIBOR for the first Interest Accrual Period will be determined by interpolating linearly (and rounding to five decimal places) between (i) the rate appearing on the Reuters Screen for deposits with a term of 4 months and (ii) the rate appearing on the Reuters Screen for deposits with a term of 5 months or (b) if such rate is unavailable at the time LIBOR is to be determined, LIBOR shall be determined on the basis of the rates at which deposits in U.S. Dollars are offered by four major banks in the London market selected by the Calculation Agent (the "Reference Banks") at approximately 11:00 a.m., London time, on the Interest Determination Date to prime banks in the London interbank market for a period approximately equal to such period and an amount approximately equal to the Aggregate Outstanding Amount of the Secured Notes. The Calculation Agent will request the principal London office of each Reference Bank to provide a quotation of its rate. If at least two such quotations are provided, LIBOR shall be the arithmetic mean of such quotations (rounded upward to the next higher 1/100). If fewer than two quotations are provided as requested, LIBOR with respect to such Interest Accrual Period will be the arithmetic mean of the rates quoted by three major banks in New York, New York selected by the Calculation Agent at approximately 11:00 a.m., New York time, on such Interest Determination Date for loans in U.S. Dollars to leading European banks for a term approximately equal to such Interest Accrual Period and an amount approximately equal to the Aggregate Outstanding Amount of the Secured Notes. If the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures described above, LIBOR will be LIBOR as determined on the previous Interest Determination Date.

"Reuters Screen" means the rates for deposits in dollars which appear on the Reuters Screen LIBOR 01 Page (or such other page that may replace that page on such service for the purpose of displaying comparable rates) on the Bloomberg Financial Markets Commodities News as of 11:00 a.m., London time, on the Interest Determination Date.

<u>EXHIBIT H</u>

<u>FORM OF SECURITIES ACCOUNT CONTROL AGREEMENT</u>

<u>EXHIBIT I</u>

FORM OF NOTE OWNER CERTIFICATE

U.S. Bank National Association,
as Trustee
60 Livingston Avenue
St. Paul, MN 55107
Attn: Corporate Trust Services — Acis CLO 2013-1

Acis CLO 2013-1 Ltd.
c/o Appleby Trust (Cayman) Ltd.
Clifton House, 75 Fort Street
PO Box 1350
Grand Cayman KYI-1108, Cayman Islands

Acis CLO 2013-1 LLC
c/o Puglisi & Associates
850 Library Avenue, Ste. 204
Newark, DE 19711

Acis Capital Management, L.P.
300 Crescent Court
Dallas, Texas 75201

Re: Reports Prepared Pursuant to the Indenture, dated as of March 18, 2013, among ACIS CLO 2013-1 Ltd., Acis CLO 2013-1 LLC and U.S. Bank National Association, as Trustee (the "<u>Indenture</u>").

Ladies and Gentlemen:

The undersigned hereby certifies that it is the beneficial owner of U.S.$_____ in principal amount of the [Class X Senior Secured Floating Rate Note due 2024] [Class A-1 Senior Secured Floating Rate Note due 2024] [Class A-2 Senior Secured Floating Rate Note due 2024] [Class B Senior Secured Floating Rate Note due 2024] [Class C Mezzanine Secured Deferrable Floating Rate Note due 2023] [Class D Mezzanine Secured Deferrable Floating Rate Note due 2024] [of Acis CLO 2013-1 Ltd. and Acis CLO 2013-1 LLC] [Class E Junior Secured Deferrable Floating Rate Note due 2024][Class F Junior Secured Deferrable Floating Rate Note due 2024] [Combination Notes] [Subordinated Notes due 2024] [of Acis CLO 2013-1 LLC], and hereby requests the Trustee to provide to it (or its designated nominee set forth below) at the following address the [information specified in <u>Section 7.17(g)</u> of the Indenture] [and/or the] [information specified in <u>Section 7.17(h)</u> of the Indenture] [and/or the] [information specified in <u>Section 7.17(i)</u> of the Indenture] [and/or the] [access to the

Exhibit I
Page 2

Trustees website specified in <u>Section 10.7(i)</u> of the Indenture] [and/or the] [statement of Independent certified public accountants specified in <u>Section 10.9(b)</u> of the Indenture].

Please return the form via facsimile to the Trustee at 190 South LaSalle Street, 10th Floor, Chicago, IL 60603, Attn: Corporate Trust Services – ACIS CLO 2013-1, Fax: 312-332-8030.

Address: _____

_____

_____

IN WITNESS WHEREOF, the undersigned has caused this certificate to be duly executed this _____ day of _____, _____.

[NAME OF BENEFICIAL OWNER]

By: _____

Authorized Signatory