# **Exhibit 5A**

Portfolio Management Agreement

This Portfolio Management Agreement (this "<u>Agreement</u>"), dated as of March 18, 2013, is entered into by and between Acis CLO 2013-1 Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Clifton House, 75 Fort Street, PO Box 1350, Grand Cayman KY1-1108, Cayman Islands (together with successors and assigns permitted hereunder, the "<u>Issuer</u>"), and Acis Capital Management, L.P., with its principal offices located at 300 Crescent Court, Suite 700, Dallas, TX 75201, as portfolio manager (together with successors and assigns permitted hereunder, in such capacity, the "<u>Portfolio Manager</u>").

WITNESSETH:

WHEREAS, the Issuer intends to issue U.S.$4,000,000 Class X Senior Secured Floating Rate Notes due 2024 (the "<u>Class X Notes</u>"), U.S.$190,750,000 Class A-1 Senior Secured Floating Rate Notes due 2024 (the "<u>Class A-1 Notes</u>"), U.S.$115,750,000 Class A-2A Senior Secured Floating Rate Notes due 2024 (the "<u>Class A-2A Notes</u>"), U.S.$10,250,000 Class A-2B Senior Secured Floating Rate Notes due 2024 (the "<u>Class A-2B Notes</u>" and, together with the Class A-1 Notes and the Class A-2A Notes, the "<u>Class A Notes</u>"), U.S.$62,500,000 Class B Senior Secured Floating Rate Notes due 2024 (the "<u>Class B Notes</u>", and together with the Class X Notes and the Class A Notes the "<u>Senior Notes</u>"), U.S.$39,500,000 Class C Mezzanine Secured Deferrable Floating Rate Notes due 2024 (the "<u>Class C Notes</u>"), U.S.$21,500,000 Class D Mezzanine Secured Deferrable Floating Rate Notes due 2024 (the "<u>Class D Notes</u>" and, together with the Class C Notes, the "<u>Mezzanine Notes</u>"), U.S.$193,000,000 Combination Notes (the "<u>Combination Notes</u>", and together with the Mezzanine Notes and the Senior Notes, the "<u>Co-Issued Notes</u>"), U.S.$19,500,000 Class E Junior Secured Deferrable Floating Rate Notes due 2024 (the "<u>Class E Notes</u>"), U.S.$10,000,000 Class F Junior Secured Deferrable Floating Rate Notes due 2024 (the "<u>Class F Notes</u>" and together with the Class E Notes and the Co-Issued Notes, the "<u>Secured Notes</u>") and U.S.$51,750,000 Subordinated Notes due 2024 (the "<u>Subordinated Notes</u>" and, together with the Secured Notes, the "<u>Notes</u>" or the "<u>Offered Securities</u>") pursuant to an indenture dated as of March 18, 2013 (as amended, supplemented or modified from time to time, the "<u>Indenture</u>"), among the Issuer, Acis CLO 2013-1 LLC, as co-issuer of the Co-Issued Notes (the "<u>Co-Issuer</u>"), and U.S. Bank National Association, as trustee (together with any successor trustee permitted under the Indenture, the "<u>Trustee</u>");

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, certain Eligible Investments, Cash and the Hedge Agreements (each, as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "<u>Assets</u>") to the Trustee as security for the Secured Notes;

WHEREAS, the Issuer wishes to enter into this Agreement, pursuant to which the Portfolio Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Assets securing the Secured Notes in the manner and on the terms set forth herein and to provide such additional services as are consistent with the terms of this Agreement and the Indenture; and

WHEREAS, the Portfolio Manager has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.     <u>Definitions</u>.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"<u>Actions</u>" shall have the meaning provided in Section 11(a).

"<u>Advisers Act</u>" means the Investment Advisers Act of 1940, as amended.

"<u>Affiliate</u>" means, with respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, officer or employee (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons, or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"<u>Affiliate Transaction</u>" shall have the meaning set forth in Section 6(a).

"<u>Agreement</u>" shall mean this portfolio management agreement, as amended from time to time.

"<u>Attorneys</u>" shall have the meaning provided in Section 33.

"<u>Board of Directors</u>" shall mean the directors of the Issuer duly appointed pursuant to the Governing Instruments of the Issuer in accordance with Cayman Islands law or any subsequent directors who are duly appointed according to the Articles of Association.

"<u>Confidential Information</u>" shall have the meaning provided in Section 7.

"<u>Expenses</u>" shall have the meaning provided in Section 11(a).

"<u>Fee Election</u>" shall have the meaning provided in Section 9(b).

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation, the partnership agreement, in the case of a partnership, or the limited liability company agreement, in the case of a limited liability company.

"Indemnified Party" shall have the meaning set forth in Section 11(a) or (b), as applicable.

"Indemnifying Party" shall have the meaning set forth in Section 11(a) or (b), as applicable.

"Independent Review Party" shall have the meaning set forth in Section 6(b).

"Issuer Documents" shall have the meaning provided in Section 17(a)(i).

"Liabilities" shall have the meaning provided in Section 11(a).

"Manager Documents" shall have the meaning provided in Section 17(b).

"OFAC" shall have the meaning provided in Section 17(a)(x).

"OFAC Programs" shall have the meaning provided in Section 17(a)(x).

"Offer" shall mean, with respect to any security, (i) any offer by the issuer of such security or by any other Person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for cash, securities or any other type of consideration or (ii) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"Offering Circular" shall have the meaning provided in Section 11(a).

"Person" means any individual, partnership, corporation, limited liability company, trust or other entity.

"Related Entities" shall mean, with respect to the Portfolio Manager, its clients, its partners, its members, funds or other investment accounts managed by it or any of its Affiliates, or their employees and their Affiliates.

"Responsible Officer" shall mean any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"Section 28(e)" shall have the meaning provided in Section 4(a).

"Service Agreements" shall mean, collectively, the Sub-Advisory Agreement and the Shared Services Agreement.

"Shared Services Agreement" shall mean that certain Shared Services Agreement dated January 1, 2011 between the Portfolio Manager and Highland Capital Management, L.P. (as amended, supplemented or modified from time to time).

"Sub-Advisory Agreement" shall mean that certain Sub-Advisory Agreement dated May 5, 2011 between the Portfolio Manager and Highland Capital Management, L.P. (as amended, supplemented or modified from time to time).

2.    Engagement.

Commencing on the date hereof, the Issuer hereby engages and retains the Portfolio Manager to provide the investment advisory and related services described below, for the period and on the terms and conditions set forth herein.  The Portfolio Manager hereby accepts such engagement and agrees, for the period and on the terms and conditions set forth herein, to provide, or to make satisfactory arrangements for the provision of, the investment advisory and related services described below, for the period and on the terms and conditions set forth herein.

3.    General Duties of the Portfolio Manager.

The Portfolio Manager shall provide services to the Issuer as follows:

(a)    Subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager agrees to supervise and direct the investment and reinvestment of the Assets, and shall perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager in this Agreement and in the Indenture (and the Portfolio Manager shall have no obligation to perform any other duties under this Agreement and the Indenture) and, to the extent necessary or appropriate to perform such duties, the Portfolio Manager shall have the power to execute and deliver all necessary and appropriate documents and instruments, and to take all other actions, on behalf of the Issuer with respect thereto, it being understood that the Portfolio Manager shall have no obligation to perform duties whose performance depends on third parties not under the control of the Portfolio Manager or its Affiliates.

(b)    The Portfolio Manager shall comply with all the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder and (without in any way limiting Section 11 of this Agreement) shall perform its obligations hereunder and thereunder in good faith and with reasonable care, using a degree of skill and attention no less than that which the Portfolio Manager (i) exercises with respect to comparable assets that it manages for itself and (ii) exercises with respect to comparable assets that it manages for others, and in a manner consistent with practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Assets, except as expressly provided otherwise in this Agreement and/or the Indenture.  To the extent not inconsistent with the foregoing, the Portfolio Manager shall follow its customary

standards, policies and procedures in performing its duties under the Indenture and hereunder (including those duties of the Issuer under the Indenture which the Portfolio Manager has agreed hereunder to perform on the Issuer's behalf). The Portfolio Manager shall not be bound to follow any amendment to the Indenture, however, until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided that with respect to any amendment to the Indenture which would (i) increase the duties or liabilities of the Portfolio Manager or adversely change the economic consequences to the Portfolio Manager, (ii) modify the restrictions on the purchases or sales of Collateral Obligations under Article 12 of the Indenture or the Investment Criteria, (iii) expand or restrict the Portfolio Manager's discretion or (iv) modify the restrictions on and procedures for resales and other transfers of Subordinated Notes, except as set forth in Section 8.1(vi) of the Indenture, the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented thereto in writing, such consent not to be unreasonably withheld or delayed. The Issuer agrees that it will not permit any such amendment to the Indenture to become effective unless the Portfolio Manager has been given prior written notice of such amendment and consented thereto in writing and that it will give prior written notice of any other amendment to the Indenture to the Portfolio Manager.

(c)     The Portfolio Manager shall (i) determine during the Reinvestment Period, consistent with the applicable provisions of the Indenture, when Principal Proceeds shall be applied to effect a Special Redemption of the Secured Notes, (ii) select all Collateral Obligations and Eligible Investments which shall be acquired by the Issuer and pledged to the Trustee pursuant to the Indenture and (iii) facilitate the acquisition and settlement of Collateral Obligations by the Issuer. In providing services to the Issuer hereunder, the Portfolio Manager shall take into consideration the interests of the Holders as a whole. The Portfolio Manager shall have no obligation to perform any duties other than as expressly specified herein, or in the provisions of the Indenture applicable to the Portfolio Manager, and the Portfolio Manager shall be subject to no implicit obligations of any kind.

(d)     Subject to any applicable terms of the Collateral Administration Agreement, the Portfolio Manager shall monitor the Assets, on behalf of the Issuer, on an ongoing basis and provide (or cause to be provided) to the Issuer all reports, schedules and other data reasonably available to the Portfolio Manager that the Issuer is required to prepare, deliver or furnish, or cause to be prepared, delivered or furnished, under the Indenture, in the form and containing all information required thereby and in sufficient time for the Issuer to review such required reports, schedules and data and to deliver them to the parties entitled thereto under the Indenture. The Portfolio Manager shall, on behalf of the Issuer, be responsible for obtaining to the extent practicable any information concerning whether a Collateral Obligation has become a Defaulted Obligation. Pursuant to the terms of the Collateral Administration Agreement, the Collateral Administrator shall provide certain reports, schedules and calculations to the Portfolio Manager regarding the Collateral Obligations. The obligation of the Portfolio Manager to furnish such information is subject to the Portfolio Manager's timely receipt of necessary reports and the appropriate information from the Person responsible for the delivery of or preparation of such reports and such information (including without limitation, the

Obligors of the Collateral Obligations, the Rating Agencies, the Trustee and the Collateral Administrator) and to any confidentiality restrictions with respect thereto. The Portfolio Manager shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing reasonably believed by it to be genuine and to have been signed or sent by a Person that the Portfolio Manager has no reason to believe is not duly authorized. The Portfolio Manager also may rely upon any statement made to it orally or by telephone and made by a Person the Portfolio Manager has no reason to believe is not duly authorized, and shall not incur any liability for relying thereon. The Portfolio Manager is entitled to rely on any other information furnished to it by third parties that it reasonably believes in good faith to be genuine.

(e) The Portfolio Manager may direct an Optional Redemption (including a Refinancing) under the Indenture on behalf of the Issuer.

(f) The Portfolio Manager may direct the Clean-Up Call Redemption under the Indenture on behalf of the Issuer.

(g) The Portfolio Manager may, in its sole discretion subject to and in accordance with the provisions of the Indenture and this Agreement, direct the Issuer and/or the Trustee to take the following actions with respect to a Collateral Obligation, Eligible Investment or other Asset:

(i) retain such Collateral Obligation, Eligible Investment or other Asset;

(ii) dispose of such Collateral Obligation, Eligible Investment or other Asset in the open market or otherwise;

(iii) acquire, as security for the Secured Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Assets, one or more additional Collateral Obligations or Eligible Investments;

(iv) if applicable, tender such Collateral Obligation, Eligible Investment or other Asset pursuant to an Offer;

(v) if applicable, consent to or refuse to consent to any proposed amendment, modification, restructuring, exchange or waiver pursuant to an Offer;

(vi) retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer;

(vii) waive any default with respect to any Defaulted Obligation or other Asset;

(viii)    vote to accelerate the maturity of any Defaulted Obligation or other Asset;

(ix)    participate in a committee or group formed by creditors of an issuer or a borrower under a Collateral Obligation, Eligible Investment, Equity Security or asset held by any ETB Subsidiary;

(x)    negotiate, modify or amend any loan for the Issuer as authorized by the Indenture in accordance with a Refinancing;

(xi)    exercise any other rights or remedies with respect to a Collateral Obligation, Eligible Investment or other Asset as provided in the related Underlying Instruments or take any other action consistent with the terms of the Indenture;

(xii)    enter into Hedge Agreements; and

(xiii)    to make loans to ETB Subsidiaries.

(h)    Notwithstanding anything to the contrary in this Agreement, none of the services performed by the Portfolio Manager shall result in or be construed as resulting in an obligation to perform any of the following:

(i)    the Portfolio Manager acting repeatedly or continuously as an intermediary in securities for the Issuer;

(ii)    the Portfolio Manager providing investment banking services to the Issuer; or

(iii)    the Portfolio Manager having direct contact with, or actively soliciting or finding, outside investors to (x) invest in the Issuer or (y) make co-investments in securities of portfolio companies with the Issuer.

(i)    The Portfolio Manager hereby agrees to the following:

(i)    The Portfolio Manager agrees not to institute against the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under U.S. federal or state bankruptcy or similar laws, or the similar laws of the Cayman Islands or other applicable jurisdiction until the payment in full of all Notes issued under the Indenture and the expiration of a period equal to one year and a day, or, if longer, the applicable preference period, following such payment.  Nothing in this Section 3(i)(i) shall preclude, or be deemed to stop, the Portfolio Manager (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Portfolio Manager, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a

bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding. The provisions of this subsection 3(i)(i) shall survive termination of this Agreement.

(ii)     The Portfolio Manager shall cause any purchase or sale of any Collateral Obligation to be conducted on arm's length terms or in the manner contemplated by Section 6, if applicable.

(iii)     In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided, however, that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties.

4.     Brokerage.

(a)     The Portfolio Manager will seek to obtain the best execution (but shall have no obligation to obtain the best prices and execution) for all orders placed with respect to the Assets, in a manner permitted by law and in a manner it believes to be in the best interests of the Issuer. Subject to the preceding sentence, the Portfolio Manager may, in the allocation of business, select brokers and/or dealers with whom to effect trades on behalf of the Issuer and may open cash trading accounts with such brokers and dealers (provided that none of the Assets may be credited to, held in or subject to the lien of the broker or dealer with respect to any such account). In addition, subject to the first sentence of this paragraph, the Portfolio Manager may, in the allocation of business, take into consideration research and other brokerage services furnished to the Portfolio Manager or its Affiliates by brokers and dealers which are not Affiliates of the Portfolio Manager; provided that the Portfolio Manager in good faith believes that the compensation for such services rendered by such brokers and dealers complies with the requirements of Section 28(e) of the Securities Exchange Act of 1934, as amended ("Section 28(e)"), or in the case of principal or fixed income transactions for which the "safe harbor" of Section 28(e) is not available, the amount of the spread charged is reasonable in relation to the value of the research and other brokerage services provided. Such services may be used by the Portfolio Manager or its Affiliates in connection with its other advisory activities or investment operations. The Portfolio Manager may aggregate sales and purchase orders of securities placed with respect to the Assets with similar orders being made simultaneously for other accounts managed by the Portfolio Manager or with accounts of the Affiliates of the Portfolio Manager, if in the Portfolio Manager's reasonable business judgment such aggregation shall result in an economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission or other expenses, as well as the availability of such securities on any other basis. In accounting for such aggregated order price, commissions and other expenses may be apportioned on a weighted average basis. When a transaction with respect to the Assets occurs as part of any aggregate sales or purchase orders, the objective of the Portfolio Manager shall be to allocate the executions among the accounts

in an equitable manner the Portfolio Manager believes, in its reasonable business judgment, to be appropriate and in accordance with (x) its internal conflicts of interest and allocation policies and (y) any applicable requirements of the Advisers Act.

(b)      The Issuer acknowledges and agrees that (i) the determination by the Portfolio Manager of any benefit to the Issuer will be subjective and will represent the Portfolio Manager's evaluation at the time that the Issuer will be benefited by relatively better purchase or sales prices, lower brokerage commissions, lower transaction costs and expenses and beneficial timing of transactions or any combination of any of these and/or other factors and (ii) the Portfolio Manager shall be fully protected with respect to any such determination to the extent the Portfolio Manager acts in accordance with Section 3(b).

(c)      Subject to the Portfolio Manager's execution obligations described in Sections 4(a) and 4(d) and the covenants set forth in Section 6, the Portfolio Manager is hereby authorized to effect client cross-transactions where the Portfolio Manager causes a transaction with respect to the Assets to be effected between the Issuer and another account advised by it or any of its Affiliates; provided that, if and to the extent required by the Advisers Act, such authorization is terminable prior to the initiation of such cross-transaction at the Issuer's option without penalty.  Such termination shall be effective upon receipt by the Portfolio Manager of written notice from the Issuer.  Subject to the Portfolio Manager's execution obligations described in Sections 4(a) and 4(d) and the covenants set forth in Section 6, the Portfolio Manager is hereby authorized to effect principal transactions where the Issuer may invest in securities of issuers in which the Portfolio Manager and/or its Affiliates have a debt, equity or participation interest, in each case in accordance with applicable law.

(d)      The Issuer acknowledges and agrees that the Portfolio Manager or any of its Affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of the Issuer.  Such investments may be the same or different from those made on behalf of the Issuer.  If, in light of market conditions and investment objectives, the Portfolio Manager determines that it would be advisable to purchase the same item of Collateral Obligation both for the Issuer, and either the proprietary account of the Portfolio Manager or any Affiliate of the Portfolio Manager or another client of the Portfolio Manager, the Portfolio Manager shall allocate such investment opportunities across such entities for which such opportunities are appropriate consistent with (i) its internal conflicts of interest and allocation policies and (ii) any applicable requirements of the Advisers Act.  The Issuer agrees that, in the course of managing the Collateral Obligations held by the Issuer, the Portfolio Manager may consider its relationships with other clients (including obligors and issuers) and its Affiliates.  The Portfolio Manager may decline to make a particular investment for the Issuer in view of such relationships.

5.    <u>Additional Activities of the Portfolio Manager</u>.

(a)    Nothing herein shall prevent the Portfolio Manager or any of its Related Entities from engaging in other businesses, or from rendering services of any kind to the Issuer and its Affiliates, the Trustee, the Holders, the Placement Agents or any other Person to the extent permitted by applicable law, regardless of whether such business is in competition with the Issuer or otherwise.  Without limiting the generality of the foregoing, the Portfolio Manager, its Related Entities and the directors, officers, employees and agents of the Portfolio Manager and its Related Entities may, subject to any limits specified in the Indenture:

(i)    serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Issuer or its Affiliates, or for any obligor or issuer in respect of the Collateral Obligations, Equity Securities or Eligible Investments or any affiliate thereof, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any obligor or issuer in respect of any of the Collateral Obligations, Eligible Investments or Equity Securities (or any Affiliate thereof) pursuant to their respective Governing Instruments, and neither the Holders of the Notes nor the Issuer shall have the right to any such fees; <u>provided</u>, that in the reasonable business judgment of the Portfolio Manager, such activity will not have a material adverse effect on any item of the Assets;

(ii)    receive fees or other compensation from third parties (including Persons in which the Issuer has made or proposes to make an investment) in connection with any business activities of the Portfolio Manager and its Affiliates and which are not related to the use of the Issuer's capital (which fees or other compensation shall be for the benefit of the Portfolio Manager's own account); <u>provided</u>, that in the reasonable business judgment of the Portfolio Manager, such activities will not have a material adverse effect on any item of the Assets; and

(iii)    be a secured or unsecured creditor of, or hold an equity interest in, or own or hold notes issued by, the Issuer, its Affiliates or any issuer of any obligation included in the Assets; <u>provided</u>, that the Portfolio Manager may not take any such actions (other than the holding of Notes issued by the Issuer) if, in the opinion of counsel to the Issuer, such action would require registration of the Issuer as an "investment company" under the Investment Company Act or violate any applicable provisions of federal, state or non-U.S. law or any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer.

As a result, such individuals may possess information relating to obligors and issuers of Collateral Obligations that is (a) not known to or (b) known but restricted as to its use by the individuals at the Portfolio Manager responsible for monitoring the Collateral Obligations and performing the other obligations of the Portfolio Manager

under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Issuer and otherwise create conflicts of interest for the Issuer. The Issuer acknowledges and agrees that, in all such instances, the Portfolio Manager and its Affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Issuer's investments and they have no duty, in making or managing such investments, to act in a way that is favorable to the Issuer.

The Issuer acknowledges that there are generally no ethical screens or information barriers among the Portfolio Manager and certain of its Affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. The officers or Affiliates of the Portfolio Manager may possess information relating to obligors of Collateral Obligations that is not known to the individuals at the Portfolio Manager responsible for monitoring the Collateral Obligations and performing the other obligations under this Agreement. As a result, the Portfolio Manager may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to effect a transaction for the Issuer, and the Issuer's investments may be constrained as a consequence of the Portfolio Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Issuer.

(b)     It is understood that the Portfolio Manager and any of its Affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Portfolio Manager with respect to the Assets and which may own securities or obligations of the same class, or which are of the same type, as the Collateral Obligations or the Eligible Investments or other securities or obligations of the issuers of the Collateral Obligations or the Eligible Investments. The Portfolio Manager will be free, in its sole discretion, to make recommendations to others or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Assets. Nothing in the Indenture and this Agreement shall prevent the Portfolio Manager or any of its Affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Portfolio Manager to be purchased or sold on behalf of the Issuer. It is understood that, to the extent permitted by applicable law, the Portfolio Manager, its Affiliates or Related Entities, or any of their directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or any member of their families or a Person or entity advised by the Portfolio Manager may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those whose purchase or sale the Portfolio Manager may direct hereunder.

(c)     The Portfolio Manager shall not be obligated to pursue any particular investment strategy or opportunity with respect to the Assets.

(d)     The Issuer acknowledges that the Portfolio Manager and its Affiliates may make and/or hold an investment in an issuer's securities that may be <u>pari passu</u>, senior or junior in ranking to an investment in such issuer's securities made and/or held by the Issuer or in which partners, security holders, members, officers, directors, agents or employees of the Portfolio Manager and its Affiliates serve on boards of directors or otherwise have ongoing relationships.

6.     <u>Conflicts of Interest</u>.

(a)     Subject to compliance with applicable laws and regulations and subject to this Agreement and the Indenture, the Portfolio Manager may direct the Trustee to acquire a Collateral Obligation from, or sell a Collateral Obligation, Equity Security, Eligible Investment or asset held by an ETB Subsidiary to, the Portfolio Manager, any of its Affiliates or any account or portfolio for which the Portfolio Manager or any of its Affiliates serve as investment advisor for fair market value. The Portfolio Manager may obtain the Issuer's written consent through the Independent Review Party as provided herein if any such transaction requires the consent of the Issuer under Section 206(3) of the Advisers Act (any such transaction, an "<u>Affiliate Transaction</u>"). The Issuer hereby acknowledges that the Portfolio Manager, its Affiliates or accounts advised or sub-advised by the Portfolio Manager or its Affiliates (collectively, the "<u>Portfolio Manager Affiliates</u>") will purchase on the Closing Date U.S.$10,250,000 Aggregate Outstanding Amount of the Class A-2B Notes, U.S.$10,000,000 Aggregate Outstanding Amount of the Class B Notes, U.S.$2,500,000 Aggregate Outstanding Amount of the Class E Notes, U.S.$10,000,000 Aggregate Outstanding Amount of the Class F Notes and U.S.$51,750,000 Aggregate Outstanding Amount of the Subordinated Notes (collectively, the "<u>Portfolio Manager Affiliate Notes</u>"). The Issuer further acknowledges and agrees that no Portfolio Manager Affiliate is under any obligation to retain any Portfolio Manager Affiliate Notes, and may sell all or a portion of such Portfolio Manager Affiliate Notes at any time. In addition, the Issuer acknowledges that the Portfolio Manager Affiliates may acquire and subsequently sell other Notes after the Closing Date. In certain circumstances, the interests of the Issuer and/or the Holders or beneficial owners of the Notes with respect to matters as to which the Portfolio Manager is advising the Issuer may conflict with the interests of the Portfolio Manager Affiliates or its Related Entities. The Issuer hereby acknowledges that various potential and actual conflicts of interest may exist with respect to the Portfolio Manager as described above and as described in the final offering circular relating to the Notes; <u>provided</u> that nothing in this Section 6 shall be construed as altering the duties of the Portfolio Manager referred to herein.

(b)     At the written request of the Portfolio Manager, the Issuer shall establish a conflicts review board or appoint an independent third party to act on behalf of the Issuer (such board or party, an "<u>Independent Review Party</u>") with respect to Affiliate Transactions. Decisions of any Independent Review Party shall be binding on the Portfolio Manager, the Issuer, and Holders of the Notes.

(c)     Any Independent Review Party (i) shall either (A) be the Issuer's Board of Directors, (B) be an established financial institution or other financial company

with experience in assessing the merits of transactions similar to the Affiliate Transactions or (C) be a review board comprised of one or more individuals selected by the Issuer (or at the request of the Issuer, selected by the Portfolio Manager), (ii) shall be required to assess the merits of the Affiliate Transaction and either grant or withhold consent to such transaction in its sole judgment and (iii) shall not be (A) affiliated with the Portfolio Manager (other than as a Holder or as a passive investor in the Issuer or an Affiliate of the Issuer) or (B) (other than the Issuer's Board of Directors) involved in the daily management and control of the Issuer.

(d)     The Issuer (i) shall be responsible for any fees relating to the services provided by any Independent Review Party and shall reimburse members of any Independent Review Party for their out-of-pocket expenses and (ii) may indemnify members of such Independent Review Party to the maximum extent permitted by law, subject to terms and conditions satisfactory to the Portfolio Manager.

7.     Records; Confidentiality.

The Portfolio Manager shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Issuer, the Trustee, the Holders, and the Independent accountants appointed by the Portfolio Manager on behalf of the Issuer pursuant to Article 10 of the Indenture at any time during normal business hours and upon not less than three Business Days' prior notice. The Portfolio Manager shall keep confidential any and all information that is either (i) of a type that would ordinarily be considered proprietary or confidential or (ii) designated as confidential (collectively "Confidential Information") obtained in connection with the services rendered hereunder and shall not disclose any such Confidential Information to non-affiliated third parties (excluding any Holders and beneficial owners of Notes) except (a) with the prior written consent of the Issuer, (b) such Confidential Information as a Rating Agency shall reasonably request in connection with its rating of the Secured Notes or supplying credit estimates on any obligation included in the Assets, (c) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions with respect to the Assets on behalf of the Issuer, (d) as required by (i) applicable law, regulation, court order, or a request by a governmental regulatory agency with jurisdiction over the Portfolio Manager or any of its Affiliates, (ii) the rules or regulations of any stock exchange or self-regulating organization, body or official having jurisdiction over the Portfolio Manager or any of its Affiliates or (iii) the Irish Stock Exchange, (e) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (f) such Confidential Information as shall have been publicly available or disclosed other than in known violation of this Agreement or the provisions of the Indenture or shall have been obtained by the Portfolio Manager on a non-confidential basis, (g) such Confidential Information as is necessary or appropriate to disclose so that the Portfolio Manager may perform its duties hereunder, under the Indenture or the related documents or (h) general performance information which may be used by the Portfolio Manager or its Affiliates in connection with their marketing activities. Notwithstanding the foregoing, it is agreed that the Portfolio Manager may disclose (a) that it is serving as portfolio manager of the Issuer, (b) the nature, aggregate

principal amount and overall performance of the Issuer's assets, (c) the amount of earnings on the Assets, (d) such other Confidential Information about the Issuer, the Assets and the Notes as is customarily disclosed by managers of collateralized loan obligations and (e) each of its respective employees, representatives or other agents may disclose to any and all Persons, without limitation of any kind, the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by the Indenture, this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. For purposes of this Section 7, the Holders and beneficial owners of the Notes shall not be considered "non-affiliated third parties."

        8.       <u>Obligations of Portfolio Manager</u>.

In accordance with the performance standard set forth in Section 3(b), the Portfolio Manager shall use commercially reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the status of the Issuer for purposes of Cayman Islands law, United States federal or state law, or other law known to the Portfolio Manager to be applicable to the Issuer, (b) not be permitted by the Issuer's Governing Instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer, including, without limitation, actions which would violate any Cayman Islands law, United States federal, state or other applicable securities law that is known by the Portfolio Manager to be applicable to it and, in each case, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer or have a material adverse effect on the ability of the Portfolio Manager to perform its obligations hereunder or under the Indenture, (d) require registration of the Issuer, the Co-Issuer or the pool of Assets as an "investment company" under Section 8 of the Investment Company Act, (e) cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise cause the Issuer to be subject to U.S. federal or state income tax on a net basis; <u>provided</u> that it shall not be a violation of this clause (e) for the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal or state income tax on a net basis as a result of an action taken either (i) in compliance with Certain Tax Restrictions attached hereto as Schedule 1 or (ii) in reliance upon an opinion or written advice from White & Case LLP, Dechert LLP or other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that, under the relevant facts and circumstances with respect to such action, the Issuer's contemplated action would not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis; or (f) knowingly and willfully adversely affect the interests of the Holders in the Assets in any material respect (other than (i) as expressly permitted hereunder or under the Indenture or (ii) in connection with any action taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its clients). In furtherance of the foregoing, the Portfolio Manager shall at all times comply with the tax restrictions set

forth in Schedule 1; <u>provided</u> that the Portfolio Manager may take an action that is not permitted by such operating guidelines if (x) such action is otherwise permitted under this Agreement and the Indenture and (y) the Portfolio Manager has received an opinion or written advice from White & Case LLP, Dechert LLP or other tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that, under the relevant facts and circumstances with respect to such transaction, taking into account the Issuer's failure to comply with one or more of such provisions and assuming compliance with the Indenture and all other provisions in Schedule 1, the Issuer's contemplated activities would not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis. If the Portfolio Manager is ordered by the Board of Directors of the Issuer or the requisite Holders or beneficial owners of Notes to take any action which would, or could reasonably be expected to, in each case in its reasonable business judgment, have any such consequences, the Portfolio Manager shall promptly notify the Issuer that such action would, or could reasonably be expected to, in each case in its reasonable business judgment, have one or more of the consequences set forth above and shall not take such action unless the Board of Directors of the Issuer then request the Portfolio Manager to do so and at least a Majority of both the Controlling Class and the Subordinated Notes (voting separately by Class) have consented thereto in writing. Notwithstanding any such request, the Portfolio Manager shall not take such action unless (1) arrangements satisfactory to it are made to insure or indemnify the Portfolio Manager, Affiliates of the Portfolio Manager and members, shareholders, partners, directors, managers, officers or employees of the Portfolio Manager or such Affiliates from any liability and expense it may incur as a result of such action and (2) if the Portfolio Manager so requests in respect of a question of law, the Issuer delivers to the Portfolio Manager an opinion of a nationally recognized law firm (from outside counsel satisfactory to the Portfolio Manager) that the action so requested does not violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or over the Portfolio Manager. Neither the Portfolio Manager nor its Affiliates, shareholders, partners, directors, members, managers, officers or employees shall be liable to the Issuer or any other Person, except as provided in Section 11. Notwithstanding anything contained in this Agreement to the contrary, any indemnification or insurance by the Issuer provided for in this Section 8 or Section 11 shall be payable out of the Assets in accordance with the Priority of Payments, and the Portfolio Manager may take into account such Priority of Payments in determining whether any proposed indemnity arrangements contemplated by this Section 8 are satisfactory.

        9.    <u>Compensation</u>.

        (a)    The Issuer shall pay to the Portfolio Manager, for services rendered under this Agreement, on each Payment Date, the Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee. Accrued and unpaid Management Fees shall be paid as set forth in Article 11 of the Indenture. To the extent any of the Subordinated Management Fee is not paid on any Payment Date, such payment will be deferred and will accrue interest at LIBOR, compounded quarterly, as set forth in the Indenture.

(b)    The Portfolio Manager may (but shall not be obligated to), at its election upon notice to the Issuer and the Trustee, reduce for a predetermined period of time the amount which is due to it as Senior Management Fee by a specific percentage, in which case the Subordinated Management Fee shall automatically be increased by the same percentage (the "Fee Election").  Any Fee Election must be made on or before the Determination Date for the first Collection Period in respect of which the Fee Election will apply and shall not be revocable during the period of the Fee Election; except that, in the event that the Portfolio Manager is removed, resigns or assigns its rights to any Persons, as contemplated by Sections 13, 14 and 15 of this Agreement, the replacement Portfolio Manager shall be bound initially by the terms set forth under subsection 9(a).

(c)    The Portfolio Manager shall pay (without reimbursement by the Issuer) its general overhead expenses, including (i) all costs and expenses on account of salaries, wages, bonuses and other employee benefits of the Portfolio Manager and (ii) all occupational expenses, including rent, taxes and utilities, of the Portfolio Manager.  The Issuer shall pay or reimburse the Portfolio Manager for its payment of any and all reasonable costs and expenses incurred on behalf of the Issuer, including, without limitation:  (i) any and all costs and expenses incurred in connection with the acquisition or disposition of the Assets (including (a) investment related travel, communications and related expenses and (b) amounts in connection with the termination, cancellation or abandonment of a potential acquisition or disposition of an Asset that is not consummated); (ii) any and all costs and expenses incurred in connection with the carrying or management of the Assets; (iii) any and all costs and expenses incurred in connection with the Notes and other indebtedness of the Issuer; (iv) any and all attorneys' and accountants' fees and disbursements relating to Issuer matters (including in-house attorneys' and accountants' services provided by or on behalf of the Portfolio Manager to the Issuer as may be reasonably allocated to the Issuer); (v) any and all taxes and governmental charges that may be incurred or payable by the Issuer or any ETB Subsidiary; (vi) any and all insurance premiums or expenses incurred in connection with the activities of the Issuer by the Portfolio Manager; (vii) any and all costs and expenses incurred in connection with the Portfolio Manager's information systems relating to the Issuer and the Assets and communications with the Holders of the Notes (including charges related to annual meetings); (viii) any and all costs and expenses incurred by the Portfolio Manager in connection with the establishment of any ETB Subsidiary (provided that such costs and expenses are directly attributable to the establishment of such ETB Subsidiary) and (ix) any and all expenses incurred to comply with any law or regulation related to the activities of the Issuer, any ETB Subsidiary and the Portfolio Manager.  Other than as stated above, the Issuer will bear, and will pay directly in accordance with the Indenture, all other costs and expenses incurred by it in connection with the organization, operation or liquidation of the Issuer.

(d)    If this Agreement is terminated pursuant to Section 13, Section 15 or otherwise, the Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee calculated as provided in the Indenture shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination, subject to Article 11 of the Indenture.

(e)      Notwithstanding anything contained herein to the contrary, the obligations of the Issuer are limited recourse obligations payable solely from Assets granted to the Trustee pursuant to the Granting Clauses of the Indenture in accordance with the Priority of Payments and, following realization of the Assets and reduction thereof to zero, all obligations of the Issuer and any claims against the Issuer under this Agreement shall be extinguished and shall not thereafter revive.  No recourse shall be had for the payment of any amount owing in respect of this Agreement against any other asset of the Issuer or against any officer, director, employee, shareholder or incorporator of the Issuer.  The provisions of this Section 9(e) shall survive termination of this Agreement.

10.      Benefit of the Agreement.

The Portfolio Manager agrees that its obligations hereunder in accordance with the terms of this Agreement and the terms of the Indenture applicable to it shall be enforceable by the Issuer and by the Trustee on behalf of the Holders, as provided in the Indenture.  The Portfolio Manager agrees and consents to the provisions contained in Section 15.1 of the Indenture.

11.      Limits of Portfolio Manager Responsibility.

(a)      Subject to Section 8, the Portfolio Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it and affecting the duties and functions that have been delegated to it thereunder and hereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence.  The Portfolio Manager shall not be responsible for any action or inaction of the Co-Issuers or the Trustee in declining to follow any advice, recommendation or direction of the Portfolio Manager including as set forth in Section 8.  Neither the Portfolio Manager nor any of its directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or Affiliates will be liable to the Co-Issuers, the Trustee, the Holders of the Notes, the Placement Agents or any other Person for any act, omission, error of judgment, mistake of law, or for any claim, loss, liability, damage, judgments, assessments, settlement, cost, or other expense (including attorneys' fees and expenses and court costs) arising out of any investment, or for any other act or omission arising out of or in connection with the performance by the Portfolio Manager, its directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or Affiliates under this Agreement or the terms of the Indenture applicable to the Portfolio Manager, incurred as a result of actions taken or recommended or for any omissions of the Portfolio Manager, or for any decrease in the value of the Collateral Obligations, except for liability to which the Portfolio Manager would be subject (i) by reason of acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations hereunder or the terms of the Indenture applicable to the Portfolio Manager or, (ii) with respect to the information concerning the Portfolio Manager included in the Offering Circular dated March 13, 2013 (the "Offering Circular") under the headings "*Summary— Portfolio Manager*", "*The Portfolio Manager*" (including Part 2 of the Portfolio Manager's Form ADV referred to therein), "*Risk Factors—Risks Relating to Certain*

*Conflicts of Interest—Conflicts of Interest Involving the Portfolio Manager*", "*Risk Factors—Risks Relating to the Portfolio Manager—Past Performance Not Indicative of Future Results*", "*Risk Factors—Risks Relating to the Portfolio Manager—The Portfolio Manager Relies on Highland to Perform Certain Services*" and "*Risk Factors—Risks Relating to the Portfolio Manager—Litigation Involving Acis and Highland*", as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Portfolio Manager shall not be liable for any consequential, punitive, exemplary or treble damages or lost profits hereunder or under the Indenture. The Issuer (the Issuer in such case, the "<u>Indemnifying Party</u>") shall indemnify and hold harmless the Portfolio Manager, its directors, managers, officers, stockholders, members, partners, partnership committee members, agents and employees and its Affiliates and their directors, managers, officers, stockholders, members, partners, partnership committee members, agents and employees (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages, judgments, assessments, costs or other liabilities (other than losses in the value of a Collateral Obligation or Eligible Investment incurred by the Portfolio Manager or any of its Affiliates in connection with a transaction in which it elects to acquire a Collateral Obligation or an Eligible Investment from the Issuer as principal) (collectively, "<u>Liabilities</u>"), and will promptly reimburse each such Person for all reasonable fees and expenses (including reasonable fees and expenses of counsel) as such fees and expenses (collectively, the "<u>Expenses</u>") are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "<u>Actions</u>"), caused by, or arising out of or in connection with the Assets or business of the Issuer or any ETB Subsidiary or otherwise relating to the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Person; <u>provided</u>, <u>however</u>, that such Person shall not be indemnified for any Liabilities or Expenses (x) it incurs as a result of any acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance by the Portfolio Manager of its obligations hereunder or the terms of the Indenture applicable to the Portfolio Manager, or (y) it incurs with respect to the information concerning the Portfolio Manager included in the Offering Circular under the headings "*Summary—Portfolio Manager*", "*The Portfolio Manager*" (including Part 2 of the Portfolio Manager's Form ADV referred to therein), "*Risk Factors—Risks Relating to Certain Conflicts of Interest—Conflicts of Interest Involving the Portfolio Manager*", "*Risk Factors—Risks Relating to the Portfolio Manager—Past Performance Not Indicative of Future Results*", "*Risk Factors—Risks Relating to the Portfolio Manager— The Portfolio Manager Relies on Highland to Perform Certain Services*" and "*Risk Factors—Risks Relating to the Portfolio Manager—Litigation Involving Acis and Highland*", as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 11 are limited recourse obligations of the Issuer payable solely out of the Assets in accordance with the Priority of Payments. The Indemnified Parties are not required to consult with, or obtain the consent of, the Issuer

with respect to any settlement, negotiation or other act of the Indemnified Parties in connection with any Action.

(b)     The Portfolio Manager shall indemnify and hold harmless (the Portfolio Manager in such case, the "Indemnifying Party") the Issuer (the Issuer in such case, the "Indemnified Party") from and against any and all expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) arising directly out of any information described in subsection 11(a)(ii) above, as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that the Portfolio Manager shall not be liable for any special, indirect, consequential, punitive, exemplary or treble damages or lost profits.

(c)     The Indemnified Party shall promptly notify the Indemnifying Party if the Indemnified Party receives a complaint, claim, compulsory process or other notice of any losses or damages giving rise to a claim for indemnification under this Section 11, but failure so to notify the Indemnifying Party or to comply with paragraph (d) below shall not relieve such Indemnifying Party from its obligations under this Section 11 unless and to the extent that such Indemnifying Party did not otherwise learn of such action or proceeding and to the extent such failure results in the forfeiture by the Indemnifying Party of material rights and defenses.

(d)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request served upon such Indemnified Party for which such Indemnified Party is or may be entitled to indemnification under this Section 11, such Indemnified Party shall:

(i)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(ii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iii)     in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, (A) to participate in the investigation, defense and settlement of such claim, and, (B) to the extent that it shall wish, to assume the defense thereof, with counsel satisfactory to such Indemnified Party (who shall not, except with the consent of the Indemnified Party, be counsel to the Indemnifying Party), and, after notice from the Indemnifying Party to such Indemnified Party of its election so to assume the defense thereof, the Indemnifying Party shall not be liable to such

Indemnified Party under such subsection for any legal fees and expenses of other counsel or any other expenses, in each case subsequently incurred by such Indemnified Party, in connection with the defense thereof other than reasonable costs of investigation, except that, if such Indemnified Party reasonably determines that counsel selected by the Indemnifying Party has a conflict of interest, such Indemnifying Party shall pay the reasonable fees and disbursements of one additional counsel selected by the Indemnified Party (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

(iv) neither incur any material expense to defend against nor make any admission with respect thereto, nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; *provided* that the Indemnifying Party shall have advised such Indemnified Party that such Indemnified Party is entitled to be indemnified hereunder with respect to such claim.

(e) No Indemnified Party shall, without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, settle or compromise any claim giving rise to a claim for indemnity hereunder, or permit a default or consent to the entry of any judgment in respect thereof; *provided* that if the Indemnified Party is the Portfolio Manager or an Affiliate or a Related Entity of the Portfolio Manager or of an Affiliate thereof, such Indemnified Party shall not be required to seek or obtain such consent if it determines in good faith that the Indemnifying Party is unlikely to have sufficient funds available to indemnify it in full, taking into account the Priority of Payments.

(f) No Indemnifying Party shall, without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, settle or compromise or consent to the entry of any judgment with respect to any claim giving rise to a claim for indemnity hereunder if such settlement includes a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

(g) If the indemnification provided for in this Section 11 is unavailable to an Indemnified Party in respect of any claims or liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such claims or liabilities in such proportion as is appropriate to reflect the relative benefits received by, and the relative fault of, the Indemnifying Party, on the one hand, and the Indemnified Parties, on the other hand, as well as any other relevant equitable considerations.

(h) The required indemnification provided by this Section 11 shall be in addition to any rights to which an Indemnified Party may otherwise be entitled by contract or as a matter of law, and shall extend to each of its or his or her heirs, successors and assigns. The provisions of this Section 11 shall continue to afford

protection to each Indemnified Party regardless of whether such Indemnified Party remains in the position or capacity pursuant to which such Indemnified Party became entitled to indemnification under this Section 11.

(i)    United States federal securities laws impose liabilities under certain circumstances on persons who act in good faith and nothing herein shall constitute a waiver or limitation of any rights which the Issuer or any Holder of Notes may have under any applicable federal securities laws.

12.    No Partnership or Joint Venture.

The Issuer and the Portfolio Manager are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them.  The Portfolio Manager's relation to the Issuer shall be deemed to be that of an independent contractor.

13.    Term; Termination.

(a)    This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes and the termination of the Indenture in accordance with its terms; (ii) the liquidation of the Assets and the final distribution of the proceeds of such liquidation to the Holders; or (iii) the termination of this Agreement in accordance with subsections (b) of this Section 13 or Section 15 of this Agreement.

(b)    Notwithstanding any other provision hereof to the contrary but subject to the provisions of clause (e) below, this Agreement may be terminated without cause by the Portfolio Manager, and the Portfolio Manager may resign, upon 90 days' (or such shorter notice as is acceptable to the Issuer) written notice to the Issuer; provided that the Portfolio Manager shall have the right to resign immediately upon the effectiveness of any material change in applicable law or regulations which renders the performance by the Portfolio Manager of its duties hereunder or under the Indenture to be a violation of such law or regulation.

(c)    Notwithstanding the provisions of clause (b) above, no resignation or removal of the Portfolio Manager or termination of this Agreement pursuant to such clause shall be effective until the date as of which a successor Portfolio Manager shall have been appointed and approved in accordance with Section 13(e) and has accepted all of the Portfolio Manager's duties and obligations pursuant to this Agreement in writing and has assumed such duties and obligations.

(d)    If this Agreement is terminated pursuant to this Section 13, neither party shall have any further liability or obligation to the other, except as provided in subsection 3(i)(i), Section 9(d) and (e) and Sections 11 and 16 of this Agreement.

(e)    Any termination, removal or resignation of the Portfolio Manager while any Notes are Outstanding will be effective only upon (a) the appointment by the Issuer, at the direction of at least a Majority of the Subordinated Notes, with the consent

of at least a Majority of the Controlling Class, of a successor Portfolio Manager that is an established institution which (i) has demonstrated an ability to professionally and competently perform duties reasonably comparable to those imposed upon the Portfolio Manager hereunder, (ii) is legally qualified and has the capacity to act as successor to the Portfolio Manager under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager hereunder and under the terms of the Indenture applicable to the Portfolio Manager, (iii) satisfies the Global Rating Agency Condition, (iv) shall not cause the Issuer or the Co-Issuer or the pool of Assets to become required to register under the provisions of the Investment Company Act and (v) shall not result in the imposition of any entity-level or withholding tax on the Issuer or the payments to the Holders or cause any other material adverse tax consequences to the Issuer and (b) written acceptance of appointment by such successor Portfolio Manager. The Issuer shall use its commercially reasonable efforts to appoint a successor Portfolio Manager to assume the duties and obligations of the removed or resigning Portfolio Manager. The Issuer, the Trustee and the successor Portfolio Manager shall take such action (or cause the outgoing Portfolio Manager to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Portfolio Manager, as shall be necessary to effectuate any such succession. In the event that the successor manager has not been appointed or has not assumed the duties of the Portfolio Manager in writing within a 60-day period, any of the Portfolio Manager, a Majority of the Controlling Class or a Majority of the Subordinated Notes may petition a court of competent jurisdiction for the appointment of a successor Portfolio Manager, which appointment will not require the consent of, or be subject to the approval or disapproval of, the Issuer or any Holder (so long as such court appointed successor meets the requirements of clauses (a)(i) through (v) above).

(f)        In the event of removal of the Portfolio Manager pursuant to this Agreement by the Issuer or, to the extent so provided in the Indenture, by the Trustee, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Portfolio Manager as provided under this Agreement terminate all the rights and obligations of the Portfolio Manager under this Agreement (except those that survive termination pursuant to subsection 13(d) above). Upon resignation or removal of the Portfolio Manager in accordance with this Section 13 or Section 15 of this Agreement, as applicable, and upon acceptance by a successor Portfolio Manager of appointment, all authority and power of the Portfolio Manager under this Agreement and the Indenture, whether with respect to the Assets or otherwise, shall automatically and without further action by any Person pass to and be vested in the successor Portfolio Manager.

(g)        For so long as Acis Capital Management, L.P. or an Affiliate of Acis Capital Management, L.P. is the Portfolio Manager, the Issuer and the Co-Issuer will be permitted to use the "Acis" name; provided, however, that if the Portfolio Manager ceases to be Acis Capital Management, L.P. or an Affiliate of Acis Capital Management, L.P., the Issuer shall use commercially reasonable efforts to change its name to remove all reference to the name "Acis" therefrom. In addition, the Portfolio

Manager, without the consent of the Issuer, may change the name of the Portfolio Manager.

14. Delegation; Assignments.

(a) Except as provided herein, the Portfolio Manager may not assign its rights or responsibilities hereunder without the written consent of the Issuer, at least a Majority of the Subordinated Notes and at least a Majority of the Controlling Class and satisfaction of the Global Rating Agency Condition. Notwithstanding the foregoing, the Portfolio Manager may, with the consent of at least a Majority of the Controlling Class and without satisfaction of the Global Rating Agency Condition or the consent of any other Class of Notes, (i) assign any of its rights or obligations hereunder to an Affiliate provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement, (B) has the legal right and capacity to act as Portfolio Manager hereunder and (C) shall not cause the Issuer or the pool of Assets to become required to register under the provisions of the Investment Company Act or (ii) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity and, (A) at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Portfolio Manager hereunder generally and the other entity is solely a continuation of the Portfolio Manager in another corporate or similar form and has substantially the same staff and (B) such action does not cause the Issuer to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation; provided that the Portfolio Manager shall deliver prior notice to the Rating Agencies then rating a Class of Notes of any assignment, delegation or combination made pursuant to this sentence. The Issuer acknowledges and agrees that pursuant to an agreement dated the date hereof in substantially the form of Annex A hereto (the "Collateral Administration Agreement") among the Issuer, the Portfolio Manager and U.S. Bank National Association, as Collateral Administrator thereunder (in such capacity, the "Collateral Administrator"), the Issuer has retained the Collateral Administrator to prepare certain reports and other information with respect to the Collateral Obligations.

(b) Notwithstanding the foregoing to the extent that applicable law requires the consent of the Issuer to any "assignment" (as defined in the Advisers Act) of this Agreement to any Person, in whole or in part, by the Portfolio Manager, such requirement may be satisfied with respect to the Issuer and all holders (i) by obtaining consent to such assignment on behalf of the Issuer from any of the following persons as determined by the Portfolio Manager: (A) one or more directors of the Issuer independent from the Portfolio Manager, (B) the Independent Review Party, or (C) an advisory committee established by the Portfolio Manager; or (ii) in any other manner that is permitted pursuant to then applicable law. Any assignment consented to by the Issuer and such Holders shall bind the assignee hereunder in the same manner as the Portfolio Manager is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Portfolio Manager. Upon the execution and delivery of such a counterpart by the assignee, the Portfolio

Manager shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 11 of this Agreement prior to such assignment and except with respect to its obligations under subsection 3(i)(i) and Section 16 hereof.

(c) This Agreement shall not be assigned by the Issuer without the prior written consent of the Portfolio Manager, and unless the Global Rating Agency Condition has been satisfied in connection with such assignment, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Granting Clause of the Indenture. In the event of any assignment by the Issuer, the Issuer shall use its commercially reasonable efforts to cause its successor to execute and deliver to the Portfolio Manager such documents as the Portfolio Manager shall consider reasonably necessary to effect fully such assignment.

15.   <u>Termination by the Issuer for Cause.</u>

This Agreement may be terminated, and the Portfolio Manager may be removed for cause (i) by at least a Majority of the Controlling Class of Notes upon 10 days' prior written notice to the Portfolio Manager or (ii) by the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Subordinated Notes upon 10 days' prior written notice to the Portfolio Manager. For purposes of the first sentence of this Section 15, Notes owned by the Portfolio Manager or any Affiliate thereof or an account or fund managed by the Portfolio Manager or its Affiliates shall be disregarded and deemed to be not Outstanding; <u>provided</u> that, Notes owned by a fund or an account managed by the Portfolio Manager or  an Affiliate thereof will not be disregarded and will be deemed to be Outstanding if the voting rights with respect to such Notes are exercised by such fund or account or the client or beneficiary of such fund or account and not by the Portfolio Manager or its Affiliate. No such termination or removal shall be effective until the date as of which a successor Portfolio Manager shall have agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to this Agreement and as specified in the Indenture. For purposes of determining "cause" with respect to any such termination of this Agreement or removal of the Portfolio Manager, such term includes any one of the following events:

(a) the Portfolio Manager willfully violates, or takes any action that it knows breaches, any material provision of this Agreement or the Indenture applicable to it in bad faith (not including a willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions);

(b) the Portfolio Manager breaches in any respect any provision of this Agreement or any terms of the Indenture applicable to it (other than as covered by clause (a) and it being understood that failure to meet any Coverage Test, any Concentration Limitation or the Collateral Quality Test is not such a violation) (except for any violation or breach that has not had, or could not reasonably be expected to have, a material

17422201.12

adverse effect on the Issuer) and fails to cure such breach within 30 days of a Responsible Officer receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within 60 days after a Responsible Officer receives notice thereof;

(c)     the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)     the occurrence of an Event of Default under the Indenture that consists of a default in the payment of principal or interest on the Secured Notes when due and payable and results primarily from any material breach by the Portfolio Manager of its duties hereunder or under the Indenture, which breach or default is not cured within any applicable cure period;

(e)     the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services;

(f)     any senior executive officer of the Portfolio Manager (in the performance of his or her investment management duties) is indicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of 10 days after such indictment; or

(g)     the inability of the Portfolio Manager to perform its duties hereunder in accordance with the standard of care specified herein due to the termination

of the Service Agreements, unless the Portfolio Manager believes in good faith that it will be able to either (i) secure reasonably equivalent substitute services to those that were performed for the Portfolio Manager under the Service Agreements or (ii) perform its duties hereunder in accordance with the applicable standard of care without engaging a third-party service provider, in each case, within 30 days, and the Portfolio Manager is in fact able to secure such services or perform such duties within such 30-day period.

If any of the events specified in the definition of "cause" in this Section 15 shall occur, the Portfolio Manager shall give prompt written notice thereof to the Issuer, each Rating Agency, each Holder of Notes and the Trustee upon the Portfolio Manager's becoming aware of the occurrence of such event. A Majority of the Controlling Class may waive any event described in (a), (b), (d), (e), (f) or (g) above as a basis for termination of this Agreement and removal of the Portfolio Manager under this Section 15.

16. <u>Action Upon Termination</u>.

(a) From and after the effective date of the termination of the Portfolio Manager's duties and obligations pursuant to this Agreement or resignation or removal of the Portfolio Manager hereunder, the Portfolio Manager shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 9 hereof (including any accrued and unpaid Subordinated Management Fee and Incentive Management Fee), and shall be entitled to receive any amounts owing under Section 11 hereof. Upon such termination, resignation or removal, the Portfolio Manager shall as soon as practicable:

(i) deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Assets then in the custody of the Portfolio Manager; and

(ii) deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Portfolio Manager appointed pursuant to subsection 13(e) hereof.

Notwithstanding such termination, resignation or removal, the Portfolio Manager shall remain liable to the extent set forth herein (but subject to Section 11 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Portfolio Manager in subsection 17(b) hereof or from any failure of the Portfolio Manager to comply with the provisions of this Section 16.

(b) The Portfolio Manager agrees that, notwithstanding any termination, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Assets (excluding any such Proceeding in which claims are asserted against the Portfolio Manager or any Affiliate of the Portfolio Manager) upon receipt of appropriate indemnification and expense reimbursement.

17.     Representations and Warranties.

(a)     The Issuer hereby represents and warrants to the Portfolio Manager as follows:

(i)     The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has the full corporate power and authority to own its assets and the securities proposed to be owned by it and included in the Assets and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture, the Hedge Agreements, the Collateral Administration Agreement or the Notes (collectively, the "Issuer Documents") would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)     The Issuer has the necessary corporate power and authority to execute, deliver and perform each of the Issuer Documents and all obligations required thereunder, and has taken all necessary action to authorize each of the Issuer Documents on the terms and conditions hereof and thereof and the execution, delivery and performance of each of the Issuer Documents and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other Person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the Indenture and the issuance of the Notes, is required by the Issuer in connection with the Issuer Documents or the execution, delivery, performance, validity or enforceability of the Issuer Documents or the obligations imposed upon it hereunder or thereunder.  This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject, as to enforcement, to (a) the effect of bankruptcy, insolvency, or similar laws affecting generally the enforcement of creditors' rights, as such laws would apply in the event of any bankruptcy, receivership, insolvency or similar event applicable to the Issuer and (b) general equitable principles (whether enforceability of such principles is considered in a proceeding at law or in equity).

(iii)     The execution, delivery and performance of this Agreement and the Collateral Administration Agreement and the documents and instruments required hereunder and thereunder do not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the

Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and do not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)    The Issuer is not required to register as an "investment company" under the Investment Company Act.

(v)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any other contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order (including, without limitation, any anti-money laundering statute or related rule, regulation or order) of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder or under the Collateral Administration Agreement.

(vi)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Portfolio Manager.

(vii)    The Issuer has not taken any action or engaged in any activity, either directly or through an agent, that could cause the Issuer to be treated as engaged in a United States trade or business for federal income tax purposes.

(viii)    The Issuer is not a "bank" for purposes of Section 881 (c)(3)(A) of the Code.

(ix)    The Issuer is a "qualified client" as such term is defined under the Advisers Act.

(x)    The Issuer understands that the rules and regulations administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/ofac>.  In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.  To the best of its knowledge, none of:

(1) the Issuer; (2) any person controlling or controlled by the Issuer; (3) any person having a beneficial interest in the Issuer; or (4) any person for whom the Issuer is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or is a person or entity prohibited under the OFAC Programs.

(xi)    By entering into this Agreement, the Issuer represents and warrants that it has received and had an opportunity to review a current copy of Part 2 of the Form ADV of Acis Capital Management, L.P., at least forty-eight hours prior to its entering into this Agreement.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in subsection 17(a)(v) above to the Portfolio Manager as promptly as practicable after its adoption or execution.

(b)    The Portfolio Manager hereby represents and warrants to the Issuer as follows:

(i)    The Portfolio Manager is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware and has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement or the Collateral Administration Agreement (together with this Agreement, the "Manager Documents") would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or on the ability of the Portfolio Manager to perform its obligations under, or on the validity or enforceability of, the Manager Documents and the provisions of the Indenture applicable to the Portfolio Manager; the Portfolio Manager is registered as an investment adviser under the Advisers Act.

(ii)    The Portfolio Manager has full power and authority to execute, deliver and perform each of the Manager Documents and all obligations required hereunder and under the provisions of the Indenture applicable to the Portfolio Manager, and has taken all necessary action to authorize each of the Manager Documents on the terms and conditions hereof and thereof and the execution, delivery and performance of each of the Manager Documents and all obligations required hereunder and thereunder and under the terms of the Indenture applicable to the Portfolio Manager.  No consent of any other Person, including, without limitation, creditors of the Portfolio Manager, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Portfolio Manager in connection with the Manager Documents or the execution, delivery, performance, validity or enforceability of the Manager

Documents or the obligations required hereunder and thereunder or under the terms of the Indenture applicable to the Portfolio Manager. Each of the Manager Documents has been, and each instrument and document required hereunder and thereunder or under the terms of the Indenture shall be, executed and delivered by a duly authorized officer of the Portfolio Manager, and each of the Manager Documents constitutes, and each instrument and document required hereunder and thereunder or under the terms of the Indenture when executed and delivered by the Portfolio Manager hereunder or thereunder or under the terms of the Indenture shall constitute, the valid and legally binding obligations of the Portfolio Manager enforceable against the Portfolio Manager in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)     The execution, delivery and performance of the Manager Documents and the terms of the Indenture applicable to the Portfolio Manager and the documents and instruments required hereunder or thereunder or under the terms of the Indenture shall not violate any provision of any existing law or regulation binding on the Portfolio Manager, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Portfolio Manager, or the Governing Instruments of, or any securities issued by the Portfolio Manager or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Portfolio Manager is a party or by which the Portfolio Manager or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or its ability to perform its obligations under the Manager Documents, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking, the existence of which would have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or its ability to perform its obligations under the Manager Documents.

(iv)     There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Portfolio Manager, threatened that, if determined adversely to the Portfolio Manager, would have a material adverse effect upon the performance by the Portfolio Manager of its duties under, or on the validity or enforceability of, the Manager Documents and the provisions of the Indenture applicable to the Portfolio Manager hereunder.

(v)     The Portfolio Manager is authorized to carry on its business in the United States and in all other jurisdictions necessary to the performance of its obligations under the Manager Documents and the Indenture applicable to the Portfolio Manager.

(vi)     The Portfolio Manager is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Portfolio Manager or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of the Manager Documents or the provisions of the Indenture applicable to the Portfolio Manager, or the performance by the Portfolio Manager of its duties hereunder or thereunder.

(vii)     The information concerning the Portfolio Manager contained under the headings entitled "*Summary—Portfolio Manager*", "*The Portfolio Manager*" (including Part 2 of the Portfolio Manager's Form ADV referred to therein), "*Risk Factors—Risks Relating to Certain Conflicts of Interest—Conflicts of Interest Involving the Portfolio Manager*", "*Risk Factors—Risks Relating to the Portfolio Manager—Past Performance Not Indicative of Future Results*", "*Risk Factors—Risks Relating to the Portfolio Manager—The Portfolio Manager Relies on Highland to Perform Certain Services*" and "*Risk Factors—Risks Relating to the Portfolio Manager—Litigation Involving Acis and Highland*" in the Offering Circular, as of the respective dates of the Offering Circular and as of the Closing Date, is true in all material respects and does not omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

18.   Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by facsimile) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of facsimile notice, when received in legible form, addressed as set forth below:

(a)     If to the Issuer:

c/o Appleby Trust (Cayman) Ltd.
Clifton House, 75 Fort Street
PO Box 1350
Grand Cayman KYI-1108, Cayman Islands
Attention: The Directors

with a copy to:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)     If to the Portfolio Manager:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(c)     If to the Trustee:

U.S. Bank National Association
190 South LaSalle St., 10th Floor
Chicago, IL 60603
Attn: Corporate Trust Services—Acis CLO 2013-1
Facsimile: 312-332-8010

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 18 for the giving of notice.

19.     Binding Nature of Agreement; Successors and Assigns.

Subject to Section 14 hereof, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein.

20.     Entire Agreement.

This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.   The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

21.     Amendment.

This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and (other than in respect of a modification or amendment of the type that may be made to the Indenture without Holder consent) (i) the consent of at least a Majority of each Class of Notes materially and adversely effected thereby (such determination to be made in the same manner as determining whether an amendment to the Indenture materially and adversely effects the Notes), (ii) the consent of at least a Majority of the Subordinated Notes, (iii) the consent of at least a Majority of the Controlling Class and (iv) satisfaction of the Global Rating Agency Condition. Notwithstanding the foregoing, the parties hereto, without the consent of any Holders, may amend or modify any provision of this agreement to (i) reflect a change that is of an inconsequential nature, (ii) correct inconsistencies, typographical or other errors, defects or ambiguities, (iii) conform this Agreement to the Offering Circular or the Indenture (as

17422201.12

it may be amended from time to time) or (iv) reflect a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation (including ERISA, the Code, the Advisers Act and the Investment Company Act) of any U.S. federal or state agency or contained in any U.S. federal or state statute. In addition, Schedule 1 may be amended or modified by the parties hereto without the consent of any Holder in accordance with the last sentence of such Schedule.

22.     Conflict with the Indenture.

In the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture (as in effect on the date hereof or as amended or supplemented, with the consent of the Portfolio Manager if such consent is required by Section 3(b)) in respect thereof shall control.

23.     Priority of Payments.

The Portfolio Manager agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be subordinated to the extent set forth in, and the Portfolio Manager agrees to be bound by the provisions of, Article 11 and Section 15.1 of the Indenture as if the Portfolio Manager were a party to the Indenture and each of the Portfolio Manager and Issuer hereby consents to the assignment of this Agreement as provided in Section 15.1 of the Indenture.

24.     Governing Law; Jury Trial.

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF). EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUCH PARTIES ENTERING INTO THIS AGREEMENT.**

25.     Indulgences Not Waivers.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to

any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

26.     Titles Not to Affect Interpretation.

The titles of Sections and subsections of this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

27.     Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

28.     Provisions Separable.

To the fullest extent permitted by law, in case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, to the fullest extent permitted by law, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

29.     Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

30.     Jurisdiction and Venue.

The parties to this Agreement irrevocably submit to the non-exclusive jurisdiction of any New York state or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to this Agreement, the Notes or the Indenture, and the parties irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court. The parties to this Agreement irrevocably waive, to the fullest extent they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The parties to this Agreement irrevocably consent to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such

process to it in accordance with Section 18. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

31. <u>Third Party Beneficiaries</u>.

No party, including any Holder of Notes, is a third party beneficiary of this Agreement.

32. <u>Miscellaneous</u>.

(a) With respect to any Defaulted Obligation, the Portfolio Manager, on behalf of the Issuer, may instruct the agent or the trustee for such Defaulted Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Obligation and under any applicable law, rule or regulation in any manner permitted under the Indenture that the Portfolio Manager has determined in its reasonable business judgment will be in the best interests of the Issuer. In the event any Offer is made with respect to any Collateral Obligation or Equity Security, the Portfolio Manager, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Portfolio Manager has determined in its reasonable business judgment will be in the best interests of the Issuer.

(b) Without prejudice to subsection 15(f) hereof, any corporation, partnership or limited liability company into which the Portfolio Manager may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Portfolio Manager shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Portfolio Manager, shall be the successor to the Portfolio Manager without any further action by the Portfolio Manager, the Co-Issuers, the Trustee, the Holders or any other Person or entity; <u>provided</u> that the Portfolio Manager shall give prompt written notice to each Rating Agency upon any such occurrence.

(c) Notwithstanding anything herein or in the Indenture to the contrary, with respect to any report, information, communication, request, demand, authorization, direction, notice, consent or waiver to be given to a Rating Agency by the Issuer, the Issuer shall instead provide such information to the Portfolio Manager, and the Portfolio Manager shall then provide such information as well as any information related to the transaction requested by any Rating Agency directly from the Portfolio Manager to the applicable Rating Agencies via the website established on behalf of the Issuer for purposes of Rule 17g-5 under the Exchange Act.

(d) If the Issuer shall receive any written or oral communication from any Rating Agency (or any of their respective officers, directors or employees) with respect to the transactions contemplated hereby or in any way relating to the Notes, the Issuer agrees to refrain from communicating with such Rating Agency and to promptly (and, in any event, within one Business Day) notify the Portfolio Manager of such

communication. The Issuer agrees to coordinate with the Portfolio Manager with respect to any communication to a Rating Agency and further agrees that in no event shall it engage in any oral or written communication with respect to the transactions contemplated hereby or in any way relating to the Notes with any Rating Agency (or any of their respective officers, directors or employees) without the participation of the Portfolio Manager.

33.   Power of Attorney.

The Issuer hereby makes, constitutes and appoints each of Josh Terry, Hunter Covitz and Philip Braner, with full power of substitution, as its true and lawful agent and attorney-in-fact (each an "Attorney" and together the "Attorneys"), jointly and severally with full power and authority in its name, place and stead, in accordance with the terms of this Agreement and the Indenture (a) to prepare, sign and deliver tax documentation, transfer documentation and all other documentation in connection with the acquisition and sale by the Issuer of Collateral Obligations and (b) to (i) vote in its discretion any securities, instruments or obligations included in the Assets, (ii) execute proxies, waivers, consents and other instruments with respect to such Collateral Obligations, (iii) endorse, transfer or deliver such securities, instruments and obligations, (iv) participate in or consent (or decline to consent) to any modification, work-out, restructuring, bankruptcy proceeding, class action, plan of reorganization, merger, combination, consolidation, liquidation or similar plan or transaction with regard to such Collateral Obligations and (v) take any other action specified in Section 3 of this Agreement. This grant of power of attorney will expire (a), with respect to each Attorney (and to each substitute appointed by such Attorney), when such Attorney ceases to be an officer or employee of Acis Capital Management, L.P. or an Affiliate thereof, acting on behalf of Acis Capital Management, L.P. or (b) upon (x) termination of this Agreement in accordance with its terms or (y) any assignment by the Portfolio Manager of its obligations under this Agreement in accordance with Section 14 hereof.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**Portfolio Manager:**

ACIS CAPITAL MANAGEMENT, L.P.

By: Acis Capital Management GP, LLC

By: _____
    Name:
    Title:

*Signatures Continue on Next Page*

*Signatures Continued from Previous Page*

**Issuer:**

ACIS CLO 2013-1 LTD., Executed as a
Deed

By: _____

    Name:   **David Boyd**
    Title:    **Director**

Witness: _Kirsten Leighton_

Acis CLO 2013-1 Ltd.
Portfolio Management Agreement

SCHEDULE 1

CERTAIN TAX RESTRICTIONS

The Issuer[1] shall follow the following restrictions:

(1)    Investment Restrictions relating to loan origination within the United States.

(A)    The Issuer shall not make loans, shall not sign a loan agreement as an original lender, shall not purchase a loan until such loan has been closed for at least 48 hours and shall not, in the case of any loan the origination of which has not yet closed, commit the Issuer to acquire a loan earlier than 48 hours after the Person from whom the Issuer will purchase such loan is legally committed to acquire, participate in or make the loan (and such legal commitment by the seller of the loan to the Issuer is independent from and is not conditioned in any way on the Issuer's purchase of (or commitment to purchase) the loan from the seller). Notwithstanding this requirement, the Issuer is permitted to purchase a Publicly Issued Debt Security from an underwriter as part of the original issuance of the Publicly Issued Debt Security.

(B)    The Issuer shall not, directly or indirectly, purchase (and will not enter into a commitment to purchase, whether or not in writing (or otherwise agree to acquire an economic, beneficial or derivative interest in)) a loan from the Portfolio Manager or one of its Affiliates if the Portfolio Manager or one of its Affiliates is lead or joint syndication agent in the loan syndicate, the originator, underwriter, placement agent or similar promoter of the loan unless (i) it has been 90 days since the loan was outstanding, issued and originated, (ii) the holder of the loan did not identify the loan as intended for sale to the Issuer until at least 60 days after the loan was issued; (iii) the price paid by the Issuer for such a loan is its fair market value on the date of the purchase, (iv) the employees or agents of the Portfolio Manager responsible for selecting the loan for the Issuer were not involved in the origination of the loan and (v) at all times after the acquisition, (A) the Issuer owns less than 50% of the aggregate principal amount of the borrowing that includes such Collateral Obligation and (B) less than 50% of the Issuer's assets are comprised of Collateral Obligations for which the Portfolio Manager or one of its Affiliates was lead or joint syndication agent in the loan syndicate, the originator, underwriter, placement agent or similar promoter of the Collateral Obligation.

(C)    Except as set forth in subparagraph (I) or (II) of this paragraph (1)(C), the Issuer shall not (i) negotiate the terms of any loan, (ii) have any

---

[1] References in these U.S. Investment Restrictions to the "Issuer" shall include any agent of the Issuer (including, but not limited to, the Portfolio Manager) when acting on behalf of the Issuer.

discussions with any obligor on a loan or the issuer of other Collateral Obligations, except for due diligence or informational purposes after all the material terms and conditions of the related Collateral Obligation are fixed and binding or (iii) structure or influence the terms of any Collateral Obligation; provided that the Issuer may (x) consent to or withhold consent to any proposed amendments, supplements or other modifications of the terms of any Collateral Obligation after such Collateral Obligation is acquired by the Issuer, (y) negotiate with respect to the terms of purchase of any loan by the Issuer and communicate its standard terms and conditions for such purchase to the agent bank or its affiliates and (z) provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).  The Issuer will not acquire a loan with the expectation of restructuring or "working-out" the loan.  For purposes of this paragraph (1)(C), the Issuer will be treated as acquiring a new loan by reason of a modification to an existing loan that is treated as a significant modification for purposes of Treasury regulations section 1.1001-3, and the Issuer will not be treated as acquiring a new loan by reason of a modification to an existing loan that is not treated as a significant modification for purposes of Treasury regulations section 1.1001-3.  Notwithstanding anything to the contrary,

(I)     if, at the time of acquisition, a loan was performing and there was no reasonable expectation that the loan would likely default, and the loan subsequently defaults or the Portfolio Manager reasonably expects the loan to default, the Issuer may renegotiate the terms of the loan with the debtor or other creditors and, may participate on a creditor's committee with respect to the loan to protect its investment, but the Issuer may not advance any additional funds (other than in compliance with the other provisions in these guidelines); and

(II)     the Portfolio Manager, any affiliate thereof, and an ETB Subsidiary of the Issuer also may, with respect to a loan held by the ETB Subsidiary (and, in the case of the Invesment Manager, a loan issued by the debtor as part of the same issuance as the loan held by the ETB Subsidiary), negotiate with a debtor or other creditors or participate on a creditors' committee if such loan held by the ETB Subsidiary is held by such ETB Subsidiary and not by the Issuer during any period of time the workout is being negotiated.

In all other cases, except as described herein, neither the Issuer nor any affiliate thereof will negotiate with a debtor or other creditors or participate on a creditors' committee without the Issuer having received advice of White & Case LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters that such activity

will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis.

(D)     No Collateral Obligation shall be purchased by the Issuer on terms such that the Issuer receives the benefit of a fee for underwriting, syndication or placement services, or other services connected with structuring the terms, marketing or placement of the Collateral Obligation (which shall not include any discount or fee for the use of or time value of money or commitment fees or any discount or fee based on market conditions at the time the Issuer purchases or commits to purchase the Collateral Obligation).

(E)     If the Issuer makes a commitment to purchase a loan that is not outstanding at the time that the Issuer makes the commitment, (i) such commitment will be subject to a satisfactory review of the terms and conditions contained in the loan documentation such that, if the loan documentation or the documentation pursuant to which the Issuer will purchase the loan from the agent bank or syndicate member is not acceptable to the Issuer, the Issuer will not be obligated to purchase the loan and (ii) the actual purchase by the Issuer will not occur earlier than 48 hours after the closing and full funding of the loan.

(F)     The Issuer cannot have a contractual relationship with the obligor with respect to a loan until the Issuer actually closes the purchase of such loan.

(G)     On the date of the legal document closing of a loan, the Issuer cannot be a signatory on the lending agreement governing such loan and, on such date, the lending agreement and other agreements and documents relating to such loan to which the obligor, or any of its agents, is a party will not list the Issuer as a "Lender" or otherwise list the Issuer as a party to such loan, or to such lending agreement or such other agreements or documents. No lending institution with respect to such loan will have the power to bind the Issuer to fund such loan directly with the obligor thereof prior to the closing of the purchase of such loan by the Issuer.

(H)     The Issuer cannot purchase or commit to purchase a loan that is a term loan if it would cause the Issuer to own more than 50% of the aggregate principal amount of all term loans issued under the related credit agreement, determined as of the date of acquisition.

(I)     The Issuer will not acquire an interest in a Collateral Obligation that consists of, or includes, a revolving or delayed draw credit facility unless (i) the underlying loan documents were negotiated, finalized and executed prior to the Issuer's commitment to purchase such interest, (ii) all the terms of any advance required to be made by the Issuer thereunder will

be fixed as of the date of the Issuer's purchase (or determinable under a formula that is fixed as of such date), (iii) such revolving or delayed draw credit facility is a "fully committed loan" (i.e., under its terms, the Issuer has no discretion as to whether to make advances thereunder provided all the conditions thereto have been satisfied), (iv) (a) such revolving or delayed draw credit facility is acquired in connection with a term loan that the Issuer intends to hold at least as long as the revolving or delayed draw credit facility or (b) an advance of more than a de minimis amount has been made by a Person that is not an Affiliate of the Issuer and (v) the Issuer acquires less than 25% of the commitment amount of the revolver or delayed draw loan.

(J)     If a Collateral Obligation requires the Issuer to participate in a letter of credit issued or to be issued to a borrower (directly or through a synthetic letter of credit structure), such Collateral Obligation only will be acquired and held in connection with an interest in a related term loan where the amount of such interest is at least as large as the Issuer's potential exposure under the letter of credit. All of the terms of any letter of credit in which the Issuer acquires an interest must have been fully negotiated no later than the original legal document closing of such credit facility.

(K)     Any agent bank or syndicate members that are acting within the United States will not act on behalf of the Issuer as its agent when negotiating the economic terms of a loan with the obligor. Such agent bank or syndicate member may, however, seek, and the Issuer may respond to, requests for indications of interest.

(L)     The Issuer will not hold itself out (or otherwise be held out) as originating loans.

(2)     <u>Investment Restrictions relating to activities (other than loan origination)</u>.

(A)     The Issuer will not perform any services (<u>e.g.</u>, loan servicing) for the obligor, the agent bank or a syndicate member in connection with a Collateral Obligation.

(B)     The Issuer will invest in Collateral Obligations only with the intent of receiving interest and principal payment with respect to such obligations, or of selling the obligations for capital appreciation, and will not invest in Collateral Obligations with the goal of seeking a liquidation of the obligor of the security in order to obtain an interest in assets of the issuer that are located within the United States.

(C)     The Issuer will not act as a dealer in stocks or securities or perform any services for others with respect to its investments. For this purpose,

"dealer" means a merchant of stocks or securities who is regularly engaged as a merchant in purchasing stocks and securities and selling them to customers with a view to the gains and profits that may be derived therefrom.

(D) The Issuer shall not hold itself out (or otherwise be held out) or take any actions (including making any filing with governmental agencies) that cause it to be treated as (i) making a market in Collateral Obligations, (ii) engaged in the business of insurance or guarantying debt obligations, (iii) a dealer in financial derivatives, (iv) a bank or (v) ready to enter into either side of a derivatives transaction with members of the public in the ordinary course of its business.

(E) The Issuer will not make a claim for exemption from U.S. withholding tax to the U.S. Internal Revenue Service (the "IRS") on the basis that income of the Issuer is effectively connected with the conduct of a trade or business in the United States, and in particular, shall not file an IRS Form W-8ECI (or any successor form) with any withholding agent with respect to any loan.

(3) <u>Investment Restrictions relating to the nature of certain investments.</u>

(A) The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Schedule 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, in each case in accordance with the Agreement, shall not constitute the making of advances).

(B) No Synthetic Security acquired by the Issuer shall, through an agreement, arrangement or understanding (i) legally require or cause the Synthetic Security Counterparty to be commercially compelled to own or hold the Related Obligation while the Synthetic Security remains in effect or (ii) require by its terms the delivery of reports or other information relating to the Reference Obligation if the effect of such requirement is that the purchaser of credit protection thereunder would be required to own the applicable Reference Obligation.

(C) With respect to each Synthetic Security: (i) the criteria used to determine whether to enter into any particular synthetic security is similar to the criteria used by the Issuer in making investment decisions in debt securities; (ii) the Synthetic Security is acquired by or entered into by the

Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities and/or any rise in their value during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit; (iii) the Issuer enters into the Synthetic Security with a counterparty that is a broker-dealer or a derivatives dealer; (iv) the Issuer does not solicit, advertise or publish to customers the Issuer's ability to enter into Synthetic Securities; (v) any net payment owed by the Issuer to the Synthetic Security Counterparty is not determined by reference, in whole or in part, to any actual loss incurred by the Synthetic Security Counterparty or any other designated person; (vi) the Synthetic Security (except such Synthetic Securities that are credit-linked notes or similar securities documented by an indenture, in which case the other provisions of this Schedule 1 apply) is structured as a default swap and is documented by a "Confirmation" as referred to in the form of ISDA Master Agreement published by the International Swaps and Derivatives Association, Inc.; (vii) the Issuer will not treat the Synthetic Security as insurance, reinsurance, indemnity bonds, guarantees, guarantee bonds or suretyship contracts for any purposes; and (viii) the Synthetic Security Counterparty, to the Issuer's knowledge, is not regulated or licensed to do business as an insurance company or a reinsurance company in any jurisdiction.

(D)    The Issuer shall not purchase, acquire or enter into (whether directly, as a part of a "unit" with a Collateral Obligation, in exchange for or upon conversion of a Collateral Obligation or otherwise) any asset or any derivative interest (including, without limitation, any option, warrant or Synthetic Security) with respect to any asset, if such asset or, in the case of such derivative interest the asset which is the subject of such derivative interest (including a Reference Obligation), is treated as (A) an equity interest in an entity or vehicle that is classified for U.S. federal income tax purposes as a partnership or grantor trust (or otherwise as a pass-through entity or disregarded entity), unless (i) all of the assets of such entity could have been purchased by the Issuer in accordance with the restrictions contained in this Schedule 1 and are (x) treated as debt for U.S. federal income tax purposes or (y) ownership interests in entities treated as corporations for U.S. federal income tax purposes, (ii) such entity is not treated as engaged in a trade or business in the United States and does not otherwise have income that is subject to U.S. federal income tax on a net basis and (iii) the organizational documents for such entity prohibits such entity from being treated as engaged in a trade or business in the United States or otherwise having income that is subject to U.S. federal income tax on a net basis, (B) a residual interest in a "REMIC" (as such term is defined in the Code), (C) an ownership interest in a "FASIT" (as such term is defined in the Code), (D) an equity interest in a "United States real property holding corporation" ("USRPHC") (as such term is defined in the Code), such as a loan or security, in either case, convertible into equity of

a USRPHC or a loan that has the right to share, directly or indirectly, in the appreciation of U.S. real estate or (E) an asset (located in the United States) that is neither debt nor equity for US federal income tax purposes. If at any time pursuant to a bankruptcy or other insolvency proceeding or workout of a debt obligation or otherwise, the Issuer would acquire in exchange for a Collateral Obligation (or otherwise would acquire) assets that do not constitute stock (or right to purchase stock) of a corporation (or a partnership not permitted to be acquired pursuant to clause (A) of this paragraph (iii)) or debt instruments for U.S. federal income tax purposes ("Non-Securities Assets"), the Issuer shall not acquire such Non-Securities Assets without establishing a subsidiary treated as a corporation for U.S. federal income tax purposes to own such Non-Securities Assets (an "ETB Subsidiary"); provided that stock (or the right to purchase stock) of a United States real property holding corporation shall be treated as a Non-Securities Asset for the purpose of this paragraph and any such stock or any US real property shall be held through an ETB Subsidiary that is a non-U.S. corporation.

(4)     Definitions and exceptions to Investment Restrictions.

(A)     For purposes of this Schedule 1, (i) the term "Portfolio Manager" shall mean the Portfolio Manager when it is acting through any agent (which, for the avoidance of doubt, shall include any entity or natural person who directly or indirectly performs any activities on behalf of the Portfolio Manager), employee, office, fixed place of business or permanent establishment, (ii) the term "loan" shall mean any loan (without regard to this definition), debt security or other investment that is treated as debt for U.S. federal income tax purposes, (iii) the term "Collateral Obligation" shall mean any loan, debt security, or other investment, as the case may be, (iv) the term "Reference Obligation" shall mean a debt security or other obligation based upon which a party's payments under a Synthetic Security are determined, (v) the term "Synthetic Security" shall mean any swap transaction or security, other than a participation interest in a loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation, (vi) the term "Synthetic Security Counterparty" shall mean an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor); and (vii) "Publicly Issued Debt Security" shall mean a Security either (a) that was issued pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act") in a firm commitment or best efforts underwriting for which no Issuer Affiliate served as underwriter or (b)(i) privately placed or eligible for resale under Rule 144A or Regulation S, in each case, (ii) purchased by the Issuer from a person other than the obligor of the Security and where the Issuer has no contractual agreements with the obligor with respect to such Security other than obligations of the obligor under the Security effective upon or after the Issuer's closing of

the purchase of such Security and (iii) originally issued in an offering with an offering memorandum, private placement memorandum or similar offering document, and in each case with respect to which the Issuer, the Portfolio Manager (and Affiliates and accounts and funds managed or controlled by the Portfolio Manager or any Affiliate) either (1) did not at original issuance acquire 50% or more of the aggregate principal amount of such Security or 50% or more of the aggregate principal amount of any other class of Securities offered by the issuer of the Security in the offering and any related offering or (2) did not at original issuance acquire 33 1/3% or more of the aggregate principal amount of all classes of Securities offered by the issuer of such Security in the offering and any related offering; and (viii) "Security" shall mean a bond, note or security that is issued under a trust indenture or similar agreement under which a trustee is appointed to act on behalf of the holders of such a bond, note or security.

(B)     In furtherance and not in limitation of the Portfolio Management Agreement and this Schedule 1, the Issuer shall comply with all of the provisions set forth in this schedule, unless with respect to a particular transaction, the Issuer shall have received advice of White & Case LLP or an opinion of counsel of nationally recognized standing in the United States experienced in such matters, that, under the relevant facts and circumstances with respect to such transaction, the Issuer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis. The provisions set forth in this Schedule 1 may be amended, eliminated or supplemented by the Issuer if the Issuer shall have received advice of White & Case LLP or an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters that the Issuer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis.

<u>ANNEX A</u>

<u>FORM OF COLLATERAL ADMINISTRATION AGREEMENT</u>

**EXECUTION VERSION**

## COLLATERAL ADMINISTRATION AGREEMENT

This COLLATERAL ADMINISTRATION AGREEMENT, dated as of March 18, 2013 (the "Agreement") is entered into by and among Acis CLO 2013-1 Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "Issuer"), Acis Capital Management, L.P., a Delaware limited partnership, in its capacity as Portfolio Manager under the Portfolio Management Agreement referred to below (the "Portfolio Manager"), and U.S. Bank National Association, a national banking association ("USB"), in its capacity as collateral administrator (the "Collateral Administrator").

### WITNESSETH:

WHEREAS, the Issuer, USB, as trustee and Acis CLO 2013-1 LLC, as co-issuer (the "Co-Issuer"), have entered into an Indenture (the "Indenture") dated as of March 18, 2013, pursuant to which the Notes were issued;

WHEREAS, pursuant to the terms of the Indenture, the Issuer pledged certain collateral debt obligations and other assets (the "Assets") as security for the Secured Debt;

WHEREAS, the Portfolio Manager has entered into a Portfolio Management Agreement with the Issuer dated as of March 18, 2013, (the "Portfolio Management Agreement"), in connection with which the Portfolio Manager has agreed to provide certain services to the Issuer with respect to the Assets;

WHEREAS, the Issuer wishes to engage the Collateral Administrator to perform on its behalf certain administrative duties of the Issuer with respect to the Assets pursuant to the Indenture; and

WHEREAS, the Collateral Administrator, on behalf of the Issuer, is prepared to perform certain specified obligations of the Issuer under the Indenture and certain other services as specified herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. <u>Definitions</u>.

Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Indenture.

2. <u>Powers and Duties of the Collateral Administrator and the Portfolio Manager</u>.

(a) The Issuer hereby appoints as its agent USB in the capacity of Collateral Administrator and USB hereby accepts its appointment as the Issuer's agent and shall act in the capacity of Collateral Administrator for the Issuer until the earlier of USB's resignation or

removal pursuant to Section 7 hereof or termination of this Agreement pursuant to Section 6 hereof. The Collateral Administrator shall assist the Issuer and the Portfolio Manager in connection with monitoring the Assets on an ongoing basis and providing to the Issuer, the Portfolio Manager and certain other parties specified in the Indenture certain reports, schedules, calculations and other data, all as more particularly described in Section 2(b), which the Issuer (or the Portfolio Manager) is required to prepare and deliver under Article X of the Indenture. The Collateral Administrator's duties and authority to act as Collateral Administrator hereunder are limited to the duties and authority specifically provided for in this Agreement. The Collateral Administrator shall not be deemed to assume the obligations of the Issuer under the Indenture or of the Portfolio Manager under the Portfolio Management Agreement.

(b)     The Collateral Administrator shall perform the following functions:

(i)     Create an Asset database compromised of, among other things, the Collateral Obligations and Eligible Investments credited to the Accounts within 30 days of the Closing Date;

(ii)     Permit access to any information in the Asset database by the Portfolio Manager and the Issuer in electronic form;

(iii)     Update the Asset database promptly for ratings changes of any item of the Assets;

(iv)     Update the Asset database promptly for Collateral Obligations and Eligible Investments acquired or sold or otherwise disposed of;

(v)     Track the receipt and daily allocation to the Accounts of Interest Proceeds and Principal Proceeds and any withdrawals therefrom and, on each Bushiness Day, provide to the Portfolio Manager daily reports reflecting balances of the Accounts as of the close of business on the preceding Business Day;

(vi)     Prepare and arrange for the delivery, within the timeframe set forth in the Indenture, of each Monthly Report, Distribution Report and the Interest Rate Notice, in each case in accordance with the Indenture;

(vii)     Assist the Issuer and the Portfolio Manager in preparing the report required to be prepared pursuant to Section 7.18(c)(i) of the Indenture, on the basis of information contained in the Asset database or provided to the Collateral Administrator by the Portfolio Manager or the Issuer;

(viii)     Assist the Independent certified public accountants in the preparation of those reports required under Section 10.9 of the Indenture;

(ix)     Reasonably cooperate with the Issuer or the Portfolio Manager in providing the Rating Agencies with such additional information in the possession of the Collateral Administrator as may be reasonably requested by the Rating Agencies under Section 10.10 of the Indenture;

(x)     Notify the Portfolio Manager upon receiving any documents, legal opinions or any other information including, without limitation, any notices, reports, requests for waiver, consent requests or any other requests relating to corporate actions affecting the Collateral Obligations and Eligible Investments; and

(xi)    Provide the Portfolio Manager with such other information as may be reasonably requested by the Portfolio Manager and as is within the possession of the Collateral Administrator.

(c)     Not later than two Business Days prior to the day on which each Monthly Report or Distribution Report is required to be provided by the Issuer pursuant to Section 10.7(a) or Section 10.7(b) of the Indenture, respectively, the Collateral Administrator shall prepare the Monthly Report or Distribution Report, as applicable, in accordance with the Indenture, using the information contained in the Asset database created by the Collateral Administrator pursuant to Section 2(b) above and any other Asset information normally maintained by USB, in its capacity as Trustee, and subject to the Collateral Administrator's receipt from the Portfolio Manager of such information as the Collateral Administrator shall reasonably request in order to prepare such Monthly Report or Distribution Report with respect to the Assets that is not contained in such Asset database or normally maintained by USB, as Trustee, each item required to be stated in such Monthly Report or Distribution Report in accordance with the Indenture.

(d)     Not more than two Business Days after receiving an Issuer Request requesting information regarding redemption pursuant to Sections 9.2 and 9.6 of the Indenture, the Collateral Administrator shall compute the information required to be provided by the Issuer in the Redemption Date notice pursuant to Sections 9.3 and 9.6 of the Indenture.

(e)     The Collateral Administrator shall assist the Portfolio Manager in the preparation of such other reports that may be required by the Indenture and that are reasonably requested in writing by the Portfolio Manager and agreed to by the Collateral Administrator.

(f)     Upon written notification by the Portfolio Manager of a proposed purchase of any Collateral Obligation pursuant to Section 12.2 of the Indenture (accompanied by such information concerning the Collateral Obligation to be purchased as may be necessary to make the calculations referred to below), the Collateral Administrator shall calculate, on a pro forma basis, each criterion included in the Investment Criteria set forth in Section 12.2(a) of the Indenture as a condition to such purchase in accordance with the Indenture and provide the results of such calculations to the Portfolio Manager so that the Portfolio Manager may determine whether such purchase is permitted by the Indenture.  The Collateral Administrator shall deliver a draft of such calculation to the Portfolio Manager to the extent possible promptly after the later of (i) notification of such proposed purchase by the Portfolio Manager and (ii) delivery of all information to the Collateral Administrator reasonably necessary to complete such calculations; provided such notification or information is received by 12:00 Noon (Chicago time) on such date; otherwise such notification or information will be deemed made at 9:00a.m. (Chicago time), on the next succeeding Business Day. For the avoidance of doubt, the Collateral Administrator shall have no obligation to determine whether any item of the Assets meets the definition of "Collateral Obligation".

(g)     Upon written notification by the Portfolio Manager of a proposed sale of any Collateral Obligation pursuant to Section 12.1 of the Indenture (accompanied by the Portfolio Manager's designation of the subsection of Section 12.1 of the Indenture pursuant to which it proposes to effect such sale), the Collateral Administrator shall calculate each criterion set forth in the designated subsection of Section 12.1 of the Indenture, if any, as a condition to such disposition in accordance with the Indenture and provide the results of such calculations to the Portfolio Manager so that the Portfolio Manager may determine whether such sale is permitted by the Indenture. The Collateral Administrator shall deliver a draft of such calculations to the Portfolio Manager to the extent possible promptly after the later of (i) notification of such proposed sale by the Portfolio Manager and (ii) delivery of all information to the Collateral Administrator reasonably necessary to complete such calculations; provided such notification or information is received by 12:00 Noon (Chicago time) on such date; otherwise such notification or information will be deemed made at 9:00a.m. (Chicago time), on the next succeeding Business Day.

(h)     In the event the Portfolio Manager does not provide the Collateral Administrator the items necessary to complete the calculations required by Sections 2(f) and (g) above and/or the Portfolio Manager proceeds with a sale or purchase of the applicable Collateral Obligations prior to the time the Collateral Administrator delivers such calculations, neither the Collateral Administrator nor the Trustee shall be responsible for determining whether the provisions of the Indenture have been satisfied and each of the Trustee and Collateral Administrator shall be entitled to conclusively rely upon the instructions of the Portfolio Manager in all respects, including but not limited to instructions (which may be in the form of trade tickets) to release the applicable Collateral Obligation from the lien of the Indenture or to acquire the applicable Collateral Obligations. In the event the Portfolio Manager consummates a sale or purchase prior to receiving the calculations of the Collateral Administrator, the Collateral Administrator shall be under no duty, and shall incur no liability, to perform the calculations set forth in Sections 2(f) and (g) above.

(i)     The Portfolio Manager shall cooperate with the Collateral Administrator in connection with the preparation (including the calculations required hereunder) by the Collateral Administrator of all reports, instructions, statements, the Monthly Reports, Distribution Reports, notices of Redemption, and the certificates required in connection with the purchase and sale of Collateral Obligations under the Indenture. The Portfolio Manager shall review and verify the contents of the aforesaid reports, instructions, statements and certificates and to the extent any of the information in such reports, instructions, statements and certificates conflicts with data or calculations in the records of the Portfolio Manager, the Portfolio Manager shall notify the Collateral Administrator of such discrepancy and use commercially reasonable efforts to assist the Collateral Administrator in reconciling such discrepancy. The Collateral Administrator shall cooperate with the Portfolio Manager in connection with the Portfolio Manager's review of the contents of the aforesaid reports, instructions, statements and certificates and shall provide such items to the Portfolio Manager within a reasonably sufficient time (as agreed between the Portfolio Manager and the Collateral Administrator, but in any event no later than two Business Days) prior to any applicable due date to enable such review. The Portfolio Manager shall cooperate with the Collateral Administrator by answering questions posed by the Collateral Administrator that are reasonably related to such reports, instructions, statements and certificates to the extent the answers to such questions are within the knowledge

of the Portfolio Manager. Upon acknowledgment from the Portfolio Manager that it has completed its review, the Collateral Administrator shall transmit same to the Issuer for execution and shall distribute such reports, instructions, statements and certificates, after execution by the Issuer or the Portfolio Manager, as applicable.

If, in performing its duties under this Agreement, the Collateral Administrator is required to decide between alternative courses of action (each of which is consistent with provisions of this Agreement), the Collateral Administrator may request written instructions from the Portfolio Manager acting on behalf of the Issuer as to the appropriate course of action desired by it. If the Collateral Administrator does not receive such instructions within two Business Days after it has requested them, the Collateral Administrator may, but shall be under no duty to, take or refrain from taking any such courses of action. The Collateral Administrator shall act in accordance with instructions received after such two Business Day period except to the extent it has already taken, or committed itself to take, action inconsistent with such instructions. The Collateral Administrator shall be entitled to conclusively rely on the advice of legal counsel and Independent accountants in performing its duties hereunder and shall be deemed to have acted in good faith if it acts in accordance with such advice.

Nothing herein shall prevent the Collateral Administrator or any of its Affiliates from engaging in other businesses or from rendering services of any kind to any Person.

The Collateral Administrator shall have no obligation to determine Market Value or price in connection with any actions or duties under this Agreement.

3.      Powers and Duties of the Information Agent.

(a)     In connection with Section 10.10 of the Indenture, the Issuer hereby appoints the Collateral Administrator to act as its agent (the "Information Agent") and in so acting, the Information Agent shall have all the protections and benefits provided for the Collateral Administrator hereunder.

(b)     The Information Agent shall make available on the 17g-5 Site (as defined in Section 10.10(f)(i) of the Indenture), solely to the Rating Agencies and to nationally recognized statistical rating organizations who deliver a certification in form and substance satisfactory to the Information Agent, the items that are delivered by the Co-Issuers, the Trustee or the Portfolio Manager (or their respective representatives or advisors) to the Information Agent by electronic mail to the following address: 17g5informationprovider@usbank.com (or by any alternative electronic mail address following notice to the parties hereto of such alternative electronic mail address or any other delivery method established by the Information Agent if or as may be necessary or beneficial).  The Information Agent shall post information to the 17g-5 Site on the same Business Day of receipt; provided that such information is received by 12:00 p.m. (Eastern time) or, if received after 12:00 p.m. (Eastern time), on the next Business Day.  Any electronic mail message sent to the Information Agent with items for posting to the 17g-5 Site shall include "ACIS 2013-1" in the subject line of such electronic mail message and shall contain in the body of such electronic mail message an identification of the type of information being provided.  Each e-mail sent to the Information Agent pursuant to this Agreement or the Indenture failing to be sent to the e-mail address specified above or failing to conform to the

foregoing requirements of this paragraph shall be deemed incomplete and the Information Agent shall have no obligations with respect thereto.

(c)    The Information Agent's posting of information to the 17g-5 Site is ministerial in nature only, and the Information Agent shall have no obligation or duty to verify, confirm or otherwise determine whether any information being delivered for posting to the 17g-5 Site is accurate, complete, conforms to the terms of the Indenture or related transaction documents, conforms to the requirements of Rule 17g-5 of the Exchange Act or otherwise is or is not anything other than what it purports to be.  In the event that any information is delivered or posted in error, the Information Agent may remove such information from the 17g-5 Site.  The Collateral Administrator, the Trustee and the Information Agent have not obtained and shall not be deemed to have obtained actual knowledge of any information merely  by posting such information to the 17g-5 Site to the extent such information was not produced by the Collateral Administrator, the Trustee or the Information Agent, as applicable.

(d)    In connection with providing access to the 17g-5 Site, the Information Agent may require registration and the acceptance of a disclaimer.  The Information Agent shall not be liable for the dissemination of information in accordance with the terms of this Agreement, makes no representations or warranties as to the accuracy or completeness of such information being made available, and assume no responsibility for such information, except to the extent such information is prepared by the Trustee or the Collateral Administrator pursuant to the term of this Agreement or the Indenture.

4.    <u>Compensation</u>.  The Issuer agrees to pay, and the Collateral Administrator shall be entitled to receive, as compensation for the Collateral Administrator's performance of the duties called for herein, including those of the Information Agent, the amounts set forth in the USB fee letter dated on June 19, 2012**.**  The Issuer shall further reimburse the Collateral Administrator for all reasonable out-of-pocket expenses incurred in connection with the performance of its obligations hereunder.  All payments hereunder shall be paid subject to and in accordance with Section 11.1(a) of the Indenture.

5.    <u>Limitation of Responsibility of the Collateral Administrator</u>.

(a)    The Collateral Administrator will have no responsibility under this Agreement other than to render the services called for hereunder in good faith and without willful misconduct or gross negligence in the performance of, or reckless disregard of, its duties hereunder. The Collateral Administrator shall incur no liability to anyone in acting upon any signature, instrument, statement, notice, resolution, request, direction, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Collateral Administrator may exercise any of its rights or powers hereunder or perform any of its duties hereunder either directly or by or through agents or attorneys, and the Collateral Administrator shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed hereunder with due care by it. Neither the Collateral Administrator nor any of its affiliates, directors, officers, shareholders, agents or employees shall be liable to the Portfolio Manager, the Issuer or others, except by reason of acts or omissions constituting bad faith, willful misconduct or gross negligence in the performance of, or reckless disregard of the

Collateral Administrator's duties hereunder. The Issuer will reimburse, indemnify and hold harmless the Collateral Administrator, and its affiliates, directors, officers, shareholders, agents, members and employees with respect to all expenses, losses, damages, liabilities, demands, charges and claims of any nature (including the reasonable fees and expenses of counsel and other experts) in respect of or arising from any acts or omissions performed or omitted by the Collateral Administrator, its affiliates, directors, officers, shareholders, agents, members or employees hereunder in good faith and without willful misconduct or gross negligence in the performance of, or reckless disregard of the Collateral Administrator' duties hereunder. Such indemnification will be paid subject to and in accordance with Section 11.1 of the Indenture.

(b)    The Collateral Administrator shall reimburse, indemnify and hold harmless the Issuer and its respective affiliates, directors, managers, officers, shareholders, agents, members and employees with respect to all expenses, losses, damages, liabilities, demands, charges and claims of any nature (including the reasonable fees and expenses of counsel) to the extent arising out of any acts or omissions performed or omitted by the Portfolio Manager or any employees, agents or subcontractors thereof, in bad faith or constituting willful misconduct, gross negligence in the performance of, or reckless disregard of the Collateral Administrator's duties hereunder.

(c)    Anything in this Agreement notwithstanding, in no event shall the Collateral Administrator be liable for special, punitive indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Collateral Administrator has been advised of such loss or damage and regardless of the form of action.

(d)    Nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer may have under any U.S. federal or state securities laws.

6.    <u>No Joint Venture</u>.  Nothing contained in this Agreement (a) shall constitute the Collateral Administrator, the Issuer and the Portfolio Manager as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, (b) shall be construed to impose any liability as such on any of them or (c) shall be deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of any other.

7.    <u>Term</u>.  This Agreement shall continue in effect so long as the Indenture remains in effect with respect to the Notes, unless this Agreement has been previously terminated in accordance with Section 7 hereof; provided that the Collateral Administrator and the Portfolio Manager shall be released from their respective obligations hereunder upon such party's ceasing to act as Collateral Administrator or Portfolio Manager, as applicable.  Notwithstanding the foregoing, the indemnification obligations of the Issuer and Collateral Administrator under Section 5 hereof shall survive the termination of this Agreement, the resignation or removal of the Collateral Administrator or the release of any party hereto with respect to matters, in the case of the indemnification obligations of the Collateral Administrator, occurring prior to such termination, resignation, removal or release.

8.    <u>Termination</u>.

(a)      This Agreement may be terminated without cause by any party hereto upon not less than 30 days' prior written notice to each other party hereto.

(b)      If at any time prior to payment in full of the Notes, USB shall resign or be removed as Trustee under Section 16.9 of the Indenture, such resignation or removal shall be deemed a resignation or removal of the Collateral Administrator hereunder (without any requirement for notice pursuant to Section 7(e) hereof).

(c)      At the option of the Portfolio Manager or the Issuer, this Agreement shall be terminated upon ten days' written notice of termination from the Portfolio Manager or the Issuer to the Collateral Administrator and the Issuer or the Portfolio Manager, as applicable, if any of the following events shall occur:

(i)      The Collateral Administrator shall default in the performance of any of its material duties under this Agreement and shall not cure such default within twenty days of receipt of written notice thereof (or, if such default cannot be cured in such time, shall not give within twenty days such assurance of the cure of such default as shall be reasonably satisfactory to the Portfolio Manager and the Issuer);

(ii)      The Collateral Administrator is dissolved (other than pursuant to a consolidation, amalgamation or merger) or has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(iii)      A court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Collateral Administrator in any involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appoint a receiver, conservator, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Collateral Administrator or for any substantial part of its property, or order the winding-up or liquidation of its affairs; or

(iv)      The Collateral Administrator shall commence a voluntary case under applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, conservator, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of the Collateral Administrator or for any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due.

If any of the events specified in clauses (ii), (iii) or (iv) of subsection (c) of this Section 7 shall occur, the Collateral Administrator shall give written notice thereof to the Portfolio Manager and the Issuer within five Business Days after the happening of such event.

(d)      Except when the Collateral Administrator shall be removed pursuant to subsection (c) of this Section 7 or shall resign pursuant to subsection (e) of this Section 7, no removal or resignation of the Collateral Administrator shall be effective until the date as of which a successor collateral administrator reasonably acceptable to the Portfolio Manager and

the Issuer shall have agreed in writing to assume all of the Collateral Administrator's duties and obligations pursuant to this Agreement and shall have executed and delivered an agreement in form and content reasonably satisfactory to the Issuer and the Portfolio Manager.

(e) Notwithstanding the foregoing, the Collateral Administrator may resign its duties hereunder without any requirement that a successor collateral administrator be obligated hereunder and without any liability for further performance of any duties hereunder upon at least 30 days' prior written notice to the Portfolio Manager and the Issuer of termination upon the occurrence of any of the following events and the failure to cure such event within such 30 day notice period: (i) failure of the Issuer to pay any of the amounts specified in Section 3 hereof within 30 days after such amount is due pursuant to Section 3 hereof to the extent that amounts thereof are available therefor under Section 11.1(a) of the Indenture or (ii) failure of the Issuer to provide any indemnity payment or expense reimbursement payable to the Collateral Administrator hereunder within 30 days of the receipt by the Issuer of a written request for such payment or reimbursement.

(f) Subject to Section 7(d), at any time that the Collateral Administrator is the same institution as the Trustee, the Collateral Administrator hereby agrees that upon the appointment of a successor trustee pursuant to Section 6.9 of the Indenture, the Collateral Administrator shall immediately resign and such successor Trustee shall automatically become the Collateral Administrator under this Agreement. Any such successor Trustee shall be required to agree to assume the duties of the Collateral Administrator under the terms and conditions of this Agreement in its acceptance of appointment as successor Trustee.

(g) Promptly upon the effective date of termination of this Agreement pursuant to Section 6 or resignation or removal of the Collateral Administration pursuant to Section 7, the Collateral Administrator shall forthwith deliver to, or as directed by, the Issuer all property and documents of or relating to the Assets then in the custody of the Collateral Administrator, and the Collateral Administrator shall cooperate with the Issuer and any successor Collateral Administrator in making an orderly transfer of the duties of the Collateral Administrator.

9. <u>Representations and Warranties</u>.

(a) The Issuer hereby represents and warrants to the Collateral Administrator and the Portfolio Manager as follows:

(i) The Issuer has been duly registered and is validly existing and in good standing under the laws of the Cayman Islands. The Issuer has the full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and has taken all necessary action to authorize this Agreement on the terms and conditions hereof on behalf of itself and for the Issuer, the execution, delivery and performance of this Agreement and the performance of all obligations imposed upon the Issuer hereunder. No consent of any other Person including, without limitation, limited partners and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Issuer in connection with this Agreement or the

execution, delivery, performance, validity or enforceability of this Agreement and the obligations imposed upon the Issuer hereunder, with respect to which the failure to obtain or make the same would materially adversely effect the Issuer's ability to perform its obligations under this Agreement, other than those which have been obtained or made. This Agreement constitutes the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms subject, as to enforcement, (A) to the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights as such laws would apply in the event of any bankruptcy, receivership, insolvency or similar event applicable to the Issuer and (B) to general equitable principles (whether enforceability of such principles is considered in a proceeding at law or in equity).

(ii)     The execution, delivery and performance of this Agreement will not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the governing instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer and will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(b)     The Portfolio Manager hereby represents and warrants to the Collateral Administrator and the Issuer as follows:

(i)     The Portfolio Manager has been duly organized and is validly existing and in good standing under the laws of the State of Delaware and has the full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and has taken all necessary action to authorize this Agreement on the terms and conditions hereof, the execution, delivery and performance of this Agreement and the performance of all obligations imposed upon it hereunder. No consent of any other Person including, without limitation, partners, managers and creditors of the Portfolio Manager, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Portfolio Manager in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement and the obligations imposed upon the Portfolio Manager hereunder, with respect to which the failure to obtain or make the same would materially adversely effect the Portfolio Manager's ability to perform its obligations under this Agreement, other than those which have been obtained or made. This Agreement constitutes, and each instrument and document required hereunder when executed and delivered by the Portfolio Manager hereunder, will constitute the legally valid and binding obligation of the Portfolio Manager enforceable against the Portfolio Manager in accordance with its terms subject, as to enforcement, (A) to the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights as such laws would apply in the event of

any bankruptcy, receivership, insolvency or similar event applicable to the Portfolio Manager and (B) to general equitable principles (whether enforceability of such principles is considered in a proceeding at law or in equity).

(ii)     The execution, delivery and performance of this Agreement and the documents and instruments required hereunder by the Portfolio Manager will not violate any provision of any existing law or regulation binding on the Portfolio Manager, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Portfolio Manager, or the governing instruments of, or any securities issued by, the Portfolio Manager or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Portfolio Manager is a party or by which the Portfolio Manager or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager and will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(c)     The Collateral Administrator hereby represents and warrants to the Portfolio Manager and the Issuer as follows:

(i)     The Collateral Administrator is a national banking association with trust powers duly organized and validly existing under the laws of the United States of America and has the full corporate power and authority to execute, deliver and perform this Agreement and all its obligations required hereunder and has taken all necessary action to authorize this Agreement on the terms and conditions hereof, the execution, delivery and performance of this Agreement and all its obligations required hereunder. No consent, approval, authorization or other action by or filing with any United States federal agency or other governmental body under any United States federal regulation or law, having jurisdiction over the banking or trust powers of USB, is required by the Collateral Administrator in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement and the obligations imposed upon it hereunder with respect to which the failure to obtain or make the same would materially adversely effect the Collateral Administrator's ability to perform its obligations under this Agreement. This Agreement constitutes, and each instrument and document required hereunder, when executed and delivered by the Collateral Administrator hereunder will constitute the legally valid and binding obligation of the Collateral Administrator enforceable against the Collateral Administrator in accordance with its terms subject, as to enforcement, (A) to the effect of bankruptcy, insolvency, reorganization, moratorium, liquidation or other similar laws affecting generally the enforcement of creditors' rights as such laws would apply in the event of any bankruptcy, receivership, insolvency, reorganization, moratorium, liquidation or other similar event applicable to the Collateral Administrator and (B) to general principles of equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing (whether enforceability of such principles is considered in a proceeding at law or in equity).

(ii) The execution, delivery and performance by the Collateral Administrator of this Agreement and the documents and instruments required hereunder will not violate any provision of any existing law or regulation binding on the Collateral Administrator, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Collateral Administrator, or the certificate or articles of association or incorporation or by-laws of the Collateral Administrator or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Collateral Administrator is a party or by which the Collateral Administrator or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Collateral Administrator and will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

10. _Amendments_. This Agreement may not be amended, changed, modified or terminated (except as otherwise expressly provided herein) except by the Portfolio Manager, the Issuer and the Collateral Administrator in writing. Promptly after the execution of any amendment hereto, the Issuer shall deliver a notice thereof to the Rating Agencies as required under the Indenture.

11. _Waiver_. No failure on the part of any party hereto to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

12. _Governing Law_. **THIS AGREEMENT AND ALL DISPUTES ARISING HEREFROM OR RELATING HERETO (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY AND CONSTRUED IN CONFORMITY WITH THE LAWS OF THE STATE OF NEW YORK WITH RESPECT TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT COULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

13. _Notices_. Except as otherwise provided herein, the Collateral Administrator agrees to accept and act upon instructions or directions pursuant to this Agreement sent by e-mail, facsimile transmission or other similar electronic methods; provided, however, that the Issuer and the Portfolio Manager shall provide to the Collateral Administrator an incumbency certificate listing persons designated to provide such instructions or directions, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing. If the Issuer or the Portfolio Manager elects to give the Collateral Administrator e-mail or facsimile instructions (or instructions by a similar electronic method) and the Collateral Administrator in its discretion elects to act upon such instructions, the Collateral Administrator's reasonable understanding of such instructions shall be deemed controlling. The Collateral Administrator shall not be liable for any losses, costs or expenses arising directly or indirectly from the Collateral Administrator's reliance upon and compliance with such instructions

notwithstanding such instructions conflicting with or being inconsistent with a subsequent written instruction. Each of the Issuer and the Portfolio Manager agree to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Collateral Administrator, including without limitation the risk of the Collateral Administrator acting in good faith on unauthorized instructions, and the risk of interception and misuse by third parties. Any notice, instruction or other instrument required or permitted to be given hereunder may be delivered in person to the offices of the parties as set forth herein during normal business hours, or delivered prepaid registered mail or by telex, electronic mail, cable or facsimile to the parties at the following addresses or such other address as may be notified by either party from time to time. All notices, requests, directions and other communications permitted or required hereunder shall be in writing and shall be deemed to have been duly given when received.

If to the Collateral Administrator, to:

U.S. Bank National Association
190 South LaSalle Street, 10th Floor
Chicago, Illinois 60603
Attention: Corporate Trust Services – ACIS CLO 2013-1
Telecopy: (312) 332-8030
E-mail: acis.clo.2013.01@usbank.com

If to the Issuer, to:

Acis CLO 2013-1 Ltd.
c/o Appleby Trust (Cayman) Ltd.
Clifton House
75 Fort Street, P.O. Box 1350
Grand Cayman, KY1-1108
Cayman Islands
Attn.:     The Directors
Telephone:     (345) 949-4900
Telecopy:     (345) 949-4901
Email:     atclsf@applebyglobal.com

If to the Portfolio Manager, to:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, Texas 75201
Attn.:     Portfolio Management – Acis CLO 2013-1
Telephone:     (972) 628-4100
Telecopy:     (972) 628-4147
Email:     jterry@hcmlp.com; hcovitz@hcmlp.com

14.    <u>Successors and Assigns; Assignments</u>.  Any corporation or association into which the Collateral Administrator may be merged or converted or with which it may be consolidated, or any corporation or association resulting from any merger, conversion or consolidation to which the Collateral Administrator shall be a party, or any corporation or association to which all or substantially all of the corporate trust business of the Collateral Administrator may be sold or otherwise transferred, shall be the successor Collateral Administrator hereunder without any further act. This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of each of the Portfolio Manager, the Issuer, and the Collateral Administrator. No party hereto may assign or delegate any of its rights or obligations under this Agreement (whether by way of security or otherwise) without the prior written consent of the other parties hereto; provided (a) that the Issuer may grant a lien on its rights hereunder as provided in the Indenture and the Collateral Administrator and the Portfolio Manager hereby acknowledge and consent to the creation of such lien, (b) the Collateral Administrator may, in accordance with Section 4(a) hereunder, delegate to, employ as agent, or otherwise cause any duty or obligation hereunder to be performed by, an agent without the prior written consent of the Portfolio Manager and the Issuer, provided that, except as otherwise provided herein, the Collateral Administrator shall remain directly liable to the Issuer and to the Portfolio Manager for the performance of its duties and the fulfillment of its obligations hereunder, and (c) the Portfolio Manager may delegate or assign its duties hereunder upon the same terms and conditions for delegation and assignment as are set forth in the Portfolio Management Agreement.

15.    <u>Counterparts</u>.  The parties hereto agree that the execution of this Agreement may be completed by the exchange of facsimile or PDF signature pages, with the exchange of originally executed copies to be completed as soon as reasonably possible thereafter.  The parties hereto further agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument.

16.    <u>Conflict with the Indenture</u>.  If this Agreement shall require that any action be taken with respect to any matter and the Indenture shall require that a different action be taken with respect to such matter, and such actions shall be mutually exclusive, or if this Agreement should otherwise conflict with the Indenture, the Indenture shall govern.

17.    <u>Conditions Precedent</u>.  The rights and obligations of the parties to this Agreement shall become effective upon execution and delivery of (a) this Agreement, (b) the Portfolio Management Agreement, and (c) the Indenture.

18.    <u>Jurisdiction</u>.    The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in the City of New York in any Proceeding arising out of or relating to this Agreement, and the parties hereby irrevocably agree that all claims in respect of any such Proceeding may be heard and determined in any such New York State or Federal court. The parties hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such Proceeding. The parties irrevocably consent to the service of process in any Proceeding by the mailing or delivery of copies of such process as set forth in Section 13 hereof. The parties agree that a final non-appealable judgment in any such

Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

19. <u>Survival</u>. Notwithstanding any term herein to the contrary, all indemnifications set forth or provided for in this Agreement, together with Sections 3, 4 and 20 of this Agreement, shall survive the termination of this Agreement and the resignation or removal of the Collateral Administrator.

20. <u>Waiver of Jury Trial Right</u>. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

21. <u>Bankruptcy Non-Petition and Limited Recourse</u>. Notwithstanding any other provision of this Agreement, (i) the Collateral Administrator and the Portfolio Manager may not, prior to the date which is one year (or the then applicable preference period) and one day after the payment in full of all the Notes, institute against, or join any other Person in instituting against the Issuer, any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or any similar laws, (ii) the Issuer's obligations hereunder will be solely the corporate obligations of the Issuer, and the Collateral Administrator and the Portfolio Manager will not have any recourse to any of the directors, officers, employees, members, managers, governors or Affiliates of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby and (iii) the obligations of the Issuer hereunder shall be limited to the net proceeds of the Assets (if any), and following realization of the Assets and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder, and any claims in respect thereof, shall be extinguished and shall not thereafter revive. This paragraph shall survive the termination of this Agreement.

22. <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

[Remainder of page intentionally blank.]

SK 03687 0125 1307118 v4

IN WITNESS WHEREOF, the parties hereto have caused this Collateral
Administration Agreement to be executed effective as of the day and year first above written.

ACIS CLO 2013-1 LTD., as Issuer

By: _____

Name: ___David Boyd_____

Title: ___Director_____


U.S. BANK NATIONAL ASSOCIATION, as
Collateral Administrator

By: _____

Name: _____

Title: _____


ACIS CAPITAL MANAGEMENT, L.P., as
Portfolio Manager

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Collateral Administration Agreement to be executed effective as of the day and year first above written.

ACIS CLO 2013-1 LTD., as Issuer

By: _____
Name: _____
Title: _____

U.S. BANK NATIONAL ASSOCIATION, as Collateral Administrator

By: _____
Name: LOUIS J. MARROTEAM
Title: ASSISTANT VICE PRESIDENT

ACIS CAPITAL MANAGEMENT, L.P., as Portfolio Manager

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Collateral Administration Agreement to be executed effective as of the day and year first above written.

ACIS CLO 2013-1 LTD., as Issuer

By: _____
Name: _____
Title: _____

U.S. BANK NATIONAL ASSOCIATION, as Collateral Administrator

By: _____
Name: _____
Title: _____

ACIS CAPITAL MANAGEMENT, L.P., as Portfolio Manager

By: _____
Name: _____
Title: _____