Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthias Kleinsasser – State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR THE CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |
| | § | |

| | | |
|---|---|---|
| **ROBIN PHELAN, Chapter 11 Trustee,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **Adversary No. 18-_____** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.,  HIGHLAND CLO FUNDING, LTD.** | § | |
| **f/k/a ACIS LOAN FUNDING, LTD., CLO** | § | |
| **HOLDCO, LTD., NEUTRA, LTD.,  ACIS** | § | |
| **CLO 2014-3 LTD., ACIS CLO 2014-4 LTD.,** | § | |
| **ACIS CLO 2014-5 LTD., ACIS CLO 2015-6** | § | |
| **LTD., ACIS CLO 2014-3 LLC, ACIS CLO** | § | |
| **2014-4 LLC, ACIS CLO 2014-5 LLC, and** | § | |
| **ACIS CLO 2015-6 LLC,** | § | |
| | § | |
| Defendants. | § | |

## VERIFIED ORIGINAL COMPLAINT AND APPLICATION
## FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TO THE HONORABLE STACEY G. C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:**

Robin Phelan (the "Trustee"), the Chapter 11 trustee of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP" together with Acis LP, the "Debtors" or "Acis") in the above styled and jointly administered bankruptcy cases (the "Bankruptcy Cases"), files this *Verified Original Complaint and Application for Temporary Restraining Order and Preliminary Injunction* (this "Complaint") against Highland Capital Management, L.P. ("Highland"), Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF" or "ALF"),[1] CLO Holdco, Ltd. ("Holdco"), Neutra, Ltd. ("Neutra," and together with HCLOF, and Holdco, the "Highland Affiliates"), Acis CLO 2014-3 Ltd. ("CLO-3"), Acis CLO 2014-4 Ltd. ("CLO-4"), Acis CLO 2014-5 Ltd. ("CLO-5"), Acis CLO 2015-6 Ltd. ("CLO-6," and together with CLO-3, CLO-4, and CLO-5, the "Issuers"), Acis CLO 2014-3 LLC ("CLO-3 LLC"), Acis CLO 2014-4 LLC ("CLO-4 LLC"), Acis CLO 2014-5 LLC ("CLO-5 LLC"), and Acis CLO 2015-6 LLC ("CLO-6 LLC," and together with CLO-3 LLC, CLO-4 LLC, CLO-5 LLC, the "Co-Issuers"), and respectfully states as follows:

## I.     INTRODUCTION[2]

1.      On May 31, 2018, as an extraordinary measure, this Court issued a temporary restraining order ("TRO"), *sua sponte*, pursuant to section 105 of the Bankruptcy Code—which the Court stated it did not take lightly—preventing all Restrained Parties from taking any action

---

[1] On October 30, 2017, Acis Loan Funding, Ltd. changed its name to Highland CLO Funding, Ltd. The defined term "ALF" used herein denotes Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. prior to October 30, 2017 and the defined term "HCLOF" used herein denotes Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. on and after October 30, 2017.

[2] Capitalized terms not defined in the Introduction have the meaning ascribed to such terms later in the Complaint.

in furtherance of an Optional Redemption for fourteen (14) days. This TRO ended on June 15 at 12:01 a.m.

2.      It appears that Highland violated the TRO by selling approximately $23 million of loans pursuant to the First Optional Redemption Notices after May 31, 2018.[3]

3.      On June 13, 2018, the day before the hearing on the Trustee's Motion to Extend the TRO, HCLOF advised the Trustee that it would withdraw the First Optional Redemption Notices. Consequently, the Trustee advised the Court that there was no need to go forward with the Motion to Extend the TRO on the following day.

4.      On June 14, 2018, HCLOF's counsel told the Court that HCLOF had withdrawn the First Optional Redemption Notices but reserved the right to reissue the notices at some future date, stating:

> That process has, in fact, concluded. That was done obviously for multiple reasons. My client doesn't believe that this is the appropriate time to be effectuating such a redemption for its own economic reasons, setting aside the complications it's obviously caused for others in this room. But needless to say, that, too, is an effort to try to bring, as I believe the Court has requested, and others have, some sanity to this process.[4]

Because the First Optional Redemption Notices had been withdrawn, the Trustee did not proceed with the Motion to Extend the TRO.

5.      At that hearing, the Trustee informed the Court and the parties that after hearing the testimony of Mr. Scott on June 12, 2018, he was developing additional options in an attempt to accommodate HCLOF.

---

[3] Considering Highland's current and prior actions in attempting to effectuate (and possibly completing) unauthorized trades without approval of the Trustee, the Trustee believes there is sufficient urgency to the Court hearing the application for a TRO on an emergency basis. The Trustee does not waive and reserves all rights in connection with any unauthorized trades or transfers that have occurred or may occur.

[4] See Docket No. 298 at p. 7, ll. 15-22, Transcript of Hearing Held June 14, 2018.

6.      On June 15, 2018, the very day after the hearing on the Motion to Extend the TRO was to have taken place, and after the TRO had expired, HCLOF—without requesting relief from the stay under section 362(d) of the Bankruptcy Code or requesting authority to take such action under section 363(b) of the Bankruptcy Code—again advised the Trustee that it had directed the Issuers to effectuate the Optional Redemption on July 30, 2018.

7.      On June 20, 2018, Highland presented to the Trustee hundreds of millions of dollars of "proposed trades" pursuant to this second Optional Redemption, and further advised the Trustee:

> **In order to effectuate the Transaction and obtain best execution, Highland requests your consent by no later than 2pm tomorrow, Thursday June 21, 2018 (the "Deadline").** The Acis Accounts may incur losses as a result of your failure to respond by the Deadline.
>
> **Highland believes it has an independent fiduciary obligation to the CLOs.  If you instruct Highland not to proceed to undertake the Optional Redemption, Highland reserves it rights to seek appropriate protection and redress at law or in equity**.[5]

8.      Once again, Highland and the Highland Affiliates, through this purported Optional Redemption, without Court approval, have attempted to exert control over Acis's property, the PMAs, in violation of the automatic stay and outside the ordinary course of Acis's business. In addition, Acis, pursuant to the PMAs, controls trading of the loans in the CLOs. Consequently, the notices of optional redemption sent by HCOLF are an attempt to obtain a property right (the right to control trading of the loans in the CLOs) from Acis as well as an attempt to exercise control over contractual property rights of Acis, all in violation of section 362(a)(3) of the Bankruptcy Code.

9.      This action by Highland and the Highland Affiliates represents yet another attempt in their greater scheme to systematically dismantle and strip away Acis's assets, with the

---

[5] Emphasis in original email correspondence.

larger goal of leaving effectively nothing for its creditors. In fact, HCLOF is attempting to use rights transferred prepetition, for no value, from Acis to now strip Acis of its remaining rights.

10. By this Complaint, the Trustee seeks: (i) a temporary restraining order and preliminary injunction to preserve the status quo and protect the estates by enjoining the Defendants from taking any action in furtherance of the Optional Redemption, or any action to effectuate yet another optional redemption at some future time under section 9.2 of the Indentures, unless the Defendants seek Court approval, and the Court lifts the automatic stay to allow such actions, or the Court confirms a plan pursuant to 11 U.S.C. § 1129; (ii) relief pursuant to 11 U.S.C. § 362(k) for Defendants' willful violation of the automatic stay for actions taken in furtherance of the Optional Redemption; (iii) a declaratory judgment that the Optional Redemption Notices are defective and ineffective pursuant to the PMAs and the Indentures; (iv) a declaratory judgment that the Optional Redemption Notices are ineffective pursuant to 11 U.S.C. § 363(b) because such actions are outside the ordinary course of Acis's business and were taken without Court approval; and (v) a declaratory judgment that the Trustee has not violated his fiduciary duties by declining to carry out the Optional Redemption.

## II.    JURISDICTION

11. This Court has subject matter jurisdiction over the Bankruptcy Cases and this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

12. This matter arises under the laws of the United States of America. This Adversary Proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The Trustee hereby consents to the Court's entry of a final judgment resolving this Adversary Proceeding.

13. Venue of the Adversary Proceeding in this District is proper under 28 U.S.C. § 1409.

### III.   PARTIES

14.     The Trustee is an individual and may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.

15.     Highland is a limited partnership incorporated under the laws of the State of Delaware, with its principal place of business located at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

16.     HCLOF is an exempted company incorporated with limited liability under the laws of Guernsey, with its registered office located at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands.

17.     Holdco is an exempted company incorporated with limited liability under the laws of Guernsey, with its registered office located at 190 Elgin Ave., George Town, Grand Cayman, Cayman Islands KY 1-9005.

18.     Neutra is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

19.     CLO-3 is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

20.     CLO-4 is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

21.     CLO-5 is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

22.     CLO-6 is an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands.

23.     CLO-3 LLC is a limited liability company organized under the laws of the State of Delaware, with its registered office located at 850 Library Avenue, Ste. 204, Newark, Delaware 19711.

24.     CLO-4 LLC is a limited liability company organized under the laws of the State of Delaware, with its registered office located at 850 Library Avenue, Ste. 204, Newark, Delaware 19711.

25.     CLO-5 LLC is a limited liability company organized under the laws of the State of Delaware, with its registered office located at 850 Library Avenue, Ste. 204, Newark, Delaware 19711.

26.     CLO-6 LLC is a limited liability company organized under the laws of the State of Delaware, with its registered office located at 850 Library Avenue, Ste. 204, Newark, Delaware 19711.

## IV.     **BACKGROUND**

**A.     The Bankruptcy Cases**

**1.     Involuntary Petitions**

27.     On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Mr. Terry"), as petitioning creditor, filed involuntary petitions against both Acis LP and Acis GP, thereby

initiating the Bankruptcy Cases. *See* Case No. 18-30264, Docket No. 1 & Case No. 18-30265, Docket No. 1.

28. On January 31, 2018, Mr. Terry filed the *Emergency Motion of Petitioning Creditor to Abrogate or Modify 11 U.S.C § 303(f), Prohibit Transfer of Assets, and Impose, Inter Alia, 11 U.S.C § 363* [Case No. 18-30264, Docket No. 3 & Case No. 18-30265, Docket No. 3] (the "303(f) Motion"). After a two-day hearing on February 6 and 7, 2018 (the "303(f) Hearing"), the Court found that it was proper to impose section 363 of the Bankruptcy Code[6] before the hearing on the Involuntary Petitions and granted the 303(f) Motion.

29. On April 13, 2018, after six days of testimony and argument, this Court entered its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] (the "Opinion") and *Order for Relief in an Involuntary Case* [Case No. 18-30264, Docket No. 119 & Case No. 18-30265, Docket No. 114] (the "Order for Relief").

### 2. Chapter 7 Cases Converted to Chapter 11

30. Following entry of the Order for Relief, Diane Reed (the "Chapter 7 Trustee") was appointed the interim Chapter 7 trustee for these Bankruptcy Cases.

31. On May 4, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 171] (the "Conversion Motion").

32. On May 4, 2018, Mr. Terry filed his *Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 173] (the "Trustee Motion").

---

[6] 11 U.S.C § 101 *et seq.* (the "Bankruptcy Code").

33.    On May 8, 2018, Highland filed its *Comments by Highland Capital Management L.P. on (A) Chapter 7 Trustee's Expedited Motion to Convert Cases to Chapter 11; and (B) Creditor Joshua Terry's Motion for an Order Appointing a Trustee for the Chapter 11 Estates for the Debtors* [Docket No. 190] (the "Comment"). The Comment states that

> the requisite equity and subordinated noteholders of the CLOs have issued Optional Redemption Notices . . . . These Optional Redemption Notices mandate that the CLOs be liquidated by June 14, 2018, in accordance with the terms of the Indentures as set forth therein. There is a potential that any change in the trustees could create market risks in effectuating the liquidation of the CLOs.

Comment ¶ 11.[7] A true and correct copy of the Comment (including the optional redemption notices as exhibits thereto) is attached hereto as **Exhibit "A."**

34.    On May 11, 2018, the Court entered its *Order Granting Trustee's Expedited Motion to Convert* Cases *to Chapter 11* [Docket No. 205] (the "Conversion Order").

35.    Following entry of the Conversion Order, Robin Phelan was appointed Chapter 11 Trustee of the Debtors in the Bankruptcy Cases.

**B.    Highland and the Highland Affiliates' Role in these Cases**

**1.    Highland**

36.    Although Highland did not appear in the Bankruptcy Cases until after the entry of the Order for Relief, Highland employees directed Acis's actions at all times before the Order for Relief. *See* Opinion ¶ 30.

> Mr. Dondero [the Chief Executive of Highland] testified that he has decision making authority for the Alleged Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington (General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant General Counsel of Highland) . . . . Mr. Leventon is designated to be the representative for the Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-trial discovery)—he explained that this representative-authority derives from the Shared Services Agreement. Mr. Leventon testified that he takes his instructions generally through his direct supervisor, Mr. Ellington.

---

[7] The Trustee disputes that the Optional Redemption Notices are effective.

*Id.* Additionally, the two indirect owners of Highland, James Dondero and Mark Okada, testified at the Involuntary Trial.[8]

### 2. The Highland Affiliates

37. As the Court is aware, Highland and its network of affiliates have numerous other connections to this case. HCLOF, Holdco, and Neutra attempted to intervene in the trial on the Involuntary Petitions.

38. HCLOF is the

> holder of subordinated notes issued by the CLOs (*i.e.*, the bottom traunche of notes on which the CLO special purpose entity is obligated), and has voting rights and is itself a capital provider, but it takes the most risk and receives the very last cash flow from the CLOs. It, in certain ways, controls the CLO vehicle—for example, by virtue of having the ability to make a redemption call after a certain 'no-call' period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's). Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ('ALF'), which was incorporated under the laws of the island nation of Guernsey, was the CLO equity holder. To be clear, ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP. Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the 'ALF Portfolio Management Agreement'— not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs). No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).

Opinion at pp. 12-13 (footnotes omitted).

### C. Additional Factual Background

### 1. The CLOs, the PMAs, and the Indentures

39. Acis LP is the portfolio manager for funds of certain CLO's: (i) Acis CLO 2013-1 Ltd. ("CLO-1"), (ii) CLO-3, (iii) CLO-4, (iv) CLO-5, and (v) CLO-6. *See* Opinion ¶ 24. CLO-1, CLO-3, CLO-4, CLO-5 and CLO-6 are collectively referred to herein as the "Acis CLOs."

---

[8] Opinion at p. 3, n. 4 ("Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and [O]kada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable").

40. As relevant herein, Acis LP manages the Acis CLOs through five PMAs.[9] Acis LP generates revenue primarily through the management of the Acis CLOs via the PMAs. *See* Opinion ¶ 13. True and correct copies of the PMAs are attached hereto as **Exhibit "B."** Each of the Acis CLOs is governed by the Indentures.[10] True and correct copies of the Indentures are attached hereto as **Exhibit "C."**

## 2. Shared Services and Sub-Advisory Agreement

41. Acis contracts out its operations to Highland pursuant to the Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland, dated March 17, 2017 (the "Sub-Advisory Agreement"), and the Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland, dated March 17, 2017 (the "Shared Services Agreement"). These agreements are terminable by Acis on 30-days' notice, without cause. As the Court explained in its Opinion:

> Acis LP and Acis GP/LLC have never had any employees. Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself. Highland has approximately 150 employees in the United States. Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of: (a) a Shared Services Agreement (herein so called), which provides "back office'" personnel—such as human resources, accounting, legal and information technology to the Highland family of

---

[9] The PMAs include: (i) that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013 (the "CLO-1 PMA"); (ii) that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014 (the "CLO-3 PMA"); (iii) that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014 (the "CLO-4 PMA"); (iv) that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014 (the "CLO-5 PMA"); and (v) that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015 (the "CLO-6 PMA"). The CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA are collectively referred to herein as the "PMAs."

[10] The Indentures include: (i) that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-1 Indenture"); (ii) that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, CLO-3 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-3 Indenture"); (iii) that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, CLO-4 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-4 Indenture"); (iv) that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, CLO-5 LLC, as co-issuer, and U.S. Bank, as trustee (the "CLO-5 Indenture"); and (v) that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, CLO-6 LLC, as co-issuer and U.S. Bank, as trustee (the "CLO-6 Indenture"). The CLO-1 Indenture, CLO-3 Indenture, CLO-4 Indenture, CLO-5 Indenture, and CLO-6 Indenture are collectively referred to herein as the "Indentures."

---

companies; and (b) a Sub-Advisory Agreement (herein so called), which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry. The evidence indicated that this is typical in the CLO industry to have such agreements.

Opinion at p. 14 (footnotes omitted).

### 3.    The ALF PMA Transfer

42.    Prior to October 27, 2017, Acis LP—not ALF—had authority to direct and effectuate an optional redemption under the PMAs. Acis LP had this authority pursuant to another Portfolio Management Agreement by and between Acis LP and ALF, dated December 22, 2016 (the "ALF PMA").  The ALF PMA provided broad authority to Acis LP as the portfolio manager of ALF. Section 5 of the ALF PMA set out Acis LP's authority, which included authority for and in the name of ALF to:

> (i) invest, directly or indirectly . . . in all types of securities and other financial instruments of United States and non-U.S. entities . . . including without limitation . . . notes representing tranches of debt ('CLO Notes') issued by a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans (which may be represented by a debt or equity security) (a 'CLO') . . . (each of such items, 'Financial Instruments'), (ii) provide credit and market research and analysis in connection with the investments and ongoing management of [ALF] and direct the formulation of investment policies and strategies for [ALF] . . . ; (iii) cause [ALF] to engage in . . . agency, agency cross, related party principal transactions with affiliates of [Acis LP] . . . ; and (iv) **vote Financial Instruments, participate in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters**.

ALF PMA § 5(a)-(q) (emphasis added). A true and correct of the ALF PMA is attached hereto as

**Exhibit "D."**

43.    While ALF did not have authority to terminate the ALF PMA, Acis LP could terminate the ALF PMA without cause upon at least ninety (90) days' notice. *See* ALF PMA § 13(a)-(c). Still, the ALF PMA provided for the removal of Acis LP as portfolio manager "for cause." *See* ALF PMA § 14(a)-(e).

44.     On October 27, 2017, just seven days after Mr. Terry's arbitration award, Acis LP effectively terminated its own portfolio management rights under the ALF PMA and transferred its authority and those valuable portfolio management rights—for no value—to Highland HCF Advisors, Ltd. ("Highland HCF").

45.     This transfer of Acis LP's portfolio management rights to Highland HCF was accomplished by way of a new Portfolio Management Agreement entered into by ALF and Highland HCF on October 27, 2017 (the "October 2017 PMA"), which cancelled and terminated the ALF PMA and empowered Highland HCF with the same broad authority to direct the management of ALF as was previously held by Acis LP under the ALF PMA (the "ALF PMA Transfer"). *See* October 2017 PMA §§ 1 & 5(a)-(q). A true and correct of the October 2017 PMA is attached hereto as **Exhibit "E."**

46.     As the Court explained:

On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF. This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.

Opinion at p. 19 (footnotes omitted).

47.     Under the prior ALF PMA, Acis LP's consent to the termination of the ALF PMA was required in order to effectuate the ALF PMA Transfer. So, (without expressing its business judgment to this transfer) Acis LP simply signed the October 2017 PMA, consenting and agreeing to its removal and replacement, and transferring all authority and  management rights as portfolio manager of ALF to Highland HCF under the October 2017 PMA.

48.     Without this ALF PMA Transfer, which transferred Acis LP's rights under the ALF PMA to Highland HCF, HCLOF could not have attempted to direct and effectuate an optional redemption, and deplete Acis's assets, as it is now attempting to do.

**4.     The First Optional Redemption Notices**

49.     On April 30, 2018, HCLOF sent five notices purportedly requesting optional redemption pursuant to the Section 9.2 of each of the Indentures (the "First Optional Redemption Notices").[11]   True and correct copies of the First Optional Redemption Notices are attached hereto as **Exhibit "F."**

50.     The First Optional Redemption Notices directed Acis LP to effectuate an Optional Redemption (as defined under each Indenture).   Under Section 9.2 of each Indenture, upon the receipt of a notice of redemption, Acis, in its discretion, is to direct the sale of the Collateral Obligations (as defined by each Indenture) and other Assets. *See* CLO-1 Indenture, § 9.2; CLO-3 Indenture, § 9.2(b); CLO-4 Indenture, § 9.2; CLO-5 Indenture, § 9.2; & CLO-6 Indenture, § 9.2. In the Indentures, "Assets" is defined to include the PMAs. *See* CLO-1 Indenture, p. 8; CLO-3 Indenture, p. 10; CLO-4 Indenture, p. 10; CLO-5 Indenture, p. 10; & CLO-6 Indenture p. 10. Consequently, the Optional Redemption directs Acis LP to liquidate assets of the CLOs over which Acis has certain property rights and, effectively, the PMAs.

51.     The Trustee analyzed the First Optional Redemption Notices and determined there were various defects which rendered them ineffective. Therefore, on May 22, 2018, the Trustee sent his responses to the five First Optional Redemption Notices (the "Redemption Responses").   True and correct copies of the Redemption Responses are attached hereto as **Exhibit "G."**

---

[11] Nexpoint Strategic Opportunities Fund (f/k/a NexPoint Credit Strategies Fund) ("Nexpoint") and Drexel Limited ("Drexel") joined in one of the Optional Redemption Notices.  Like HCLOF, Nexpoint is an affiliate of Highland.

**D.    Highland Litigation and TRO**

52.    On May 30, 2018, Highland and HCLOF filed Adversary No. 18-03078, styled *Highland Capital Management, L.P. and Highland CLO Funding, Ltd. v. Robin Phelan, Chapter 11 Trustee*, in this Court (the "<u>Highland Adversary</u>"). The Highland Adversary alleges, among other things, that the Trustee, by failing to effectuate the Optional Redemption pursuant to the First Optional Redemption Notices, breached the PMAs.

53.    On May 31, 2018, upon the request of the Trustee, the Court held a status conference in the Bankruptcy Cases, and the Trustee explained that, almost immediately after his appointment, he began exploring plan options regarding a potential transaction that would transfer rights under the PMAs, the Sub-Advisory Agreement, the Shared Services Agreement, and the subordinated notes, with respect to CLO-3, CLO-4, CLO-5, and CLO-6, with the goal of maximizing value for all parties.  The Trustee informed the Court that he was in the process of negotiating a transaction with a party that would potentially provide enough value to pay all parties, including all of Acis's creditors in full.

54.    On May 31, 2018, at the conclusion of the status conference, the Court, *sua sponte*, issued a TRO, which prevented all parties from taking any action in furtherance of the Optional Redemption for fourteen (14) days.

55.    On June 6, 2018 the Court entered its *Temporary Restraining Order*, whereby the Restrained Parties (as defined in the TRO) were enjoined until 12:01 a.m. on June 15, 2018, from:

a)    proceeding with, effectuating, or otherwise taking any action in furtherance of the Optional Redemption, call, or other liquidation of the Acis CLOs; and

b)    sending, mailing, or otherwise distributing any notice to the holders of the Acis CLOs in connection with the Optional Redemption, call, or other liquidation of the Acis CLOs.

56.     On June 8, 2018, the Trustee filed the *Emergency Motion to Approve Break-Up Fee*, *Expense Reimbursement, and Replacement Sub-Advisory and Shared Services Provider, Oaktree Capital Management, L.P.* (the "Motion to Approve Break-Up Fee"). *See* Docket No. 263.

57.     As described in the Motion to Approve Break-Up Fee, the Trustee has executed a Commitment Letter (the "Commitment Letter") with Oaktree Capital Management, L.P. ("Oaktree") whereby Oaktree would: (i) obtain the subordinated equity rights in CLO-3, CLO-4, CLO-5, and CLO-6 after payment in full to HCLOF of a premium above the value of those rights; (ii) obtain Acis LP's rights, title and interests in the respective PMAs for enough to pay the creditors of Acis in full; and (iii) replace Highland as provider of the services currently provided by Highland under the Sub-Advisory Agreement and the Shared Services Agreement, at a fraction of the cost currently being charged by Highland (the "Oaktree Transaction"). A true and correct copy of the Commitment Letter is attached hereto as **Exhibit "H."**

58.     The Oaktree Transaction, if consummated, would provide a return to all holders of the subordinated notes *in excess* of what they would receive in an optional redemption and pay all Acis's allowed creditors in full.[12]   The Trustee intends to effectuate the Oaktree Transaction via a Chapter 11 plan.

59.     On June 11, 2018, the Trustee filed his *Motion to Extend the Temporary Restraining Order* (the "Motion to Extend the TRO"), in which the Trustee sought to extend the TRO for an additional 14 days. *See* Docket No. 275.

60.     Also on June 11, 2018, HCLOF filed its *Memorandum of Law in Opposition to the Continuance of the Temporary Restraining Order* (the "Brief in Opposition to Extending the TRO"). *See* Docket. No. 271. This pleading did not mention that Highland apparently violated

---

[12] Based upon current projected and known claims and also based on expeditious plan confirmation.

the TRO by initiating approximately $23 million of sales of CLO assets pursuant to the Optional Redemption after the Court issued its TRO on May 31.

**E.     The Second Optional Redemption Notices**

61.     On June 13, 2018, the day before the hearing on the Motion to Extend the TRO, HCLOF advised the Trustee that HCLOF would withdraw the First Optional Redemption Notices.  HCLOF's correspondence with the Trustee indicating its intent to withdraw the First Optional Redemption Notices is attached hereto as **Exhibit "I"** and incorporated herein for all purposes. Thereafter, the Trustee advised the Court that HCLOF was withdrawing the First Optional Redemption Notices, and the Trustee therefore did not intend to go forward with the Motion to Extend the TRO on June 14.

62.     On June 14, 2018, counsel for HCLOF advised the Court that HCLOF had withdrawn the First Optional Redemption Notices.  Counsel for HCLOF further advised the Court that the First Optional Redemption Notices were withdrawn to bring "some sanity to this process":

> That was done obviously for multiple reasons. My client doesn't believe that this is the appropriate time to be effectuating such a redemption for its own economic reasons, setting aside the complications it's obviously caused for others in this room. But needless to say, that, too, is an effort to try to bring, as I believe the Court has requested, and others have, some sanity to this process.[13]

63.     On June 15, 2018, at 12:01 a.m., the TRO expired.

64.     Later on June 15, 2018, despite the fact that HCLOF had just withdrawn the First Optional Redemption Notices, had advised the Court of the same, and the Trustee and the Court acted in reliance on same, HCLOF gave notice to the Trustee that it was again requesting an Optional Redemption pursuant to the Section 9.2 of each of the Indentures (the "Second Optional Redemption Notices," and together with the First Optional Redemption Notices, the "Optional

---

[13] See Docket No. 298 at p. 7, ll. 16-22, Transcript of Hearing Held June 14, 2018.

Redemption Notices"").  The Second Optional Redemption Notices are attached hereto as **Exhibit**

**"J"** and are incorporated herein for all purposes.

65.    By the Second Optional Redemption Notices, HCLOF directed the Issuers:

to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full on July 30, 2018 for the express purpose of placement of a portion of the portfolio of assets held by the Co-Issuers into a warehouse arrangement or a total return swap or other derivative arrangement with Highland Capital Management, L.P. acting as the Sub-Advisor pursuant to a Sub-Advisory Agreement.

66.    On June 20, 2018, Highland presented to the Trustee hundreds of millions of

dollars of "proposed trades" pursuant to this second Optional Redemption.  In its correspondence

to the Trustee regarding such proposed trades, Highland further stated:

**In order to effectuate the Transaction and obtain best execution, Highland requests your consent by no later than 2pm tomorrow, Thursday June 21, 2018 (the "Deadline")**.  The Acis Accounts may incur losses as a result of your failure to respond by the Deadline.

**Highland believes it has an independent fiduciary obligation to the CLOs.  If you instruct Highland not to proceed to undertake the Optional Redemption, Highland reserves it rights to seek appropriate protection and redress at law or in equity.**[14]

## V.    CAUSES OF ACTION

### *Count 1:  Temporary Restraining Order and Preliminary Injunction*

67.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

68.    Absent affirmative relief from the automatic stay, any action to effectuate the

Optional Redemption by way of the Optional Redemption Notices violates the automatic stay

because it represents an "act to obtain possession of property of the estate or of property from the

estate or to exercise control over property of the estate."[15] Further, any action taken by the

Defendants to effectuate the Optional Redemption is outside the ordinary course of Acis's

---

[14] Emphasis in original email correspondence.
[15] 11 U.S.C. § 362(a)(3).

business, and therefore requires Court approval.[16] Acis's rights under the PMAs are valuable, and if Acis were to lose such rights, immediate and irreparable harm would result to Acis's creditors and third parties with financial interests in Acis's bankruptcy estates because confirmation of a plan of reorganization funded by Oaktree pursuant to the Oaktree Transaction would be impossible.  In addition to the Oaktree Transaction, the Trustee has received proposals from other qualified parties to fund alternative plans of reorganization which may include a reset of the CLOs and continuance of Acis as the portfolio manager of the CLOs. In addition, HCLOF is using rights fraudulently transferred from Acis to effectuate the Optional Redemptions. Therefore, pursuant to Bankruptcy Rule 7001(7) and Civil Rule 65, incorporated by Bankruptcy Rule 7065, the Trustee seeks a temporary restraining order and preliminary injunction, to prohibit the Defendants from taking any further actions to effectuate the Optional Redemption, or any action to effectuate yet another optional redemption at some future time under section 9.2 of the Indentures, unless the Defendants seek Court approval, and the Court lifts the automatic stay to allow such actions, or the Court confirms a plan pursuant to 11 U.S.C. § 1129.

69.     The standards for a temporary restraining order and a preliminary injunction are the same.[17]   To obtain either, the movant must show (a) it has a substantial likelihood of prevailing on the merits; (b) it will suffer irreparable injury without the injunction; (c) the threatened injury to the movant outweighs the damage the proposed injunction may cause to the parties opposing it; and (d) that the requested injunction would not be against the public interest.[18]  The Court must necessarily make its decision by relying on an early and abbreviated

---

[16] *See* 11 U.S.C. § 363(b).
[17] *Clark v. Pritchard*, 812 F.2d 991, 993 (5th Cir. 1987); *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015); *Miranda v. Wells Fargo Bank, N.A.,* 2013 U.S. Dist. LEXIS 90632 (N.D. Tex. June 27, 2013).
[18] *Id.*

proceeding and set of facts.[19]  Quick and abbreviated determinations are necessary to recognize the goal of injunctive relief, which is to maintain the status quo to permit the Court the time necessary to make a decision on the merits after full development of the facts.[20]

70.     Moreover, not all of the four (4) factors must be given equal weight.  According to the Fifth Circuit Court of Appeals: "a sliding scale must be applied in considering the probability of plaintiffs' winning on the merits and plaintiffs' irreparable injury in the absence of interlocutory relief…."[21] and "…none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."[22]  This means that as long as the Court finds that there is some likelihood of ultimate success (*i.e.,* not zero likelihood of success), the Court can give greater weight to the severity and irreparability of the harm and the relative hardships to the movant and opponent of the injunctive relief.[23]

71.     The Trustee can show that the elements warranting a temporary restraining order and preliminary injunction exist here: (1) the Trustee has a "substantial likelihood of success on the merits" of a claim regarding (i) violation of the automatic stay if injunction is not granted, (ii) failing to comply with the requirements of an optional redemption, (iii) utilizing assets transferred for no value to attempt to effectuate an optional redemption, (iv) failing to obtain court authority under Section 363 to effectuate an optional redemption, and (v) confirmation of an effective plan of reorganization; (2) creditors and interested third-parties face a substantial threat of imminent and irreparable injury to their interests in the Debtors' bankruptcy estates if an injunction is not issued since confirmation of a plan of reorganization funded by Oaktree or other

---

[19] *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975).
[20] *Kliebert*, 141 F. Supp. 3d at 635.
[21] *Siff v. State Democratic Executive Committee*, 500 F.2d 1307 (5th Cir. 1974).
[22] *Seatrain*, 518 F.2d at 180.
[23] *Id.*

competent party will be eliminated; (3) the threatened injury to interested parties "if the injunction is denied outweighs any harm that will result if the injunction is granted"; and (4) "public interest" favors letting the Trustee exercise its fiduciary duties and effectuate his process over costly litigation.[24]

## A.     Substantial Likelihood of Success on the Merits

72.     The Optional Redemption Notices demand the liquidation of property currently under the control of Acis LP, as portfolio manager, as well as the PMAs, which are defined as Assets under the Indentures and are property of the Acis LP estate.  Indeed, the main, if not sole, purpose of the redemptions appears to be to remove Acis LP as portfolio manager and terminate its primary asset, the PMAs.  Accordingly, by extinguishing the PMAs, the purported Optional Redemption is prohibited because it represents an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" in violation of 11 U.S.C. § 362(a)(3).

73.     Further, any action taken by the Defendants to effectuate the Optional Redemption, and thereby extinguish rights under the PMAs, is outside the ordinary course of Acis's business, and therefore would require Court approval pursuant to 11 U.S.C. § 363(b).

### 1.     The Automatic Stay

74.     Section 362 of the Bankruptcy Code operates as a stay, applicable to all entities of: "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[25] Property of the estate is defined by section 541 of

---

[24] *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (stating the elements of a preliminary injunction).
[25] 11 U.S.C. § 362(a)(3).

the Bankruptcy Code as including: "all legal or equitable interests of the debtor in property as of the commencement of the case."[26]

75.    The protection afforded to a debtor by the automatic stay is one of the most important benefits that a debtor and its creditors receive when filing for bankruptcy. "The automatic stay has broad scope."[27]  "This breadth suggests Congressional intent that, in the face of uncertainty or ambiguity, courts should presume protection of arguable property."[28]  The stay is automatic and "springs into being immediately upon the filing of a bankruptcy petition."[29] Actions in violation of the automatic stay are voidable.[30]

## 2.    The Automatic Stay is Applicable to the PMAs and CLOs

76.    In the TRO, the Court enjoined "the Optional Redemption, call, or other liquidation of the Acis CLOs" because such actions appeared to this Court to have the potential to liquidate or harm valuable property of the Debtors, namely the PMAs.  Moreover, this Court found the "Trustee has a substantial case on the merits on a serious legal question" that such actions would constitute a violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(3). Thus, to obtain a second TRO and a preliminary injunction, the Trustee must demonstrate a substantial likelihood of success on the merits regarding whether the actions by HCLOF and others to liquidate the assets of the Acis CLOs, and thereby eviscerate the value of Acis LP's interest in the PMAs, violate the automatic stay.

---

[26] 11 U.S.C. § 541(a).
[27] *Burns v. Home Zone Sales & Lease Purchase, LLC*, 503 B.R. 666, 673 (Bankr. S.D. Miss. 2013).
[28] *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005).
[29] *Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.),* 345 F.3d 338, 344 (5th Cir. 2003)(quoting *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 975 (1st Cir. 1997)).
[30] *Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.),* 345 F.3d 338, 344 (5th Cir. 2003).

77.     The Debtors' rights under the PMAs, which are executory contracts, are property

of the estate.[31] The Debtors' rights under the PMAs are therefore protected by the automatic

stay.[32] If the Optional Redemption or other liquidation of the assets in the Acis CLOs is

permitted to go forward, it would render the PMAs valueless. Consequently, the Optional

Redemption and any other attempt by HCLOF liquidate the assets of the Acis CLOs would

violate section 362(a)(3) because such actions involve exercising control over property of the

estate (the PMAs).

78.     In *Three Strokes Limited Partnership*, this Court held that a foreclosure sale was

an attempt to exercise control over property of the estate under 11 U.S.C. § 362(a)(3) where the

debtor held the second lien, but not the first lien on the property subject to foreclosure.[33] The

Court held that, even though the underlying asset (i.e., the real property subject to foreclosure)

was not the debtor's property:

> [T]he second line interest of the Debtor in that property is a property interest
> worth of recognition and protection. Thus, Section 362 applies to automatically
> stay the foreclosure proceedings. The foreclosure proceedings could have the
> effect of extinguishing the Debtor's second lien interest. The foreclosure
> proceedings would constitute an exercise of control over property of the estate,
> pursuant to Bankruptcy Code Section 362(a)(3). The court recognizes that the
> automatic stay is generally a tool to stop creditor collection efforts, and Conseco
> is not a creditor of this Debtor. However, section 362 is worded to prevent "of all
> entities" (not merely creditors) from engaging in certain accts including "an act …
> to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Clearly,
> Section 362(a)(3) is intended to prevent dismemberment of the estate and to allow
> a breathing spell for a debtor-in-possession."[34]

The *Three Strokes* case is analogous to this one. Here, Acis has a property interest in the PMAs

– an interest "worthy of recognition and protection" – that will be extinguished if the CLOs are

---

[31] *In re Mirant Corp.,* 303 B.R. 319, 328 (Bankr. N.D. Tex. 2003) ("a debtor has rights under the contract which are property of the estate and so are protected by the automatic stay from actions of other parties").
[32] *Id.* at 328.
[33] 397 B.R. 804, 807 (Bankr. N.D. Tex. 2008).
[34] *Id.*

liquidated. Consequently, any attempt to extinguish Acis LP's property interest in the PMAs would be an exercise of control over property of the estate, and is therefore stayed by Section 362(a)(3).

79. The *Three Strokes* opinion is consistent with a long line of cases holding that where a non-debtor's actions would directly or indirectly interfere with and/or substantially diminish a debtor (or trustee's) intangible property rights, such actions violate section 362(a)(3) of the Bankruptcy Code. *See, e.g., In re 48th Street Steakhouse*, 835 F.2d 427, 430-31 (2d Cir. 1987) (finding landlord's termination as to the primary tenant would destroy the debtor's subtenancy violated the automatic stay and was therefore void because, where a non-debtor's interest is intertwined with that of a bankrupt debtor and an action would "inevitably have an adverse impact on property of the estate," such action is barred by the automatic stay); *In re Prudential Lines*, 928 F.2d 565, 573-574 (2d Cir. 1991) (affirming order of the bankruptcy court permanently enjoining parent from taking a "worthless stock" deduction on its tax return where it would effectively eliminate the value of the debtor's net operating loss and have an adverse impact on its reorganization); *cf., Allentown Ambassadors, Inc. v. Northeast Am. Baseball, LLC (In re Allentown Ambassadors, Inc.)*, 361 B.R. 422, 438 and n. 34 (Bankr. E.D. Pa. 2007) (analyzing the phrase "to exercise control over property of the estate" and collecting cases explaining what that means in the context of section 362(a)(3)). Thus, because the liquidation of the CLOs represents an "act to obtain possession of property of the estate," – namely, Acis LP's intangible property rights in the PMAs – such actions constitute a violation of section 362(a)(3).

80. Moreover, apart from the fact that the Optional Redemption directs Acis LP to cancel the PMAs, the Optional Redemption also seeks to force the winding down of the CLOs. By Acis LP's own admission on the Acis LP SOFA, Acis LP has at least a possessory interest in the CLO assets, such that a transfer of CLO assets constitutes a transfer of property *from* the

estate under section 362(a)(3) of the Bankruptcy Code. Property from the estate includes property that does not belong to debtor, but over which the debtor has possession or control. The legislative history of section 362(a)(3) makes this clear:

> Paragraph (3) stays any act to obtain possession of property of the estate (that is, property of the debtor as of the date of the filing of the petition) or property **from** the estate (**property over which the estate has control or possession**). The purpose of this provision is to prevent dismemberment of the estate. Liquidation must proceed in an orderly fashion. Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available for distribution.[35]

Similarly, Collier extensively discusses the concept that property over which a debtor has possession or control is appropriately covered by the automatic stay:

> Section 362(a)(3) stays all actions, whether judicial or private, that seek to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. The trustee or debtor in possession takes control of all property of the estate in order to maintain any going concern value and to ensure an equitable distribution of the property among creditors. This requires that no entity seek to interfere with these tasks by taking possession or exercising control over property of the estate. It also requires that no entity grab non-estate property *from* the estate without the court supervision that comes from a stay relief proceeding . . . . The property protected may be property of the estate or property in the possession of the estate.[36]

81.     Finally, cases interpreting section 362(a)(3) uniformly hold that property in the possession of a debtor (even if not property of the estate) is covered by the protections and procedures of Section 362(a)(3). For example, Judge Isgur has called section 362(a)(3) an "anti-grab-law statute" and noted that "[t]he intent and purpose of (a)(3) is to prohibit physical taking of property . . . ." In *Adana Mortgage*, the Georgia bankruptcy court thoroughly explained the purpose of section 362(a)(3) related to property from the estate in finding a willful violation of the automatic stay:

---

[35] S. REP. No. 95-989, at 50 (1978) (emphasis added).
[36] 3 COLLIER ON BANKRUPTCY ¶ 362.03[5] (16th ed. 2018) (emphasis in original).

Title or ownership of property is not controlling to a Section 362(a)(3) violation. Possession or control by the debtor is sufficient to enact the protection of the automatic stay. The prohibition against any act to remove property from the estate was apparently "included to forestall a lienor or other adverse claimant from asserting as a justification for an exercise of selfhelp that the property taken from the debtor did not belong to the estate." The accounts clearly were under the control of Debtor at the time of filing. Thus, regardless of whether they are property of the estate, the accounts constituted property from the estate at the time of filing and were under the protection of Section 362(a)(3). The actions taken by GNMA to attempt to divest the Debtor of control and to obtain possession of these accounts were, therefore, in violation of the automatic stay.[37]

82.     Likewise, many cases have found that a debtor's mere possessory interest in property is sufficient to make it property of the estate under section 541 of the Bankruptcy Code and subject to the stay.[38]

### 3.     Section 555 of the Bankruptcy Code Does Not Apply to HCLOF

83.     Section 365(e)(1) prohibits the operation of an *ipso facto* clause in an executory contract or unexpired lease due the filing of a bankruptcy case.[39] Section 555 provides a "safe harbor" from the automatic stay when a stockbroker, financial institution, financial participant, or securities clearing agency exercises its contractual right under an *ipso facto* clause to liquidate, terminate, or accelerate a securities contract for one of the conditions specified in section 365(e)(1)—that is, the insolvency or financial condition of the debtor, the commencement of a case under title 11, or the appointment of or taking possession by a trustee

---

[37] *Adana Mortgage Bankers, Inc.*, 12 B.R. 989, 1005 (Bankr. N.D. Ga. 1980) (vacated by the agreement of parties).

[38] *See In re Canon*, 130 B.R. 748, 750 (Bankr. N.D. Tex. 1991) (citing legislative history of Bankruptcy Code to show that a "possessory interest" is property of the estate); *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 430 (2d Cir. 1987) ("[A] mere possessory interest in real property, without any accompanying legal interest, is sufficient to trigger the protection of the automatic stay."); *In re Salov*, 510 B.R. 720, 729 (Bankr. S.D.N.Y. 2014) ("Courts in all ten circuits have found that the automatic stay protects a possessory interest in property.") (collecting cases); *Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.*, 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008) ("The stay protects interests in property whether an ownership interest, possessory interest or some other interest."); *Boydstun v. Reed*, 218 B.R. 840, 842 (N.D. Miss 1998) (finding that even stolen property is property of the estate).

[39] *See* 3 COLLIER ON BANKRUPTCY ¶ 365.08[1].

in a case under title 11.[40] Section 555 does not provide an unqualified right to liquidate, terminate, or accelerate a securities contract in violation of the automatic stay merely because the contract contains a broad termination provision.[41]

84.    Here, although HCLOF has asserted that it is protected by the safe harbor of section 555 of the Bankruptcy Code, HCLOF is not exercising a "contractual right . . . [under a] securities contract . . . because of a condition of the kind specified in section 365(e)(1) of [the Bankruptcy Code]."[42]

85.    Specifically, HCLOF has not demonstrated that it is exercising its contractual right under a securities contract to liquidate, accelerate, or terminate due to an *ipso facto* clause in such contract.

86.    Further, HCLOF must show that it has:

agreements or transactions described in described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross market-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor of any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition.[43]

87.    HCLOF has not demonstrated that it is exercising purported contractual rights under securities contracts with the Debtors or non-affiliates. HCLOF has also not demonstrated that it is a "financial participant," as required under section 555. Accordingly, HCLOF has not

---

[40] *Cf. In re Enron Corp.*, 306 B.R. 465, 472-733 (Bankr. S.D.N.Y. 2004) (reaching the same result under analogous provision of section 560 of the Bankruptcy Code).
[41] *See In re Amcor Funding Corp.*, 117 B.R. 549, 551 (Bankr. D. Ariz. 1990) (finding contractual provision permitting liquidation of a securities contract for *any reason* did not bring contract within section 555's safe harbor provision where liquidation was not triggered by a condition of the kind specified in section 365(e)(1)).
[42] *See* HCLOF's Brief in Opposition to Extending the TRO, Docket No. 271, at 22-27.
[43] See 11 U.S.C. § 101(22A).

shown that the safe harbor of section 555 of the Bankruptcy Code applies to its actions to effectuate the Optional Redemption.

> **4.  The Optional Redemption is Outside the Ordinary Course of the Debtors' Business**

88.  Under section 363(b) of the Bankruptcy Code, the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

89.  To determine whether a transaction is within the ordinary course of business, courts look to "whether the transaction is abnormal or unusual, in which case it is probably not in the ordinary course of business, or whether it is a reasonably common type of transaction."[44] The Optional Redemption contemplated by HCLOF is not a common event in the course of the Debtors' business.  Indeed, the Optional Redemption is an extraordinary event, which would effectively cause the liquidation of the CLOs and the PMAs. This is not in the ordinary course of business.

90.  Further, any party that "deals with a bankruptcy trustee in a transaction that is not in the ordinary course of business is charged with the knowledge that the law may require court approval."[45]

91.  Actions taken by Defendants in furtherance of the purported Optional Redemption were outside the ordinary course of the Debtors' business and were taken without the Trustee's consent or authorization from the Court.  Thus, such actions are ineffective pursuant to 11 U.S.C. § 363(b).

---

[44] 3 COLLIER ON BANKRUPTCY ¶ 363.03[1][a] (citing *In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir. 1988) (applying the "horizontal test").
[45] *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 266 (5th Cir. 2010).

92. For the reasons set forth above, sections 362(a)(3) and 363(b) of the Bankruptcy Code foreclose any action by the Defendants in furtherance of the Optional Redemption, call, or liquidation of the Acis CLOs. Thus, the Trustee has a substantial likelihood of succeeding on the merits.

**B. Substantial Threat of Irreparable Injury**

93. Injunctive relief is necessary to prevent imminent and irreparable injury in the form of substantial losses to creditors and parties-in-interest, as well as to third parties' financial interests, related to the Optional Redemption, call, or other liquidation of the Acis CLOs. The losses that would result in the event an injunction is not issued cannot be presently measured by any certain pecuniary standard, are not reasonably quantifiable, and cannot be adequately compensated with monetary damages; thus, creditors and interested third parties otherwise would have no adequate remedy at law. The Optional Redemption would eliminate the confirmation of a plan of reorganization based on the Oaktree Transaction, or a similar plan.

**C. Balancing of Harms**

94. The balancing of the harms weighs in favor of issuing a preliminary injunction because any alleged harm to Highland, or any of the Highland Affiliates, is substantially outweighed by the damage that would be caused to all parties-in-interest if the Court does not enjoin the Optional Redemption, call, or other liquidation of the Acis CLOs, and return more to all affected parties than would be received by the Optional Redemption.[46] Highland and the Highland Entities will receive the same monetary benefit from the Oaktree Transaction, creditors will be paid in full, and economic stakeholders would reap a benefit. HCLOF's claimed harm is exaggerated.

---

[46] Any alleged harm to Defendants is illusory and specious because, among other things, the Defendants have options available that immediately mitigate any purported damage. Namely, Defendants could (1) authorize a "refinance" or "reset" transaction or (2) sell their equity to a third party in an amount that exceeds what they would receive in an Optional Redemption.

**D.     Public Interest**

95.     Public policy supports restraining the actions described herein to allow the Trustee to exercise his fiduciary duties to maximize the value of the estate for the benefit of creditors by allowing the Trustee to direct and control the refinancing, sale, or other monetization of Debtors' property and other assets. Further, there is a public interest in allowing for a Chapter 11 process, rather than costly prolonged litigation.

96.     Therefore, the Trustee asks that the Court, after a hearing on this application, grant a temporary restraining order and preliminary injunction enjoining the Defendants and Defendants' officers, agents, servants, employees, and attorneys from engaging in the following actions:

      a)  proceeding with, effectuating, or otherwise taking any action in furtherance of the Optional Redemption, call, or other liquidation of the Acis CLOs, including any further optional redemption under section 9.2 of the Indentures; and

      b)  sending, mailing, or otherwise distributing any notice to the holders of the Acis CLOs in connection with the Optional Redemption, call, or other liquidation of the Acis CLOs.

97.     The Trustee requests that such injunctive relief remain effective unless the Defendants seek Court approval, and the Court lifts the automatic stay to allow such actions, or the Court confirms a plan pursuant to 11 U.S.C. § 1129.

### *Count 2: Willful Violation of the Automatic Stay*

98.     A willful violation of the automatic stay does not require a specific intent.

Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.[47]

---

[47] *Campbell v. Countrywide Home Loan, Inc.,* 545 F.3d 348, 355 (5th Cir. 2008) (quoting *In re Chestnut*, 422 F.3d.298, 302 (5th Cir. 2005).

99.     "It is not up to a party exercising a self-help remedy to determine, to the preclusion of this court, what is or is not property of the estate."[48]

100.    Section 362(k)(1) of the Bankruptcy Code provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Fifth Circuit has indicated that remedies under 362(k)(1) are available to trustees.[49]

101.    Further, pursuant to section 105(a) of the Bankruptcy Code, "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[50] The purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."[51] This is consistent with the broad equitable authority of the bankruptcy courts.[52]

102.    Pursuant to section 362(k)(1), Plaintiff seeks recovery of damages commensurate with its injury, due to Defendants' violation of the automatic stay.  Further, given Defendants' blatant and willful violation of the automatic stay (as well as the TRO), the Plaintiff seeks attorneys' fees and sanctions against Defendants, as the Court finds appropriate, pursuant to section 105(a) of the Bankruptcy Code.

### Count 3:  Declaratory Judgment that the Optional Redemption Notices Were Defective and Ineffective Under the PMAs and Indentures

103.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

---

[48] *Chesnut v. Brown (In re Chesnut),* 300 B.R. 880, 887 (Bankr. N.D. Tex. 2003).

[49] *St Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539-540 (5th Cir. 2009) he term "individual" is not defined by the Bankruptcy Code, but it is used throughout the Code to refer to debtors and non-debtors. *See Homer Nat'l Bank v. Namie*, 96 B.R. 652, 654 (W.D. La. 1989) (citing, inter alia, 11 U.S.C. §§ 522(b) (individual as debtor), 321(a)(1) (individual as trustee).

[50] 11 U.S.C. § 105(a).

[51] 2 COLLIER ON BANKRUPTCY ¶105.01 (collecting cases).

[52] *See United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549 (1990).

104.    The Optional Redemption Notices were not sent by properly authorized parties, pursuant to the certain PMA, dated November 15, 2017 (the "11-15-17 PMA"), between HCLOF and Highland HCF. A true and correct copy of the 11-15-17 PMA is attached hereto as **Exhibit "K."**

105.    Under Section 5(a)(xvii) of this 11-15-17 PMA, Highland HCF has the authority for and in the name of HCLOF to "vote Financial Instruments . . . ."  The Subordinated Notes referenced in the Optional Redemption Notices are clearly Financial Instruments covered by Section 5(a)(xvii).  Further, Section 4 of the 11-15-17 PMA requires that State Street Custodial Services (Ireland) Limited ("State Street"), as custodian, "shall at all times be responsible for the . . . exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by [HCLOF]."  Yet, the Optional Redemption Notices were signed only by directors of HCLOF, not Highland HCF or State Street.

106.    Section 9.4(a) of the Indenture states that, with any redemption under Section 9.2, the Holders of the Subordinated Notes (currently, HCLOF) must provide written direction/notice of such redemption no later than 45 days prior to the Redemption Date, and Section 9.4(b) requires that all notices of redemption delivered pursuant to Section 9.4(a) state:

(i)      the applicable Redemption Date;

(ii)     the Redemption Prices of the Notes to be redeemed;

(iii)    that all of the Secured Notes are to be redeemed in full and that interest on such Secured Notes shall cease to accrue on the Redemption Date specified in the notice;

(iv)     the place or places where Notes are to be surrendered for payment of the Redemption Prices, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2; and

(v)      if all Secured Notes are being redeemed, whether the Subordinated Notes are to be redeemed in full on such Redemption Date and, if so, the place or places where the Subordinated Notes (other than any Uncertificated Subordinated Notes) are to be surrendered for payment of the Redemption Prices, which shall be the office or

agency of the Co-Issuers to be maintained as provided in <u>Section 7.2</u> in order to receive payment therefor.

107. The Optional Redemption Notices fail to provide any such information other than the Redemption Date. Thus, the Optional Redemption Notices are defective on their face. Additionally, it has not been demonstrated that the Optional Redemption Notices were actually received by the required parties, which is required at least with respect to U.S. Bank.

108. Also, as originally referenced the Trustee's May 22, 2018 Redemption Responses, and as adduced above, completion of the Optional Redemption as requested by the Optional Redemption Notices would, or could reasonably be expected to: (i) violate applicable law; and/or (ii) knowingly and willfully adversely affect the interests of the Holders in the Assets in any material respect that is not expressly permitted under the PMAs or the Indentures. Under such circumstances, Section 8 of the PMAs requires coordination with the Trustee in order to make indemnification arrangements and providing a legal opinion from outside counsel, which must meet the Trustee's approval. Defendants have not complied with Section 8 of the PMAs.

109. Finally, the Second Optional Redemption Notices make reference to placing "a portion of the portfolio of assets held by the Co-Issuers into a warehouse arrangement or a total return swap or other derivative arrangement with Highland Capital Management, L.P." The Indentures and PMAs do not provide for such an arrangement.

110. Thus, for the numerous deficiencies set forth above, the Optional Redemption Notices are defective and ineffective.

### Count 4: Declaratory Judgment that the Optional Redemption Notices Were Outside the Ordinary Course of Business and Therefore Ineffective under 11 U.S.C. § 363(b)

111. Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

112.    Under section 363(b) of the Bankruptcy Code, the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

113.    The Trustee did not consent to Defendants' actions taken in connection with the Optional Redemption Notices.

114.    Actions taken by Defendants in furtherance of the purported Optional Redemption were outside the ordinary course of the Debtors' business and were taken without the Trustee's consent or authorization from the Court.  Thus, such actions are ineffective pursuant to 11 U.S.C. § 363(b).

### Count 5: Declaratory Judgment that the Trustee Has Not Violated His Fiduciary Duties by Declining to Carry Out the Optional Redemption

115.    Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

116.    The Trustee is mindful of his fiduciary obligations under the PMAs and Indentures. At the same time, the Trustee believes any action taken to effectuate the Optional Redemption are in violation of the automatic stay, outside the ordinary course of Acis's business, and an attempt to destroy the primary vehicle by which Acis generates revenue.

117.    The Trustee was appointed on Monday, May 14, 2018. In the brief period of time since the Trustee's appointment, Highland, pursuant to the Shared Services Agreement and Sub-Advisory Agreement, has advised the Trustee on the day-to-day business operations of Acis. Highland, as a fiduciary for Acis LP, pursuant to the Sub-Advisory Agreement, has stated that if the Trustee does not begin the process of liquidating the Acis CLOs and comply with the Optional Redemption, the Trustee will breach certain fiduciary duties owed to the Acis CLOs. As described believe, the Trustee believes the Optional Redemption will violate sections 362 and 363 of the Bankrupty Code and leave Acis without its most valuable assets, the PMAs. Highland

has further suggested to the Trustee that if he does not agree to effectuate the Optional Redemption, he was be individually liable for violating his fiduciary duty to the Acis CLO's equity.[53] At the May 31, 2018 status conference in these Cases, the Trustee advised the Court of Highland's demands related to the Optional Redemption. The Trustee believes that he has proposed a plan of reorganization that maximizes recovery for all parties, including HCLOF.

118.    As such, the Trustee seeks a declaratory judgment that he has not violated his fiduciary obligations by declining to carry out the Optional Redemption, as ordered by HCLOF.

## VI.    PRAYER

119.    For the foregoing reasons, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee, and specifically and expressly provide the following relief to the Plaintiff for the benefit of the Debtors' bankruptcy estates:

(i)    Temporary restraining order and preliminary injunction pursuant to Federal Rule of Bankruptcy Procedure 7065, to preserve the status quo and protect the estates by enjoining the Defendants from taking any action in furtherance of the Optional Redemption, or any action to effectuate yet another optional redemption at some future time under section 9.2 of the Indentures, unless the Defendants seek Court approval, and the Court lifts the automatic stay to allow such actions, or the Court confirms a plan pursuant to 11 U.S.C. § 1129;

(ii)    Plaintiff's recovery of damages pursuant to 11 U.S.C. § 362(k), for Defendants' violation of the automatic stay;

(iii)    Declaratory judgment that the Optional Redemption Notices are defective and ineffective pursuant to the PMAs and Indentures;

(iv)    Declaratory judgment that the Optional Redemption Notices are ineffective pursuant to 11 U.S.C. § 363(b);

(v)    Declaratory judgment that the Trustee has not violated his fiduciary duties by declining to carry out the Optional Redemption;

---

[53] HCLOF is the only signatory on the Optional Redemptions related to CLO-3, CLO-4, CLO-5, and CLO-6. The signatories for the Optional Redemption related to CLO-1 are New ALF, Nexpoint Strategic Opportunities Fund (f/k/a NexPoint Credit Strategic Fund) (a Highland affiliate), and Drexel Limited.

(vi)   Plaintiff's recovery from Defendants of pre- and post-judgment interest, at the greatest rate permitted by law, on all amounts awarded to Plaintiff;

(vii)  Plaintiff's recovery from Defendants of all attorney's fees and costs incurred in connection with the prosecution of this Adversary Proceeding;

(viii) All such other and further relief as to which Plaintiff has shown or hereafter shows himself to be justly entitled in law or in equity.

**DATED: June 20, 2018**

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

By:/s/ Rakhee Patel
Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

**-and-**

Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthias Kleinsasser
State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR THE CHAPTER 11
TRUSTEE**

## VERIFICATION

STATE OF TEXAS        §
                                §

COUNTY OF DALAS      §

BEFORE ME, the undersigned notary public on this day personally appeared Robin Phelan, Chapter 11 Trustee, as authorized representative of Acis Capital Management, L.P. and Acis Capital Management GP, LLC, who, after being duly sworn stated under oath that he has read the foregoing Verified Original Complaint and Request for Temporary Restraining Order and Preliminary Injunction, and that every statement contained therein is true and correct based on his personal knowledge or information obtained from other persons.

SWORN TO and SUBSCRIBED before me on this 20th day of June, 2018.



Notary Public in and for the State of Texas

My Commission Expires:

_____

SHERYL PRECOPIA
Notary Public, State of Texas
Notary ID 1128990-0
My Commission Exp. 05-29-2021