Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthias Kleinsasser – State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone:  (817) 877-8855
Facsimile:  (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR THE CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| **DEBTORS.** | § | **Chapter 11** |

## BRIEF OF LIMITED ISSUES IN SUPPORT OF FIRST AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

# TABLE OF CONTENTS

I.    PLAN A: IMPLEMENTATION THROUGH EQUITABLE SUBROGATION............... 1

   A.    HCLOF has a claim against the estate .................................................................. 1

   B.    Under the doctrine of equitable subrogation, Acis will be subrogated to the
         position of HCLOF with respect to the Subordinated Notes ................................. 5

   C.    Assignment of the PMAs to Oaktree does not violate section 365 of the
         Bankruptcy Code ................................................................................................... 9

II.    PLANS B & C: MODIFICATION OF THE INDENTURES UNDER 11 U.S.C.
       § 1123(a)(5)(F)..................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Surety Co. v. Bethlehem Nat'l Bank*,
  314 U.S. 314 (1941)............................................................................5

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,
  2015 U.S. Dist. LEXIS 105597, 2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015)....................11

*Broadway Houston Mack Dev., LLC v. Kohl*,
  71 A.D.3d 937 (N.Y. App. Div. 2d Dep't 2010) ........................................5

*In re Congoleum Corp.*,
  2008 Bankr. LEXIS 2375, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ........................15

*Cox v. Cox (In re Cox)*,
  292 B.R. 141 (Bankr. E.D. Tex. 2003) ..................................................5

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*,
  2018 U.S. Dist. LEXIS 90174 (S.D.N.Y. May 23, 2018)....................................10

*In re Davis*,
  3 F.3d 113 (5th Cir. 1993) ...............................................................3

*Farooqi v. Carroll (In re Carroll)*,
  464 B.R. 293 (Bankr. N.D. Tex. 2011)..................................................3

*In re FCX, Inc.*,
  853 F.2d 1149 (4th Cir. 1988) .........................................................15

*Gerseta Corp. v. Equitable Trust Co. of N.Y.*,
  241 N.Y. 418 (1926) .......................................................................5

*Gil Ramirez Grp. V. Houston Indep. Sch. Dist.*,
  786 F.3d 400 (5th Cir. 2015) .............................................................4

*In re Gillette Assocs., Ltd.*,
  101 BR 866 (Bankr. N.D. Ohio 1989) ................................................18

*Great E. Bank v. Chang*,
  227 A.D.2d 589 (N.Y. App. Div. 2d Dep't 1996) ....................................8

*Hamlet at Willow Cr. Dev. Co., LLC v. Ne. Land Dev. Corp.*,
  64 A.D.3d 85 (N.Y. App. Div. 2d Dep't 2009) ......................................5

*In re Harlow Props., Inc.*,
   56 B.R. 794 (B.A.P. 9th Cir. 1985)........................................................................9

*Highland CLO Funding, Ltd. v. Phelan*,
   Case No. 3:18-cv-01810-D ...................................................................................3

*Highland CLO Funding, Ltd. v. Phelan*,
   Case No. 3:18-cv-01817-D ...................................................................................3

*Indus. Dev. Bd. v. Fuqua Indus., Inc.*,
   523 F.2d 1226 (5th Cir. 1975) ...........................................................................7, 8

*Irving Tanning Co. v. Maine Superintendent of Ins.*,
   496 B.R. 644 (B.A.P. 1st Cir. 2013) ...................................................................15

*In re Kizzac Mgmt. Corp.*,
   44 B.R. 496 (Bankr. S.D.N.Y. 1984) ..................................................................18

*Kurtz v. United States*,
   156 F. Supp. 99 (S.D.N.Y. 1957) *aff'd*, 254 F.2d 811 (2d Cir. 1958) ...................12

*In re Liao*,
   553 B.R. 584 (Bankr. S.D. Tex. 2016) ..................................................................5

*MBIA Ins. Corp. v. Cooperative Centrale Raiffeisen-Boerenleenbank B.A.*,
   2011 U.S. Dist. LEXIS 31307 (S.D.N.Y. Mar. 25, 2011) ...........................12, 13, 14

*In re Mirant Corp.*,
   Case No. 04-04283-dml, Docket No. 162 (Bankr. N.D. Tex. April 5, 2005)
   (Lynn, J.)...........................................................................................................12

*N.Y. Stock Exch. v. Sloan*,
   1980 U.S. Dist. LEXIS 13316 (S.D.N.Y. Aug. 15, 1980) ......................................8

*Neiman-Marcus Grp. v. Dworkin*,
   919 F.2d 368 (5th Cir. 1990) ...............................................................................4

*Nikoloutsos v. Nikoloutsos (In re Nikoloutsos)*,
   199 F.3d 233 (5th Cir. 2000) ...............................................................................3

*Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind (In
   re Erie Hilton Joint Venture)*,
   137 B.R. 165 (Bankr. W.D. Pa. 1992) ...................................................................9

*Ohio v. Kovacs*,
   469 U.S. 274 (1985).............................................................................................3

*Pathe Exchange, Inc. v. Bray Pictures Corp.*,
231 A.D. 465 (N.Y. App. Div. 1st Dep't 1931)........................................................6

*PricewaterhouseCoopers LLP v. Giddens (In re MF Global, Inc.)*,
505 B.R. 623 (S.D.N.Y. 2014).....................................................................6, 8

*Prod. Res. Grp. v. Martin Prof'l*,
907 F. Supp. 2d 401 (S.D.N.Y. 2012).................................................................11

*Reed v. City of Arlington*,
650 F.3d 571 (5th Cir. 2011) .......................................................................4

*In re RNI Wind Down Corp.*,
2007 Bankr. LEXIS 982 (Bankr. D. Del. Mar. 29, 2007)................................16, 17, 18

*In re Sears Methodist Ret. Sys.*,
2015 Bankr. LEXIS 709 (Bankr. N.D. Tex. Mar. 5, 2015) .......................................7

*Segovia v. Equities First Holdings, LLC*,
2008 Del. Super. LEXIS 197 (Del. Super. Ct. May 30, 2008) .................................12

*In re Stations Holding Co.*,
No. 02-10882, 2002 Bankr. LEXIS 1617 (Bankr. D. Del. Sept. 30, 2002) ..............17, 18

*This Is Me, Inc. v. Taylor*,
157 F.3d 139 (2d Cir. 1998)........................................................................11

*TVT Records v. Island Def Jam Music Grp.*,
412 F.3d 82 (2nd Cir. 2005).........................................................................12

*U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*,
301 F.3d 296 (5th Cir. 2002) .........................................................................9

*Vigilant Ins. Co. v. Travelers Prop. Cas. Co. of Am.*,
243 F. Supp. 3d 405 (S.D.N.Y. 2017)..............................................................5, 8

*Wade v. Bradford*,
39 F.3d 1126 (10th Cir. 1994) .......................................................................18

**Statutes**

11 U.S.C. § 506.........................................................................................2

11 U.S.C. § 1123(a)(5)(E)............................................................................18

11 U.S.C. § 1123(a)(5)(F) ..................................................................... *passim*

11 U.S.C. § 1142.........................................................................................9

11 U.S.C. § 1142(b) ...............................................................................................9

15 U.S.C. § 80b-5(a)(2) .......................................................................................10

Bankruptcy Code section 101(5) .......................................................................1, 3

Bankruptcy Code sections 105(a) and 1142(b) ......................................................8

Bankruptcy Code section 365 ................................................................................9

Bankruptcy Code Section 365(c)(1) ..................................................................9, 10

Investment Advisers Act of 1940 Section 205(a)(2) ............................................10

**Other Authorities**

24 CORBIN ON CONTRACTS § 24.21 (1998) ..........................................................12

Robin Phelan (the "Trustee"), the Chapter 11 Trustee of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," together with Acis LP, the "Debtors" or "Acis"), the Debtors in the above-styled and numbered bankruptcy cases (the "Bankruptcy Cases"), files this brief of limited issues (the "Brief") in support of the *First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 441] (the "Plan"), and respectfully states as follows: [1]

## I.    PLAN A: IMPLEMENTATION THROUGH EQUITABLE SUBROGATION

1.    Under the Plan A Transaction, the Trustee will treat HCLOF's claim under the Plan, with Oaktree as the anticipated plan funder, which will result in HCLOF receiving at least as much as it would receive in an optional redemption in satisfaction of its claim. Once HCLOF's claim is satisfied, which would also satisfy the Issuers' obligations in an optional redemption, under the doctrine of equitable subrogation, the Trustee will be subrogated to HCLOF's position with respect to the Subordinated Notes.   The Trustee will then transfer and assign the Subordinated Notes to Oaktree.

### A.    HCLOF has a claim against the estate.

2.    Under section 101(5) of the Bankruptcy Code, a claim is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

3.    HCLOF has claim against the estate. This is evidenced by (i) statements in correspondence dated May 4, 2018, from HCLOF to U.S. Bank, the indenture trustee for all five

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to such term in the Plan.

Acis CLOs, claiming setoff right against funds held by the indenture trustee belonging to the Debtors, (ii) HCLOF's suit against the Trustee to compel an optional redemption and liquidate the CLOs (the "<u>Highland Adversary</u>"),[2] and (iii) appeals initiated by HCLOF to compel the Trustee to effectuate the optional redemption.  Any entity holding a right of setoff is a secured creditor of the Debtor.  *See* 11 U.S.C. § 506.  Accordingly, HCLOF has affirmatively represented that it is a creditor of the Debtors.

4.     HCLOF has twice attempted to effectuate optional redemptions of the Subordinated Notes under the Indentures.  Under the Indentures, an optional redemption of the Subordinated Notes can only be made in whole from the proceeds received from the sale of all assets, *i.e.* the loans, held in the CLOs, less sale expenses and administrative expenses, and after payment in full of all secured obligations of the CLOs. Indenture § 9.2. In other words, an optional redemption of the Subordinated Notes commences a liquidation of the CLO assets that results in the Subordinated Note holders receiving the remainder of the proceeds after payment of other, senior debts and expenses in cash (the "<u>Redemption Proceeds</u>").  In this process, Acis would direct the liquidation of the underlying CLO assets, and the Issuers are obligated to pay down the secured notes and then the Subordinated Notes.  This liquidation of the CLO assets would also extinguish the PMAs, which are owned by Acis.

5.     After the Trustee refused to effectuate an optional redemption, HCLOF filed suit against the Trustee, commencing the Highland Adversary, demanding that the Trustee specifically perform and effectuate an optional redemption. If HCLOF gains the relief it has demanded, the Trustee would be required to liquidate the assets of the CLOs, and HCLOF would receive a monetary distribution in an amount equal to the Redemption Proceeds. This demand for

---

[2] Adversary No. 18-03078-sgj.

equitable relief gives rise to a right of payment and is therefore a claim pursuant to the definition of "claim" in Bankruptcy Code. The Fifth Circuit has held that if a debtor's contractual obligation to specifically perform can be satisfied by an alternative claim for money damages in case the debtor breaches, the obligation may be treated as a claim under section 101(5) of the Bankruptcy Code. *See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993) (citing *Ohio v. Kovacs*, 469 U.S. 274, 279 (1985) ("[When] specific performance may be satisfied by an alternative right to payment in the event performance is refused . . . the creditor entitled to specific performance would have a 'claim' for purposes of a proceeding under title 11."))[3] Accordingly, HCLOF is a creditor in the Bankruptcy Cases, with the monetary equivalent of its claim being what it would receive in an optional redemption.

6.      In addition to commencing the Highland Adversary against the Trustee, HCLOF also appealed two orders of the Court to force the Trustee to effectuate the optional redemption. HCLOF appealed this Court's order denying injunctive relief to HCLOF in the Highland Adversary, which relief would force the Trustee to effectuate the optional redemption.[4] *See Highland CLO Funding, Ltd. v. Phelan*, Case No. 3:18-cv-01817-D. HCLOF also appealed this Court's order granting injunctive relief to the Trustee in the Trustee's Adversary, which relief enjoined HCLOF from taking any action to further effectuate the optional redemption. *See Highland CLO Funding, Ltd. v. Phelan*, Case No. 3:18-cv-01810-D.

---

[3] The Fifth Circuit has held that the filing of an adversary proceeding may constitute an informal proof of claim. *See Nikoloutsos v. Nikoloutsos (In re Nikoloutsos)*, 199 F.3d 233, 236 (5th Cir. 2000); *see also Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 311 (Bankr. N.D. Tex. 2011).

[4] This appeal emanates from HCLOF's *Motion for Preliminary Injunctive Relief* [Case No. 18-30264, Docket No. 318; Adv. No. 18-03078, Docket No. 18], which was decided and ruled upon by this Court. *See* Adv. No. 18-03078, Docket No. 31.

7. And despite purportedly withdrawing the notices of optional redemption, HCLOF has expressly represented to the Court that it continues to seek all relief previously sought in order to effectuate the optional redemption:

> THE COURT: . . . I thought you were asking for an injunction to stop him from ignoring your request to do a redemption.
>
> MR. MALONEY: . . . yes, we want injunctive relief and, frankly, mandatory injunctive relief such that both for any redemption notice, whether now pending or not, he's instructed by the Court not to interfere. And the Court has to make multiple determinations and factual determinations to get to that result and we still request that relief . . . .
>
> THE COURT: What are we doing here? I'm just trying to understand what we're doing here. . . .
>
>   . . . .
>
> MR. MALONEY: Your Honor, we are still here for every bit of relief that we were looking for[.]

Transcript from July 6, 2018 Hearing at pp. 177-79.

8. Moreover, under the doctrines of judicial estoppel and quasi estoppel, HCLOF cannot now conveniently change its position and argue otherwise. "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573-574 (5th Cir. 2011). Judicial estoppel is also an equitable doctrine that courts may apply flexibly to achieve substantial justice. *Id.* at 576. Further, under the doctrine of quasi estoppel, HCLOF cannot now claim that it is entitled to a "reset," "warehouse arrangement," or any other benefit that is inconsistent with its claim in these Bankruptcy Cases and that would disadvantage Acis. *See Neiman-Marcus Grp. v. Dworkin*, 919 F.2d 368, 371 (5th Cir. 1990); *Gil Ramirez Grp.*

*V. Houston Indep. Sch. Dist.*, 786 F.3d 400, 414 (5th Cir. 2015); *In re Liao*, 553 B.R. 584, 610 (Bankr. S.D. Tex. 2016). "Such maneuvers are precisely those the [quasi-estoppel] doctrine aims at foreclosing." *Cox v. Cox (In re Cox)*, 292 B.R. 141, 148 (Bankr. E.D. Tex. 2003).

**B.**  **Under the doctrine of equitable subrogation, Acis will be subrogated to the position of HCLOF with respect to the Subordinated Notes.**

9.      Equitable subrogation allows one party who has satisfied the debt of another to succeed to the position and rights of the satisfied creditor under certain circumstances. *See Am. Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. 314, 317 (1941).

10.      Under New York law:

> [The doctrine of equitable subrogation] is broad enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability.

*Gerseta Corp. v. Equitable Trust Co. of N.Y.*, 241 N.Y. 418, 425-26 (1926); *accord Hamlet at Willow Cr. Dev. Co., LLC v. Ne. Land Dev. Corp.*, 64 A.D.3d 85, 105-106 (N.Y. App. Div. 2d Dep't 2009). As "an equitable doctrine, subrogation is designed to promote justice, and thus, is dependent upon the particular relationship of the parties and the nature of the controversy in each case." *Hamlet,* 64 A.D.3d at 106.

11.      Further:

> A party seeking subrogation can establish that its payments were not voluntary either by pointing to a contractual obligation or to the need to protect its own legal or economic interests. When invoking the latter ground, however, the party seeking subrogation must show that the act is not merely helpful but necessary to the protection of its interests.

*Broadway Houston Mack Dev., LLC v. Kohl*, 71 A.D.3d 937 (N.Y. App. Div. 2d Dep't 2010) (internal citations omitted); *Vigilant Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 243 F. Supp. 3d 405, 423 (S.D.N.Y. 2017) ("The equitable doctrine of subrogation is applicable to cases where a

party is compelled to pay the debt of a third person to protect his own rights or save his own property." (internal citations omitted)); *PricewaterhouseCoopers LLP v. Giddens (In re MF Global, Inc.)*, 505 B.R. 623, 633-34 (S.D.N.Y. 2014) (recognizing that having an interest in avoiding litigation can give rise to subrogation rights).

12.    In a more typical subrogation scenario, a guarantor would pay the creditor's claim against the debtor, and then subrogate to the position of the creditor:



13.    Contrary to Highland's assertions, the Trustee is not satisfying only Acis's debt to HCLOF by paying HCLOF the amount it would receive under an optional redemption. *See* Transcript from July 30, 2018 Hearing, at pp. 30-31 (citing *Pathe Exchange, Inc. v. Bray Pictures Corp.*, 231 A.D. 465 (N.Y. App. Div. 1st Dep't 1931)) and arguing that "subrogation is an equitable remedy not given to one who merely pays his own debt"). Under an optional redemption, the *Issuers* have an obligation to pay the Subordinated Noteholders, including HCLOF, on their Subordinated Notes.  At the hearing before the Court on July 6, 2018, counsel for the Issuers asked the Trustee:

> Q     . . . Now the issuers and the co-issuers, they issued
> the notes and the subordinated notes, including the
> subordinated notes that Highland owns, correct?
> A     That's correct.

> Q    And outside of bankruptcy, those are obligations of
> the issuers and co-issuers. They issued the notes and it's
> the obligation of the issuers and co-issuers to make sure
> the notes are repaid, correct?
> A    That's correct.

Transcript from July 6, 2018 Hearing, at pp. 87-88.

14.    Here, rather than the Issuers paying HCLOF on its Subordinated Notes, as they are obligated to do, the Trustee will pay HCLOF's claim through the Plan, and Acis will then be subrogated to the rights of HCLOF as pictured below:



15.    By paying HCLOF's claim through the Plan, the Trustee fully satisfies the Issuers' obligations under the Indentures. HCLOF cannot receive payment on its claim and also retain the Subordinated Notes—this would be an inequitable result, constituting double recovery and unjust enrichment. *See In re Sears Methodist Ret. Sys.*, 2015 Bankr. LEXIS 709, at *150 n.5 (Bankr. N.D. Tex. Mar. 5, 2015) (noting that, under the "single satisfaction rule," a creditor may only recover once on its claim). As a doctrine to prevent unjust enrichment, equitable subrogation prevents HCLOF from recovering twice on its claim. *See, e.g., Indus. Dev. Bd. v. Fuqua Indus., Inc.*, 523 F.2d 1226, 1232, n.5 (5th Cir. 1975) ("[S]ubrogation is . . . a remedy invoked by courts – originally equity courts – to prevent unjust enrichment, and for this purpose it is appropriate in any case where restitution is warranted and the remedy can be given without working an

injustice." (internal quotation marks omitted)); *Great E. Bank v. Chang*, 227 A.D.2d 589, 589 (N.Y. App. Div. 2d Dep't 1996).

16.     Still, "a mere 'volunteer' is not entitled to subrogation." *N.Y. Stock Exch. v. Sloan*, 1980 U.S. Dist. LEXIS 13316, at *2 (S.D.N.Y. Aug. 15, 1980). The Trustee satisfies the "non-voluntary" element of equitable subrogation because the Trustee is compelled to satisfy the obligation to HCLOF in order to preserve its rights in the PMAs and Indentures and to avoid litigation (for failing to carry out the optional redemption). Courts have specifically found that when a party takes action to protect its rights or property by avoiding litigation, such action can give rise to subrogation rights. *See MF Global*, 505 B.R. at 633-34; *N.Y. Stock Exch.*, 1980 U.S. Dist. LEXIS 13316, at *3. Indeed, the U.S. District Court for the Southern District of New York has commented that "cases suggest that any reasonable economic interest on the part of the plaintiff will satisfy the doctrine." *N.Y. Stock Exch.*, 1980 U.S. Dist. LEXIS 13316, at *3-4 (citing, among other cases, *Indus. Dev. Bd. v. Fuqua Indus., Inc.*, 523 F.2d 1226 (5th Cir. 1975)). Accordingly, the doctrine of equitable subrogation applies under these circumstances because the Trustee "is compelled to pay the debt of a third person to protect his own rights or save his own property." *See Vigilant*, 243 F. Supp. 3d at 423.

17.     Once the Trustee pays HCLOF's claim under the Plan, which amount the Issuers are obligated to pay pursuant to an optional redemption, under the doctrine of equitable subrogation, Acis would be subrogated to the position of HCLOF and step into the shoes of HCLOF, with all rights HCLOF has in connection with the Subordinated Notes, including the ability to assign such notes.

18.     Post-confirmation, under sections 105(a) and 1142(b) of the Bankruptcy Code, the Court retains jurisdiction to direct "the debtor *and any other necessary party* to . . . join in the

execution of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b) (emphasis added); *see U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*, 301 F.3d 296, 303-06 (5th Cir. 2002). Under section 1142(b), the Court may even order third parties to perform acts necessary to consummate the plan. *See Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind (In re Erie Hilton Joint Venture)*, 137 B.R. 165, 170 (Bankr. W.D. Pa. 1992) (directing an investor to advance funds necessary to consummate the plan from an entity committed to advance the funds); *In re Harlow Props., Inc.*, 56 B.R. 794, 797-98 (B.A.P. 9th Cir. 1985) (ordering the officers of a corporate debtor to execute documents necessary for sale of the corporate assets). Thus, pursuant to section 1142(b) of the Bankruptcy Code, the Court retains jurisdiction to order any parties, including third parties, to execute any instrument or perform any other act necessary to consummate the Plan.

19. Pursuant to the Bankruptcy Court's authority under 11 U.S.C. § 1142, all parties necessary to implement Plan A, including parties necessary to the transfer and assignment of the Subordinated Notes, or any other action required to consummate and implement Plan A, will join in the execution of any instruments, including those necessary to effectuate the transfer and assignment of the Subordinated Notes from HCLOF to the Debtor, and then from the Debtor to Oaktree, or perform any other act required for the consummation and implementation of Plan A.

**C. Assignment of the PMAs to Oaktree does not violate section 365 of the Bankruptcy Code.**

20. Contrary to assertions otherwise, section 365 of the Bankruptcy Code does not prohibit the Trustee from assigning its rights under the PMAs to Oaktree without the written consent of the CLOs, the Subordinated Noteholders, and others. Section 365(c)(1) of the Bankruptcy Code provides:

> The trustee may not assume or assign any executory contract . . . if . . . applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract . . . prohibits or restricts assignment of rights; and . . . such party does not consent to such assumption or assignment[.]

11 U.S.C. § 365(c)(1).

21.     Section 205(a)(2) of the Investment Advisers Act of 1940 (the "<u>IAA</u>"), provides that a registered investment adviser (such as Acis LP) cannot enter into an investment advisory contract unless such *contract* provides "that no assignment of such contract shall be made by the investment adviser with the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2). Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision—the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs.  Indeed, in the Southern District of New York, the court held:

> Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an investment adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC,* 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018).  Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent.

22.     Accordingly, the assignment of the PMAs to Oaktree does not violate the IAA or section 365(c)(1) of the Bankruptcy Code.

## II.   PLANS B & C: MODIFICATION OF THE INDENTURES UNDER 11 U.S.C. § 1123(a)(5)(F)

23.     Section 1123(a)(5)(F) expressly provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall provide adequate means for the plan's implementation, such as cancellation or modification of any indenture or similar instrument." 11 U.S.C. § 1123(a)(5)(F). Although the Debtors are not signatories to the Indentures, applicable principles of contract law integrate multiple documents that comprise a single transaction. Specifically, the PMAs and Indentures for each CLO are part of a single transaction and are read together. Debtors are bound by the terms of the Indentures and are therefore a party to the Indentures. Accordingly, because the Debtors are burdened with the obligations of the Indentures, section 1123(a)(5)(F) allows for the modification of the Indentures.

**A.     For each CLO, the PMA and Indenture are part of one integrated contract to which Acis LP is a party.**

24.     New York law governs each PMA and Indenture for each respective CLO. Under New York law, "[w]hen interpreting contracts, it is accepted that separate agreements executed contemporaneously and that are part of a single transaction are to be read together." *Prod. Res. Grp. v. Martin Prof'l*, 907 F. Supp. 2d 401, 413 (S.D.N.Y. 2012) (citing *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)). Also, "multiple documents must be read together as a single contract when the plain language of the agreements unambiguously requires them to be read together." *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 U.S. Dist. LEXIS 105597, at *13, 2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) (internal quotation marks omitted).

25.     Additionally, under New York law, multiple documents may be construed together even when some of the documents are executed by parties who did not have a part in executing the other documents. *This Is Me v. Taylor*, 157 F.3d at 143 ("New York law requires that all writings which form part of a single transaction and are designed to effectuate the same

purpose be read together, even though they were executed on different dates and were not all between the same parties."); *accord TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2nd Cir. 2005); *see also Kurtz v. United States*, 156 F. Supp. 99, 103-104 (S.D.N.Y. 1957) *aff'd*, 254 F.2d 811, 812 (2d Cir. 1958) (affirming that a "Separation Agreement" between a decedent and his wife and a "Trust Instrument" between the decedent and his trustee should be construed together, stating, "it is both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together"); *Segovia v. Equities First Holdings, LLC*, 2008 Del. Super. LEXIS 197, at *31-32 (Del. Super. Ct. May 30, 2008) (citing 24 Corbin on Contracts § 24.21 (1998) and applying to Delaware law, which is similar to New York Law); *In re Mirant Corp.*, Case No. 04-04283-dml, Docket No. 162, at pp. 7-8, n.16 (Bankr. N.D. Tex. April 5, 2005) (Lynn, J.) (citing New York law and finding that the "various Dickerson and Morgantown Agreements function together for the central purpose of establishing the ownership, possessory and operation rights attendant to the Dickerson and Morgantown Stations" and considering the agreements as a single integrated contract).

26.    In a breach of contract case involving a collateral debt obligation ("CDO") structure (similar to CLOs), the U.S. District Court for the Southern District of New York found, pursuant to New York law, that the "series of agreements (collectively, the 'Transaction Documents') setting up the framework for a synthetic CDO" should be construed together as one contract even though different Transaction Documents were signed by different parties. *MBIA Ins. Corp. v. Cooperative Centrale Raiffeisen-Boerenleenbank B.A.*, 2011 U.S. Dist. LEXIS 31307, at *19-20 (S.D.N.Y. Mar. 25, 2011). In *MBIA*, among the "Transaction Documents" were (i) an indenture among the issuer, co-issuer, and the trustee, and (ii) a portfolio management agreement between the issuer and the portfolio manager. *See id.* at *5-8. The court stated: "There

is no question here that the Transaction Documents entered into on November 24, 2004 in connection with the formation of this CDO were part of a single, integrated transaction, and along with the parties, the Court reads them together." *Id. at* *20. The court then analyzed, among other things, whether the portfolio manager, who was not a signatory to the indenture, had breached the indenture.

27. Here, as in *MBIA*, each PMA and Indenture was entered into as part of an integrated transaction, in connection with the formation of each respective CLO structure.[5] Using CLO 2014-3 as an example, on February 25, 2014: (i) the PMA was entered into by Acis CLO 2014-3 Ltd., as issuer, and Acis LP, as portfolio manager; and (ii) the Indenture was entered into by Acis CLO 2014-3 Ltd., as issuer, Acis CLO 2014-3 LLC, as co-issuer, and U.S. Bank National Association, as indenture trustee. In addition to being contemporaneously executed, each contemplates and requires the other to operate the CLO—*each cannot be read without the other*. The term "Porfolio Management Agreement" is found approximately 66 times in the Indenture.

28. Generally, for each CLO, the PMA governs the portfolio manager's duties in supervising and directing the investment and reinvestment of the underlying CLO assets, in accordance with the Indenture. The Indenture generally governs matters concerning the secured notes issued pursuant to the Indenture (which fund the CLO), including refinancing, redemption, and related procedures, in accordance with the PMA. As such, the PMA and Indenture function together as operating documents of the CLO.

---

[5] Under the Indenture for CLO 2014-3, "Transaction Documents" are defined as: "This Indenture, the Securities Account Control Agreement, the Portfolio Management Agreement, the Collateral Administration Agreement, the Security Purchase Agreement, the Administration Agreement and the Registered Office Agreement." Indenture at p. 61.

29.     The PMA expressly provides, "[s]ubject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager . . . shall perform on behalf of the Issuer the duties that have been specifically delegated to Portfolio Manager in this Agreement and in the Indenture[.]" PMA § 3(a). Further, the PMA provides that the "Portfolio Manager shall comply with all the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder and . . . shall perform its obligations hereunder and thereunder in good faith and with reasonable care[.]" PMA § 3(b).

30.     Additionally, even though Acis LP is not a signatory to the Indentures, Acis LP has numerous obligations under the Indentures as portfolio manager, and, as discussed in *MBIA*, potential liability for breaching the Indentures (as also evidenced by the Highland Adversary filed against the Trustee for failing to comply with the terms of the Indentures). Such obligations include (but are not limited to):

a.      "notify[ing] S&P, the Trustee and the Collateral Administrator of the Trading Plan Period and any Collateral Obligations covered in such Trading Plan" in connection with "calculating compliance with the Investment Criteria," Indenture § 1.2(o);

b.       notifying the co-issuer and the indenture trustee "[u]pon obtaining knowledge of the occurrence of an Event of Default[,]" *id.* § 5.1(g);

c.      providing certain data and determining compliance in connection with the purchase of additional "Collateral Obligations," *id.* § 7.17(c) & (g);

d.      "[u]pon the receipt of a notice of redemption . . . direct[ing] the sale . . . of all or part of the Collateral Obligations and other Assets[,]" *id.* § 9.2(b);

e.      notifying the issuer, collateral administrator, and the indenture trustee of the occurrence of any "Tax Event," *id.* § 9.3(d);

f.      "in the event of any redemption pursuant to <u>Section 9.2</u> or <u>9.3</u> . . . furnish[ing] to the Trustee evidence . . . that the Portfolio Manager . . . has entered into a binding agreement or agreements with a financial or other institution . . . to purchase . . . all or part of the Assets[,]" *id.* § 9.4(c);

g. "[a]fter the Issuer has notified the Trustee of an Optional Redemption of Notes in accordance with <u>Section 9.2</u>, . . . direct[ing] the Trustee to sell . . . all or a portion of the Collateral Obligations if the requirements of <u>Article 9</u> . . . are satisfied," *id.* § 12.1(e);

h. "us[ing] its reasonable efforts to purchase additional Collateral Obligations" . . . "[d]uring the Reinvestment Period, following the sale of any Credit Improvement Obligation or any discretionary sale of a Collateral Obligation," *id.* § 12.2(a)(iv);

i. "deliver[ing] to the Trustee and the Collateral Administrator an Officer's certificate of the Portfolio Manager certifying that [any purchase of Collateral Obligations] complies with <u>Section 12.2</u> and <u>Section 12.3</u>[,]" *id.* § 12.2(c); and

j. "deliver[ing] to the Trustee copies of all notices, statements, communications and instruments delivered or required to be delivered by the Portfolio Manager to the Issuer pursuant to the [PMA,]" *id.* § 15.1(f)(iii).

31. Accordingly, although Acis LP is not a signatory under the Indentures, for each CLO, the PMA and Indenture are construed as part of one contract, to which Acis LP is a party.

**B. The Indentures may be modified to implement the Plan pursuant to 11 U.S.C. § 1123(a)(5)(F).**

32. Courts have found that section 1123(a)(5) is an "empowering statute," and that "the plan may propose such actions notwithstanding nonbankruptcy law or agreements." *In re FCX, Inc.*, 853 F.2d 1149, 1155 (4th Cir. 1988); *accord In re Congoleum Corp.*, 2008 Bankr. LEXIS 2375, at *18-19, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008). HCLOF and others may argue that the Trustee cannot modify HCLOF's purported "property rights" in the Subordinated Notes because HCLOF is somehow a third party out of reach of this Court's jurisdiction. *See, e.g., Irving Tanning Co. v. Maine Superintendent of Ins.*, 496 B.R. 644, 663-664 (B.A.P. 1st Cir. 2013) (recognizing that section 1123(a)(5)(F) "cannot extend to laws defining and protecting the property rights of third parties"). This is not the case—HCLOF is not an outside third party. HCLOF is a *creditor* of Acis, established by its claim asserted in these Bankruptcy Cases, as discussed above, and its repeated appearances before this honorable Court

(and resulting appeals). And its claim may be treated under the Plan, with all other creditors' claims.

33. Furthermore, Acis's rights under the PMAs and the Indentures, which are properly read together, are property of the estate. Thus, modification of the Indentures under section 1123(a)(5)(F), as set forth under plans B and C, falls within the intended ambit of the statute.

34. To implement the plan, under section 1123(a)(5)(F) of the Bankruptcy Code, the plan may provide for the modification of "any indenture or similar instrument." Under section 101(28), the term "indenture" means an "indenture, under which there is an outstanding security . . . constituting a claim against the debtor[.]" Here, HCLOF's Subordinated Notes are outstanding securities pursuant to the Indentures, and HCLOF has a claim (a right to payment or right to an equitable remedy that gives rise to a right to payment) under the Bankruptcy Code based on those Subordinated Notes. Thus, pursuant to the plain language of the Bankruptcy Code, the Plan may modify the Indentures in order to effectuate its implementation.

35. In the *RNI* case, cited by Highland,[6] the debtors raised cash by issuing convertible subordinated notes, pursuant to an indenture (under which U.S. Bank was the indenture trustee). *In re RNI Wind Down Corp.*, 2007 Bankr. LEXIS 982, at *4-5 (Bankr. D. Del. Mar. 29, 2007). As part of its claim, U.S. Bank, as indenture trustee, sought payment for fees and expenses incurred in connection with the bankruptcy and had asserted a charging lien for such fees. *Id.* at *9-12. The noteholders objected and argued that the plan had modified the indenture to limit payment of U.S. Bank's fees. *Id.* at *24-31. U.S. Bank argued that the court lacked jurisdiction to determine whether it could assert a charging lien under the terms of the indenture. *Id.* at *25. The court first noted:

---

[6] See Docket No. 432 ¶ 16.

> The Court agrees that, *assuming the Plan did not modify the Indenture,* the Court lacks subject matter jurisdiction to determine the Indenture Trustee's rights under the Indenture.
>
>     . . .
>
> Nonetheless, this Court does have subject matter jurisdiction to determine whether the Plan modified the terms of the Indenture and, if so, to enforce the Court's order confirming the Plan.

*Id.* at * 25, 28 (emphasis in original). Ultimately, the court held that, "**absent evidence that the Indenture was modified under applicable law or its own terms**, the Court simply lacks the authority to order a modification of the contract." *Id.* at *33 (emphasis added). In its analysis, the court indicated that, had the debtors invoked section 1123(a)(5)(F), and the indenture had been modified as suggested, the rights of the indenture trustee to recover fees (and assert a charging lien) may have been limited. This result denotes the use of section 1123(a)(5)(F) to modify more than just the debtor's obligations under an indenture.

36. In the *Stations* case, also cited by Highland,[7] the confirmation order provided that stock, notes, and the debtor's obligations under an indenture would be cancelled, but that the "Senior Note Indenture that governs the rights of the Holder of a Claim and that are administered by the Senior Note Trustee shall continue [to] allowing the Senior Note Trustee to make the distributions . . . on account of such Claims under the Plan." *In re Stations Holding Co.*, No. 02-10882, 2002 Bankr. LEXIS 1617, at *26-27 (Bankr. D. Del. Sept. 30, 2002). Effectively, the indenture was modified to eliminate all but the distribution provisions of the indenture. The confirmation order in *Stations* does not interpret section 1123(a)(5)(F) to mean that *only* a debtor's obligation under an indenture may be modified.

37. While there is limited case law interpreting section 1123(a)(5)(F), section 1123(a)(5)(E), which is analogous to (a)(5)(F), provides that the "satisfaction or modification of

---

[7] See Docket No. 432 ¶ 16.

any lien" may provide adequate means to implement a plan. 11 U.S.C. § 1123(a)(5)(E). Pursuant to section 1123(a)(5)(E), courts have modified creditors' property rights through a Chapter 11 plan. *See Wade v. Bradford*, 39 F.3d 1126, 1130 (10th Cir. 1994) (holding that the plan could modify a creditor's right to foreclose on the debtor's property); *In re Gillette Assocs., Ltd.*, 101 BR 866, 875 (Bankr. N.D. Ohio 1989) (finding that a plan may "may provide for conveying of second mortgage against assets of project funded by county bonds, despite fact that trust indenture and loan agreement preclude second mortgage on property"); *In re Kizzac Mgmt. Corp.*, 44 B.R. 496, 504 (Bankr. S.D.N.Y. 1984) (finding that section 1123(a)(5)(E) provides the court's "authority to compel the first mortgagees to give an assignment of the first mortgage rather than a satisfaction"). Accordingly, by analogy, a plan may modify a creditor's property rights under section 1123(a)(5)(F) in order to provide a means for the plan's implementation.

38. Importantly, while Acis is not the issuer under the Indentures (as in *RNI* and *Stations*), HCLOF has asserted a claim against Acis, as discussed above, demanding that the Trustee carry out an optional redemption pursuant to section 9.2 of the Indenture. Under Plans B and C, HCLOF's claim will be satisfied by the retention of the Subordinated Notes and having the option to elect a "reset" of the CLOs. In order to implement Plans B and C, the Indentures are modified to limit the ability to call a redemption, which allows for payment of Allowed Claims against the Debtors. While the circumstances here differ from those described in *RNI* or *Stations*, it is squarely within the ambit of section 1123(a)(5)(F) to allow for modification of the Indentures—under which the Debtor is obligated, and under which a claim has been asserted against the Debtor—in order to implement the Plan, as is the case here.

39.     In sum, Acis is a party to the PMAs and the Indentures.  HCLOF is a creditor of

Acis. Accordingly, to implement the Plan, the Indentures may be modified, which will fund the

Plan and pay creditors, including HCLOF and Highland, in full.

**DATED:  AUGUST 10, 2018.**

Respectfully submitted,

**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)

By: */s/ Rakhee V. Patel*
       Rakhee V. Patel
       State Bar No. 00797213
       Phillip Lamberson
       State Bar No. 00794134
       Joe Wielebinski
       State Bar No. 21432400
       Annmarie Chiarello
       State Bar No. 24097496
       rpatel@winstead.com
       plamberson@winstead.com
       jwielebinski@winstead.com
       achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11
TRUSTEE**

-and-

Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthias Kleinsasser
State Bar No. 24071357
**FORSHEY & PROSTOK LLP**

777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone:  (817) 877-8855
Facsimile:  (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR
THE CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2018 true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, and that, additionally, on the same date he caused true and correct copies of this document to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached Service List.

*/s/ Jason A. Enright*
One of Counsel