Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482) (admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING
LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### JOINT OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND HIGHLAND CLO FUNDING, LTD. TO FINAL APPROVAL OF DISCLOSURE STATEMENT AND TO CONFIRMATION OF THE JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

Highland Capital Management, L.P. ("**Highland**") and Highland CLO Funding, Ltd.

("**HCLOF**") hereby file their joint objection (the "**Objection**") to final approval of the

disclosure statement [Doc. No. 442] (as amended, the "**Disclosure Statement**") and to

confirmation of the *First Amended Joint Plan for Acis Capital Management, L.P. and Acis*

*Capital Management GP, LLC* [Doc. No. 441] (as amended, the "**Plan**"),[1] and respectfully state as follows:[2]

# I.
## PRELIMINARY STATEMENT

"If at first you don't succeed, try, try again." *–William Edward Hickson*

1.      In proposing Plans A, B and C, it would appear that the Chapter 11 Trustee has taken this old adage to heart.  Although originally penned as a motivator to would-be teachers, in the context of these bankruptcy proceedings, this approach by the Chapter 11 Trustee has proven to be a colossal waste of time and resources at a cost to the estates that eclipses not only the value of the estates' assets, but the very pre-petition claims the Chapter 11 Trustee is purportedly responsible for paying.  The result of this case appears to be nothing more than functionally administratively insolvent estates with mountains of administrative claims continuing to accrue daily.

2.      By their literal interpretation, the Chapter 11 Trustee's Plans, supported by unequivocal admissions in his pleadings, establish that post-petition, he has intentionally breached pre-petition contractual obligations of the Debtors to create a purported $100 million post-petition claim against the estates for an entity that had no claims against the estates when the Orders for Relief were entered.  By his own account, he has rendered the estates administratively insolvent.  Having thus admitted to putting the estates into this predicament— which under almost every other measure would be considered a flagrant breach of fiduciary

---

[1] Defined terms herein shall be as set forth in the Plan unless otherwise provided herein.

[2] HCLOF has filed no proof of claim in these cases, seeks no monetary relief from the Debtors, and has moved to amend its pending adversary proceeding claim to reflect that it no longer seeks the equitable claims that it sought previously (such claims are moot in any event).  Nonetheless, HCLOF objects on the basis that the proposed plans propose either to take its property or alter its contractual and legal rights.  HCLOF asserts no creditor standing in any of the objections set forth herein, and makes these objections as a party in interest given the substantial harm the plans propose to impose on it.

duty—he is now championing to "fix" the situation by either (i) taking non-estate property from the purported (involuntary) claimant and selling it along with some executory contracts of the estates that are otherwise valueless, then distributing the ill-gotten proceeds after carving off a substantial fee for himself, or (ii) re-writing multiple securities contracts to which the estates are not a party in order to not only insulate the estates from the consequences of his self-proclaimed intentional breach, but to radically alter the bargained-for rights of third party market participants in five collateralized loan obligation funds with over $2 billion at stake, none of which ever belonged to the Debtors.

3.    What the Chapter 11 Trustee is proposing under each of Plans A, B and C violates some of the most basic tenets of Title 11 and ignores the very confines of this Court's jurisdiction.  These Plans are patently unconfirmable with an unconscionable premise: that a Chapter 11 Trustee should be handsomely rewarded for an intentional post-petition breach of the estates pre-petition contractual obligations.  Such a conclusion is beyond the pale no matter how allegedly noble  the cause.  These cases should be either dismissed or, at most, converted back to Chapter 7 liquidation.

## II.
## RELEVANT BACKGROUND

4.    On January 30, 2018, Joshua N. Terry ("**Terry**") filed involuntary petitions for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("**Acis GP**," and with Acis LP, the "**Debtors**").  A Chapter 7 Trustee was thereafter appointed.

5.    On May 4, 2018, the Chapter 7 Trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**").  Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis*

*Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

6.     On May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206]. Thereafter, the United States Trustee appointed Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").[3]

7.     On July 5, 2018, the Chapter 11 Trustee filed the initial Plan [Doc. No. 383], which proposed three (3) alternatives – Plans A, B and C. In summary, Plan A of the Chapter 11 Trustee's Plan proposes to transfer HCLOF's Equity Notes, along with the portfolio management agreements (the "**PMAs**") to which Acis LP is a counter-party, to a third party "plan funder," which is Oaktree. Through this transaction, the Chapter 11 Trustee claims that all creditors will be satisfied in full. Alternatively, the Chapter 11 Trustee has proposed Plans B and C, which are effectively identical in their treatment of creditors and call for Acis LP to retain the PMAs and pay out creditors from future cash flow streams therefrom, as well as potential recoveries from estates' causes of action. Both Plans B and C require radical modification to of the CLO Indentures, ostensibly to ensure the future income stream to the estates.

8.     On July 13, 2018, the Chapter 11 Trustee filed (i) the Disclosure Statement [Doc. No. 405]; (ii) the *First Modification to the Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Doc. No. 406]; and (iii) *the Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines; (C)*

---

[3] Mr. Phelan was initially appointed on May 11, 2018 as the Chapter 11 Trustee of Acis LP and was appointed on May 16, 2018 as the Chapter 11 Trustee of Acis GP.

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* [Doc. No. 407] (the "**Motion for Conditional Approval**").

9.  On July 24, 2018, Highland and HCLOF filed respective objections to the Motion for Conditional Approval, [Doc. No. 431] and [Doc. No. 432]. On July 28, 2018, Highland filed a supplement to such objection [Doc. No. 440]. In each objection, Highland and HCLOF reserved rights to object to the final approval of the Disclosure Statement.

10. On July 29, 2018, the Chapter 11 Trustee amended the Plan and Disclosure Statement following an expedited hearing on the Motion for Conditional Approval held earlier that day. Thereafter, on July 30, 2018, the Court entered the *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV) Approving Related Matters* [Doc. No. 446] (the "**Conditional Approval Order**"), conditionally approving the Disclosure Statement, setting an August 21, 2018 combined hearing for final approval of the Disclosure Statement and confirmation of the Plan, and setting related deadlines, including a compressed and expedited discovery schedule (the "**Discovery Schedule**").

11. The Conditional Approval Order required the Chapter 11 Trustee to file a "**Limited Issues Brief**" on or before 4:00 p.m. on August 10, 2018, addressing: (a) issues related to section 1142 of the Bankruptcy Code in connection with the proposed transfer of HCLOF's subordinated notes under the Plan A alternative, and (b) issues related to sections 365 and 1123(a)(5)(F) of the Bankruptcy Code in connection with the proposed modification of the existing Indentures under the proposed Plan B and Plan C (collectively, the "**Limited Issues**").

Also as per the Conditional Approval Order, the deadline for parties to respond to the Limited Issues Brief is 4:00 p.m. on August 16, 2018.

12.     Per the Discovery Schedule, the Chapter 11 Trustee filed the Limited Issues Brief on August 10, 2018 [Doc. No. 493]. Highland and/or HCLOF intend to timely respond to the Limited Issues Brief per the Discovery Schedule. As such, while certain Limited Issues are mentioned herein, Highland and HCLOF reserve all rights on those issues for subsequent objection. Per the Discovery Schedule, this joint objection is to cover matters other than the Limited Issues; provided, however, discovery is actually occurring after the deadline to file this objection. Thus, Highland and HCLOF reserve their rights to supplement these objections.

### III.
### OBJECTION

13.     In order to confirm the Plan, the Chapter 11 Trustee bears the burden of establishing the various provisions of Bankruptcy Code section 1129 by a preponderance of the evidence. *See In re Couture Hotel Corp.*, 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015). The Plan is deficient on almost every applicable subsection of 1129 and, as a result, the Plan is unconfirmable as a matter of law.

**A.     The Bankruptcy Court Lacks Subject Matter Jurisdiction to Confirm the Plan**

14.     The Bankruptcy Court lacks subject matter jurisdiction over this proceeding and, therefore, proceeding with confirmation of any plan will be void *ab initio*. This Court should have dismissed the involuntary petitions that were filed by Joshua Terry in bad faith, and because this Court lacks subject matter jurisdiction over essentially a two-party dispute subject to arbitration. *See* Brief of Appellant Neutra (Case No. 3:18-cv-01056 (N.D. Tex.), [Doc. No. 11].

15.     Even assuming this Court has subject matter over this proceeding, the Plans violate the strictures of that jurisdiction in at least two critical and insurmountable ways:

a. Plan A is premised on the taking of non-estate property without its owners consent; and

b. Plans B and C are premised on radically altering non-estate executory contracts.

16. The Court's lack of subject matter jurisdiction is so fundamental, that frankly the Court need look no further. The Chapter 11 Trustee has presented the Court with patently unconfirmable Plans. Section 1129(a)(1) and (a)(2) require, respectively, that the plan and the plan proponent, comply with the applicable provisions of the Bankruptcy Code. The Chapter 11 Trustee's Plan A, however, asks this Court to exceed its constitutional and statutory authority to infringe upon the rights of a non-creditor and effect a taking of non-estate property (the "**Equity Notes**") via an equitable subrogation theory that is completely contrary to the law, and convert that non-estate property into "property of the estate," so that he can then sell it to a third party (Oaktree). This Court cannot approve this scheme because it has no jurisdiction to do so. Confirming Plan B or C likewise would require the Court to exceed its authority because both plans are premised on the nonconsensual alteration of non-executory contracts. Worse yet, the amendments will be to the determent of third parties who are not creditors of these estates and who are not remotely implicated in these proceedings. This Court simply has no such jurisdiction.

17. It is fundamental that bankruptcy courts do not have subject matter jurisdiction over property that does not belong to a debtor's estate. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 (5th Cir. 2014) (bankruptcy court did not have in rem jurisdiction over assets that were not "property of the estate"); *see also Scott v. Bierman*, 429 F. App'x. 225, 231 (4th Cir. 2011) ("[A] bankruptcy court's jurisdiction does not extend to property not part of a debtor's estate."); *see also NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.)*, 267 B.R. 46, 59

(Bankr. D. Del. 2001) (same); *In re Funneman*, 155 B.R. 197, 199-200 (Bankr. S.D. Ill. 1993) (partnership property was not property of the debtor-partner's estate and, therefore, outside the court's subject matter jurisdiction).

18.     These jurisdictional principles exist to protect the very type of non-debtor property interests that are at issue in this case.  And they apply even when the property would benefit a debtor's estate.  *See, e.g., Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013 (5th Cir. 1985) (noting the limitations placed on the trustee's strong arm powers by section 541, and stating that "Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own.").

19.     Before the Court can order a transfer of the Equity Notes to Oaktree, it would necessarily have to find that they constitute "property of the estate."  If the Court cannot conclude that the Equity Notes are property of the estate, then it will lack jurisdiction to order their transfer by any means.  *See, e.g., In re Murchison*, 54 B.R. 721, 725 (Bankr. N.D. Tex. 1985). (finding that the court was without jurisdiction to approve the  sale of property that was not property of the estate: "Because the criterion of § 541(a)(1) has not been satisfied, § 363(b)(1) cannot apply.").[4]

20.     Section 541 of the Bankruptcy Code defines "property of the estate" as, in relevant part, (i) "all legal or equitable interests of the debtor in property as of the commence of the case," (ii) "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title," and (iii) "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. §§ 541(a)(1), (a)(3), (a)(7).

---

[4] Bankruptcy courts have been held to be without jurisdiction to order the sale of non-estate assets, even where the sale was entirely consensual. *See, e.g., First Nat'l Bank v. Community Trust Bank*, No. 05-1610, 2006 WL 724882, at *4 (W.D. La. Mar. 21, 2006) ("Since the property was not part of the bankruptcy estate, the Bankruptcy Court had no authority or jurisdiction to order the consensual sale and, therefore, the sale was void").

21.     Neither the Chapter 11 Trustee nor his proposed transferee, Oaktree, dispute that the Equity Notes are the property of HCLOF. *See* July 6, 2018 Hrg. Tr. at 71:19-25; 119:11-18. Nor has the Chapter 11 Trustee obtained an interest in the Equity Notes via any of the Bankruptcy Code sections enumerated in section 541(a)(3). Thus, for the Equity Notes to be "property of the estate," they would necessarily have to be "property that the estate[s] acquire after the commencement of the case" under section 541(a)(7).[5]

22.     Upon first blush, that would seem to require only that the Chapter 11 Trustee prevail upon his equitable subrogation theory, thereby converting the Equity Notes into "property of the estate." However, even if the Chapter 11 Trustee successfully can obtain ownership of the Equity Notes, such property acquired post-petition is not "property of the estate" under section 541(a)(7).

23.     Under controlling Fifth Circuit law, section 541(a)(7) only applies to "property interest that are themselves traceable to 'property of the estate' or generated in the normal course of the debtor's business." *In re TMT Procurement Corp.*, 764 F.3d at 524-25 ("As we previously recognized in *In re McLain*, 'Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate'") (citing *In re McLain*, 516 F.3d 301 (5th Cir. 2008)) (emphasis added); *see also In re Cent. Med. Ctr.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) ("Congress did not intend Section 541 'to enlarge a debtor's rights against others beyond those

---

[5] The Chapter 11 Trustee also does not, and cannot, dispute the axiom that the debtor in possession or trustee steps into the shoes of a debtor and possesses no greater rights than that of the debtor. *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a given that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on the date the bankruptcy case was commenced.") (internal alterations omitted)); *In re Gibralter Res., Inc.*, 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor and stands in the shoes of the debtor"); *In re Brooks*, 60 B.R. 155, 160 (Bankr. N.D. Tex. 1986) ("Of course, a bankruptcy trustee can acquire no greater rights in property than the debtor possessed.") (citation omitted)). The Debtors had no right to sell the Equity Notes before the commencement of these bankruptcy cases and have no such rights now.

existing at the commencement of the case..'") (citing *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985)). That is not the case with the Equity Notes, which are not traceable to any property of the estate, but under the Chapter 11 Trustee's (unsupportable) theory, are property of the estate as a result of a subrogation right that purportedly vested with the estates post-petition.

24.     The property at issue in *In re TMT Procurement* was certain corporate shares that were pledged by a non-debtor third party into a court-ordered escrow that served as the collateral for the debtors' DIP loan. *In re TMT Procurement Corp.*, 764 F.3d at 524. The shares never belonged to the debtors at issue. *Id.* at 524-25. The corporation whose shares had been pledged appealed the orders of the district court (which had withdrawn the reference from the bankruptcy court), arguing that the district court did not have jurisdiction to issue orders with respect to the shares, which were not "property of the estate." *Id.* at 522-23.

25.     The Fifth Circuit, vacating the district court's order, rejected the debtors' argument that the shares were property of the estate under section 541(a)(7). In doing so, the Fifth Circuit made clear that: "[T]he Vantage Shares are not 'property of the estate' under § 541(a)(7) because they were not created with or by property of the estate, they were not acquired in the estate's normal course of business, and they are not traceable to or arise out of any pre-petition interest included in the bankruptcy estate." *Id.* at 525 (rejecting also the argument that the tracing limitation did not apply to corporate debtors in chapter 11 bankruptcies).

26.     The Plan does not satisfy sections 1129(a)(1) and (a)(2) because it seeks to impermissibly expand the scope of estate property and requires the Court to exceed its jurisdiction. The Equity Notes were not "property of the estate" at the commencement of these cases and the Chapter 11 Trustee has not obtained the Equity Notes through one of the

enumerated sections in Section 541(a)(3). Nor are the Equity Notes traceable to any property of the estate. Therefore, the Plan cannot be confirmed. *See In re Cent. Med. Ctr.*, 122 B.R. at 573 (holding that the plan failed to satisfy section 1129(a) "[b]ecause the Plan violates Section 541(a) due to its improper expansion of the estate's interest" in certain funds in which it only had a reversionary interest at the commencement of the case; the plan "baldly seeks to divest the bondholders of property which is rightfully theirs.").

**B.      Sections 1129(a)(1), (3) – The Plan Violates the Bankruptcy Code and Violates Other Applicable Law**

27.      Bankruptcy Code section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title," and section 1129(a)(3) states that a plan cannot be proposed "by any means forbidden by law." As to section 1129(a)(1), the Plan violates well-accepted tenets of bankruptcy law because the Chapter 11 Trustee seeks to (i) take possession of non-estate property and (ii) fundamentally alter non-debtor executory contracts. These are included among the Limited Issues and will be set forth in the response to the Limited Issues Brief.

28.      As to section 1129(a)(3), despite the Chapter 11 Trustee's obfuscations regarding "transfers" and other similar self-serving characterizations, the practical reality is that the Plan A transaction effects a sale of the Equity Notes to Oaktree. The Equity Notes are undoubtedly securities. *See Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-43 (S.D.N.Y. 2013) (finding sale of CLO notes to be a sale of a security under *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010)). Any sale of securities must comport with the requirements of federal securities laws, including the Securities Act of 1933 (the "**'33 Act**").[6]

---

[6] Moreover, none of the Indentures or other relevant documents permit the Chapter 11 Trustee, on behalf of Acis, or otherwise, to market HCLOF's Equity Notes for sale. The Chapter 11 Trustee cannot sell the Equity Notes in violation of the terms of the Indentures, and seek at the same time to retain the benefits of the Indentures.

4815-0110-1423.4

29.     Section 77e of the '33 Act makes it unlawful "to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(c).[7] The Chapter 11 Trustee has not filed a registration statement covering his proposed sale of the Equity Notes.

30.     Section 1145(a)(1) and (a)(2) do not absolve the Chapter 11 Trustee from compliance with these requirements because Oaktree is not receiving the Equity Notes on account of claims against the estates. *See also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 425 (S.D.N.Y. 2007) ("[T]he section 1145(a) exemption is available only when the offerees are receiving the securities, at least in part, in exchange for claims against or interests in the debtor which they hold." (internal citation omitted)).

31.     The mechanism set forth in the Plan for the transfer of the Equity Notes makes plain that Oaktree is not the initial transferee (or subrogee). Instead, the initial transferee are the bankruptcy estates. As described, the estates will then transfer the notes to Oaktree. Because Oaktree will not be receiving the Equity Notes in exchange for claims or interests that Oaktree has against the Debtors, the section 1145(a) exemption cannot, and does not, apply.

32.     Bankruptcy Code section 1145 provides a limited exemption when the Chapter 11 Trustee sells a security "of an issuer other than the debtor or an affiliate" 11 U.S.C. § 1145(a)(3). The exemption allows trustees to raise cash for an estate while protecting purchasers by requiring that adequate information about the securities is available. This "portfolio securities" exemption should be strictly construed because public policy strongly supports the registration of securities. *See Quinn & Co. v. S.E.C.*, 452 F.2d 943, 946 (10th Cir. 1971); 8

---

[7] In any litigation or enforcement action, it would be the Chapter 11 Trustee's burden to show the applicability of an exemption to this requirement. *E.g.*, *SEC v. Carrillo Huettell LLP*, No. 13 Civ. 1735(GBD)(JCF), 2017 WL 213067, at *3 n.7 (S.D.N.Y. Jan. 17, 2017). The Chapter 11 Trustee has not argued that any of these exemptions apply. *See* 15 U.S.C. § 77d (providing exemptions to registration requirements).

Collier on Bankr. ¶ 1145.02 (16th ed. 2018). This exemption requires that (1) the debtor own the security on the date the bankruptcy petition was filed; (2) any exempt securities are not securities of the debtor's affiliates; (3) the issuer of the securities is in full compliance with registration and disclosure laws; and (4) the volume of the securities sold be limited to less than 4% of shares outstanding. 11 U.S.C. § 1145(a)(3).

33.     The Chapter 11 Trustee's Plan A transaction clearly does not qualify for this exemption. First, neither the Chapter 11 Trustee nor the Debtors owned the Equity Notes on the date the bankruptcy petition was filed, nor do they own them now. Second, the proposed sale would be far in excess of the 4% threshold permitted by the exemption. Because the section 1145 exemptions do not apply, the Chapter 11 Trustee will be in violation of the '33 Act.

34.     In addition to violating the '33 Act, the Plan violates the Investment Advisors Act of 1940 (the "**IAA**"). It is clear that the Chapter 11 Trustee owes fiduciary duties to HCLOF and its investors. In agreeing to manage the CLO investments, Acis LP represented to the CLOs that it is "registered as an investment adviser" under the IAA and agreed to perform its portfolio management services consistent with the IAA. *See, e.g.*, 2013-1 PMA § 17(b)(i). The IAA imposes a fiduciary duty on Acis LP to act for the benefit of the CLO and its investors, including Equity Noteholders like HCLOF. *See Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 36 (1979) ("Congress intended to impose enforceable fiduciary obligations" in passing the Act); 15 U.S.C. § 80b-6.[8] The scope of Acis LP's (and thus the Chapter 11 Trustee's) fiduciary duties is broad. The Chapter 11 Trustee's obligations include a duty to refrain from conduct that directly harms the CLOs, as well as the more general duty of undivided loyalty. *See Bullmore v. Banc of*

---

[8] Acis LP also owes fiduciary duties as an investment advisor under New York's common law. *See Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties . . . .'") (citations omitted).

*Am. Sec. LLC*, 485 F. Supp. 2d. 464, 471 (S.D.NY. 2007) (applying New York law). Each of the plans proposed by the Chapter 11 Trustee rest upon a flagrant violation of Acis LP's fiduciary duties: Plan A proposes to sell HCLOF's property without its consent and Plan B and Plan C propose to impermissibly modify the Indentures to strip HCLOF and the other noteholders of their right to call a redemption. These issues will be more thoroughly addressed in HCLOF and Highland's response to the Chapter 11 Trustee's Limited Issues Brief.

35.   Moreover, the Chapter 11 Trustee cannot disclaim the duties he owes to the CLOs and the investors under the contracts and securities laws, including the IAA. In one analogous case, *In re New Center Hospital*, 200 B.R. 592 (E.D. Mich. 1996), the chapter 11 trustee sought to escape the duties of the debtor-hospital as the administrator of an employee benefit plan governed by ERISA. The chapter 11 trustee argued that if he were to administer the plan, he would be required to act solely in the interest of the ERISA plan beneficiaries which would be in conflict with his duties to the bankruptcy estates; therefore, he could not serve as an ERISA fiduciary and a bankruptcy estate fiduciary at the same time. *Id.* The district court rejected this argument and overturned the decision of the bankruptcy court, concluding that, "[t]he Bankruptcy Trustee assumes the positon of the debtor as to that debtor's many obligations. Courts have held that statutory obligations that bind the debtor will subsequently bind the bankruptcy estate." *Id.* (internal citations omitted). Likewise, the Chapter 11 Trustee is bound to perform the obligations and duties of Acis LP under relevant contract and applicable law, including the IAA. Because the Chapter 11 Trustee has put forth a Plan that violates such duties, he cannot meet the section 1129(a)(3) standard that the Plan is not "forbidden by law."

**C.   Section 1129(a)(3) – The Plan Was Not Proposed in Good Faith**

36.   Bankruptcy Code section 1129(a)(3) further provides that a plan must be proposed in good faith. The Chapter 11 Trustee, as proponent of the Plan, bears the burden of

demonstrating that it was filed in good faith. *In re Barnes*, 309 B.R. 888, 892 (Bankr. N.D. Tex. 2003). A good faith plan "must fairly achieve a result consistent with the [Bankruptcy] Code." *Id.* (quoting *In re Block Shim Dev. Co. – Irving*, 939 F.2d 289, 292 (5th Cir. 1991)). Good faith itself is "evaluated in light of the totality of the circumstances surrounding establishment of [the] plan, mindful of the purposes underlying the Bankruptcy Code." *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). The ultimate goal of the analysis is to determine the "subjective motive" of a plan proponent. *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 694 (Bankr. N.D. Tex. 2013).

37. The record demonstrates there was virtually no negotiation of the economic terms of the Oaktree proposal, and in particular there was no effort by the Chapter 11 Trustee to secure the highest possible price for the Equity Notes.[9] The purported consideration for the PMAs was clearly based not on any actual metric of value for those contract rights, but on an amount necessary to pay Josh Terry's claim. Certainly as to the Equity Notes, this was not a negotiation between a willing seller and a willing buyer – the seller was not even present. It is instead a scheme, concocted in bad faith, to take property from one party and provide a windfall to other parties.

38. Moreover, improper motives have tainted these bankruptcy cases from the beginning. Joshua Terry initiated these proceedings on the eve of a state court hearing to consider the very relief he then requested from this Court. From the very beginning, Terry has made clear his motivation for initiating the involuntary bankruptcy: to prevent Acis LP from

---

[9] The Chapter 11 Trustee has testified that he engaged in no substantive negotiation concerning the sale price of the Equity Notes. *See* Transcript of July 6, 2018 hearing at 75:14-16; 76:6-8:

> MR. MALONEY. Was there any negotiation over the price formula that they were proposing for the subordinated notes?
> MR. PHELAN. No . . .
> . . .
> Q. Now you didn't ask that they increase that at all?
> A. No.

meeting its contractual obligation to effectuate the reset requested by the equity—so that the Debtors could continue to earn management fees they are not entitled to.[10]

39.     The Chapter 11 Trustee has adopted Terry's cause.

40.     At the end of the day, these bankruptcy cases and the Plan amount to nothing but a free option play by Terry, the Chapter 11 Trustee, and Oaktree to monetize PMAs with less than nominal value, at the expense of Highland (who is effectively funding the administrative expenses of these cases on account of the substantial management fees being withheld from it) and HCLOF (who is being denied its contractual rights with non-debtor parties and stripped of its own property against its will to fund that payment).  The Chapter 11 Trustee has nothing to lose from this strategy – he can turn an asset with little or no value into a big pay day for Terry and himself.  Oaktree similarly has nothing to lose – if it doesn't end up getting the Equity Notes, it walks away with all its expenses paid and a $2.5 million break-up fee for its time.

41.     In these circumstances, the Court should not make a good faith finding.

**D.      Section 1129(a)(5) – The Plan Does Not Properly Disclose or Address Insider Issues**

42.     Bankruptcy Code section 1129(a)(5)(A)(i) requires a plan proponent to disclose "The identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."  Under both Plan B and Plan C, Terry is slated to receive 100% of the equity in the Reorganized Debtor (as well as, inexplicably, any residual assets of the Acis Trust upon payment in full of all creditors).  Terry therefore clearly comes within the definition of individuals described in section 1129(a)(5)(A)(i).

---

[10] Among the things acknowledged by Terry at the involuntary trial in March 2018 was the fact that he "had no issues with the rest or refinance transaction.  [Rather,] the issue was that these collateral-management agreements were transferred for no consideration to Acis."  March 21, 2018 Hrg. Tr. At 132:16-19.  Note, however, that fees would not continue to be payable under the PMAs following a reset in any circumstance.  *See also Id.* at 27:22-28:1: "Q: And you knew there was an extreme likelihood that the [reset] transaction was not going forward as a result of the bankruptcy filing, correct?  MR. TERRY: Yes, that was our goal on filing the involuntary petitions."

While Terry's identity is disclosed in Plans B and C, his affiliations are not. Specifically, the Chapter 11 Trustee makes no effort to describe Terry's relationship and affiliations with other parties in interest in this case including (without limitation) Oaktree, Brigade Capital Management, L.P., and Cortland Capital Markets Services LLC. Furthermore, the Chapter 11 Trustee does not disclose or otherwise describe the post-petition affiliation between Terry and the Chapter 11 Trustee himself. Discovery in this matter has revealed, and evidence at the confirmation hearing will further demonstrate, that Terry has essentially acted as the co-trustee in this case. This includes: taking it upon himself to market the Debtors' assets, introducing the Chapter 11 Trustee to Oaktree, participating in most substantive communications with Oaktree, and participating in the formulation of a Plan that (under Plans B and C) hands control of the Debtors over to him. On this record, it is clear that Terry's affiliations have not been disclosed, in violation of section 1129(a)(5)(A)(i).

43. While Terry's undisclosed affiliations is a significant issue in and of itself, the relationship between Terry and the Chapter 11 Trustee raises yet another, troubling issue. The facts of this case lead inexorably to the conclusion that Terry is an insider of the Plan proponent (i.e., the Chapter 11 Trustee). The term "insider" is defined in Bankruptcy Code section 101(31) to "include" parties who have certain officer, director, or ownership interests in a debtor. However, the concept of a non-statutory insider has been recognized by many courts, including the Supreme Court. *See U.S. Bank N.A. v. Village at Lakeside, LLC*, 138 S. Ct. 960 (2018). The Fifth Circuit has identified the following factors to consider when determining whether a party is non-statutory insider: (1) the closeness of the relationship between the party and the debtor; and (2) whether the transactions between the party and the debtor were conducted at arms-length. *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

Importantly, cases recognize that control over the debtor is <u>not</u> a requirement for determining non-statutory insider status. *See, e.g., In re The Village at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 n.5 (10th Cir. 2008).

44.     The ultimate point of analyzing whether any party is an insider is to determine whether such party is using "their privileged position to disadvantage non-insider creditors." *See In re South Beach Secs., Inc.*, 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007). Insider status is also critical for determining whether a party's desire to obtain, or maintain, control over a debtor is motivating the party. *See In re Rexford Props., LLC*, 557 B.R. 788, 799 (Bankr. C.D. Cal. 2016) (noting that insiders seeking to retain ownership of the reorganized debtor were "influenced by totally different considerations from those motivating the other creditors.") (quoting *In re Featherworks Corp.*, 25 B.R. 634, 640 (1st Cir. BAP 1982)).

45.     In this case, the Chapter 11 Trustee is the proponent of the Plan. Plan proponent insiders should be scrutinized because they, like a debtor insider, may be using a plan process to benefit their "privileged position." For example, in *In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1982), the court found that a non-debtor plan proponent (Japonica Partners, L.P.) was considered an insider because Japonica during the case had access to "voluminous and thorough" information available only to insiders. Moreover, the court noted that while Japonica "did not have actual control or legal decision making power [over the debtor] . . . [Japonica] attempted to influence, in not very subtle ways, decisions made by the debtor." *Id.* at 298.

46.     Terry's actions fit perfectly into such a non-statutory insider analysis. A review of the Plan makes plain Terry's favorable treatment. His claim is separately classified, the claim is treated the same as an entirely secured claim would be, despite the fact that Terry did not even

alleged his claim was fully secured, he is being permitted to use $1 million to acquire Acis LP's equity, despite the fact that the claim on file is less than $1 million, and the Chapter 11 Trustee has made no indication that Terry's secured claim may be avoided, despite the fact that the garnishment took place well within the 90-day pre-petition preference period.

47.     In addition, while Terry is not in formal "control" of the Chapter 11 Trustee, Terry had access to voluminous insider information during the pendency of this case and he clearly influenced decisions made by the Chapter 11 Trustee. Nothing about the relationship between Terry and the Chapter 11 Trustee suggests that they acted at arms-length. Moreover, Terry used his close relationship to further his non-creditor motivation to put into place provisions that will allow him to take sole control over the Reorganized Debtor. Thus, Terry meets every single element for establishing that he is a non-statutory insider of the Plan proponent in this case. Moreover, any attempt by the Chapter 11 Trustee to distinguish the facts and cases on the basis that the Chapter 11 Trustee is not the same entity as the Debtors is specious. Once again, the Chapter 11 Trustee is the Plan proponent in this case. If a Chapter 11 trustee were able to hide behind an "I am not the debtor" argument, then it would follow that parties could engage in all manner of inside dealing and wrongful acts with a trustee with impunity. That makes no sense. The non-statutory insider analysis is designed to identify whether a party has a close relationship that allows the party to influence the process to further non-creditor goals (i.e., control). Terry meets that test with respect to the Plan proponent in this case. And, as discussed below, the fact that Terry is a non-statutory insider means the Chapter 11 Trustee cannot cram down the Plan.

**E.**     **Sections 1129(a)(7) and 1129(b) – The Plan Is Not In the Best Interest of Creditors and Is Not Fair And Equitable**

48.     Bankruptcy Code sections 1129(a)(7) and 1129(b) require that a plan be in the best interest of creditors and otherwise fair and equitable. First and foremost, Plans A, B, and C are premised on actions that are not supported by the law. How could it ever be in the best interest of creditors for a plan proponent to act outside the law? The Plan is a legal fallacy and, even if confirmed, will be the subject of years of litigation and ever-increasing administrative expense claims. That is not in the creditors' best interests.

49.     Also, included in a best interest of creditors analysis is a determination that creditors who have not accepted the plan will receive no less under the Plan then they would in a hypothetical Chapter 7 liquidation. *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993). This requires a valuation analysis comparing what the creditor would receive if the property were sold today versus the value such creditor would receive as a creditor in a Chapter 7 case. *Id.*

50.     The Chapter 11 Trustee cannot meet his burden on this valuation issue with respect to HCLOF.[11] It is undisputable that HCLOF was not a creditor as of the Petition Date. That is, the basis for the Chapter 11 Trustee asserting that HCLOF is a creditor is the equitable relief sought in an adversary proceeding brought by HCLOF against the Chapter 11 Trustee after the Petition Date. In a hypothetical Chapter 7 case, there would simply be an orderly liquidation and therefore no need to twist the law of equitable relief and subrogation to support a plan process and HCLOF would keep its subordinated notes. As such, any liquidation analysis by the Chapter 11 Trustee is a non-sequitur from the beginning because it would be based on the facially incorrect assumption that HCLOF was a creditor on the Petition Date. Moreover, even if

---

[11] As noted, HCLOF asserts no creditor standing.

that flaw is simply ignored (and there is no reason to do so), the valuation numbers do not add up. The Plan proposes to pay HCLOF amounts based entirely on a May 2018 letter sent by Highland. Evidence has shown in this case that circumstances have changed dramatically since May 2018, and further, that HCLOF values its Equity Notes much higher than what is being proposed under the Plan. The Chapter 11 Trustee bears the burden of rebutting that valuation evidence and, based on the record of this case, he will not be able to meet such burden. In fact, the Chapter 11 Trustee has not even substantively included HCLOF in its analysis purporting to satisfy section 1129(a)(7)[12] and he has advanced no expert witness to address the valuation issues necessary to do so at the confirmation hearing. Therefore, the Chapter 11 Trustee cannot satisfy the required test under section 1129(a)(7).

**F.      Sections 1129(a)(8), (10) and 1129(b) – The Plan Does Not Meet the Requirements for Cram Down**

51.      Bankruptcy Code sections 1129(a)(8) requires that each impaired class vote in favor of a plan. Bankruptcy Code section 1129(a)(10) permits a plan proponent to cram down a plan on non-voting classes, as long as one class of impaired creditors votes in favor of the plan. Insider votes are not counted for the purposes of consent under 1129(a)(10). Section 1129(b), in turn, requires in a cram down plan that the plan not unfairly discriminate and is fair and equitable to the non-voting creditors. Based on the record of this case, it is assumed that Class 3 (the Terry Secured Claim) will be the only class with the claim amount and numerosity to be deemed (according to the Chapter 11 Trustee) a consenting class. Therefore, in order to meet the cram down confirmation requirements, the Chapter 11 Trustee has the burden of showing that: (i) Terry is impaired; (ii) Terry is not an insider; and (iii) cramming the Plan down solely on

---

[12] The Chapter 11 Trustee's liquidation analysis is attached as Exhibit 2-D to the Disclosure Statement. The amount of the Class 2 HCLOF claim is listed as "TBD." *Id.*

Terry's vote does not unfairly discriminate and is fair and equitable to other creditors. The Chapter 11 Trustee cannot meet such a burden.

52. The Fifth Circuit interprets the concept of impairment broadly to include any alternation of a creditor's rights. *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 245. However, a broad interpretation does not mean that the concept of impairment does not exist. The policy reason for requiring an impaired class to accept the plan under a cram down is to ensure that at least one group of creditors that is "<u>hurt</u> . . . nonetheless favors the plan." *In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 776-77 (S.D.N.Y. 1994) (emphasis added).

53. Here, no viable argument can be made that Terry is impaired under Plan A because Plan A proposes to pay Terry in full with interest. The interest element, of course, compensates Terry for any delay in receiving what he alleges he is owed. Paying a creditor in full with interest is the very definition of non-impairment. Using a lone creditor, let alone in insider such as Terry, should not be sufficient to fulfill the section 1129(a)(10) requirement. This is a textbook case of using artificial impairment to generate an impaired accepting class.

54. Moreover, even if Terry were considered impaired under Plan A, Terry's votes should not be counted under any of the plans (A, B, or C) because Terry is a non-statutory insider. The basis for deeming Terry a non-statutory insider is set forth above. Because of his status as such, the Chapter 11 Trustee is prohibited by the plain language of section 1129(a)(10) from relying on Terry's votes to support a plan.

55. The final requirement for a cram down plan is that it is fair and equitable and does not unfairly discriminate. Whether a plan is proposed in good faith is a critical element of this determination. *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247 (citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)). Because, as set forth above, the Chapter 11

Trustee is unable to establish that the Plan was proposed in good faith, he likewise will be unable to establish that he meets the cram down standard. The Plan also unfairly discriminates on a number of different bases. Moreover, the Chapter 11 Trustee provides no basis for classifying Highland's claims separately under the Plan, other than to gerrymander the classes.

## G.    Section 1129(a)(10) – The Plan's Claim Classifications are Improper

56.    A further requirement under section 1129(a)(10) and related case law is that claims be properly classified under a plan. *See, e.g., In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (prohibiting the gerrymandering of classes to create a consenting impaired class). Claims that are "substantially similar" must be classified together. Terry's claim treatment under the Plan is a blatant example of gerrymandering. Terry has alleged a partial secured claim based on pre-petition garnishment of certain funds. However, the garnishment occurred within the 90-day preference period and is *per se* avoidable. As such, Terry is nothing more than a general unsecured creditor in this case. His claim should be classified alongside other general unsecured creditors in Class 4.

57.    Highland is a general unsecured creditor in the case, but its claim has been separately classified from other general unsecured creditors. Similarly, HCLOF is a Class 2 claimant under Plan A, but is effectively a Class 5B claimant under Plan B and Plan C. Presumably, the Chapter 11 Trustee bases such separate classification and disparate treatment on his allegation that Highland and/or HCLOF are liable for a fraudulent transfer. However, that matter remains subject to an on-going adversary proceeding. In other words, the Chapter 11 Trustee has simply made an allegation and is yet to prove his case. Permitting separate classification based on unproven allegations would seem an invitation for plan proponents to

engage in all manner of mischief in order to craft around the requirement that substantially similar claims be classified together.[13]

## H. Section 1129(a)(11) – The Plan is Not Feasible

58. Bankruptcy Code section 1129(a)(11) has been interpreted to require a finding that a plan is economically feasible. This requires the Chapter 11 Trustee to demonstrate that the plan has a "reasonable assurance of commercial viability." *In re Briscoe Enters., Ltd. II*, 994 F.2d at 1166. Moreover, the Chapter 11 Trustee must "present proof through reasonable projections that there will be sufficient cash flow to funder the [Plan]." *See In re Couture Hotel Corp.*, 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015).

59. On the record before the Court, the Chapter 11 Trustee has failed to demonstrate sufficient funds to meet all the obligations set forth in the Plan. That includes the very substantial administrative expense burden that appears to have surpassed the total claims alleged by the Chapter 11 Trustee to be payable in this case.

## I. The Plan Cannot Effect an Assumption and Assignment of the PMAs Without Consent.

60. The Plan A transaction cannot be confirmed because it proposes to assume and assign the PMAs to Oaktree (*see* Plan § 2.17(c)) in violation of section 365(c)(1) of the Bankruptcy Code and without the requisite consent. *See* 11 U.S.C. § 365(c)(1) (trustee "may not

---

[13] HCLOF and Highland object to the Chapter 11 Trustee's apparent attempt to litigate the fraudulent transfer claims currently pending in the adversary proceeding as part of the plan confirmation process. As set forth in their separately-filed joint motion to strike the expert report of Kevin Haggard of Miller Buckfire, any such attempts are procedurally improper and inconsistent with the parties' understanding and agreed-upon schedule. Highland and HCLOF have a right under the Bankruptcy Code and applicable rules to litigate the fraudulent transfer claims in a proceeding subject to the heighted procedural protections available in an adversary proceeding—not in the context of a harried and accelerated confirmation process (a process of the Trustee's own making). *See In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008) ("[W]here the Rules require an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue without one."). The Court should not condone this type of "litigation by ambush." *See In re Vidal*, No. 12-11758 BLS, 2013 WL 441605, at *5 (Bankr. D. Del. Feb. 5, 2013) (applying *Mansaray-Ruffin* to avoid "lien-stripping by ambush").

assume or assign any executory contract . . .if applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor . . . and such party does not consent to such assumption or assignment"); *In re Cedar Chem. Corp.*, 294 B.R. 224, 232 (Bankr. S.D.N.Y. 2003) ("a contract otherwise unassignable under § 365(c)(1) can be assumed and assigned if the non-debtor party consents"). The IAA and New York state law provide the relevant "applicable law" prohibiting assignment and excusing HCLOF from accepting performance from anyone other than Acis and/or Highland.

61. The IAA prohibits the assumption and assignment of the PMAs to Oaktree without, among other things, the Equity Noteholders' consent. Section 205(a)(2) of the IAA prohibits investment advisers (i.e., Acis LP) from entering into an investment advisory contract with a client (here, the CLOs) that "fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party by the contract." 15 U.S.C. § 80b–5(a)(2). Section 202(a)(1) of the IAA defines "assignment" generally to include "any direct or indirect transfer . . . of an investment advisory contract" by an adviser. 15 U.S.C. § 80b–2(a)(1) (emphasis added).

62. Section 14 of the PMAs (titled "Delegations/Assignments") provides the provisions intended to satisfy section 205(a)(2) of the IAA. Those sections, in relevant part, prohibit Acis from assigning its responsibilities under the PMAs without the written consent of each relevant CLO, at least a majority of the Equity Notes of each CLO, at least a majority of the Controlling Class (as defined in the indentures), and satisfaction of the Global Rating Agency Condition. *See*, *e.g*., 2013-1 PMA, § 14(a). Acis cannot transfer, either directly or indirectly, its responsibilities under the PMAs without first satisfying the requisite conditions, including

obtaining the written consent of a majority of the Equity Noteholders of each CLO (which the Chapter 11 Trustee has not obtained).

63.    The *CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, No. 17 Civ. 9463, 2018 U.S. Dist. LEXIS 90174 (S.D.N.Y. May 23, 2018) case does not mandate a different result. First, the language the Trustee quotes is from a decades-old SEC no-action letter. *Id.* at *12 (quoting *SEC No-Action Letter, Am. Century Cos.*, 1997 WL 1879138, at *5 (Dec. 23, 1997)). SEC no-action letters are only binding with respect to the party requesting guidance, have no precedential value unless the SEC agrees to allow a party to rely on them, and the SEC is free to change their interpretation at any time. *See* SEC, Fast Answers, available at https://www.sec.gov/fast-answers/answersnoactionhtm.html. Second, CWCapital did not decide whether the IAA separately requires client consent. 2018 U.S. Dist. LEXIS 90174, at *12-13. Third, a reported case from a court in this District recently found to be well-pleaded a cause of action for "assigning the benefits of [an] agreement to provide investment advisory services to others" based on the IAA. *Douglass v. Beakley*, 900 F. Supp. 2d 736, 748 (N.D. Tex. 2012).

64.    The proposed assumption and assignment undermines the public policy reasons for section 205(a)(2) of the IAA. The Chapter 11 Trustee's transfer of portfolio management duties to Oaktree thus violates section 205(a)(2) of the IAA, and in turn, violates section 365(c)(1) of the Bankruptcy Code. The Chapter 11 Trustee and this Court cannot ignore the dictates of the IAA. *Cf. In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 78-79 (Bankr. S.D.N.Y. 2007) (local ordinances provided "applicable law" that prohibited assignment).

65.    The PMAs are also a personal services contract that cannot be assigned under New York law without consent. *See Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 482 (N.Y. 2006) (hotel management contract held below to be personal services contract;

"personal services contracts generally may not be assigned absent the principal's consent") (citing 9 Corbin, Contracts § 865 [interim ed.]; 3 Farnsworth, Contracts §§ 11.4, 11.10 [3d ed]); *Marriott Int'l, Inc. v. Eden Roc, LLLP*, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013) ("The parties' detailed management agreement places full discretion with plaintiffs to manage virtually every aspect of the hotel. Such an agreement, in which a party has discretion to execute tasks that cannot be objectively measured, is a classic example of a personal services contract that may not be enforced by injunction"); *see also* 6A N.Y. Jur., Assignments § 11 ("[T]he principle that all ordinary business contracts are assignable is subject to the exception that executory contracts for personal services or those involving a relationship of personal confidence are not assignable by one party unless the other party consents or waives the right to object. Thus, as a general rule, an employment contract for the performance of personal duties or services is not assignable by the employer so as to vest in the assignee the right to the labor of someone who never agreed to such employment. In fact, generally, no executory contract for personal services can be assigned by either party.").

66. Under New York law, personal service contracts are generally those that depend on the skill or reputation of the performing party. *See In re Schick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999) ("Faced with a state law restricting assignment . . . a court must inquire into its rationale and uphold the restriction under section 365(c) if the identity of the contracting party is material to the agreement"). As one bankruptcy court has stated with respect to New York law on the issue:

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the debtor-in-possession or trustee is unable to assume or assign the rights of the bankrupt in such contract. . . . It is patently unfair in such cases to require a non-debtor third party to accept performance from anyone other than the original contract vendee,

unless the contract clearly provides for the right to assign to another contract vendee.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996); *see also Donald Rubin, Inc. v. Schwartz*, 559 N.Y.S. 2d 307, 310 (N.Y. App. Div. 1990) (describing a consulting agreement as being "in the nature of a personal services contract"); *Carbo Indus., Inc. v. Coastal Ref & Mktg., Inc*., 154 F. App'x 218, 220 (2d Cir. 2005) ("this case does not fall within the limited exception developed for 'personal services contracts'—*e.g.*, consulting contracts.") (citing *Donald Rubin*, 559 N.Y.S. 2d at 310) (emphasis added).

67.     As has been previously explained, HCLOF and its investors invested in reliance on the skill and expertise of Highland to manage the CLOs.  In this case, a witness put on by the Chapter 11 Trustee – Zach Alpern of Stifel, Niocolas – testified to the fact investors pick sub-advisors based on the fact that different advisors "have different styles and make different creditor choices."[14]  Mr. Alpern further testified that "equity holders make an informed decision when they make their investment and their opinion of the advisor is one of the considerations that they may make at the time of their investment, and it's a consideration that they probably take into account whether they hold or sell that investment."[15]

68.     Replacing Acis/Highland with Oaktree/Brigade frustrates the investment objective of the parties, denies them the benefit of their bargain, and undermines and violates the IAA as well as black-letter New York law relating to personal service contracts.  The assumption and assignment of the PMAs cannot be approved.

---

[14] *See* Transcript of August 1, 2018 hearing on the Chapter 11 Trustee's *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC*, at 67:24-25.
[15] *Id.* at 69:9-14.

**J.      The Disclosure Statement Should Not be Finally Approved**

69.      As to the Disclosure Statement, Highland and HCLOF renew their objections to its final approval based on the fact that it describes a patently unconfirmable Plan.  *See In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007); *In re Arnold*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2002).

## IV.
## <u>RESERVATION OF RIGHTS</u>

70.      Nothing herein shall be construed as an admission of, or concession to, any fact contained in the Disclosure Statement or the Plan, and Highland and HCLOF reserve all rights to contest and rebut any and all factual allegations at the Confirmation Hearing.  As previously mentioned herein, because discovery is ongoing per the Discovery Schedule, Highland and HCLOF reserve their rights to amend these Objections.


WHEREFORE, Highland and HCLOF respectfully request entry of an order (i) denying confirmation of the Plan; (ii) denying final approval of the Disclosure Statement; and (iii) granting such other and further relief to which Highland and HCLOF are entitled.

Dated: August 13, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482)
Paul R. Bessette (TX 02263050) (admitted *pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING,**
**LTD.**

4815-0110-1423.4

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on August 13, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Melina Bales*
Melina Bales