Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthias Kleinsasser – State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR THE CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| DEBTORS. | § | **Chapter 11** |

### REPLY BRIEF ON LIMITED ISSUES IN SUPPORT OF FIRST AMENDED PLAN

Robin Phelan (the "Trustee"), the Chapter 11 Trustee of Acis Capital Management, L.P.

("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," together with Acis LP, the

"Debtors" or "Acis"), the Debtors in the above-styled and numbered bankruptcy cases (the

"Bankruptcy Cases"), files this *Reply Brief on Limited Issues in Support of First Amended Plan*

(the "Reply Brief") in support of the *First Amended Joint Plan for Acis Capital Management,*

*L.P. and Acis Capital Management GP, LLC* [Docket No. 441] (the "Plan"). This Reply Brief

responds to certain arguments raised in objections to confirmation and responses to the *Brief of*

*Limited Issues in Support of First Amended Joint Plan for Acis Capital Management, L.P. and*

*Acis Capital Management GP, LLC* [Docket No. 493] (the "Limited Issues Brief"), including

certain arguments raised in: the *Objection of Issuers and Co-Issuers to Confirmation of the*

*Chapter 11 Trustee's First Amended Joint Plan for Acis Capital Management, L.P. and Acis*

*Capital Management GP, LLC* [Docket No. 496] (the "Issuers' Objection"); the *Joint Objection*

*of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of*

*Disclosure Statement and to Confirmation of the Joint Plan for Acis Capital Management, L.P.*

*and Acis Capital Management GP, LLC* [Docket No. 497] (the "Highland Objection"); the

*Response of Issuers and Co-Issuers to the Chapter 11 Trustee's Brief of Limited Issues in*

*Support of First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital*

*Management GP, LLC* [Docket No. 517] (the "Issuers' Response"); and the *Joint Response of*

*Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Chapter 11 Trustee's*

*Brief of Limited Issues* [Docket No. 518] (the "Highland Response"), and the Trustee respectfully

states as follows:[1]

## I.     LIMITED ISSUES UNDER PLAN A

**A.     This Court has subject matter jurisdiction over Plan A because, among other things, HCLOF has a claim against the estate pursuant to the adversary proceeding it brought against the estate.**

1.      Both Highland[2] and the Issuers argue that the Court lacks subject matter

jurisdiction to confirm Plan A because Plan A purportedly seeks to transfer non-estate property

from HCLOF to Oaktree. *See* Issuers' Objection ¶¶ 13-18; Highland Objection ¶¶ 17-26.  Both,

however, either deny or completely ignore HCLOF's claim against the estate, resulting from the

adversary proceeding brought against the estate by HCLOF (the Highland Adversary), by which

HCLOF seeks to compel the Trustee to effectuate an optional redemption and liquidate the CLOs.

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to such term in the Plan.

[2] References to Highland herein refer to Highland Capital Management, L.P. and Highland CLO Funding, Ltd.

2.      The determination of claims under section 101(5) of the Bankruptcy Code, and treatment of such claims under the Bankruptcy Code, are core proceedings. *See* 28 U.S.C. § 157(b)(2). The determination and treatment of claims arises under the Bankruptcy Code, and the Court therefore has subject matter jurisdiction over such proceedings. *See* 28 U.S.C. § 1334(b); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92, 96-97 (5th Cir. 1987).

3.      As set forth in the Limited Issues Brief, HCLOF has a claim against the estate pursuant to the Highland Adversary asserting claims against the Trustee to compel an optional redemption and liquidate the CLOs, as well as appeals initiated by HCLOF to do the same. *See* Limited Issues Brief ¶¶ 2-8. HCLOF's claim is a contingent claim based on prepetition contract rights held by HCLOF, as holders of Subordinated Notes under the Indentures. Although the claim is based on postpetition actions, the claim emanates from the prepetition contractual relationship of the parties, and therefore is a "claim" pursuant to section 101(5) of the Bankruptcy Code. *See AMPAM Power Plumbing, L.P. v. Capstone Bldg. Corp. (In re AMPAM Power Plumbing, L.P.)*, 520 B.R. 553, 557-58, n.3 (Bankr. W.D. Tex. 2014) (noting that "the Fifth Circuit adopted the *Piper* pre-petition relationship approach," and with respect to contract, "a 'claim' under Chapter 11 of the Bankruptcy Code extends to post-petition, but pre-confirmation conduct"); *see also In re Chateaugay Corp.*, 944 F.2d 997, 1004-05 (2d Cir. 1991) ("In the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'") (quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (S.D. Tex. 1980), *aff'd mem.*, 646 F.2d 193 (5th Cir. 1981)).

4.      The Highland Adversary and subsequent appeals brought by Highland to liquidate the CLOs are not "hypothetical" or "imagined," and despite Highland's suggestions and backtracking, *see* Highland Response ¶¶ 7-8, 25, HCLOF's *claim* against the estate is not "hypothetical" or "imagined," but is rather a contingent claim that may be treated under the Plan, for which this Court has jurisidiction.[3]

5.      As also set forth in the Limited Issues Brief, HCLOF's claim for specific performance may be satisfied by paying the monetary equivalent of what it would receive in an optional redemption (and payment on its Subordinated Notes following liquidation of the CLOs). *See* Limited Issues Brief ¶¶ 4-6 (citing *In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993)). Still, Highland asserts that it is not required to accept money damages if it would be a "suboptimal remedy" or "clearly not in proportion to the equitable remedy." *See* Highland Response ¶¶ 20-22 (citing *Davis*, 3 F.3d at 116; *In re Indian River Estates, Inc.*, 293 B.R. 429, 434 (Bankr. N.D. Ohio 2003)). Despite Highland's assertion, under Plan A, HCLOF will receive more than it would receive in an optional redemption—giving HCLOF an amount at least "in proportion to the equitable remedy."

6.      Once HCLOF's claim is established, the subrogation analysis becomes elementary:

   (a)      HCLOF's claim against the estate is based on the optional redemption demanded (and sued on) by HCLOF, which would result in the liquidation of the CLOs to pay down the Subordinated Notes. *See* Limited Issues Brief ¶¶ 2-8 (and above).

   (b)      Under an optional redemption, the Issuers are obligated to pay HCLOF in full on its Subordinated Notes, which is at least what HCLOF will be paid on its claim under the Plan. *See* Limited Issues Brief ¶¶ 13-15.

   (c)      The payment of HCLOF's claim is not voluntary because the Trustee, on behalf of the estate, is making such payment to preserve its rights in the

---

[3] On August 15, 2018, pursuant to Fed. R. Bankr. P. 3004, the Trustee filed a proof of claim on behalf of HCLOF, with the amount of the claim being the amount HCLOF would receive based on the liquidation of the CLOs. *See* Proof of Claim No. 30.

PMAs (which have significant value to the estate) and avoid further litigation. *See* Limited Issues Brief ¶ 16.

7.      As the Court of Appeals of New York said in *Gerseta*, cited in our Limited Issues Brief, the doctrine of equitable subrogation "is broad enough to include *every instance*" in which one party pays the debt of another and makes such payment involuntarily. *Gerseta Corp. v. Equitable Trust Co. of N.Y.*, 241 N.Y. 418, 425-26 (1926) (emphasis added). Accordingly, this is such an "instance in which one person, not acting voluntarily, has paid a debt for which another is primarily liable and which in equity should have been paid by the latter." *In re Hyang Ran Hwang*, 452 B.R. 187, 193 (Bankr. N.D. Tex. 2011).[4]

8.      Highland further argues that even if the bankruptcy estate subrogates to the position of HCLOF with respect to the Subordinated Notes, the Subordinated Notes would not be property of the estate, and the Court would therefore lack subject matter jurisdiction to confirm Plan A, and approve the assignment of the Subordinated Notes to Oaktree.

9.      Both Highland and the Issuers cite the Fifth Circuit case, *TMT*, to support their assertion that this Court lacks subject matter jurisdiction to approve the assignment of the Subordinated Notes to Oaktree. In *TMT*, a non-debtor third party pledged shares of a non-debtor entity as collateral for a DIP loan. *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 524-525 (5th Cir. 2014). *TMT* is not applicable here—the property at issue in *TMT* was never estate property, was never acquired by the estate (through subrogation or otherwise), and was not traceable to estate property. Further, the non-debtor

---

[4] Highland's suggestion that subrogation to a property interest is somehow foreclosed under the doctrine of equitable subrogation is misplaced. *See* Highland Response ¶ 1. Under equitable subrogation, it is not uncommon for a party to be subrogated to the lien rights (which are a property interest) of the original creditor. *See, e.g., In re Hutchings*, 2017 Bankr. LEXIS 3172, at *5-6 (Bankr. W.D. Tex. Sept. 19, 2017) ("[Equitable subrogation] allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes and assume the lienholder's right to the security interest against the debtor.") (quoting *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007)); *Rocky Mountain High LLC v. Lofstedt (In re Old Town North, LLC)*, 519 B.R. 307, 319 (Bankr. D. Col. 2014).

entity had no claim against the estate based upon its pledged shares. The situation here is completely different.

10. Under section 541(a)(7) of the Bankruptcy Code, property of the estate includes "[a]ny interest in property that *the estate* acquires after the commencement of the case." 11 U.S.C. § 541(a)(7) (emphasis added); *see also In re Herberman*, 122 B.R. 273, 278-79 (Bankr. W.D. Tex. 1990) (explaining the application of section 541(a)(7) in the context of a business Chapter 11 case). It is a basic principle of bankruptcy jurisprudence that claims in bankruptcy are paid by the estate. Here, Oaktree is providing the funds *to the estate*, so that *the estate* may pay creditors' claims under the Plan. *See* Plan §§ 2.17-.18. It is not the Debtors or another party that subrogates to the position of HCLOF when HCLOF's claim is paid—it is the estate. The legislative history is also instructive regarding the application of section 541(a)(7):

> Section 541(a)(7) is new. The provision clarifies that any interest in property that the estate acquires after the commencement of the case is property of the estate; for example, if the estate enters into a contract, after the commencement of the case, such contract would be property of the estate.

124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978); S17413 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini).

11. In addition, the estate's right to subrogate to HCLOF's position arises from HCLOF's claim, which is traceable to the prepetition contract rights of the parties. Moreover, if the ALF PMA transfer was a fraudulent transfer (as the Trustee believes and has initiated litigation to pursue recovery on such transfer), then the estate's rights in connection with the Subordinated Notes are further strengthened. Accordingly, through subrogation, the rights to the Subordinated Notes are an "interest in property that the estate acquires after the commencement of the case." *See* 11 U.S.C. § 541(a)(7).

B. **The PMAs are not personal service contracts and may be assumed and assigned pursuant to section 365 of the Bankruptcy Code.**

12. Contrary to the assertion of Highland and HCLOF, *see* Highland Objection ¶¶ 65-68, the PMAs are not personal service contracts.

13. As an initial matter, under the basic rationale of section 365(a) and (f), "a debtor's contracts and leases are generally assumable and assignable, because these are some of the most valuable assets of most bankruptcy estates. If this were not the rule, it would thwart one of the Code's basic underlying goals of maximizing value for the creditors of the bankruptcy estate." *In re Lil' Things*, 220 B.R. 583, 591 (Bankr. N.D. Tex. 1998).

14. The exception under section 365(c)(1) "to the general rule of the assignability of contracts was intended by Congress to be applied narrowly and to such circumstances as contracts for the performance of nondelegable duties." *In re Grove Rich Realty Corp.*, 200 B.R. 502, 506 (Bankr. E.D.N.Y. 1996). "The genesis of this 'applicable law which excuses a party . . . from accepting performance from or rendering performance to' one other than the contracting party . . . is rooted in the long standing rule that courts of equity will not order specific performance of personal service contracts." *In re Ontario Locomotive & Indus. Ry. Supplies, Inc.*, 126 B.R. 146, 148 (Bankr. W.D.N.Y. 1990).[5]

15. Assessing whether a contract is a personal service contract "depends upon the subject of the contract, the circumstances of the case and the intent of the parties to the contract." *Leonard v. Gen. Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 682-83 (3d Cir. 1993) (internal quotation marks omitted); *see also In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011-12 (Bankr. E.D.N.Y. 1986) ("Ascertaining whether a contract is personal posits on close

---

[5] Ironically, here, Highland and HCLOF have sued the Trustee to force his specific performance under the PMAs and Indentures.

distinctions, *e.g.,* the nature and subject matter of the contract, the circumstances of the case placed in juxtaposition with the intention of the parties."). Even "clauses in the contract . . . attesting to a personal relationship will not be dispositive." *Leonard*, 13 F.3d at 683. Ultimately, if "the identity of that person or entity [rendering performance under the contract] is an essential element of the contract, and if the contract is non-assignable under applicable non-bankruptcy law then the estate cannot assign the contract." *Grove Rich Realty*, 200 B.R. at 507. Accordingly, in order to determine whether the PMAs are personal service contracts, the Court must assess the particular circumstances in the case, the nature of the services provided by Acis LP under the PMAs, and whether such services are nondelegable.

16.     Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. Highland Objection ¶¶ 66-67. If this were the standard, the exception would swallow the rule—any prudent party contracting for another's services considers the other party's skill, expertise, and reputation—and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party providing services is skilled and reputable—it is whether such services are unique in nature. *See Compass Van & Storage Corp.*, 65 B.R. at 1011.

17.     To support its contention, Highland cites New York cases under which hotel management contracts or consulting contracts were found to be personal service contracts. *See id.* ¶¶ 65-66. In the *Marriott* case cited by Highland, in which the court found the hotel management to be a personal service contract, the court observed that the hotel manager had "full discretion . . . to manage virtually every aspect of the hotel." *Marriott Int'l, Inc. v. Eden Roc, LLLP*, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013). *Marriott* is distinguishable from

our case. Here, Acis LP did not manage virtually every aspect of the CLOs. Pursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique—as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers.

18. Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties:

> In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; *provided* that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties.

2014-3 PMA § 3(h)(iii).

19. And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." *Id.* § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis LP with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." *Id.* §§ 14(a) and 32(b).

20. Pursuant to the terms of the PMAs themselves, the duties of Acis LP were not "so unique that the dut[ies were] thereby rendered nondelegable." *See Compass Van & Storage*, 65 B.R. at 1011 (citing RESTATEMENT (SECOND) OF CONTRACTS § 318(2) (1981)). As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . .

distinctive characteristics that commit to a special knowledge, unique skill or talent, singular

judgment and taste." *Compass Van & Storage*, 65 B.R. at 1011.

21.     Accordingly, because the duties of Acis LP under the PMAs are delegable (and

were delegated) and are not unique, the PMAs cannot be personal service contracts that fall

within the narrow exception of section 365(c)(1).

**C.     Plan A is proposed in good faith.**

22.     Finally, Highland's assertion that the Oaktree Transaction was "concocted in bad

faith" lacks merit.  In order to maximize value for the estate, the Trustee solicited various

companies, such as Oaktree, who are prominent in the CLO business, as a potential plan funder.

These companies signed non-disclosure agreements with the Trustee and had the opportunity to

submit a higher and better proposal than Oaktree, but none ultimately submitted a higher and

better proposal.  Indeed, it was through this process that Brigade made a separate proposal to act

as sub-servicer—and Brigade's current position as sub-servicer is evidence of the efforts made by

the Trustee to maximize value for the estate.

## II.     MODIFICATION OF THE INDENTURES UNDER PLANS B & C

23.     Both the Issuers and Highland have misstated the Trustee's position regarding

assumption and assignment of the PMAs and modification of the Indentures under Plans B and C.

24.     First, pursuant to section 365(a) of the Bankruptcy Code, the Trustee will assume

the PMAs and the Indentures, which constitute an integrated contract comprising a single

transaction. The Trustee is not assuming part of the contract and rejecting another part of the

contract—the Trustee is assuming the whole contract.

25.     Contrary to Highland's assertions otherwise, the PMAs and Indentures are "read

together as a single contract when the plain language of the agreements unambiguously requires

them to be read together." *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, 2015 U.S. Dist.

LEXIS 105597, *13, 2015 WL 4940126 (S.D.N.Y. 2015) (internal quotation marks omitted). The result of construing multiple documents as a single contract is more than just "interpretation" of the documents. As discussed in the Limited Issues Brief, in *MBIA*, the court assessed whether the portfolio manager, *who was not a signatory to the indenture, had breached the indenture*. Limited Issues Brief ¶ 26. As also mentioned in the Limited Issues Brief, the PMAs require Acis LP to perform duties delegated to it under the Indentures, of which there are many. *Id.* ¶ 29. While Acis LP is not a signatory to the Indentures, it is a party to the Indentures.

26. Additionally, assumption of the whole contract (including the Indentures) pursuant to section 365 does not mean that section 365 preempts section 1123 or that the Trustee is foreclosed from modifying the Indentures pursuant to section 1123(a)(5)(F). And neither the Issuers nor Highland cite any case purporting to suggest such a limitation to 1123(a)(5)(F)—they simply misconstrue such a limitation.

27. Another reason Highland argues that the Indentures cannot be modified under the plan is due to Highland's failure to recognize HCLOF's claim against the estate (discussed above). When HCLOF filed the Highland Adversary against the estate, it was no longer an outside third party. HCLOF is a *creditor* of Acis, and its claim may be treated under the Plan, with all other creditors' claims.

28. As set forth in the Limited Issues Brief, with HCLOF's claim established and the recognition of the Indentures and PMAs as single contracts, under the plain language of section 101(28) and 1123(a)(5)(F), the Indentures may be modified to implement the Plan.[6] *See* Limited Issues Brief ¶¶ 34-39. Under the Bankruptcy Code, an "indenture" is an "indenture, under which

---

[6] Even if the Court determines that the Indentures cannot be modified pursuant to 1123(a)(5)(F), the Plan Injunction would effectively serve the same purpose—to enjoin parties from calling an optional redemption until the earlier of (i) when the Trustee obtains control of the Subordinated Notes pursuant to certain fraudulent transfer litigation, (ii) the creditors are paid in full, or (iii) three years after the Effective Date.

there is an outstanding security . . . constituting a claim against the debtor[.]" Here, HCLOF holds its Subordinated Notes (securities), pursuant to the Indentures. Here, HCLOF's Subordinated Notes are outstanding securities pursuant to the Indentures, and HCLOF has a claim under the Bankruptcy Code based on those Subordinated Notes. Accordingly, to implement the Plan, the Indentures may be modified, which will fund the Plan and pay creditors, including HCLOF and Highland, in full.

### III. RESERVATION OF RIGHTS

29. The Trustee reserves all rights to supplement or amend any arguments contained herein with respect to any objection to confirmation or response to the Limited Issues Brief filed by the Issuers, Highland, HCLOF, or any other party in interest.

**DATED: AUGUST 20, 2018.**

Respectfully submitted,

**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)

By: */s/ Rakhee V. Patel*
    Rakhee V. Patel
    State Bar No. 00797213
    Phillip Lamberson
    State Bar No. 00794134
    Joe Wielebinski
    State Bar No. 21432400
    Annmarie Chiarello
    State Bar No. 24097496
    rpatel@winstead.com
    plamberson@winstead.com
    jwielebinski@winstead.com
    achiarello@winstead.com

**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11**
**TRUSTEE**

-and-

Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthias Kleinsasser
State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR
THE CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2018 true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, and that, additionally, on the same date he caused true and correct copies of this document to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached Service List.

*/s/ Jason A. Enright*
One of Counsel