Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104)
(admitted *pro hac vice*)
W. Austin Jowers (GA 405482)
(admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO**
**FUNDING LTD.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **ACIS CAPITAL MANAGEMENT, L.P. and** | § | **Case No. 18-30264-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **Case No. 18-30265-SGJ-11** |
| | § | |
| | § | **(Jointly Administered Under Case** |
| **DEBTORS** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |

**JOINT OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**
**AND HIGHLAND CLO FUNDING, LTD. TO FINAL APPROVAL OF**
**DISCLOSURE STATEMENT AND TO CONFIRMATION OF THE**
**THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P.**
**AND ACIS CAPITAL MANAGEMENT GP, LLC**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

RELEVANT FACTS ....................................................................................................4

ARGUMENT ...............................................................................................................6

I. PLAN D FAILS FOR MANY OF THE SAME REASONS AS PLANS A, B, AND C ..........6

    A. The Court Lacks Subject Matter Jurisdiction to Confirm Plan D.......................7

    B. Plan D Proposes to Again Impermissibly Modify the Indentures and PMAs ....8

II. THE REQUESTED INJUNCTION IS UNPRECEDENTED AND LEGALLY IMPROPER 11

    A. Section 105(a) is Inappropriately Invoked........................................................11

    B. The Court Lacks Authority to Enter the Asset Freeze Injunction .....................14

    C. Asset Freeze Injunctions Must be in Aid of the Recovery Sought in Equity ...................15

    D. An Injunction Is Not Necessary To Preserve Final Relief.................................16

        *i. Equitable Relief Would Not Be Enforceable in Guernsey* ...........................*17*

        *ii. Equitable Relief is Not Available Under Other Applicable Law* ................*17*

        *iii. An Injunction Cannot Serve As a Judgment Collection Mechanism* .........*19*

III. NO INJUNCTION IS WARRANTED UNDER TRADITIONAL FED. R. CIV. P. 65 REQUIREMENTS............................................................................................20

    A. The Trustee's Fraudulent Transfer Claims Will Not Succeed, and Even If They Do, Will Not Provide the Result Desired By the Trustee ...................................21

        *i. Acis LP Was Subject at All Times to the Plain Language of the ALF PMA* ...............*22*

        *ii. Intent and Actions of Actual Parties to the ALF PMA Refute the Trustee's Argument*......................................................................................*24*

        *iii. Acis LP Could Not Act Contrary to Its Clients' Interests*...........................*25*

        *iv. The Trustee Will Not Be Able to Establish That Acis LP Gave Up Anything of Value* ......................................................................................*26*

B. Irreparable Harm ............................................................................................27

    i. *The Trustee Cannot Be Irreparably Harmed Because He Has Adequate Remedies at Law* ..........................................................................................27

    ii. *HCLOF Continues to Suffer Irreparable Harm*..........................................*30*

C. Balance of Harms............................................................................................31

D. Public Policy ...................................................................................................33

IV. THE PLAN CANNOT SATISFY THE CODE'S CONFIRMATION REQUIREMENTS....35

A. Sections 1129(a)(1), (3) – The Plan Violates the Bankruptcy Code and Violates Other Applicable Law.......................................................................................35

B. Section 1129(a)(3) – The Plan Was Not Proposed in Good Faith.....................37

C. Section 1129(a)(5) – The Plan Does Not Properly Address Insider Issues Relating to Terry and Is Not Consistent With Public Policy.............................................39

D. Sections 1129(a)(7) and 1129(b) – The Plan Is Not in the Best Interest of Creditors and Is Not Fair And Equitable ...........................................................43

E. Sections 1129(a)(8), (10) and 1129(b) – The Plan Does Not Meet the Requirements for Cram Down ...........................................................................44

F. Section 1129(a)(10) – Gerrymandering .............................................................46

G. Section 1129(a)(11) – The Plan is Not Feasible ...............................................47

RESERVATION OF RIGHTS ............................................................................................48

CONCLUSION....................................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Commc'ns Corp. v. The America Channel, LLC*
  *(In re Adelphia Commc'ns Corp.)*, 345 B.R. 69 (Bankr. S.D.N.Y. 2006)..............................13

*In re Advent Corp.*,
  24 B.R. 612 (B.A.P. 1st Cir. 1982) .......................................................................................9

*Amsco Pipe Line Co. v. Donico Prod. Co.*,
  112 S.W.2d 483 (Tex. Civ. App. 1938) ...............................................................................17

*Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*,
  531 F.3d 1272 (10th Cir. 2008) ..........................................................................................40

*In re Atlas Fin. Mortg. Inc.*,
  2014 WL 172283 (Bankr. N.D. Tex. Jan. 14, 2014).....................................................15, 16

*In re Barnes*,
  309 B.R. 888 (Bankr. N.D. Tex. 2003)................................................................................37

*In re BP RE, L.P.*,
  735 F.3d 279 (5th Cir. 2013) .......................................................................................14, 15

*In re Briscoe Enters., Ltd. II*,
  994 F.2d 1160 (5th Cir. 1993) ......................................................................................43, 47

*Broadhead Ltd. P'ship v. Goldman, Sachs & Co.*,
  No. 2:06CV0009, 2007 WL 951623 (E.D. Tex. March 26, 2007) ........................................36

*Browning Interests v. Allison (In re Holloway)*,
  955 F.2d 1008 (5th Cir. 1992) ............................................................................................39

*Bullmore v. Ernst & Young Cayman Islands*,
  846 N.Y.S.2d 145 (N.Y. App. Div. 2007) ...........................................................................33

*In re Caesars Entertainment Operating Co.*,
  808 F.3d 1186 (7th Cir. 2015) ............................................................................................12

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004).............................................................................................20

*In re Couture Hotel Corp.*,
  536 B.R. 712 (Bankr. N.D. Tex. 2015)................................................................................48

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981) ...............................................................30

*In re Digerati Techs., Inc.*,
    No. 13-33264, 2014 WL 2203895 (Bankr. S.D. Tex. May 27, 2014) ..............................42, 43

*Dong v. Miller*,
    2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ................................................16, 19

*Douglass v. Beakley*,
    900 F. Supp. 2d 736, 748-51 (N.D. Tex. 2012) .....................................................36

*F.D.I.C. v. Faulkner*,
    991 F.2d 262 (5th Cir. 1993) ................................................................27

*F.T.L. v. Crestar Bank (In re F.T.L., Inc.)*,
    152 B.R. 61 (Bankr. E.D. Va. 1993).............................................................13

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
    835 F.2d 554 (5th Cir. 1987) ..........................................................14, 28

*Feld v. Zale Corp. (In re Zale Corp.)*,
    62 F.3d 746 (5th Cir. 1995) ..........................................................12, 13

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*,
    209 F.3d 252 (3d Cir. 2000)................................................................37

*In re FTANDD Intern., Ltd.*,
    2004 WL 5846710 (Bankr. N.D. Ga. March 25, 2004) ......................................................47

*In re Gibralter Res., Inc.*,
    197 B.R. 246 (Bankr. N.D. Tex. 1996).................................................................9

*Great Am. Ins. Co. v. Primo*,
    512 S.W.3d 890 (Tex. 2017).................................................................23

*In re Greystone III Joint Venture*,
    995 F.2d 1274 (5th Cir. 1991) ..............................................................46

*Grupo Mexicano de Dessarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999)................................................................16, 19

*In re Irving Tanning Co.*,
    496 B.R. 644 (B.A.P. 1st Cir. 2013) ....................................................7

*James Jianhua Wu v. Weizhen Tang*,
    No. 3:10-CV-0218-O, 2011 WL 145259 (N.D. Tex. Jan. 14, 2011)......................................36

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ...................................................................................20

*Laird v. Integrated Resources, Inc.*,
    897 F.2d 826 (5th Cir. 1990) ...................................................................................36

*In re Machne Menachem, Inc.*,
    304 B.R. 140 (Bankr. M.D. Pa. 2003) ....................................................................42

*Majestic Star Casino, LLC v. Barden Dev., Inc.*
    *(In re Majestic Star Casino, LLC)*, 716 F.3d 736 (3d Cir. 2013) ............................9

*In re Maxim Indus., Inc.*
    22 B.R. 611 (Bankr. D. Mass. 1982) ......................................................................34

*In re Moore*,
    739 F.3d 724 (5th Cir. 2014) ...................................................................................14

*Morgan v. Fletcher*,
    518 F.2d 236 (5th Cir. 1975) ...................................................................................29

*In re Nat'l Gypsum Co.*,
    208 F.3d 498 (5th Cir. 2000) ...................................................................................10

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988) .................................................................................................14

*In re One Times Square Assocs. Ltd. P'ship*,
    165 B.R. 773 (S.D.N.Y. 1994) ................................................................................45

*In re Premier Network Servs., Inc.*,
    333 B.R. 130 (Bankr. N.D. Tex. 2005) ...................................................................46

*U.S. ex rel. Rahman v. Oncology Assocs., P.C.*,
    198 F.3d 489 (4th Cir. 1999) ...................................................................................15

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
    415 U.S. 1 (1974) .....................................................................................................29

*In re Rexford Props., LLC*,
    557 B.R. 788 (Bankr. C.D. Cal. 2016) ....................................................................40

*Scott v. Bierman*,
    429 F. App'x. 225 (4th Cir. 2011) .............................................................................7

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    491 B.R. 27 (S.D.N.Y. 2013) ..................................................................................30

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963)..................................................................................35

*In re Smith*,
  21 F.3d 660 (5th Cir. 1994) ......................................................................12

*In re South Beach Secs., Inc.*,
  376 B.R. 881 (Bankr. N.D. Ill. 2007) .......................................................40

*In re Texas Rangers Baseball Partners*,
  521 B.R. 134 (Bankr. N.D. Tex. 2014) (Jernigan, J.)................................10

*In re Texas Star Refreshments, LLC*,
  494 B.R. 684 (Bankr. N.D. Tex. 2013)......................................................37

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*,
  764 F.3d 512 (5th Cir. 2014) ......................................................................7

*Transamerica Mortg. Advisors v. Lewis*,
  444 U.S. 11 (1979)..............................................................................33, 35

*Turner v. Avery*,
  947 F. 2d 772 (5th Cir. 1991) ...................................................................17

*U.S. Bank N.A. v. Village at Lakeside, LLC*,
  138 S. Ct. 960 (2018)................................................................................39

*U.S. Bank Nat'l Ass'n v. Verizon Commcn's Inc.*,
  No. 3:10-CV-1842-G, 2012 WL 3100778 (N.D. Tex. July 31, 2012).......2

*U.S. v. Sutton*,
  786 F.2d 1305 (5th Cir. 1986) ..................................................................11

*In re Village at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) ...............................................................45, 46

*In re The Village at Lakeridge, LLC*,
  814 F.3d 993 (9th Cir. 2016) ....................................................................39

**Statutes**

11 U.S.C. § 101(14) ........................................................................................43

11 U.S.C. § 101(31) ........................................................................................39

11 U.S.C. § 105...................................................................................... *passim*

11 U.S.C. § 365.........................................................................................6, 19

11 U.S.C. § 365(c)(1)..................................................................................................................17

11 U.S.C. § 547..........................................................................................................................45

11 U.S.C. § 1123(a)(7)..................................................................................................................1

11 U.S.C. § 1129(a)(1)................................................................................................................35

11 U.S.C. § 1129(a)(3)...........................................................................................................35, 37

11 U.S.C. § 1129(a)(5)(A)(i) .......................................................................................................39

11 U.S.C. § 1129(a)(7)................................................................................................................43

11 U.S.C. § 1129(a)(8)................................................................................................................44

11 U.S.C. § 1129(a)(10).....................................................................................................44, 45, 46

11 U.S.C. § 1129(a)(11)..............................................................................................................47

11 U.S.C. § 1129(b)...............................................................................................................43, 44

15 U.S.C. § 80b-5.................................................................................................................18, 42

15 U.S.C. § 80b-6........................................................................................................................33

15 U.S.C. § 80b-15.......................................................................................................................5

Highland Capital Management, L.P. ("**Highland**") and Highland CLO Funding, Ltd. ("**HCLOF**") hereby file their joint objection (the "**Objection**") to final approval of the disclosure statement [Doc. No. 661] (as amended and otherwise supplemented, the "**Disclosure Statement**") and to confirmation of the *Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Doc. No. 660] (as amended and otherwise supplemented, the "**Plan**" or "**Plan D**") filed by Chapter 11 Trustee (the "**Trustee**") and, in support thereof, respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As these cases have progressed, the Trustee's tone has become ever more aggressive and acrimonious, and he has taken every opportunity to disparage and cast aspersions upon Highland, HCLOF, and an ever-increasing cast of Highland-related parties.  But, the Trustee's bluster and invective does not disguise the fact that although running an investment management business, the Trustee is singularly focused on generating fees, rather than properly managing investments.  Outside of bankruptcy, the Trustee's "business" model would not survive because no investor would tolerate such behavior.  Yet in this bankruptcy case, he has been allowed to continue despite the fact that the CLOs the Trustee manages are dying and its investors are suffering massive losses.  This does not seem to matter to the Trustee's business model as long as he continues to earn fees to pay a quantum of administrative expenses he has amassed that exceeds the only material pre-petition claim that the Trustee concedes – that of Joshua Terry.

2.      The Trustee has maintained this "business" model solely because of a Court-imposed injunction – an injunction that he asks this Court to continue post-confirmation effectively until such time as the Terry claim is paid in full, but ostensibly until the fraudulent transfer litigation is concluded.  Ironically, the Trustee initially claimed that, in proposing his

first round of proposed plans that he wanted to avoid expensive and lengthy litigation.[1] Now, his new Plan D (defined below), and the injunction that purports to make Plan D feasible, are necessarily *premised* on expensive and lengthy litigation. And therein lies the duplicity.

3.     Plan D is entirely premised on the litigation injunction, without which, the Plan fails. Yet, the proposed injunction is wholly improper and unprecedented. Never before has a plan injunction been used in this fashion – that is, to provide the very life-blood of the purported post-confirmation "business." Rather, plan injunctions are typically used to protect a debtor's business post-confirmation while it consummates the terms of its plan. Contrast to what is happening in Plan D: the injunction does not protect the business, it *creates* the business. Moreover, it does so by directly impairing rights of a non-creditor third party pursuant to contracts (the CLO indentures) to which the Debtors are not even parties and over which this Court has no jurisdiction. This is contrary to applicable law and this Court's own decision when it denied the Trustee's prior Plans B and C concluding that the Bankruptcy Code does not permit amendments to non-debtor indentures without the consent of the parties.

4.     To the extent the Trustee purports to justify his plan injunction as a litigation-based effort to preserve a supposed equitable remedy, he fails there as well. He posits that he must have this injunction to protect Acis LP's ability to revive the ALF PMA[2] that was terminated by its own terms, after which he asserts Acis LP will have unfettered rights to make decisions of its choosing (again, decisions designed to ensure that Acis LP will continue to earn fees even if in violation of its fiduciary duties to the investors and even if those decisions contradict the explicit directions of the investors). This justification is erroneous on many levels,

---

[1] *See* Hr'g Tr. (May 31, 2018) at 15:12–25; Hr'g Tr. (July 6, 2018) at 43:10–14.

[2] "**ALF PMA**" refers to the Portfolio Management Agreement, dated December 22, 2016, by and between Acis Loan Funding, Ltd. ("**ALF**") and Acis Capital Management, L.P. ("**Acis LP**" or "**Acis**").

not the least of which is that this Court has no jurisdiction to compel this outcome and such remedy is not available under applicable law.

5.　Even assuming arguendo that the Court could dial back the clock to reinstate the ALF PMA, the Court cannot alter its terms, which would be absolutely necessary in order to adhere to the Trustee's "business" model.　As the evidence from the first plan confirmation hearing made clear and will be reiterated at Plan D's confirmation hearing, HCLOF never ceded control under the ALF PMA: the plain language of the agreement, the stated intent of the parties to the agreement, and the actual conduct of the parties under that agreement all absolutely refute the Trustee's argument.

6.　The Trustee has no equitable remedy to protect – and he certainly has no ability to force Acis LP in as an investment manager to HCLOF for the express and openly hostile purpose of disregarding HCLOF's instructions and defying its control.　Effectively, the goal of the Trustee's Plan injunction is to facilitate a circumstance that would lead to Acis LP unabashedly breaching its fiduciary duties to its investors – a goal this Court should summarily reject.

7.　Finally, even if the Court assumes Acis LP has valid claims to pursue, it has an adequate remedy at law.　The terms of the Trustee's proposed injunction make clear that a legal (money) remedy is what the Trustee seeks.　If such claims are proven, the estate will have moneyed defendants from which to collect.　If claims cannot be proven, then the estate will get what the law says it deserves – nothing.　The Trustee does not want to face those prospects. Instead, the Trustee wants to assure a win regardless of the outcome of the litigation.　In the meantime, the CLO investors – the equity noteholders and even the lower tranches of the senior notes – will continue to suffer.　The Trustee has been allowed to operate with impunity, because

he has the injunction. The balance of harms and public policy do not support this result, and the Court should cease to condone it.

8.      Apart from the injunction, Plan D is replete with other infirmities that render it unconfirmable under the standards set forth in Bankruptcy Code section 1129. In his failed prior attempt to confirm a plan, the Trustee laid bare his intention to seek confirmation on the vote of a single creditor: Josh Terry. Plan D is more of the same. The Trustee has improperly gerrymandered Terry into a single class, has given Terry credit for a $1 million secured claim that is *per se* avoidable, and has unjustifiably quantified Terry's secured claim in an amount significantly higher than even Terry asserted in his proof of claim. The Trustee has created this fallacious foundation to support an argument that Terry is entitled to use $1 million of his claim to purchase all of the equity in the Debtors, despite the fact that the Trustee himself alleges that the Debtors have more than $20 million in equity based on estate causes of action alone. Such a plan cannot realistically be described as being proposed in good faith or in the best interest of all creditors and interest holders or otherwise fair and equitable. In addition, the Plan is not feasible because (as noted above) the Trustee has run up an incredible administrative expense bill, rendering the estate administratively insolvent.

9.      The Court should deny Plan D, grant HCLOF's *Motion to Dissolve Preliminary Injunction and Lift the Automatic Stay* [Doc. No. 638] ("**Motion to Dissolve**") and/or grant Highland's *Motion for an Order Dismissing the Debtors' Chapter 11 Cases or, In the Alternative, Converting the Cases to Chapter 7 For Cause* [Doc. No. 601] ("**Motion to Dismiss**").

## RELEVANT FACTS

10.      On July 5, 2018, the Trustee filed his joint plan for the Debtors [Doc. No. 383], proposing three (3) alternatives – Plans A, B and C. Plan A proposed to transfer non-estate property (i.e., HCLOF's equity notes) and the portfolio management agreements between Acis

LP and the various CLO entities (the "**CLO PMAs**") to Oaktree Capital Management, L.P. Alternatively, the Trustee proposed Plans B and C, both of which were premised on preventing HCLOF from exercising certain rights under the five CLO indentures (the "**Indentures**"), thereby ensuring future revenue streams from which the estates would pay creditors. Notably, Plans B and C included a plan injunction designed "as a belt and suspender measure" to prevent HCLOF from exercising its rights "[t]o the extent that somehow this Court determines that modification of the indenture would not be appropriate." *See* Hr'g Tr. (Aug. 27, 2018) (AM) at 52:9–15 (Testimony of Robin Phelan).

11. On August 30, 2018, the Court denied confirmation of all three plans. *See generally* Court's Ruling on Confirmation [Doc. No. 549] ("**Confirmation Decision**"), attached hereto as Exhibit 1, and subsequent Order entered at Doc. No. 569.

12. On September 28, 2018, the Trustee filed (1) Plan D; (2) the Disclosure Statement; and (3) the motion seeking conditional approval of the Disclosure Statement [Doc. No. 622]. The Trustee has filed numerous amendments and supplements to the Plan [Doc. Nos. 612, 643, 646, 653, 660, 693, 702] and the Disclosure Statement [Doc. Nos. 621, 644, 654, 661] (collectively, the "**Amendments**").

13. Plan D is substantively identical to Plans B and C in that it seeks to modify HCLOF's rights under the Indentures to capture and guarantee future revenue streams to pay Josh Terry. Plan D relies on a plan injunction, issued pursuant to sections 105(a), 1123(a)(5), and 1123(b)(6), and other plan provisions to achieve the same result. *See* Plan D §§ 6.08; 14.03. Put simply, the centerpiece of Plan D is the same "belt and suspender measure" contained in the Plans B and C that the Court has already rejected. Furthermore, Plan D has an identical classification structure as Plans B and C, whereby both Terry and Highland's claims are put into

separate classes and whereby Terry is treated as a secured creditor who would be permitted to purchase the Debtors' equity via his alleged secured claim.

14.    On September 24, 2018, Highland filed its Motion to Dismiss.  On October 11, 2018, the Trustee filed his response to the Motion to Dismiss [Doc. No. 637].

15.    On October 11, 2018, HCLOF filed its Motion to Dissolve.  On November 2, 2018, the Trustee filed his response to the Motion to Dissolve [Doc. No. 683] ("**Opp. MTD**").

16.    On October 22, 2018, the Trustee filed the *Brief of Robin Phelan, Chapter 11 Trustee, in Support of Confirmation of Chapter 11 Trustee's Second Amended Joint Plan of Reorganization* [Doc. No. 651] ("**Trustee's Brief**").

## ARGUMENT

17.    The Trustee's latest Plan D fails for multiple reasons.  First, Plan D suffers from many of the same legal infirmities that doomed Plans A, B, and C.  Second, the proposed plan injunction is unprecedented and improper.  Third, even if viewed as a more traditional Rule 65 injunction, the Trustee's requested injunction fails there as well.  Finally, the Plan fails multiple other Bankruptcy Code requirements, rendering it unconfirmable.

## I.    PLAN D FAILS FOR MANY OF THE SAME REASONS AS PLANS A, B, AND C

18.    In denying Plans A, B, and C, the Court made certain of its findings very clear. First, HCLOF is not a creditor of the Debtors – thus HCLOF's rights cannot be modified by way of a plan.  *See* Exh.1 (Confirmation Decision) at *4.  Second, Acis is not a party to the Indentures – thus, the Trustee cannot modify the Indentures' terms.  *See id*; *see also* 11 U.S.C. § 365(a)(1) ("the trustee. . . may assume or reject any executory contract or unexpired lease *of the debtor*") (emphasis added).  Plan D ignores the Court's critical holdings and contains the same defects as its predecessor, and must be denied.

## A. The Court Lacks Subject Matter Jurisdiction to Confirm Plan D

19. The Trustee clearly hopes that the modifications to the Indentures proposed by Plan D appear, on the surface, to be more innocuous than the Trustee's more flagrant attempts under Plan A to force a sale of the equity notes or under Plans B and C to re-write the terms of Indentures, which are non-debtor contracts. However, Plan D amounts to no less of an offensive intrusion upon HCLOF's property rights than what was proposed under Plan A, and radically alters the rights of HCLOF just the same. Plan D relies upon injunctions and de facto amendments to the Indentures to effectively seize and hold captive HCLOF's investments in the CLOs (i.e., its property, without its consent and for no consideration) to generate management fees to support the "reorganization" of these Debtors. This again raises issues relating to the taking of third-party rights that courts have explicitly identified and denounced.[3]

20. HCLOF is neither a creditor nor a contract counter-party to the Debtors *See* Exh. 1 (Confirmation Decision) at *4. This Court is thus without jurisdiction to modify HCLOF's contractual rights and effectively commandeer its equity notes through judicial fiat. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 (5th Cir. 2014) (bankruptcy court did not have *in rem* jurisdiction over assets that were not "property of the estate"); *see also Scott v. Bierman*, 429 F. App'x. 225, 231 (4th Cir. 2011) ("[A] bankruptcy court's jurisdiction does not extend to property not part of a debtor's estate.").

21. Highland and HCLOF also incorporate by reference the objection filed to the Plan by Neutra, Ltd., which, among other things, asserts that due to the pending appeal of the Orders

---

[3] *See, e.g.*, *In re Irving Tanning Co.*, 496 B.R. 644, 664-65 (B.A.P. 1st Cir. 2013) ("Even if the takings clause were deemed to permit a private plan proponent to appropriate the property of another for plan purposes, "just compensation" would be a necessary condition of that appropriation. . . .").

for Relief following the trial of the involuntary petitions, this Court was divested of subject matter jurisdiction to consider the confirmation of Plan D.[4]

### B. Plan D Proposes to Again Impermissibly Modify the Indentures and PMAs

22. While presented differently, the outcome is the same. The relief sought by Plan D is no different from Plans B and C in that it impermissibly modifies the Indentures to diminish HCLOF's rights and effectively re-writes the PMAs to provide Acis LP with a guaranteed cash flow from locked-in management fees not otherwise provided for under the agreements. Plan D is fundamentally premised on vitiating HCLOF's rights under the Indentures pursuant to the "Plan Injunction." *See* Plan §14.03.

23. The Indentures cannot be modified either through section 1123(a)(5) (just as the Court concluded under Plans B or C), through section 1142(b) (as added by the Trustee in his Amendments), or through injunction and plan provisions (like under Plan D). This Court has already held that section 1123(a)(5)(F) – which specifically addresses the modification of indentures – does not authorize such modifications in this case because the Debtors are not parties to them. Exh. 1 (Confirmation Decision) at *1. Even if they were a party, they could not accomplish what is being proposed in Plan D.

24. At the confirmation trial on the prior plans, Professor Westbrook explained that the Trustee does not "have the power unilaterally" "to change the so-called reset or refinancing provisions of these contracts . . . in ways that would permit the plan to be funded":

> Well, again, there's assumption and there's rejection. We can't mix and match the remedies for each. If there's to be assumption, and I think that's clearly what

---

[4] On January 30, 2018, purported creditor Joshua Terry filed involuntary petitions under Chapter 7 of the Bankruptcy Code against the Debtors. This Court denied the Debtors' motion to dismiss the bankruptcy petitions and Neutra, Ltd.'s motion to intervene and entered Orders for Relief against the Debtors on April 13, 2018. Neutra, Ltd., the sole limited partner of Acis LP, and sole member of Acis Capital Management GP, LLC, filed an appeal of the Orders for Relief on April 23, 2018. *Neutra Ltd. v. Terry*, 3:18-cv-01056-D (N.D. Tex.). As of the date of this Objection, that appeal is fully briefed and awaiting decision.

the trustee proposes to do is to assume these contracts, then you assume the contracts as they were with the specific exception that are set forth in Section 365, notably the opportunity to cure. But that's it. **Otherwise the estate is a contract party like any other contract party and has to perform under an assumed contract just the way the original contract party would have to perform.** So there's no power typically in a contract for one party to unilaterally amend the contract unless the contract grants that power in so many words, and therefore the estate doesn't have that power either, in my view. And **the alternative is to permit, again, a sort of unbounded opportunity to amend [ ] assume[d] contracts.**

Hr'g Tr (Aug. 28, 2018) (AM) at 28:8–29:18. According to Professor Westbrook, allowing the Trustee to amend the Indentures is not "permissible, and I think **it would be a seriously dangerous precedent** if they were permitted . . . [b]ecause it would provide this kind of unbounded opportunity for parties to amend contracts that had been assumed by the estate." *Id.* at 30:10–19. It would be equally "dangerous" to allow the Trustee to do through section 105(a), section 1123(b)(6), or section 1123(a)(5) more generally, what the Court has already said he cannot do under the specific section of the Code that deals with indenture modifications – section 1123(a)(5)(F). *See* Exh. 1 (Confirmation Decision) at *1.

25. Similarly, neither the Indentures nor the PMAs provide Acis LP with any guarantee to management fees or any right to prevent HCLOF from exercising the options available to it as an investor under the Indentures. Such rights cannot now be created out of whole cloth either through injunctions or modification of the PMAs or the Indentures. *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a given that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on the date the bankruptcy case was commenced." (internal alterations omitted)); *In re Gibralter Res., Inc*., 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor"); *see also In re Advent Corp.*, 24 B.R. 612, 614 (B.A.P. 1st Cir. 1982) ("[A] bankruptcy court may not extend a contract beyond

its original terms. The Bankruptcy Code neither enlarges the rights of a debtor under a contract, nor prevents the termination of a contract by its own terms.").

26.     Likewise, the Trustee cannot propose to re-write contracts that are proposed to be assumed under Plan D whether or not the Debtors were parties to such contracts. Under Plan D, the Trustee proposes to assume the Indentures[5] and PMAs. Although he cannot assume contracts to which the estates are not parties (the Indentures), as to the PMAs, it is axiomatic that he cannot cherry-pick the benefits he desires without being bound by the burdens attendant thereto. *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("A non-debtor is further protected by the requirement that an executory contract may not be assumed in part and rejected in part. Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere* – the debtor accepts both the obligations and the benefits of the executory contract) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)); *In re Texas Rangers Baseball Partners*, 521 B.R. 134, 179–80 (Bankr. N.D. Tex. 2014) (Jernigan, J.) ("A debtor may not merely accept the benefits of a contract and reject the burdens to the detriment of the other party." (discussing *In re Nat'l Gypsum*, 208 F.3d 498)); *see also* Hr'g Tr. (Aug. 28, 2018) (AM) at 28:21–29:18 (Testimony of Prof. Westbrook: "If there's to be assumption, and I think that's clearly what the trustee proposes to do is to assume these contracts, then you assume the contracts as they were").

---

[5] Notably, the Trustee seeks to "assume" the Indentures, yet openly admits the Debtors are not parties thereto. This leads to the inescapable conclusion that he seeks to do so only to give some "plausibility" to the Plan Injunction that alters non-debtor parties' rights under the Indentures. This Court has no jurisdiction to approve the Trustee's end-run around the fact that he cannot existentially alter non-debtor property rights or modify non-estate contracts. Further, this would be in direct contravention of this Court's prior ruling denying Plan A, B and C. *See* Exh. 1 (Confirmation Decision).

## II. THE REQUESTED INJUNCTION IS UNPRECEDENTED AND LEGALLY IMPROPER

27. Having been denied on his attempts to modify the Indentures through section 1123(a)(5)(F), the Trustee has invoked section 105. Section 105 provides no refuge for the Trustee.

28. The Trustee has argued that an injunction freezing HCLOF's exercise of its contractual rights is nevertheless justified because he is seeking equitable relief (i.e., the avoidance of the purported "transfer" of Acis's rights under the ALF PMA). This argument fails because this Court does not have the constitutional authority, per *Stern v. Marshall*, to enter a final judgment avoiding the purported transfer of the ALF PMA as to non-creditors, so it does not have the authority to issue a preliminary injunction as a precursor. *See* 564 U.S. 462, 503 (2011) (bankruptcy court "lack[s] the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim"). Even if such authority is assumed, such an injunction is permissible only to protect the availability of an equitable remedy, which is not available to the estates in this circumstance.

### A. Section 105(a) is Inappropriately Invoked

29. The Trustee's reliance on section 105(a) to support his injunction is improper. Section 105(a) must be exercised within the boundaries of the Bankruptcy Code and is not intended to create new, substantive rights.

30. While bankruptcy courts have fashioned relief under section 105(a) in a variety of situations, the powers granted by that statute may be exercised only in a manner consistent with the provisions of the Bankruptcy Code. That statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity. *See U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

11

31. In keeping with this limitation, courts have refused to use section 105(a) to expand the scope of specific statutes and rules. *See, e.g., In re Smith*, 21 F.3d 660, 666 (5th Cir. 1994) ("Bankruptcy courts cannot use their equitable powers created by Section 105(a) to expand the requirements of Rules 3003(c)(3) and 9006(b)(1)."); *U.S. Bank Nat'l Ass'n v. Verizon Commcn's Inc.*, No. 3:10-CV-1842-G, 2012 WL 3100778, *7 (N.D. Tex. July 31, 2012) (Fish, J.) (refusing to expand scope of section 550 under "equitable jurisdiction and Section 105. . . [b]ecause allowing this action would be inconsistent with a more specific provision of the Code.").

32. As of yet, the Trustee has not pointed to a single case involving a plan injunction that enjoined a ***non-creditor*** from taking actions ***with respect to its own property***. Nor are HCLOF and Highland aware of any case where an injunction was granted to hold a non-creditor, third party's property hostage so that value could be generated from that property to pay creditors.

33. The cases cited by the Trustee are all inapposite: the Fifth Circuit's decision in *In re Zale* involves a garden-variety plan injunction granted by bankruptcy courts: an injunction over lawsuits to aide in the successful implementation of a reorganization. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995). Cases like *Zale* and *In re Caesars Entertainment*,[6] did not involve injunctions that serve as the ***basis*** of a reorganization (when there is otherwise no such basis), and plans that serve, at the end of the day, the interests of a ***single creditor***. Others involved channeling injunctions in mass tort cases that involve future claimant concerns that have no application here. *See* Trustee Brief ¶ 116.

---

[6] *In re Caesars Entertainment Operating Co.*, 808 F.3d 1186 (7th Cir. 2015).

34. Indeed, even traditional plan injunctions barring parties – in the vast majority, if not in every instance, enjoining (i) creditors or potential future claimants from (ii) bringing *lawsuits* – are granted very sparingly and only to the extent necessary to promote reorganizations and assist the debtor through a "crucial point in the reorganization proceedings." *See F.T.L. v. Crestar Bank (In re F.T.L., Inc.)*, 152 B.R. 61, 64 n. 3 (Bankr. E.D. Va. 1993) (temporary rather than permanent injunction was granted to principals of corporate debtor and was issued "to assist the debtor through a crucial point in the reorganization proceedings"); *In re Zale*, 62 F.3d at 761 ("If the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions.").

35. In further grasping at straws, the Trustee cites to *Adelphia* to support the argument that bankruptcy courts can nevertheless enjoin non-creditor third parties. *Adelphia Commc'ns Corp. v. The America Channel, LLC (In re Adelphia Commc'ns Corp.)*, 345 B.R. 69 (Bankr. S.D.N.Y. 2006). But the facts of *Adelphia* are not "instructive" as the Trustee purports. In *Adelphia*, the bankruptcy judge enjoined a party who was asking a Minnesota district court to halt the debtor's proposed sale of assets that were actually in the possession of the debtors. *Id*. at 87. The action that was enjoined in *Adelphia* was described by the judge as a "classic and egregious" stay violation that would hinder the sale of the debtors' own assets in bankruptcy (*id.* at 78) – yet another garden-variety injunction aimed at stopping litigation in a separate forum. *Adelphia* had nothing to do with a bankruptcy court enjoining a non-creditor from being able to exercise rights with respect to its own property or an injunction being used to generate the funds necessary to implement the plan.

36. The Trustee's request for a section 105(a) injunction is nothing more than an end-run around section 1123(a)(5)(F) and the Court must reject it, just as the Court did in conjunction

with the Trustee's prior plans.  To do otherwise would be an improper extension of section 105(a).  *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, (1988) (a bankruptcy court's powers "must and can only be exercised within the confines of the Bankruptcy Code.")

**B.    The Court Lacks Authority to Enter the Asset Freeze Injunction**

37.    Unable to cite a single case involving a plan injunction like this one, the Trustee has offered that the plan injunction is justified as an "asset freeze" injunction, necessary to protect the equitable relief he is requesting, i.e., the avoidance and recovery of the ALF PMA rights.  However, that argument fails as well.

38.    "Because the authority to issue a preliminary injunction rests upon the authority to give final relief, the authority to freeze assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy."  *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987) (citing *FTC v. Singer*, 668 F.2d 1107, 1112 (9th Cir. 1982)).  Here, because this Court does not have jurisdiction to enter a final order on the fraudulent transfer claims with respect to non-creditors HCLOF and Highland HCF Advisors, Ltd. ("**HCF Advisor**"), it cannot enter the plan injunction.

39.    While the contours of *Stern*-related issues still remain fluid, the Fifth Circuit has firmly recognized that where a trustee brings a claim that would not be necessarily resolved in the claims allowance process, it is a "*Stern* claim" that requires adjudication by an Article III judge.  *See In re BP RE, L.P.*, 735 F.3d 279, 286 (5th Cir. 2013) ("when the debtor pleads an action that would augment the bankruptcy estate, but not necessarily be resolved in the claims allowance process, then the bankruptcy court is constitutionally prohibited from entering final judgment") (citing *Waldman v. Stone*, 698 F.3d 910, 919 (6th Cir. 2012) (citing *Stern*, 564 U.S. at 499)); *see also In re Moore*, 739 F.3d 724, 728 (5th Cir. 2014) (distinguishing *Stern* because there "the trustee asserted counterclaims to augment the estate apart from the bankruptcy

proceeding. Here, Cadle is a creditor who has filed a proof of claim for debts owed by the debtor, and resolving the state-law claims is necessary to adjudicating its proof of claim."). The Fifth Circuit has been clear that the fact that a claim, if successful, would "augment the bankruptcy estate" is insufficient to bring it within the constitutional authority of this Court. *In re BP RE, L.P.*, 735 F.3d at 286 ("Importantly, the fact that the claim, if successful, would augment the bankruptcy estate,' did not create a sufficient nexus to the resolution of the bankruptcy proceeding."); *see also Stern*, 564 U.S. at 499 (stating that counterclaimant's claim in *Stern* was similar to and should not be "treat[ed] . . . any differently from the fraudulent conveyance action in *Granfinanciera*.") (internal citation omitted).

40. Neither HCF Advisor nor HCLOF has filed a claim against the Debtors. Because the Court cannot enter a final order "to which the asset freeze is a provisional remedy," the Court cannot enter the plan injunction.

### C. Asset Freeze Injunctions Must be in Aid of the Recovery Sought in Equity

41. "[W]hen a plaintiff asserts a cognizable claim to specific assets of the defendant or seeks an equitable remedy involving those assets, a court may issue injunctive relief to preserve the status quo pending judgment *where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested*." *In re Atlas Fin. Mortg. Inc.*, 2014 WL 172283, *3 (Bankr. N.D. Tex. Jan. 14, 2014) (emphasis added); *see also U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489 , 496-97 (4th Cir. 1999) (same).

42. Courts require the party seeking the asset freeze "to demonstrate a 'nexus' between the injunctive relief requested and the equitable relief ultimately sought. . . . To establish that such a "nexus" exists, the party seeking an injunction must show that the *injunction acts in aid of the recovery sought in equity . . . in other words, that the preliminary injunction is reasonably necessary to preserve the status quo with respect to particular assets so that the court*

15

*can grant the movant ultimate relief*." *Dong v. Miller,* 2018 WL 1445573, at *8 (E.D.N.Y. Mar. 23, 2018) (citing *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (emphasis added)).

43.     A court's ability to enter such injunctions does not extend, however, to actions where only legal relief is sought. *See Grupo Mexicano de Dessarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). That is because "the general equitable powers of the federal courts do not include the authority to issue preliminary injunctions in actions solely at law." *In re Atlas Fin. Mortg. Inc.*, 2014 WL 172283, at *3 (citing *Grupo Mexicano*, 527 U.S. at 310). In cases involving a mix of legal and equitable claims, the court must conduct an analysis of each claim to determine whether the court may properly grant the asset freeze with respect to that claim. *See, e.g.*, *Dong v. Miller*, 2018 WL 1445573, at *8 (stating that it is "not true that the *Grupo Mexicano* rule falls away once a plaintiff asserts any claim for equitable relief" and conducting claim-by-claim analysis).

**D.     An Injunction Is Not Necessary To Preserve Final Relief.**

44.     Even if this court has the constitutional authority to enter a final judgment on the fraudulent transfer claims, the injunction requested by the Trustee is proper only to the extent that he can establish that it is necessary to preserve the availability of equitable relief. *See Dong v. Miller,* 2018 WL 1445573, at *8; *In re Atlas Fin Mortg. Inc.*, 2014 WL 172283, at *3.

45.     Here, equitable relief is not available, distinguishing this case from all those cited by the Trustee. First, any judgment by this Court or any other U.S. court to thrust Acis, an affirmatively hostile and conflicted party, on HCLOF, will have to be enforceable in Guernsey, where HCLOF is based, domiciled, and regulated. Guernsey law does not recognize equitable remedies. Rather, if the Trustee were to prevail on his claims, he would be entitled only to legal (money) damages. Second, other applicable (U.S.) law prohibits the equitable remedy sought by the Trustee.

i. *Equitable Relief Would Not Be Enforceable in Guernsey*

46. Even if this Court finds that there was a fraudulent transfer of the ALF PMA rights, this Court will not be able to grant the ultimate equitable relief, which is to reinstall Acis LP as HCLOF's portfolio manager. *See* Exh. 2 (Corfield Affidavit) ¶¶ 22-29. That is because the Royal Court of Guernsey, the only local court, is not a court of equity, and it does not have jurisdiction to enforce a foreign judgment for anything other than money damages. *Id.* Moreover, it is inconceivable that the stringent investment advisory laws and regulatory bodies of Guernsey would approve the compulsion of Acis LP as a "thrust upon" portfolio manager to HCLOF. *Id.* ¶¶ 30-43. Thus, the equitable relief sought by the Trustee will not be available or enforceable in Guernsey.

ii. *Equitable Relief is Not Available Under Other Applicable Law*

47. In addition to offending basic notions of fairness and freedom of contract, the ALF PMA (like the CLO PMAs) was a personal service contract that is not assignable under applicable state law, therefore not assumable by the Debtors. While the Fifth Circuit has not yet determined whether the "hypothetical test" or "actual test" should apply to Bankruptcy Code section 365(c)(1), it has stated that "[a]n executory contract is nonassumable if, under applicable law, any party other than the debtor may decline to accept performance by the trustee." *See Turner v. Avery*, 947 F. 2d 772, 774 (5th Cir. 1991) (citing *Tonry v. Hebert (In re Tonry)*, 724 F.2d 467 (5th Cir. 1984)). Texas law, which governed the ALF PMA, restricts the assignment of personal service contracts like the ALF PMA, which rely upon the skill or personal confidence of the service party. *See, e.g.*, *Amsco Pipe Line Co. v. Donico Prod. Co.*, 112 S.W.2d 483, 485 (Tex. Civ. App. 1938) ("Some of the well-noted exceptions [to assignability] are grounded upon the right of one making a contract to select the party with whom he deals, in contracts involving *character, skill, and confidence.* Thus, where a contract provides for personal services requiring

skill or personal confidence, no assignment may be made without the consent of the parties." (citing *Menger v. Ward*, 87 Tex. 622, 30 S.W. 853, 855 (Tex. 1895) (emphasis added)).[7]

48.     The Trustee himself has admitted that the performance of portfolio management duties requires expertise. *See* Trustee Brief ¶ 107 (Trustee arguing that discretion was delegated to the portfolio manager under the ALF PMA "because of the portfolio manager's ***expertise*** in managing the portfolio") (emphasis added).   It also bears noting that the "portfolio manager's expertise" that the Trustee points to can only be the portfolio management expertise of *Highland*, who was acting as sub-manager for a shell entity – Acis LP – under the ALF PMA.   The importance of Highland is confirmed by HCLOF's Offering Memorandum, dated November 15, 2017, which contains a "key man provision" that required the portfolio manager (HCF Advisor) to notify the equity holders in the event of the termination of any of James Dondero, Mark Okada, Trey Parker or Hunter Covitz, or in the event any of two of them ceased to devote "such time to the affairs of [HCLOF] as is sufficient to effectively manage the operations of [HCLOF]." *See* Exh. 3 (Offering Memorandum) at 8.   Their experience was so critical that the consequences of this provision being triggered was that the "Investment Period" would terminate until suitable replacements were found and approved by the requisite parties. *See id.*

49.     This comports with the common sense notion that an investor should not be forced into a relationship with an investment adviser without its consent.   It also explains why laws like section 205 of the Investment Advisers Act of 1940 (the "**IAA**") exist. *See* 15 U.S.C. § 80b-5 (adviser cannot enter into advisory contract that fails to provide that no assignment of such contract can be made by the adviser without the consent of the other party).   It would be

---

[7] *Compare* Exh. 1 (Confirmation Decision) at *4-5 ("It is not whether the party providing services is skilled and reputable—it is whether such services are unique in nature.").

inequitable to force a marriage between an investor and an investment adviser, let alone any fiduciary.[8]

### iii. An Injunction Cannot Serve As a Judgment Collection Mechanism

50. Given that equitable relief is impossible, the requested injunction, and the Plan as a whole, will serve as nothing but an impermissible pre-judgment attachment intended to protect the Trustee's or Terry's ability to collect on account of any money judgment. *See, e.g., Dong v. Miller*, 2018 WL 1445573, at *10 (examining fraudulent transfer claim and holding no asset freeze could be granted with respect to such because plaintiff sought only money recoveries); *see also Grupo Mexicano*, 527 U.S. 308 (1999).

51. The prior plan process revealed that these bankruptcy cases still amount to little more than a two-party dispute between Josh Terry and Highland. The only creditor who voted in support of the prior plans was Josh Terry.[9] The only creditor, other than Highland, who has taken time to voluntarily participate in these cases at all is Josh Terry. Unsurprisingly (albeit unjustifiably), Josh Terry will be gaining control over the reorganized Debtors under Plan D. All this again lays bare that the injunction and Plan D (like its predecessors) amounts to little more than a collection mechanism for Josh Terry, does not serve a valid reorganization purpose, and thus should not be approved.

---

[8] The Trustee has also failed to establish how this Court can even fashion the equitable relief that he is requesting – which would require the Court, upon avoidance of the purported transfer, to order HCLOF, a non-creditor third party, to enter into a new agreement with a reorganized entity that was never even party to the contract.

That relief does not square with section 365 of the Bankruptcy Code, which requires an extant, executory contract, and requires a debtor to cure any defaults prior to assumption. *See* 11 U.S.C. § 365(a).

[9] *See* Hr'g Tr. (Aug. 27, 2018) (AM) at 61:1-3 (acknowledgment by counsel for the Trustee that confirmation of the Plans hung solely on Mr. Terry's vote); *see also Tabulation of Ballots in Connection with Confirmation of the First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Doc. No. 523].

### III. NO INJUNCTION IS WARRANTED UNDER TRADITIONAL FED. R. CIV. P. 65 REQUIREMENTS

52. Even if the Court determines that it has authority to issue the asset freeze injunction, the Court must still then assess the record and the traditional injunction factors to determine whether it is appropriate. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (assessing its authority to grant asset freeze injunction, then conducting traditional injunction test). These elements are: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the injury to the defendant; and (4) that granting the injunction does not disserve the public interest. *See, e.g*., *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted).

53. Although the Trustee's purported justifications for an injunction have varied over the course of the case, his argument now centers on the supposition that if Acis can be forcibly reinserted as the portfolio manager of a Guernsey-regulated entity (as noted, an impossibility under Guernsey law), Acis can do as it pleases with HCLOF's equity notes (regardless of instructions from HCLOF) and thus "control its own destiny" and its right to a continued stream of management fees. As noted below, even if the Trustee could prove a voidable transfer, he will *not* succeed ultimately on his wrong-headed premise that Acis can effectively take HCLOF's property and do with it as it chooses. To accept this premise, this Court would likewise have to accept the notion that Acis could knowingly and wantonly breach its fiduciary duties by defying the instructions of its client.

54. Moreover, Acis will suffer no irreparable harm (or any harm at all) by having to prove its claims and, if successful, collecting a money judgment (the only remedy available to it). The balance of harms and public policy also strongly favor HCLOF and disfavor a continued

injunction. This is particularly so when, as noted below, it is now clear that the Trustee's mismanagement of the CLOs is strangling the value – not only to the equity noteholders, but to the senior noteholders as well.

### A. The Trustee's Fraudulent Transfer Claims Will Not Succeed, and Even If They Do, Will Not Provide the Result Desired By the Trustee

55.     Highland and HCLOF reiterate their continuing objection to litigating the fraudulent transfer claims in confirmation. Nevertheless, it is not necessary to determine whether the purported "ALF PMA" transfer is avoidable – because even if it were, Acis does not get what it asserts entitles it to an injunction, namely, the right to unfettered control of HCLOF's property.

56.     The crux of the Trustee's claims is that HCLOF's rights under the Indentures once belonged to Acis LP pursuant to the ALF PMA. At the last plan confirmation, the Trustee presented his evidence in support of avoidance, which consisted entirely of Mr. Terry's self-serving legal conclusions disguised as "testimony" that the ALF PMA allowed Acis to make all decisions on behalf of HCLOF. Hr'g Tr. (Aug. 28, 2018) (AM) at 69:7–76:11. Interestingly enough, Terry was not even employed by Highland during the time of the ALF PMA, having been terminated in June 2016. The ALF PMA at issue became effective on December 22, 2016. Likely because the Trustee realized the ridiculous nature of balancing yet another fundamental plan tenet solely on Terry's shoulders, the Trustee has now proffered expert testimony on the subject – including from the same so-called "expert" (Mark Froeba) that Terry hired in the arbitration against Acis. Such testimony will be discredited at trial.

57.     Terry's and the Trustee's arguments fall flat when measured against: (1) the plain language of the agreements, which cannot be squared with their absurd arguments, (2) the

express intent of the parties who actually executed and performed under the ALF PMA, and (3) the actual, objectively evidenced conduct of the parties to the ALF PMA.

           i.     *Acis LP Was Subject at All Times to the Plain Language of the ALF PMA*

58.    It is not necessary to resort to anecdotal accounts and expert witnesses to determine what the language of the ALF PMA says in black and white. A copy of the ALF PMA is attached to this Objection as Exhibit 4, and a read-through, from beginning to end, makes the intent of the parties thereto very clear: Acis LP was a facilitator and administrator and was never intended to have the unfettered discretion that the Trustee has been peddling. And Acis LP remained at all times, subject to the control of HCLOF and its investment policy.

59.    In support of his contorted interpretation of the ALF PMA, the Trustee points primarily to section 5 of the ALF PMA, which he says provided Acis LP with the unfettered authority to "exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments." Exh. 4 (ALF PMA) § 5. However, the Trustee ignores multiple other provisions of the ALF PMA, *including the immediately preceding qualifier* that subjected all those rights "at all times to . . . the Investment Policy" of the Fund. ALF PMA § 5. Section 6 of the ALF PMA also leaves no doubt in providing that the "activities engaged in by the Portfolio Manager **shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy**." *Id.* Even ignoring the explicit language subjecting Acis to the "control" of HCLOF, how can it be that Acis had unfettered discretion if it was subject at all times to the Investment Policy, which was set by HCLOF, and not Acis?

60.    The Trustee also cites sections 14(a) and 14(b) of the ALF PMA to further support of his strained reading of the ALF PMA. *See* Opp. MTD ¶ 26. The Trustee argues that the fact that the ALF PMA contemplates that a "good faith dispute" could occur "regarding reasonable

alternative courses of action" means that Acis could take actions with which the HCLOF directors disagreed.  However, the Trustee conveniently omits the immediately following words that contemplate that such a good faith dispute could arise with respect to "interpretation of instructions," clearly contemplating that Acis would take direction from the directors.  Besides, in any principal/agent agreement it is possible for disputes to arise with respect to the interpretation of instructions.  But that does not mean that the agent can outright disregard the instructions of its principal, as explained below.  *See* Section III.A.iv.

61.    Whatever discretion HCLOF (then ALF) delegated to the portfolio manager to conduct day-to-day operations, HCLOF/ALF always retained the absolute right to direct the portfolio manager to do (or not to do) anything that ALF saw fit.  The ALF PMA is not ambiguous.  *See* Exh. 4 (ALF PMA) § 6 ("the Portfolio Manager shall be subject to the policies and control of the Company").  Texas law, which governed the ALF PMA, is clear with respect to matters of contract interpretation:

> A contract's plain language controls, not what one side or the other alleges they intended to say but did not. . . .  If the language lends itself to a clear and definite legal meaning, the contract is not ambiguous and will be construed as a matter of law.  An ambiguity does not arise merely because a party offers an alternative conflicting interpretation, but only when the contract is actually susceptible to two or more reasonable interpretations."

*See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (internal citations and quotation marks omitted).  Moreover, as demonstrated on April 30, 2018 and again on June 15, 2018 HCLOF, through its directors, can, and did, exercise the authority to issue redemption notices on their own.  *See* Exhs. F and J to Complaint (Adv. Proc. 18-3212, Doc. No. 1).

      *ii.*     *Intent and Actions of Actual Parties to the ALF PMA Refute the Trustee's Argument*

62.     Representatives of Highland and the HCLOF directors, the actual parties who performed under the ALF PMA, will testify that Acis never possessed unfettered control over HCLOF's property and were always subject to the instructions of the independent directors.

63.     Moreover, the conduct of the parties during the pendency of the ALF PMA unequivocally demonstrates that the Trustee's suggestion of "unfettered discretion" is a complete fabrication. Emails from Highland employees, acting in their capacity as portfolio manager to ALF, clearly demonstrate that Acis acted, at all times, subject to the direction and consent of the directors with respect to major, as well as even more mundane, decisions. *See, e.g.*, Exh. 5. Subsequently, resets of the other CLOs were the subject of an October 6, 2017 ALF board meeting. *See* Exh. 7 (Board Minutes) at § 8.1.

64.     For example, on March 3, 2017, while the ALF PMA was in effect, Tim Cournoyer of Highland (in his capacity as sub-manager to Acis, as ALF's portfolio manager) sent an email to the two HCLOF directors, Mr. Scott and Ms. Bestwick specifically seeking their consent to submit necessary direction to effect a reset of Acis CLO 2013-1 Ltd, and advising on the benefits of the transaction. Exh. 5 (Emails) at 2 (Highland0232562). That same day, both Mr. Scott and Ms. Bestwick responded, giving their consent, and Mr. Cournoyer responded with an acknowledgment email. *Id*.

65.     And if even that evidence leaves any doubt, the terms set forth in HCLOF's November 15, 2017 offering memorandum, clearly delineate the role and functions of its portfolio manager vis-à-vis the directors. While the portfolio manager had the discretion to conduct the "day-to-day management of the Company's business and implementation of its investment objective and policy," the HCLOF directors possessed the "ultimate responsibility for

the management and operations of the Company." *See* Exh. 3 (Offering Memorandum) at 70, 71. Substantial evidence was presented at the last confirmation hearing confirming that the foregoing is consistent with market practice. *See* Hr'g Tr. (Aug. 28, 2018) (AM), at 157:3–158:21 (testimony of Dan Castro, Jr. explaining that "th[e] control provisions, it's explicit there, and that is the market understanding"); Hr'g Tr. (Aug. 29, 2018) at 44:12–46:6 (testimony of Isaac Leventon); Hr'g Tr. (Aug. 23, 2018) (PM) at 77:25–78:22 (testimony of Zachary Alpern).

### iii.    *Acis LP Could Not Act Contrary to Its Clients' Interests*

66.    It is clear that the Trustee's intention, if given his alleged "control" over HCLOF's rights, is to attempt to force decisions on behalf of HCLOF that preserve at all costs the right of Acis to earn management fees. The Trustee has left no doubt in that regard, declaring that "the exercise of contractual rights expressly delegated to Acis LP under the ALF PMA, including the right to reset the Acis CLOs, would not be a breach of Acis LP's fiduciary duties." Opp. MTD ¶ 26.

67.    Recent SEC guidance issued with respect to the IAA is precisely on point and leaves it absolutely unambiguous that an investor ***cannot*** contract away fiduciary duties, which is the bottom line of the Trustee's argument with respect to the ALF PMA. *See* Proposed Comm'n. Interpretation Regarding Standard of Conduct for Investment Advisers, S.E.C. Release No. IA-4889, 2018 WL 1875608 (Apr. 18, 2018). The SEC guidance provides that:

> Although the ability to tailor the terms [of their contract] means that the application of the fiduciary duty will vary with the terms of the relationship, the relationship in all cases remains that of a fiduciary to a client. In other words, the investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty.

*Id*. at *3 (citing, among others, Restatement (Third) of Agency, § 8.06 (2006) ("The law applicable to relationships of agency … imposes mandatory limits on the circumstances under which an agent may be empowered to take disloyal action. These limits serve protective and

cautionary purposes.")); *see also* Hr'g Tr. (Aug. 28, 2018) (AM), at 157:3–158:21 (testimony of Dan Castro, Jr. that "if the portfolio manager disagrees with [the investor], the fiduciary duty of the portfolio manager is, well, I may not agree with it, I may … think this is a better trade or a different way to go, but if that's what he wants me to do, I'm supposed to do it.").

68.     Acis LP's exercise of its delegated authority was subject at all times to the fiduciary duties it owes as an investment adviser.  It would absolutely defy common sense, and law, for any investment adviser to be given authority to take actions that would be contrary to the directives of its investor and indulge in a breach of fiduciary duty and pursuit of self-interest.  If such were to be allowed, the financial markets would descend into anarchy, investment advisers plundering their clients' portfolios with impunity.

> iv.     *The Trustee Will Not Be Able to Establish That Acis LP Gave Up Anything of Value*

69.     The Trustee is seeking the avoidance of the termination of the ALF PMA, which he has alleged effected a "transfer" of "valuable" rights away from Acis LP for no value.

70.     First, Acis LP did not earn any fees under the ALF PMA arrangement and thus it did not give up anything of value when it relinquished its rights thereunder.  If anything, Acis LP was relieved of burdensome obligations.

71.     Second, even if the value of the ALF PMA rights could somehow derive from Acis LP's rights under the CLO PMAs, the alleged lost value is only prospective and, at most, nominal.  That is because the termination of the ALF PMA did not cause termination of the CLO PMAs.  To the contrary, Acis LP has continued to fully benefit from the CLO PMA management fee stream even since the termination of the ALF PMA, *in excess* of the valuation the Trustee's expert ascribed to the CLO PMAs in the context of the last plan confirmation process.  *See* Exh. 6 (Expert Report) at 14–16 (opining that the value of the CLO PMAs was approximately $3.6

million); Hr'g Tr. (Aug. 27, 2018) (PM) at 153:14-154:9. The Debtors to date have earned in excess of $7.2 million from management fees post-petition and in fact this whole Plan is premised on asserting the continuation of those fees for at least the next two years.

### B. Irreparable Harm

   *i.*   *The Trustee Cannot Be Irreparably Harmed Because He Has Adequate Remedies at Law*

72.  No injunction is necessary because the Trustee has a more than adequate remedy at law. Indeed, ***this Court itself*** has repeatedly asked that either HCLOF or Highland put up a pot of cash – recognizing the adequacy of a legal remedy in this case. Even more, the Trustee himself testified that HCLOF's complaint requesting optional redemption "wasn't the type of equitable relief that does not result in a complaint – in a claim, like 'stop this guy from throwing chemicals in the river.' This was all about money. It was make the Trustee liquidate these CLOs and give us money." Hr'g Tr. (Aug. 27, 2018) (AM) at 51:8–12; *see also id.* at 89:9–91:21 ("It certainly brings contract causes of action, and it asks for the trustee to accomplish a liquidation, which would result in the payment of money to a HCLOF. I interpret that as resulting in money damages. . . . It would result in the CLO making payments. If I didn't do that, it would result in damages. And the result is they would get dollars. . . . [T]he relief requested in the complaint would result in the payment of money to HCLOF."). The same reasoning applies to his mirror-image claims.

73.  Indeed, if the Trustee can successfully prove the theories in his amended counterclaims (he has stated he has claims of more than $20 million),[10] he can collect damages and pay creditors in full. The existence of an injunction does nothing to preserve or enhance those claims. *See F.D.I.C. v. Faulkner*, 991 F.2d 262, 265 (5th Cir. 1993) ("Because the

---

[10] *See* Hr'g Tr (Aug. 23, 2018)(AM) at 25:3–8; Hr'g Tr (Aug. 27, 2018) (AM) at 47:4–48:9.

availability of a legal remedy often indicates that an applicant's injury is not irreparable, courts generally do not issue injunctions to protect legal remedies."). In fact, the Fifth Circuit has likened such an injunction to an impermissible "prejudgment attachment." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 560 (5th Cir. 1987).

74. The Trustee's arguments in support of irreparable harm are all easily dispensed with. First is the argument that "destruction of the value of the PMAs would … effectively destroy the Debtors' ability to satisfy their obligations to creditors" (Opp. MTD. ¶¶ 37-40). In addition to ignoring the availability of an adequate remedy at law, that concern elevates creditors' interests (really just one individual) over the interests of the investors that the Debtors purportedly exist to serve, a conflict of interest that must be resolved in the investors' direction if the Debtors intend to carry on the business of a portfolio manager. Similarly, the argument that ALF PMA rights could be "rendered meaningless" before they can be recovered is beside the point. Trustee Brief ¶ 117. Even if the Trustee were successful in his fraudulent transfer claims, he would not do anything with those rights other than to keep the PMAs in place, generating management fees, i.e., money. This case is all about money – not about any equitable relief – and there is more than an adequate legal remedy.

75. The Trustee's argument that the Debtors would suffer irreparable harm because he would need to pursue a "multiplicity of actions" to get his relief is also unavailing. Opp. MTD ¶ 40. If the Trustee is implying that he would need to file multiple actions to pay creditors in full, that is plainly not true. If the Trustee (or Terry) is successful in the prosecution of his latest amended counterclaims (80 pages, 35 counts), and is entitled to collect damages in the asserted tens of millions of dollars, all creditors would be paid in full and interest holders would be entitled to a recovery. And if the Trustee is saying that he does not want to litigate to get to his

desired result (which has clearly been the aim of his Plans A, B, and C), then that is not a valid justification for the injunction. The prosecution of claims and marshalling of assets are some of the basic duties of a bankruptcy trustee and he should not be permitted to short-cut around the fraudulent transfer statutes in this impermissible manner.[11]

76. Likewise, the fact that the Debtors may be "without the resources to effectively litigate" does not constitute irreparable harm. *See Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.") (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51-52, 58 (1938)); Trustee Brief ¶ 111. The Trustee can litigate on contingency like so many other trustees do – it is wrong to hold HCLOF hostage to essentially fund litigation against itself. Moreover, the concern for dissipation of assets by Highland and HCLOF is unfounded and baseless, and does not serve as a proper basis for an injunction.

77. The termination of the PMAs and the winding-up of the CLOs will not produce the "doomsday scenario" that has been prophesized. Even this Court previously recognized that even if there was an equity call, the CLOs were liquidated, and the Debtors' right to receive future management fees terminated, "there would still be potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which include fraudulent transfers). . . . Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were

---

[11] As the Fifth Circuit has concluded, the inconvenience of having to litigate is not irreparable harm:

> "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

to happen, there is still a potential benefit to creditors if this court chooses not to abstain."[12] Even if the CLOs are liquidated and the PMAs rendered worthless – the Trustee will have adequate legal remedies against financially capable defendants with damages easily subject to quantification.[13] The Trustee *cannot* suffer irreparable harm if he has an adequate remedy at law.[14]

### ii. HCLOF Continues to Suffer Irreparable Harm

78. While the Trustee enjoys more than adequate legal remedies, HCLOF has been accruing irreparable harm on a daily, ever-increasing basis. In rendering its Confirmation Decision, this Court made one thing crystal clear: HCLOF is not a creditor and does not have a claim against the Trustee or the estates. *See* Exh. 1 (Confirmation Decision) at *3-4. HCLOF therefore has no remedy against these estates – not only for the continuing harm from being unable to allocate its funds into more optimal investments but now from the complete cessation of cash flows from any of the five CLOs. This is a textbook example of "irreparable harm." *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

79. HCLOF will present evidence at the confirmation hearing that the Trustee is actively mismanaging the CLOs in violation of the terms of the Indentures, to the irreparable detriment of HCLOF and other CLO investors. In the quarter ended October 31, 2018, *zero* cash

---

[12] Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions (Apr. 13, 2018) [Doc. No. 118].

[13] The Trustee has already proffered opinion testimony on this issue. *See generally* Hr'g Tr. (Aug. 27, 2018) (PM), at 139:19–159:20.

[14] *See, e.g.*, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 491 B.R. 27, 39 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) ("Since the Trustee would be able to recover any property deemed to be property of the estate in the fraudulent transfer action, the Trustee has failed to demonstrate . . . that the Madoff Securities estate would suffer irreparable harm under the traditional test for an injunction . . . .").

flow was paid on account of the equity notes and even the Class F senior notes for Acis CLO 2014-3 did not receive any interest payments. *See* Exh. 6 (Expert Report of Dan Castro) ¶¶ 55-56. The situation will grow worse unless the Trustee and Brigade start actively and appropriately managing the situation by paying down the senior tranches of notes, which the Trustee has steadfastly refused to do in an effort to maximize fees to the Debtors.

80.     The CLOs are also failing numerous, important tests under the Indentures. *See* Exh. 6 (Castro Report) ¶¶ 63–72. Non-conforming loans (totaling approximately $46.6 million) have been bought into the CLOs in violation of the Indentures, and these mistakes are harming the CLOs. *Id.* These mistakes could also potentially trigger ratings agency actions that could result in a downgrade of the CLOs and cause further pain to all investors. *Id.* ¶ 91. All this has proven the warnings of HCLOF's CLO expert true: that the Trustee has no idea what he is doing with these CLOs, and is in no position to judge what is in the "best interests" of the CLOs and HCLOF. The Trustee cannot be granted further license to continue to irreparably harm those interests through any further injunction.[15]

### C.     Balance of Harms

81.     If the balance of harms ever tipped in favor of the Trustee, they have fully swung back around the other way. The Trustee has had the benefit of an injunction for months while he pressed forward with three patently unconfirmable plans – more than doubling the debts of the estates in the process. During that time, HCLOF has continued to incur extensive losses. Unfortunately, the Court has held that HCLOF has no remedy against Acis or the Trustee for

---

[15] It is also not true that HCLOF can sell its equity positions on the open market. The terms of the plan injunction would prohibit a sale because the notes would have same limitations in any purchaser's hands. *See* Plan § 14.03 (enjoining HCLOF and its "transferees, assigns, and successors"). Again, no rational investor will ever want to buy into a situation where a portfolio manager (in bankruptcy no less) is actively litigating against its equity holder.

these losses – and is left to sit and suffer the harm without recourse. Meanwhile, the Trustee

possesses (and is in fact pursuing) legal remedies against HCLOF and Highland, among others.[16]

82.     The Trustee has repeated his parochial view that HCLOF is acting "economically

irrationally" and that he is trying to save HCLOF from committing "economic suicide."  The

Trustee (a bankruptcy attorney with no background in CLO investing or portfolio management)

is in no position to instruct HCLOF on how to run its business.  There is nothing economically

irrational or suicidal in HCLOF's efforts to divorce itself of Acis (a party which is affirmatively

hostile toward, and affirmatively suing, HCLOF and its current portfolio manager) or obtain a

reset with an investment manager of its choosing.  HCLOF has every right to seek enforcement

of its contractual rights, and the Trustee's judgment should not be supplanted for HCLOF's

judgment with respect to its own property.  An injunction impeding those rights, causing

irreparable harm on a daily, continuous basis, while the party benefitting from the injunction has

an adequate remedy at law, offends all notions of fairness and equity.

83.     Ironically, it is the Trustee who has been acting in an economically irrational

manner, choosing to *never once* approach HCLOF regarding a consensual plan, while reiterating

the disingenuous notion that he is giving HCLOF "everything it wants."  In that process, he has

pursued manifestly unconfirmable plans while racking up millions in administrative expenses,

driving the estates into administrative insolvency, all while continuously placing the estates'

interests in earning management fees above all other interests.  No investor anywhere would

voluntarily tolerate this behavior from an investment advisor.

---

[16] The Trustee purports to preserve an ever-growing list of Estate Claims under the oft-amended Exhibit A to the Plan.

### D. Public Policy

84. The public interest would not be served by giving the Trustee, who owes fiduciary duties to the CLOs, and, by extension, to the CLOs' investors, continuing license to irreparably harm the CLO investors. The Trustee cannot in good conscience be said to be fulfilling those fiduciary duties when he is continuously in pursuit of plans that seek to undermine the interests of the CLOs and their investors – the very parties that he is duty-bound, by contract and state and federal law, to serve. *See, e.g.*, 2013-1 PMA § 17(b)(i); *see also Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 17 (1979) ("Congress intended to impose enforceable fiduciary obligations" in passing the Investment Advisers Act of 1940); 15 U.S.C. § 80b-6; *Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients. . . .'") (citations omitted).

85. Furthermore, the public interest would not be served by unfairly holding HCLOF hostage to an investment, tying up its property and its funds, solely so that a bankrupt portfolio manager can generate management fees from that relationship in abject derogation of its fiduciary duties to HCLOF. This notion flies in the face of fundamental tenets of investment advisory services. *See* Section III.A.iii; 15 U.S.C. § 80b-6 (prohibiting any investment adviser from, among other things, "acting as principal for his own account").

86. Moreover, it bears noting that the Debtors here are no more than shell entities with nothing other than a conditional, unguaranteed payment stream. There is no "going concern" here to preserve – there are no jobs to be saved or an enterprise to be preserved through a reorganization. Thus, traditional policy concerns weighing in favor of Chapter 11 rehabilitation

are just not present here.[17] There are only a sparse number of creditors – and really, just Terry – who have every avenue of recovery left open to them. Again, these cases have been "cash and claims" cases since the very beginning. This lengthy detour through Chapter 11 should be put to an end.

87.     The idea that an injunction would preserve the "status quo" is also a complete fallacy. The "status quo" the Trustee is describing is a completely unnatural and untenable situation – where an investor is forced into a relationship with an investment manager that it cannot trust, and is openly hostile to its interests. This situation should never be permitted to exist in a fiduciary context, and it cannot be forced via a "plan of reorganization." A forced marriage between an investor and manager is simply not workable. It cannot be appropriate under any law to foist investment adviser or fiduciary upon an unwilling party. It is just flat-out wrong and illegal.

88.     The extent of the Trustee's inequitable behavior and hypocrisy is best illustrated by reference to the Trustee's persistent efforts to remove Highland as sub-advisor to Acis. The Trustee appealed to this Court's equity, sounding the imperative that Highland had to be fired as sub-advisor because (1) he could not trust Highland and (2) because Highland was overcharging Acis. Meanwhile, he has been engaged in a scorched earth effort that would coerce the opposite result on HCLOF, binding it to Terry and Acis LP, two parties that HCLOF and the other investors clearly cannot trust, as well as Brigade, a sub-servicer who in just a few months has made clear that it is mismanaging the CLOs. In the same vein, the Trustee's repeated assertion that that Highland was "overcharging" Acis by taking 35bps is ridiculous and contrary to

---

[17] Courts have refused to confirm plans of reorganization involving shell companies on the basis that they were not filed in good faith where the goal was not rehabilitation (e.g., tax avoidance purposes). *See, e.g.*, *In re Maxim Indus., Inc.* 22 B.R. 611 (Bankr. D. Mass. 1982).

evidence elicited from the Trustee's own expert Zach Alpern.[18]  If Highland was overcharging Acis, then what Acis is charging the CLO investors – for doing literally nothing other than hiring a sub-manager – goes far beyond "overcharging."  *This* is the "going concern" value that the Trustee is trying so hard to protect.

## IV.    THE PLAN CANNOT SATISFY THE CODE'S CONFIRMATION REQUIREMENTS

89.    In rendering its Confirmation Decision, this Court left open certain issues briefed by Highland and HCLOF in their general objection to Plans A, B, and C.  Highland and HCLOF believe that Plan D suffers from many of the same issues rendering it similarly unconfirmable.

### A.    Sections 1129(a)(1), (3) – The Plan Violates the Bankruptcy Code and Violates Other Applicable Law

90.    Bankruptcy Code section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title," and section 1129(a)(3) states that a plan cannot be proposed "by any means forbidden by law."  11 U.S.C. § 1129(a).  As to section 1129(a)(1), the Plan violates well-accepted tenets of bankruptcy law because, as explained above, the Trustee seeks to: (1) take control non-estate property, (2) fundamentally alter non-debtor contracts, (3) cherry-pick provisions in contracts that are proposed to be assumed, (4) improperly classify claims, and (5) wipe out equity interests despite trumpeting to excessive value in the estates.

91.    Plan D is further forbidden by law because it violates the IAA.[19]  Plan D flies in the face of applicable IAA duties.  Like Plans B and C, Plan D would nullify HCLOF's right to

---

[18] *See* Hr'g Tr. (Aug. 23, 2018) (AM) at 59:3–24.

[19] Section 215 of the IAA provides that "[e]very contract made in violation of any provision" of the IAA, and "every contract . . . the performance of which involves the violation of . . . any provision of this subchapter . . . shall be void."  15 U.S.C. § 80b-15.  The Supreme Court has explained that this provision provides a private right to rescission of a contract that violates the IAA, "or for an injunction against continued operation of the contract, and for restitution."  *Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 19 (1979).  Section 206 of the IAA "establishes 'federal fiduciary standards' to govern the conduct of investment advisers. . . ."  *Transamerica*, 444 U.S. at 17 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 n.11 (1977)); *see also SEC v. Capital Gains*

decide who manages its assets in order to maintain a guaranteed cash flow from management fees for it investment adviser. The proposed contract modifications therefore violate the IAA, and are void under IAA section 215. *See Laird v. Integrated Res., Inc.*, 897 F.2d 826, 839–42 (5th Cir. 1990) (finding adequately pleaded a claim for rescission based on violations of Section 206); *Douglass v. Beakley*, 900 F. Supp. 2d 736, 748-51 (N.D. Tex. 2012) (same); *James Jianhua Wu v. Weizhen Tang*, No. 3:10-CV-0218-O, 2011 WL 145259, at *8 (N.D. Tex. Jan. 14, 2011) (same); *Broadhead Ltd. P'ship v. Goldman, Sachs & Co.*, No. 2:06CV0009, 2007 WL 951623, at *5 (E.D. Tex. March 26, 2007) (same).

92.     Highland and HCLOF also object to the overly broad release provisions of the Plan that could be read to affect the ability of parties to assert any defense to any claim or cause of action that may be asserted by the Reorganized Debtor or otherwise. *See, e.g.*, Plan § 6.01 (vesting assets in the Reorganized Debtor "free and clear of all rights, title, interests, claims, liens, encumbrances and charges" which arguably could include counterclaims and defenses, including setoff rights); § 14.01(a) (purporting to compromise all claims against the estates); *but see* § 14.04 (preserving estates' right of setoff); § 14.05 (preserving estates' right to recoupment).

93.     In the event the Court were to confirm the Plan and implement the Plan as it currently reads, Highland and HCLOF anticipate that the Trustee will argue that every pending adversary proceeding and appeal is permanently enjoined and released. As this Court is aware, there are several pending adversary proceedings and appeals dealing with non-confirmation issues, including an appeal of the Court's Order for Relief. Highland and HCLOF object to any implication that the Plan can affect the parties' rights under such pending adversary proceedings

---

*Research Bureau, Inc.*, 375 U.S. 180, 191–92 (1963) ("[The IAA] reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.").

and appeals. There is no basis under the law to strip away the parties' rights under the pending adversary proceedings and the appeals through plan confirmation. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252 (3d Cir. 2000) (affirmative defenses did not constitute "interests" that could be extinguished in sale).

### B. Section 1129(a)(3) – The Plan Was Not Proposed in Good Faith

94. Bankruptcy Code section 1129(a)(3) further provides that a plan must be proposed in good faith. The Trustee, as proponent of the Plan, bears the burden of proof in demonstrating that the Plan was proposed in good faith. *See In re Barnes*, 309 B.R. 888, 892 (Bankr. N.D. Tex. 2003). A good faith plan "must fairly achieve a result consistent with the [Bankruptcy] Code." *Id.* at 893 (quoting *In re Block Shim Dev. Co.–Irving*, 939 F.2d 289, 292 (5th Cir. 1991)). The ultimate goal of the analysis is to determine the "subjective motive" of a plan proponent. *See In re Texas Star Refreshments, LLC*, 494 B.R. 684, 694 (Bankr. N.D. Tex. 2013).

95. Improper motives have tainted these bankruptcy cases from the beginning. Terry initiated these proceedings on the eve of a state court hearing to consider the very relief he then requested from this Court. Also from the very beginning, Terry has made clear his motivation for initiating the involuntary bankruptcy: to prevent Acis LP from meeting its contractual obligation to effectuate the reset requested by the equity – so that the Debtors could continue to earn management fees they are not entitled to.

96. Those improper motives continue to this day. The Trustee's mantra in this case has been that he is giving HCLOF "everything it wants." Yet, the Trustee has never once proposed the terms of a consensual plan and has only acted in an openly hostile manner to the interests of HCLOF (a third party, and the investor that Acis LP is supposed to be serving) and Highland (the second largest creditor in these cases).

97. The Plan is also not proposed in good faith because it is highly unlikely that Acis will ever be able to deliver a reset for HCLOF, rendering that critical aspect of Plan D entirely illusory. HCLOF has presented credible testimony, and will offer further testimony, that industry participants would not want to engage with a reorganized portfolio manager in a reset transaction, let alone the four sequential resets that would be required in this case. Hr'g (July 6, 2018) at 200:8–14. Further, as the Trustee's own expert explained, "[t]o the extent that there's still significant animosity" between the equity and the portfolio manager, the reset process "wouldn't function very well." Hr'g (Aug. 23, 2018) at 92:4–19 (Testimony of Zach Alpern).[20]

98. And even if resets could be effectuated, they would necessarily be on terms highly unfavorable to HCLOF. As a third party to these proceedings, HCLOF cannot be compelled against its will into transactions that it does not wish to enter into by giving it a choice between a bad choice and a worse one. HCLOF never bargained for investment into CLOs managed by Brigade, Terry, or anyone other than Highland when it invested in the equity notes. Moreover, the involvement of a formerly-bankrupt portfolio manager, let alone one that is helmed by Terry, and a mandatory lock up will undoubtedly result in sub-market terms that will be unfavorable to HCLOF. The market is very well aware of this bankruptcy case and the pricing of any Acis-led reset will reflect that market perception.

99. Given those circumstances, and the non-compliance with the other provisions of Bankruptcy Code section 1129 identified herein (and any supplement hereto filed following the close of discovery) this Court should not make a good faith finding.

---

[20] The extent of the Trustee's ambivalence (at best) towards his investors is made plain by his requirement that any reset be effected in a way that is "economically rational and beneficial to all parties…" Trustee Brief ¶ 92. A reset is done at the direction of and for the benefit of the equity – not for anyone else, certainly not the portfolio manager.

### C. Section 1129(a)(5) – The Plan Does Not Properly Address Insider Issues Relating to Terry and Is Not Consistent With Public Policy

100. Bankruptcy Code section 1129(a)(5)(A)(i) requires a plan proponent to disclose "[t]he identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan." Section 1129(a)(5)(A)(ii) requires that the appointment of any such individual be "consistent with the interests of creditors and equity security holders and with public policy."

101. Under Plan D, Terry is inexplicably transferred 100% of the equity in the reorganized Debtor. Terry therefore clearly comes within the definition of individuals described in section 1129(a)(5)(A)(i) and (ii).

102. First, Terry's relationship with the Trustee remains a significant and still troubling issue. The facts of this case lead inexorably to the conclusion that Terry is an insider of the Plan proponent (i.e., the Trustee). The term "insider" is defined in Bankruptcy Code section 101(31) to "include" parties who have certain officer, director, or ownership interests in a debtor. However, the concept of a non-statutory insider has been recognized by many courts, including the Supreme Court. *See U.S. Bank N.A. v. Village at Lakeside, LLC*, 138 S. Ct. 960 (2018). The Fifth Circuit has identified the following factors to consider when determining whether a party is non-statutory insider (1) the closeness of the relationship between the party and the debtor; and (2) whether the transactions between the party and the debtor were conducted at arms-length. *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992). Importantly, cases recognize that control over the debtor is <u>not</u> a requirement for determining non-statutory insider status. *See, e.g., In re The Village at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016);

*Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 n.5 (10th Cir. 2008).

103.    The ultimate point of analyzing whether any party is an insider is to determine whether such party is using "their privileged position to disadvantage non-insider creditors." *See In re South Beach Sec., Inc.*, 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007). Insider status is also critical for determining whether a party's desire to obtain, or maintain, control over a debtor is motivating the party. *See In re Rexford Properties, LLC*, 557 B.R. 788, 799 (Bankr. C.D. Cal. 2016) (noting that insiders seeking to retain ownership of the reorganized debtor were "influenced by totally different considerations from those motivating the other creditors.") (quoting *In re Featherworks Corp.*, 25 B.R. 634, 640 (1st Cir. BAP 1982)).

104.    Terry's actions fit perfectly into such a non-statutory insider analysis. A review of the Plan makes plain Terry's favorable treatment: (a) Terry's claim is separately classified; (b) the claim is treated the same as an entirely secured claim would be, despite the fact that Terry did not file a claim as fully secured; and (c) Terry's "secured claim" is being inflated to $1 million for no apparent reason and given the extraordinary treatment of receiving all of Acis LP's equity, despite the fact that the Trustee has indicated that Terry's secured claim may be subject to avoidance. *See Motion for Entry of Agreed Order Authorizing the Use of Cash Collateral and Granting Adequate Protection* [Doc. No. 580] at ¶ 15. Under Plan D, the Trustee's gift of the equity to Terry is improper, discriminatory, and not in the best interests of the estates.

105.    The direct placement of the equity of reorganized Acis LP with Terry without the benefit of an auction or other market test is also further evidence of Terry's insider status. The question must be asked: If the Debtors are such viable, going-concern, with tens of millions in litigation claims to boot, why is their equity being sold for a mere $1 million claim reduction and

all existing equity being expunged?  Moreover, why is Terry getting the residual value of the reorganized Debtors?  If the Estate Claims are as valuable as the Trustee has made them out to be (in excess of $20 million), why is Terry obtaining the benefit of these, again for that same $1 million claim reduction?  Highland and HCLOF clearly disagree with the Trustee's valuation of the estate causes of action, but it is the Trustee who bears the burden of plan confirmation and it is the Trustee who is talking out of both sides of his mouth.  If the estates are so viable (and valuable), there is no justification to provide Terry with this extraordinary treatment.  The undeniable affiliation between the Trustee and Terry, which arose **before** the Trustee's appointment,[21] taints every provision of this Plan D.

106.    In addition, while Terry is not in formal "control" of the Trustee, Terry had access to voluminous insider information during the pendency of this case and he clearly influenced decisions made by the Trustee.  Nothing about the relationship between Terry and the Trustee suggests that they acted at arms-length.  Moreover, Terry used his close relationship to further his non-creditor motivation to put into place provisions that will allow him to take sole control over the reorganized Debtors.  Thus, Terry meets every single element for establishing that he is a non-statutory insider of the Plan proponent in this case.  And, as discussed below, the fact that Terry is a non-statutory insider means the Trustee cannot cram down the Plan.

107.    Separately, section 1129(a)(5)(A)(ii) requires that the individual proposed to serve as "director, officer, or voting trustee of the debtor" (here, Terry) be "consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. § 1129(a)(5)(A).[22]  In considering whether such an appointment is "consistent with public policy" courts have looked

---

[21] *See* Hr'g Tr. (Nov. 6, 2018) at 60:23–61:13.

[22] A similar provision is found in section 1123(a)(7) which states that "a plan shall . . . contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).

at a variety of factors, including whether the individual was a "disinterested person" as defined by the Bankruptcy Code, and whether the individual would adequately represent the interests of other constituents. *See In re Digerati Techs., Inc.*, No. 13-33264, 2014 WL 2203895 (Bankr. S.D. Tex. May 27, 2014) (synthesizing the "little case law" on point and listing out nine factors).

108.    Courts have denied confirmation of plans, even where the plan had overwhelming support and conferred other benefits, because the plan failed to satisfy section 1129(a)(5)(A)(ii). *See, e.g.*, *In re Machne Menachem, Inc.*, 304 B.R. 140 (Bankr. M.D. Pa. 2003) (denying confirmation pursuant to section 1123(a)(7) solely because manner in which plan appointed director was not in compliance with New York statute governing non-profit corporations); *see also In re Digerati Techs., Inc.*, 2014 WL 2203895 (denying confirmation where individuals to be appointed directors and officers were on one side of a "warring faction" with other shareholders and their appointment would not adequately represent other shareholders, among other reasons).

109.    Public policy, including the provisions of the IAA, should dictate that no investor should ever be compelled into *any* relationship with an investment adviser, let alone one helmed by an individual whom the investor is actively litigating against and whom the investor cannot possibly be asked to trust as a fiduciary. *See, e.g.*, 15 U.S.C. § 80b-5(a)(2) (prohibiting investment advisers from entering into an investment advisory contract with a client that "fails to provide, in substance, that no assignment shall be made by the investment adviser without the consent of the other party to the contract").

110.    Nor can Josh Terry be said to be anything close to resembling a "disinterested person" which is defined by the Bankruptcy Code as:

> a person that – (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a

director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest, in the debtor, or for any other reason.

11 U.S.C. § 101(14); *see In re Digerati Techs., Inc.*, 2014 WL 2203895 (denying confirmation because individuals were not "disinterested persons" because they had interests materially adverse to other shareholders). Putting aside the animus between Terry and Highland (the second largest creditor of the estates), forcing a fiduciary relationship between Josh Terry and HCLOF would be wholly inconsistent with public policy and manifestly unjust with respect to HCLOF and its expectations as an investor. Most notably, Terry is simply unqualified and unfit to serve in the role proposed by Plan D.[23]

### D. Sections 1129(a)(7) and 1129(b) – The Plan Is Not in the Best Interest of Creditors and Is Not Fair And Equitable

111. Bankruptcy Code sections 1129(a)(7) and 1129(b) require that a plan be in the best interest of creditors and otherwise fair and equitable. First and foremost, Plan D is premised on a plan injunction that is not supported by the law. The Plan is a legal fallacy and, even if confirmed, will be the subject of years of litigation and ever-increasing administrative expense claims. That is not in the creditors' best interests.

112. Also, included in a best interest of creditors analysis is a determination that creditors who have not accepted the plan will receive no less under the Plan then they would in a hypothetical Chapter 7 liquidation. *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993). This requires a valuation analysis comparing what the creditor would receive if the property were sold today in a chapter 7 versus the value such creditor would receive as a creditor under the plan. *Id.*

---

[23] *See* Hr'g Tr. (Aug. 28, 2018) (AM) at 78:18-25; 79:1-20 (testimony of Terry making clear that he has not engaged in trading for any third party, and no party has otherwise hired him, since June 2016).

113. It bears repeating that the estates' alleged principal assets (alleged claims against Highland and HCLOF) could have been, and should have been, pursued in Chapter 7 without incurring the many millions of dollars spent by the Trustee in his course of his quixotic efforts to get Plans A, B, and C confirmed. The Trustee is now at it again as he needlessly barrels forward into another plan fight. This will burden the already administratively insolvent estate with yet more Chapter 11 administrative expenses.[24] Any consideration of the best interest of creditors test should take into account these facts, including that almost none of those administrative expenses would have been incurred in a normal (and rational) Chapter 7 process.

114. The record in this case has been developed sufficiently to make a finding that creditors are not better off in Chapter 11.

**E.     Sections 1129(a)(8), (10) and 1129(b) – The Plan Does Not Meet the Requirements for Cram Down**

115. Bankruptcy Code sections 1129(a)(8) requires that each impaired class vote in favor of a plan. Bankruptcy Code section 1129(a)(10) permits a plan proponent to cram down a plan on non-voting classes, as long as one class of impaired creditors votes in favor of the plan. Insider votes are not counted for the purposes of consent under 1129(a)(10). Section 1129(b), in turn, requires in a cram down plan that the plan not unfairly discriminate and is fair and equitable to the non-voting creditors. Based on the record of this case, it is again assumed that Class 2 (the Terry Secured Claim) will be the only class with the claim amount and numerosity to be deemed (according to the Trustee) a consenting class. Therefore, in order to meet the cram down confirmation requirements, the Trustee has the burden of showing that: (1) Terry is impaired; (2) Terry is not an insider; and (3) cramming the Plan down solely on Terry's vote does not

---

[24] *See* Highland's Motion to Dismiss at ¶¶ 23-24 (citing to the Debtors' expert at the prior plan confirmation hearing of the "highly unusual" nature of administrative expenses exceeding claims in a Chapter 11 case).

unfairly discriminate and is fair and equitable to other creditors. The Trustee cannot meet such a burden.

116. The Fifth Circuit interprets the concept of impairment broadly to include any alteration of a creditor's rights. *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 245 (5th Cir. 2013). However, a broad interpretation does not mean that the concept of impairment does not exist. The policy reason for requiring an impaired class to accept the plan under a cram down is to ensure that at least one group of creditors that is "***hurt*** . . . nonetheless favors the plan." *In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 776-77 (S.D.N.Y. 1994) (emphasis added).

117. Terry's claim is not impaired because he not only is being paid in full with interest, he is in fact being paid more than what he is entitled to receive on his claim. Terry's amended proof of claim (no. 1, as amended) represents his position that he has, at best, a secured claim of $634,373.99, based on a garnishment order entered within 90 days of the involuntary petition date. Pursuant to Bankruptcy Code section 547(f), there is a presumption of insolvency, albeit rebuttable, on and during the 90 days immediately preceding the petition. On its face, pursuant to Bankruptcy Code section 547, the secured portion of Terry's claim is a statutory preference. To the contrary, Plan D ignores the potential preference and, in fact, provides Terry substantially more than even he has alleged to be his secured claim, by not only inflating such claim by 58% more than he has asserted, but by likewise giving Terry the equity in the reorganized Acis LP. A creditor whose claim is classified as a higher priority than is justified under the law and who is paid more than what he is entitled to is not impaired.

118. Under these circumstances, using a lone creditor, let alone an insider such as Terry, should not be sufficient to fulfill the section 1129(a)(10) requirement. This is a textbook case of using artificial impairment. Moreover, even if Terry were considered impaired, Terry's

votes should not be counted because Terry is a non-statutory insider. The basis for deeming Terry a non-statutory insider is set forth above. Because of his status as such, the Trustee is prohibited by the plain language of section 1129(a)(10) from relying on Terry's votes to support a plan.

119. The final requirement for a cram down plan is that it is fair and equitable and does not unfairly discriminate. Whether a plan is proposed in good faith is a critical element of this determination. *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247 (citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)). Because, as set forth above, the Trustee is unable to establish that the Plan was proposed in good faith, and that it is fair and equitable with respect to all creditors, he likewise will be unable to establish that he meets the cram down standard.

### F. Section 1129(a)(10) – Gerrymandering

120. A further requirement under section 1129(a)(10) and related case law is that claims be properly classified under a plan. *See, e.g., In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (prohibiting the gerrymandering of classes to create a consenting impaired class). It is settled law in this Circuit and elsewhere that "'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id.* at 1278; *see also In re Premier Network Servs., Inc.*, 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005) (same). The disparate treatment of Terry and Highland's claims under the Plan is a blatant example of gerrymandering.

121. In addition, the record from the prior failed plan process demonstrates the true reason that the Trustee separately classified Terry's claim. Terry will be the single vote in favor of Plan D (just like last time) and the Trustee cannot get across the confirmation finish line without an impaired consenting class. As set forth above, there is no valid basis for treating

Terry's claim as secured. Thus, the only reason for separately classifying Terry's claim is to create a consenting class, which is gerrymandering by definition.

122. Highland is a general unsecured creditor in the case, but its claim has been separately classified from other general unsecured creditors. Presumably, the Trustee bases such separate classification and disparate treatment on his allegation that Highland is liable for a fraudulent transfer and other alleged misdeeds. The Trustee has also filed a last-minute objection to Highland's claim on November 13, 2018, arguing that Highland is not even a creditor, apparently based on setoff allegations.[25] At this point, the Trustee has simply made allegations and has yet to prove any of his case against Highland, or anyone else. Permitting separate classification based on unproven allegations denies Highland's prima facie rights as the second largest creditor in this case. *See In re FTANDD Intern., Ltd.*, 2004 WL 5846710, at *2 (Bankr. N.D. Ga. March 25, 2004) (sustaining the objection of the largest unsecured creditor in the case to the disclosure statement on the grounds that the debtor's "colorable," but unproven, allegations of liability and general animosity by the creditor to the debtor were insufficient bases to separately classify the creditor's claim). It also would seem an invitation for plan proponents to engage in all manner of mischief in order to craft around the requirement that substantially similar claims be classified together.

### G.    Section 1129(a)(11) – The Plan is Not Feasible

123. Bankruptcy Code section 1129(a)(11) has been interpreted to require a finding that a plan is economically feasible. This requires the Trustee to demonstrate that the plan has a "reasonable assurance of commercial viability." *In re Briscoe Enters., Ltd. II*, 994 F.2d at 1166.

---

[25] Notably, despite months of vague threats against Highland made by the Trustee in the courtroom, the Trustee waited until the last minute to actually file his claim objection, thus ensuring Highland had zero chance to substantively defend itself prior to the confirmation hearing.

Moreover, the Trustee must "present proof through reasonable projections that there will be sufficient cash flow to fund the [Plan]." *See In re Couture Hotel Corp.*, 536 B.R. 712, 736-37 (Bankr. N.D. Tex. 2015).

124. On the record before the Court, the Trustee has failed to demonstrate sufficient funds to meet all the obligations set forth in the Plan. On the asset side, Plan D is premised on management fees over a sustained period of time that can only be supported by the Plan's unprecedented and flawed injunction. On the liability side, this estate is burdened by very substantial administrative expenses. In fact, administrative expense claims appear to have significantly surpassed the total claims alleged by the Trustee to be payable in this case. Even the Trustee's expert witness, Mr. Klein, testified to the "highly unusual" nature of administrative expense claims exceeding claims in a Chapter 11 case.[26] The out-of-proportion administrative expense claims are the result of the Trustee's decision to propose plans full of untested and unprecedented legal theories. Professor Jay Westbrook testified that the Trustee's plans were "very dangerous" and "seriously dangerous."[27] No contrary evidence was presented by the Trustee. Yet, here we are again with an unconfirmable plan and even more administrative expenses to deal with. The financial situation is unsustainable and Plan D is not feasible.

## RESERVATION OF RIGHTS

125. Nothing herein shall be construed as an admission of, or concession to, any fact contained in the Disclosure Statement or Plan D, and Highland and HCLOF reserve all rights to contest and rebut any and all factual allegations at the confirmation hearing, as well as supplement their Objection in light of ongoing discovery.

---

[26] August 28, 2018 Hr'g Tr. at 193:14-17.
[27] *Id.* at 27:13 and 30:14.

## <u>CONCLUSION</u>

WHEREFORE, HCLOF respectfully requests that the Court (a) deny confirmation of the

Plan and approval of the Disclosure Statement and (b) grant to HCLOF such other and further

relief as the Court may deem proper.

Dated:  November 26, 2018

Respectfully submitted,


/s/ Holland N. O'Neil
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.**

/s/ Mark M. Maloney
Mark M. Maloney (GA 468104)
W. Austin Jowers (GA 405482)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING, LTD.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was served electronically by the Court's ECF system on November 26, 2018.

/s/ Rebecca Matsumura
Rebecca Matsumura