Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Laurie Dahl Rea – State Bar No. 00796150
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
lrea@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case |
| | § | No. 18-30264-SGJ-11) |
| DEBTORS. | § | |
| | § | Chapter 11 |

**RESPONSE OF ROBIN PHELAN, CHAPTER 11 TRUSTEE, TO THE *JOINT OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND HIGHLAND CLO FUNDING, LTD. TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND TO CONFIRMATION OF THE THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC***

December 5, 2018.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...............................................................................................i

TABLE OF AUTHORITIES ...................................................................................... iv

I.      EXECUTIVE SUMMARY ...............................................................................1

II.     PROCEDURAL HISTORY...............................................................................4

III.    ARGUMENTS AND AUTHORITIES ..............................................................8

        A.      THE COURT HAS JURISDICTION TO APPROVE THE PLAN INJUNCTION .....8

                1.      *Stern Does Not Affect the Court's Jurisdiction to Issue the Plan Injunction under Section 105(a)*...............................................9

                2.      *The Court Has Authority Under Sections 105(a), 1123(a)(5) and 1123(b)(6) to Enter the Plan Injunction*...................................10

                3.      *The Court Has Statutory Jurisdiction Over the Highland Adversary*........15

                4.      *The Court Has Constitutional Authority to Enter a Final Order under Stern v. Marshall* ...........................................................16

                        (a)     *This Court Has Constitutional Authority to Enter a Final Order on the Fraudulent-Transfer Actions Because They Will Need to Be Resolved to Liquidate HCM's Claim*..................16

                        (b)     *The Highlands Have Consented to the Court's Authority to Enter a Final Order* ...................................................18

                5.      *The Highland's Remaining Arguments Regarding Jurisdiction and the Plan Injunction Lack Merit*...........................................20

                        (a)     *The Plan Injunction Does Not Amend the Indentures*.................20

                        (b)     *The Plan Injunction Is Not an Unconstitutional Taking of Highland Funding's Property*.......................................21

                        (c)     *The Reorganized Acis Will Not Need to Enforce Anything in Guernsey – but, Specific Performance Is Available If It Does*...................................................................23

                        (d)     *The Appeal of the Order for Relief Did Not Divest the Court of Jurisdiction to Confirm the Plan* ................................24

                        (e)     *The ALF PMA Is Not a Personal Services Contract* ...................25

        B.      THE PLAN INJUNCTION IS WARRANTED UNDER THE FED. R. CIV. P. 65 REQUIREMENTS ..............................................26

1.   *The Trustee Has a Substantial Likelihood of Success on the Merits of His Avoidance Claims* ...................................................27

(a)   *The Trustee Has Already Demonstrated a Likelihood of Success on the Merits on the Estate's Claims Relating to the ALF PMA Rights* .......................................................27

(b)   *The Avoidance Claims Provide a Basis for the Plan Injunction* ...28

(c)   *The ALF PMA Unequivocally Gives Acis LP the Ability to Determine the Timing of an Optional Redemption* .....................29

(i)   *The ALF PMA Unambiguously Delegates the Right to Request an Optional Redemption to Acis as the Portfolio Manager* ............................................................30

(ii)   *The Exercise of Acis LP's Rights Under the ALF PMA to Improve the Position of the Acis CLOs Would Not Be a Breach of Acis LP's Fiduciary Duties* .....................35

(iii)   *The Termination of the ALF PMA was a Transfer* ...........37

(iv)   *Termination of the ALF PMA was a Transfer of Valuable Intangible Property Rights* ...............................40

2.   *The Estate Will Suffer Irreparable Harm In the Absence of a Plan Injunction* ..............................................................................................42

3.   *The Highlands Are Not Being Irreparably Harmed* ................................45

4.   *Balancing the Equities Favors Maintaining Injunctive Relief* ..................47

5.   *Public Policy Favors Continued Injunctive Relief* ...................................49

C.   THE PLAN AND THE TRUSTEE ARE IN COMPLIANCE WITH SECTION 1129(A) AND (B) ..............................................................................................50

1.   *The Plan Complies With Section 1129(a)(1) and (3)* ..............................50

(a)   *The Plan Does Not Impermissibly Control Non-Estate Property or Alter Non-Debtor Contracts* .....................................50

(b)   *The Plan Does Not Violate the Investment Advisers Act of 1940* ......................................................................................51

(c)   *The Vesting and Compromise Language in the Plan Does Not Have the Effect that the Highlands Say It Does* ...................51

(d)   *The Plan Was Proposed in Good Faith* ......................................52

2.   *The Plan Complies with Section 1129(a)(5)* ............................................53

3. *The Plan Complies with Section 1129(a)(7)*............................................57

4. *The Plan Complies With Section 1129(a)(8), (a)(10), and (b)* .................58

    (a) *Terry's Class is Impaired* ............................................................59

    (b) *Terry is Not an Insider*.................................................................60

    (c) *The Plan's Classification of Claims Meets the Requirements of the Bankruptcy Code* .............................................................60

    (d) *The Plan Satisfies Section 1129(b)*..............................................64

5. *The Plan Complies With Section 1129(a)(11)*........................................65

## **TABLE OF AUTHORITIES**

**Cases**

*Animale Group v. Sunny's Perfume, Inc.*, 256 F. App'x 707 (5th Cir. 2007)...............................28

*Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.*), 531 F.3d 1272
    (10th Cir. 2008) ................................................................56

*Asarco LLC v. Ams. Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009) ............................................45

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999)...........57

*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836 (5th Cir. 2004) ..............................................48

*Brandt v. KLC Fin., Inc. (In re Equip. Acquisition Res., Inc.)*, 481 B.R. 422
    (Bankr. N.D. Ill. 2012) ..............................................................41

*Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008 (5th Cir. 1992) ...........................56

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ......................................................27

*Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*,
    808 F.3d 1186 (7th Cir. 2015).......................................................9-10

*Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt.)*, 4 F.3d 1329
    (5th Cir. 1993) ................................................................14-15

*Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983)...........................................................31

*Comptroller of Public Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*,
    303 F.3d 571 (5th Cir. 2002)............................................................49

*Crane v. Napolitano*, 2013 U.S. Dist. LEXIS 193120 (N.D. Tex. Mar. 15, 2013) .......................49

*Dong v. Miller*, 2018 U.S. Dist. LEXIS 48506 (E.D.N.Y. Mar. 23, 2018).....................................29

*Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 2018 U.S. Dist. LEXIS 179769
    (N.D. Tex. Oct. 19, 2018) ................................................62, 63, 66

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631 (Bankr. Del. 2006) .................39

*Ebert v. DeVries Family Farm, LLC (In re Devries)*, 2014 Bankr. LEXIS 3621
    (Bankr. N.D. Tex. 2014)................................................................45

*Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995) ............................................14

*Financial Sec. Assur. v. T-H New Orleans Ltd. P'ship (In re T-H New
    Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997)...................................52, 66

*Frazin v. Haynes & Boone, LLP (In re Frazin)*, 2017 Bankr. LEXIS 4378
    (Bankr. N.D. Tex. Dec. 22, 2017)..................................................19

*Hawkins v. Lister (In re Lister)*, 2011 Bankr. LEXIS 5579 (Bankr. E.D. Ca. 2011) ....................41

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters. Ltd., II
(In re Briscoe Enters. Ltd., II)*, 994 F.2d 1160 (5th Cir. 1993)...................................61-63

*Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998)......................................................27

*Iantosca v. Step Plan Servs.*, 604 F.3d 24 (1st Cir. 2010) ...........................................29

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.)*, 408 F.3d 689 (11th Cir. 2005) ..................20

In *In re Allegheny International, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) ..............................56

*In re Couture Hotel Corp.*, 536 B.R. 712 (Bankr. N.D. Tex. 2015) ...........................58, 62-63, 66

*In re Direct Media Power, Inc.*, 582 B.R. 739 (Bankr. N.D. Ill. 2018).........................................10

*In re Friedman*, 126 B.R. 63 (B.A.P. 9th Cir. 1991) ..................................................56

*In re General Homes Corp.*, 134 B.R. 853 (Bankr. S.D. Tex. 1991).........................................63

*In re G-I Holdings Inc.*, 420 B.R. 216 (Bankr. D.N.J. 2009) .......................................13

*In re Grove Rich Realty Corp.*, 200 B.R. 502 (Bankr. E.D.N.Y. 1996).......................................25

*In re Hallwood Energy, Ltd. P'ship*, 2009 Bankr. LEXIS 5099
(Bankr. N.D. Tex. Oct. 16, 2009) .......................................................9

*In re Ingersoll, Inc.*, 562 F.3d 856 (7th Cir. 2009) ...........................................11-14, 21

*In re Jermoo's, Inc.*, 38 B.R. 197 (Bankr. W.D. Wis. 1984)......................................38

*In re LightSquared Inc.*, 513 B.R. 56 (Bankr. S.D.N.Y. 2014) ....................................63

*In re McCommas LFG Processing Partners*, 2007 Bankr. LEXIS 4053
(Bankr. N.D. Tex. Nov. 29, 2007)...................................................63

*In re Mirant*, 2007 Bankr. LEXIS 4951 (citing *Phoenix Mut. Life Ins. Co. v. Greystone III
Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274 (5th Cir. 1991)) ..........61

*In re Nartron Corp.*, 330 B.R. 573 (Bankr. W.D. Mich. 2005)...................................54

*In re Ontario Locomotive & Indus. Ry. Supplies, Inc.*, 126 B.R. 146
(Bankr. W.D.N.Y. 1990)..............................................................25

*In re Premiere Network Servs.*, 2005 Bankr. LEXIS 2298
(Bankr. N.D. Tex. Jul. 1, 2005) ..............................................53-54, 63

*In re Rexford Properties, LLC*, 557 B.R. 788 (Bankr. C.D. Cal. 2016) .......................57

*In re Rosenberger*, 400 B.R. 569 (Bankr. W.D. Mich. 2008)...................................15

*In re Scrub Island Dev. Group Ltd.*, 523 B.R. 862 (Bankr. M.D. Fla. 2015) ....................12-13, 15

*In re Seatco, Inc.*, 259 B.R. 279 (Bankr. N.D. Tex. 2001) ..........................................................15

*In re South Beach Securities, Inc.*, 376 B.R. 881 (Bankr. N.D. Ill. 2007) ...................................56

*In re Sun Country Dev., Inc.,* 764 F.2d 406 (5th Cir. 1985) ........................................................52

*In re Thru, Inc.*, 2017 Bankr. LEXIS 1902 (Bankr. N.D. Tex. Jul. 10, 2017) ...................61, 63, 66

*In re TrueStar Barnett, LLC*, 2008 Bankr. LEXIS 3310 (Bankr. N.D.Tx, Oct. 3, 2008)...............31

*Janvey v Alguire*, 647 F.3d 585 (5th Cir. 2011) ...................................................................29, 44

*Lee v. Bickell*, 292 U.S. 415, 54 S. Ct. 727 (L. Ed. 1337 (1934)) ...............................................44

*Lloyd McKee Motors v. Chrysler Corp. (In re Lloyd McKee Motors)*, 166 B.R. 725
    (Bankr. D. N. Mex. 1993) ........................................................................................39

*Lynch v. Winslow (In re Winslow)*, 473 B.R. 94 (E.D.N.C. 2012) ...............................................55

*Maas v. Northstar Educ. Fin., Inc. (In re Maas)*, 497 B.R. 863
    (Bankr. W.D. Mich. 2013) ..........................................................................................9

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.),*
    150 F.3d 503 (5th Cir. 1998)....................................................................................52

*MCA Fin. Grp. v. Hewlett-Packard (In re Fourthstage Techs.)*, 355 B.R. 155
    (Bankr. D. Ariz. 2006) ..............................................................................................56

*Metro Water & Coffee Servs. v. Rochester Community Baseball*
    *(In re Metro Water & Coffee Servs.)*, 157 B.R. 742 (Bankr. W.D.N.Y. 1993) .............39-40

*Milbank v. Sharpshooter II, Inc. (In re Worldwide Diamond Ventures, LP)*,
    559 B.R. 143 (Bankr. N.D. Tex. 2016) ..............................................................15-16, 19

*Omni Mfg. v. Smith (In re Smith)*, 21 F.3d 660 (5th Cir. 1994)...................................................15

*Phoenix Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III*
    *Joint Venture)*, 995 F.2d 1274 (5th Cir. 1991) .........................................................62-64

*Rentas v. Olavarria (In re Editorial Flash, Inc.)*, 2016 Bankr. LEXIS 2435
    (Bankr. D. P.R. June 29, 2016).................................................................................41

*Rodriguez v. Drive Fin. Servs. L.P. (In re Trout)*, 609 F.3d 1106 (10th Cir. 2010).....................45

*Sargeant v. Al Saleh*, 512 S.W.3d 399 (Tex. App. – Corpus Christi 2016, no pet.)...................29

*Save Our Springs (SOS) Alliance v. WSI (II)-COS, L.L.C. (In re Save*
    *Our Springs (SOS) Alliance)*, 632 F.3d 168 (5th Cir. 2011)...........................................63

*Seidel v. Warner (In re Atlas Fin. Mortg., Inc.)*, 2014 Bankr. LEXIS 140
(Bankr. N.D. Tex. Jan. 14, 2014) ............................................................................28-29

*Silverman v. General Ry. Signal Co. (In re LECO Enters.),* 144 B.R. 244 (S.D.N.Y. 1992) .......15

*Stern v. Marshall*, 564 U.S. 462 (2011) ............................................................3, 8-10, 16, 18-19

*Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147 (Bankr. W.D. Tex. 2015) .........55

*U.S. Bank N.A. v. Verizon Communs., Inc.,* 761 F.3d 409 (5th Cir. 2014) ................................17

*U.S. Bank N.A. v. Village at Lakeridge, LLC (In re Village at Lakeridge, LLC)*,
814 F.3d 993 (9th Cir. 2015), *aff'd*, 138 S. Ct. 960 (2018) ........................................55-56

*United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489 (4th Cir. 1999) ...................28

*United States v. Energy Res. Co.*, 495 U.S. 545 (1990) .......................................................12-13

*United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213 (1996)...............................58

*United States v. Sutton*, 786 F.2d 1305 (5th Cir. 1986) .........................................................14-15

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015) ...................................................18

*Wentzell v. JPMorgan Chase Bank, N.A.,* 627 Fed. Appx. 314 (5th Cir. 2015) .........................48

*Western Real Estate Equities, L.L.C. v. Vill. At Camp Bowie I, L.P.*
*(In re Vill. At Camp Bowie I, L.P.),* 710 F.3d 239 (5th Cir. 2013) ........................52, 59-61

*Women's Med. Ctr. v. Bell*, 248 F.3d 411 (5th Cir. 2001) .........................................................27

## <u>Statutes</u>

11 U.S.C. § 101(31) ...............................................................................................................54-55

11 U.S.C. § 101(54)(D) .............................................................................................................37

11 U.S.C. § 105(a) ............................................................................................................3, 8-15

11 U.S.C. § 362(a)(3) ..................................................................................................................6

11 U.S.C. § 365(c)(1) ................................................................................................................25

11 U.S.C. § 502(d) ....................................................................................................................17

11 U.S.C. § 503(b) ....................................................................................................................60

11 U.S.C. § 507(a)(8)................................................................................................................60

11 U.S.C. § 524(e) ....................................................................................................................13

11 U.S.C. § 544 ...................................................................................................................7, 15

11 U.S.C. § 547 ..................................................................................................................40

11 U.S.C. § 548 .......................................................................................................7, 15, 37-40

11 U.S.C. § 548(a)(1)(A) .....................................................................................................41

11 U.S.C. § 548(a)(2) ..........................................................................................................38

11 U.S.C. § 550 ....................................................................................................7, 15, 20, 44

11 U.S.C. § 550(a) ..........................................................................................................19, 45

11 U.S.C. § 1122 ............................................................................................................60, 63

11 U.S.C. § 1122(a) ........................................................................................................60-63

11 U.S.C. § 1123 ..................................................................................................................63

11 U.S.C. § 1123(a)(1) ....................................................................................................60-61

11 U.S.C. § 1123(a)(5) ..............................................................................................3, 10-13-15

11 U.S.C. § 1123(b)(6) ...............................................................................................3, 10-15

11 U.S.C. § 1129 ..................................................................................................................13

11 U.S.C. § 1129(a) ..............................................................................................................50

11 U.S.C. § 1129(a)(1) .........................................................................................................50

11 U.S.C. § 1129(a)(3) ....................................................................................................50-53

11 U.S.C. § 1129(a)(5) .............................................................................................10, 52-54

11 U.S.C. § 1129(a)(5)(A) ....................................................................................................53

11 U.S.C. § 1129(a)(5)(A)(i) ................................................................................................53

11 U.S.C. § 1129(a)(5)(A)(ii) ...............................................................................................53

11 U.S.C. § 1129(a)(5)(B) ....................................................................................................53

11 U.S.C. § 1129(a)(7) ....................................................................................................57-58

11 U.S.C. § 1129(a)(8) ....................................................................................................59, 64

11 U.S.C. § 1129(a)(10) ..................................................................................................59-60

11 U.S.C. § 1129(a)(11) ..................................................................................................65-66

11 U.S.C. § 1129(b) .............................................................................................50, 60, 63-64

11 U.S.C. § 1129(b)(1) .................................................................................64

15 U.S.C. § 80b-15 ......................................................................................51

22 U.S.C. § 157(b) ...................................................................................3, 16

22 U.S.C. § 157(b)(2)(H) ............................................................................16

22 U.S.C. § 157(b)(2)(L) ...........................................................................8-9

22 U.S.C. § 1334 ...................................................................................15-16

22 U.S.C. § 1334(b) ...........................................................................3, 8, 15

Tex. Bus. & Comm. Code § 24.001 ..............................................................7

Tex. Bus. & Comm. Code § 24.002(12) .....................................................38

Tex. Bus. & Comm. Code §24.008 .........................................................7, 29

## RULES

FED. R. CIV. P. 12(b)(2) .............................................................................23

FED. R. CIV. P. 65.......................................................................................26

## SECONDARY SOURCES

COLLIER ON BANKRUPTCY ¶ 1124.03 (16th ed. rev. 2012) .........................61

TO THE HONORABLE STACEY G.C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:

Robin Phelan (the "Trustee"), Chapter 11 Trustee of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP") (collectively, the "Debtors" or "Acis") in these cases, files this Response (the "Response") to the *Joint Objection of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Objection") [Docket No. 722]. In support of this Response, the Trustee would respectfully show the Court as follows:

## I. EXECUTIVE SUMMARY

1.      Highland Capital Management, L.P. ("HCM"), Highland CLO Funding, Ltd. ("HCLOF"), and their respective affiliates (collectively, the "Highlands") object to confirmation of the Plan,[1] which includes a Plan Injunction[2] necessary to preserve the *status quo* (*e.g.*, it would allow the Reorganized Acis to continue serving as the portfolio manager to the Acis CLOs[3] pending resolution of the Estate's avoidance and other claims) because it prevents them from completing the last step in their coordinated scheme to appropriate the going concern business of Acis, strip Acis LP of all of its valuable assets and fraudulently transfer those assets (*i.e.*, Acis LP's business) to the Highlands. Consistent with the Highlands' long-cultivated and well-deserved reputation for litigious behavior and outspending their opponents until they capitulate, the Highlands seek to destroy the ongoing business of Acis LP, cut off its cash flow, and ensure that the estate will not have sufficient resources to pay creditors and pursue legitimate causes of

---

[1] *Trustee's Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 660], as the same may be modified, supplemented, or amended (the "Plan"). Any capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Plan.

[2] See Section 14.03 of the Plan.

[3] The term "Acis CLOs" originally included Acis CLO-1, Ltd. ("CLO-1"), Acis CLO 2014-3, Ltd. ("CLO-3"), Acis CLO 2014-4, Ltd. ("CLO-4"), Acis CLO 2014-5, Ltd. ("CLO-5"), and Acis CLO 2015-6, Ltd. ("CLO-6") However, the Bankruptcy Court entered orders on October 15, 2018 granting relief from the automatic stay and modifying a preliminary injunction to permit the trading, sale or other disposition of the collateral of CLO-1. Consequently, in the Plan and used herein, the term Acis CLOs refers to CLO-3, CLO-4, CLO-5, and CLO-6.

action against the Highlands, *all based on rights the Highlands fraudulently stole from Acis.*

2. The Highlands' constant refrain that avoiding and returning the ALF PMA rights to Acis would result in an untenable "forced marriage" between HCLOF and Acis is flat wrong. There was a *legal marriage* between HCLOF and Acis LP pursuant to which HCLOF voluntarily agreed for Acis LP to serve as its portfolio manager and delegated to Acis LP broad rights to exercise all incidents of ownership over the Subordinated Notes, including the right to vote to reset or redeem the Acis CLOs to Acis. What the Highlands are really unhappy about is that the Court will not recognize their *illegal divorce*. There is nothing at all untenable about holding HCLOF to the terms of a contract with Acis into which it voluntarily entered. The fact that HCLOF is merely a puppet for HCM, willing to incur millions in losses to further HCM and Jim Dondero's agenda, is not a basis for the Court to deny a Plan Injunction mirroring relief already granted in the Highland Adversary aimed at maintaining the *status quo* until the Trustee's avoidance and other claims relating to the ALF PMA rights have been resolved.

3. The Highlands' contention that the Debtors and Brigade are somehow mismanaging the Acis CLOs is pure sophistry. The Trustee's evidence at trial will show that Brigade has substantially improved the economic position of the Acis CLOs, and that any loss in value to the Acis CLOs was a direct result of the build up in cash caused by the Highlands in an attempted stealth liquidation. Likewise, the Highlands' hyperbole that the Plan Injunction is improper and unprecedented also falls flat. Federal courts have the authority and routinely issue injunctions to preserve the *status quo* in avoidance actions so that the equitable relief requested will be available at the time of judgment.

4. Unable to overcome this well-settled authority, the Highlands confect an array of jurisdictional arguments hoping to obfuscate the issues and convince the Court that it cannot grant continued injunctive relief through the Plan Injunction. Specifically, the Highlands contend that the Court cannot issue the Plan Injunction because it lacks jurisdiction to enter a final order

in the Highland Adversary. The Highlands arguments are unavailing. The Court has subject matter jurisdiction to confirm the Plan, and *Stern*[4] does not affect the Court's jurisdiction to issue the Plan Injunction under section 105(a). Further, the Court has broad authority under sections 105(a), 1123(a)(5), and 1123(b)(6) to confirm a plan to fit the exigencies of a particular circumstance, so long as the plan does not violate any other sections of the Bankruptcy Code. The fact that HCLOF is not a creditor is irrelevant. Here, the Plan Injunction is necessary to implement the Plan and it does not violate any other provisions of the Bankruptcy Code.

5.     Moreover, although it is not particularly relevant to confirmation, the Court has subject matter jurisdiction and statutory authority to issue a final order on the Trustee's avoidance and other claims under 28 U.S.C. §§ 157(b) and 1334(b). Finally, the Court has constitutional authority to enter a final order on the Trustee's avoidance and other claims under *Stern* because such claims will need to be resolved in order to liquidate HCM's claim. In any event, the Highlands consented to the Court's authority to enter a final order granting injunctive relief by failing to raise the *Stern* issue before the Court entered the Preliminary Injunction and by dismissing their appeal of same. Consequently, contrary to the Highlands' suggestion, the only thing unprecedented about this case is the lengths to which the Highlands have gone (and the amount of money they have been willing to lose – and spend) to avoid paying approximately $8 million to Mr. Terry and a handful of other creditors.

6.     Further, as to the merits of the Plan Injunction, the Court has already decided in connection with the prior confirmation hearing that continued injunctive relief is appropriate. The Court's decision includes certain miscellaneous rulings to be used "for any future proposed plans,"[5] including a ruling that "there is a basis for keeping the preliminary injunction in place

---

[4] *Stern v. Marshall*, 564 U.S. 462 (2011).

[5] See Prior Confirmation Ruling [Docket No. 549] at p. 4.

pending determination of the Acis Trustee's fraudulent transfer lawsuits,"[6]  Completely ignoring

the Court's prior ruling, the Highlands seek another bite at the apple on their failed argument

that injunctive relief is not appropriate in this case.  The Highlands do not (and cannot) dispute

that Acis LP's rights under the ALF PMA were fraudulently transferred to Highland HCF to

hinder, defraud or delay creditors.  Instead, they argue that the ALF PMA rights will not permit

the Reorganized Acis, as the portfolio manager of HCLOF, to control the timing of the reset or

redemption of the Acis CLOs notwithstanding the ALF PMAs broad and unambiguous

delegation of authority to Acis to vote HCLOF's financial instruments and exercise all other

incidents of ownership over the Subordinated Notes.  The Highlands also continue to argue that

HCLOF is suffering irreparable harm but, as the Court has already found, any harm suffered by

HCLOF is self-inflicted and could be avoided by electing to do a reset under the Plan, selling its

interests in the Subordinated Notes in the market, or proposing its own plan.  Finally, and

unbelievably, the Highlands argue that injunctive relief is not necessary because the Trustee's

"concern for dissipation of assets by Highland and HCLOF is unfounded and baseless."[7]  Under

the circumstances of this case, including the concerted efforts of the Highlands to strip Acis LP

of its business and valuable assets to avoid paying an $8 million judgment, the Trustee's

concern that the Highlands will continue to act in a similar fashion is completely justified.

7.     Finally, the Highlands raise certain technical arguments regarding the Plan's

alleged non-compliance with the confirmation standards.  Such arguments likewise fail for the

reasons set forth below.

## II. <u>PROCEDURAL HISTORY</u>

8.     On May 25, 2018, the Trustee filed a request for status conference [Docket No.

239] to, *inter alia*, advise the Bankruptcy Court of a request for an optional redemption made by

---

[6] *Id.* at p. 6.

[7] See Objection, ¶ 76.

HCLOF. At the May 31, 2018 status conference, the Court issued a *sua sponte* temporary restraining order (the "First TRO") [Docket No. 256], which restrained and enjoined the Highlands from taking any action to effectuate the optional redemption requested by HCLOF or otherwise liquidate the Acis CLOs.

9.  The day after the expiration of the First TRO, on June 15, 2018, HCLOF issued a second round of optional redemption notices. In response, on June 21, 2018, the Trustee filed Adversary Case No. 18-03212-sgj (the "Trustee Adversary") seeking the entry of an *ex parte* temporary restraining order and preliminary injunction to prevent HCLOF from liquidating the Acis CLOs. The Court entered an *ex parte* temporary restraining order (the "Second TRO") on June 21, 2018 [Trustee Adv. Docket No. 3], which likewise enjoined the Highlands from taking any action to call for an optional redemption or otherwise liquidate the Acis CLOs.

10.  Following a full evidentiary hearing on July 6, 2018, the Court entered a *Preliminary Injunction Order* (the "Preliminary Injunction") [Trustee Adv. Docket No. 21], which enjoins the Highlands and certain other "Enjoined Parties" from: (i) taking any action in furtherance of an optional redemption or any other attempts to liquidate the Acis CLOs, (ii) trading any collateral of the Acis CLOs without the express written authorization of the Trustee, and (iii) sending any notice to the holders of the Acis CLOs in connection with the effectuation of any optional redemption, call or other liquidation of the Acis CLOs. The Preliminary Injunction is based on a number of preliminary fact findings and conclusions of law, including the following:

(a)  [P]ersons connected with Highland began implementing transactions that changed the Acis LP "CLO ecosystem" and impaired Acis LP's contractual rights, almost immediately after October 20, 2017 – the date that an individual named Joshua Terry obtained a multi-million arbitration award against Acis LP;[8]

(b)  Prior to October 27, 2017, Acis LP – not ALF – had authority to direct and effectuate an optional redemption under the PMAs. Acis LP had this authority pursuant to another Portfolio Management Agreement between Acis LP and

---

[8] Preliminary Injunction, ¶ 2,

ALF,[9] dated December 22, 2016 (the "ALF PMA");[10]

(c)     Significantly, on October 27, 2017, *just seven days after Joshua Terry's arbitration award, Acis LP effectively terminated its own portfolio management rights under the ALF PMA and transferred its authority and those valuable portfolio management rights – for no apparent value – to Highland HCF Advisors, Ltd. ("Highland HCF")*;[11]

(d)     Finally, HCLOF is using rights that appear to have been fraudulently transferred from Acis LP (i.e., rights under the ALF PMA) to attempt to effectuate the Optional Redemptions;[12]

(e)     The losses that would result in the event an injunction is not issued cannot be presently measured by any certain pecuniary standard, are not reasonably quantifiable, and cannot be adequately compensated with monetary damages; thus, creditors and interested third parties otherwise would have not adequate remedy at law.  The Optional Redemption would eliminate any chance of confirmation of a plan of reorganization based on the Oaktree Transaction, or a similar plan;[13]

(f)     If the Optional Redemption or other liquidation of the assets in the Acis CLOs is permitted to go forward, it would render the PMAs valueless.  Consequently, the Optional Redemption and any other attempts by HCLOF to liquidate the assets of the Acis CLOs would violate Section 362(a)(3) because such actions involve exercising control over property of the estate (the PMAs).  Thus, because the liquidation of the CLOs represents an 'act to obtain possession of property of the estate,' – namely, Acis LP's intangible property rights in the PMAs – such actions constitute a violation of Section 362(a)(3);[14] and,

(g)     Any alleged harm to Defendants is illusory and specious because, among other things, the Defendants have options available that immediately mitigate any purported damage.  Namely, Defendants could (1) authorize a "refinance" or "reset" transaction or (2) sell their equity to a third party in an amount that exceeds what they would receive in an Optional Redemption . . .. HCLOF's claimed harm is exaggerated.[15]

The Preliminary Injunction provides that it expires upon confirmation of any plan of

reorganization or conversion, unless further extended by the Court or by agreement, or until

---

[9] Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd.

[10] Preliminary Injunction, ¶ 3.

[11] Preliminary Injunction, ¶ 5 (emphasis in original).

[12] Preliminary Injunction, ¶ 10.

[13] Preliminary Injunction, ¶ 14.

[14] Preliminary Injunction, ¶ 13.

[15] Preliminary Injunction, ¶ 15.

such time as it may be dissolved, or the Highlands obtain relief from the automatic stay.

11. Meanwhile, in Adversary No. 18-03078-sgj (the "Highland Adversary"), the Trustee also filed his *Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (the "Counterclaims") [Highland Adv. Docket No. 84], in which he seeks, *e.g.*, to avoid the transfer of Acis LP's rights under the ALF PMA to Highland HCF as an intentionally and constructively fraudulent transfer under sections 544 and 548 of the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act ("TUFTA"), Tex. Bus. & Comm. Code § 24.001 *et seq.*, and recover such rights under section 550 of the Bankruptcy Code and/or section 24.008 of TUFTA.[16]

12. On September 9, 2018, the Court entered its ruling denying confirmation on the Trustee's prior plan (the "Plan Ruling") [Docket No. 549]. The Plan Ruling provides as follows:

**Miscellaneous Rulings**

The court rules on a few miscellaneous matters that were contested, although it is denying confirmation. This may be useful for any future appeals ***or for any future proposed plans.***

. . .

**Preliminary Injunction**

The preliminary injunction in place preventing HCLOF from pursuing optional redemptions will remain in place for now … ***There is also a basis for keeping the preliminary injunction in place pending determination of the Acis Trustee's fraudulent transfer lawsuits. The evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value— perhaps even the ability to control its own destiny when the ALF PMA was essentially terminated without cause and Acis was made to sell its shares in ALF/HCLOF back to ALF/HCLOF.*** In the face of these facts, the court will be reluctant to terminate the preliminary injunction until this litigation is fully resolved.

See Plan Ruling, p. 4-6 (emphasis added).

---

[16] Counterclaims, ¶¶ 55-64, 117-134, and 194-200.

13.     On October 25, 2018, the Trustee filed the current Plan, which includes the Plan Injunction. The Plan provides for HCLOF to obtain a "reset" of the Acis CLOs, which everyone agrees would improve the economics of the Acis CLOs, with the Reorganized Acis and Brigade Capital Management, L.P. ("Brigade"), as its sub-advisor. Except as necessary to effectuate a reset under the Plan, the Plan Injunction would likewise enjoin the Highlands from, *e.g.*, attempting to redeem or liquidate the Acis CLOs until the earlier of: (w) the entry of a final order resolving the Estate's avoidance claims relating to Acis LP's rights under the ALF PMA, (x) the date upon which all allowed claims have been paid, (y) the entry of an order by the Bankruptcy Court finding that a material default has occurred under the Plan, or (z) the entry of a subsequent order by the Bankruptcy Court providing otherwise with respect to one or more of the Acis CLOs.

### III.  ARGUMENTS AND AUTHORITIES

### A.     THE COURT HAS JURISDICTION TO APPROVE THE PLAN INJUNCTION.

14.     The Highlands argue that the Court has no authority to approve the Plan Injunction because the Court lacks the power to enter a final order in the Highland Adversary as to the Trustee's counterclaims for avoidance and recovery of fraudulent transfers because of the Supreme Court's holding in *Stern v. Marshall*, 564 U.S. 462 (2011). The Highlands are mistaken. First, the only relevant jurisdiction is the Court's jurisdiction to confirm the Plan and approve the Plan Injunction. Those are core matters under 28 U.S.C. §§ 1334(b) and 157(b)(2)(L) and 11 U.S.C. § 105(a). Second, if jurisdiction of the Highland Adversary is relevant, the Court has statutory jurisdiction to hear and finally determine all the causes of action in the Highland Adversary. Third, *Stern* does not divest the Court of jurisdiction because liquidation of HCM's claim will necessarily require that the Court resolve the Trustee's fraudulent-transfer counterclaims. Fourth, even if *Stern* would otherwise deprive the Court of final-order authority, the Highlands consented to this Court's exercising such authority in the Trustee's Adversary and therefore cannot complain now that the Court has no power to issue

the Plan Injunction as a final order.

15.     The Highlands' remaining arguments regarding jurisdiction and the Plan Injunction likewise fail.  As the Court has already determined, the Plan Injunction does not amend the CLO Indentures or the PMAs, nor is it an unconstitutional taking of HCLOF's property.  Further, the Highlands' arguments pertaining to Guernsey law are a red herring because (i) the Reorganized Acis would not need to obtain specific performance in Guernsey, and (ii) even if it did, such remedy is available.  Finally, as the Court previously found in relation to the CLO PMAs, the ALF PMA is not a personal services contract.

### 1.      *Stern Does Not Affect the Court's Jurisdiction to Issue the Plan Injunction under Section 105(a)*

16.     The Highlands aim at the wrong target when they attack the Court's jurisdiction and/or constitutional power over the causes of action in the Highland Adversary because they are not relevant to the Court's authority to confirm the Plan or to approve the Plan Injunction. The Court clearly has final-order authority to confirm the Plan as a core proceeding under 28 U.S.C. § 157(b)(2)(L). *In re Hallwood Energy, Ltd. P'ship*, No. 09-31253, 2009 Bankr. LEXIS 5099 at *3 (Bankr. N.D. Tex. Oct. 16, 2009). *See Maas v. Northstar Educ. Fin., Inc. (In re Maas)*, 497 B.R. 863, 864 (Bankr. W.D. Mich. 2013) (*Stern*'s narrow holding does not apply to an order confirming a chapter 11 plan). Accordingly, there can be no doubt that this Court has jurisdiction and the power to enter a final order confirming the Plan.

17.     The fact that the Plan includes the Plan Injunction does not affect the Court's jurisdiction to confirm the Plan. The Court has authority to issue the Plan Injunction under section 105(a) of the Bankruptcy Code. That provision states as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

Section 105(a) is essentially an all-writs act that "grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1188 (7th

Cir. 2015). It is a creature of bankruptcy law, and therefore the *Stern* analysis does not apply. *In re Direct Media Power, Inc.*, 582 B.R. 739, 742 (Bankr. N.D. Ill. 2018) ("The court's section 105 powers arise only in bankruptcy and are essential to the administration of bankruptcy matters. . . . As such, the exercise of those powers is squarely within the court's constitutional authority"). In any event, the Plan Injunction is a temporary injunction, not a final dispositive judgment. For these reasons, the Court has constitutional authority and statutory jurisdiction to issue a final order confirming the Plan and approving the Plan Injunction.

> **2.      The Court Has Authority Under Sections 105(a), 1123(a)(5) and 1123(b)(6) to Enter the Plan Injunction**

18.      The Highlands also contend that the Court cannot enjoin a non-creditor from taking actions with respect to its own property.[17] As an initial matter, although it is not a creditor, HCLOF is hardly a stranger to the Court and these bankruptcy proceedings.  It is a defendant in the Trustee Adversary and a Plaintiff in the Highland Adversary.  In fact, it has participated in this case since before the entry of the order for relief.  Moreover, the Trustee asserts that HCLOF and Highland HCF are alter egos of HCM, which is a creditor in this case.  (See Counterclaims, ¶¶ 242-248).  Indeed, in its Plan Ruling, the Court noted that:

> While HCLOF is not itself a creditor (and while "the Highlands" entity separateness is not being challenged, and is not being disregarded by either the Acis Trustee, the court, or anyone else at this juncture), *the court notes that HCLOF, Highland, and other Highland-related parties seem to work in tandem.  Highland asserts a claim against Acis.  Actions taken by HCLOF could be construed to be actions of Highland, an actual creditor.*

See Plan Ruling, p. 6 (emphasis added).  Thus, the Court has already seen that on multiple occasions that HCLOF is acting to further HCM's agenda, even where such actions cause substantial losses to HCLOF.

19.      Further, and significantly, the Highlands contend that the Court lacks the

---

[17] See Objection, ¶ 32.

authority to enjoin HCLOF from taking actions "*with respect to its own property.*"[18]  The fallacy

with the Highlands' position is that the Trustee is not asking the Court to enjoin HCLOF, a non-

creditor, from taking actions with respect to its own property.  The actions the Highlands want to

take stem from property rights that were fraudulently stolen from Acis – namely, Acis LP's rights

to "exercise all incidents of ownership" over the subordinated notes, including the right to vote

the financial instruments for the purpose of effectuating a reset or refinancing transaction.  Here,

it is HCLOF's status as an adversary defendant and alleged alter ego to HCM, acting in respect

to valuable property rights fraudulently stolen from Acis, that provide the basis for the injunction.

The fact that HCLOF is not a creditor is irrelevant.

20.     Moreover, the fact that HCLOF is not a creditor of the Debtors does not limit this

Court's authority to approve the Plan Injunction. In *In re Ingersoll, Inc.*, 562 F.3d 856 (7th Cir.

2009), the Seventh Circuit upheld the bankruptcy court's confirmation of a plan that released a

non-creditor's claims against non-debtors, where the release was enforced through a

section 105(a) injunction. *Id.* at 865. The court noted that the complaining party's status as a

non-creditor made the case "one step removed" from the more common scenario where a

*creditor* is enjoined from proceeding against a non-debtor. *Id.* That fact, however, did not affect

the analysis. While cautioning that such a release and injunction are not "always – or even

normally -- valid," under the circumstances of the case – where the release was "narrowly

tailored and critical to the plan as a whole" and where the affected non-creditor had fair notice

and an opportunity to object, the bankruptcy court acted within its authority. *Id.* "And there is

nothing in the Bankruptcy Code that tells us otherwise." *Id.*

21.     *Ingersoll* is consistent with a line of cases which observe that Congress intended

to give a chapter 11 plan proponent a high degree of flexibility in crafting a plan of

---

[18] Id.

reorganization that meets the exigencies of the particular case.

> Each chapter 11 case is unique. Chapter 11 cases—whether individual or corporate—run the gamut from simple to exceedingly complex. It would be impossible for Congress to anticipate every possible tool a debtor would need to restructure its business. To be sure, when Congress passed the Bankruptcy Reform Act of 1978, it created a single chapter for reorganizing all types of businesses. But it was designed to provide debtors with as much flexibility as possible to formulate a plan. As one former bankruptcy judge observed, "the extraordinary flexibility of chapter 11 has proven itself in handling a wide panoply of business enterprises—and business problems."

*In re Scrub Island Dev. Group Ltd.*, 523 B.R. 862, 874 (Bankr. M.D. Fla. 2015) (quoting Hon.

Leif M. Clark, Chapter 11 – Does One Size Fit All?, 4 Am. Bankr. Inst. L. Rev. 167, 167-68

(Spring 1996)); *see also id.* at 865 ("The Bankruptcy Code provides a chapter 11 debtor with

great flexibility to formulate a plan—limited only by the debtor's creativity and the prohibition in

§ 1123(b)(6) that the plan provisions not be in 'inconsistent' with the Bankruptcy Code").

22.     The Bankruptcy Code requires that a plan "provide adequate means for the

plan's implementation," and then offers a non-exhaustive list of elements by which a plan might

be implemented. 11 U.S.C. § 1123(a)(5). Additionally, a plan may "include any other appropriate

provision not inconsistent with the applicable provisions of this title." *Id.* § 1123(b)(6). The latter

statute, in particular, gives bankruptcy courts "residual authority" to confirm a chapter 11 plan

that includes creative solutions to the specific challenges of the case, so long as no other

provision of the Bankruptcy Code is violated. *United States v. Energy Res. Co.*, 495 U.S. 545,

549 (1990); *Ingersoll*, 562 F.3d at 864. A bankruptcy court may effectuate its "residual authority"

through section 105(a), which empowers the court to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a);

*Ingersoll*, 562 F.3d at 864.

23.     In *Energy Resources*, the Supreme Court upheld confirmation of a chapter 11

plan that forced the IRS to apply payments to the debtor's trust-fund tax liability first, then to its

non-trust-fund tax obligation. *Id.* at 551. The IRS had objected to confirmation on the grounds

that, outside of bankruptcy, a taxpayer in the debtor's position could not compel the IRS to apply

these payments in this way. However, the Court reviewed Bankruptcy Code sections 105(a), 1123(b)(6), and 1129 and found them "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *Id.* at 549. Because the IRS could not point to a specific statute that was being violated, the bankruptcy court properly confirmed the plan. *Id.* at 551.

24.     In *In re Scrub Island Development Group Ltd.*, 523 B.R. 862 (Bankr. M.D. Fla. 2015), the court used section 105(a) to approve a plan injunction that restrained a bank creditor from suing non-debtors so long as the debtor was not in default on its payment obligations under the plan. *Id.* at 876. The injunction was appropriate as a provision of the plan under section 1123(a)(5) and (b)(6), and the court had authority to approve the injunction under section 105(a) as the injunction did not violate any provision of the Bankruptcy Code. *Id.* at 875.

25.     In *In re G-I Holdings Inc.,* 420 B.R. 216 (Bankr. D.N.J. 2009), the court confirmed a plan that incorporated a pre-confirmation tolling agreement between the debtors, their affiliates, and the IRS which limited the IRS's right to pursue the non-debtor affiliates for tax liability. The IRS objected to the plan's incorporation of the tolling agreement on several grounds, including that the plan effectively discharged non-debtors in violation of section 524(e). The court held that incorporation of the tolling agreement in the plan was permissible under section 1123(b)(6) as it did not violate any other part of the Bankruptcy Code. *Id.* at 278. Going further, the court stated that it would have had authority to approve the incorporation of the tolling agreement in the plan *as an injunction*: "[S]ections 105(a) and 1123(b)(6) of the Bankruptcy Code provide this Court with authority to issue orders 'necessary to the success of a reorganization plan,' even when that authority is not specifically designated by the Bankruptcy Code." *Id.* at 279 (citing *Energy Resources*, 495 U.S. at 549). Finding that the IRS's compliance with the tolling agreement was critical to the debtors' reorganization efforts, the court concluded that an injunction under section 105(a) would be appropriate. *Id.*

26. *Ingersoll* is part of the line of cases reading together sections 1123(a)(5), 1123(b)(6), and 105(a). They teach that a bankruptcy court has wide latitude to confirm a chapter 11 plan that has provisions narrowly tailored and necessary to meet the unique challenges of the particular case and that do not violate another provision of the Bankruptcy Code. The fact that such a plan provision affects the rights of a non-creditor is not a valid basis for an objection. *Ingersoll*, 562 F.3d at 865. In this case, the Plan Injunction is just such a provision. It is temporary and necessary to protect and preserve valuable property rights stolen from Acis, and approval of it will not transgress any other provision in the Bankruptcy Code. HCLOF's status as a non-creditor does not affect the analysis in any way. Indeed, significantly, the Highlands have not identified any provision of the Bankruptcy Code which is violated by the proposed Plan Injunction.

27. As discussed, this Court is statutorily empowered to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of title 11. 11 U.S.C. § 105(a). Issuance of the Plan Injunction is "necessary [and] appropriate to carry out the provisions" of the Bankruptcy Code. The bankruptcy court's power under section 105(a) is not open-ended. Only such orders as are "necessary to further the substantive provisions of the Bankruptcy Code" are appropriate. *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt.)*, 4 F.3d 1329, 1333 (5th Cir. 1993). Section 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (footnote and citations omitted); *see also Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 760 (5th Cir. 1995) ("Although we interpret § 105 liberally, . . . a § 105 injunction must be consistent with the rest of the Bankruptcy Code") (citations omitted).

28. The Plan Injunction is consistent with Fifth Circuit precedent. The Plan Injunction would not affect the liability of any entity, or the liability of any property. The injunction would only temporarily prohibit the Highlands from exercising one form of economic recourse, thereby

preserving the *status quo* while the Trustee has a fair opportunity to prosecute the avoidance claims relating to the ALF PMA Transfer. *See In re Seatco, Inc.,* 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan). Likewise, the proposed injunction does not contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules. *Compare Omni Mfg. v. Smith (In re Smith)*, 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Oxford Management*, 4 F.3d at 1334 (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Sutton*, 786 F.2d at 1308 (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)). The Plan Injunction is appropriate as a plan provision under section 1123(a)(5) and (b)(6), and as an exercise of the Court's judicial power under section 105(a).

### 3.    The Court Has Statutory Jurisdiction Over the Highland Adversary

29.    Even if the Court's subject-matter jurisdiction over the Highland Adversary is relevant to the Court's power to issue the Plan Injunction, the Court has that jurisdiction under the applicable federal statutes. The district courts of the United States are granted "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). A proceeding to avoid and recover a fraudulent transfer in a bankruptcy case is a proceeding "arising under" title 11. *See In re Rosenberger*, 400 B.R. 569, 572 (Bankr. W.D. Mich. 2008) ("Bankruptcy avoidance actions . . . have consistently been held to be proceedings which 'arise under' the Bankruptcy Code"). The Trustee's counterclaims include causes of action for avoidance and recovery of fraudulent transfers pursuant to sections 544, 548, and 550 of the Bankruptcy Code.  See Counterclaims at pp. 32-59. Adjudication of these causes will "depend upon the application or construction of bankruptcy law as expressed in title 11," which is the defining characteristic of "arising under" jurisdiction. *Silverman v. General Ry. Signal Co. (In re LECO Enters.),* 144 B.R. 244, 248 (S.D.N.Y. 1992); *see also Milbank v. Sharpshooter II, Inc. (In re Worldwide Diamond Ventures,*

*LP)*, 559 B.R. 143, 145-46 (Bankr. N.D. Tex. 2016) (court had jurisdiction under § 1334 over fraudulent-transfer action). Therefore, the Court clearly has subject-matter jurisdiction over the Trustee's counterclaims in the Highland Adversary under section 1334.

30.     Once statutory jurisdiction is established, the bankruptcy courts are granted authority to "hear and determine . . . all core proceedings arising under title 11, or arising in a case under title 11 . . . and may enter appropriate orders and judgments . . . ." 28 U.S.C. § 157(b). "Core proceedings" include "proceedings to determine, avoid, or recover fraudulent conveyances." *Id.* § 157(b)(2)(H). Given the multitude of causes of action, including alter ego and conspiracy, contained in the Highland Adversary, the Court has subject-matter jurisdiction of, and statutory authority to issue a final order on, the Trustee's counterclaims for avoidance and recovery of fraudulent transfers.

### 4.     The Court Has Constitutional Authority to Enter a Final Order under *Stern v. Marshall*

31.     Even though title 28 clearly provides statutory jurisdiction for the Court to enter a final order on the Trustee's counterclaims in the Highland Adversary, the Highlands maintain that such jurisdiction would be unconstitutional under the Supreme Court's opinion in *Stern v. Marshall*, 564 U.S. 462 (2011). However, the *Stern* case does not require or even support the result the Highlands seek. This is true for two reasons. First, *Stern* does not deprive this Court of constitutional authority and the Court may enter a final order on the fraudulent-transfer actions because the Trustee's counterclaims must be resolved in order to adjudicate HCM's claim. Second, even if the holding in *Stern* would otherwise divest this Court of final-order authority to issue the Plan Injunction, the Highlands have waived any right to raise the objection.

#### (a)     This Court Has Constitutional Authority to Enter a Final Order on the Fraudulent-Transfer Actions Because They Will Need to Be Resolved to Liquidate HCM's Claim.

32.     Even if *Stern* can be read as applying to a fraudulent-transfer action brought by an estate representative, the test for final-order authority is met because the Trustee's

fraudulent-transfer counterclaims will need to be decided in order to establish the validity and extent (if any) of HCM's claim in these cases. On August 1, 2018, HCM filed a proof of claim, Claim No. 27, in Acis LP's case. In the *Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* [Docket No. 84 in the Highland Adversary] (the "Amended Counterclaims"), filed by the Trustee on November 13, 2018, the Trustee objected to HCM's claim on several grounds, including under section 502(d) of the Bankruptcy Code, which provides that the claim of a recipient of an avoidable transfer must be disallowed unless and until the recipient repays the money or returns the subject property to the estate. 11 U.S.C. § 502(d). For this reason, liquidation of HCM's claim cannot occur until the fraudulent-transfer actions are resolved. *Cf. U.S. Bank N.A. v. Verizon Communs., Inc.,* 761 F.3d 409, 425 (5th Cir. 2014) (no right to jury trial in fraudulent-transfer action where trustee objected to creditor's claim under § 502(d); resolution of claim will necessarily require resolution of fraudulent-transfer action), *cert. denied*, 135 S. Ct. 1430 (2015).

33.     In the Highland Adversary, the Trustee has asserted alter ego, conspiracy to appropriate the business of Acis and other remedies and causes of action which, if successful, would result in the Highlands, including Highland HCF Advisor, Ltd., Highland CLO Management, Ltd., and Highland CLO Holdings, Ltd. each being liable for damages to the same extent as each of the other entities. The Trustee's entitlement to these remedies has not yet come before the Court. However, the Trustee has alleged and will show at the appropriate time that, for example, HCM is liable to the Trustee for recovery of the fraudulent transfer of the ALF PMA to the same extent as if it were the initial transferee of the ALF PMA.

34.     The Trustee is confident that he will prevail on his alter ego and other theories of vicarious liability. At minimum, the Trustee would urge the Court to defer any determination that it lacks authority to enter a final order until it becomes apparent whether resolution of HCM's claim will require adjudication of the fraudulent-transfer actions.

### (b) The Highlands Have Consented to the Court's Authority to Enter a Final Order

35.      Last, even if the holding in *Stern* would otherwise divest this Court of final-order authority to issue the Plan Injunction, the Highlands have waived any right to raise the objection. A *Stern* objection is effectively waived if a litigant knowingly and voluntarily consents to the bankruptcy court's exercising final-order authority in a matter that would otherwise be outside the court's judicial power under *Stern*. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015). Consent may be express or implied. *Id.* Here, the Highlands have consented to this Court's final-order authority in these cases.

36.      On June 21, 2018, the Trustee commenced the Trustee's Adversary by filing his Complaint along with a Motion for an Ex Parte Temporary Restraining Order [Docket No. 2 in the Trustee's Adversary] (the "TRO Motion"). Both the Complaint and the TRO Motion sought injunctive relief against the Highlands and related parties that is considerably broader in scope than the Plan Injunction. On the same day, the Court entered an Ex Parte Temporary Restraining Order [Docket No. 310 in the main case] (the "Second TRO")[19] granting the injunctive relief that the Trustee requested.

37.      The Highlands did not object to the Court's authority to enter the Second TRO. On the contrary, the Highlands agreed to an extension of the injunction through July 9, 2018. *See* Agreed Extension of Temporary Restraining Order, June 29, 2018, at pp. 6-7 [Docket No. 14 in the Trustee's Adversary].

38.      On July 10, 2018, the Court entered its Preliminary Injunction Order [Docket No. 21 in the Trustee's Adversary], effectively continuing the injunctive relief granted in the Second TRO until confirmation of a plan, conversion of the cases, the defendants' obtaining relief from the automatic stay, or as provided by further order of the Court. The Highlands filed a

---

[19] The "first TRO" was entered on the Court's own motion on June 6, 2018. *See* Docket No. 256 in the main case.

Notice of Appeal [Docket No. 22 in the Trustee's Adversary] of the Preliminary Injunction Order and two other orders: the Court's order denying the Highlands' request for a preliminary injunction in the Highlands' Adversary, and the Court's order granting certain relief in respect of Oaktree Capital Management, L.P. In conjunction with their appeal, the Highlands filed a Statement of Issues, which included the Court's subject-matter jurisdiction as an issue on appeal. *See* Docket No. 30 in the Trustee's Adversary.

39.    However, on November 1, 2018, the Highlands moved to dismiss their appeal. *See* Unopposed Motion to Dismiss Appeal [Docket No. 30 in U.S. Dist. Cause No. 3:18-cv-01810-D]. Accordingly, at this time, the Highlands have no extant objection or appeal concerning the Court's jurisdiction or judicial power in these cases.

40.    The Highlands' active participation in these cases and adversary proceedings; their agreement, without reservation, to extend the Second TRO; and their dismissal of the appeal premised in part on the issue of the Court's subject-matter jurisdiction constitute knowing and voluntary consent to this Court's judicial power to enter final orders in these cases.  In fact, certain of the Highlands are plaintiffs in the Highlands Adversary.  Indeed, by failing to raise its *Stern* objection before the Court entered the Preliminary Injunction Order, the Highlands consented to the Court's final-order authority. *See Frazin v. Haynes & Boone, LLP (In re Frazin),* Nos. 02-32351-bjh-13, 08-3021-bjh, 2017 Bankr. LEXIS 4378 at *45 (Bankr. N.D. Tex. Dec. 22, 2017). By appealing the Preliminary Injunction Order on the issue (among others) of subject-matter jurisdiction *and then dismissing the appeal*, the Highlands' consent to this Court's judicial power was made even more clear. *See Milbank v. Sharpshooter II, Inc. (In re Worldwide Diamond Ventures, LP),* 559 B.R. 143, 146 (Bankr. N.D. Tex. 2016) (consent was effective when litigant withdrew prior request for jury trial).[20]

---

[20] Moreover, the fact that the Highlands have consented to this Court's adjudication by final order means that the Court has full judicial power with respect *all* of the Trustee's fraudulent-transfer actions, even those that concern transfers as to which HCM or HCLOF was not the initial transferee. *See* 11 U.S.C. § 550(a) (recovery for an

**5.    The Highland's Remaining Arguments Regarding Jurisdiction and the Plan Injunction Lack Merit.**

**(a)    The Plan Injunction Does Not Amend the Indentures**

41.    The Highland's assert that the Plan Injunction is a prohibited attempt by the Trustee to amend the CLO indentures.  However, there are obvious legal and practical distinctions between amending the indentures and temporarily enjoining the Highlands from exercising rights under the indentures.  A contractual amendment would permanently modify the rights of the parties to the indentures.  The Plan Injunction, by contrast, *does not* permanently amend the indentures; instead, it merely maintains the status quo by temporarily enjoining the Highlands from liquidating the collateral in the Acis CLOs until the earlier of:  (i) the entry of a final order on the Trustee's avoidance claims relating to the ALF PMA Transfer, (ii) the payment in full of creditors, (iii) the entry of an order finding that a material default under the Plan has occurred, or (iv) the entry of an order by the Bankruptcy Court providing otherwise.[21]  Indeed, the Plan Injunction does not permanently modify the rights of any parties under the indentures. Consequently, as the Court correctly observed at the hearing to consider conditional approval of the disclosure statement:

> I know it's not an amendment to an indenture anymore.  And I know it is not only not an amendment of indentures anymore, but it's just directed to litigation parties, people who have already -- parties who have already been sued or I guess are on the list to be sued based on the pre-petition transfers of rights and assets.[22]

Consequently, based on the changes to the Plan Injunction incorporated into the Plan, the Highland's contention that the Plan Injunction impermissibly modifies the indentures is

---

avoidable transfer may be obtained from an "entity for whose benefit such transfer was made"); *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.)*, 408 F.3d 689, 703 (11th Cir. 2005) (estate does not have to seek recovery from initial transferee before proceeding against other parties liable under § 550).

[21] *See* Plan, § 14.03.

[22] Transcript, October 24, 2018 at 116:16-21.

inapposite.[23]

### (b) The Plan Injunction Is Not an Unconstitutional Taking of HCLOF's Property

42.     HCLOF's assertion that the Plan Injunction would somehow constitute an unconstitutional taking of HCLOF's property without its consent similarly fails.  The Plan Injunction does not involve any taking of HCLOF's property whatsoever.  As a practical matter, HCLOF is complaining because the Preliminary Injunction temporarily enjoins the Highlands from exercising rights they stole from Acis LP before the Debtors' estate has an opportunity to recover those rights in the Highland Adversary.  Under the circumstances, maintaining the status quo through the Plan Injunction to ensure that Acis LP's rights under the ALF PMA (and, in turn, in the CLO PMAs) are not rendered valueless through the liquidation of the collateral in the Acis CLOs is permissible under both the applicable caselaw and the statutory language of TUFTA.  Further,  as discussed above, the fact that the Court previously found that HCLOF is not a creditor of the Debtors is irrelevant to its ability to bind it through the Plan Injunction.[24]  The Court's ability to maintain injunctive relief through the Plan Injunction is premised on the fact that the rights the Highlands are seeking to exercise through an optional redemption were fraudulently transferred out of Acis LP for no consideration to avoid payment of Acis LP's legitimate creditors and has nothing to do with whether or not HCLOF is a creditor.

43.     Next, the Highlands' contention that Acis has no business to reorganize is also untrue (and belied by the Highlands' repeated attempts to steal it from Acis).  Specifically, Acis is the portfolio manager to the Acis CLOs, for which it receives portfolio management fees in an amount capable of paying creditors in full within two years under the Plan regardless of whether

---

[23] The Highlands also contend that the fact that the Indentures are on the list of executory contracts to be assumed supports their contention that the Trustee seeks to amend the indentures.  However, because the Debtors are not parties to the indentures, they will not be on the final list of contracts to be assumed attached to the confirmation order.

[24] *Ingersoll*, 562 F.3d at 865.

HCLOF decides to request a reset of the Acis CLOs. Indeed, the only unsecured claims at risk of not receiving payment in full if a reset is not requested are class 4 insider claims (*i.e.,* HCM's claims), which the Trustee believe will be either offset entirely or equitably subordinated. However, in the unlikely event HCM does end up with an allowable claim, the Highlands can elect a reset under the Plan and ensure that the claim is paid in full. If the Highlands decide to act against their own economic best interest, and do not request a reset of the Acis CLOs, the only parties that will be harmed by that decision are the Highlands themselves.

44.     In addition, Mr. Terry intends to generate new business for Acis. As Mr. Dondero previously acknowledged in his deposition during the involuntary case, "there's always the ability for an RIA [registered investment advisor] to resurrect its reputation, and if it's got a unique and differentiated product offering, you can raise money for new investors."[25] Thus, in addition to potentially being able to reset the Acis CLOs after the ALF PMA rights have been restored, Mr. Terry (who was primarily responsible for raising the initial Acis CLOs) is perfectly capable of marketing the Acis brand, developing new portfolio management business, and raising new CLOs.

45.     There is also no basis for the Highlands' contention that the reset option under section 6.08 of the Plan, which would be performed by the Reorganized Acis and its sub-advisor, Brigade, is not possible or that the terms of any proposed reset would be unfavorable to HCLOF because no one will want to work with the Reorganized Acis. The Highlands' argument fails because it rests on the faulty premise that HCLOF would be compelled to do a reset against its will. Instead, the Plan contemplates a consensual reset requested by HCLOF. Alternatively, a reset of the Acis CLOs would not be performed until the Reorganized Acis has recovered the ALF PMA rights, including the right to vote the sub-notes and effectuate an

---

[25] Deposition testimony of J. Dondero, March 19, 2018, p. 109:6-11 (except attached as **Exhibit E).**

optional redemption.  The testimony at the prior confirmation hearing already established that the Reorganized Acis will be able to perform a reset of the Acis CLOs.[26]  The sad fact is that any reluctance by the market to do a reset, or any unfavorable pricing of a reset, will be due to the market's resistance to become involved with the Highlands, which have not sponsored a new CLO in more than a year, *and not* because industry participants would have any issue performing a reset at the request of the Reorganized Acis and Brigade.

46.     Finally, the statement in the Objection that HCLOF "never bargained for investment into CLOs managed by Brigade, Josh Terry, or anyone other than Highland when it invested in the equity notes" (see Objection, ¶ 98) is completely baseless.  The fact is that Acis LP and Mr. Terry were managing the Acis CLOs when HCLOF acquired its subordinated notes, and the Reorganized Acis and Brigade are perfectly capable of managing them today.  If HCLOF wanted to ensure that only HCM would be able to manage or sub-advise the Acis CLOs it could have made that a condition of its original investment.  It did not do so and cannot now insist upon requiring HCM as the portfolio manager of the Acis CLOs.

### (c)     The Reorganized Acis Will Not Need to Enforce Anything in Guernsey – but, Specific Performance Is Available If It Does

47.     Although the Court has already found that it has personal jurisdiction over HCLOF,[27] the Highlands contend that any equitable relief granted avoiding the termination of the ALF PMA would not be enforceable in Guernsey.  In other words, HCLOF apparently contends that it does not intend to honor an order from this Court avoiding the termination of the ALF PMA.  However, and importantly, the Highlands never explain why enforcement of an avoidance judgment in Guernsey would be necessary.

48.     Here, the Estate's intangible rights under the ALF PMA are subject to Texas

---

[26] See Transcript, August 28, 2018 (AM) at pp. 53:20-54:4 and 57:17-58:16.

[27] See *Order on Highland CLO Funding, Ltd.'s Motion to Dismiss* [Highland Adversary, Dkt. No. 80] ("The portion of the HCLOF MTD dealing with lack of personal jurisdiction over HCLOF {pursuant to F.R.C.P. 12(b)(2)} is denied for the reasons stated on the record at the Hearing.").

law.[28] Further, even if the Highlands ignored a judgment from this Court avoiding the fraudulent transfer of Acis LP's rights under the ALF PMA, Acis LP is also the portfolio manager of the Acis CLOs and, therefore, would not be obliged to take instructions from Highland HCF or any other Highland affiliate purporting to act for HCLOF in violation of this Court's judgment. Likewise, the Indentures are subject to New York law and the Indenture Trustee, U.S. Bank, would also be subject to any rulings by the Court. Consequently, neither the Trustee nor the Reorganized Acis would have any need to go to Guernsey to enforce an avoidance judgment.

49.     Moreover, any dispute between HCLOF and the Reorganized Acis pursuant to the ALF PMA will be subject to arbitration in Dallas, Texas.[29] Consequently, there would be no reason to go to Guernsey at all when HCLOF has already consented to binding arbitration in Dallas, Texas to resolve any disputes arising under the ALF PMA. Regardless, even if enforcement of an avoidance judgment in Guernsey is necessary, the Trustee will present evidence at the confirmation hearing that specific performance of a judgment granting equitable relief in a fraudulent transfer case by a United States Bankruptcy Court would be subject to enforcement through specific performance under Guernsey law.[30]

### (d)     The Appeal of the Order for Relief Did Not Divest the Court of Jurisdiction to Confirm the Plan

50.     In paragraph 21 of the Objection, the Highlands incorporate by reference the objection to the Plan filed by Neutra, which asserts that the pending appeal of the Orders for Relief divested the Court of subject matters jurisdiction to confirm the Plan. The Trustee has filed a separate response to the Neutra objection, which is incorporated herein by reference as though set forth at length herein.

---

[28] See ALF PMA, § 15(e).

[29] See ALF PMA § 15(f).

[30] See *Expert Report of Advocate Todd McGuffin on Issues of Guernsey Law*, a copy of which is attached hereto as **Exhibit B.**

### (e)    The ALF PMA Is Not a Personal Services Contract

51.     The Highlands argue that Acis LP cannot assume the ALF PMA, because the

ALF PMA (like the CLO PMAs) is a non-assignable personal service contract.  Section 365(c)(1)

of the Bankruptcy Code limits a trustee's right to assume or assign a contract if the other party

to the contract is excused by "applicable law" from accepting performance from or rendering

performance to "an entity other than the debtor or the debtor in possession."  The exception

under section 365(c)(1) "to the general rule of the assignability of contracts was intended by

Congress to be applied narrowly and to such circumstances as contracts for the performance of

nondelegable duties." *In re Grove Rich Realty Corp.*, 200 B.R. 502, 506 (Bankr. E.D.N.Y. 1996).

"The genesis of this 'applicable law which excuses a party . . . from accepting performance from

or rendering performance to' one other than the contracting party . . . is rooted in the long

standing rule that courts of equity will not order specific performance of personal service

contracts.' *In re Ontario Locomotive & Indus. Ry. Supplies, Inc.*, 126 B.R. 146, 148 (Bankr.

W.D.N.Y. 1990).

52.     The Highlands argue that HCLOF is excused by Texas law from accepting

performance from Reorganized Acis because the ALF PMA is a personal services contract

entered into by HCLOF/ALF in reliance on the skill and expertise of Highland and related

persons, such as Jim Dondero, Mark Okada, Trey Parker or Hunter Covitz.  HCLOF's belief is

not the controlling factor in determining whether the ALF PMA is a personal services contract.

53.     The ALF PMA is not a personal services contract.  The Highlands made the

same argument in connection with the Trustee's prior plan as to the CLO PMAs.  In the Plan

Ruling, the Court determined the CLO PMAs were not personal services contracts.  The ALF

PMA is not a personal service contract based on the same reasoning.  Instead of restating the

analysis, the Trustee incorporates by reference the Plan Ruling at pages 4-6.  Because the ALF

PMA is not a personal services contract, it is assignable; thus, it is certainly assumable under

the Plan.

**B.      THE PLAN INJUNCTION IS WARRANTED UNDER THE FED. R. CIV. P. 65 REQUIREMENTS**

54.      The Court has already ruled, on numerous occasions, that the Trustee is entitled to injunctive relief pending the resolution of his avoidance claims against the Highlands.  Indeed, in the Court's ruling following the prior confirmation hearing, the Court made a miscellaneous ruling, for the purposes of "any future proposed plans," that "***[t]here is also a basis for keeping the preliminary injunction in place pending determination of the Acis Trustee's fraudulent transfer lawsuits.***"[31]  The circumstances providing the basis for injunctive relief granted to the Trustee on multiple occasions has not changed.

55.      Although the Court has already determined that continued injunctive relief is appropriate, the Trustee will nevertheless address the Rule 65 factors.  First, the Debtors and their creditors will be irreparably harmed if the Preliminary Injunction is dissolved.  The destruction of the going concern value of Acis LP is a classic example of irreparable harm.  Acis LP's valuable rights under the ALF PMA, as well as all value under the PMAs with the Acis CLOs, would be destroyed if the Acis CLOs are liquidated.  Further, because the preferred remedy in an avoidance action is the return of the property itself (here, the ALF PMA rights), the Court *and not* the Highlands gets to determine the remedy for the Trustee's avoidance claims.  Consequently, the Plan Injunction is necessary to preserve the value of Acis LP's rights under the ALF PMA until the merits of the Trustee's claims relating to the ALF PMA have been adjudicated.

56.      In addition, the harm alleged by the Highlands is either self-inflicted or illusory and specious because (i) HCLOF can sell its equity positions on the open market at any time or could have sold at a premium to Oaktree, (ii) HCLOF can obtain a reset of the Acis CLOs under the Plan, (iii) HCLOF has no contractual right under the indentures to dictate who the portfolio

---

[31] See Plan Ruling [Docket No. 549], at pp., 4 and 6 (emphasis added).

manager or sub-advisor of any reset CLOs will be, and (iv) the Highlands at any time could have proposed an alternative plan which pays creditors in full. Finally, the balance of the equities and public policy also strongly favor confirming the plan, including the Plan Injunction. Among other things, the Highlands are not entitled to any equitable consideration or relief because they come to Court with unclean hands.

57.     Through their actions both pre-petition and throughout the course of this case, the Highlands have made it abundantly clear that they will stop at nothing to appropriate the going concern value of the Acis business, destroy what would remain of Acis' business, and prevent it from being able to pay legitimate creditors' claims. In order to do this, however, they must exercise rights fraudulently stolen from Acis – i.e., Acis LP's rights under the ALF PMA. The Trustee has asserted a number of avoidance claims against the Highlands, including claims to avoid and recover Acis LP's rights under the ALF PMA. In order to preserve the *status quo* until such time as the avoidance claims against the Highlands have been determined, the Plan seeks to continue the injunctive relief granted in the Preliminary Injunction. To be entitled to continued injunctive relief, the Trustee must show: (a) a substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the defendant; and (d) the injunction is in the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. v. Bell,* 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales,* 164 F.3d 221, 224 (5th Cir. 1998).

### 1.     The Trustee Has a Substantial Likelihood of Success on the Merits on His Avoidance Claims

#### (a)     The Trustee Has Already Demonstrated a Likelihood of Success on the Merits on the Estate's Claims Relating to the ALF PMA Rights

58.     The Plan Injunction is appropriate in this case because the Court has already found that the Trustee has demonstrated a likelihood of success on his claim that the rights the Highlands seek to exercise are rights that were stolen from Acis LP and fraudulently transferred

to Highland HCF so that the Highlands could direct the liquidation of the Acis CLOs and render Acis LP unable to pay its creditors. As is set forth in the procedural history above, the Court has made these findings on several occasions in connection with its ruling on the following matters: (i) the Orders for Relief, (ii) the *sua sponte* TRO, (iii) the Preliminary Injunction, and (iv) the Trustee's prior plan in the Plan Ruling. The Trustee incorporates the Court's prior rulings herein by reference. Because the factual predicate for continued injunctive relief has already been determined there is no need to retread this ground at either the confirmation hearing or herein.

### *(b)* *The Avoidance Claims Provide a Basis for the Plan Injunction*

59. The Trustee's claims to avoid and recover Acis LP's rights under the ALF PMA provide a quintessential basis for the Plan Injunction because injunctive relief is necessary to preserve the *status quo* so that Acis LP's rights under the ALF PMA and the CLO PMAs are not rendered valueless through the liquidation of the Acis CLOs before the adjudication of the Trustee's claims:

> [W]hen a plaintiff asserts a cognizable claim to specific assets of the defendant or seeks an equitable remedy involving those assets, a court may issue injunctive relief to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.

*Seidel v. Warner (In re Atlas Fin. Mortg., Inc.)*, No. 13-32683-bjh-7, 2014 Bankr. LEXIS 140, at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (*citing United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999)). The Fifth Circuit, in an unpublished opinion, has also recognized the propriety of an injunction to preserve the *status quo* in cases where equitable relief is sought. *See Animale Group v. Sunny's Perfume, Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze.").

60. The Trustee's Counterclaims in the Highland Adversary to avoid fraudulent transfers, and particularly Acis LP's rights under the ALF PMA, seek equitable relief. *See Rahman*, 198 F.3d at 498 ("The complaint's request to void transfers as fraudulent – a form of

rescission – is also an equitable remedy.")); *Dong v. Miller, No. 16-CV-5836 (NGG) (JO)*, 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief."). Furthermore, the Trustee's avoidance claims seek to avoid and recover a specific asset, *viz.*, Acis LP's rights under the ALF PMA. It is therefore beyond peradventure that awarding injunctive relief in the form of the Plan Injunction – which serves to maintain the *status quo* until the Trustee's avoidance claims relating to the ALF PMA are adjudicated – is warranted. *See Iantosca v. Step Plan Servs.*, 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Rahman*, 198 F.3d at 498-99; *Atlas Fin.*, 2014 Bankr. LEXIS 140 at *10 (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act).

61. The Trustee's avoidance claim relating to the ALF PMA Transfer under TUFTA also provides a statutory basis for injunctive relief. Tex. Bus. & Comm. Code § 24.008 (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require."). TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction." *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App. – Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

### (c) *The ALF PMA Unequivocally Gives Acis LP the Ability to Determine the Timing of an Optional Redemption*

62. Unable to overcome the existing Preliminary Injunction and well-settled authority supporting the Court's ability to grant injunctive relief, the Highlands instead argue about the rights Acis LP will have under the ALF PMA after they are recovered. Specifically, the Highlands erroneously contend that, even if the Trustee succeeds in getting Acis LP's intangible

property rights under the ALF PMA back, such rights do not authorize Acis LP to determine when and whether to effectuate an optional redemption.  (See Objection, ¶ 58-61).  Essentially, the Highlands are asking the Court to believe that two tax haven Guernsey directors each serving on multiple other boards and with no investment management experience retained ultimate control over all decisions relating to the subordinated notes in the Acis CLOs, and thus control over the $2 billion in the Acis CLOs, including whether to request an optional redemption of the Acis CLOs.  The Highlands position defies credulity, is contrary to well-established canons of contract construction, and is contrary to the record from the prior confirmation hearing, *including the testimony of HCLOF's own expert.*

> ### *(i)    The ALF PMA Unambiguously Delegates the Right to Request an Optional Redemption to Acis as the Portfolio Manager*

63.    The ALF PMA, a copy of which is attached as **Exhibit A,** delegates broad authority to Acis as the portfolio manager for ALF/HCLOF, including the right to sell the subordinated notes of HCLOF and the to "exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments,"[32] including the right to "vote Financial Instruments."[33]

64.    Despite the broad and specific grant of authority to Acis LP in paragraph 5 of the ALF PMA, the Highlands contend that the expansive delegation of authority to Acis LP is essentially nullified by the single sentence in paragraph 6 of the ALF PMA, which provides that the "activities engaged in by the Portfolio Manager shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy."[34]  The Highlands' argument is centered on its contention that Acis could not have been given unfettered discretion under the ALF PMA because it was subject to HCLOF's Investment Policy, which they erroneously

---

[32] ALF PMA, ¶ 5(g).

[33] ALF PMA, ¶ 5(q)

[34] ALF PMA ¶ 6.

contend "was set by HCLOF, and not Acis."  (See Objection, ¶ 59).

65.     As an initial matter, the Trustee is not contending that Acis has "unfettered discretion," but rather the discretion to exercise all incidents of ownership relating to the Subordinated Notes, including the right to vote such instruments, as permitted under section 5 of the ALF PMA.  Further, the Highlands' contention that HCLOF sets its own investment policy is simply incorrect.  The plain language of the ALF PMA makes it clear that the ALF PMA grants Acis (*not HCLOF*) the authority to:  "direct the formulation of investment policies and strategies for the Company."[35]  In other words, although the PMA says Acis is subject to the HCLOF's "investment policy," it is Acis as the portfolio manager which has the authority to formulate such policies in the name of HCLOF.

66.     Under Texas law, when dealing with an unambiguous contract, the Court need not look outside of the four corners of the document.  *In re TrueStar Barnett, LLC*, 2008 Bankr. LEXIS 3310, *6-9 (Bankr. N.D.Tex. Oct. 3, 2008).  A contract is not ambiguous only because the parties have conflicting interpretations, but only when those conflicting interpretations are both reasonable. *Id.* at *8.  Where the contract is only susceptible to one reasonable meaning, it is not ambiguous.  The Trustee contends, and the Highlands admit (see Objection, ¶ 61), the ALF PMA is *not* ambiguous.  Accordingly, the Court must determine the intentions of the parties as expressed in the ALF PMA by considering the entire document, giving effect and meaning to each provision, and harmonizing all of its provisions. *Id.* at *6 (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The Court must give each of the terms in the ALF PMA their ordinary and generally accepted meanings.  *Id.* at *9. In giving effect to each provision of the ALF PMA, the Court must be guided by Texas black letter law that more specific provisions control over a contract's general provisions.  *Id.*

---

[35] See Exhibit A, ALF PMA, section 5(c).

67.     Here, the language of the ALF PMA is unambiguous. Section 5(c) grants Acis the ability to "direct the formulation of investment policies for the Company."[36] Section 5(g) allows Acis, as HCLOF's portfolio manager, to "exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property or funds held or owned by the Company."[37] Section 5(g) grants Acis the power to "vote Financial Instruments."[38] In section 6, HCLOF appoints Acis as its "attorney-in-fact, with full power and authority to act in the Company's name and on its behalf with respect to the matters set forth in Section 5."[39] Finally, sections 14(a) and (b) provide that Acis may only be removed for cause, which *does not* include "a willful and intentional breach [of the ALF PMA] that results from a good faith dispute regarding reasonable alternative courses of action,"[40] or any "violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company."[41]

68.     As applied, the foregoing means that HCLOF delegated its rights to effectuate an optional redemption to Acis LP. Specifically, the Trustee's expert, Zachary Alpern, testified that, based on the broad authority delegated to Acis LP under the ALF PMA, including the ability to vote ALF's financial instruments, Acis LP had the authority to determine when and whether to request an optional redemption:

Q.     And Mr. Alpern, when a portfolio manager votes financial instruments, what does that mean?

A.     That means whenever there's a – a question on the underlying financial instrument, the portfolio manager makes the decision and then so instructs whoever is on the other side there. If it's a loan amendment, it might be delivering instruction to the administrative agent on that loan. Or

---

[36] See ALF PMA, § 5(c),

[37] Id. at § 5(g).

[38] Id. at § 5(q).

[39] Id. at § 6.

[40] Id. at § 14(a).

[41] Id. at § 14(b).

if – if it's a notes investment, it might be delivering a notice of option or [sic] redemption on behalf of the fund.

Q.   So in connection with Highland CLO Funding, who has the right to effect an optional redemption on its behalf?

A.   The advisor to ALF or HCLOF would be the – the – the party delivering and – and signing for the fund.[42]

Further, when asked specifically about the "control" language in paragraph 6, Mr. Alpern testified that because the ALF PMA gave Acis LP the "authority for and in the name of the company to vote financial instruments," Acis LP had the right to exercise an optional redemption.[43]

69.   Perhaps most tellingly, when asked by the Court who the *actual humans* would be that would make the decision for HCLOF as to whether to request an optional redemption, HCLOF's own expert, Daniel Castro, testified that the people acting for HCLOF would be Jim Dondero (75% owner of HCM), Mark Okada (25% owner of HCM), and Hunter Covitz, the actual person acting for Highland HCF as the portfolio manager of HCLOF -- *and not* William Scott or Heather Bestwick, the two tax haven directors of HCLOF.[44]

70.   Finally, to the extent the Court needs any additional evidence on this point, the Trustee will present expert testimony from Mark Froeba, an attorney and former ratings analyst at Moody's, that under the terms of the ALF PMA, Acis LP has authority to exercise control over the Subordinated Notes, including over any election by the Subordinated Notes under Article 9 of the Indentures to redeem or refinance the Acis CLOs, and the any form of control retained by ALF/HCLOF's Guernsey directors is essentially nominal.[45]  Further, and significantly, CLO investors make investment decisions based on the reputation and experience of the portfolio

---

[42] See, e.g., Transcript, Aug. 23, 2018 (AM) at 84:3-20 (overruled objection omitted).

[43] Transcript, August 23, 2018 (PM) at 75:19-76:2.

[44] Transcript, August 28, 2018 (PM) at 61:10-63:7.

[45] See Froeba Report, **Exhibit C**, ¶¶ 37-53.

manager and would not have recognized the need to conduct an analysis of the abilities and experience of Guernsey directors as part of their investment decision. In other words, the construction of the ALF PMA endorsed by the Highlands would undermine key investor expectations made at the time of their original investment decisions.

71.     Against the broad and specific delegation of authority to Acis in paragraphs 5, 6 and 14 of the ALF PMA, the Highlands focus their construction of the ALF PMA as requiring Acis to act only upon the direction of HCLOF's two tax haven Guernsey directors on the general language at the beginning of section 6 that says, "The activities engaged in by the Portfolio Manager shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy."[46]  As discussed above, however, the reference to HCLOF's investment policy is meaningless because Acis, as portfolio manager, has the power to direct the formulation of HCLOF's investment policy under section 5(c).  Consequently, the only portion of the entire agreement that supports the Highlands' construction that the two Guernsey directors retained the authority to determine the timing of any optional redemption of the Acis CLOs, is the single word "control" in paragraph 6.  However, this general reference to control in section 6 does not nullify the very specific grants of authority to Acis as the portfolio manager. In contract interpretation, specific provisions control over general provisions.  Instead, construing the ALF PMA as a whole, it is clear that the only "control" retained by the Guernsey directors was the ability to perform ministerial functions and terminate Acis for "cause" which, as outlined above, could be done only if Acis takes actions in bad faith that have a material adverse effect on HCLOF.

72.     Finally, despite their admission that the ALF PMA is unambiguous, the Highlands go on in paragraphs 62 through 65 to explain the parties' intent and course of dealing with

---

[46] See ALF PMA, § 6.

respect to the ALF PMA in an effort to convince the Court that their interpretation of the interplay between sections 5 and 6 of the ALF PMA is proper. But, the intent and actions of the parties is not relevant to the Court's interpretation of an unambiguous contract. Consequently, both longstanding authority and the record in this case support the Court's preliminary finding in the Preliminary Injunction that, but for the ALF PMA Transfer, HCLOF "could not have attempted to direct or effectuate an optional redemption, which it is now attempting to do."[47]

> ### (ii) The Exercise of Acis LP's Rights Under the ALF PMA to Improve the Position of the Acis CLOs Would Not Be a Breach of Acis LP's Fiduciary Duties

73. The Highlands also contend that, even if the estate does recover Acis LP's rights under the ALF PMA, a refusal by Acis LP to follow a directive from HCLOF would be a breach of Acis LP's fiduciary duties. This contention places the cart before the horse because the Trustee has not yet recovered Acis LP's rights under the ALF PMA, and the Highlands have not voluntarily agreed to give them back. Indeed, the refusal of the Highlands to return the ALF PMA rights to Acis seriously undercuts their position that the ALF PMA does not provide Acis LP with the right to determine the timing of an optional redemption. Regardless, the exercise of contractual rights expressly delegated to Acis LP under the ALF PMA, including the right to reset the Acis CLOs, would not be a breach of Acis LP's fiduciary duties. As a point of fact, under the express terms of the ALF PMA as described above, HCLOF ceded the right to "exercise all rights, powers, and privileges and other incidents of ownership" over the Subordinated Notes, including all voting rights, to Acis.[48] Consequently, once the ALF PMA rights have been restored, it is not clear upon which authority HCLOF will rely to instruct the Reorganized Acis to do anything. Moreover, the ALF PMA itself expressly contemplates that Acis LP may potentially pursue a course of action with which the directors of HCLOF may

---

[47] Preliminary Injunction, ¶ 7.

[48] ALF PMA, §§ 5(g) and (q).

disagree and provides that, so long as a good faith dispute exists regarding reasonable alternative courses of action and/or the action does not have a material adverse effect on HCLOF, such action does not constitute cause to terminate Acis LP as HCLOF's portfolio manager.[49]  Finally, it is always possible that the HCLOF directors, or their replacements, consistent with their own fiduciary duties, will accept the recommendations of Acis LP and Brigade that are in the economic best interests of the fund. But, even if they do not, any issue regarding the Reorganized Acis' performance will be subject to determination through arbitration in Dallas, Texas and will not be resolved in Guernsey.

74.    Regardless, any contention that the Trustee and Brigade have in any way mismanaged the Acis CLOs (or any feigned concern that the Reorganized Acis and Brigade would mismanage the Acis CLOs) is disingenuous.  Here, every action the Trustee has taken in this case has been to try to improve the economic position of HCLOF.  First, HCLOF demanded liquidation of the Acis CLOs, which would have resulted in the cash out of the subordinated notes.  Accordingly, the Trustee proposed a plan which would have cashed out HCLOF at a premium.  HCLOF then reversed course and demanded resets.  Now that the Trustee has proposed a plan that will permit HCLOF to obtain resets, HCLOF is now demanding that the portfolio manager of the reset CLOs be HCM which, as discussed below, HCLOF has no right to request under either the PMAs or the indentures.  HCLOF's contention that Acis LP would be breaching its fiduciary duties to HCLOF by effectuating an optional redemption that *improves* the economics of the Acis CLOs is nonsensical.  Not only would such action not be a breach of Acis LP's fiduciary duties, a refusal by the HCLOF directors to follow the recommendations of Reorganized Acis would likely be a breach of the Guernsey directors' own fiduciary duties.  Regardless, any issue regarding whether Acis or the Guernsey directors would be breaching

---

[49] ALF PMA, § 14(a) and (b).

their fiduciary duties is premature and need not be determined in connection with confirmation.

### *(iii)* *The Termination of the ALF PMA was a Transfer*

75.    The Highlands' argument that the prepetition termination of a contract is not a transfer for purposes of section 548 of the Bankruptcy Code does not apply when the termination was a result of collusion and nefarious motives rather than the debtor's prepetition default and/or inability to perform under the contract.  In this case, the reason for the termination of the ALF PMA was not Acis LP's independent default or inability or failure to perform; rather, it was a result of the Highlands' scheme to appropriate the business of Acis and denude Acis LP of all value so that its creditors would be left with no means of collection.[50]  Even though Acis LP ostensibly terminated the ALF PMA itself as permitted by its terms, the signatory for Acis LP and Acis GP was Jim Dondero. As explained below, the language of the avoidance statutes would recognize the termination of Acis LP's rights under the ALF PMA as a transfer.  In addition, courts generally consider the reasons for the contract termination in determining whether a prepetition contract termination is a transfer.

76.    The Highlands' argument that the termination of Acis' rights under the ALF PMA was not a transfer conflicts with the definition of a "transfer" under both the Bankruptcy Code and TUFTA.  The definition of "transfer" under the Bankruptcy Code includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).  Likewise, TUFTA defines the term "transfer" as follows:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance….

---

[50] This scheme included, for example, the transfer of Acis LP's interest in ALF (now known as HCLOF), which it needed to be risk retention compliant, and Acis LP's interest the ALF PMA.  This scheme forms the basis of the Trustee's counter claims and third party claims in the Highland Adversary.

Tex. Bus. & Comm. Code § 24.002(12). Consequently, under the definition of "transfer" under both avoidance statutes, the termination of Acis LP's valuable rights under the ALF PMA constituted a disposition or release of Acis LP's intangible rights under the ALF PMA. The case law is in accord.

77.     One of the first cases to address the issue was *In re Jermoo's, Inc.*[51] In that case, the debtor operated three Amoco stations under franchise dealership contracts, which provided that Amoco could terminate if the debtor failed to cure any dishonored check within five days. The debtor delivered checks to Amoco that were dishonored by the debtor's bank, Amoco gave notice of the default, and, when the debtor failed to cure the default, Amoco terminated the contracts. The debtor filed chapter 11 the next day. The debtor sought to assume the contracts, but the bankruptcy court denied that request because they had been terminated pre-petition. The unsecured creditors' committee later sued to avoid the contract termination under section 548(a)(2) of the Bankruptcy Code. The court considered, as an issue of first impression, whether the contract termination was a "transfer" within the meaning of section 548. The court held that the fraudulent transfer statute excludes "***rightful*** terminations of operating agreements,"[52] explaining that the debtor's rights under a ***properly*** terminated contract "simply disappear."[53]

78.     In *Jermoo's*, the debtor unquestionably defaulted on the contract, and Amoco terminated the contract in accordance with its provisions because the debtor could not perform its obligations under the contract. In a case where the debtor ***can perform*** and ***is performing***, but the termination is caused by some collusive or nefarious motive, the result is different.

---

[51] 38 B.R. 197 (Bankr. W.D. Wis. 1984).

[52] *Id.* at 204 (emphasis added).

[53] *Id.*

79.     In the *Metro Water & Coffee*[54] case, the court considered whether the prepetition termination of an executory contract could be a transfer for purposes of section 548.  The court held that it could be under certain circumstances.[55]  In that case, the debtor had a concession agreement with RCB under which the debtor provided concession services for baseball games. In August 1992, RCB gave the debtor notice that it was in default under the provisions of the concession agreement requiring it to remain current on payment of fees to RCB and current on payments to its suppliers.  The debtor did not cure the default, so RCB terminated the contract in November 1992.  In March 1993, the debtor filed both a chapter 11 case and a fraudulent transfer action against RCB to recover the terminated concession agreement.  The debtor contended that RCB's termination was in bad faith and deprived the estate of $200,000 in value. RCB filed a motion to dismiss the complaint.

80.     The court dismissed the complaint—not because a prepetition contract termination can **never** be a fraudulent transfer—but because the termination was done under ordinary business terms, with no allegations of collusion, and because the debtor defaulted under the contract.[56]  The court held that a contract termination is a transfer of the debtor's interest, but it is not a fraudulent transfer absent allegations the termination was "the result of any collusion between any individuals or entities in any way associated with both of the respective parties designed to bring about a financial benefit to themselves or related entities to the prejudice of the Debtor's estate or its creditors."[57]  In this case, the termination of the ALF PMA was precisely a result of collusion between entities (the Highlands) seeking to benefit themselves at the expense of Acis LP and its creditors.

---

[54] *Metro Water & Coffee Servs. v. Rochester Community Baseball (In re Metro Water & Coffee Servs.)*, 157 B.R. 742 (Bankr. W.D.N.Y. 1993).

[55] *Id.* at 746.

[56] *Id.*

[57] *Id.*

81.    Several courts have agreed with the common-sense approach taken by the

*Metro Water & Coffee* court, refusing to say that a prepetition contract termination can never be

a transfer for avoidance action purposes.    For example, in *Lloyd McKee Motors,*[58] the Court

addressed whether termination of a contract is a transfer for purposes of section 548 of the

Bankruptcy Code because a termination "transforms or eliminates" rights.  The court held that

contract termination can be a transfer and that whether a termination is fraudulent depends on

the termination ***when viewed as a whole***."[59]  Moreover, in *EBC I, Inc. v. Am. Online, Inc. (In re*

*EBC I, Inc.),*[60] the court held that there "is no language in section 548 to suggest that executory

contracts or terminated contracts are not subject to its provisions."[61]

82.    What *Metro Water & Coffee* and other cases make clear is that a prepetition

termination of a contract is not actionable under section 548 of the Bankruptcy Code ***if*** the

termination is based on ordinary business terms and the debtor's default.  But, where the

prepetition termination is based on collusion, nefarious motive, or an attempt to take something

of value from a debtor, it may be a transfer potentially recoverable under section 548 and other

similar avoidance statutes.

### (iv)    Termination of the ALF PMA was a Transfer of Valuable Intangible Property Rights

83.    The Highlands' next argument is that the ALF PMA had no value to Acis LP,

therefore the transfer of it was not actionable as a fraudulent transfer.  That argument is

irrelevant to the Trustee's causes of action under the Bankruptcy Code and Texas law based on

intentional fraudulent transfer theories (*i.e.* that the ALF PMA was transferred to Highland HCF

---

[58]*Lloyd McKee Motors v. Chrysler Corp. (In re Lloyd McKee Motors)*, 166 B.R. 725 (Bankr. D. N. Mex. 1993).

[59] *Id.* at 729. See also, *In re Egyptian Bros. Donut*, 190 B.R. 26 (Bankr. D.N.J. 1995) (deciding that a contract termination can be a transfer, but that sections 547 and 548 of the Bankruptcy Code should not be used to revive an agreement validly terminated prior to the petition date).

[60] 356 B.R. 631 (Bankr. Del. 2006).

[61] Id. at 638.

Advisor, Ltd. with actual intent to hinder, delay or defraud Acis LP's creditors). In the context of a complaint for recovery of a fraudulent transfer based on actual intent to hinder, delay, or defraud, questions of value are immaterial.[62] Likewise, questions of intent are immaterial to constructive fraudulent transfer actions.[63]

84.     In addition to being irrelevant, the Highlands' argument is also flat wrong. Even if the ALF PMA itself did not provide a fee payable to Acis LP (which is further evidence that the Highlands are alter egos), there is no question that it still had economic value to Acis LP and will have economic value when it is recovered by the Trustee. As discussed above, the Court has already entered numerous findings in this case that recognize the value. Such findings were based, in part, on testimony at the prior confirmation hearing.

85.     For example, at the morning hearing on November 23, 2018, during the confirmation hearing on the Trustee's prior plan, Zach Alpern explained the value:

> But I think it's been found that by virtue of controlling the timing of
> the optional redemption of the CLO, the manager can ensure sort
> of an evergreen fee stream, if you will. They receive portfolio
> management fees for running the CLO. They have control over
> what goes into the CLO for the benefit of themselves as equity
> investors…And they control the portfolio that, you know, that
> generates those returns….

See November 23, 2018 a.m. Transcript, p. 66, lines 15-25, p. 67, lines 1-2.

86.     In testimony from later the same day, Mr. Alpern testified:

> Is it common market practice for the controlling interest in sub-
> notes and portfolio management agreement to be bought or sold
> together.

See November 23, 2018 p.m. Transcript, p. 49, lines 3-5.

---

[62] *Brandt v. KLC Fin., Inc. (In re Equip. Acquisition Res., Inc.)*, 481 B.R. 422, 428 (Bankr. N.D. Ill. 2012). See also, *Rentas v. Olavarria (In re Editorial Flash, Inc.)*, 2016 Bankr. LEXIS 2435, at *12 (Bankr. D. P.R. June 29, 2016) (stating that where actual fraud is proven, a transfer can be avoided without regard to value); *Hawkins v. Lister (In re Lister)*, 2011 Bankr. LEXIS 5579, at *21 (Bankr. E.D. Ca. 2011) (holding that "if property is transferred with actual fraudulent intent, then questions of 'reasonably equivalent value' and insolvency, while still relevant as possible 'badges of fraud,' are not required as elements of a claims under subsection 548(a)(1)(A).")

[63] *Id.*

---

87.     Later in the course of the confirmation hearing, Daniel Castro, expert for the

Highlands testified that control has value.

> Well, it's control—it's—you have control, and have rights, and you-
> --you effectively—you know, you can to the reset and realize that
> value, yeah.

See November 28, 2018 p.m. Transcript, p. 36, lines 13-15.

88.     The Highlands' argument that the Trustee is wasting his time trying to recover the

ALF PMA is disingenuous and is contrary to all of the evidence presented to date in this case

and contrary to evidence that will be presented at the hearing on confirmation of this Plan.

### 2.     *The Estate Will Suffer Irreparable Harm In the Absence of a Plan Injunction*

89.     The Debtors, creditors, and other parties in interest face irreparable harm without

a Plan Injunction.  A primary source of funding for distributions to creditors under the Plan is

revenue to be generated under the PMAs.  Absent a Plan Injunction, the Highlands will be free

to direct an optional redemption of the collateral in the Acis CLOs before the Trustee's claims

relating to the ALF PMA Transfer can be adjudicated.  Such action would destroy the value of

the ALF PMA rights, which the Trustee seeks to recover in the Highland Adversary.  Moreover,

the Court has previously recognized that an optional redemption constitutes a "doomsday"

scenario that "would effectively destroy all value in the Acis PMAs."[64]  Destruction of the going

concern business of Acis is a classic example of irreparable harm. Notwithstanding the

determined opposition of the Highlands in support of their agenda to destroy the Debtors, Acis is

now a profitable going concern business with positive cash flow to pay its creditors and, to the

extent necessary, fund continuing litigation with the Highlands.  Further, after confirmation it is

anticipated that the Reorganized Acis will obtain additional portfolio management contracts.

There are economies of scale in the portfolio management business, and termination of the Acis

---

[64] *Order Granting Emergency Motion to Approve Break-Up Fee, Expense Reimbursement, and Replacement Sub-Advisory and Shared Services Provider, Oaktree Capital Management, L.P.,* July 10, 2018, at p. 5 [Docket No. 390].

CLOs by HCLOF would negatively impact the ability of Reorganized Acis to obtain new business.

90.    Injunctive relief is necessary to prevent imminent and irreparable injury in the form of substantial losses to creditors and other parties in interest, as well as to third parties' financial interests, that will necessarily flow from an optional redemption designed to remove Acis LP as the portfolio manager of the Acis CLOs. The losses resulting from the destruction of the going concern business of Acis cannot be presently measured by any certain pecuniary standard, are not reasonably quantifiable, and cannot be adequately compensated with monetary damages. Indeed, the destruction of the value of the PMAs would, in turn, effectively destroy the Debtors' ability to satisfy their obligations to creditors. Thus, no adequate remedy at law exists.  Further, absent a Plan Injunction, the Highlands would be free to complete the last step in their concerted effort to strip Acis LP of its assets and transfer its entire business to themselves.  Indeed, as the Court will recall, the ALF PMA Transfer was not an isolated occurrence, but rather just one piece of a larger illegal conspiracy by the Highlands to steal the Debtors' business and leave them unable to pay legitimate creditors.  Indeed, in addition to the ALF PMA Transfer, the Highlands also caused the Debtors to transfer, *e.g.*, the following assets to the Highlands for little or no consideration (or improperly manufactured purported consideration) in an effort to thwart creditors:  (i) Acis LP's right to receive management fees relating to Acis CLO 2017-7, Ltd., (ii) Acis LP's equity interests in certain risk retention vehicles related to Acis CLO 2017-7; (iii) a note receivable with a $9.5 million balance, and (iv) Acis LP's participation interest in ALF/HCLOF.  In addition to the foregoing, the Highlands also retroactively increased the shared service and sub-advisory fees being paid by Acis to HCM to thirty-five (35) basis points, an amount that was way above market.  Finally, even throughout this bankruptcy case, HCM has been trying to take away Acis LP's valuable portfolio management rights with Universal/BvK.  Dissolving the Preliminary Injunction, which would allow the Highlands to complete the last step in their scheme to denude the Debtors of all of

their assets, is the epitome of irreparable harm.

91.     The Highlands' argument that the Trustee cannot suffer irreparable harm because he has an adequate remedy at law also misses the mark.  The destruction of the Debtors' ongoing business which has the potential to repay creditors under the Plan in two years constitutes irreparable harm.  The fact that the estate possesses a number of avoidance claims for damages against the Highlands, and could potentially obtain damages on such claims, does not render the destruction of Acis LP's ongoing business any less harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'  For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions.

*Janvey*, 647 F.3d at 600 (*citing, Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction.")).

92.     Thus, the fact that the Debtors' collective estate possesses multiple claims against the Highlands does not mean that the there is an adequate remedy at law with respect to the ALF PMA Transfer. Dissolving the Preliminary Injunction and leaving the Debtors with no ongoing source of revenue would return this case to the litigation arena so often used by the Highlands to browbeat adversaries into submission by utilizing the vast resources of the Highlands to outspend their opponents.  The Debtors would be left with causes of action but without the resources to effectively litigate them against the Highlands' billions.

93.     Further, the Trustee seeks to avoid and recover Acis LP's rights under the ALF PMA so that it can continue to operate the Debtors' business and pay creditors.  Absent the Plan Injunction, these rights would be destroyed and the estate would be left solely with a claim against the Highlands for damages.  Although the remedy under section 550 is discretionary, "it is clear that courts favor a return of the property itself if at all possible so as to avoid speculation

over its value." *Asarco LLC v. Ams. Mining Corp.*, 404 B.R. 150, 162-63 (S.D. Tex. 2009); *accord, Rodriguez v. Drive Fin. Servs. L.P. (In re Trout)*, 609 F.3d 1106, 1113 (10th Cir. 2010) ("the language of § 550(a) suggests that the default rule is the return of the property itself, whereas a monetary recovery is a more unusual remedy to be used only in the court's discretion."). This is so because section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred. *Ebert v. DeVries Family Farm, LLC (In re Devries)*, 2014 Bankr. LEXIS 3621, *49 (Bankr. N.D. Tex. 2014) (Lynn, J.). As a result, transferees should typically be required to return the property transferred unless to do so would be inequitable, in which event they must pay the property's value. *Asarco*, 404 B.R. at 162. Here, there is nothing inequitable about requiring the Highlands to return Acis LP's rights under the ALF PMA to the estate. Consequently, the Plan Injunction is necessary for the Trustee to obtain his preferred remedy of recovering Acis LP's rights under the ALF PMA, which would give the Reorganized Acis the right to control its own destiny under the PMAs.

94. Finally, under the facts and circumstances of this case, where the Highlands engaged in a coordinated scheme to dismantle Acis' entire business piece by piece to avoid paying the Terry judgment, the Highlands' contention that the Trustee's "concern for dissipation of assets by Highland and HCLOF is unfounded and baseless" is truly outrageous. To the contrary, and as the Court witnessed firsthand in the involuntary trial, the Highlands have a demonstrated pattern of fraudulently transferring assets out of Acis in order to defeat the claims of judgment creditors. Thus, even if the Debtors were to litigate for years against the Highlands, there is no guarantee that there would be any assets left in any entity against which the estate could collect on its judgment. Under the circumstances, the fact that the estate may be left with a claim for damages absent the Plan Injunction is not an adequate remedy at law where the Debtors would be left without adequate resources to pursue the litigation and there is reason to believe the Highlands would continue to transfer assets to avoid payment on a judgment.

### 3. **The Highlands Are Not Being Irreparably Harmed**

95.      The Highland are not being irreparably harmed by the Court's injunctive relief because any alleged harm that has or may be suffered by HCLOF is either self-inflicted or specious and illusory because it is based on alleged rights that HCLOF does not possess.  For example, HCLOF's contention that its investment in the Acis CLOs is being held captive and would be forced into a relationship with a hostile portfolio manager are completely inaccurate. HCLOF has not been held captive.  At any time, it could have sold its interests in the Acis CLOs in the open market.  Likewise, it could have cashed out of its investment at a premium with the Oaktree transaction.  It can also elect to do the resets everyone agrees are in the best interests of the Acis CLOs under the Plan.  Or, if none of those options are appealing, the Highlands at any time could have proposed a competing full pay plan.  The Highlands have done none of the foregoing and instead remain bent on their mission to destroy the going concern value of the Debtors, even if it means reducing the value of HCLOF's investment in the Acis CLOs in the process.  Further, HCLOF is not being forced into a relationship with Acis.  Rather, HCLOF entered into a legally binding and enforceable contract with Acis, and there is nothing inequitable about requiring HCLOF to honor the terms of that bargain.  The fact that HCLOF only wants for Acis to be its portfolio manager if it is sub-advised by Highland is irrelevant.

96.      Finally, HCLOF does not have a "contractual right" under the indentures to reset the CLOs or select HCM as the new portfolio manager to any reset CLOs.  In fact, its own expert testified that the indentures do not specifically provide for a right of reset, but rather only include an ability to initiate an optional redemption.[65]  The indentures provide that, "[u]pon receipt or delivery of a notice of redemption of the Secured Notes, *the Portfolio Manager in its sole discretion* will (except in the case of a Refinancing) direct the sale of all or part of the

---

[65] Transcript, August 28, 2018 (PM) at p. 27:5-22.

Collateral Obligations and other Assets…."[66]  Thus, as Mr. Alpern testified at the prior confirmation hearing, Acis LP (the portfolio manager of the Acis CLOs) and not HCLOF has sole discretion over how an optional redemption is carried out.[67]  Consequently, HCLOF does not have the ability under the indentures to control how an optional redemption is carried out or to require that HCM be the portfolio manager of any reset CLOs.  HCLOF likewise does not have the ability under the indentures to select who the sub-advisor for the portfolio manager will be.  Thus, any harm alleged by HCLOF from not being able to have HCM as the portfolio manager of sub-advisor under the Acis CLOs or reset CLOs is specious and illusory.

### 4.    *Balancing the Equities Favors Maintaining Injunctive Relief*

97.    The balancing of the equities weighs in favor of continuing injunctive relief through the Plan Injunction.  As discussed, there is no harm to the Highlands.  HCM has already been fired, and the actions of the Trustee, most of which have been approved by the Court, have been in the best interests of the Acis CLOs and, ultimately, HCLOF.  HCM was mismanaging the CLOs by, among other things, building up way too much cash and engaging in a stealth liquidation campaign. HCM was also grossly overcharging Acis for such disservice.

98.    Mr. Covitz testified that there were no conforming loans available for purchase by the CLOs.[68]  It has been demonstrated that his testimony was at minimum incorrect and more likely a deliberate misrepresentation. Acis fired HCM as sub-manager of the CLO portfolios.  Since then, Acis and its new sub-manager Brigade, have purchased approximately $300 million of conforming loans for the CLOs.[69]  By substantially all industry measurables, the professed preference by HCLOF for HCM instead of Brigade is irrational.  Instead, HCLOF is apparently being used by the Highlands to complete their twin aims of stealing Acis LP's business for

---

[66] *E.g.,* 2013-1 Indenture § 9.2 (emphasis added).

[67] *See* Transcript, August 23, 2018 (PM) at p. 92:13-93:3.

[68] Transcript, August 1, 2018 at pp. 133:7-134:14.

[69] See the Report of Zachary Alpern, attached hereto as **Exhibit D.**

themselves and destroying Acis LP as a competitor despite the cost to HCLOF. Consequently, any alleged harm to the Highlands is substantially outweighed by the imminent and irreparable harm that would be suffered by the Debtors, creditors, and other parties in interest if the Preliminary Injunction is dissolved and an optional redemption follows.

99.     The Highlands assert that HCLOF "has every right to take the actions that it is legally entitled to take, regardless of the motivations, and the Trustee's judgment should not be supplanted for HCLOF's judgment with respect to its own property." Objection, ¶82. While this statement may be true under ordinary circumstances, it does not apply where the rights the Highlands seek to exercise are rights that were fraudulently transferred out of Acis LP. Consequently, the balance of the equities lean in favor of continuing injunctive relief through the Plan Injunction until the merits of the estate's avoidance claims relating to the ALF PMA rights have been determined.

100.     Finally, based on their inequitable conduct in stripping the Debtors of their assets (and fraudulently transferring them to the Highlands) so that the Debtors would be unable to pay their legitimate debts, the Highlands are not entitled to any equitable relief or consideration. "The clean hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue." *Wentzell v. JPMorgan Chase Bank, N.A.,* 627 Fed. Appx. 314, 317-318 (5th Cir. 2015) (per curiam) (unpublished); *see also*, *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (doctrine of unclean hands applies where a party's conduct has been "marked by a want of good faith or violates the principles of equity and righteous dealing," and finding that party seeking equitable relief must show that it has not contributed to the harm at issue). The Court has found that the evidence thus far has been compelling that the Highlands worked in tandem to denude Acis LP of value, including the ability to control its own destiny in relation the ALF PMA rights. *See* Plan Ruling, at p. 6. Based on these preliminary findings, the Court should deny HCLOF's request to dissolve the Preliminary Injunction based on its unclean hands.

**5.** **_Public Policy Favors Continued Injunctive Relief_**

101.     Finally, the Plan Injunction is consistent with public policy. Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and potentially wasteful way. Public policy also supports successful reorganizations. _Comptroller of Public Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.),_ 303 F.3d 571, 580 (5th Cir. 2002). The Court observed as much in issuing the Preliminary Injunction: "There is a public interest in allowing for a Chapter 11 process, rather than costly, prolonged litigation."[70]

102.     As detailed above, an optional redemption will destroy the going concern value of Acis and eliminate future revenues under the PMAs – a key source of funding distributions to creditors.  Protecting and maximizing the value of the PMAs is integral to enabling the Reorganized Acis to make required distributions to creditors under the Plan and is, therefore, consistent with public policy.  Continuing injunctive relief through the Plan Injunction is necessary to prevent the Highlands from renewing their demand for an optional redemption and is likewise consistent with public policy.

103.     Additionally, public policy favors disposition of cases on their merits. _Crane v. Napolitano_, Civ. Action No. 3:12-cv-03247-O, 2013 U.S. Dist. LEXIS 193120, at *3 (N.D. Tex. Mar. 15, 2013). Consistent with its past practice, the Highlands can be expected to renew their demand for an optional redemption if the Plan Injunction is not entered.  This would destroy the value of the ALF PMA rights, which the Trustee seeks to recover as a fraudulent transfer, before the Reorganized Acis has any opportunity to prosecute the claim.  Public policy most certainly does not favor dissolving the Preliminary Injunction so that a network of wrongdoers can

---

[70] Preliminary Injunction at p. 11.

complete the last step in their fraudulent scheme to destroy the Debtors, render them unable to pay their creditors, and leave them without the resources to effectively pursue legitimate actions against the Highlands. For these reasons, public policy strongly favors maintaining the Preliminary Injunction.

**C.    THE PLAN AND THE TRUSTEE ARE IN COMPLIANCE WITH SECTION 1129(A) AND (B).[71]**

104.    The Highlands assert a variety of objections to the Plan under section 1129(a) and (b). See Highlands' Objection at pp. 35-48. As demonstrated below, and as will be shown through evidence presented at the Confirmation Hearing, each of these objections has no support in law or fact and should be overruled.

*1.    The Plan Complies with Section 1129(a)(1) and (3).*

105.    The Highlands raise multifarious objections under section 1129(a)(1) and (3) to the effect that the Plan and the Trustee are in violation of certain provisions of the Bankruptcy Code and other law, which violations, according to the Highlands, are evidence of lack of good faith in proposing the Plan. As demonstrated below and as further shown by the evidence to be presented at the Confirmation Hearing, each of these objections is without merit and should be overruled.

*(a)    The Plan Does Not Impermissibly Control Non-Estate Property or Alter Non-Debtor Contracts.*

106.    First, the Highlands argue that the Plan controls non-estate property, alters contracts to which the Debtors are not parties, cherry-picks the provisions of contracts to be assumed, and impermissibly wipes out equity. In fact, the Plan does none of these things. The argument that the Plan improperly affects rights to non-estate property is nothing more than a

---

[71] On October 22, 2018, the Trustee previously filed a *Brief of Robin Phelan, Chapter 11 Trustee, in Support of Confirmation of Chapter 11 Trustee's Second Amended Joint Plan of Reorganization* [Docket No. 651] (the "Confirmation Brief"). For the sake of brevity, as to any confirmation elements or Plan provisions to which the Highlands have not specifically objected, the Highlands incorporates the applicable sections of his prior Confirmation Brief as though fully set forth herein.

repackaging of the Highlands' attack on the Plan Injunction, which attack is dealt with in detail elsewhere. The Plan Injunction, which mirrors the existing Preliminary Injunction, is appropriate, and its effects on the Highlands' use of their property are temporary, limited, and necessary for a successful reorganization. Similarly, the Plan Injunction does not "alter" any contract – it only affects, for a limited time, certain parties' abilities to exercise certain rights thereunder. Additionally, all contracts that will be assumed under the Plan will be assumed *cum onere* – with all contractual burdens as well as benefits. Finally, the extinguishment of equity interests under the Plan is not only appropriate but necessary, given the present valuation of the Debtors and projections of future income, as the evidence presented at the Confirmation Hearing will show.

### *(b)* *The Plan Does Not Violate the Investment Advisers Act of 1940*

107.    Next, the Highlands argue that the Plan violates section 215 of the Investment Advisers Act of 1940 (the "IAA") because the Plan "would nullify HCLOF's right to decide who manages its assets." Highlands' Objection at 35-36. The Highlands have cited no case, and the Trustee is not aware of any, in which a court has denied confirmation of a plan on account of the IAA. More importantly, the Plan does not "nullify HCLOF's right to decide who manages its assets" because HCLOF has no such right. As discussed elsewhere in this Brief, HCLOF has never had a contractual or statutory right to veto changes in the management of the Acis CLOs. The Plan does not violate section 206 or any other provision of the IAA, and therefore it is not voidable under IAA § 215. *See* 15 U.S.C. § 80b-15.

### *(c)* *The Vesting and Compromise Language in the Plan Does Not Have the Effect that the Highlands Say It Does*

108.    The Highlands object to certain language in the Plan regarding vesting of assets (*Plan* § 6.01) and compromise of claims (*Plan* § 14.01) on the concern that, at some point in the future, the Reorganized Debtor might assert that this language in the Plan effectively compromised claims and assertions raised in pending adversary proceedings that would otherwise survive a plan confirmation. It was not the Trustee's intent that the referenced Plan

provisions would have the effect of foreclosing defensive use of causes of action in pending adversary proceedings. The Trustee would invite the Highlands to provide him proposed language which, if incorporated as a Plan amendment or in the Confirmation Order, would resolve this objection.

### (d)    The Plan Was Proposed in Good Faith

109.    The Highlands continue to maintain that the Plan was not proposed in good faith. In arguing lack of good faith, the Highlands level a variety of charges at the Plan, the Trustee, and Terry, including the contention that the Reorganized Debtor cannot deliver the promised resets of the CLOs and that any resets actually implemented would be unfavorable to HCLOF. These allegations are dealt with elsewhere in this Response and will be further addressed in the evidence that the Trustee presents at the Confirmation Hearing. For present purposes, however, the Trustee would note that the Highlands fail to address the real test of good faith. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of §1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985); *see also Western Real Estate Equities, L.L.C. v. Vill. At Camp Bowie I, L.P. (In re Vill. At Camp Bowie I, L.P.),* 710 F.3d 239 (5th Cir. 2013); *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.),* 150 F.3d 503, 519 (5th Cir. 1998); *Financial Sec. Assur. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 802 (5th Cir. 1997).

110.    The Trustee, as the plan proponent, has met his good faith obligation under the Bankruptcy Code. The Trustee proposed the Plan with the purpose of expeditiously distributing value to creditors and not by any means forbidden by law. Inasmuch as the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code, the Plan and the related documents have been filed in good faith.

111.    Likewise, the Trustee has not proposed the Plan by any means forbidden by law.

The Plan is not premised upon and does not contemplate any transaction that is even arguably violative of any substantive nonbankruptcy law. For these reasons, the Trustee has met his obligations under section 1129(a)(3).

### 2. The Plan Complies with Section 1129(a)(5)

112.    The Highlands argue that Terry is an insider of the Trustee and that the Trustee has failed to make the disclosures and showings required by section 1129(a)(5). On the contrary, Terry is not an insider, and the Plan and the Trustee are in full compliance with section 1129(a)(5).

113.    One of the prerequisites to confirmation of a chapter 11 plan is disclosure of

> the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan. . . .

11 U.S.C. § 1129(a)(5)(A)(i). In addition, the plan proponent must show that

> the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy. . . .

Id. § 1129(a)(5)(A)(ii). Further, the proponent must have

> disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

Id. § 1129(a)(5)(B).

114.    The Trustee has already made the requisite disclosures regarding Terry's role prior to the commencement of these cases and his anticipated role after confirmation of the Plan. Terry's management of the CLOs as an employee of Highland, his termination by Highland, his obtaining an arbitration award and subsequent judgment against the Debtors, and his filing of the involuntary bankruptcy petitions against the Debtors are all detailed in the Disclosure Statement. (Disclosure Statement at pp. 15-16.) No further disclosure is required under section 1129(a)(5). See In re Premiere Network Servs., Case No. 04-33402-HDH-11,

2005 Bankr. LEXIS 2298, at *8 (Bankr. N.D. Tex. Jul. 1, 2005) (plan describing "in general terms the proposed operations of the successor to the debtor" held to be "[s]ufficient disclosure" under § 1129(a)(5)(A)).

115.    The objection under section 1129(a)(5) is a red herring. The Highlands assert that "Terry's relationship with the Trustee remains a significant and still troubling issue" (*Highlands' Objection* at p. 39), but they offer not a shred of support that any untoward "affiliation" exists. In fact, there is no such affiliation that would require disclosure under section 1129(a)(5). To the extent that any further disclosure is required, the Trustee will provide it at the Confirmation Hearing. *See Premiere Network*, 2005 Bankr. LEXIS 2298, at *8 (disclosure requirement of § 1129(a)(5)(B) satisfied by evidence presented at confirmation hearing).

116.    The Highlands go on to argue that Terry is an insider – not of the Debtors, but of the Trustee. The Highlands implicitly concede, as they must, that Terry cannot possibly be considered an insider of the Trustee within the statutory definition of the term. *See* 11 U.S.C. § 101(31). Instead, they contend that Terry is a "non-statutory insider" of the Trustee.

117.    Importantly, none of the cases that the Highlands cite involves an insider of a chapter 11 trustee. It is not surprising that the Highlands could not produce a single case in which a court held that a person or entity was a non-statutory insider of a chapter 11 trustee. Often, a trustee is appointed in a chapter 11 case for the very purpose of bringing in an outside representative of the estate, someone who will be free from actual or potential influences resulting from the debtor's prepetition activities. *See In re Nartron Corp.*, 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005) (lack of evenhandedness in dealing with insiders is a factor in appointment of chapter 11 trustee). Further, the definition of "insider" focuses exclusively on the relationship between the person or entity in question *and the debtor. See* 11 U.S.C. § 101(31). Accordingly, it seems all but certain that a person's relationship with a chapter 11 trustee cannot give rise to insider status for the purpose of section 1129(a)(5).

118.    Even if a person could be considered an insider of a chapter 11 trustee for this

purpose under certain facts, those facts are not present in this case. Courts have noted that the

categories set forth in section 101(31) were not meant to be exhaustive and that, in an

appropriate case, a person or entity can be considered an insider without fitting into any of the

statutory descriptions. *See, e.g., Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008,

1010 (5th Cir. 1992) (debtor's ex-wife of over 20 years was non-statutory insider); *Think3 Litig.*

*Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 190-91 (Bankr. W.D. Tex. 2015) (reviewing

pleadings for allegations that defendants were non-statutory insiders); *Lynch v. Winslow (In re*

*Winslow),* 473 B.R. 94, 106 (E.D.N.C. 2012) (debtor's auctioneer was not non-statutory insider).

The concept of the non-statutory insider is not nearly so expansive as the Highlands would have

the Court believe, and not broad enough to include Terry and the Trustee.

119.    As the Fifth Circuit has observed, courts consider two factors in determining

whether non-statutory insider status exists:

> (1) the closeness of the relationship between the [potential insider]
> and the debtor; and (2) whether the transactions between the
> [potential insider] and the debtor were conducted at arm's length.

*Holloway*, 955 F.2d at 1011; *see also U.S. Bank N.A. v. Village at Lakeridge, LLC,* 138 S. Ct.

960, 965 (2018) (mentioning two-part test without addressing correctness of the standard).

Applying these two factors to the present case, Terry cannot be considered an insider of the

Trustee. First, Terry and the Trustee had no relationship, close or otherwise, before the

commencement of these cases. Since the petition date, the relationship between Terry and the

Trustee has not been any closer or otherwise different from the typical relationship between a

very large creditor and the estate representative in any chapter 11 case. Second, all of the

dealings between Terry and the Trustee in these cases, including negotiation of the terms of the

Plan, have been fair and at arm's length. Terry's has been an important and influential voice in

these proceedings. He commenced these cases by filing the involuntary petitions. Terry's claim

is the largest in this reorganization. However, his position is due solely to the size and priority of

his claim with respect to the other claims in these cases. The fact that a creditor holds a strong

or even dominant bargaining position does not make it an insider. *In re Friedman*, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991); *MCA Fin. Grp. v. Hewlett-Packard (In re Fourthstage Techs.*), 355 B.R. 155, 160 (Bankr. D. Ariz. 2006).

120.    The Highlands' case authorities are inapposite. With the exception of the Supreme Court's opinion in *Lakeridge* and the Fifth Circuit's *Holloway* decision, cited above, none is binding on this Court. Moreover, all the cases are distinguishable in material ways. The Supreme Court's opinion in *Lakeridge* was about the appropriate standard of review; the Court specifically withheld judgment on whether the lower courts were correct on the substantive ruling. 138 S. Ct. at 965. In *In re Allegheny International, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990), the insider was a claim-purchasing investor and plan proponent that was guilty of all manner of inequitable conduct. *See id.* at 299. *Holloway* involved the debtor's ex-wife of more than twenty years who engaged in transactions with the debtor with personal, not commercial, motivation. 955 F.2d at 1013-14. In the Ninth Circuit's opinion in *Lakeridge*, the court held that the purchaser of a claim from a statutory insider does *not* thereby become an insider of the debtor. *U.S. Bank N.A. v. Village at Lakeridge, LLC (In re Village at Lakeridge, LLC)*, 814 F.3d 993, 1003 (9th Cir. 2015), *aff'd*, 138 S. Ct. 960 (2018). In *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.*), 531 F.3d 1272 (10th Cir. 2008), the court addressed the legal issue whether a party's "extreme closeness" to the debtor can make him a non-statutory insider, without any showing of control, attempt to control, undue influence, or dealings at less than arm's length. The Tenth Circuit adopted the two-part test cited above. *Id.* at 1282.

121.    In *In re South Beach Securities, Inc.*, 376 B.R. 881 (Bankr. N.D. Ill. 2007), the debtor was a corporate shell with no business operations or income. Its only assets were net operating losses, and its only creditor was a company whose officer and director signed the debtor's chapter 11 petition as "authorized agent." Initially, the chapter 11 filing was dismissed as having been filed in bad faith, but the dismissal was reversed on appeal. Later the debtor proposed a plan. At the confirmation hearing, the court found that the creditor was a non-

statutory insider of the debtor. *Id.* at 893. In *In re Rexford Properties, LLC*, 557 B.R. 788 (Bankr. C.D. Cal. 2016), an investment trust that held an equity interest in the debtor and was managed by a personal friend of the debtor's founder was held to be an insider of the debtor, where principals in the debtor were also income beneficiaries of the trust, and there was evidence that the trust extended a loan to the debtor not on an arm's-length basis. *Id.* at 801.

122.    In all of the cases cited by the Highlands where the court found non-statutory insider status, the facts showed both a high degree of closeness between the debtor and the other party and a transaction or course of dealings where the parties did not interact at arm's length. Neither is present here. Terry and the Trustee had no relationship of any kind prior to the petition date, and their relationship since then has not been characterized by anything like the kind of closeness that is found in the cases on which the Highlands rely. Likewise, all of the interactions between Terry and the Trustee have been at arm's length.  Thus, the argument that Terry is an insider of the Trustee is wholly unsupported by the relevant facts and applicable law.

### 3.    *The Plan Complies with Section 1129(a)(7)*

123.    The Highlands object that the Plan does not meet the requirements of section 1129(a)(7). That provision requires, in relevant part, that with respect to each impaired class of claims or interests, each holder of a claim or interest in such class either

> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date.

Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best-interests-of-creditors" test or the "liquidation" test. The best-interests test focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). The court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were

liquidated [under chapter 7 of the Bankruptcy Code]." *Id.* at 440; *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996).

124. Under the Plan, there is only one unimpaired Class, Class 1 (Secured Tax Claims). By its terms, the best-interests test does not apply to an unimpaired class. Therefore, the Plan's treatment of Class 1 is consistent with section 1129(a)(7).

125. The best-interests test is also satisfied by the treatment of the other Classes under the Plan, which are impaired. The Plan proposes to pay all creditors (with the exception of creditors who hold equitably subordinated insider claims) in full with interest. "By definition," as Judge Houser observed, such a plan "*cannot* fail the best-interests test of § 1129(a)(7)." *In re Couture Hotel Corp.*, 536 B.R. 712, 736 (Bankr. N.D. Tex. 2015) (emphasis added).

126. In this case, the Plan's inherent structure makes it impossible for creditors to obtain a greater recovery under chapter 7 than they would under the Plan. Under chapter 7, the Debtors would have fewer assets following the loss of revenues from the PMAs and more claims based on the additional layer of administrative expenses resulting from the conversion to chapter 7. Indeed, the Trustee is currently projecting payment in full with interest to the holders of allowed general unsecured claims under the Plan. On the other hand, if the case is converted to a chapter 7, the testimony at the confirmation hearing will show that general unsecured creditors likely will not receive any recovery on their claims.

### 4. The Plan Complies With Section 1129(a)(8), (a)(10), and (b).

127. The Highlands point out that the Plan cannot be confirmed as a consensual plan because it was not accepted by all impaired classes, as section 1129(a)(8) requires. The Highlands go on to argue that the Trustee cannot obtain confirmation under section 1129(a)(10) and (b). Section 1129(a)(10) requires that a plan receive the acceptance of at least one impaired class, without including any acceptances by insiders. The Highlands maintain that Terry's class's acceptance of the Plan does not count for purposes of section 1129(a)(10) because (1) Terry's class is not impaired, (2) Terry is an insider, and (3) the Plan

gerrymandered Terry's class to produce an impaired accepting class. Further, the Highlands

contend that the Plan discriminates unfairly and is not fair and equitable, in violation of section

1129(b). Each of these objections is unsupported by the law and the facts and should be

overruled.

### (a)    Terry's Class is Impaired.

128.    First, Terry's class is clearly impaired under the Plan. Disclosure Statement at

p. 3. The Plan treats this claim as follows: in exchange for a $1 million reduction in the amount of

the claim, Terry will receive 100% of the equity in the Reorganized Debtor. Plan § 4.02. The

balance of the claim will be treated as a General Unsecured Claim in Class 3, on account of

which Terry will receive a three-year Unsecured Cash Flow Note. *Id.* §§ 4.02, 4.03. Thus, in

exchange for a judgment claim that is partially secured by a writ of garnishment, Terry will receive

equity and an unsecured promissory note. His judgment lien will be "released, terminated and

nullified" upon the Effective Date of the Plan. *Id.* § 16.13.

129.    A class of claims is impaired under a plan of reorganization unless the plan

(1) "leaves unaltered the legal, equitable, and contractual rights" to which such claims are

entitled or (2) cures any defaults, reinstates the maturity, compensates for damages, and "does

not otherwise alter the legal, equitable, or contractual rights" to which such claims are entitled.

11 U.S.C. § 1124. Congress intended the concept of impairment to be broadly construed.

Indeed, as the Fifth Circuit has observed, "any alteration of a creditor's rights, no matter how

minor, constitutes impairment." *Western Real Estate Equities, LLC v. Vill. at Camp Bowie I, LLP*

*(In re Vill. at Camp Bowie I, LLP)*, 710 F.3d 239, 245 (5th Cir. 2013).

130.    There can be no question that Class 2 is impaired under the Plan. When a plan

treats a partially secured claim by distributing equity and an unsecured note, that is a substantial

alteration of a creditor's right. Impairment does not turn on whether the consideration provided

under the plan may be more valuable or less valuable than the creditor's prebankruptcy bundle

of rights – "*[a]ny* alteration of . . . rights constitutes impairment, even if the value of the rights is

enhanced." COLLIER ON BANKRUPTCY ¶ 1124.03 (16th ed. rev. 2012) (emphasis added) (quoted in *Camp Bowie*, 710 F.3d at 245 n. 21).

131.     Given the broad definition of impairment as adopted by the Fifth Circuit, and the fact that the Plan requires Terry to give up his judgment lien and to exchange his partially secured judgment claim for equity and an unsecured promissory note, the Plan leaves Class 2 impaired. The same would be true even if Terry's claim were entirely unsecured. The Highlands' objection on this point is lacking in merit.

### *(b)     Terry is Not an Insider.*

132.     As discussed in detail above, Terry is not an insider. Therefore, Terry's class's acceptance of the Plan counts under section 1129(a)(10).

### *(c)     The Plan's Classification of Claims Meets the Requirements of the Bankruptcy Code.*

133.     The Highlands' argument that the Plan "gerrymanders" the Terry class in order to produce an impaired accepting class is not well founded. The Plan classifies claims against and equity interests in the Debtors as required by sections 1122 and 1123(a)(1) of the Bankruptcy Code. The classification is reasonable and justified; it complies with the requirements in the Bankruptcy Code; and it is not motivated by, or evidence of, any lack of good faith in these chapter 11 cases.

134.     Section 1123(a)(1) of the Bankruptcy Code provides that a plan shall, subject to section 1122, designate (i) classes of claims other than claims that qualify as allowed administrative expenses under section 503(b) of the Bankruptcy Code or priority tax claims under section 507(a)(8) of the Bankruptcy Code, and (ii) classes of interests. 11 U.S.C. § 1123(a)(1). Section 1122(a) of the Bankruptcy Code provides in pertinent part as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).

135.    For a classification structure to satisfy section 1122(a) of the Bankruptcy Code, not all substantially similar claims or interests need to be designated in the same class. *In re Thru, Inc.*, Case No. 17-31034, 2017 Bankr. LEXIS 1902, at *8-9 (Bankr. N.D. Tex. Jul. 10, 2017), *aff'd in part, rev'd and remanded in part, dism'd as equitably moot in part, Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018 U.S. Dist. LEXIS 179769 (N.D. Tex. Oct. 19, 2018); *Couture Hotel*, 536 B.R. at 733; *In re Mirant,* 2007 Bankr. LEXIS 4951 at *21 (Bankr. N.D. Tex. Apr. 27, 2007). Instead, claims or interests designated to a particular class must be substantially similar to each other. *Mirant*, 2007 Bankr. LEXIS 4951 at *20-21 (citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278-81 (5th Cir. 1991)). A plan proponent is permitted to separately classify claims that are similar as long as there is a reasonable basis or good business justification for such separate classification. *Id.* at *21 (citing *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters. Ltd., II (In re Briscoe Enters. Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993)); *Thru,* 2017 Bankr. LEXIS 1902 at *9.

136.    The Plan designates Classes of Claims against and Interests in the Debtors in accordance with section 1123(a)(1) of the Bankruptcy Code, and provides, in a manner consistent with section 1122(a) of the Bankruptcy Code, for the separate classification of Claims and Interests based upon valid business, factual, and legal reasons. Specifically, in addition to Administrative Expenses, Priority Tax Claims, and quarterly fees payable to the United States Trustee, which need not be classified, Article II of the Plan designates six Classes and subclasses of Claims against and Interests in the Debtors, as follows:

Class 1 — Secured Tax Claims

Class 2 — Terry Partially Secured Claim

Class 3 — General Unsecured Claims

Class 4A — Insider Claims

Class 4B — Equitably Subordinated Insider Claims

Class 5 — Interests in the Debtors

137.     Each class in the Plan includes only claims or equity interests that are "substantially similar" to the other claims or equity interests in the class. Claims are "substantially similar" when they "share common priority and rights against the debtor's estate." *Phoenix Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) (unsecured deficiency claim under § 1111(b) "substantially similar" to unsecured trade claims). The Plan does not lump together, in any class, claims or equity interests with different rights of priority with respect to the Debtors or their assets. Accordingly, the Plan's classification system meets the requirements of sections 1122 and 1123(a)(1).

138.     Specifically, Class 1 consists of all Secured Tax Claims, which includes any ad valorem tax claims that arose or are deemed to have arisen on or before the Petition Date, irrespective of the date on which such claim is assessed or is due. Class 2 includes Terry's Partially Secured Claim, which is a judgment claim partially secured by a writ of garnishment. Class 3 consists of all General Unsecured Claims. Class 4 includes Insider Claims and is divided into two subclasses. Subclass 4A includes Insider Claims not subject to equitable subordination, and Subclass 4B includes equitably subordinated Insider Claims.[72] Class 5 consists of Interests in the Debtors.

139.     Even if the judicial lien created by service of the writ of garnishment were avoided and Terry stood in the position of an unsecured creditor, it would still be appropriate to classify Terry's claim separately. Section 1122(a) does not require that all "substantially similar" claims be classified together. *In re Thru, Inc.*, Case No. 17-31034, 2017 Bankr. LEXIS 1902, at *8-9 (Bankr. N.D. Tex. Jul. 10, 2017), *aff'd in part, rev'd and remanded in part, dism'd as equitably moot in part, Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018

---

[72] Subclass 4B is currently an empty subclass.

U.S. Dist. LEXIS 179769 (N.D. Tex. Oct. 19, 2018); *Couture Hotel,* 536 B.R. at 733. Indeed, courts recognize that a plan proponent has and should have a large degree of flexibility in classifying claims and equity interests. *See Couture Hotel,* 536 B.R. at 733; *In re McCommas LFG Processing Partners,* Case No. 07-32219-HDH-11), 2007 Bankr. LEXIS 4053 (Bankr. N.D. Tex. Nov. 29, 2007); *In re General Homes Corp.,* 134 B.R. 853, 863 (Bankr. S.D. Tex. 1991). In the Fifth Circuit, separate classification of "substantially similar" claims will be upheld if the plan proponent shows that the classification was based on a reasonable justification and not to gerrymander an impaired accepting class. *Save Our Springs (SOS) Alliance v. WSI (II)-COS, L.L.C. (In re Save Our Springs (SOS) Alliance)*, 632 F.3d 168, 174 (5th Cir. 2011); *Heartland Fed. Sav. & Loan v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1167 (5th Cir. 1993); *Greystone*, 995 F.2d at 1279.

140.     Terry is uniquely situated in these cases. His claim is by far the largest claim. Before the commencement of these cases, Terry, as an employee of Highland, served as portfolio manager for the Acis CLOs. Terry's history – and, more importantly, his economic interest in what happens to Acis after confirmation of the Plan – are not shared by any other creditor in these cases. For this reason, it is appropriate for Terry's claim to constitute a separate class in the Plan. *See Briscoe*, 994 F.2d at 1167 (creditor's unique interest in reorganized debtor justified separate classification); *Thru*, 2017 Bankr. LEXIS 1902, at *9 (creditor's special "non-creditor interest" made separate classification appropriate); *see also In re LightSquared Inc.*, 513 B.R. 56, 88-89 (Bankr. S.D.N.Y. 2014) (competitor of debtor held to have significant non-creditor interest; separate classification of claim upheld); *In re Premiere Network Servs.*, 333 B.R. 130, 135 (Bankr. N.D. Tex. 2005) (same).

141.     The reasonable justification for separately classifying Terry's claim, and the absence of any motive to gerrymander claims, are further supported by the unique treatment given to the claim, which treatment befits Terry's unique situation. Under the Plan, Terry will receive 100% of the equity in reorganized Acis in exchange for a $1 million reduction in the

amount of the secured portion of his claim. The balance of the claim will be treated as a General Unsecured Claim. Plan § 4.02. Holders of Allowed General Unsecured Claims receive quarterly distributions of cash. *Id.* § 4.03. *Compare Greystone*, 995 F.2d at 1280-81 (separately classifying similar claims, but giving same treatment, undercuts proponent's justification for separate classes).

142.     The Plan's classification of claims and equity interests, including classification of the Terry Partially Secured Claim, is compliant with sections 1122 and 1123 of the Bankruptcy Code and governing Fifth Circuit law. The Plan's classification of Claims and Interests does not prejudice the rights of any creditor or equity security holder, is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate.

### (d)     The Plan Satisfies Section 1129(b).

143.     To obtain confirmation of a plan that has not received the acceptance of all impaired classes, the proponent must show (i) that the plan and the proponent have met all the requirements for confirmation except for section 1129(a)(8) (acceptance by all impaired classes) and (ii) that the plan "does not discriminate unfairly, and is fair and equitable" with respect to each non-accepting impaired class. 11 U.S.C. § 1129(b)(1).  Here, the Plan has been accepted by two classes of unsecured claims:  Class 2 (the Terry Partially Secured Claim) and Class 2 (General Unsecured Claims).  The only voting class that has not voted to accept the Plan is Class 4 (Insider Claims).  As a result, because not all impaired classes have voted to accept the Plan, the Trustee will show that the Plan can be confirmed under the "cramdown" provisions of section 1129(b).

144.     First, as discussed in detail above, the Trustee and the Plan have satisfied or will have satisfied all of the requirements for confirmation except for the requirement that all impaired classes accept the Plan.

145.     Second, the Plan "does not discriminate unfairly, and is fair and equitable" with respect to each potential non-accepting impaired Class. Class 1 is unimpaired. Class 2 is

impaired and consists of a secured claim. Classes 3 and 4 are impaired and consist of unsecured claims. Class 5 consists of Interests, which are cancelled. As shown in the projections attached as Exhibit 3 to the Disclosure Statement, the Trustee anticipates that the Plan will provide for a 102%[73] recovery for the Allowed Class 2 Claim, 102%[74] recovery for Allowed Class 3 Claims, and between 65% and 100% recovery for Allowed Class 4 Claims. The treatment and projected recoveries for Allowed Claims in impaired Classes under the Plan clearly meet the "cramdown" requirements for any such Class as set forth in section 1129(b).

### 5. The Plan Complies With Section 1129(a)(11).

146.   The Highlands object that the Plan does not meet the feasibility test of section 1129(a)(11). As the Trustee will show through evidence presented at the Confirmation Hearing, the Plan satisfies the requirements of this provision.

147.   Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the Court determine that the Plan is feasible. Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

As described below, and as will be shown at the Confirmation hearing, the Plan meets the requirements of this provision.

148.   Section 1129(a)(11) requires the Court to determine that confirmation of the Plan is not likely to be followed by the liquidation, or a need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, other than as proposed in the Plan. To satisfy section 1129(a)(11) of the Bankruptcy Code the Trustee need not prove a guaranteed

---

[73] Including an interest component.

[74] Including an interest component.

success, but only a reasonable probability of success. *In re Thru, Inc.*, Case No. 17-31034, 2017 Bankr. LEXIS 1902, at *16 (Bankr. N.D. Tex. Jul. 10, 2017), *aff'd in part, rev'd and remanded in part, dism'd as equitably moot in part, Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018 U.S. Dist. LEXIS 179769 (N.D. Tex. Oct. 19, 2018); (citing *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H Orleans Ltd. P'ship*), 116 F.3d 790, 801 (5th Cir. 1997)). Courts often consider several factors is determining whether a plan is feasible, including (1) capital structure, (2) earning power, (3) economic conditions, (4) the ability of management, (5) the probability of continuation of management, and (6) other related facts. *Id.* (citing *In re Couture Hotel*, 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015)).

149.     Applying the foregoing legal standards, the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Trustee has analyzed the Estate's ability to fulfill obligations under the Plan. As part of this analysis, the Trustee's financial advisors and investment bankers have prepared financial projections (the "Projections"), which are attached to the Disclosure Statement as Exhibit 3.

150.     The Projections were prepared in good faith and are based on reasonable assumptions. The Projections indicate that sufficient resources will exist to satisfy obligations under the Plan. Based upon the foregoing, the Plan has more than a reasonable likelihood of success and satisfies the feasibility standard of section 1129(a)(11).

WHEREFORE, the Trustee prays that the Court confirm the Plan, deny the Objection, and for any other and further relief to which he may be justly entitled.

DATED: December 5, 2018

Respectfully submitted,

*/s/ Jeff P. Prostok*
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Laurie Dahl Rea
State Bar No. 00796150
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
lrea@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN, CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
rpatel@winstead.com
Phillip Lamberson
State Bar No. 00794134
plamberson@winstead.com
Joe Wielebinski
State Bar No. 21432400
jwielebinski@winstead.com
Annmarie Chiarello
State Bar No. 24097496
achiarello@winstead.com
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)

**SPECIAL COUNSEL FOR ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served electronically via the Court's ECF Notification system on December 5, 2018.

/s/ Jeff P. Prostok
Jeff P. Prostok

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Pleadings 18-30264-sgj11\Response to HCM and HCLOF Plan Objection 12.5.18.docx

# EXHIBIT "A"
## [ALF PMA]

<u>PORTFOLIO MANAGEMENT AGREEMENT</u>

THIS PORTFOLIO MANAGEMENT AGREEMENT (this "***Agreement***"), dated to be effective from December 22, 2016 (the "***Effective Date***") is entered into by and between **Acis Loan Funding, Ltd.**, a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120, (the "***Company***") and **Acis Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "***Portfolio Manager***" or "***Acis***").

RECITALS

WHEREAS, the Company and the Portfolio Manager entered into that certain Portfolio Services Agreement, dated to be effective from August 10, 2015 (the "***Portfolio Services Agreement***"); and

WHEREAS, the Company and the Portfolio Manager desire to supersede and replace the Portfolio Services Agreement in its entirety with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      <u>Termination of the Portfolio Services Agreement</u>.  Effective as of the Effective Date, the Portfolio Services Agreement is hereby terminated and shall have no further force or effect.

2.      <u>Appointment of the Portfolio Manager</u>.  The Portfolio Manager shall act as the investment manager to the Company and shall manage the investment and reinvestment of the cash, Financial Instruments (as defined in Section 5 below) and other properties comprising the assets and liabilities of the Company, in each case, subject to and in accordance with the investment policy of the Company (the "***Investment Policy***").

3.    Additional Portfolio Services.  The Portfolio Manager shall discuss with the directors of the Company (the "**_Directors_**") the investment objectives of the Company and assist the Directors to develop, monitor and update the Company's Investment Policy; shall identify and present information to the Directors with respect to potential investments available to the Company in furtherance of the Investment Policy, including (without limitation) credit and market research and analysis in connection with the origination or acquisition of such investments; shall provide such assistance with respect to the administration and valuation of the Company's investment portfolio as the Directors shall reasonably require; and shall make available to the Company such personnel and resources as are necessary in connection with the foregoing services.

4.    Custody.  The Financial Instruments (as defined in Section 5 below) shall be held in the custody of State Street Custodial Services (Ireland) Limited or one or more banks selected by the Company (each such bank, a "**_Custodian_**").  The Company will notify the Portfolio Manager promptly of the proposed selection of any other Custodians.  The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the Company.  At no time shall the Portfolio Manager have possession of or maintain custody over any of the Financial Instruments.  The Portfolio Manager shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

5.    Authority of the Portfolio Manager.  Subject at all times to (i) provisions of applicable law, and (ii) the Investment Policy, the Portfolio Manager shall have the authority for and in the name of the Company to:

(a)    invest, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated,

convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) senior secured loans, (ii) notes representing tranches of debt ("***CLO Notes***") issued by a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans (which may be represented by a debt or equity security) (a "***CLO***"), (iii) preference shares, income notes or other equity instruments issued by CLO issuers, (iv) equity interests or loans in asset management companies, (v) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (vi) swaps and contracts for difference, options, swaptions, rights, warrants, when- issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (vii) spot and forward currency transactions and (viii) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales;

(b)     engage in such other lawful Financial Instruments transactions as the Portfolio Manager may from time to time determine;

(c)     provide credit and market research and analysis in connection with  the investments and ongoing management of the Company and direct the formulation of investment policies and strategies for the Company;

- 3-

(d)      purchase Financial Instruments and hold them for investment;

(e)      enter into contracts for or in connection with investments in Financial Instruments;

(f)      invest in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)      possess, transfer, mortgage, pledge or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Company and/or its subsidiaries;

(h)      lend, either with or without security, any Financial Instruments, funds or other properties of the Company, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Company;

(i)      open, maintain and close accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)      open, maintain and close accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)      combine purchase or sale orders on behalf of the Company with orders for other accounts to which the Portfolio Manager or any of its affiliates provides investment services ("***Other Accounts***") and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Portfolio Manager in its sole discretion, among such accounts;

(l)      enter into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Company and Other Accounts and are allocated among such accounts using an average price;

(m)     organize one or more corporations and other entities formed to hold record title, as nominee for the Company (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Company;

(n)     cause the Company to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Portfolio Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)     engage and/or provide personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants, investment bankers and any human resources as may be necessary for the Company to conduct any matters related to its portfolio of assets on behalf of or for the Company);

(p)     provide certain support and assistance (including back office and middle office functions) to the Company; and

(q)     vote Financial Instruments, participate in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

6.     Policies of the Company.     The activities engaged in by the Portfolio Manager shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy.

The Portfolio Manager shall submit such periodic reports, recommendations, research and analytic material to the Company regarding the Investment Policy, the Company's investment portfolio and the Portfolio Manager's activities hereunder as the Company may reasonably request and a representative of the Portfolio Manager shall be available to meet with the Company (whether in person or by telephone) as reasonably requested by the Company.

In furtherance of the foregoing, the Company hereby appoints the Portfolio Manager as the Company's attorney-in-fact, with full power of authority to act in the Company's name and on its behalf with respect to the matters set forth in Section 5 above.

7.      <u>Status of the Portfolio Manager</u>.  The Portfolio Manager shall, for all purposes, be an independent contractor and not an employee of the Company, and nothing herein shall be construed as making the Company a partner, member or co-venturer with the Portfolio Manager or any of its affiliates or clients.  The Portfolio Manager shall have no authority to act for, represent, bind or obligate the Company except as specifically provided herein.

8.      <u>Reimbursement by the Company</u>.  The Portfolio Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Company with respect to the Company and/or its subsidiaries (any such appointee, a "***Sub-Services Provider***"), including, but not limited to, any affiliate of the Portfolio Manager, but payment for any such services shall be assumed by the Portfolio Manager, and the Company shall not have any liability therefor; *provided, however*, that the Portfolio Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Company, and the Company shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom, including any irrecoverable VAT arising on such costs and expenses.

9.      <u>Expenses</u>.

(a)      The Company shall pay or reimburse the Portfolio Manager and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes imposed upon the Company (including, but not limited to, any irrecoverable VAT arising on such costs and expenses), fees relating to valuing the Financial

Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Portfolio Manager. For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)     To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any Sub-Services Provider, the Company shall reimburse the Portfolio Manager  (or the relevant Sub-Services  Provider,  as applicable)  for such expenses so long as such expenses are determined on an arm's length basis.

10.     Exculpation; Indemnification.

(a)     Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Portfolio Manager, its managers, directors, officers, partners, shareholders, agents and employees, or any of their respective affiliates and their respective managers, directors, officers, partners, shareholders, agents and employees (including parties acting as agents for the execution of transactions) (each, a "***Covered Person***" and collectively, "***Covered Persons***") shall be subject to the provisions of this Section.

(b)     To the fullest extent permitted by law, no Covered Person shall be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Company or any of its subsidiaries or anyone for liabilities incurred by the Company as a result of or arising out of or in connection with the performance by the Portfolio Manager under this Agreement, or for any losses or damages resulting from any failure to satisfy the Standard of Care (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the Company,

- 7-

(iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any such liabilities were incurred by reasons of acts or omissions constituting bad faith, fraud, willful misconduct or gross negligence (with such term given its meaning under New York law) or reckless disregard of the duties and obligations of the Portfolio Manager (as determined by a non-appealable judgment of a court of competent jurisdiction), (a "***Portfolio Manager Breach***").

(c)     Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the Company shall indemnify and hold harmless Covered Persons, from and against any and all claims, liabilities, damages, losses, costs and expenses ("***Losses***"), including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Covered Person and arise out of or in connection with the business of the Company, any investment made under or in connection with this Agreement, or the performance by the Covered Person of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person in connection with the Company, provided that a Covered Person shall not be entitled to indemnification hereunder to the extent the Covered Person's conduct constitutes a Portfolio Manager Breach.  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Covered Person's conduct constituted a Portfolio Manager Breach.

(e)     Expenses incurred by an Covered Person in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the

Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately that the Covered Person is not entitled to be indemnified hereunder.

(f)     The right of any Covered Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Portfolio Manager and each Covered Person will generally not be liable to the Company for any act or omission (or alleged act or omission), absent a Portfolio Manager Breach, and the Company will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the Company, absent a Portfolio Manager Breach.  As a result of these provisions, the Company (not the Portfolio Manager or any other Covered Person) will be responsible for any Losses resulting from trading errors and similar human errors, absent a Portfolio Manager Breach or the inability to waive or limit such Losses under applicable law.  Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements.  Given the volume of transactions executed by the Portfolio Manager and its affiliates on behalf of the Company, the Company acknowledges that trading errors (and similar errors) will occur and that the Company

- 9-

will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Portfolio Manager or its affiliates.

11.    <u>Activities of the Portfolio Manager and Others</u>.  The Portfolio Manager, and its affiliates may engage, simultaneously with their portfolio servicing and management activities on behalf of the Company, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Company. Notwithstanding the foregoing, the Portfolio Manager and its affiliates shall devote as much time and resources to the performance of its obligations hereunder as the Portfolio Manager deems necessary and appropriate. In addition, the Portfolio Manager or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, any guidance provided by the Portfolio Manager to the Company. The Portfolio Manager may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from guidance given to, or securities recommended for, the Company, even though their investment objectives may be the same or similar.  The Portfolio Manager may recommend transactions in securities and other assets in which the Portfolio Manager has an interest, including securities or other assets issued by affiliates of the Portfolio Manager. The Company acknowledges that it has received a copy of Part 2 of the Portfolio Manager's Form ADV, which further describes conflicts of interest, including the Portfolio Manager, its affiliates and their respective advised accounts.

12.    <u>Standard of Care</u>. Under this Agreement, the Portfolio Manager agrees to perform its obligations hereunder, with reasonable care (a) using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets that it manages for itself and others having similar investment objectives and restrictions, and (b) to the extent not inconsistent with the foregoing, in a manner consistent with the Portfolio Manager's customary standards, policies and procedures (the "***Standard of Care***"); provided that the Portfolio Manager shall not be liable for any loss or damages resulting from any failure to satisfy the Standard of Care except to the extent any act or omission of the Portfolio Manager constitutes a Portfolio Manager Breach. The Standard of Care may change from time to time to

reflect changes by the Portfolio Manager to its customary standards, policies and procedures provided that such customary standards, policies and procedures are at least as rigorous as the foregoing.

13.    Term; Termination.

(a) This Agreement shall remain in effect through an initial term concluding August 10, 2018 and shall be automatically extended for additional three-year terms thereafter, *provided*, *however*, this Agreement may be terminated in the event of: (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act of 1940, as amended (the "***Investment Company Act***") (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full, (C) such other date as agreed between the Company and the Portfolio Manager and (D) under subsection (b) of this Section 13 or Section 14 of this Agreement.

(b) Notwithstanding any other provision hereof to the contrary but subject to the provisions of clause (d) below, this Agreement may be terminated without cause by the Portfolio Manager, and the Portfolio Manager may resign, upon at least ninety (90) days' (or such shorter notice as is acceptable to the Company) written notice to the Company. The resignation shall not be effective until the date as of which a successor adviser has been appointed.  The Portfolio Manager may immediately resign by providing written notice to the Company upon the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a willful breach or knowing violation by the Company of a material provision of this Agreement or the occurrence of insolvency proceedings in respect of the Company.

(c) Notwithstanding the provisions of clause (b) above, no resignation or removal of the Portfolio Manager or termination of this Agreement pursuant to such clause shall be effective until the date as of which a successor Portfolio Manager shall have been appointed and approved in accordance with Section 13(d) and has accepted all of the Portfolio Manager's

duties and obligations pursuant to this Agreement in writing and has assumed such duties and obligations.

(d) Any termination, removal or resignation of the Portfolio Manager shall be effective only upon (a) the appointment by the Company of a successor Portfolio Manager that is an established institution which (i) has demonstrated an ability to professionally and competently perform duties reasonably comparable to those imposed upon the Portfolio Manager hereunder, (ii) is legally qualified and has the capacity to act as successor to the Portfolio Manager under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager hereunder and under the terms of the offering memorandum dated August 10, 2015 (as amended from time to time, the "*Offering Memorandum*") applicable to the Portfolio Manager, (iii) shall not cause the Company to become required to register under the provisions of the Investment Company Act and (iv) shall not result in the imposition of any entity-level or withholding tax on the Company or cause any other material adverse tax consequences to the Company and (b) written acceptance of appointment by such successor Portfolio Manager. The Company shall use its commercially reasonable efforts to appoint a successor Portfolio Manager to assume the duties and obligations of the removed or resigning Portfolio Manager. The Company, the Custodians and the successor Portfolio Manager shall take such action (or cause the outgoing Portfolio Manager to take such action) consistent with this Agreement and the terms of the Offering Memorandum applicable to the Portfolio Manager, as shall be necessary to effectuate any such succession. In the event that a successor has not been appointed or has not assumed the duties of the Portfolio Manager in writing within a 60-day period the Portfolio Manager or the Company may petition a court of competent jurisdiction for the appointment of a successor Portfolio Manager, which appointment will not require the consent of, or be subject to the approval or disapproval of, the Company (so long as such court appointed successor meets the requirements of clauses (a)(i) through (iv) above).

(e) In the event of removal of the Portfolio Manager pursuant to this Agreement, the Company shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Company may by notice in writing to the Portfolio Manager as provided under this Agreement terminate all the rights and obligations of the Portfolio Manager under this Agreement (except those that survive termination pursuant to

Section 13(d) above). Upon resignation or removal of the Portfolio Manager in accordance with this Section 13 or Section 14 of this Agreement, as applicable, and upon acceptance by a successor Portfolio Manager of appointment, all authority and power of the Portfolio Manager under this Agreement and the Offering Memorandum, shall automatically and without further action pass to and be vested in the successor Portfolio Manager.

(f) For so long as Acis Capital Management, L.P. or an Affiliate of Acis Capital Management, L.P. is the Portfolio Manager, the Company shall be permitted to use the "Acis" name; provided that, if the Portfolio Manager ceases to be Acis Capital Management, L.P. or an Affiliate of Acis Capital Management, L.P., the Company shall use commercially reasonable efforts to change its name to remove all reference to the name "Acis" therefrom. In addition, the Portfolio Manager, without the consent of the Company, may change the name of the Portfolio Manager.

14. <u>Termination by the Company for Cause</u>. This Agreement may be terminated, and the Portfolio Manager may be removed for Cause (as defined below) by the Company upon ten (10) days' prior written notice to the Portfolio Manager. No such termination or removal shall be effective until the date as of which a successor Portfolio Manager shall have agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to this Agreement and as specified in the Offering Memorandum. "Cause" shall mean any one of the following events:

(a) the Portfolio Manager willfully violates, or takes any action that it knows breaches any material provision of this Agreement or the Offering Memorandum applicable to it in bad faith (not including a willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions);

(b) the Portfolio Manager breaches in any respect any provision of this Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Company receiving notice of such

- 13-

breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Company receives notice thereof;

(c)  the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for sixty (60) days;

(d)  the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or

(e)  any senior executive officer of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services

and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

If any of the events specified in the definition of "Cause" in this Section 14 shall occur, the Portfolio Manager shall give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event. The Company may waive any event described in (a), (b), (d), or (e) above as a basis for termination of this Agreement and removal of the Portfolio Manager under this Section 14.

15.  <u>Miscellaneous</u>.

(a)  <u>Notices</u>.  Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

> If to the Portfolio Manager, to:
>
> Acis Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Telephone Number: (972) 628-4100
> Facsimile Number: (972) 628-4147
>
> If to the Company, to:
> Acis Loan Funding, Ltd.
> 1st Floor
> Dorey Court Admiral Park St Peter Port
> Channel Islands
> Guernsey
> GY1 3BG
> Attention: Sharon Wrench
> Telephone Number: +44 (0) 1481 704543
> Facsimile Number:  +44 (0) 1481 715602

(b)  <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c) <u>Amendments and Waivers</u>. No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties. No amendment to this Agreement may be made without first obtaining the required approval from the Company. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d) <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Company, the Portfolio Manager, each Covered Person and their respective successors and permitted assigns. Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Portfolio Manager and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent. No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; *provided*; *however*, that the Portfolio Manager may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e) <u>Governing Law</u>. Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f) <u>Arbitration</u>.

(i) Any controversy or claim or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (a "***Disputed Matter***") shall be handled exclusively pursuant to the following procedures. In the event of any Disputed Matter, the parties agree that upon written notice of such Disputed Matter sent by one party to the party, the parties shall arbitrate the Disputed Matter pursuant

- 16-

to this Section 15(f) unless the parties expressly agree in writing to resolve the Disputed Matter in another manner through mediation or otherwise. The arbitration shall be conducted pursuant to the commercial arbitration rules of the American Arbitration Association in Dallas, Texas. Any arbitration pursuant to this Agreement unless otherwise agreed to by the parties shall be conducted by a panel of three (3) arbitrators mutually selected by the parties from a list of arbitrators determined in accordance with the American Arbitration Association's arbitrator selection procedure.

(ii) The judgment upon the award rendered in any such arbitration shall be final and binding upon the parties and may be entered in any court having jurisdiction thereof. All fees and expenses of the arbitrator and all other expenses of the arbitration shall be paid by the non-prevailing party in such arbitration. The arbitrator shall have no authority to impose any punitive or consequential damages.

(iii) Nothing in this Section 15(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g) <u>Headings</u>. The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h) <u>Counterparts</u>. This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i) <u>Survival</u>. The provisions of Sections 8, 9, 10 and 15 hereof shall survive the termination of this Agreement.

(j) <u>Pronouns.</u> All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)    <u>Arm's-Length Agreement</u>.    The Company has approved this Agreement and reviewed the activities described in Section 11 and in the Portfolio Manager's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

ACIS LOAN FUNDING, LTD.

By:_____
Name: William Scott
Title:  Director

.ACIS CAPITAL MANAGEMENT, L.P.

By:    Acis Capital Management GP, LLC, its
       general partner


       By:_____
       Name: James Dondero
       Title: President

- 19-

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

ACIS LOAN FUNDING, LTD.

By:_____
Name: William Scott
Title:  Director


ACIS CAPITAL MANAGEMENT, L.P.

By:    Acis Capital Management GP, LLC, its
       general partner

By:_____
Name: James Dondero
Title: President

# EXHIBIT "B"
## [McGuffin Expert Report]

IN RE ACIS CAPITAL MANAGEMENT LP AND ACIS CAPITAL MANAGEMENT GP LLC

---

## EXPERT REPORT OF ADVOCATE TODD MCGUFFIN
## ON ISSUES OF GUERNSEY LAW

---

## Instructions

1. I am instructed by Forshey Prostok LLP as counsel to Robin Phelan in his capacity as the Chapter 11 bankruptcy trustee ("**the Bankruptcy Trustee**") of Acis Capital Management LP and Acis Capital Management GP LLC (collectively, "**Acis**"). The extent of my instructions is to provide my opinions in response to opinions expressed in an affidavit by Tim Channer Corfield sworn 14 November 2018 filed in proceedings before the United States Bankruptcy Court with respect to the above named entities and others ("**the US Bankruptcy Proceedings**").

2. I understand that my opinion is sought in the context of the continuance or further granting of an injunction in the Bankruptcy Trustee's Third Amended Joint Plan for Acis entered on 25 October 2018 and related proceedings.

3. The views and opinions expressed therein are specifically in relation to Mr Corfield's opinions with respect to Guernsey law. It is not my intention to engage with respect to the merits of otherwise any proceedings commenced by any party to the US Bankruptcy Proceedings or any claim made by any party on those proceedings.

4. In the absence of a Guernsey statutory rule as to the duty of experts when giving evidence, I adopt and provide my opinions below in accordance with Rules 35.3 of *The Civil Procedure Rules 1998* in England and Wales as cited by Mr Corfield in paragraph 5 of his affidavit. Therefore it is my duty to help the court on matters of Guernsey law and that duty is paramount and overrides any obligation to the party to whom I have received instructions in or by whom I will be paid.

5. Whilst I express my opinions as to Guernsey law below with complete independence, in accordance with my professional duties candour and to ensure full and frank disclosure, I wish to draw to the attention of the Court that Babbé LLP acts for Joshua Terry with respect to extant proceedings before the Royal Court of Guernsey commenced by Highland CLO Funding Limited. Mr Terry is aware that I have been asked to provide this opinion and the Bankruptcy Trustee is aware that Babbé LLP acts for Mr Terry in the above extant Guernsey proceedings

## Extent of Opinion Provided and Documents Reviewed

6. Given that I was only formally instructed on 28 November 2018 ahead of, as I understand, a filing deadline in the US Bankruptcy Proceedings on 30 November 2018, the opinions expressed below are of

a preliminary nature and are expressed summarily given the time constraints involved.    Further, I read only the following documents or extracts of such as follows: Preliminary Injunction Order entered on 10 July 2018; paragraphs 55 to 64 and paragraphs 117 to 138 of the Defendant's Amended Answer, Counterclaims (including Claim Objections) and Third-Party Claims entered on 13 November 2018; paragraph 14.03 of the Third Amended Joint Plan for Acis entered on 25 October 2018; pages 15, 16 and 19 to 22 of Disclosure Statement entered on 25 October 2018; and page 17 of the Joint Objection document entered on 26 November 2018.

**My Background and Qualifications**

7.  I am an Advocate of the Royal Court of Guernsey and am qualified to practice and appear in all the courts of the Bailiwick of Guernsey.   I am a Partner in the dispute resolution team of the Guernsey law firm, Babbé LLP.     I was firstly admitted as a Solicitor of the Supreme Court of New South Wales, Australia in May 2003 and as a Solicitor of the High Court of Australia in January 2004.  Subsequently, I was admitted as a Solicitor of the Supreme Court of England and Wales in November 2007 and was called to the Guernsey Bar in January 2013.  I have practised law in Guernsey since October 2008.   In addition to my various under graduate legal qualifications, I have a number of post-graduate qualifications including a Masters of Law from the University of London with a specialisation in Equity and Trusts (with Merit).

8.  I have been invited to speak on various issues of Guernsey law previously including with respect to the annual Channel Islands seminar held by INSOL International of which I have been on the organising committee for a number of years.  I have recently been invited to be appointed to the global editorial board of INSOL World.  I am a member of Legal and Regulatory Committee of the local INSOL affiliated chapter, ARIES.  That committee is currently consulting with the States of Guernsey with respect to the content of legislation to facilitate extensive reforms of Guernsey corporate insolvency law.  I sit as a representative of the Guernsey Bar on a forum chaired by the Guernsey Financial Services Commission ("**GFSC**") briefed to review the financial services and regulatory laws of Guernsey with a view of examining their competitiveness to other international finance centres.

9.  Whilst specialising in corporate liquidation, I am regularly instructed in complex regulatory matters including enforcements, especially in the area of fiduciaries and funds.  I have been instructed to act previously on behalf of the GFSC with respect to a public interest winding up of a closed-ended investment fund.  I regularly advise foreign lawyers on Guernsey law most recently for the successful respondent in the recent English Court of Appeal judgment in *First Tower Trustees Limited v CDS (Superstores International) Limited* [2018] EWCA Civ 1396 which applied (for the first time) the important Guernsey trust law case of the Judicial Committee of the Privy Council (the highest appellant court in Guernsey law) in *Investec Trust (Guernsey) Limited v Glenalla Properties Limited* [2018] UKPC 7 (in which Babbé LLP acted).

**Enforcement of a foreign judgment in Guernsey**

10. It is correct that there is no statutory reciprocal enforcement regime between the United States and Guernsey.  In the absence of such, the recognition and enforcement a US judgment in Guernsey can

only be facilitated under common law principles. Those applicable principles, in summary, require the relevant foreign court to have competent jurisdiction (i.e. as the defendant submitted to the jurisdiction of that court), the judgment is conclusive (i.e. cannot be impeached for fraud for example) and must be for a definite sum of money (but not relating to taxes or penalties of such nature). However, it would be open to the US Bankruptcy Court to seek the assistance of the Royal Court with respect to any action that that court wished to take in the liquidation process. In *EFG Private Bank (Channel Islands) Limited v BC Capital Group SA (in Liquidation) & Ors* (2013) GLR 354, the Royal Court held that, as a matter of Guernsey law, the doctrine of universalism was recognised. That doctrine dictates, as the Royal Court found, that it was desirable that a single legal system be allowed to conduct the liquidation, irrespective of the location of assets and the creditors. Once the liquidation had begun under the law of the place of incorporation, upon a request for judicial assistance, the Royal Court retains a discretion as to the extent of assistance it should give when asked. At page 379, paragraph 50, the Court relevantly stated:

(c) *In determining how to exercise the court's discretion, proper regard must be had to the principle of universalism in the insolvency proceedings.*

(d) *The court has an obligation pursuant to inter-jurisdictional comity or co-operation to render active assistance to the liquidation processes taking place in the British Virgin Islands but, in doing so, it has to determine what that assistance amounts to. It is clear that this court is not bound to accede to any assistance requested; the assistance sought must be what this court can properly and sensibly do to assist rather than frustrate the foreign insolvency.*

(e) *The court must consider carefully whether the question of determining the ownership of assets is some form of particular relief available in the insolvency process or an ordinary question of resolving the civil rights and obligations of the competing claimants.*

(f) *A factor to bear in mind in considering whether to stay the Bank's interpleader proceedings is the doctrine of forum non conveniens and whether another jurisdiction, here the British Virgin Islands, is clearly and distinctly a more appropriate forum to determine the ownership question than Guernsey is.*

(g) *The role of the Royal Court is to assist and certainly not to frustrate the insolvency proceedings under way in the British Virgin Islands and should endeavour to ensure that no one is taking an unfair advantage through litigating issues in Guernsey.*

(h) *Ultimately, the discretion available to the court must be exercised judicially, with a view to achieving fairness and justice as between all parties.*

11. I accept that the common law restrictions on the enforcement of non-monetary judgments will be a proper matter for the Royal Court to take into account when exercising its discretion, but it cannot be considered determinative on whether assistance would be provided or the extent of any assistance. Unless and until the form of order is known, it is impossible to predict the outcome of the exercise of discretion by the Royal Court in response to a request for judicial assistance.

**Availability of Specific Performance in Guernsey Law**

12. With respect to paragraph 67 of Mr Corfield's affidavit, it is my opinion that the assertion that the Royal Court of Guernsey is not a court of equity, and thereby cannot grant equitable remedies, is wrong.

13. The Royal Court has, in my opinion, always been a court of both law and equity, but using the term "equity" in its more general sense, and not in the more technical sense, which would be used with

respect to the courts of Chancery in England.  This distinction was commented upon in the Jersey case of *GA Trollope v Jackson* [1990] JLR 192 where it states (at page 198):

> "In so far as the equitable remedy of specific performance is concerned, I had occasion in a recent case of Ex p. Viscount Wimborne to make some observations about the meaning of equity in this jurisdiction, and I was not prepared, and this court is not prepared, to equate it wholly with the principles enunciated in the Chancery Division of the High Court of England and Wales.  In our view the word "equity" in Jersey corresponds mainly to the French équité – in other words, a question of fairness".

14. The above judgment clearly considers that specific performance is available.   Jersey law and Guernsey law share considerable similarities and their judicial systems share a common pool of judges for their respective Courts of Appeal.

15. The right to specific performance has never truly been considered in the context of the general law of contract in Guernsey.  However, it has been considered in the context of contracts relating to real property and I note that Mr Corfield's opinion relies (in part) upon the Privy Council decision of *Godfray v The Constables of the Island of Sark* [1902] AC 534.  That case relates to a "private contract" for the sale of land and therefore the case is only authority that specific performance is not available with respect to private contract for the sale of land.

16. Mr Corfield then cites the decision in *RG Phillips Limited v Hill and Hill (*1999) 27 GLJ 71.  It is notable that this judgment is of a single judge of the Royal Court and is thereby not binding on another judge of the Royal Court and the report of which is very limited (to some 7 lines).  It is wholly unclear whether that substantive argument was heard.  In any event, it appears to involve building works with respect to real property so the prohibition on the availability of specific performance as detailed above would properly apply.  Finally, Mr Corfield cites *Gaudion and Gaudion v Weardale* [1997] Guernsey Court of Appeal, 23 July 1997.  I assume Mr Corfield relies upon the reference to *Godfray* on page 100.  However, the *Gaudion* judgment discounts the application *Godfray* at page 100 where is states "*since it is apparently reference to a consideration of equities in the context of a* [real property] *sale transaction*".

17. In my opinion, it is unarguable that the Royal Court of Guernsey grants equitable relief.   Declaratory relief is sought often and without opposition as to its availability.  In this regard, the Court has the power to declare constructive trusts (in the appropriate cases, especially where there are findings of fraud) and knowing receipt and dishonest assistance are recognised:  *Jefcoate v Spread Trustee Co. Limited* (2013) GLR 220.  The equitable remedy of retrospective rectification has been imported from English law and applied in the context of the fraudulent transfer of shares:  *Harlequin Chemicals Limited v Urban*, Royal Court, 18 March 2016, 12/2016.  Further, in cases of defrauding creditors, in addition to any other remedy, a Guernsey customary law remedy (Pauline Action) is available:  *Batty v Bourse Trusts C Limited* (2017) GLR 54.

18. Equitable tracing and interpleader are available: *EFG Private Bank (Channel Islands) Limited v BC Capital Group SA (in liquidation) et al,* Royal Court, 14 July 2014, 32/2014; (2014) GLR N11.  The law of undue influence has been imported from English equity law and Jersey law: *Hitchins v Hill* [2011-12]

GLR 336. The Royal Court and Court of Appeal have recognised the appointment of foreign court appointed equitable receivers appointed by the US District Court: *In the Matter of Battoo and Robb Evans and Associates LLC* (2014) GLR 86. Whilst our trust law is based in statute, English trust law is considered for its interpretation and application: *Spread Trustee Co Limited v Hutcheson* [2011-12] GLR 164.

19. Whilst I accept there has been informal debate for some years with respect to this issue within the Guernsey Bar, it is my opinion that the issue simply has not been properly argued and tested before the Royal Court of Guernsey. There is no definitive binding case law on the issue as a matter of general contract law in Guernsey but there are substantive and credible legal bases and arguments that such a remedy is available. At the very minimum, it cannot be considered on a binary basis that the remedy is not available.

20. My conviction in relation to my views and opinions as expressed above are strengthened from the fact that, arguably the most respected commentator on Guernsey law and the author of the main text on Guernsey law (*Law of Guernsey, Dawes, 2013*) , Advocate Gordon Dawes, considers, on the basis of the above reasons and others, that it is not correct to state as a matter of law, that specific performance is not a remedy available to the Royal Court: see his note produced in English High Court proceedings, *Rawlinson & Hunter Trustees SA v ITG Limited* [2015] EWHC 1664 (Ch).

21. With respect to paragraph 69, in principle, I agree that as a matter of public policy, the Royal Court of Guernsey, would not, in the normal course, enforce a judgment which would compel another party to breach extant lawful contractual agreements. However, the opinion offered by Mr Corfield is based upon the assumption that any existing contractual arrangements are lawful and are not set aside by the court in the relevant jurisdiction.

22. Given the content of paragraph 30 of Mr Corfield's affidavit, I agree that "*The Legal and Regulatory Issues*" (as defined by him) would be redundant in the event an appropriate order for specific performance was granted in Guernsey. In any event and to further assist the court, I will respond to his opinions on those issues (including those expressed in paragraph 70(iii) and (iv)) below.

**Guernsey company director decisions are subject to an objective standard**

23. In the *Carlyle* case cited by Mr Corfield at paragraph 72 of his affidavit, the Royal Court of Guernsey held that directors of Guernsey companies have both: (i) fiduciary duties; and (ii) a duty of care to the company of which they are a director. The Court held that, with respect to the duty of care, "*the director's duty is to exercise due skill, care and diligence according to all the circumstances of his action or decision*" [at 510]. It was further held that the formulated standard of care in relation to such duty is "*that of a reasonably diligent person having both (i) the general knowledge skill and experience that may reasonably be expected of a person carrying out the same functions as those of the relevant director with regard to the company and (ii) the actual knowledge skill and experience of that director*" [at 501].

24. As the directors of Highland CLO Funding Limited (the "**Fund**") owe an objective duty of care to the Fund, the standard of a reasonably diligent director to any decision or action of the Fund directors

applies. Accordingly, the directors may breach their duties to the Fund if they refuse to take into consideration changes in the circumstances of the Fund as they occur from time to time when making decisions.

25. If the directors were to prejudge Acis Capital Management LP as an objectionable investment manager without taking into account changed circumstances, it would, in my opinion, be open to allege they have breached their duties as directors. For example, were the court to find allegations of fraudulent transfer and civil conspiracy against the Fund or related entities, the directors would be duty-bound to consider these new circumstances on the objective standard of a reasonably diligent person having both the general knowledge skill and experience that may be reasonably expected of such directors as well as the knowledge skill and experience that they actually have. In my opinion, the directors of the Fund would not be properly exercising their duties as directors if they were to refuse to reconsider past actions or decisions in the circumstances where the court finds that previous actions or decisions were unlawful or otherwise have been impeached.

**It is not appropriate to prejudge the outcome of the GFSC's assessment**

26. The GFSC has significant discretionary power to regulate and supervise investment funds under the *Protection of Investors (Bailiwick of Guernsey) Law 1987* ("**POI Law**") in order to achieve its objectives set out by the POI Law, namely: (i) protecting investors, the public, and the reputation of the Bailiwick of Guernsey as a financial centre, (ii) ensuring that markets for controlled investments are fair, efficient and transparent, and (ii) reducing risks to the financial system in the Bailiwick of Guernsey: POI Law, section 2A.

27. The GFSC does not merely depend and rely on its licensees to self-report compliance with their relevant regulatory obligations. The GFSC actively uses its authority to establish rules for investment funds and exercises its discretion in determining if such rules are being met.

28. Section 12(1) of the POI Law sets out that the GFSC "*may make rules in relation to the carrying on of controlled investment business by licensees and in relation to authorised or registered collective investment schemes.*" Pursuant to such power, the GFSC has issued the Registered Collective Investment Scheme Rules 2018 (the "**RCIS Rules**"), which set out the reporting requirements of the designated administrator of the Fund.

29. The RCIS Rules set out at paragraph 5: "*the Commission is always prepared to meet managers, potential promoters or their professional advisers in order to discuss matters of policy and practice regarding the disclosure requirements as set out in these rules.*"

30. The GFSC also issues guidance notes, including with respect to outsourcing arrangements. The Guidance Note on Outsourcing of Functions by Entities Licensed under the POI Law (the "**Outsourcing Guidance**") sets out the GFSC's policy and gives practical guidance in relation to its consideration of the outsourcing of various functions of licensees, including the functions of investment managers. The Outsourcing Regulations state: "*As always, the Commission is prepared to meet with the Guernsey*

*Licensee and other parties to discuss proposals to outsource functions and would encourage such discussion at an early stage of any proposal.*"

31. In the event of a proposed change of investment manager by the Fund pursuant to a court order, the GFSC's rules and policies set out that it will be prepared to meet with all parties to discuss the proposal and the policies and practices needed to adhere to its rules with respect to such proposal.  Once the GFSC has had the opportunity to meet with State Street (Guernsey) Limited as manager (as such term is defined in the RCIS Rules), Acis as potential promoter, their professional advisors and other parties about the contemplated change of investment manager, the GFSC may use its discretion to determine the suitability of Acis as investment advisor to the Fund.

32. Were the court to find that a fraudulent transfer and civil conspiracy took place, Acis or the professional legal advisors of Acis would very likely meet with the GFSC to raise and discuss such findings.  The outcome of such discussions and the resulting views that the GFSC would take with regard to the fitness and propriety of Acis, as victim of a fraudulent transfer, and the Fund directors, as those who oversaw any fraudulent transfer, is not possible to assess in advance.

33. In my opinion it is inappropriate to prejudge what the GFSC's determination would be before any of the meetings contemplated by the GFSC's rules and guidance have taken place and without knowing the facts that would be presented to the GFSC by the various parties that consult with it.  I have seen no evidence suggesting that the GFSC had any objection to Acis as a fit and proper investment manager of the Fund prior to its removal.  It is open to the GFSC to determine in its discretion that Acis would be a fit and proper investment manager to the Fund in the event that a court orders that it be restored to such role.

Signed: ...................................................

**Advocate Todd McGuffin**
**Babbé LLP**
**30 November 2018**

# EXHIBIT "C"
## [Froeba Expert Report]

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

**EXPERT REPORT OF MARK FROEBA**

**November 14, 2018**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................... 1

    A. Assignment ...................................................................................................... 1

    B. Summary of Principal Opinions...................................................................... 2

    C. Qualifications .................................................................................................. 2

II. BACKGROUND: GENERAL FEATURES OF CLOS ....................................... 8

    A. Parties.............................................................................................................. 8

    B. Transaction Documents ................................................................................ 10

    C. Structural Features ........................................................................................ 10

III. PRINCIPAL OPINIONS ....................................................................................... 11

    A. Under the terms of the ALF PMA, Acis has authority to exercise control over the Subordinated Notes, including over any election by the Subordinated Notes under Article 9 of the Indentures to redeem or refinance the Secured Notes and the merely nominal role of ALF's Guernsey Directors in its governance does not alter this grant of authority......... 11

    B. Acis has authority as Portfolio Manager to the Acis CLOs to control all aspects of a redemption or refinancing under Article 9, with the only exception being the election to redeem or refinance itself. .................................. 18

    C. Acis, through its subservicing agreement with Brigade, will continue to be able to provide high quality CLO management services to the Acis CLOs, including for any refinancing of its Secured Notes. Joshua Terry's resumed involvement in a reorganized Acis would help, not hurt, with any refinancing. ........................................................................................................ 21

IV. CONCLUSION........................................................................................................ 25

I.      **INTRODUCTION**

A.      **Assignment**

1.      I have been retained by counsel for the Bankruptcy Trustee to provide my opinion (i) whether, under the terms of the Acis Loan Funding, Ltd. ("ALF") Portfolio Management Agreement (the "ALF PMA"), Acis has authority to exercise control over the Subordinated Notes, including over any election by the Subordinated Notes under Article 9 of the Indentures with the Acis CLOs (defined below) to redeem or refinance the Secured Notes and whether the merely nominal role of ALF's Guernsey Directors in its governance alters this grant of authority; (ii) whether Acis has authority as Portfolio Manager to the Acis CLOs to control all aspects of a redemption or refinancing under Article 9 of the Indentures, with the only exception being the election to redeem or refinance itself; (iii) whether Acis, through its subservicing agreement with Brigade Capital Management L.P. ("Brigade"), will continue to be able to provide high quality CLO management services to the Acis CLOs, including for any refinancing of its Secured Notes and whether Joshua Terry's resumed involvement in a reorganized Acis would help or hurt with any refinancing.

2.      In preparing this report, I have relied on my experience, general knowledge, training, and other expertise. I have also reviewed documents related to this litigation. Appendix C lists the materials I have relied on in forming my opinions for this report.

3.      This report provides a summary of my conclusions and opinions in this matter. My work on this matter is ongoing, and I reserve the right to supplement this report as necessary.

4.      I am being compensated for my services in this matter at the rate of $750 per hour for tasks relating to providing this report, and at the rate of $1,000 per hour for testimony at deposition or at trial.  In conducting the analysis reflected in this report, I am working

independently.  None of my compensation is contingent upon either the substance of my opinions or conclusions or the outcome of this action.

**B.    Summary of Principal Opinions**

5.    Under the terms of the ALF PMA, Acis has authority to exercise control over the Subordinated Notes, including over any election by the Subordinated Notes under Article 9 of the Indentures to redeem or refinance the Secured Notes, and the merely nominal role of ALF's Guernsey Directors in its governance does not alter this grant of authority.

6.    Acis has authority as Portfolio Manager to the Acis CLOs to control all aspects of a redemption or refinancing under Article 9 of the Indentures, with the only exception being the election to redeem or refinance itself.

7.    Acis, through its subservicing agreement with Brigade, will continue to be able to provide high quality CLO management services to the Acis CLOs, including for any refinancing of its Secured Notes, and Joshua Terry's resumed involvement in a reorganized Acis would help, not hurt, with any refinancing.

**C.    Qualifications**

8.    I currently work as an independent consultant affiliated with PF2 Securities Evaluations, Inc. ("PF2").  PF2 provides, among other services, consulting and evaluation services relating to various types of structured finance securities including Collateral Debt Obligations ("CDOs").[1]

---

[1]    As explained further below, a CDO is a structured investment vehicle that borrows money through the sale of notes to investors and invests that money in debt securities.  These debt securities generate income to repay the notes.  There are several types of CDOs that have a similar structure but invest in different types of collateral. For example, "Collateralized Bond Obligations" invest in various types of corporate bonds and "Collateralized Loan Obligations" invest in various types of corporate loans.

9.      Prior to affiliating with PF2 in 2008, I was a Senior Vice President in the Derivatives Group at Moody's Investors Service, Inc. ("Moody's") where I worked for ten years. During my last several years at Moody's, I was both Team Leader and Co-Chair of Rating Committees for Collateralized Loan Obligations ("CLOs") with joint responsibility for assigning ratings to CLOs and for evaluating and developing Moody's CLO rating criteria.

10.     I earned my JD *cum laude* from Harvard Law School in 1990. After graduation, I practiced federal income tax law at Kirkland & Ellis LLP in Chicago. In 1994, I joined the Tax Department at Skadden, Arps, Slate, Meagher & Flom, LLP in New York, where my tax practice expanded to include tax issues of structured finance transactions. In 1997, I joined Moody's Derivatives Group, where I focused exclusively on the analysis and rating of all types of CDOs.

11.     I have substantial experience conducting credit analysis of CDOs, especially CLOs. During my ten years at Moody's, I participated as an analyst in assigning ratings to — and closely reviewing the applicable transaction documents, including the indentures of — more than 250 CDOs.[2] As the CDO market continued to develop, I was often selected to be part of the team that assigned ratings to new types of CDOs, including the first CLO of project finance loans, the first CDO of REIT bonds and the first CDO of CDOs. My most extensive CDO experience has been with CLOs, both CLOs of broadly syndicated loans and CLOs of middle market loans.

12.     As CLO Team Leader and Co-Chair of CLO Rating Committees, I played a major role at Moody's in the development and implementation of all CLO rating guidelines. I helped

---

[2]  At Moody's, I worked on several transactions for which Highland Capital Management, L.P. (and/or its affiliates) served as portfolio manager, including (i) as legal analyst for the assignment of initial ratings by Moody's Rating Committee to securities issued by Highland Loan Funding V Ltd. (2001) and by Restoration Funding CLO Ltd. (2002) and (ii) for several years, as monitoring analyst for ongoing rating actions by Moody's Rating Committee with respect to outstanding ratings of notes issued by Pamco Cayman Ltd. (1997) and PAM Capital Funding LP (1998).

develop a standardized template for Moody's CLO Rating Committee memoranda, and co-chaired nearly every CLO Rating Committee convened while I was CLO Team Leader. I authored (or contributed to) many Moody's publications updating CDO/CLO rating guidelines. For example, when Moody's corporate ratings group changed its methodology for rating corporate loans, I wrote the CDO group's analysis of how the change would affect existing CLOs.[3] Later, when the CDO group proposed to adapt its CLO methodology to incorporate these changes into new CLO ratings, I wrote both the request for comment on the proposal and the final proposal.[4]

13.     I have made many public presentations on CDOs and related topics. I was frequently invited on behalf of Moody's to speak (or moderate speaker panels) at securitization conferences. I have also made presentations at Moody's annual CDO briefings on topics relating to Moody's CDO/CLO rating guidelines. In 2007, Moody's corporate rating group invited me to participate in a national tour of investor briefings to describe how changes to Moody's loan rating methodology would affect both existing CLOs and Moody's CLO rating methodology.

14.     As part of the credit analysis of CDOs, I also developed extensive expertise conducting operations reviews of CDO portfolio managers, which is a standard part of the CDO rating process. During my career at Moody's, I attended hundreds of operations reviews of CDO

---

[3]  Froeba *et al.*, <u>Responses to Frequently Asked Questions About U.S. CLOs and Proposed Changes to Moody's U.S. Loan Rating Methodology</u>, Mar. 29, 2006.

[4]  Froeba *et al.*, <u>Proposal to Adapt U.S. Cash-Flow CLO Rating Methodology to LGD/PDR Initiative</u>, August 31, 2006; Froeba, *et al.*, <u>Moody's Approach to Adapting U.S. Cash-Flow CLO Rating Methodology to PDR/LGD Initiative</u>, Feb. 21, 2007.

portfolio managers.[5] My experience conducting these meetings became the basis for the guide to Moody's operations reviews that I authored for CDO portfolio managers.[6]

15.     In addition to assigning ratings to new CDOs and conducting operations reviews of portfolio managers, I also developed significant expertise monitoring Moody's CDO ratings for ongoing credit improvement or deterioration.  I have participated in hundreds of Moody's CDO monitoring committees and initiated numerous Moody's rating actions (i.e., watchlistings, upgrades or downgrades of ratings) in response to ongoing credit improvement or deterioration of the CDO's performance.  I also authored Moody's guide to the CDO monitoring process.[7]

16.     Since becoming affiliated with PF2, I have continued to speak publicly and write about CDOs, CLOs, the rating process and rating agencies.  In August 2008, I was invited to make a presentation about CDOs to the annual training seminar sponsored by the Federal Financial Institutions Examination Council (FFIEC).[8]  I have written an investor's guide on the impact to CLO structures of excess concentrations of low-rated securities.[9]  I have also testified before the Senate Banking Committee on rating agency reform (August 2009) and the Financial Crisis Inquiry Commission on the role of rating agencies in the recent financial crisis (June 2010).

---

[5]   In the course of performing operations reviews of Highland either for new CLO ratings or for monitoring existing CLO ratings, I visited Highland's offices in Dallas, TX, on two or more occasions.  I also met with the representatives of Highland, including James Dondero, at Moody's offices in New York City.

[6]   Froeba *et al.*, Moody's Approach:  Preparing CDO Managers for Moody's Operations Reviews, Dec. 23, 2002.

[7]   Froeba, Moody's Approach:  The CDO Monitoring Process, Sept. 30, 2002.

[8]   The FFIEC is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the National Credit Union Administration (NCUA), the Office of the Comptroller of the Currency (OCC), and the Office of Thrift Supervision (OTS), and to make recommendations to promote uniformity in the supervision of financial institutions.

[9]   Froeba, "Special Report – CLO CCC Buckets:  Key Variations in Terms and Performance," Structured Credit Investor (2009).

17. In *MBIA Insurance Corp. v. Patriarch Partners VIII, LLC*, I was retained by counsel to Patriarch Partners ("Patriarch").[10] I prepared and submitted an expert report, was deposed, and ultimately testified at trial. In this case, MBIA alleged breach of an agreement relating to Class B Notes issued by a CLO Patriarch managed. My report and testimony concerned whether these notes would have received an investment grade rating during the period required. I concluded that the Class B Notes would not have received an investment grade rating during that period.

18. In *In re Tilton, et al.*, I was again retained by counsel to Patriarch. I prepared and submitted an expert report and ultimately testified at trial.[11] In this case, the Enforcement Division of the Securities and Exchange Commission (SEC) brought an Order Instituting Administrative and Cease-and-Desist Proceedings alleging that Patriarch did not use "the categorization methodology set forth in the documents" resulting in incorrect calculations of the overcollateralization (the "OC") ratio test in certain CLOs. My report and testimony concerned my opinion that the portfolio manager had broad and unusual discretion in these CLOs to amend the underlying loans with the result that there were no incorrect calculations of the OC ratio.

19. In *Zohar II 2005-1, Limited v. FSAR Holdings Inc.*, I was retained by counsel, submitted an expert report, was deposed and ultimately testified at trial in the matter.[12] This case concerned a claim in Delaware Chancery Court for a judgment declaring the identity of the directors of certain entities organized under the law of Delaware the control of which was in dispute. My report concerned the scope of the portfolio manager's power to act on behalf of

---

[10] *MBIA Insurance Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013).

[11] SEC Administrative Proceeding, File No. 3-16462.

[12] *Zohar II 2005-1, Limited v. FSAR Holdings Inc.*, Court of Chancery of the State of Delaware, C.A. No. 12946-VCS.

entities it controls, directly or indirectly through a CLO, including in conflicts that might arise between it and other parties to the transaction.

20.     In a confidential matter I served as expert witness in an arbitration hearing on behalf of Joshua N. Terry at which I was retained by counsel, submitted an expert report, was deposed and testified.  My report concerned whether proposed changes to an asset's terms would prohibit specified CDOs from making or continuing an investment in that asset.[13]

21.     In *Tilton et al., v. MBIA Inc. et al.*, I was retained by counsel, submitted an expert report and rebuttal report and was deposed.[14]  This case concerns a claim against MBIA for fraud and promissory estoppel in connection with negotiations to extend the maturity of certain CLO notes prior to their maturity.  My report concerned the impact of a monoline insurer on the CLO amendment process and how non-standard CLOs are more likely to require amendments as unanticipated issues arise during ordinary operations and at maturity.

22.     In a confidential matter before the SEC, I was retained by counsel and submitted an expert report concerning whether the sale of a defaulted security by a CDO manager to a party related to the manager violated the terms of the CDO's indenture.

23.     In *Norddeutsche Landesbank Girozentrale et al. vs. Tilton et al.,* I was retained by counsel and submitted an expert report to the court.  This case concerns whether losses sustained in the sale of CLO notes several years prior to their stated maturity are attributable to the portfolio manager's management of the collateral pool.[15]  My report concluded that such losses are entirely attributable to factors unrelated to the collateral manger's management of the

---

[13]     JAMS Arbitration Proceeding, JAMS, 1310022713.

[14]     New York Supreme Court, County of Westchester, No. 68880/2015.

[15]     New York Supreme Court, County of New York, No. 651695/2015

pool.[16]

24. I have attached as Appendix A hereto a list of all the publications I have authored in the past ten years and as Appendix B hereto a list of prior testimony within the last five years.

## II. BACKGROUND: GENERAL FEATURES OF CLOS

25. In this section, I describe the key terms and features of typical CLOs and, where applicable, explain how the Acis CLOs are different.

26. A CLO is an investment vehicle created to buy a collateral pool of debt instruments, primarily commercial loans. CLOs borrow money to buy the collateral pool by issuing securities or instruments to investors. These securities are typically in the form of notes (rated and, sometimes, not rated) and preference shares (normally not rated). The collateral pool secures the notes and preference shares and generates the income the CLO will use to make payments due on them over time. The Acis CLOs issued (i) senior notes that were rated by Standard & Poors Ratings Services ("S&P") and/or by Moody's at closing ("Secured Notes") and (ii) subordinated notes that were not rated at closing ("Subordinated Notes").

### A. Parties

27. CLOs are heavily negotiated transactions. The parties who participate directly in the negotiation of CLO terms include (i) the investment bank, (ii) the portfolio manager, (iii) the rating agencies, (iv) the trustee, and (v) key investors. In some transactions, certain notes are guaranteed by a third party, known as the "credit enhancer." Each of these parties (and sometimes their respective counsel) reviews the transaction documents and comments on various provisions in the documents relevant to the party.

---

[16] My other expert engagements have been as follows. I submitted a report, but did not testify, in *Chau v. Lewis*, No. 11-cv-01333 (S.D.N.Y. filed Feb. 25, 2011). I also submitted a report relating to a discovery issue in *China Development Industrial Bank v. Morgan Stanley & Co. Inc., et al*., Index No. 650957/2010 (N.Y. Sup. Ct. filed Sept. 30, 2010).

28.    <u>Investment Bank</u>.  CLOs are normally structured by an investment bank.  The investment bank negotiates the terms of the governing documents, works with the rating agencies to obtain ratings of the notes issued by the CLO, and markets and places the notes and preference shares with investors.  For the Acis CLOs, various investment banks were involved in structuring the CLOs including Cantor Fitzgerald & Co., Nomura Securities International, Inc. and Jefferies LLC.

29.    <u>Portfolio Manager</u>.  Most CLOs have an investment advisor called the collateral or portfolio manager that makes all decisions regarding the management of the CLO and its collateral pool, including regarding the purchase, sale, and, if it is a managed pool, the reinvestment of the CLO's collateral assets.  From the inception of the Acis series of CLOs, the portfolio manager of the Acis CLOs was Acis Capital Management, L.P..

30.    <u>Rating Agencies</u>.  Most CLOs issue notes that have public ratings from one of two rating agencies, usually S&P and/or Moody's.  As part of the rating process, the rating agencies review and carefully analyze the terms of every rated transaction in light of their general criteria.  The rating agencies participate closely in the negotiation of indenture terms, discussing novel and non-standard terms and the impact that such terms will have on their ratings.  For the Acis CLOs, S&P and/or Moody's assigned initial ratings to the Secured Notes and, thereafter, as required under the Acis Indentures, conducted ongoing monitoring of their ratings.

31.    <u>Trustee/Collateral Administrator</u>.  In most CLOs, there is an indenture trustee/collateral administrator ("Indenture Trustee") that plays a key role in monitoring and reporting on the CLO's collateral pool.  The Indenture Trustee prepares and distributes periodic reports on the collateral pool and its compliance with specified tests in the CLO indenture.  The

Indenture Trustee for the Acis CLOs is U.S. Bank National Association.

**B.     Transaction Documents**

32.     <u>Indenture</u>.  For most U.S. CLOs, including the Acis CLOs, the governing document is called the indenture.  The indenture is a comprehensive agreement that specifies, among other things, (i) the CLO's capital structure, (ii) the initial ratings required for the CLO's notes, (iii) the priority of payments to the CLO's noteholders and service providers (the payment waterfall), (iv) the types of collateral the CLO may purchase and rules for trading that collateral, and (v) the various coverage and quality tests.  Indentures can differ substantially in their terms and language.

33.     <u>Portfolio Management Agreement</u>.  The portfolio management agreement is an agreement between the CLO and the party that will serve as portfolio manager of the CLO.  These agreements set forth, among other things, the duties of the manager, the standard of care the manager must exercise, and the grounds for removing the manager.

34.     <u>CLO Collateral</u>.  CLOs can be categorized by the primary types of loan collateral they are structured to purchase.  Most CLOs are structured to purchase broadly syndicated loans or middle market loans.  Broadly syndicated loans are large-sized loans made by a syndicate of institutional lenders to large corporate borrowers.  Most of these loans will have a public rating from S&P and/or Moody's.  Middle market loans are made by a limited group of lenders to smaller corporate borrowers.  Most of these loans will not have a public rating from S&P and/or Moody's.  In the Acis CLOs, the collateral consists primarily of broadly syndicated bank loans.

**C.     Structural Features**

35.     <u>Coverage Tests</u>.  Most managed CLOs have two tests — the coverage tests — that directly affect the CLO's cash flows.  One is called the overcollateralization test ("OC test") and establishes a minimum ratio of the total par (or face) value of the CLO's collateral to the

total par value of its outstanding obligations to noteholders.  The other is called the interest

coverage test ("IC test") and establishes a minimum ratio of total interest earned by the CLO on

its collateral to the interest owed by it to noteholders.  The method for calculating the OC and IC

tests is set out in the Indenture, and may differ from one CLO to another.  If a coverage test is

violated, the CLO's cash flows are typically redirected to bring the test back into compliance

either by increasing assets or by decreasing debt.

36.    <u>Excess Interest</u>.  "Excess interest" is one of the primary motivations for the

creation of CLOs.  CLOs generate excess interest because of the difference between what they

earn in interest income from the collateral pool and what they pay in expenses, including interest

expense to noteholders and fees to service providers.  When there is no coverage test violation,

most CLOs distribute excess interest to investors, typically the holders of the CLO's preference

shares.  When there is a coverage test violation, the CLO must retain interest in excess of what is

needed to pay senior interest and fees for use either to buy more collateral or to redeem the

CLO's senior-most notes.

## III.    PRINCIPAL OPINIONS

**A.    Under the terms of the ALF PMA, Acis has authority to exercise control over the Subordinated Notes, including over any election by the Subordinated Notes under Article 9 of the Indentures to redeem or refinance the Secured Notes and the merely nominal role of ALF's Guernsey Directors in its governance does not alter this grant of authority.**

37.    Acis is the portfolio manager of the four CLOs at issue in this report:

- Acis CLO 2014-3 Ltd. ("CLO 2014-3");
- Acis CLO 2014-4 Ltd. ("CLO 2014-4");
- Acis CLO 2014-5 Ltd. ("CLO 2014-5"); and,
- Acis CLO 2015-6 Ltd. ("CLO 2015-6" and together with CLO 2014-3, CLO 2014-4, CLO 2014-5 and CLO 2015-6, the "Acis CLOs").[17]

---

[17]    A fifth CLO, Acis CLO 2013-1 Ltd., is currently in the process of being liquidated by agreement of the parties.

Each of the Acis CLOs is party to an Indenture (each as specified, the "Indenture" and together, the "Acis Indentures") and to a Portfolio Management Agreement (each as specified, the "PMA" and together, the "Acis PMAs").

38.     The Acis CLOs issued both Senior Notes, the repayment of which is secured by a portfolio of broadly syndicated bank loans, and Subordinated Notes.  The Senior Notes were assigned ratings at issuance by S&P and/or by Moody's.  The Subordinated Notes are not rated and constitute the first-loss/equity position in the capital structures of the Acis CLOs.

39.     All of the Subordinated Notes issued by the Acis CLOs are controlled by a single Highland-affiliated entity, organized under the laws of Guernsey, originally named Acis Loan Funding, Ltd., ("ALF") and later renamed Highland CLO Funding, Ltd. ("HCLOF").  In addition to the various PMAs that Acis entered into to manage each of the Acis CLOs, Acis also entered into a separate portfolio management agreement with ALF (the "ALF PMA") concerning Acis' management of ALF and all of its assets, including the Subordinated Notes issued by the Acis CLOs.

40.     The net effect of these arrangements was that a single entity, Acis, controlled management of both (i) the Acis CLOs through the Acis PMAs and (ii) the Acis CLO equity, the Subordinated Notes, through the ALF PMA.

41.     The ALF PMA.  Section 2 of the ALF PMA appoints Acis "to act as the investment manager" of ALF "subject to and in accordance with the Investment Policy of the Company (the '**Investment Policy**')."  Although this term — Investment Policy — is defined (without content), Section 3 of the ALF PMA uses the term in a way that does not suggest an external standard for the Investment Policy, but rather one the development and modification of which directly involves Portfolio Manager:

> [t]he Portfolio Manager shall discuss with the directors of the Company
> (the '**Directors**') the investment objectives of the Company and assist the
> Directors to develop, monitor and update the Company's Investment
> Policy.

Further, Section 5(c) of the ALF PMA, makes clear that responsibility for formulating the

Investment Policy is explicitly allocated to the Portfolio Manager, Acis:

> the Portfolio Manager shall have the authority for and in the name of the
> Company to: … (c) … *direct the formulation of investment policies and
> strategies for the Company*."[18]

In other words, although the Portfolio Manager is technically subject in all matters to the

Investment Policy of the Company, it is the Portfolio Manager who develops that very policy to

which it is subject.

42.     Moreover, although the ALF PMA does not explicitly adopt an external standard

by reference as the Investment Policy, there are external descriptions of an investment policy that

relate to ALF/HCLOF.  For example, there are two offering memoranda of ALF/HCLOF, the

2015 OM and the 2017 OM (as defined below), each of which describes an investment policy.

Notably, both make clear that the Investment Policy described does not limit ALF to investing in

Highland managed investments:

> "[ALF] will from time to time invest directly or indirectly . . . in CLO Notes
> issued by . . . CLOs *managed by other asset managers*" (2015 OM, pg 4,
> emphasis added), and

> "[HCLOF] will from time to time invest directly or indirectly . . . in CLO Notes
> issued by . . . CLOs *managed by other asset managers*" (2017 OM, pg. 3,
> emphasis added).

Thus, whatever other ambiguities relate to the Investment Policy specified in the ALF PMA, it is

clear that the Portfolio Manager directs the formulation of the Investment Policy and strategies

---

[18] ALF PMA, Section 5(c) (emphasis added).

for ALF, and such Investment Policy does not contemplate investment exclusively in Highland managed investments.

43.     Next, Section 5 of the ALF PMA, grants Acis power to engage in a long list of permitted investment activities and subjects this list only to the limitations of "(i) provisions of applicable law, and (ii) the Investment Policy."  In particular, Section 5(g) gives the Portfolio Manager authority in the name of the Company to,

> possess, transfer, mortgage, pledge or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Company and/or its subsidiaries.

In other words, the Portfolio Manager could sell any or all of the Subordinate Notes if it elected to do so.  They are just another investment that the Portfolio Manager controls.  Section 5(q) also explicitly grants to the Portfolio Manager (Acis) authority "to vote Financial Instruments" that it controls, which would include voting the Subordinated Notes to effect a redemption or refinancing under the Indentures.

44.     Finally, Section 6 of the ALF PMA, grants Acis broad authority to act on behalf of ALF, once again subject to whatever limits arise through the Investment Policy:

> The activities engaged in by the Portfolio Manager shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy.  . . .
>
> In furtherance of the foregoing, *the Company hereby appoints the Portfolio Manager as the Company's attorney-in-fact, with full power of authority to act in the Company's name and on its behalf with respect to the matters set forth in Section 5 above.*[19]

45.     Thus, the ALF PMA sets up a framework in which there is a broad delegation of powers and authority to the Portfolio Manager subject only to a form of "control" by the

---

[19] __ALF PMA, Section 6 (emphasis added).

Company that is essentially nominal. The grounds for removing Acis as Portfolio Manager under the ALF PMA confirm that this "control" is merely nominal. First, the Portfolio Manager may only be removed for cause.[20] Second, cause is defined very narrowly such that, for example, even willful violations of the terms of the ALF PMA do not constitute cause if they are not made in bad faith. Thus, the Portfolio Manager may not even be removed for a "willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions."[21] In other words, the structure of the appointment of Acis as Portfolio Manager of ALF under the ALF PMA reflects a clear intention to subject Acis only to nominal limits to its authority to manage ALF.

46. <u>The Guernsey Directors</u>. Among such limits to Acis' authority is the role of ALF's Directors. As an entity organized under the laws of Guernsey, it is true that ALF's Directors play a role in connection in the governance of ALF. In particular, ALF has two Guernsey Directors (William Scott and Heather Bestwick), who would typically also serve as Directors on the Boards of numerous other entities organized under the laws of Guernsey or other tax havens. The limits of the responsibilities of such tax-haven directors are, of course, implicit in the variety of these commitments.

47. CLO issuers are almost always organized in a tax haven jurisdiction. In a prior arbitration, I offered my opinion on the limited role of tax-haven directors in CLO governance. There the question was whether tax haven directors might approve action otherwise arguably not allowed by a CLO Indenture. My opinion was that, while such directors do play a nominal role

---

[20]   ALF PMA, Section 14.

[21]   ALF PMA, Section 14(a).

in governance, they had no authority to approve action otherwise not allowed by the governing documents.

48.     This case raises similar questions about the role of tax-haven directors.  Here, the question is whether tax-haven directors can provide direct guidance, even contradictory to the Portfolio Manager, on a matter where the governing documents are silent or leave room for discretion but where the Portfolio Manager may have taken a different position.  More specifically, one question raised here is whether Guernsey Directors could direct Subordinated Notes held by ALF/HCLOF to elect to redeem or refinance the related CLO and, if they did, whether the Portfolio Manager would have to follow such a directive.

49.     In my opinion, tax-haven directors would normally never provide such a directive *sua sponte*.  They would generally only act on such a matter if under clear guidance to do so by the portfolio manager and then only within whatever limits arise under the law of the tax haven.  Thus, Guernsey Directors would normally not offer or act upon their own independent view on whether to redeem or refinance a particular CLO.

50.      Of course, should a conflict arise between a directive of the Guernsey Directors and, in this case, Acis, as Portfolio Manager of a Guernsey entity, I would view the conflict as a departure from market precedents about the nature of tax haven directors, and a distortion of the nominal role tax-haven directors are expected by market participants to play in governance matters in an externally-managed fund such as ALF/HCLOF.  As such, in my opinion, Acis would have reasonable grounds not to defer in such matters to the Guernsey Directors unless and until ordered to do so by a competent court.  Because the ALF PMA is governed by Texas law, it is the application of Texas Law that would ultimately control.[22]

---

[22] ALF PMA, Section 15(e).

51. <u>Offering Memoranda</u>. The nominal role that the Guernsey Directors now play in governance of ALF/HCLOF is also confirmed in the most recent Offering Memorandum issued on behalf of HCLOF dated November 17, 2017 (the "2017 OM"). The 2017 OM contrasts significantly with the earlier Offering Memorandum issued by ALF dated August 15, 2015 (the "2015 OM"). Under the 2015 OM and the corresponding Portfolio Services Agreement between ALF and Acis dated August 10, 2015 (the "PSA"), ALF was a self-managed fund and its Board retained a list of significant managerial responsibilities including the following:

- the appointment and termination of the Portfolio Services Provider;
- the approval of material contracts of the Company;
- the appointment and removal of the Company's officers;
- establishing a distribution policy for the Company; and
- creating a subsidiary, entering into a loan warehouse facility or sponsoring a CLO.

52. In contrast, under the ALF PMA (dated December 22, 2016), ALF transitioned to become an externally-managed fund. Reflecting this transition, the 2017 OM no longer includes any of the list of significant managerial responsibilities described in the 2015 OM when ALF was a self-managed fund. Moreover, the 2017 OM makes clear that, in describing essentially the same agreement as the ALF PMA, ALF/HCLOF has delegated all investment management responsibility to the Portfolio Manager:

> [t]he Company has appointed [Acis' successor] as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

53. Thus, even if ALF's Guernsey Directors once had broader responsibility for its management, that responsibility was altered in the ALF PMA as reflected in the 2017 OM. From that time, the Guernsey Directors' role in the management of AFL/HCLOF has been little more than nominal. Moreover, investors in the Acis CLOs would not have expected Guernsey

Directors to have any significant involvement in substantive decisions relating to the

management of the CLOs. CLO investors make investment decisions based upon the reputation

and experience of a portfolio manager and would not have recognized the need to conduct an

analysis of the abilities and experience of Guernsey Directors in assessing the portfolio manager

with which they were considering investing. Thus, recognizing any significant substantive

authority in such Directors would undermine key investor expectations made as part of the

original investment decision.

**B.      Acis has authority as Portfolio Manager to the Acis CLOs to control all aspects of a redemption or refinancing under Article 9, with the only exception being the election to redeem or refinance itself.**

54.      Although the Subordinated Notes issued by the Acis CLOs were previously

controlled by Acis under the ALF PMA, sometime in the Fall of 2017, ALF entered into a new

portfolio management agreement with a newly formed Cayman Island entity, Highland HCF

Advisor, Ltd., and was itself renamed (HCLOF). Under this new agreement, the right to make

certain decisions relating to the Subordinated Notes no longer belongs to Acis and instead

belongs to Highland HCF Advisor, Ltd. I understand the Chapter 11 Trustee asserts that Acis

LP's rights under the ALF PMA were fraudulently transferred by Acis to Highland HCF

Advisor; however, that issue is beyond the scope of this report. Regardless, as it currently

stands, certain elections relating to the Subordinated Notes may be made without the cooperation

or consent of Acis.

55.      For example, under Section 9.2 of the Acis Indentures, after the expiration of the

Non-Call Period, 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes can

elect to redeem or refinance the Acis CLOs Secured Notes. However, Section 9.2 of the Acis

Indentures operates in such a way that all aspects of a redemption/refinancing of the Secured

Notes (with the exception of the initial election itself) is controlled by the Portfolio Manager of

the Acis CLOs, Acis. Thus, without regard to which party makes the election on behalf of the Subordinated Notes under Section 9.2, it is the Portfolio Manager who controls all aspects of the process initiated by and following the election.

56. In all four of the Acis CLOs at issue in this report, the execution of an election under Article 9 to redeem/refinance Secured Notes is controlled by the Portfolio Manager. The process begins when the Portfolio Manager (and both the Issuer and Indenture Trustee) receive "written direction" from 66 2/3% of the Subordinated Notes "not later than 30 days prior to the Business Day on which such redemption shall occur."

57. <u>Redemption</u>. For redemptions — in which all of the Secured Notes are repaid with proceeds from the sale of the CLO's collateral pool — Article 9 sets forth a process to ensure that sale proceeds will be sufficient for the redemption. Section 9.2 specifically calls attention to the Portfolio Manager's "sole discretion" or "discretion" at three separate points in a single paragraph describing the sale process upon receipt of a notice of redemption:

> [T]he ***Portfolio Manager in its sole discretion*** will . . . direct the sale of all or part of the Collateral Obligations and other Assets in order that the proceeds from such sale and all other funds available for such purpose . . . will be at least sufficient to pay the Redemption Price on all of the Secured Notes . . .

> If such sale, ***in the sole discretion of the Portfolio Manager***, would not be sufficient to redeem all Secured Notes . . . the Secured Notes may not be redeemed.

> The ***Portfolio Manager, in its discretion***, may effect the sale of all or any part of the Collateral Obligations or other Assets through the sale of one or more participations in such Assets.

58. Thus, the redemption procedure allocates every aspect of the process to the discretion of the Portfolio Manager. The Portfolio Manager decides whether to sell all of the collateral, how to sell the collateral, to whom to sell the collateral, and whether the proceeds of a

sale will be sufficient to redeem the Secured Notes. The Portfolio Manager may even decide to cancel a redemption based upon its belief that proceeds will not be sufficient. It does not need to justify this belief. There is no appeal process. The Portfolio Manager's decision is final.

59. <u>Refinancing</u>. For a refinancing — in which any class or classes of Secured Notes may be redeemed by "obtaining a loan or an issuance of replacement securities" — Article 9 allocates to the Portfolio Manager similarly broad autonomy. For example, in a refinancing, "the terms of [the] loan or issuance [of replacement securities] will be negotiated by the Portfolio Manager." Whether a refinancing replaces less than all classes of Secured Notes or, instead, all classes of Secured Notes, the Portfolio Manager must follow separate procedures and provide different certifications to the Indenture Trustee and the Issuer. For a refinancing, the Portfolio Manager "determines and certifies" to the Indenture Trustee that at least eight different conditions are satisfied including, among other things (i) that the rating condition is satisfied and (ii) that proceeds from the refinancing will be sufficient to pay the amount due to the notes being refinanced and numerous other requirements. In the absence of such a certification, the Issuer "shall not obtain a Refinancing." Moreover, Section 9.2 makes explicit that holders of the Notes "shall not have any cause of action against any of the Co-Issuers, the Portfolio Manager or the [Indenture] Trustee for any failure to obtain a Refinancing."

60. As this discussion suggests, Section 9.2 gives the Portfolio Manager substantial discretion to control the refinancing process even in ways that might make redemption or refinancing less likely. In other words, the process is one controlled not by the Subordinated Notes who merely elect to begin the process but by the Portfolio Manager who is entrusted with responsibility to conclude it.

20

61. <u>Summary</u>. Acis retains broad discretion to control any redemption/refinancing under Article 9 of the Acis Indentures. The Acis Indentures make many aspects of a redemption of all the notes financed by a sale of the CLO's collateral pool subject to the sole discretion of the Portfolio Manager. They also make many aspects of a refinancing of all the notes financed either by a loan or new issuance of notes subject to the discretion and determination of the Portfolio Manager. Thus, the Portfolio Manager remains firmly in control of the process of redemptions/refinancings under Article 9 of the Acis Indentures even where Acis does not control the holders of the Subordinated Notes.

**C.    Acis, through its subservicing agreement with Brigade, will continue to be able to provide high quality CLO management services to the Acis CLOs, including for any refinancing of its Secured Notes. Joshua Terry's resumed involvement in a reorganized Acis would help, not hurt, with any refinancing.**

62.    Acis is a Delaware limited partnership that has entered into agreements, the Acis PMAs, to provide CLO management services to the Acis CLOs. To do so, Acis originally entered into certain shared services and sub-advisory agreements with Highland Capital Management, LP ("Highland"). On August 1, 2018, such agreements were terminated and replaced with a sub-servicing agreement with Brigade.

63.    *Brigade*. Brigade is a New York City based global investment management firm that manages over $20 billion in assets across multiple credit strategies. It employs 111 professionals globally of which 47 are part of its investment team. Brigade has issued 15 CLOs and (excluding the Acis CLOs) currently manages $5.3 billion in CLOs across 12 active transactions.

64.    Although Acis currently has little capacity to provide CLO management services on its own, it could develop that capacity at some future time. In the meantime, Acis procures CLO management services for the Acis CLOs from other CLO management providers. I have

been asked to provide my opinion about Brigade, the provider from which Acis currently procures such services. In my opinion, Acis will continue to be able to provide high quality CLO management services to the Acis CLOs through its subservicing arrangement with Brigade. I base this opinion on (i) Brigade's record over the last three months in providing such services to the Acis CLOs, (ii) my meeting with Brigade to conduct an operations review of its CLO management services, (iii) my assessment of Brigade's reputation as a CLO manager, and (iv) my review of materials about Brigade provided to me.

65.    Prior to Brigade's engagement on behalf of Acis, the Acis CLOs had accumulated very substantial positions in uninvested cash. In the three months since Brigade began to function as subservicer to Acis, Brigade has assisted the Acis CLOs with the investment of as much as $300 million in cash back into broadly syndicated bank loans. Thus, Acis has transitioned to a CLO management-support relationship with Brigade that has already been objectively effective. Faced with acute challenges in the CLOs investment posture at the time of the transition, Brigade assisted Acis in restoring the Acis CLOs to full investment in a relatively short period of time.

66.    Nevertheless, to formulate my own view of Brigade's qualifications to provide ongoing CLO management services to the Acis CLOs, I also undertook to conduct an abbreviated operations review of Brigade and its operations. My goal in this review was to replicate a typical rating agency collateral manager operations review. Such a review typically involves, among other things: (i) visiting the manager's offices, (ii) meeting with representatives of the investment team, (iii) reviewing the manager's organizational chart, team biographies, and credit review process, (iv) assessing the manager's view of the broadly syndicated bank loan market and of current trends in CLO structuring and terms, (v) evaluating the manager's record

of CLO management and performance, and (vi) assessing the manager's systems for monitoring loans, for trading loans and for working out distressed loans and loans with deteriorating risk profiles.

67.     To conduct this operations review, I visited Brigade's New York City offices for a meeting in person on November 14, 2018.  Based upon my observations during this meeting and upon my review of materials provided to me about Brigade, it is my opinion that Brigade is fully capable of providing high quality CLO management services to the Acis CLOs and that these services are more than sufficient to replace the services formerly provided to the Acis CLOs by Highland.  In particular, had this review been conducted as part of a rating analysis of the Acis CLOs, I would have concluded that the transition from CLO management services provided by Highland to CLO management services provided by Brigade did not raise concerns about the ongoing credit quality of the Secured Notes issued by the Acis CLOs.

68.     *Joshua Terry*.  In addition to assessing the impact on the Acis CLOs of substituting Brigade's CLO management services for Highland's, I have also been asked to assess the impact on the Acis CLOs of Joshua Terry resuming his active involvement in the Acis CLO management process.  In particular, I have been asked to consider whether his resumed involvement in a reorganized Acis might have a negative impact on any effort to refinance the Acis CLOs.  In my opinion, Mr. Terry's resumed involvement would not have a negative impact on an effort to refinance the Acis CLOs.

69.     It is my understanding that Joshua Terry was directly involved in Highland's effort to develop a new Acis CLO brand that distinguished itself from other Highland CLO brands.  The new Acis CLO brand constituted a fresh start for an established Highland business

line.  It also offered the opportunity for a clean break from any marketing challenges that had come to be associated with Highland's established business lines.

70.      It is also my understanding that, as part of marketing its new Acis brand, Mr. Terry was the primary Highland employee who traveled on roadshows marketing the new Acis CLOs.  Thus, Mr. Terry became the face of Highland's new Acis CLO brand.  It was he who met with investors, he who articulated Acis' CLO investment strategy, and he who, presumably, responded to the very investor concerns that gave rise to Highland's interest in creating the new Acis CLO brand in the first place.  Of course, in addition to marketing Highland's new Acis CLO brand, Mr. Terry was also involved in structuring the new Acis CLOs.

71.      Since it was Mr. Terry who helped build the Acis brand, Mr. Terry who helped structure and invest the Acis CLOs, and Mr. Terry who was most closely associated with the Acis brand by investors, it is my opinion that Mr. Terry's resumed involvement in the reorganized Acis would help facilitate (not impede) any effort by Acis to refinance the Acis CLOs' Secured Notes.  Obviously, Mr. Terry would have met and marketed the Acis CLO brand to many of the same investors who would be approached for any refinancing of the Acis CLOs. The relationships developed by Mr. Terry in the course of his original marketing efforts on behalf of the Acis CLOs would clearly benefit the effort to market a refinancing.  Thus, Mr. Terry's resumed involvement in a reorganized Acis would almost certainly make it easier to market a refinance of the Acis CLOs' Secured Notes than would be possible without his involvement.

72.      In summary, although Highland originally provided management and sub-advisory services to Acis, Brigade now provides such services and has achieved objectively better results for the holders of the equity in the Acis CLOs.  Based upon my operations review

of Brigade and its CLO management business, it is my opinion that Brigade is fully capable of continuing to provide high quality CLO management services to the Acis CLOs.  In addition, Josh Terry's resumed involvement in CLO management at Acis is more likely to facilitate efforts by the Acis CLOs to refinance the Secured Notes than it is to impede such efforts.

## IV.     CONCLUSION

73.     Under the terms of the ALF PMA, Acis has authority to exercise control over the Subordinated Notes, including over any election by the Subordinated Notes under Article 9 of the Indentures to redeem or refinance the Secured Notes, and the merely nominal role of ALF's Guernsey Directors in its governance does not alter this grant of authority;

74.     Acis has authority as Portfolio Manager to the Acis CLOs to control all aspects of a redemption or refinancing under Article 9 of the Indentures, with the only exception being the election to redeem or refinance itself

75.     Acis, through its subservicing agreement with Brigade, will continue to be able to provide high quality CLO management services to the Acis CLOs, including for any refinancing of its Secured Notes, and Joshua Terry's resumed involvement in a reorganized Acis would help, not hurt, with any refinancing.

November 14, 2018

_____

Mark N. Froeba

# APPENDIX A

<u>Mark Froeba</u>
Publications

**Author**

Froeba, <u>CLO triple-C Buckets:  Key Variations in Terms and Performance</u>, Structured Credit Investor, September 9, 2009.

Froeba, *et al.*, <u>Moody's Approach to Adapting U.S. Cash-Flow CLO Rating Methodology to PDR/LGD Initiative</u>, Moody's Investors Service, February 16, 2007.

Froeba, *et al.*, <u>Proposal to Adapt U.S. Cash-Flow CLO Rating Methodology to LGD/PDR Initiative</u>, Moody's Investors Service, August 31, 2006.

Froeba, *et al.,* <u>Responses to Frequently Asked Questions About U.S. CLOs and Proposed Changes to Moody's U.S. Loan Rating Methodology</u>, Moody's Investors Service, March 29, 2006.

Froeba, *et al.,* <u>Moody's Approach:  Preparing CDO Managers for Moody's Operations Reviews</u>, Moody's Investors Service, December 23, 2002.

Froeba, *et al*., <u>Moody's Approach:  The CDO Monitoring Process</u>, Moody's Investors Service, September 30, 2002.

**Contributor**

Chen, *et al.*, <u>Post-Reinvestment Period Reinvesting in Actively-Managed </u>CDOs, Moody's Rating Factors Vol. III, No. 2, Moody's Investors Service, April 20, 2006.

Wyszomierski, *et al.*, <u>Assigning Market Value To CDO Assets</u>, Moody's Rating Factors Vol. II, No. 4, Moody's Investors Service, December 14, 2005.

Froeba, *et al.*, <u>Responses to Frequently Asked CDO Questions (Third of Series)</u>, March 29, 2004.

Michalek*, et al.,* <u>New Defined Terms for U.S. Cash Flow CBOs/CLOs:  "Moody's Default Probability Rating" and "Moody's Obligation Rating</u>", Moody's Rating Factors Vol. I, No. 4, Moody's Investors Service, March 21, 2004.

<u>Teicher*, et al.,* Moody's Recovery Rate Assumptions for U.S. Corporate Loans and Bonds: Picking Up the Pieces</u>, Moody's Rating Factors Vol. I, No. 3, Moody's Investors Service, March 17, 2004.

Torres, *et al.*, <u>Current Pay Obligations in Cash-Flow CDOs</u>, Moody's Rating Factors Vol. I, No. 2, Moody's Investors Service, March 2, 2004.

# APPENDIX B

<u>Mark Froeba</u>
Prior Expert Testimony/Reports

1. *Norddeutsche Landesbank Girozentrale et al. v. Tilton et al.* No. 651695/2015 (N.Y. Sup. Ct.) (report).

2. Confidential matter (see ¶ 15) (report)

3. *Tilton, et al., v. MBIA Inc. et al.*, No. 68880/2015 (N.Y. Sup. Ct.)(report, rebuttal report).

4. Confidential matter (see ¶ 13) (report, arbitration testimony)

5. *Zohar II 2005-1, Limited v. FSAR Holdings Inc.,* No. 12946-VCS (Del. Ch. Nov. 29, 2016) (report, trial testimony).

6. *In re Tilton*, SEC Administrative Proceeding, SEC Release No. 1182, 2017 WL 4297256 (ALJ Sept. 27, 2017) (report, trial testimony).

7. *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013) (report, trial testimony).

8. *Chau v. Lewis*, No. 11-CV-01333 (S.D.N.Y. filed Feb. 25, 2011) (report).

9. *China Dev. Indus. Bank v. Morgan Stanley & Co.*, Index No. 650957/2010 (N.Y. Sup. Ct. filed Sept. 30, 2010) (report).

# APPENDIX C

<u>Mark Froeba</u>
Materials Relied Upon

1.   Agreed Protective Order [Docket No. 535]
2.   ALF PSA 8.10.2015 [Confirmation Ex. 208]
3.   ALF PMA 12.22.2016 [Confirmation Ex. 329]
4.   HCF Advisor PMA 10.27.2017 [Confirmation Ex. 209]
5.   HCF Advisor PMA 11.15.2017 [Confirmation Ex. 215]
6.   HCLOF Offering Memorandum dated November 15,.2017 [Confirmation Ex. 90]
7.   ALF Offering Memorandum dated Aug. 10, 2015 [HCLOF0000207]
8.   Indenture for CLO 2013-1 [Confirmation Ex. 1]
9.   Indenture for CLO 2014-3 [Confirmation Ex. 2]
10.  Indenture for CLO 2014-4 [Confirmation Ex. 3]
11.  Indenture for CLO 2014-5 [Confirmation Ex. 4]
12.  Indenture for CLO 2015-6 [Confirmation Ex. 5]
13.  CAA for CLO 2014-4 [Confirmation Ex. 14]
14.  PMA between Acis and CLO 2014-4 [Confirmation Ex. 8]
15.  Deposition transcript from D. Castro 8.18.2018
16.  HCLOF Motion to Dissolve TRO and Lift Stay [Dkt. 639]
17.  Trustee Response to Motion to Dissolve TRO and Lift Stay [Dkt. 683]
18.  Involuntary FOF/COL [Dkt. 118]
19.  Second Amended Joint Plan [Dkt. 612]
20.  Amended Disclosure Statement [Dkt. 621]
21.  Ruling on Confirmation [Dkt. 549]
22.  Preliminary Injunction [Dkt. 204]
23.  Confirmation Transcript 8.23.2018 (AM and PM)
24.  Confirmation Transcript – 10.27.2018 (AM and PM)
25.  Confirmation Transcript – 10.28.2018 (AM and PM)
26.  Confirmation Transcript – 10.29.2018
27.  Acis Compliance Manual [Confirmation Ex. 132]
28.  Rebuttal report – Zachary Alpern 8.15.2018
29.  JP Sevilla Affidavit from Guernsey Action
30.  Castro expert report
31.  Castro Supplemental exhibit [Confirmation Ex. 143]
32.  Proposed order on conditional approval of Disclosure Statement
33.  First Modification to Second Amended Plan [Dkt. 643]
34.  First Modification to Disclosure Statement [Dkt. 644]
35.  Supplement to Amended Motion for Conditional Approval of Disclosure Statement [Dkt. 646]
36.  Confirmation Brief [Dkt. 651]
37.  Second Modification to Plan [Dkt. 653]
38.  Second Modification to DS [Dkt. 654]
39.  Transcript of hearing on Oct. 24, 2018
40.  Wells Fargo – U.S. CLO Manager Style Guide, Sept. 18, 2018
41.  Nomura CLO Special Topics – Evaluating Changes in Tail Risk, Oct. 5, 2018
42.  Third Amended Plan [Dkt. 660]
43.  Disclosure Statement for Third Amended Plan [Dkt. 661]
44.  First Modification to Third Amended Plan [Docket No. 693]
45.  Notice of Redline between Second Amended Plan/DS and Third Amended Plan/DS [Dkt. 662]
46.  List of Revised Confirmation Dates

47.    Deposition of James Dondero dated March 19, 2018
48.    Offering Memorandum – Acis CLO 2013-1 [Confirmation Ex. 85]
49.    Offering Memorandum – Acis CLO 2014-3 [Confirmation Ex. 86]
50.    Offering Memorandum – Acis CLO 2014-4 [Confirmation Ex. 87]
51.    Offering Memorandum – Acis CLO 2014-5 [Confirmation Ex. 88]
52.    Offering Memorandum – Acis CLO 2015-6 [Confirmation Ex. 89]
53.    Order Approving Brigade as Replacement Sub-Servicer [Dkt. 464]
54.    Acis-Brigade Interim Sub-Advisory Agreement


All other materials cited in this Report.

# EXHIBIT "D"
## [Alpern Report]

IN RE ACIS CAPITAL MANAGEMENT, L.P., ET AL.
CASE NO. 18-30265-SGJ-11

# REPORT OF ZACHARY ALPERN
## STIFEL, NICOLAUS & CO.

NOVEMBER 14, 2018

I have been asked to prepare this report in support of the Third Amended Joint Plan for Acis Capital Management LP and Acis Capital Management GP, LLC. [Docket No. 660]. The information and opinions herein are based on my education and experience, as well as the documents and information provided to me, which I have assumed to be authentic and correct.

I have twelve years of experience in the leveraged finance market. I have worked at Blackrock Financial Management, at Cantor, Fitzgerald & Co, at CM Investment Partners LLC, and at Stifel, Nicolaus & Co. I have worked on the buy-side as a credit analyst, loan trader, and assistant portfolio manager, and on the sell-side as a loan trader. I also have substantial experience as an investor and as a trader in distressed credit assets, including in- and out-of-court restructurings. I have broad perspective into the variety of fund structures that participate in the leveraged finance market, the trading dynamics and nuances of transacting in the loan market, the process of ramping and unwinding portfolios, and the role of funds and advisors as it pertains to funds participating in the loan market. I have also been recognized as an expert in the leveraged loan market in this bankruptcy case.

1. The right to call for an Optional Redemption is possessed by a majority or supermajority of the Subordinated Notes of a given CLO. In the case of Acis 2014-3, Acis 2014-4, Acis 2014-5, and Acis 2015-6 (the "Acis CLOs"),[1] the requisite position in the Subordinated Notes is owned by the entity formerly known as Acis Loan Funding Ltd. ("ALF"), now known as Highland CLO Funding Ltd. ("CLO Funding").[2]

   Highland CLO Funding is an externally managed fund. It has no employees; it has a Board of Directors, and is advised under a Portfolio Management Agreement ("PMA").[3] Per section 5(c) of the PMA, the Portfolio Manager "direct[s] the formulation of investment policies and strategies for the Company," and under section 5(q) has the authority to "vote Financial Instruments."

   As with any CLO, any right to call for an Optional Redemption of an Acis CLO is a right of the requisite majority of its Subordinated Notes. In the case of the Acis CLOs, where these positions are held by ALF/CLO Funding, it is the fund's *advisor* who controls the operative voting and management rights under the PMAs. Accordingly, the external advisor has always been the proper party to assert any positions with regard to any rights of, or on behalf of, the Subordinated Notes of the Acis CLOs.

2. After the appointment of the Chapter 7 Trustee on April 13,[4] Highland continued to purchase collateral for several days. Acis 2014-3 and 2014-4 last purchased loans on April 17th, and Acis 2014-5 and 2015-6 subsequently purchased a single loan on May 3rd, after otherwise ceasing purchases on April 17.[5] Given that there was no notice of Optional Redemption delivered to the Portfolio Manager until April 30, 2018, Highland's decision to abruptly cease buying loans cannot be credibly attributed to either a notice of Optional Redemption or the appointment of a bankruptcy Trustee.

---

[1] Acis CLO 2014-3 Indenture, Section 9.2 "Optional Redemption"
Acis CLO 2014-4 Indenture, Section 9.2 "Optional Redemption and Refinancing"
Acis CLO 2014-5 Indenture, Section 9.2 "Optional Redemption and Refinancing"
Acis CLO 2015-6 Indenture, Section 9.2 "Optional Redemption and Refinancing"
[2] Declaration of Compliance in relation to Acis Loan Funding Ltd. dated October 30, 2017
[3] Portfolio Management Agreement dated to be effective from December 22, 2016 between Acis Loan Funding, Ltd. and Acis Capital Management, L.P. and Portfolio Management Agreement dated to be effective from 27 October 2017 between Acis Loan Funding, Ltd. and Highland HCF Advisor, Ltd.
[4] Notice of Chapter 7 Bankruptcy Case – No Proof of Claim Deadline [Case No. 18-30264, Docket No. 120 & Case No. 18-30264, Docket No. 115]2018
[5] Acis CLO 2014-3, Ltd. Note Valuation Report As of April 19, 2018
Acis CLO 2014-4, Ltd. Note Valuation Report As of April 19, 2018
Acis CLO 2014-5, Ltd. Note Valuation Report As of April 19, 2018 and May 21, 2018
Acis CLO 2015-6, Ltd. Note Valuation Report As of April 19, 2018 and May 21, 2018

As of the April 19, 2018 monthly Note Valuation Reports, 2014-3 held approximately 10.2% cash, and had modestly built cash since the March report. 2014-4 held approximately 7.7% cash, and was essentially flat to the March report. 2014-5 held approximately 3.1% cash, and had net spent cash since the March report. 2015-6 held approximately 1.8% cash, and like 2014-5 had net spent cash since the March report.

Highland did not recommend a single loan for purchase for the entire period between the appointment of the Chapter 11 Trustee and Highland's termination as sub-advisor. By August 2, when Highland was removed and Brigade was appointed as sub-advisor to the Acis CLOs, [6] the CLOs' cash positions had ballooned. 2014-3 held approximately 32.5% cash, 2014-4 held approximately 28.5% cash, 2014-5 held approximately 20.1% cash, and 2015-6 held approximately 14.6% cash.[7] The cash which built up over the course of these three-and-a-half months is to the clear detriment of returns to the Subordinated Notes holders.

From the inception of bankruptcy proceedings on January 30, 2018 through July 31, 2018, the S&P/LSTA Loan Index bid price ranged from 98.04 to 98.72. From August 2, when Brigade was appointed as sub-advisor, through November 13, the average bid price of the Loan Index has ranged from 98.00 to 98.68. In this substantially identical market context, Highland recommended zero loan purchases, and Brigade has recommended approximately $300 million of purchases in the Acis CLOs. Prior to the change in sub-advisors, the Acis CLOs' equity valuation, "OC cushion," and "Market Value OC Ratio" for BB notes all ranked near the bottom of the fourth quartile of managers in the analysis, which is a stark and surprising position for these CLOs given their relative ranking for WARF scores.[8] Given this performance, and the relative improvement to the CLO's test metrics and cash positions since the change in sub-advisor, there does not appear to be any objective reason for CLO Funding to prefer Highland to Brigade as sub-advisor to the Acis CLOs.

3. Historically, Acis was a coherent "CLO ecosystem." Acis has portfolio management authority for the Acis CLOs under their respective PMAs. Prior to the transfer of the portfolio management agreement for ALF, Acis had portfolio management authority for ALF/CLO Funding. In essence,

---

[6] Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC, Case No. 18-30264, Docket No. 464

[7] Acis CLO 2014-3, Ltd. Note Valuation Report As of August 21, 2018
Acis CLO 2014-4, Ltd. Note Valuation Report As of August 21, 2018
Acis CLO 2014-5, Ltd. Note Valuation Report As of August 21, 2018
Acis CLO 2015-6, Ltd. Note Valuation Report As of August 21, 2018

[8] Wells Fargo Securities "The U.S. CLO Manager Style Guide" dated June 20, July 19, and October 17, 2018

Acis had the right to direct the purchase and sale of collateral in the CLOs, as well as to direct the purchase or sale of CLO equity, investment in new warehouse lines or new CLOs, and the voting authority for these CLO investments. Highland Capital Management sub-advised Acis (and continues to sub-advise HCF Advisor),[9] enabling Highland to effectively make managerial decisions for the CLOs and ALF/CLO Funding. Since the transfer of the ALF PMA, no single entity has controlled the management of both the CLOs and the requisite voting majorities of the Subordinated Notes of the Acis CLOs, although the same entity – Highland – provided sub-advisory services to both Acis and HCF Advisor until August 2, 2018.

For the past two years, Hunter Covitz (a Highland employee) was the lead portfolio manager for both Acis and Highland HCF Advisor, as well as for the underlying Acis CLOs. It appears likely that this dual role as portfolio manager for CLO Funding and for the Acis CLOs was conflated, whereby the CLOs were not actively managed for the benefit of investors in said CLOs, but instead to support Highland's agenda in this bankruptcy case – despite the negative economic impact Highland's portfolio management recommendations as sub-advisor had on the value of, and cashflows to, the Subordinated Notes held by HCF Advisor's managed fund, CLO Funding.

None of Highland Capital Management, Highland CLO Funding, or Highland HCF Advisor have been counterparties to the Portfolio Management Agreements of the Acis CLOs – these PMAs have always been between the CLO Issuers and Acis. While Acis formerly delegated much of its decision-making to Highland under the sub-advisory agreement, Highland lost its unilateral authority to manage the CLOs as it saw fit when Acis entered bankruptcy. Highland served as sub-advisor and sub-services provider to Acis, under the supervision of a bankruptcy Trustee[10] from April 13, 2018 until August 2, 2018 but in that capacity – as sub-advisor to a third party with fiduciary duties to Acis – Highland did not have a unilateral right to direct the purchase or sale of any asset or to direct any sale of collateral to any particular counterparty or entity. As discussed in my Opinion #1, HCF Advisor had the ability to vote the requisite majority of the Subordinated Notes in each of the Acis CLOs, but those Subordinated Notes have no right to direct the method of disposition of CLO collateral, nor to force the sale of assets into a "warehouse" arranged by Highland. ALF/CLO Funding's investment in the Acis CLO Subordinated Notes only provides the economic right to receive the excess cashflows after Secured Notes are paid[11] and the rights of the Subordinated Notes under the CLOs' respective Indentures. While Highland continues to

---

[9] Sub-advisory Agreement by and between Highland HCF Advisor, Ltd. and Highland Capital Management, L.P. dated effective as of October 27, 2017

[10] Notice of Chapter 7 Bankruptcy Case – No Proof of Claim Deadline [Case No. 18-30264, Docket No. 120 & Case No. 18-30264, Docket No. 115]

[11] Expert Report of Daniel I. Castro, Jr. dated August 10, 2018, Section 47

both provide sub-advisory services to HCF Advisor and to be an investor in CLO Funding, now that Highland is not the sub-advisor to Acis, it cannot control the portfolio management decisions of Acis's advised funds.

4. Per the 2014-3 Indenture, "the terms of such Refinancing and financial institutions acting as lenders thereunder or purchasers thereof must be acceptable to the Portfolio Manager," alternatively, under the 2014-4, 2014-5, and 2015-6 Indentures, "the terms of which loan or issuance will be negotiated by the Portfolio Manager on behalf of the Issuer from one or more financial institutions or purchasers (a refinancing provided pursuant to such loan or issuance, a "Refinancing").[12] Acis clearly had affirmative influence and control over the terms of any Refinancing of an Acis CLO. Further, the Indentures state that "The Holders of the Notes shall not have any cause of action against any of the Co-Issuers, the Portfolio Manager or the Trustee for any failure to obtain a Refinancing."

Under the Indentures, the negotiation of a "loan or issuance" to effectuate a Refinancing is a right exclusively held by the Portfolio Manager. The "Designated CLO Reset" transactions which CLO Funding described in its Offering Memorandum would, under the CLO Indentures, have been negotiated by Acis. These reset CLOs could have been managed by "Highland, the Portfolio Manager, Highland CLO Management or any of its affiliates" – which, at that time, included Acis.[13] Given that *only* Acis holds the right to negotiate a reset for the Acis CLOs, it would be illogical for Acis to deliberately choose another party to assume the Portfolio Management Agreements after a "reset," which would clearly be to the detriment of its Acis's own interests. All investment management businesses – including Acis and Highland - depend on managing capital in exchange for fees. Replacing Acis with Highland CLO Management LLC, as was intended with the reset of Acis 2014-3 into Highland CLO 2014-3R (and was clearly contemplated for the other Acis CLOs subsequently), would have caused Acis to hand over value to Highland CLO Management LLC, for no consideration.

---

[12] Acis 2014-3, 2014-4, 2014-5, and 2015-6 Indentures, section 9.2
[13] Offering Memorandum of Highland CLO Funding, Ltd. dated November 15, 2017

This report submitted November 14, 2018

By: Zachary Alpern
Director

## DOCUMENTS REVIEWED

In connection with the foregoing report, I have given consideration to, among other documents, the following:

- Portfolio Management Agreements for Acis CLO 2013-1, Ltd., Acis CLO 2014-3, Ltd. Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2015-6, Ltd.
- Indentures for Acis CLO 2013-1, Ltd., Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2015-6, Ltd.
- Collateral Administration Agreements for Acis CLO 2013-1, Ltd., Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2015-6, Ltd.
- Third Amended and Restated Sub-Advisory Agreement by and between Acis Capital Management, L.P. and Highland Capital Management, L.P., dated March 17, 2017
- Fourth Amended and Restated Shared Services Agreement by and between Acis Capital Management, L.P. and Highland Capital Management, L.P., dated March 17, 2017
- Sub-advisory Agreement by and between Highland HCF Advisor, Ltd. and Highland Capital Management, L.P. dated effective as of October 27, 2017
- U.S. Bank Monthly Trustee Reports for Acis CLO 2013-1, Ltd., Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd., Acis CLO 2015-6, Ltd.
- Declaration of Compliance in relation to Acis Loan Funding Ltd. dated October 30, 2017
- Portfolio Management Agreement dated to be effective from December 22, 2016 between Acis Loan Funding, Ltd. and Acis Capital Management, L.P.
- Portfolio Management Agreement dated to be effective from 27 October 2017 between Acis Loan Funding, Ltd. and Highland HCF Advisor, Ltd.
- Notice of Chapter 7 Bankruptcy Case – No Proof of Claim Deadline [Case No. 18-30264, Docket No. 120 & Case No. 18-30264, Docket No. 115]
- Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC, Case No. 18-30264, Docket No. 464
- Expert Report of Daniel I. Castro, Jr. dated August 10, 2018
- Offering Memorandum of Highland CLO Funding, Ltd. dated November 15, 2017
- Wells Fargo Securities CLO Research, including "The U.S. CLO Manager Style Guide" dated June 20, July 19, and October 17, 2018
- Transcripts of Court Hearings, and other Docket items

# EXHIBIT "E"
## [Dondero Excerpt]

**JAMES DONDERO**

1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3

 4   IN RE:                    ) CASE NO. 18-30264-SGJ7
                               )
 5   ACIS CAPITAL MANAGEMENT   ) CHAPTER 7
     L.P.,                     )
 6                             )
             ALLEGED DEBTOR.   )
 7
     _____
 8

 9   IN RE:                    ) CASE NO. 18-30265-SGJ7
                               )
10   ACIS CAPITAL MANAGEMENT GP,) CHAPTER 7
     L.L.C.,                   )
11                             )
             ALLEGED DEBTOR.   )
12
     _____
13

14

15

16   *******************************************

17   ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF

18           JAMES DONDERO - 30(b)(6)

19         AS CORPORATE REPRESENTATIVE OF

20         HIGHLAND CAPITAL MANAGEMENT, LP

21                MARCH 19, 2018

22   *******************************************

23

24

25
```

**JAMES DONDERO**

2

```
1
2       ********************************************
3           ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF
4                  JAMES DONDERO - 30(b)(6)
5              AS CORPORATE REPRESENTATIVE OF
6              HIGHLAND CAPITAL MANAGEMENT, LP
7                     MARCH 19, 2018
8       ********************************************
9
10
11          ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF
12      JAMES DONDERO, produced as a witness at the instance
13      of the Petitioning Creditor Joshua N. Terry and duly
14      sworn, was taken in the above-styled and numbered
15      cause on MARCH 19, 2018, from 2:04 p.m. to 5:42
16      p.m., before Karen L. D. Schoeve, CSR, RDR, CRR, in
17      and for the State of Texas, reported by computerized
18      machine shorthand, at the law offices of McKool
19      Smith, 300 Crescent Court, Suite 1500, Dallas,
20      Texas, pursuant to the Federal Rules of Bankruptcy
21      Procedure and the provisions stated on the record or
22      attached hereto.
23          It is further agreed that Rule 30(b)(5) is
24      waived by agreement of the parties.
25
```

**JAMES DONDERO**

```
                                                       3
 1              A P P E A R A N C E S
 2  APPEARING ON BEHALF OF DEBTOR AND THE WITNESS:
 3       GARY CRUCIANI, ESQUIRE
         CARSON D. YOUNG, ESQUIRE
 4       McKOOL SMITH
         300 Crescent Court, Suite 1500
 5       Dallas, Texas 75201
         D:  214.978.4009 (Mr. Cruciani)
 6       D:  214.978.6368 (Mr. Young)
         T:  214.978.4000
 7       F:  214.978.4044
         gcruciani@mckoolsmith.com
 8       cyoung@mckoolsmith.com
 9
10  APPEARING ON BEHALF OF THE PETITIONER CREDITOR
    JOSHUA N. TERRY:
11
         BRIAN P. SHAW, ESQUIRE
12       CLOUSE DUNN LLP
         1201 Elm Street, Suite 5200
13       Dallas, Texas 75270
         D:  214.239.2707
14       T:  214.220.3888
         F:  214.220.3833
15       shaw@clousedunn.com
16            --AND--
17       RAKHEE V. PATEL, ESQUIRE
         WINSTEAD PC
18       2728 N. Harwood Street, Suite 500
         Dallas, Texas 75201
19       D:  214.745.5250
         T:  214.745.5400
20       rpatel@winstead.com
21
    ALSO PRESENT:
22
         Joshua N. Terry
23
         Scott B. Ellington, Chief Legal Officer and
24       General Counsel, Highland Capital Management LP
25       Jerry Miller, Videographer
```

**JAMES DONDERO**

```
                                                              4
 1                          INDEX

 2                                                         PAGE

 3   Appearances                                              3

 4

 5   JAMES DONDERO

 6         Examination By Mr. Shaw                            7

 7
     Changes and Signature                                 127
     Reporter's Certificate                                129
10

11

12                  DEPOSITION EXHIBIT INDEX

13   NUMBER     DESCRIPTION                                PAGE

14   1          Notice of Appearance pleading               19

15   2          Assignment and Transfer Agreement,          31
                dated 12/19/17
16              Bates stamped Acis0000227 - 236
                Confidential
17

18

19

20

21

22

23

24

25
```

**JAMES DONDERO**

5

TRIAL EXHIBIT INDEX

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1 | Final Award, dated 10/20/17 (28 pages) | 23 |
| 13 | Notice of List of Creditors Pursuant to Fed. R. BankR.P.1003(b), dated 01/31/18 | 13 |
| 15 | Promissory Note for $12,666,446, dated 10/07/16 (6 pages) | 29 |
| 16 | Assignment and Transfer Agreement, dated 11/03/17 Bates stamped Acis000050 - 55 Confidential | 55 |
| 21 | E-mail dated 10/27/17 from Roy Amit to Neil Desai Subject:  Hi (1 pages) | 42 |
| 23 | Acis Capital Management, LP, Balance Sheet, dated 01/26/18 (2 pages) | 27 |
| 40 | Case 18-30264-sgj7 Doc 39 Filed 03/06/18 List of Creditors (3 pages) | 34 |
| 43 | Portfolio Management Agreement, dated 10/27/17 Bates stamped Acis0000420 - 439 Confidential | 50 |
| 104 | Letter Agreement dated 11/15/17 from Mizuho Private and Confidential (19 pages) | 80 |
| 105 | Final Judgment, dated 12/13/17 (2 pages) | 89 |

**JAMES DONDERO**

```
                                                        6
 1                  TRIAL EXHIBIT INDEX
 2     NUMBER    DESCRIPTION                          PAGE
 3     110       Consent of the Sole Member of          8
                 Acis Capital Management GP, LLC,
 4               dated 06/10/16
                 (3 pages)
 5
       111       E-mail dated 11/03/17 from NexBank     38
 6               to Blair Roeber
                 Subject:  Online transfer is
 7               processed:  One-to-One, with
                 attachment
 8               (3 pages)
 9     173       Acis Loan Funding, Ltd. (The Company)  45
                 Bates stamped
10               TerryInvoluntary00003441 - 3444
                 (4 pages)
11
       184       Assignment, Transfer and Amendment     90
12               Agreement, dated 12/19/17
                 Bates stamped Acis0000760 - 768
13               Confidential
14
15
16
17         REPORTER'S NOTE 1:  Please be advised that an
18     UNCERTIFIED ROUGH DRAFT version of this transcript
19     exists.  If you are in possession of said rough
20     draft, please replace it immediately with this
21     CERTIFIED FINAL TRANSCRIPT.
22
23         REPORTER'S NOTE 2:  Quotation marks are used for
24     clarity and do not necessarily reflect a direct
25     quote.
```

**Complete Legal**                                    **214-746-5400**

**JAMES DONDERO**

7

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  This is the

3    videotaped deposition of James Dondero.  The date is

4    March 20th, 2018.  The time is approximately

5    2:04 p.m.

6              Will counsel present please identify

7    yourself and who you represent, and will the court

8    reporter please swear in the witness.

9              MR. SHAW:  Brian Shaw and Rahkee Patel

10   on behalf of Joshua Terry.

11              MR. CRUCIANI:  Gary Cruciani with

12   Carson Young and Scott Ellington on behalf of Acis

13   and Mr. Dondero.

14              JAMES DONDERO,

15   having been first duly sworn to tell the truth, the

16   whole truth, and nothing but the truth, so help him

17   God, testified as follows:

18              EXAMINATION

19   BY MR. SHAW:

20        Q.   State your name.

21        **A.   James Dondero.**

22        Q.   Mr. Dondero, you're the president of Acis

23   Capital Management GP, L.L.C., correct?

24        **A.   I don't know if I still am, but . . .**

25        Q.   You were the president of Acis Capital

**JAMES DONDERO**

108

1    Q.   (BY MR. SHAW)  What about Ms. Patel's
2  firm, are you gonna threaten them as well?
3          MR. CRUCIANI:  Objection; assumes
4  facts not in evidence.
5    **A.   We don't threaten, ever.  And I'm -- I'm**
6  **not aware of liability that she has yet.**
7    Q.   (BY MR. SHAW)  You've sued law firms
8  before on behalf of Highland, haven't you?
9    **A.   I believe we have.**
10   Q.   All right.  You've sued Lackey -- and
11 let's see.  Lackey -- you had Lackey Hershman file a
12 lawsuit against Looper Reed, right, in the Pat
13 Daugherty litigation?
14   **A.   Yes.**
15   Q.   And that case was dismissed and affirmed
16 on appeal, right?
17   **A.   I -- I don't know.**
18   Q.   Highland sued Haynes and Boone before,
19 right?
20   **A.   I don't -- I don't recall that one.  I --**
21 **I recall the $12 million we got from Orrick, but I**
22 **don't recall the Haynes Boone one, though.**
23   Q.   Highland sued Winstead, PC, right?
24   **A.   Yes.  We've gotten a firm to take it on**
25 **contingency there, so we're optimistic on that one.**

**JAMES DONDERO**

109

1    Q.   So other than these litigation claims that

2  you say would remain, is there anything else that

3  Acis would do?

4            If it's not managing collateralized

5  management agreements . . .

6    **A.   Well, the -- there's -- I don't know.  I**

7  **mean, there'll be some assets left in there, and**

8  **there's always an ability for an RIA to resurrect**

9  **its reputation, and if it's got a unique and**

10  **differentiated product offering, you can raise money**

11  **for new investors.**

12            **Performance -- performance is always**

13  **the Phoenix, so -- but I do believe the litigation**

14  **business is a good business.  I mean, we -- we -- we**

15  **run six, eight litigators internally.  It's a big**

16  **business for us.  I think it could be an important**

17  **part of Acis going forward.**

18    Q.   Yeah, you have a litigation claims

19  business that you're a partner in with

20  Mr. Ellington, right?

21    **A.   Yes.**

22    Q.   Now, you've been in the kind of distressed

23  debt space for a long time.  Is that fair?

24    **A.   Yes.**

25    Q.   You've been involved in involuntary

**JAMES DONDERO**

```
                                                              127
1                     CHANGES AND SIGNATURE
2   WITNESS NAME:  JAMES DONDERO
3   DATE:  MARCH 20, 2018
4   PAGE/LINE      CHANGE                    REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

**Complete Legal**                                    **214-746-5400**

**JAMES DONDERO**

128

1        I, JAMES DONDERO, have read the foregoing

2   deposition and hereby affix my signature that same

3   is true and correct, except as noted above.

4

5        _____

6                    JAMES DONDERO

7

8   THE STATE OF _____)

9   COUNTY OF _____)

10

11       Before me, _____, on

12   this day personally appeared JAMES DONDERO, known to

13   me (or proved to me under oath or through

14   _____) (description of

15   identity card or other document) to be the person

16   whose name is subscribed to the foregoing instrument

17   and acknowledged to me that they executed the same

18   for the purposes and consideration therein

19   expressed.

20       Given under my hand and seal of office this

21   _____ day of _____, 2018.

22

23            _____

24            NOTARY PUBLIC IN AND FOR

25            THE STATE OF _____

**Complete Legal**                                    **214-746-5400**

**JAMES DONDERO**

129

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION
3
4    IN RE:                        ) CASE NO. 18-30264-SGJ7
                                   )
5    ACIS CAPITAL MANAGEMENT       ) CHAPTER 7
     L.P.,                         )
6                                  )
             ALLEGED DEBTOR.       )
7
8    _____
9    IN RE:                        ) CASE NO. 18-30265-SGJ7
                                   )
10   ACIS CAPITAL MANAGEMENT GP,   ) CHAPTER 7
     L.L.C.,                       )
11                                 )
             ALLEGED DEBTOR.       )
12
13   _____
14
15                  REPORTER'S CERTIFICATE
16
17       -------------------------------------------
18        DEPOSITION OF JAMES DONDERO - 30(b)(6)
19                  TAKEN MARCH 20, 2018
20       -------------------------------------------
21
22       I, Karen L. D. Schoeve, Certified Shorthand
23   Reporter, Registered Diplomate Reporter, Certified
24   Realtime Reporter, and Realtime Systems
25   Administrator, residing in the State of Texas, do
```

**JAMES DONDERO**

130

1  hereby certify that the foregoing proceedings were

2  reported by me and that the foregoing transcript

3  constitutes a full, true, and correct transcription

4  of my stenographic notes, to the best of my ability

5  and hereby certify to the following:

6        That the witness, JAMES DONDERO, was duly

7  sworn by the officer and that the transcript of the

8  oral deposition is a true record of the testimony

9  given by the witness;

10       That the original deposition was delivered to

11  GARY CRUCIANI, custodial attorney;

12       That a copy of this certificate was served on

13  all parties and/or the witness shown herein on

14  _____.

15       I further certify that pursuant to FRCP No.

16  30(f)(i) that the signature of the deponent was

17  requested by the deponent or a party before the

18  completion of the deposition and the signature is to

19  be returned within 30 days from date of receipt of

20  the transcript.

21       If returned, the attached Changes and

22  Signature Page contains any changes and the reasons

23  therefore.

24     That pursuant to information given to the

25  deposition officer at the time said testimony was

**JAMES DONDERO**

131

```
1    taken, the following includes counsel for all
2    parties of record:
3
4    APPEARING ON BEHALF OF DEBTOR AND THE WITNESS:
5         GARY CRUCIANI, ESQUIRE
          CARSON D. YOUNG, ESQUIRE
6         McKOOL SMITH
          300 Crescent Court, Suite 1500
7         Dallas, Texas 75201
          D:  214.978.4009 (Mr. Cruciani)
8         D:  214.978.6368 (Mr. Young)
          T:  214.978.4000
9         F:  214.978.4044
          gcruciani@mckoolsmith.com
10        cyoung@mckoolsmith.com
11
12   APPEARING ON BEHALF OF THE PETITIONER CREDITOR
     JOSHUA N. TERRY:
13
          BRIAN P. SHAW, ESQUIRE
14        CLOUSE DUNN LLP
          1201 Elm Street, Suite 5200
15        Dallas, Texas 75270
          D:  214.239.2707
16        T:  214.220.3888
          F:  214.220.3833
17        shaw@clousedunn.com
18             --AND--
19        RAKHEE V. PATEL, ESQUIRE
          WINSTEAD PC
20        2728 N. Harwood Street, Suite 500
          Dallas, Texas 75201
21        D:  214.745.5250
          T:  214.745.5400
22        rpatel@winstead.com
23
24        I further certify that I am neither counsel
25   for, related to, nor employed by any of the parties
```

**Complete Legal**                                              **214-746-5400**

**JAMES DONDERO**

132

1  in the action in which this proceeding was taken,

2  and further that I am not financially or otherwise

3  interested in the outcome of the action.

4          Subscribed and sworn to on this the 20th

5  day of March, 2018.

6

7

8

9

10  _____

11  Karen L.D. Schoeve, CSR, RDR, CRR
    Realtime Systems Administrator

12  Texas CSR No. 3354, Exp.: 12-31-2018
    NCRA Exp. Date:  09-31-18

13  COMPLETE LEGAL
    Firm Registration No. 289

14  2650 Renaissance Tower
    1201 Elm Street

15  Dallas, Texas 75270
    214-746-5400

16

17

18

19

20

21

22

23

24

25