Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com
**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com
**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 18-30264-SGJ-11 |
| | ) | CASE NO. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | ) | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | ) | (Jointly Administered Under |
| | ) | Case No. 18-30264-SGJ-11) |
| DEBTORS. | ) | |
| ———————————————— | ) | |

## CLOSING SUMMATION OF ROBIN PHELAN, CHAPTER 11 TRUSTEE, IN SUPPORT OF CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN OF REORGANIZATION

TO THE HONORABLE STACEY G.C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:

Robin Phelan (the "Trustee"), Chapter 11 Trustee of Acis Capital Management, L.P.

("Acis LP") and Acis Capital Management GP, LLC ("Acis GP") (collectively, the "Debtors") in

these cases, files this Closing Summation in support of confirmation of the Trustee's Third

Amended Joint Plan of Reorganization [Dkt. No. 660], as amended, modified or supplemented

(the "Plan"). [1]  In support of confirmation of the Plan, the Trustee would respectfully show the

Court as follows:

---

[1] Certain capitalized terms used in this Brief and not otherwise defined herein shall have the definitions ascribed to them in the Plan.

## INTRODUCTION

1.      The evidence is overwhelming and, in many instances, uncontroverted that the Trustee's Plan is confirmable. The evidence also demonstrates that Highland Capital Management, L.P. ("HCM"), HCLOF, Highland HCF, and their respective affiliates (the "Highlands") engaged in a coordinated program to steal the business of Acis, leave Acis unable to pay Josh Terry and, as Dondero testified, move the business of Acis from one Highland-related pocket to the other.[2] The evidence further demonstrates that the Highlands repeatedly misled this Court and others, including the directors of HCLOF, alleging that "the investor made me do it." Even if that were true – which the testimony of Harbourvest demonstrated that it was not – the Highlands attempt to convince this Court stealing the business of Acis and not paying creditors is justified because it was beneficial for the Highlands and (allegedly) Harbourvest. "I wanted it" is not a defense to a fraudulent transfer suit. Confirmation of the Plan will serve the principles underlying the Bankruptcy Code and prevent the final step in the vendetta of the Highlands to obliterate Acis and wrongfully appropriate its business.

## ADDITIONAL BRIEFING

2.      Although the Court has permitted the parties to present up to twenty-five (25) additional pages of briefing in their closing summation, the issues for confirmation are very straightforward and have been extensively briefed by the parties. Consequently, the Trustee hereby incorporates herein by reference the arguments and authorities previously submitted to the Court in (i) the Trustee's Response (the "Trustee Response") [Docket No. 757] to the objections to the Plan raised by HCM and HCLOF, (ii) the Trustee's Response [Docket No. 751] to the objection to the Plan raised by Neutra, and (iii) the Trustee's brief (the "Trustee Brief") [Docket No. 651] in support of confirmation of the second amended plan.

---

[2] See Ex. 25, Transcript 3/23/18 at p. 152.

3.      However, there are two additional cases which bear mention.  First, the Highlands have argued, based on the Supreme Court's holding in *Stern v. Marshall*, 564 U.S. 462 (2011), that this Court lacks constitutional authority to enter a final order confirming the Plan.[3]  The Trustee has briefed this issue extensively, pointing out the weaknesses of the Highlands' position.[4]  As further support for this Court's authority to confirm the Plan, the Trustee would direct the Court's attention to the recent case of *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC),* 591 B.R. 559 (D. Del. 2018). There, the district court rejected the very argument advanced here by the Highlands. In *Millennium*, the objecting party opposed confirmation of a chapter 11 plan that included releases of non-debtor third parties.  The objector argued that, under *Stern v. Marshall*, the bankruptcy court had no constitutional authority to enter a final order confirming the plan because *Stern* would prevent the court's entering a final order in the litigation that would be affected by the releases.  The district court rejected the objecting party's contention and upheld the bankruptcy court's ruling that the *Stern* analysis does not even apply to a chapter 11 plan confirmation proceeding, which is unquestionably at the very essence of the bankruptcy process.[5]

4.      Second, as further support for the proposition that approval of the Temporary Plan Injunction is an appropriate exercise of this Court's power to do equity, the Trustee would note the very recent case of *Claridge Associates, LLC v. Schepis (In re Pursuit Capital Management, LLC)*, Nos. 14-10610 (LSS), 16-50083 (LSS), 2018 Bankr. LEXIS 3385 (Bankr. D. Del. Nov. 2, 2018). There, the bankruptcy court dealt with a fact setting that is remarkably

---

[3] *See* the Highlands' Objection to Confirmation of the Plan, Docket No. 722, at pp. 14-15.

[4] *See* the Trustee's Response to the Highlands' Objection to Confirmation of the Plan, Docket No. 757, at pp. 8-19.

[5] *In re Millennium Lab Holdings II, LLC*, 591 B.R. 577.  Because the district court concluded that the *Stern* analysis was not applicable to a confirmation proceeding, the court found it unnecessary to decide whether a confirmation proceeding would satisfy either prong of *Stern*'s "Disjunctive Test." *Id.* at 575. The bankruptcy court had held that, even if *Stern* did apply, *both* prongs are met because ruling on the third-party releases in a confirmation proceeding both (1) "stems from the bankruptcy itself" and (2) "would necessarily be resolved in the claims allowance process." *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 275 (Bankr. D. Del. 2017), *aff'd in part, appeal dism'd in part*, 591 B.R. 559 (D. Del. 2018).

similar to the one in the present case. A substantial arbitration award was entered against the debtor. The debtor's owners were alleged to have transferred valuable contract rights away from the debtor to other entities within the same enterprise, in an effort to make the debtor unable to satisfy the arbitration award. After the debtor filed for bankruptcy under chapter 7, the trustee assigned the estate's litigation rights to a third party, which brought an adversary proceeding for, among other things, avoidance and recovery of fraudulent transfers. In ruling on whether the third party's derivative standing was consistent with governing law, the court had to assess whether the fraudulent-transfer action was colorable. Judge Silverstein concluded that it was:

> ***In instances, such as this one, where a debtor's prepetition corporate management is alleged to have engaged in fraudulent transfers immediately prior to the bankruptcy filing,*** stripping the debtor of any funds that a chapter 7 trustee could use to make distributions to those creditors and/or to investigate management's actions, ***the intended system has broken down, and it is appropriate for the bankruptcy court to use its equitable powers and craft a flexible remedy.***

*Id.* at *47 (emphasis added). Similarly, the Temporary Plan Injunction is appropriate as a flexible remedy to protect creditors, and allows parties to ask the Court to modify it, if appropriate. Thus, it is a temporary remedy that is narrowly tailored to its purpose – to prevent the Highlands from using stolen property to do further damage to the Debtors and their creditors.

5.      Because the Trustee is incorporating his prior briefing by reference, the remainder of this closing summation is an outline directing the Court to the relevant portions of the record that support confirmation of the Plan, demonstrate the Highlands' witnesses' lack of credibility, and demonstrate the complete abdication of responsibilities by HCLOF's Guernsey directors.  The Plan itself is fundamentally valid; two impaired classes of creditors voted to accept the Plan, and only the Highlands (the entities bent on destroying Acis, stealing its business, and leaving it unable to pay creditors) have objected.

**CLOSING SUMMATION**

I. **The Trustee Has Met His Burden of Showing that Each Applicable Element in Section 1123(a) (Mandatory Contents of a Plan) Is Satisfied.**[6]

    A.    Section 1123(a)(1) – See Plan § 2.01; Transcript 12/11/18 (AM) at p. 80.

        1.    Each class of claims or interests in the Plan contains only claims or interests that are substantially similar to all other claims or interests included in such class. Plan § 2.01; Transcript 12/11/18 (AM) at p. 78.

        2.    The Plan's classification of claims and interests, including the classification of the Terry Partially Secured Claim and the claim of HCM, was motivated by good business reasons and not by any intent to gerrymander an impaired accepting class. Transcript 12/11/18 (AM) at p. 87; see also, Trustee Response, ¶¶ 133-142.

    B.    Section 1123(a)(2) (Plan specifies classes that are not impaired) – **Uncontested**. See Plan § 2.02.

    C.    Section 1123(a)(3) (Plan specifies the treatment of impaired classes) – **Uncontested.** See Plan §§ 4.02-4.05.

    D.    Section 1123(a)(4) (Plan provides for same treatment of claims or interests in a particular class) – **Uncontested.** See Plan Art. IV.

    E.    Section 1123(a)(5) (Plan provides adequate means for implementation) – See Plan Art. VI; Transcript 12/11/18 (AM) at p. 79; Transcript 12/12/18 (AM) at pp. 48-49; see also, discussion of feasibility of the Plan and the Temporary Plan Injunction (defined below), *infra*.

    F.    Section 1123(a)(6) (relates to corporations) – **Inapplicable**. See Transcript 12/11/18 (AM) at pp. 79, 84.

    G.    Section 1123(a)(7) (Plan provisions are consistent with the interests of creditors, equity security holders and public policy with respect to selection of officers and directors under the Plan). See Transcript 12/11/18 (AM) at pp. 79-80; see also, Trustee Response, ¶¶ 133-145; Trustee Brief, ¶ 37.

    H.    Section 1123(a)(8) and (c) (sections apply to individual debtors) – **Inapplicable**. See Transcript 12/11/18 (AM) at pp. 79, 84.

II. **The Trustee Has Met His Burden of Showing that Each Applicable Element in Section 1129 (Requirements for Confirmation of a Plan) Is Satisfied.**[7]

    A.    Section 1129(a)(1) (Plan complies with the applicable provisions of title 11) – See above; see also, Transcript 12/11/18 (AM) at p. 80; Trustee Response, ¶¶ 105-

---

[6] The section 1123 requirements are also addressed in the Trustee Brief at ¶¶ 22-51.

[7] The section 1129 factors are also discussed in the Trustee's Brief at ¶¶ 52-90.

111; Trustee Brief, ¶¶ 21-51.

B.    Section 1129(a)(2) (the Trustee has complied with the applicable provisions of title 11) – See Transcript 12/11/18 (AM) at p. 80; see also, Trustee Response, ¶¶ 133-145; Trustee Brief, ¶¶ 52-55.

C.    Section 1129(a)(3) (the Plan has been proposed in good faith) – See Transcript 12/11/18 (AM) at pp. 80-81; Trustee Response, ¶¶ 105-111; Trustee Brief, ¶¶ 56-58.

D.    Section 1129(a)(4) (payments to be made by the Trustee for services pursuant to the Plan are subject to approval by the Court for reasonableness) – **Uncontested**.  See Plan § 3.01(e); Transcript 12/11/18 (AM) at p. 81.

E.    Section 1129(a)(5) (the Trustee has disclosed the identity and affiliations of individuals proposed to serve as officers or directors of the Debtors or Reorganized Debtor after confirmation).

    1.    Section 1129(a)(5)(A) -- See Disclosure Statement at pp. 15-16; Transcript 12/11/18 (AM) at p. 81.

    2.    Section 1129(a)(5)(B) – See Disclosure Statement at pp. 15-16; Transcript 12/11/18 (AM) at p. 81.

    3.    Terry is not a "non-statutory insider" of the Trustee.  He has no special relationship with the Trustee and did not even know him prior to the entry of the order for relief.  Transcript 8/28/18 (AM) at p. 61; Transcript 12/11/18 (AM) at pp. 85-86; Transcript 12/12/18 (AM) at p. 61.[8]

    4.    See Trustee Brief, ¶¶ 61-62; Trustee Response, ¶¶ 112-122.

F.    Section 1129(a)(6) (governmental regulatory commission rate changes) – **Inapplicable**.  See Plan at pp. 1-34; Transcript 12/11/18 (AM) at pp. 81-82.

G.    Section 1129(a)(7) (impaired classes will receive more under the plan than in a liquidation under chapter 7) – See Disclosure Statement Ex. 4; Transcript 12/11/18 (AM) at pp. 88-90; Transcript 12/12/18 at p. 49; see also, Trustee Response, ¶¶ 123-126; Trustee Brief, ¶¶ 64-68.

H.    Section 1129(a)(9):

    1.    Section 1129(a)(9)(A) (payment of administrative expenses and gap claims) – See Plan Art. III; Transcript 12/11/18 (AM) at pp. 82-84; see also, additional discussion regarding the payment of allowed administrative expenses, *infra*.

---

[8] The Trustee would note that although the Highlands have twice alleged that Terry is a "non-statutory insider" of the Trustee, they have never put on a single shred of evidence to support this contention at either of the confirmation hearings, despite having conducted extensive discovery on this topic.

    2.      Section 1129(a)(9)(B) (payment of priority claims) – **Uncontested.** See Plan Art. III; Transcript 12/11/18 (AM) at pp. 83-84.

    3.      Section 1129(a)(9)(C) (payment of priority tax claims) – **Uncontested**. See Plan § 3.03; Transcript 12/11/18 (AM) at pp. 82-83.

    4.      Section 1129(a)(9)(D) (payment of secured tax claims) – **Uncontested**. See Plan § 4.01; Transcript 12/11/18 (AM) at p. 84.

I.      Section § 1129(a)(10) (acceptance by an impaired accepting class) – See Ballot Tabulation [Ex. 613]; Transcript 12/11/18 (AM) at p. 84, 88; Trustee Response, ¶¶ 127-145; see also, Transcript 8/28/18 (AM) at p. 61; Transcript 12/11/18 (AM) at pp. 85-86; Transcript 12/12/18 (AM) at p. 61 for evidence that Terry is not a non-statutory insider of the Trustee.

J.      Section 1129(a)(11) (confirmation not likely to be followed by the liquidation or need for further reorganization of the Debtors). See Disclosure Statement Ex. 3; Transcript 12/11/18 (AM) at pp. 89-91; Transcript 12/12/18 (AM) at pp. 48-49; see also, discussion of feasibility, *infra*.

K.      Section 1129(a)(12) (payment of U.S. Trustee fees) – **Uncontested**. See Plan § 3.04; Transcript 12/11/18 (AM) at p. 84.

L.      Section 1129(a)(13) (continuation of retiree benefits) – **Inapplicable**. See Transcript 12/11/18 (AM) at p. 84.

M.      Sections 1129(a)(14) (domestic support obligations) and (15) (applies to individual debtors) – **Inapplicable**. See Transcript 12/11/18 (AM) at pp. 79, 84.

N.      Section 1129(a)(16) (transfers of property by corporations) – **Inapplicable**. See Transcript 12/11/18 (AM) at pp. 79, 84-85.

O.      Section 1129(b)(1) (Plan is fair and equitable and does not unfairly discriminate) – See Plan §§ 4.04, 4.05; Trustee Response, ¶¶ 143-145; Trustee Brief, ¶¶ 88-90.

P.      Section 1129(b)(2) (absolute priority rule) – **Uncontested**. See Plan § 4.05 and pp. 1-34.

Q.      Section 1129(c) (only one plan) – **Uncontested**. The Trustee requests that the Court take judicial notice of the fact that no other plan has been confirmed in this case.

R.      Section 1129(d) (principal purpose of Plan is not the avoidance of taxes) – **Uncontested**. See Transcript 12/11/18 (AM) at p. 85.

S.      Section 1129(e) (applies to small business cases) – **Inapplicable**. See Transcript 12/11/18 (AM) at p. 85.

**III.    The Trustee Can Pay All Allowed Administrative Claims on the Effective Date.**

A.      Phelan testified that at the time of the Confirmation Hearing, the Debtors' Estate had $7.484 million in cash.  [Transcript 12/11/18 (PM) at p. 79].

B.      Certain of the Trustee's professionals filed interim fee applications, which the Court has approved on an interim basis.  [See Dkt. Nos. 796 (Winstead), 803 (Forshey Prostok), 805 (Terry section 503(b)(3) claim), and 806 (Miller Buckfire)].

C.      The Court has allowed on an interim basis, and authorized and directed the Trustee to pay, seventy-five percent (75%) of the fees and one hundred percent (100%) of expenses requested, which were paid by the Trustee on or about December 20, 2018 as follows:

| Admin. Claimant | Interim Admin. Expense Requested | Interim Admin. Expense Allowed/Paid | Outstanding Admin. Expenses |
|---|---|---|---|
| Winstead P.C. | $1,705,184.52 | $1,307,023.90 | $398,160.62 |
| Forshey Prostok, LLP | $1,835,847.04 | $1,389,418.40 | $446,428.64 |
| Miller Buckfire/Stifel | $577,751.88 | $497,751.88 | 80,000.00 |
| Josh Terry 503(b)(3) Claim | $567,209.42 | $430,837.42 | $136,372.00 |
| Total: | $4,685,992.86 | $3,625,031.60 | $1,060,961.26 |

D.      After payment of these interim administrative expenses, the Estate has approximately $3,858,968.40.  Phelan also testified that the Estate will receive over $2 million in portfolio management fees on February 1, 2019.  [Transcript 12/11/18 (PM) at pp. 75, 80].

E.      Additional administrative expense claims have been or will be asserted against the Debtors' Estate, including the Chapter 7 Trustee [Dkt. No. 783], the Chapter 7 Trustee's counsel [Dkt. No. 784], the U.S. Trustee, the Trustee, the Trustee's professionals, the Trustee's experts, Oaktree Capital Management, L.P., and HCM [Dkt. No. 772].  However, none of these administrative expense claims have yet been allowed (and many have not even been asserted yet).  Further, the Trustee opposes the administrative expense claim asserted by HCM and asserts that any HCM claim will either be disallowed because HCM's conduct harmed rather than benefitted the Estate, offset by amounts owed by HCM to the Estate, or equitably subordinated.  [See Ex. 627, Trustee's Counterclaim and Claim Objection].[9]  But even assuming HCM's administrative claim is someday allowed in the entire amount ($3,554,224.29), the Estate currently has more than sufficient cash to pay such claim and will indisputably have even more cash generated by the operation of the Debtors' profitable business over time.

F.      Consistent with section 1129(a)(9)(A) of the Bankruptcy Code, Section 3.01(b) of the Plan provides that each holder of an Allowed Administrative Expense shall receive payment of such Allowed Administrative Expense in full and in cash on "the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such

---

[9] The Trustee will also be filing a separate objection to Highland's request for payment of an administrative expense claim.

other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court." See Plan § 3.01(b).

G.     The Estate has already paid the Administrative Expenses that have been Allowed on an interim basis. There are currently no other Allowed Administrative Expenses that will need to be paid on the Effective Date. In the unlikely event any additional Administrative Expenses are Allowed between the time of the Confirmation Hearing and the Effective Date, including HCM's $3.5 million administrative claims, such Allowed Administrative Expenses can be paid from the Cash presently in the Estate and the additional $2 million that will be received on February 1, 2018. In addition, Phelan testified that the Trustee's legal professionals have agreed to defer payment of any additional Allowed Administrative Expenses that may be allowed prior to the Effective Date, if necessary. [Transcript 12/11/18 at p. 66].

H.     Any Administrative Claims that become Allowed after the Effective Date can be paid by the Reorganized Debtor within ten (10) days of the date they are Allowed by using either the Cash that will be transferred to the Reorganized Debtor under section 6.01 of the Plan or from the cash flow to be generated by the Reorganized Debtor. Phelan testified such cash flow will be approximately $2 million per quarter. [Transcript 12/11/18 (PM) at pp. 75, 80]. Terry also testified that the Trustee's legal professionals have agreed to defer payment of any Administrative Expenses that may be Allowed post-confirmation as may be necessary to ensure that the Reorganized Debtor has sufficient working capital to operate the business. [Transcript 12/12/18 (AM) at p. 68; Transcript 12/18/18 at p. 91].

## IV.     The Plan Is Feasible.

### A.     The Highlands,[10] who have been actively trying to destroy the Debtors, are the only parties objecting to the Plan.

1.     Legitimate creditors voted in favor of the Plan [See Exs. 711-715 (Ballots) and 613 (Tabulation)].

2.     The U.S. Trustee did not object to the Plan.

---

[10] Make no mistake, HCM, Neutra, Ltd., and HCLOF are all part of the Highland enterprise and ultimately controlled by HCM and Dondero. The Highlands merely "select" the entity that is best positioned to make the argument the Highlands would like to advocate. For example, Foley & Lardner, LLP is counsel for Neutra, Ltd. (current equity of the Debtors) and HCM (an alleged creditor of the Debtors). Neutra, Ltd. has argued inexplicably and in direct opposition to binding Fifth Circuit case law that this Court lacks jurisdiction to enter a confirmation order because the orders for relief are on appeal. There is no conceivable reason why Neutra would want Acis to be out of bankruptcy other than the Highlands' deviant goals — to systematically destroy Acis. Additionally, Ex. 654 makes clear that Dondero approved the October 6, 2017 optional redemption notice for Acis CLO 2014-3. In fact, the October 6, 2017 optional redemption notice was signed by Dondero. [Ex. 325]. It appears that the directors of HCLOF did not sign a notice of optional redemption until after the entry of the orders for relief, when it was convenient to create a fictitious distance between HCM and HCLOF.

3.  The Issuers, Co-Issuers and SEC did not object to the Plan.

4.  Only the Highlands objected, but HCLOF is not a creditor and the Trustee has objected to and seeks the disallowance of HCM's claim. [See Ex. 627, Trustee's *Amended Answer, Counterclaims (including Claim Objections) and Third-Party Claims* (Adv. No. 18-03078, Dkt. No. 84)].

5.  Although the Plan proposes to pay creditors in full, the Highlands' opposition apparently stems from Mr. Dondero's position that "***Nobody's going to let a dime go out of the firm that we don't have to pay ever to – to Josh, period.***" [See Ex. 101 from Involuntary Trial, Dondero Depo. 6/28/17, at p. 262 (p. 66 of 108 in condensed version)].

## B. Josh Terry is well-qualified to reorganize the Debtors.

1.  Terry testified that Acis received numerous awards during his service as the portfolio manager of the Acis CLOs. [Transcript 12/11/18 (PM) at pp. 162-163 and Ex. 752].

2.  The arbitration panel found that Terry was terminated for doing the right thing for investors and not agreeing to Dondero's wrong-headed ideas. [Transcript 12/11/18 (PM) at pp. 161-62].

3.  Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for Acis. [Transcript 12/11/18 (PM) at pp. 172-73].

4.  Terry testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed. [Transcript 12/12/18 (AM) at pp. 16-18].

5.  Dondero testified that there is always an ability for a registered investment advisor to resurrect its reputation and raise money from new investors. [Ex. 624, Dondero Depo., at p. 109].

## C. Brigade is qualified to serve as a sub-advisor to the Reorganized Acis.

1.  Worman testified Brigade currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs. [Transcript 12/11/18 (PM) at 84].

2.  Worman testified Brigade has issued seventeen CLOs and has reset or refinanced several of them. [Transcript 12/11/18 (PM) at p. 86]. HCM, by contrast, has not done a reset. [Transcript 12/13/18 (AM) at p. 80].

3.  Worman and Terry testified Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis points. [Transcript 12/11/18 (PM) at p. 89; Transcript 12/12/18 (AM) at p. 62].

4.  Terry testified that the fact that a few failed trades were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis.

Trades out of compliance with the applicable CLO tests occasionally happen, and Brigade has handled them appropriately. [Transcript 12/11/18 (PM) at 182-83; Transcript 12/18/18 at pp. 72-73]. In fact, at least ten (10) failed trades occurred while HCM was acting as sub-advisor. [See Exs. 727, 728; Transcript 12/11/18 (PM) at pp. 71-74, 182-83].

5.     Worman testified that HCM, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs and that Brigade has reduced that cash balance by $280 million to approximately $100 million. [Transcript 12/11/18 (PM) at p. 100].

6.     Worman also testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs. [Transcript 12/11/18 (PM) at pp. 70, 94].

7.     Phelan and Terry testified that the build-up of cash in the Acis CLOs while HCM was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders. [Transcript 12/11/18 (AM) at pp. 67-69; Transcript Transcript 12/11/18 (PM) at pp. 70-71; 12/12/18 (AM) at pp. 34-37].

8.     Covitz's testimony was not credible that there were few conforming loans available to be purchased for the Acis CLOs between the entry of the Order for Relief on April 13, 2018 and August 2, 2018, when HCM was terminated as sub-advisor. [Transcript 12/13/18 (AM) at pp. 12-13].

    a)     Terry testified that there were $85 million in purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but virtually no purchases of loans in the CLOs afterwards – only sales. [Transcript 12/12/18 (AM) at pp. 18-19, 28-31; Transcript 12/18/18 at pp. 87-89; see also, Terry Demonstrative].

    b)     Terry testified that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test. [Transcript 12/18/18 at p. 87].

    c)     Terry also testified that HCM purchased loans for CLO-7 that would have satisfied the weighted average life constraints in CLO-4, CLO-5, and CLO-6. [Transcript 12/18/18 at pp. 87-88].

    d)     Terry testified that, although there was no change in market conditions, HCM essentially stopped buying collateral for the Acis CLOs after the entry of the Orders for Relief. [Transcript 12/18/18 at p. 88-89].

9.     Covitz's testimony was not credible that Brigade should have used accumulated cash to pay down the AAA notes rather than invest in new loans. [Transcript 12/13/18 (AM) pp. 13-16].

a)      Phelan and Terry both testified that allowing cash to build in the Acis CLOs reduced the interest income generated by the CLOs and caused the Acis CLOs to be unable to make a distribution to equity.  [Transcript 12/11/18 (AM) at p. 67; Transcript 12/11/18 (PM) at pp. 70-71; Transcript, 12/12/18 (PM) at pp. 35-36].

b)      Terry likewise testified that it did not make sense to pay down the cheapest cost of capital in the CLOs and that doing so reduces the ability of the CLOs to make a distribution to the equity holders. [Transcript 12/18/18 at pp. 72-73].

c)      Covitz's testimony was also contrary to Dondero's testimony during the involuntary trial that the portfolio manager's duties are "keeping the cash balances spent in the CLOs…." [Ex. 25, Transcript 3/23/18 at p. 117].

**D.     The Reorganized Acis and Brigade can perform a consensual reset of the Acis CLOs if requested by HCLOF or a successor holder of the Subordinated Notes.**

1.      The Plan only contemplates a consensual reset.  [See Plan § 6.08].

2.      Worman and Terry both testified that they believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis CLOs. [Transcript 12/11/18 (PM) at pp. 86-90, 176-178; Transcript 12/12/18 (AM) at pp. 16-18].

3.      Terry testified that other asset managers have been able to issue or reset CLOs after a bankruptcy proceeding.  [Transcript 12/11/18 (PM) at pp. 179-180].

4.      Terry also testified that he wants to come to a resolution with HCLOF and reset the Acis CLOs.  [Transcript 12/18/18 at p. 74].

**E.     The HCLOF Offering Memorandum does not preclude a reset of the Acis CLOs by the Reorganized Acis under the Plan.**

1.      The Offering Memorandum between HCLOF and Harbourvest, dated November 15, 2017, provides that there may be a change in circumstances following the date of the Offering Memorandum and that any forward-looking statements in the Offering Memorandum involve risks and uncertainties "because they relate to events and depend on circumstances that may or may not occur in the future."  [See Ex. 90, HCLOF Offering Memorandum, at pp. 4-5].

2.      Bestwick testified that the Offering Memorandum does not require HCLOF to invest only in HCM-managed funds [See Ex. 719, Bestwick Depo., at pp. 109. 118-121]. and instead expressly provides that HCLOF will invest in "CLOs managed by other asset managers."  [See Ex. 90, HCLOF Offering Memorandum, at p. 12].

3. Phelan testified that HCLOF and Harbourvest can agree to change the Offering Memorandum, which was put in place between HCLOF and Harbourvest as part of the Highlands' scheme to steal Acis LP's business. [Transcript 12/11/18 (AM) at pp. 74-76; Transcript 12/11/18 (PM) at p. 19].

4. McGuffin testified that the HCLOF directors' fiduciary duties require them to act independently and objectively in the best interests of HCLOF, and also require them to consider a change in circumstances. [Transcript 12/13/18 (PM) at pp. 142-145].

5. HCLOF's counsel, HCLOF's director, and Harbourvest have all testified that they would consider doing a reset with Acis in the event the Plan is confirmed. [See Ex. 602, p. 12 of 70 (statement by HCLOF Counsel), Ex. 719 at pp. 166-167 (Heather Bestwick); Ex. 745, p. 72 (Investor representative)].

F. **Terry testified that a reset of the Acis CLOs can occur after the expiration of the reinvestment periods of the Acis CLOs.** [Transcript 12/18/18 at pp. 82-83].

G. **The Plan is feasible regardless of whether a reset of the Acis CLOs is requested by HCLOF.** Phelan and Terry both testified that the Reorganized Debtor will have cash flow from multiple potential sources – including the revenues from the PMAs with the Acis CLOs, potential new business developed by the Reorganized Acis, and the outcome of any potential litigation claims. [Transcript 12/11/18 (AM) at pp. 72, 88-90; Transcript 12/12/18 (AM) at p. 53].

## V. The Portion of the Plan Injunction Temporarily Enjoining the Liquidation of the Acis CLOs and Related Actions (the "<u>Temporary Plan Injunction</u>") Is Necessary and Appropriate.[11]

A. **The Trustee Has Asserted Numerous Avoidance Claims[12] against the Highlands, Including Claims to Recover Acis LP's Rights under the ALF PMA.** [See Ex. 627, Trustee's Counterclaims and Claim Objection].

1. On July 10, 2018, to maintain the status quo pending adjudication of the Trustee's avoidance claims against the Highlands, the Court granted the

---

[11] The other portion of the Plan Injunction is a general plan injunction prohibiting action against the Debtors, Reorganized Debtor and the Estate Assets based on acts occurring before the Effective Date, which is permanent and does not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[12] The transfers at issue in Ex. 627, Trustee's Counterclaims and Claim Objection assert some of the avoidance claims. Additional transfers (and therefore additional potential avoidance claims) were the subject of the trial on the involuntary petitions and, subsequently, one of the bases for which this Court entered the Orders for Relief. Counsel for the Trustee used a PowerPoint during opening statement that demonstrated additional fraudulent transfers. The exhibits underlying this PowerPoint are Exs. 2, 7, 209, 216-221, 225-229, 237, 260, 667, 670, 674, 675, 677, 678, 681, 682, 687, and 688.

Preliminary Injunction, enjoining the Highlands and affiliates from, among other things, taking actions to liquidate the CLOs. [See Ex. 204].

2. The Preliminary Injunction expires upon confirmation of a plan.

3. The Plan seeks to continue—through the Temporary Plan Injunction—the same relief granted by the Court in the Preliminary Injunction. As argued in the Trustee's prior briefing, that relief is appropriate as part of confirmation of the Plan, and there is ample evidence in the record to support it.

**B.     The Court Has Made Prior Rulings Supporting the Preliminary Injunction, Which Apply Equally to the Temporary Plan Injunction.**

1. In numerous prior decisions, this Court has ruled that the Trustee is entitled to the same injunctive relief in the Temporary Plan Injunction pending resolution of avoidance claims against the Highlands.

2. The Trustee asks the Court to take notice of its prior findings, conclusions and orders in the following documents:

a) *Findings of Fact and Conclusions of Law in Support of Orders for Relief* [Ex. 243 at pp. 16-23 (regarding asset transfers), pp. 23-26 (regarding the motivations for the transfers), and p. 49 (regarding considerable evidence of fraudulent transfers)].

b) *Sua sponte TRO* [Ex. 256] enjoining the Highlands from effectuating an optional redemption or liquidating the Acis CLOs.

c) *Ex parte TRO* [Ex. 257] enjoining the Highlands from effectuating an optional redemption or liquidating the Acis CLOs.

d) *Preliminary Injunction* [Ex. 204], which contains extensive findings and conclusions regarding the injunction factors and the transfers the Trustee seeks to avoid.

e) *Ruling denying confirmation of the Trustee's prior plan* [Ex. 623]. Specifically, the Trustee directs the Court to the Miscellaneous Rulings at the end of the document.

**C.     Additional Evidence of Substantial Likelihood of Success on the Merits.**

1. The record contains evidence of both intentional and constructive fraudulent transfers of the ALF PMA and other assets.

2. The record contains evidence of the "badges of fraud"[13] used to analyze intentional fraudulent transfers related to the ALF PMA and other assets.

---

[13] *Wiggains v. Reed (In re Wiggains),* Nos. 13-33757-SGJ-7 & 14-03064, 2015 Bankr. LEXIS 1121, *67-68 (Bankr. N.D. Tex. April 6, 2015) (the "Fifth Circuit has identified the following "badges of fraud" for purposes of actual

3. Property of Acis LP was transferred prepetition. **Badge of Fraud: the financial condition of the debtor before and after the transaction and general chronology of events and transactions in inquiry.**

a) Terry testified about the transfers of the Debtors' assets and his arbitration award. [Ex. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein].

b) Terry testified in detail about what Acis LP owned as of October 20, 2017 and the various transfers made of the Debtors' assets. [Ex. 201, Transcript 3/21/18 at pp. 110-133, and the exhibits discussed therein].

c) Terry testified that he was with Acis LP since its inception in 2011 through his termination in 2016 and as to his familiarity with the Acis and Highlands operations and structure. [Ex. 201, Transcript 3/21/18 at pp. 186-191].

d) Leventon admitted that the transfers took place near the time of Terry's award. [Ex. 24, Transcript 3/22/18 at pp. 71-75].

e) Leventon admitted that Acis sold its shares back to ALF. [Ex. 24, Transcript 3/22/18 at pp. 204-205].

f) Phelan testified about the transfers of Acis LP assets (including the ALF PMA and the note), the increase in fees charged by HCM to Acis, and the Trustee's counterclaim for those transfers and actions. [Transcript 12/11/18 (AM) at pp. 52-56; see also, Transcript 8/27/18 (AM) at p. 52].

g) Greenspan testified that the termination of a contract can constitute a transfer. [Transcript 12/12/18 (PM) at pp. 92-96].[14]

---

fraudulent transfer under the Bankruptcy Code: 1) the lack or inadequacy of consideration; 2) the close familial or friendship relationship between the parties; 3) the retention of the possession, benefit or use of the subject property; 4) the financial condition of the debtor before and after the transaction; 5) financial difficulties or pendency or threat of suits by creditors after the incurring of debt; 6) general chronology of the events and transactions in inquiry." "Actual intent … may be inferred from the actions of the debtor and may be proven by circumstantial evidence." *In re Chastant*, 873 F.2d 89, 91 (5th Cir. 1989). Courts may deduce fraudulent intent from all the facts and circumstances of a case. *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1983).

[14] Indeed, the Highlands' position that the termination of the ALF PMA was not a transfer is inconsistent with the position taken by their expert in *Greenspan v. Orrick, Harrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318 (Bankr. N.D. Cal. 2009), in which Greenspan argued (and the Court held) that a contractual waiver of rights to income from certain "unfinished business" was a transfer of property for fraudulent-transfer purposes, and that, *as a matter of law*, the debtor did not receive "reasonably equivalent value" for the waiver because the debtor received nothing. *Id.* at 338 and 346.

h)    Greenspan admitted that the definition of a transfer in the Bankruptcy Code does not include a value component. [Transcript 12/12/18 (PM) at pp. 97-98].

i)    The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component. Tex. Bus. & Comm. Code § 24.002(12).

j)    Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors. In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A); see also, Trustee's Response at ¶ 83 and fn. 62.

4.    The prepetition transfers were made to deprive Acis LP of value and with actual intent to hinder, delay or defraud the Debtors' creditors. The Highlands' only purported business justification for the prepetition transfers (i.e. that Harbourvest demanded it) turned out to be a lie. The evidence shows that the transfers were part of an intentional scheme to keep assets away from Terry as a creditor.

a)    Terry testified about the transfers of the Debtors' assets and his arbitration award. [Ex. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein].

b)    Terry testified in detail about what Acis LP owned as of October 20, 2017 and the various transfers made of the Debtors' assets. [Ex. 201, Transcript 3/21/18 at pp. 110-133, and the exhibits discussed therein].

c)    Ellington testified that Harbourvest said it had no interest in doing business with Acis because the Acis brand was purportedly toxic and, consequently, nothing associated with Acis could be managed or marketed as a CLO. [Ex. 23, Transcript 2/7/18 at pp. 55-58].

d)    Ellington testified that Harbourvest demanded that the ALF PMA be transferred. [Ex. 23, Transcript 2/7/18 at pp. 203-204].

e)    Ellington also testified that, because Harbourvest would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions. [Ex. 23, Transcript 2/7/18 at p. 226].[15]

f)    Okada testified that a reset transaction could not be performed by Acis because the market would not accept Acis as a portfolio

---

[15] As this Court is aware, risk retention compliance is no longer in effect for CLOs in the United States due to the D.C. Circuit's decisions, *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220 (D.C. Cir. 2018).

manager and Acis was no longer risk-retention compliant. [Ex/ 25, Transcript 3/23/18 at p. 53].

g)      Dondero testified that the "Boston investor" deal was contingent on getting away from Acis and getting a new collateral manager. [Ex. 25, Transcript 3/23/18 at p 143-144].

h)      Although representatives of the Highlands said that Harbourvest's demands were the reason for the transfer of the ALF PMA, Harbourvest's representative testified that this was untrue and that these alleged demands were never made by Harbourvest. [See Ex. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157. In fact, Harbourvest was a passive, minority investor in HCLOF with no ability to influence or control any of the actual investment decisions. [Ex. 720, Depo. of Harbourvest Rep. at pp. 32-33].

i)      Greenspan testified that he did not consider whether the ALF PMA transfer was an actual fraudulent transfer, but only considered whether the transfer was constructively fraudulent. [Transcript 12/12/18 (PM) at pp. 116- 117 and 161].

j)      Covitz repeatedly testified that the justification for the Highlands' fraudulent transfer scheme was that Acis "was a shell" and not capable of being risk retention compliant. [Transcript 12/13/18 (AM) at pp. 55-57 and 58. However, Covitz also testified that in October 2017, prior to the Terry arbitration award, there was a structure in place that would comply with risk retention. [Transcript 12/13/18 (AM) at pp. 77-78].

k)      Covitz could not distinguish why the "shell" status of Acis was distinguishable from the "shell" status of other Highland-related entities that were the recipients of various fraudulent transfers. [Transcript 12/13/18 (AM) at p. 78; Transcript 12/18/18 at pp. 59-63].

l)      Covitz also subsequently admitted that Harbourvest did not request that Acis end its involvement with ALF/HCLOF through the ALF PMA fraudulent transfer or request that ALF change its name to HCLOF. [Transcript 12/13/18 (AM) at p. 103]. Covitz's testimony contradicts the testimony provided by Scott Ellington, General Counsel [see Ex. 23, Transcript 2/7/18 at pp. 177:178] and Dondero [see Ex. 25, Transcript 3/23/28 at pp. 143-44].

m)      Once the "Investor made us do it" story had been proven false, the Highlands recalled Covitz, who then testified that the business had to be transferred because Acis allegedly did not have sufficient assets to meet risk retention requirements or perform the resets. [Transcript 12/18/18 at pp. 33-34, 40-41].

n)  However, Terry previously testified that the fact Acis was not risk retention compliant was the result of the fraudulent transfer of Acis LP's interest in the risk retention structure.  [Ex. 201, 3/21/18 at pp. 111-113, 119-121].

o)  Terry also testified that Acis had sufficient assets to satisfy risk retention requirements and perform a reset before the fraudulent transfer of Acis LP's assets and/or that Acis LP could have obtained a revolving line of credit.  [Transcript 12/18/18 at pp. 98-99, 102-103].

p)  Additionally, the discovery the Trustee obtained from BVK/Universal demonstrates that this intentional fraudulent transfer scheme continued after the involuntary petitions were filed, including HCM's efforts to transfer the BVK/Universal business from Acis to HCM.  Indeed, it is clear that Highland aggressively "encouraged" BVK/Universal to seek stay relief from this Court to terminate Acis. [Exs. 631-644, and 646].

5.  The transfers deprived the Debtors of valuable assets. The Highlands argue the ALF PMA has no economic value because the ALF PMA provides that ALF retains "control." That argument is belied by Texas law, including but not limited that specific contractual provisions control over general ones,[16] the Highlands' actions, including transferring the ALF PMA, lying about why it was transferred, and failing to return it or to even offer to return it to Acis. The evidence shows that ALF PMA has value.

a)  Alpern testified that the portfolio manager (under the ALF PMA) makes decisions regarding the underlying financial instruments including seeking optional redemption and negotiating reset. Alpern also testified about the importance of the portfolio manager having control of the sub notes in the CLO industry to ensure an "evergreen fee stream." [Ex. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49].

b)  Terry also testified that the portfolio manager (not the equity interest holders) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.  [Transcript 12/18/18 at pp. 77-78].

c)  Phelan testified that the ALF PMA allowed Acis control of an optional redemption. [Ex. 405, Transcript 8/27/18 (AM) at p. 53].

---

[16] See Trustee Response, at ¶ 66; *State Prop. Dallas v. Paris Sav.,* 1994 U.S. App. LEXIS 41139, *17 (5th Cir. 1994) ("It goes without saying, under longstanding rules of contract construction, a more specific provision controls a general provision.").

d)   Klein testified about the value of the ALF PMA and the negative impact of its transfer on Acis LP. [Ex. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207].

e)   Terry testified about the control rights Acis LP had under the ALF PMA. [Ex. 405, Transcript 8/27/18 (AM) at pp. 63-75].

f)   Castro testified that control has value. [Ex, 405, Transcript 8/27/18 (PM) at p. 36].

g)   Castro also testified that the "actual humans" who would make the decision for HCLOF as to whether to request an optional redemption of the Acis CLOs were Dondero (75% owner of HCM), Okada (25% owner of HCM) and Covitz (acting for Highland HCF), *and not* the Guernsey directors.  [Ex. 406, Transcript 8/28/18 (PM) at pp. 61-63].

h)   Alpern also testified that, before the Terry arbitration award, Acis LP, as the portfolio manager of ALF, rather than the Guernsey directors, issued the notices of optional redemption for ALF.  [Ex. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exs. 323-325 (Notices of Optional Redemption signed by Acis LP as portfolio manager of HCLOF)].

i)   Although Covtiz alleged that the determination regarding whether to issue a notice of optional redemption was collaborative, the evidence is clear that Covitz needed Dondero's consent, rather than the consent of the Guernsey directors, to send out a notice of optional redemption.  [See Ex. 654 and Transcript 12/13/18 at pp. 86-89].

j)   The testimony of Scott and Bestwick, the Guernsey directors of HCLOF, made it abundantly clear that, notwithstanding their fiduciary duty to act independently and in the best interests of HCLOF, they have wholly abdicated their duties to HCLOF. Instead, they have at best adopted a "head in the sand" approach, and at worst are complicit in the Highlands' scheme.  Scott and Bestwick testified that they delegated both the portfolio management function and virtually all decisions of any consequence relating to HCLOF to the Highlands.  For example,

(1)   HCM retained the Bell Nunnally firm to act for HCLOF in the involuntary proceeding without the knowledge or consent of the HCLOF directors.  [Ex. 721, Scott Depo., pp. 93-94, 277].

(2)   HCM recommended HCLOF retain the Gardere firm.  [Ex. 721, Scott Depo. at pp. 91-92].

(3) The Highlands recommended HCLOF retain the King & Spalding firm, and HCLOF did not consider any other firms. [Ex. 719, Bestwick Depo. at pp. 32-22].

(4) An HCM employee attends HCLOF's board meetings, even though more than portfolio management issues are discussed. [Ex. 719, Bestwick Depo. at p. 45].

(5) The Guernsey directors never disagreed with each other or HCM. [Ex. 719, Bestwick Depo. at pp. 48-49; Ex. 721, Scott Depo. at pp. 102-103].

(6) Scott admitted that the portfolio manager formulates the investment decisions for HCLOF and the role of the Guernsey directors was merely to "police" HCLOF's service providers, not to second-guess them. [Ex. 721, Scott Depo. at p. 105-06].

(7) Neither of the Guernsey directors has ever spoken to the 49% Investor in HCLOF or the representative of the DAF (the other 49% investor in HCLOF); rather, they have only spoken to HCM. [Ex. 719, Bestwick Depo. at pp. 118, 188-90].

(8) HCM did not tell the Guernsey directors, nor did they know, about the Terry arbitration award (Oct. 2017), the Terry judgment (Dec. 2017), or the involuntary bankruptcy proceeding (Jan. 2018) until after the entry of the orders for relief in mid-April 2018. [Ex. 719, Bestwick Depo. at pp. 130-31, 133-137, Ex. 721 Scott Depo. at pp. 134-35].

(9) The Guernsey directors were not aware of Terry's arbitration award at the time of the transfer of the ALF PMA, the name change to HCLOF, or the ALF share transfer. [Ex. 719, Bestwick Depo. at pp. 191-96].

(10) HCM told the Guernsey directors that the replacement of Acis was a condition precedent to the investment in HCLOF by Harbourvest. [Ex. 719, Bestwick Depo. at pp. 58-60; Ex. 721, Scott Depo. at pp. 254-55].

(11) The Guernsey directors conducted no due diligence on Highland HCF as the replacement portfolio manager, and Bestwick did not know that the entity had been formed as a Cayman entity on the same day the ALF PMA was transferred. [Ex. 719, Bestwick Depo. at pp. 200-201].

(12) Terry was sued in Guernsey during the prior confirmation hearing for alleged actions solely taken in this bankruptcy proceeding. Bestwick testified that the idea to file suit against Terry in Guernsey did not come from either HCLOF

director and, although Scott testified that he purportedly authorized the suit to be filed, he was not aware of any purportedly confidential information allegedly improperly disclosed by Terry. [Ex. 719, Bestwick Depo. at pp. 189-90, 213-14; Ex. 721, Scott Depo. at pp. 158, 165-66].

(13)     Scott testified that J.P. Sevilla (in-house counsel for HCM) would have more information than Scott about the facts underlying the suit filed by HCLOF against Terry in Guernsey [Ex. 721, Scott Depo. at p. 165].

(14)     Despite the lack of information provided to the directors and the alleged losses to HCLOF stemming from the bankruptcy proceeding, the Guernsey directors remain happy and satisfied with HCM.  [Ex. 719, Bestwick Depo. at pp. 133-36].

(15)     Bestwick refers to HCM as HCLOF's advisor and does not know if HCF Advisor has any interests that are different from HCM's interests.  [Ex. 719, Bestwick Depo. at pp. 152, 155-56].

(16)     Scott was unaware that HCLOF had sued the Trustee, and thought only the Trustee had sued HCLOF.  [Ex. 721, Scott Depo. at pp. 282-83].

(17)     HCM approved the additional hourly compensation for the Guernsey directors for time incurred relating to the bankruptcy proceeding.  [Ex. 719, Bestwick Depo. at pp. 197-99].

k)     Klein testified that the termination of the ALF PMA resulted in a transfer of valuable rights to manage the CLOs and to earn management fees doing so. [Transcript 12/12/18 (PM) at pp. 9-13].

l)     The evidence demonstrates that the Guernsey directors have either completely delegated the right to exercise all incidents of ownership relating to the subordinated notes to the portfolio manager (including the right to vote the instruments and call for an optional redemption) and/or breached their fiduciary duties to HCLOF under Guernsey law.  However, the nature and extent of the rights available to Acis under the ALF PMA once the ALF PMA transfer is avoided need not be determined at confirmation. Instead, the Trustee has demonstrated a likelihood of success on the merits of his avoidance claims and the nature and extent of the rights ultimately recovered by Acis will either be determined at the time of the fraudulent transfer action or, as HCLOF's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas under the terms of the ALF PMA.  [Transcript 12/13/18 at pp. 116, 118-19, 122, 124 (Corfield); see also, p. 140 (McGuffin)].

6.      Acis received no value in exchange for the transfers, therefore, they received less that reasonably equivalent value.

        a)      Phelan testified that the ALF PMA was cancelled, and the rights thereunder were transferred to Highland HCF.  [Transcript 12/11/18 (AM) at p. 54].

        b)      Klein testified that the ALF PMA rights were transferred to HCF Advisor for zero value. [Ex. 405, Transcript 8/27/18 (PM) at 154].

        c)      Greenspan also admitted that no value was given for the ALF PMA rights.  [Transcript 12/12/18 (pm) at p. 71].

        d)      Klein also testified that Acis LP received less than reasonably equivalent value in exchange for the rights it held under the ALF PMA. [Transcript 12/12/18 (PM) p. 52].

7.      Insolvency.

        a)      The Klaus Declaration says that Acis LP's management agreements with each of the CLOs were cash flow negative, meaning that Acis LP is required to pay more cash than it receives.  [See Ex. 619].

        b)      Ellington testified that Acis was cash flow negative.  [Ex. 23, Transcript 2/7/18 at pp. 78-79 and 167].

        c)      Klein testified that the Debtors were insolvent at the time of the prepetition transfers. [Ex. 405, Transcript 8/27/18 (PM) at pp. 152-159].

        d)      Even though he disagreed with Klein's conclusion of insolvency, Greenspan did not undertake to evaluate or opine about whether Acis LP was solvent at any time.  [Transcript 12/12/18 (PM) at pp. 115-116]. Greenspan also testified about the important information he was not given for his analysis, all of which would be pertinent to whether Acis LP was solvent or insolvent, including prior rulings and admissions by Klos and Ellington that Acis was balance sheet insolvent and cash flow negative. [Transcript 12/12/18 (PM) at pp. 118-150].

8.      It is undisputed that prior to the appointment of the Chapter 11 Trustee, Acis and Highland were affiliated and had a close relationship.  [Exs. 17, 18, 22-27, 251, 619 & 649].

**D.     Evidence of Irreparable Harm to the Debtors Absent the Temporary Plan Injunction.**

1.      Scott testified that, absent the Temporary Plan Injunction, HCLOF would call for an optional redemption and seek to redeem the Acis CLOs.  [Ex. 721, Scott Depo. at pp. 204].

2.     Bestwick's testimony also implied that, when the injunction expires, HCLOF would redeem the Acis CLOs so that they could once again be managed by HCM.  [Ex. 719, Bestwick Depo. at p. 112].

3.     Ellington testified that an optional redemption would have resulted in liquidation of the CLOs and that would, in turn, result in termination of the manager (Acis LP) because there would be nothing left to manage. [Ex. 23, Transcript 2/7/18 at pp.81-85].

4.     Phelan testified that if the CLOs are liquidated, there is nothing for Acis LP to manage. [Ex. 405, Transcript 8/27/18 (AM) at p. 40].

5.     Courts favor a return of the property in avoidance actions.  See Response Brief, ¶ 93.  Here, liquidating the CLOs would deprive Acis of its preferred remedy, i.e., the return of its rights under the ALF PMA, and deprive it of the opportunity to be returned to the financial position it enjoyed prior to the fraudulent transfers.

6.     Phelan testified about the Highlands' continued efforts to disrupt and steal the Debtors' business. [Transcript 12/11/18 (AM) at pp. 61-62, 64-68 and Ex. 636].

7.     Phelan testified that the Temporary Plan Injunction is very important because it protects the revenues under the PMAs, which is a source of potential recovery to creditors under the Plan.  [Transcript 12.11/18 (AM) at pp. 71-72].

8.     Terry testified that the Temporary Plan Injunction is a critical component of the Plan and that Acis would have no going concern value without it.  In fact, without the Plan Injunction, Terry will be precluded from reorganizing the business and paying creditors.  [Transcript 12/12/18 (AM) at pp. 40-41, 54-55].

9.     Dondero testified about his animosity toward Terry and that this litigation would go on for years.  [Ex. 25, Transcript 3/23/18 at pp. 167-168]. It also appears that a portion of this testimony is under seal, see p. 174.

10.    The Trustee does not have an adequate remedy at law.  Phelan testified that paying creditors from ongoing business operations is preferable to litigation that would cost a fortune, take forever, and that the Highlands would continue to try to steal the business so creditors cannot be paid. [Transcript 12/11/18 (AM) at pp. 60-62].

11.    Terry also testified that pursuing litigation and attempting to collect against the Highlands is not a realistic possibility because of the high risk of collection based on the Highlands' demonstrated track record of transferring assets to avoid paying legitimate creditors.  [Transcript 12/12/18 (AM) at pp. 60-61].

12.    The Highlands have demonstrated that they would do anything to avoid paying Terry's judgment.  In addition to transferring assets and trying to

steal Acis LP's business, HCLOF sued Terry in Guernsey during the first confirmation hearing, and Sevilla submitted an affidavit to the Guernsey court describing Terry's statutorily authorized 503(b) claim, which was recently approved by the Court, as a "highly unorthodox fee" that Terry would receive in exchange for giving the trustee confidential information. [See Ex. 649, ¶¶ 41-43]. Thus, any entity under the Highlands' control, including HCLOF, will likewise fraudulently transfer assets to avoid a judgment by the Reorganized Debtor. As a result, a judgment against HCLOF is not an adequate remedy at law.

13.   Despite the Highlands' contention that the Temporary Plan Injunction is "unprecedented," HCM itself sued one of its investors in the Liberty CLO case in order to obtain a permanent injunction to prevent HCM's removal as portfolio manager and the liquidation of its CLO. [See Ex. 304 and Transcript 12/13/18 (PM) at 55:6-66:2] The Liberty CLO petition also makes repeated reference to HCM's dire need for injunctive relief, which HCM now seeks to deny the Trustee.

**E.      Evidence that the balance of harms shows greater harm to the Debtors.**

1.   Phelan testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors. [Transcript 12/11/18 (AM) at pp. 71-72].

2.   Terry also testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors. [Transcript 12/12/18 (AM) at pp. 40-41, 54-55].

3.   Conversely, there is no harm to the Highlands because they can ask for a reset under the Plan, and any harm to the Highlands is a problem of their own making. [Transcript 12/11/18 (AM) at p. 92].

4.   Scott testified that HCLOF can sell its interest in the subordinated notes in the market. [Ex. 721, Scott Depo. p. 28].

5.   Phelan also testified that the Temporary Plan Injunction would not impair the value of the subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan. [Transcript 12/11/18 at pp. 23-24].

6.   Terry testified that even if the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs. [Transcript 12/12/18 at p. 82].

7.   Because they come to Court with unclean hands, the Highlands are not entitled to the benefit of any equitable considerations. It bears mentioning that neither the HCLOF directors (Scott and Bestwick) nor Highland's upper management, Dondero, Okada and Ellington, could be bothered to even show up at the confirmation hearing.

F. **The Temporary Plan Injunction is in the public interest:**

1. The public interest is furthered by confirming a plan that saves Acis LP's business operations and allows it to pay its creditors under a successful plan of reorganization.

2. The public interest is also furthered by maintaining the status quo through the Temporary Plan Injunction so that the avoidance action relating to the ALF PMA can be determined on its merits.

3. The public interest is not furthered by allowing wrongdoers to complete the last step in their scheme to strip Acis of its assets, steal its business, and leave it unable to pay creditors.

4. The public interest is not furthered by leaving the Debtors without sufficient resources to pursue legitimate causes of action and effectively litigate them against the Highlands' billions.

VI. **The Highlands' Concern About Reserving for Equitably Subordinated Claims Has Been Resolved through the Proposed Confirmation Order.**

A. The proposed Confirmation Order addresses this issue and provides that, "notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed Subclass 4B Claims." [See Proposed Confirmation Order, Dkt. No. 814, at ¶ 31].

B. Counsel for the Trustee represented that the Trustee has reached out to the Highlands' counsel to discuss any changes that would satisfy their objections or make the Plan less objectionable if confirmed but received no response. [Transcript 12/11/18 (AM) at p. 19]. Likewise, neither the Highlands nor any other party-in-interest has proposed an alternative plan or any other solution for getting creditors paid in this case.

C. Phelan and Terry both testified that they will incorporate any other changes into the Plan or confirmation order that the Court deems necessary or appropriate for confirmation. [Transcript 12/11/18 (PM) at p. 75; Transcript 12/18/18 at p. 93].

<u>CONCLUSION</u>

The Trustee and the Plan have met all the requirements for confirmation of a chapter 11 plan of reorganization. Accordingly, the Trustee requests that the Court confirm the Plan.

WHEREFORE, the Trustee prays that the Court issue an Order confirming the Plan and granting such other and further relief to which he may be justly entitled.

DATED: December 31, 2018

Respectfully submitted,

*/s/ Jeff P. Prostok*
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
rpatel@winstead.com
Phillip Lamberson
State Bar No. 00794134
plamberson@winstead.com
Joe Wielebinski
State Bar No. 21432400
jwielebinski@winstead.com
Annmarie Chiarello
State Bar No. 24097496
achiarello@winstead.com
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)

**SPECIAL COUNSEL FOR ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF electronic Notice on December 31, 2018. I further certify that a true and correct copy of the foregoing document was additionally served upon the parties listed below via email on December 31, 2018.

Holland N. O'Neil
Jason B. Binford
Shiva D. Beck
Melina N. Bales
**Foley Gardere**
**Foley & Lardner LLP**
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com
*Counsel for Highland Capital Management, LP*

Michael K. Hurst
Ben A. Barnes
**LYNN PINKER COX & HURST, LLP**
mhurst@lynnllp.com
bbarnes@lynnllp.com
*Counsel for Highland Capital Management, LP*

Mark M. Maloney
W. Austin Jowers
Paul R. Bessette
**KING & SPALDING LLP**
mmaloney@kslaw.com
ajowers@kslaw.com
pbessette@kslaw.com
*Counsel for Highland CLO Funding, Ltd.*

Daniel P. Novakov
**FROST BROWN TODD LLC**
dnovakov@fbtlaw.com
*Counsel for U.S. Bank, N.A. as CLO Trustee*

Mark D. Kotwick, Esq.
Arlene R. Alves, Esq.
**SEWARD & KISSEL LLP**
kotwick@sewkis.com
alves@sewkis.com
*Counsel for U.S. Bank, N.A. as CLO Trustee*

Brian P. Shaw
John M. Lynch
**Rogge Dunn Group, PC**
shaw@roggedunngroup.com
lynch@roggedunngroup.com
*Counsel for Josh Terry*

Lisa Lambert, Trial Attorney
United States Trustee
lisa.l.lambert@usdoj.gov

James Bentley
Jay Williams
SCHUTLE ROTH & ZABEL
james.bentley@srz.com
jay.williams@srz.com
***Counsel for ACIS CLO 14-00001 and 3-6, Ltds.***

Joseph Bain
JONES WALKER
jbain@joneswalker.com
***Counsel for ACIS CLO 14-00001 and 3-6, Ltds.***

/s/ Jeff P. Prostok
Jeff P. Prostok

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Closing Summation 12.31.18 Final.docx