Mark M. Maloney (GA 468104)
(admitted *pro hac vice*)
W. Austin Jowers (GA 405482)
(admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO
FUNDING LTD.**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | Case No. 18-30265-SGJ-11 |
| | § | |
| | § | (Jointly Administered Under Case |
| DEBTORS | § | No. 18-30264-SGJ-11) |
| | § | |
| | § | **Chapter 11** |

**POST TRIAL BRIEF OF HIGHLAND CLO FUNDING, LTD. ("HCLOF")
OPPOSING CONFIRMATION OF THIRD AMENDED JOINT PLAN FOR ACIS
<u>CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC</u>**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

HCLOF AND ITS 49% INVESTOR........................................................................................ 1

AS A "PLAN INJUNCTION" THE INJUNCTION FAILS .......................................................... 3

THE INJUNCTION IS NOT OTHERWISE SUSTAINABLE........................................................ 5

    Substantial Likelihood of Success is Lacking .................................................................. 10

    An Adequate Remedy at Law Exists / No Irreparable Harm............................................ 11

    The Balance of Harms Favors HCLOF ............................................................................ 11

    A Continued Injunction Frustrates Rather Than Furthers Public Policy .......................... 14

CONCLUSION......................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aon Re, Inc. v. TIG Ins. Co.*,
   No. CIV.A. 3:09-CV-0300, 2009 WL 3075584 (N.D. Tex. Sept. 28, 2009) ..........................11

*In re Atlas Fin. Mortg. Inc.*,
   No. 13-32683-BJH-7, 2014 WL 172283 (Bankr. N.D. Tex. Jan. 14, 2014) .............................9

*Beitel v. OCA, Inc. (In re OCA, Inc.)*,
   551 F.3d 359 (5th Cir. 2008) ..................................................................................................14

*Crane v. Napolitano*,
   No. 3:12-CV-03247-O, 2013 WL 12100740 (N.D. Tex. Mar. 15, 2013) ..............................14

*Dong v. Miller*,
   No. 16CV5836NGGJO, 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ..................................9

*Great Am. Ins. Co. v. Primo*,
   512 S.W.3d 890 (Tex. 2017) ....................................................................................................5

*Grupo Mexicano de Dessarrollo S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) .................................................................................................................9

*Hunt v. Bankers Tr. Co.*,
   646 F. Supp. 59 (N.D. Tex. 1986) .........................................................................................11

*In re Ingersoll, Inc.*,
   562 F.3d 856 (7th Cir. 2009) ....................................................................................................4

*Morgan v. Fletcher*,
   518 F.2d 236 (5th Cir. 1975) ....................................................................................................3

*In re Pac. Lumber Co.*,
   584 F.3d 229 (5th Cir. 2009) ....................................................................................................4

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
   415 U.S. 1 (1974) .....................................................................................................................3

*In re Worldwide Diamond Ventures, LP*,
   559 B.R. 143 (Bankr. N.D. Tex. 2016) ..................................................................................10

# INTRODUCTION[1]

The central dispute in this case has existed since 2016, but until these cases were filed, the fight was (properly) a two party dispute — *not* involving HCLOF. Since then, however, HCLOF and its investors, including its new 49% Investor, have suffered severe damage. But it is *collateral* and undeserved damage. The legacy of an employment dispute between Joshua Terry ("Terry") and Acis is now focused on harming HCLOF's rights and economic interest — so that Terry can be paid on a claim that is not, and has never been, against HCLOF. That should stop now. The Trustee has made repeated suggestions that HCLOF should cough up cash to solve this problem. But that is simply "stick-up artist" logic: "Hand over your wallet or I will shoot you." However, HCLOF is not in a dark alley. It is here, in full view of the law.

## HCLOF AND ITS 49% INVESTOR

The Trustee went out of his way to depose HCLOF's 49% owner (the "Investor"). That testimony, however, does not support the Trustee's theories or his vitriol toward HCLOF. The Investor's investment was comprehensively diligenced, negotiated, and documented on the premise that its investment would be managed by Highland Capital Management, L.P. ("Highland"). APP. 138–146, 150–155 (Covitz); APP. 344, 352 (9/15/17 Sum. of Terms); APP. 395–403 (HCLOF Off. Mem.); APP. 429, 435–437, (Investor); APP. 455–456 (Scott).[2]

The Investor was aware of the infamous "Terry Arbitration" but, appropriately, did not believe an employment dispute should have any impact on its investment. APP. 431, 433 (Investor). This is perfectly consistent with HCLOF's position from the very first day its chairman appeared before this Court, up to now. APP. 274–276, 451–454 (Scott); APP. 424–

---

[1] HCLOF has focused this closing brief principally on the issues raised by the evidence presented at the confirmation hearing on December 11–14, and 18. HCLOF incorporates fully the objections and legal arguments set forth in its initial and supplemental objections found at Docket Nos. 722 and 756 respectively.

[2] Citations to "APP. __" refer to pages of the Joint Appendix filed by the parties opposing confirmation of the plan.

426 (Bestwick). Indeed, even now the Investor draws no legitimate causal connection between the Terry litigation, the various alleged fraudulent transfers, and their current plight. APP. 432 (Investor). Simply put, it was not reasonably foreseen, nor should it properly be the case, that a third party investor would be held hostage by this process.

Likewise, the Investor — a party whose motivations no one has questioned — specifically rejected the Trustee's constant chorus that HCLOF has acted in an economically irrational manner in opposing Plans A, B, C and D. APP. 436–437 (Investor); *see also* APP. 122–123 (Greenspan) ("[I]f I was an investor in Acis Loan Funding and a court issued an injunction saying . . . I can't exercise my contract . . . I'd be very, very upset and screaming bloody murder."). Put simply, HCLOF (and its investors) do not want to sell their property against their will (Plan A), have the rights granted to them in documents governing their CLO investments altered without their consent (Plans B, C, and D), or be enjoined for two years or more from exercising bargained for rights with respect to the CLOs — all while the CLOs are being managed by a party that (1) is not the party they signed up for, (2) is suing it for tens of millions of dollars and has otherwise litigated against it for the last 6 months, (3) fired Highland (the party it signed up for and had diligenced for months), (4) replaced it with an unfamiliar sub-advisor who either does not want to, or is not being allowed to, operate in a "market" way with the CLO equity investors (including providing requested information, and generally acting in a non-adversarial way), (5) is advocating for CLO "resets" that are not possible, and, even if they were, are not permissible under HCLOF's governing documents, and (6) is suing to forcibly take over HCLOF with the stated purpose of disregarding HCLOF's governing documents and illegally asserting total control and sole discretion over HCLOF's investments. APP. 435–436 (Investor); APP. 442–445 (Scott).

As the evidence reveals, the Trustee has legal remedies and other options. He is not entitled to an injunction simply because pursuing the costs and risks of litigation is not "as good an alternative" as having an injunction that guarantees payment (at HCLOF's expense). APP. 5–10, 12–14, 309–311 (Phelan). No litigant would ever deny that an injunction that *guarantees* a "win" is the "better option." But that is not the standard. *See Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.") (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51–52, 58 (1938)); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (same). Injunctions, whether "plan" injunctions or Rule 65 litigation injunctions, should not serve the mere convenience of a litigant. *Id.*

If the Trustee proves wrongdoing, he has a remedy. In the meantime, he should not have a remedy-in-full borne entirely by HCLOF, a party who is 49% owned by an indisputably independent party, and controlled by directors who have no connection with Highland other than having been selected as directors for HCLOF. APP. 421, 423 (Bestwick); APP. 429–430 (Investor); APP. 449 (Scott). The Trustee's assertion that anyone with "Highland" in its name should fully fund this estate (an estate whose "tab" has been more than doubled by the Trustee's actions) is incorrect, and should be tested through litigation in the adversary proceeding, not prejudged. *Cf.* APP. 406 (the Court). The injunction, however, places the full weight of this estate on HCLOF and moots any litigation on the merits because the estate will be fully funded at HCLOF's expense long before litigation concludes. That, simply, is wrong.

## AS A "PLAN INJUNCTION" THE INJUNCTION FAILS

The Trustee can point to no precedent where a similar injunction was incorporated into a confirmed plan of reorganization. Never before has a plan injunction been used to bar a non-creditor (here HCLOF) from taking actions with respect to its own financial instruments with a

3

non-debtor party. And there is no case anywhere to HCLOF's knowledge that has approved a plan injunction preventing a non-creditor from exercising rights against a non-debtor party (here, the CLOs) who is not settling claims and contributing funds in furtherance of the reorganization. *Compare In re Ingersoll, Inc.,* 562 F.3d 856, 864-65 (7th Cir. 2009) (approving "unique" third party injunction barring non-creditor claim, but noting that benefitted party provided "valuable consideration" to unsecured creditors). In addition to recognizing the "valuable consideration" issue, *Ingersoll* comes from the Seventh Circuit which, unlike the Fifth Circuit, is receptive to third party injunctions in "unique" circumstances. *See In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (noting that other circuits have taken a "more lenient approach" but that "[Fifth Circuit] cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions."). This case does not involve any disclosed settlements or compromises or channeling injunctions as in mass tort cases where courts have been more receptive to allowing non-debtor releases and permanent injunctions. *See In re Pac. Lumber Co.*, 584 F.3d at 252 (discussing the appropriateness of third-party releases).

The Injunction does not protect an otherwise viable business. That too is unique in the context of a plan injunction. The injunction here is not a shield that protects a viable business. APP. 20–21 (Phelan); APP. 47–48, 55–57, 60–61 (Worman); APP. 76–77 (Terry); APP. at 379–388 (Discl. Stmt.). **It is a sword, without which no business would exist.** APP. 28 (Phelan); APP. 70–72 (Terry). The only "customer" of Acis who was given the choice to stay or go, has chosen to go. APP. 29 (Phelan). Moreover, the injunction is not even *designed* to protect a viable business — by its terms it stays in place only until creditors are paid in full. APP. 391 (Plan). That is clear from the terms of the Plan and from the testimony of the Trustee and Terry, the Plan's primary beneficiary. The Trustee freely admits this is "all about money." APP. 9–10,

4

312–313 (Phelan). Terry testified that he just wants to get paid. That is why he preferred Plan A to Plans B and C in the previous confirmation hearing. APP. 66–67 (Terry). The very idea that Terry, who has been out of the CLO market for two and a half years, and who has detonated a bankruptcy litigation bomb over the investors of the CLOs he now wants to forcibly "manage," can rebuild a CLO management business, is at best speculative and naïve. APP. 156–157 (Covitz); APP. 162–166 (Castro). But the "business" is not the point — and never has been. The only point is to pay creditors at the expense of HCLOF and its investors.

## THE INJUNCTION IS NOT OTHERWISE SUSTAINABLE

As a "litigation"-based injunction under FRBP 7065, the proposed Plan D Injunction also fails. The litigation claim that purportedly supports the requested injunction is the alleged fraudulent transfer of the 2016 "ALF PMA." The entire premise of this injunction is that if Acis can get its "rights" back under the ALF PMA, it can call all the shots and "control its own destiny." Thus, so the theory goes, the injunction should freeze any action pending a determination of whether Acis can get its "rights" back. Indeed, those same alleged "rights" are the very basis for the "value" that Acis alleges was fraudulently transferred away from Acis in 2017. APP. 82–83, 322 (R. Klein); APP. 414–415 (Trustee's Countercl.); APP. 465 (Haggard Rep.) at 7. Now, however, the evidence is overwhelming that this fundamental premise of both the underlying fraudulent transfer claim *and* the requested injunction — *i.e.,* that Acis had, and will regain, unfettered rights to do whatever it wants under the ALF PMA — is false.

The terms of the ALF PMA are clear, and they dispel the Trustee's argument. APP. 250–253 (ALF PMA); APP. 326–328 (Castro). The analysis can and should end here. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (holding that "[a] contract's plain language controls"). The additional confirmatory evidence, however, is plentiful and compelling.

Expert witnesses for *both* HCLOF and the Trustee *agree* that the Trustee's interpretation (contrary on its face to the plain language) would violate Guernsey law. APP. 210–211 (Corfield); APP. 215 (McGuffin); APP. 375–377 (Corfield Suppl. Aff.); *see also* APP. 250 (ALF PMA). No one disputes that the Directors of HCLOF cannot abdicate their authority. That, too, should end the inquiry. But there is more.

*Both* the parties to the ALF PMA confirm they did NOT intend for Acis to have unfettered authority or the ability to take actions contrary to the instructions of HCLOF. APP. 158–159, 331 (Covitz); APP. 419–420 (Bestwick); APP. 440–442 (Scott). More still, the very *conduct* of the parties to the ALF PMA is inconsistent with the Trustee's notion that Acis can do whatever it wants and does not need to follow HCLOF's instructions. Permission (at least for transformative issues such as refinancings, redemptions, and resets) was in fact sought during the tenure of the ALF PMA. *E.g.*, APP. 300 (3/4/17 email); APP. 301 (9/13/17 email). The "reset" transactions stymied by the bankruptcy were fully briefed to the directors, and the directors were fully supportive, before the redemption notices were sent. APP. 294 (10/6/17 notice); APP. 303 (10/6/17 ALF Board Mins.); APP. 416 (10/6/17 email);[3] APP. 441–442 (Scott).

Finally, the Trustee fails to reckon with the fact that both sets of optional redemption notices issued in April and June were executed not by the portfolio manager, but by HCLOF itself through its directors. APP. 254–260 (4/30/18 notices); APP. 261–272 (6/15/18 notices). HCLOF, of course, could send similar notices *regardless* of the identity of its portfolio manager. The Trustee offers no explanation or evidence for how this problem is "solved" in Acis's favor, even if Acis could ever be reinstated.

---

[3] Notably, the email requesting internal permission at Highland to proceed with this reset was sent nearly eight hours after HCLOF's approval had already been secured. *Compare* APP. 303 (10/6/17 ALF Board Mins.) *with* APP. 416 (10/6/17 email).

6

In the face of this mountain of contrary evidence, the Trustee is left merely with the naked assertion that if the ALF PMA were reinstated — as discussed further below, an at-best dubious proposition — Acis could do what it wanted, even in express disregard of HCLOF's instructions. Legally and factually, that proposition is false. Notably, the Trustee designated two experts on this issue. Neither testified. Another Trustee witness, Richard Klein, was at best equivocal, on this issue when he testified in August. APP. 316–320, 322–323 (R. Klein). On the other hand, Dan Castro and Ronald Greenspan both reject the Trustee's reading of the ALF PMA. APP. 88–89, 116–119, 123–124 (Greenspan); APP. 193–194, 326–328 (Castro). In fact, no knowledgeable witness has ever specifically described Acis's rights as "unfettered."

The Trustee instead will likely argue only that HCLOF must in fact have no independent rights because the HCLOF directors have, up to now, never outright disagreed with Highland's recommendations. Of course, the Trustee ignores HCLOF's testimony that it has probed and tested Highland's recommendations. APP. 422 (Bestwick); APP. 450 (Scott). That these discussions have never resulted in an impasse should not be surprising. HCLOF's investors bargained for Highland's management services and took specific measures to ensure economic alliance ("skin in the game") and key Highland personnel retention. APP. 138–146, 150–155 (Covitz); APP. 344, 352 (9/15/17 Sum. of Terms); APP. 395–403 (HCLOF Off. Mem.); APP. 429, 435–437, (Investor); APP. 455–456 (Scott). Put simply, Highland is the party the investors signed up for and has been acting consistently with HCLOF's mandates and its investors' goals. APP. 220–223 (Covitz); *see also* APP. 169–173 (Castro). That would change dramatically if a Terry or Trustee-led Acis were forced into Highland's role as a fiduciary to HCLOF. The entire history of this case makes clear that forcing a Trustee or Terry-led Acis into the role of HCLOF's fiduciary (as its direct portfolio manager) would be putting the Fox into the Henhouse. HCLOF

7

and its 49% Investor are lock-step in their "extreme concern" over that proposition. APP. 435–436 (Investor); APP. 445 (Scott).

HCLOF and Acis have agreed on virtually nothing since the case began, and Acis has gone out of its way to be hostile to HCLOF's interests, as noted above. As a further example, Acis has not allowed Brigade to engage with HCLOF in a "market" way — even Brigade confirms this. APP. 58–60, 62–65 (Worman); APP. 132–136 (Covitz); APP. 195–196 (Castro); APP. 239–240 (Terry); APP. 298–299 (9/18/18 email). Moreover, the very heart of Acis' argument — that if it becomes HCLOF's portfolio manager it could compel a reset on terms that HCLOF does not approve, or refuse an optional redemption that HCLOF seeks — is itself a declaration of war against HCLOF. And war it would be. Consequently, HCLOF's positive working relationship with Highland to date has no bearing on the legal authority it retains over its portfolio manager. It simply reflects that HCLOF and its portfolio manager are aligned and in agreement. That would all change in a "Fox in the Henhouse" world.

For those same reasons, it is not plausible to assume that Acis could ever be legally reinstated as HCLOF's portfolio manager. The Guernsey law experts agree, and there is no dispute, that the Guernsey Financial Services Commission is active and robust and will consider the views of all stakeholders. APP. 203–206 (Corfield); APP. 215–217 (McGuffin); APP. 357–362, 365–373 (Corfield Aff.); APP. 462–463 (McGuffin Rep.). While the Trustee's expert opines it is premature to predict the result of this robust regulatory scrutiny, he offers no opinion that a Terry-led Acis would in fact ever be approved as a fiduciary of HCLOF. It is inconceivable that the Guernsey regulators will allow a hostile party with rampant conflicts, not of the investors' choosing, one fiercely opposed by the fund's directors, and one who affirmatively interprets its proposed portfolio management agreement (the ALF PMA) in a way

8

that violates Guernsey law, to serve as HCLOF's fiduciary. APP. 197–198 (Corfield); APP. 358–359 (Corfield Aff.); APP. 445 (Scott).

Finally, in a world where HCLOF will not — indeed, by law cannot — voluntarily accept a hostile party as its fiduciary / portfolio manager, it is difficult to conceive how Acis will not need to seek assistance from the Guernsey courts to actually attempt to exercise rights — particularly when its interpretation of its purported "rights" indisputably violates Guernsey law. As noted in Tim Corfield's expert report, that help is not available as specific performance has never been recognized in Guernsey, and foreign judgments need to be for money damages, in a sum certain, to be enforced in Guernsey. APP. 198–203, 207–209, 211 (Corfield); APP. 356–357, 362–364a (Corfield Aff.). The Trustee's expert offered only that Guernsey assistance *might* be available. APP. 212–214 (McGuffin); APP. 458–461 (McGuffin Rep.).

For all these reasons, the foundation for the Trustee's injunction is false. The ALF PMA was never a "golden ticket" permitting it to do whatever it wants over the objection of the company it serves. Even if it could prove anything of value was fraudulently transferred, it will be entitled to damages and nothing more. An injunction is therefore inappropriate as a matter of law. *See In re Atlas Fin. Mortg. Inc.*, 2014 WL 172283, *3 (Bankr. N.D. Tex. Jan. 14, 2014) ("[T]he general equitable powers of the federal courts do not include the authority to issue preliminary injunctions in actions solely at law.") (citing *Grupo Mexicano de Dessarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 310 (1999)); *Dong v. Miller*, 2018 WL 1445573, at *8–10 (E.D.N.Y. Mar. 23, 2018) (noting it is "not true that the *Grupo Mexicano* rule falls away once a plaintiff asserts any claim for equitable relief" and conducting claim-by-claim analysis). Accordingly, the Plan and injunction should be denied.

Even if the Court were to proceed to the standard four factor test, the injunction nonetheless fails as a result of much of the evidence noted above, and as further set forth below.

**Substantial Likelihood of Success is Lacking**

As noted, the fact that the ALF PMA is not the golden ticket Acis wants and needs it to be is a fundamental problem for the Trustee on many levels. The Trustee's "value" transfer proposition is now missing. The ALF PMA generated no fees — only obligations to perform. Acis' fees, if any, come from Acis' management of the CLOs. HCLOF certainly has rights that may impact Acis' CLO fee income, but, as noted above, the ALF PMA does not put Acis' fate in its own hands. Thus, where is the value transfer? What did Acis lose? On this record, it lost nothing.[4] APP. 88–91, 116–121, 123–124 (Greenspan); APP. 193–194, 326–328 (Castro); *see also In re Worldwide Diamond Ventures, LP*, 559 B.R. 143, 150 (Bankr. N.D. Tex. 2016) ("The salient issue [for a fraudulent transfer claim] is whether the estate lost value.").

The Court has now also heard extensive testimony from Ronald Greenspan, a leading solvency and fraudulent transfer expert, concerning the infirmities of the Trustee's solvency analysis, and the absence, in fact, of a "transfer." APP. 84–115 (Greenspan). Further, the evidence demonstrates that the efforts to find another investor, the negotiations with the Investor (including the "skin in the game" and "key man" issues noted above), the focus and strategy of resetting the aging CLOs (which was being undertaken market-wide), and the considerations regarding risk retention structures and capitalization all occurred independent of and prior to Terry's arbitration award. The Trustee and Terry self-centeredly maintain this award was the cause of *everything*. The time line proves otherwise. APP. 138–146, 223–238 (Covitz); APP.

---

[4] Note also that even the *purported* "value" of the ALF PMA, $3,669,935, as opined by the Trustee's expert (Exh. 777 (Haggard Expert Rep.) at 14), has already been delivered to Acis as a result of the injunction, in the form of the substantial net fee income that has already accrued. *See* Monthly Operating Report for Acis LP (Nov. 1–30, 2018), ECF No. 809 (showing total receipts by Acis LP since August 2018 in excess of $10 million, and cash on hand of $7.9 million — more than double the purported lost "value" of the ALF PMA).

243–248 (Terry); APP. 341–352 (9/15/17 Sum. of Terms); APP. 404 (SEC No Action Letter); APP. 428–429 (Investor).

The Court did not have the benefit of the existing evidentiary record in its prior hearings. The difference makes a difference. On *this* record, the likelihood of success of an ALF PMA fraudulent transfer claim is not substantial. It is at best highly speculative — and therefore cannot support an injunction. *See Aon Re, Inc. v. TIG Ins. Co.*, 2009 WL 3075584, at *4 (N.D. Tex. Sept. 28, 2009) ("[S]peculation or the mere risk of irreparable harm is not a sufficient showing of irreparable harm." (internal citation omitted)); *Hunt v. Bankers Tr. Co.*, 646 F. Supp. 59, 65 (N.D. Tex. 1986) (same).

### An Adequate Remedy at Law Exists / No Irreparable Harm

The existing evidentiary record also confirms that, if the Trustee's claims have any merit at all, he has an adequate remedy at law. HCLOF has $135 million in net assets. APP. 393 (Stmt. of Fin. Position); APP. 448 (Scott). Guernsey law will recognize and enforce an order for money damages. APP. 211 (Corfield). The Trustee does not deny this — he simply does not *prefer it* to a guaranteed "win" through an injunction. APP. 5–6, 9–10 (Phelan). Terry, the presumptive owner of Acis if the plan is confirmed, was noncommittal on whether the litigation will even be pursued at all to final judgment. Instead, he hopes to use the pending injunction as settlement leverage. APP. 73–74 (Terry). Again, as noted, the evidence demonstrates that a return of the ALF PMA is not a golden ticket allowing it to "control its own destiny." If Acis is entitled to anything, ever, it will be money. Acis not only has an adequate remedy at law — that is its only remedy that is available.

### The Balance of Harms Favors HCLOF

The Trustee has a legal remedy — he need only prove the claims upon which he presumably bases all of his vitriol against HCLOF. HCLOF, per the Court's prior ruling, has no

11

remedy against Acis. The "offer" of a potential reset is illusory. The Trustee has taken no steps to substantiate his mere "wishful thinking" that a reset can be accomplished, and the only expert to testify on the issue concludes that a favorable reset cannot be achieved. APP. 27–28 (Phelan); APP. 58–65 (Worman); APP. 162–169, 195–196 (Castro); APP. 239–240 (Terry); *see also* APP. 132–136, 156–157, 330, 332–336 (Covitz). More important, a reset with Brigade violates the Investment Policy — HCLOF cannot approve it. APP. 219–220 (Covitz); APP. 398 (HCLOF Off. Mem.); APP. 455–456 (Scott). No witness rebuts that fact. The Trustee caused this problem. If he wanted to make progress, he could start by reinstating Highland.

The injunction is almost certain to last for three years, or more — thus, there is nothing "temporary" about this proposed injunction. Given the reinvestment periods for these CLOs will terminate in 2019, the prospect that the CLOs will be viable in two or three years is beyond dim. *See* APP. 79, 241 (Terry). The decay and demise of Acis 2013-1 is illustrative. APP. 46 (Worman); APP. 409, 468–469 (Phelan). Accordingly, the injunction is effectively permanent, disabling, and punitive to HCLOF and its investors.

Further, as Plan D provides, and the Trustee verified, Terry will have virtually unfettered authority on whether and when to pay claims. He can, therefore, stockpile revenue to fund litigation reserves or Acis' operating expenses (amounts of which are left again to his sole discretion). APP. 22–25 (Phelan). The plan projections and payment schedules are, therefore, hypothetical and meaningless. As such, HCLOF will shoulder this entire estate for years on end — all because Acis (as would any litigant) "prefers" not to be exposed to the time, cost and risk of actually litigating its claims. This unfairness is coupled with the fact that the Trustee's own conduct (to which HCLOF strenuously objected) saddled the estate with more than $5 million in

undeserved and unwarranted administrative expenses — all of which the Trustee seeks to pile onto HCLOF's "fund the whole case" tab.

While there is competing "opinion" testimony on whether Highland or Brigade was / is doing the better or more appropriate job, the objective facts are clear:  Since Highland was replaced, (1) the CLOs have declined in value (over $10 million in losses from post-Highland trades); (2) they have, for the first time ever, failed interest coverage tests (and thus failed to pay even certain senior notes); (3) for the first time ever, *none* of the Acis CLOs made *any* payments to equity note holders; and (4) indenture-violating trades have been made on multiple occasions (perhaps because the portfolio manager admittedly has not fully reviewed the Indentures).  APP. 17–19 (Phelan); APP. 49–54 (Worman); APP. 129–132 (Covitz); APP. 179–193 (Castro). HCLOF is displeased, as is the Investor.  APP. 434, 437–438 (Investor); APP. 442–443, 446–447 (Scott).  In particular, both HCLOF and the Investor are displeased that Acis has not applied cash to pay down the senior notes.  *Id.*  If they had done so, some of the poor results noted above would have been mitigated.  APP. 126–132, 137–138 (Covitz); APP. 174–178, 186–188 (Castro).  In the "real world" HCLOF would have the leverage to protect its interests.  Under the injunction, HCLOF is powerless and left to suffer the harm.  APP. 156–157, 160 (Covitz); APP. 167–169, 178, 195–196 (Castro).  The harm has been, is, and will continue to be, substantial — particularly as these CLOs age-out even further.  APP. 147–149 (Covitz); APP. 280–282, 285–286, 289 (F. Saah); APP. 446–447 (Scott).

The Trustee's suggestion that HCLOF, if it doesn't like it, can just go sell its equity notes, is another departure from reality.  The Trustee admits the injunction attaches to HCLOF's notes.  Incredibly, he denies this circumstance impairs the value of those notes.  APP. 22–23 (Phelan).  Contrary *expert* opinion is unrebutted on this issue.  APP. 178–179 (Castro).

13

### A Continued Injunction Frustrates Rather Than Furthers Public Policy

Public policy cannot favor the frustration of securities contracts held by third party investors — least of all just so that bankrupt investment advisers can pay their debts. APP. 178, 325–326 (Castro). The Trustee's only argument to the contrary is premised on his presumption that HCLOF is a party to wrongdoing and deserves this treatment. But on that score, public policy also strongly favors that disputes be resolved on their merits. *E.g.*, *Beitel v. OCA, Inc. (In re OCA, Inc.)*, 551 F.3d 359, 374 (5th Cir. 2008) (noting public policy favors deciding cases on the merits); *Crane v. Napolitano*, 2013 WL 12100740, at *1 (N.D. Tex. Mar. 15, 2013) (same). The Trustee, instead, prefers an injunction that delivers a "victory" regardless of whether he proves, or even finally litigates, those allegations. APP. 5–6 (Phelan). The Trustee's "two wrongs make a right" premise is improper — particularly when he merely assumes (wrongly) that HCLOF has done anything wrong.

### CONCLUSION

WHEREFORE, HCLOF respectfully requests that the Court deny confirmation of Plan D and grant such further relief as is appropriate.

Dated: December 31, 2018

Respectfully submitted,

Mark M. Maloney
Mark M. Maloney (GA 468104)
W. Austin Jowers (GA 405482)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING, LTD.**