| | |
|---|---|
| Holland N. O'Neil (TX 14864700)<br>Jason B. Binford (TX 24045499)<br>Melina N. Bales (TX 24106851)<br>**FOLEY GARDERE**<br>**FOLEY & LARDNER LLP**<br>2021 McKinney Avenue, Ste. 1600<br>Dallas, Texas 75201<br>Telephone: (214) 999.3000<br>Facsimile: (214) 999.4667<br>honeil@foley.com | Michael K. Hurst (TX 10316310)<br>A. Shonn Brown (TX 24007164)<br>Ruben A. Garcia (TX 2410787)<br>**LYNN PINKER COX & HURST, LLP**<br>2100 Ross Avenue, Ste. 2700<br>Dallas, Texas 75201<br>Telephone: (214) 981.3800<br>Facsimile: (214) 981.3839<br>mhurst@lynnllp.com |

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P. AND NEUTRA LTD.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
|  | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. 18- |
|  | § | 30264-SGJ-11) |
|  | § | |
| Debtors. | § | Chapter 11 |

**POST-TRIAL BRIEF OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND NEUTRA,
LTD. OPPOSING CONFIRMATION OF THIRD AMENDED JOINT PLAN FOR ACIS
CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**

i

## **Table of Contents**

Introduction ........................................................................................................................... 1

The Estates are Administratively Insolvent/Plan D Is Not Feasible ................................... 5

Plan D Violates Other Applicable Non-Bankruptcy Law .................................................. 8

Plan D Does Not Meet the Requirements for Cram Down ................................................ 9

Plan D Was Not Proposed In Good Faith ......................................................................... 11

## **TABLE OF AUTHORITIES**

**Cases**

*In re BH S&B Holdings, LLC*,
   439 B.R. 342 (Bankr. S.D.N.Y. 2010) ........................................................................... 6
*In re Briscoe Enters., Ltd. II*,
   994 F. 2d 1160 (5th Cir. 1993) ...................................................................................... 7
*In re Coastal Plains, Inc.*,
   179 F.3d 197 (5th Cir. 1999) ......................................................................................... 4
*In re Couture Hotel Corp.*,
   536 B.R. 712 (Bankr. N.D. Tex. 2015) ......................................................................... 7
*In re Grasso*,
   497 B.R. 448 (Bankr. E.D. Pa. 2013) ........................................................................... 6
*In re SM 104 Ltd.*,
   160 B.R. 202 (Bankr. S.D. Fla. 1993) .......................................................................... 9
*In re Village at Camp Bowie I, L.P.*,
   710 F.3d 239, 247 (5th Cir. 2013) .............................................................................. 10

**Statutes**

Bankruptcy Code
   § 101(31) ..................................................................................................................... 10
   § 1112(b) ....................................................................................................................... 6
   § 1112(b)(1) ................................................................................................................ 11
   § 1112(b)(4)(A) ............................................................................................................. 6
   § 1129 .................................................................................................................. 3, 4, 5
   § 1129(a)(11) ................................................................................................................ 7

Highland Capital Management, L.P. ("**Highland**") and Neutra, Ltd. ("**Neutra**") submit this post-trial brief in support of their objections to the *Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* ("**Plan D**") filed by the Chapter 11 Trustee (the "**Trustee**") on behalf of the above-captioned debtors (collectively, the "**Debtors**" or "**Acis**"). For purposes of this post-trial submission, Highland and Neutra incorporate herein the: (1) Highland CLO Funding Ltd. ("**HCLOF**") post-trial submission; (2) joint objection to Plan D filed by Highland and HCLOF [Doc. No. 722] (the "**Joint Plan Objection**"); (3) Neutra Plan D objection [Doc. No. 723]; (4) HCLOF supplemental Plan D objection [Doc. No. 756]; and (5) objections filed to Plans A, B, and C [Doc. Nos. 497, 518, 524] (collectively, the "**Prior Submissions**"). Nothing herein is intended to limit the scope of the Prior Submissions.

## INTRODUCTION

The Court is being asked to confirm Plan D that is, once again, "a bridge too far." Setting aside the massive accumulated administrative claims, there have been only three (3) stakeholders of these Debtors since the beginning of these cases: two pre-petition unsecured creditors – Josh Terry and Highland—and the equity owned by Neutra. All three are or have become insiders; all are separately classified under Plan D; yet all are treated dramatically different requiring cram down of two of the three. Despite this seemingly straightforward constituent body the Trustee was appointed to serve as a neutral fiduciary, he has been anything but. Almost every colloquy uttered by the Trustee on the record of this case since his appointment has been laced with aspersions toward Highland and any party related to or affiliated with Highland. The Trustee, of course, justifies his open hostility by blaming Highland for threatening him with litigation at the very first meeting on May 16, 2018—but why did that happen?

The Trustee—a fiduciary by the very nature of his appointment—was to take over an entity with *its very lifeblood being to act as a fiduciary of the highest order to its investor clients* as Congressionally-mandated by the Investment Adviser's Act of 1940 (the "**IAA**"), which is

**PAGE 1**

premised on the "findings" that "… investment advisers are of **national concern**…."[1] Yet, as relayed in testimony by Mr. Leventon, the Trustee said: "Well, I don't necessarily agree that I have any sort of fiduciary duty" and that even if he did have a duty and intentionally violated it, "so what? At most [the investors] have an administrative claim. Why should that bother me at all?"[2] The Trustee has never denied making these statements. As such, the Trustee's bald and unabashed rebuke of his heightened fiduciary duties gave rise to and justification for Mr. Leventon's reply.[3]

The Trustee's actions since that fateful meeting have exhibited that he was true to his word. Not only is he not "bothered," but he has demonstrated utter disdain for the very investor clients that the Debtors were charged to hold in the highest of fiduciary care. The Trustee threw aside the Debtors' Compliance Manual, which was comprised of hundreds of pages of policies and procedures specifically designed to ensure the utmost protection to the Debtors' investor clients: *"The Company has adopted the procedures set forth in this Manual to ensure that the Company, its principals and its employees fulfill their fiduciary duties to the Clients and the Company's compliance with the [Investment] Advisers Act and the rules promulgated thereunder.…"*[4] The Trustee's own expert agreed with the statement that "as somebody who works for a registered investment advisor . . . there has to be . . . a compliance manual, in writing . . ."[5] By contrast, the Trustee considered it "not an appropriate use of estate assets."[6] Millions of dollars in losses have been suffered by the Debtors' investor clients during the course of this bankruptcy proceeding, and the losses continue to mount. The Trustee is unphased. And Plan D puts the proverbial nail in the coffin of these aging CLOs and the investors' money.

---

[1] IAA at section 201 "Findings" delineating, *inter alia*, certain interstate commerce concerns related to the activities of investment advisers. App. 295. Citations to "App. __" refer to pages of the Joint Appendix filed by the parties opposing confirmation of Plan D, contemporaneously herewith.
[2] App. 339.
[3] The Trustee would have the Court assume that because Highland is purported to be litigious, this was just standard procedure. Yet, the Court must recognize that nothing of this sort ever happened with the Chapter 7 trustee or her counsel.
[4] Acis Capital Management, L.P. Compliance Manual, "Adoption of Policies and Procedures," at p. 21. App. 290-91.
[5] App. 307 (Zach Alpern responding affirmatively to a question from Highland counsel Mr. Hurst at the first confirmation hearing).
[6] App. 015.

**PAGE 2**

Plan D further rebukes basic bankruptcy tenets and cannot be confirmed under section 1129. Consider its context:

- A lone petitioning creditor puts the Debtors into involuntary bankruptcy;

- The Debtors fight for months to contest the bankruptcy. No additional creditors join the lone petitioning creditor in the fight. The Debtors lose the fight and Chapter 7 Orders for Relief are entered;

- Those Orders are appealed by the Debtors' equity owner, who is the remaining aggrieved party able to effectively exercise the rights to carry on the fight in the appellate courts for the now-bankrupted Debtors;

- The lone petitioning creditor then advocates for the appointment of the Chapter 11 Trustee (the "**Trustee**") and, once appointed, the Trustee even employs the same lawyers as that of the lone petitioning creditor;

- The Trustee coordinates with the lone petitioning creditor to find a buyer *not* for assets of the Debtors' estates, but for the assets of the very investor clients the Debtors were charged as a fiduciary to protect; alternatively, the Trustee proposes through optional plans to modify non-estate contracts to allow the lone petitioning creditor to effectively exert his unfettered will on the investors to hold them hostage to his unwanted management. These efforts fail as a matter of law and Plans A, B and C are denied. Millions of dollars are incurred by the Trustee in the process of these failed endeavors;

- Undeterred despite the damage caused to the Debtors' estates and to the investors, the Trustee and the lone petitioning creditor formulate Plan D that is as egregious as the prior failed plans. Plan D proposes to once again put the investors in a veritable "hostage" situation via an unprecedented "Plan injunction" (which in reality is a modification of their rights under non-estate contracts), casts aside the other two stakeholders of the Debtors, and hands total control of everything of the Debtors over to the lone petitioning creditor;

- To support this Plan D, the Trustee relies almost exclusively on the self-serving testimony of the lone petitioning creditor to carry his burden of proof. The Trustee spent estate funds on three (3) experts and their reports to support his Plan D—he calls none of them in his case in chief or on rebuttal at the Confirmation Hearing.

- If confirmed, Plan D would hand over the Debtors' estates lock, stock and barrel to the lone petitioning creditor, along with the Debtors' very heightened fiduciary obligations to the investors to which the lone petitioning creditor is openly hostile, despite the facts that established that the lone petitioning creditor:

    o Was an architect of Plan D with the Trustee;[7]
    o Receives favorable disparate treatment for a claim that is indisputably unsecured;[8]
    o By the Trustee's estimates, receives more in value than his unsecured claim is worth, including (inexplicably) 100% of the equity of the Debtors for a "value" in

---

[7] App. 032.
[8] App. 034.

**PAGE 3**

    the form of a credit on his "secured" claim that was made up from whole cloth by the Trustee and never negotiated or market tested;[9] and
- Is the appellee in a pending appeal against the very equity stakeholder that the Plan proposes to wipe out and to moot the appeal.[10]

The whole scenario is so flawed that counsel for the lone petitioning creditor resorted to arguing "poetic justice" as a justification for the Court confirming Plan D.[11]  But "poetic justice" has no place in section 1129.  Regardless of the purported circumstances leading up to it, the lone petitioning creditor, Josh Terry ("**Terry**") is nothing more than an unsecured creditor looking to get paid.[12]  The Bankruptcy Code does not view his unsecured claim through a special lens just because his road to that claim was bumpy.  His claim deserves no elevated or special treatment; the 5th Circuit specifically says, "no windfall."[13]

  The Trustee has been so blinded by his allegiance to Terry that he has abdicated his duties to the stake-holders of the Debtors and to the Debtors' fiduciary investor clients, amassed post-petition claims that dwarf the pre-petition liabilities and interests of the original stakeholders, and set these estates on a collision course of appeals and litigation for years to come.

  Over the course of the five-day confirmation hearing (the "**Confirmation Hearing**"), twelve (12) witnesses testified and hundreds of exhibits were admitted into evidence.  The Trustee's counsel predicted "smoke and mirrors" and "a lot of misdirection" by parties opposing confirmation.  However, the record before the Court belies these predictions and, to the contrary, establishes that Plan D fails as a matter of fact and of law.  The foundation of Plan D is at least as faulty as Plans A, B, and C, which were denied.  Plan D was not proposed in good faith and is otherwise forbidden by applicable law.  And, despite the Trustee's perfunctory statements, Plan D

---

[9] App. 026.
[10] App. 031 (Trustee: "I believe that the appeal of the involuntary may very well be moot as a result of the confirmation.").
[11] App. 004 (opening statement of Terry's counsel Mr. Shaw).
[12] App. 168.
[13] See *In re Coastal Plains, Inc.*, 179 F.3d 197, 213 (5th Cir. 1999).

**PAGE 4**

does not and cannot meet the necessary burden of proof of cram down under section 1129 of the Bankruptcy Code.

### THE ESTATES ARE ADMINISTRATIVELY INSOLVENT/PLAN D IS NOT FEASIBLE[14]

The estates have been rendered administratively insolvent by the excessive costs incurred by the Trustee.[15] At the Confirmation Hearing, Highland provided the Court with a demonstrative reflecting the projected magnitude of the administrative insolvency, which was not materially refuted by the Trustee.[16] Rather, the Trustee testified that the fee estimates for two of the experts were less than estimated[17] and the Trustee otherwise seemed to make a distinction as to whether his own professionals' fees had been "allowed" (even though they had been incurred).[18]

Further, the Trustee and Terry both testified that certain professionals had agreed to "defer" payment on their claims and the Trustee estimated that he would have sufficient funds to pay the administrative claimants after the February 2019 waterfall payments for management fees from the CLOs.[19] However, the February 2019 waterfall will be insufficient to pay the accrued and ongoing expenses of these bankruptcies. The Trustee testified that he estimated $2 million would be received from the waterfall;[20] however, this amount does not comport with his own experts' estimate as set forth in the Liquidation Analysis. The Liquidation Analysis reflects that only $1,321,770, in gross payments will be received in the February waterfall.[21]

---

[14] Without limiting the scope of the objections raised in the Prior Submissions, each of which stands as an independent basis for the Court to deny confirmation of Plan D and convert these cases back to Chapter 7, Highland and Neutra specifically refer the Court to HCLOF's post-trial submission filed contemporaneously herewith and the Joint Appendix submitted by HCLOF, Highland and Neutra.
[15] See Highland Capital Management, L.P.'s Motion for an Order Dismissing the Debtors' Chapter 11 Cases or, in the Alternative, Converting the Cases to Chapter 7 for Cause [Doc. No. 601].
[16] See Demonstrative 1 at App. 506.
[17] The Trustee asserted that the estimated fees for the two experts was $125,000 rather than the $290,000 estimated by Highland. See App. 039.
[18] See App. 041 (Trustee: "The unasked for, unfiled and unallowed claims of the professionals are not allowed. I mean they're not filed, they're not allowed. They're not allowed claims. They have nothing to do with confirmation.").
[19] See App. 045 (Trustee); App. 242 (Terry).
[20] App. 043.
[21] See Liquidation Analysis at Exhibit 490 at p. 3. App. 354.

**PAGE 5**

Based on the evidence as well as the recently filed Monthly Operating Reports ("**MORs**"),[22] the administrative insolvency is even deeper than Highland's original predictions and the February 2019 waterfall will not dig them out of the hole. Attached hereto as **Exhibit "A"** is an updated demonstrative based on the evidentiary record and the recently-filed MORs.

These estates continue to be saddled with exorbitant administrative costs.[23] Section 1112(b) of the Bankruptcy Code requires the Court to convert or dismiss a case "if the movant establishes cause," unless a few listed exceptions apply. "Cause" under section 1112(b)(4)(A) for converting a case is "the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[24] Courts have equated the first clause of section 1112(b)(4)(A) to administrative insolvency.[25] Because of the cash deficit in the Debtors' estates and the evidence that covering that deficit will require depletion of limited ongoing estate resources, there is likewise "the absence of a reasonable likelihood of rehabilitation." At the Confirmation Hearing, no evidence was offered as to any new capital for the Reorganized Debtors. Notably, Terry did not offer any of his own capital, claiming that "it's not needed," ostensibly relying solely on future management fees from the CLOs to operate.[26] The February waterfall will yield insufficient residual cash without further deferral of administrative costs. The hole is being dug deeper.

The fact that the Debtors' estates are administratively insolvent clearly makes Plan D infeasible. However, the Trustee otherwise failed to carry his burden of demonstrating feasibility with respect to Terry's proposed role as portfolio manager and 100% equity owner of the Reorganized Debtor. Bankruptcy Code section 1129(a)(11) has been interpreted to require a

---

[22] *See* Docket Nos. 808, 809. App. 470-505, which were filed after completion of the Confirmation Hearing.
[23] At the prior confirmation hearing on Plans A, B and C, Mr. Klein, testified to the "highly unusual" nature of administrative expense claims exceeding claims in a Chapter 11 case. App. 321.
[24] 11 U.S.C. § 1112(b)(4)(A).
[25] *See In re Grasso*, 497 B.R. 448, 456-57 (Bankr. E.D. Pa. 2013); *In re BH S&B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010).
[26] App. 71.

**PAGE 6**

finding that a plan "has a reasonable assurance of commercial viability."[27] Yet, Terry is allegedly going to be responsible for managing over $2 billion of collateral of the CLOs.[28] The Trustee's evidence in support of feasibility consists of the Trustee's statements that, despite more than two-and-a-half years of sustained **un**employment, Terry "has an excellent track record as a portfolio manager"[29] and that creditors would not be better off in Chapter 7 because Chapter 7 would eventually result in cutting off management fees.[30] Terry also provided testimony that he "was confident" that he will be successful.[31] These unsubstantiated predilections were not supported by any factual evidence and belie logic. Such a scenario would never happen in the real world of fund management, because no investor would ever allow their funds to be directed into this type of situation.[32] "Cause" has been established and these cases must be converted to Chapter 7.

Moreover, the Trustee must "present proof through reasonable projections that there will be sufficient cash flow to fund the [Plan]."[33] The Trustee retained and paid independent experts to draft a liquidation analysis and to otherwise opine on the issue of plan feasibility. However, neither Mr. Haggard nor Mr. Klein testified in support of the feasibility analysis (although both were in attendance at the hearing). Thus, for the purposes of the Court considering the evidence presented, the Trustee is seeking to meet his burden under sections 1129(a)(7) and (a)(11) based on an unsupported feasibility analysis. Rather, the Trustee is relying entirely on the cursory, self-serving testimony of the Trustee and the self-aggrandizing testimony of Terry, despite the fact neither were identified as experts. Such testimony should not be considered sufficient for the Trustee to meet his burden of proof.

---

[27] *In re Briscoe Enters., Ltd. II*, 994 F. 2d 1160, 1166 (5th Cir. 1993).
[28] The Plan provides that Brigade will be the sub-advisor, yet no contract had been negotiated with Brigade for the Reorganized Debtors. App. 507-509.
[29] App. 013-14.
[30] App. 012.
[31] App. 070.
[32] *See* testimony of Dan Castro at App. 163; App. 178.
[33] *See In re Couture Hotel Corp.,* 536 B.R. 712, 736 (Bankr. N.D. Tex. 2015).

**PAGE 7**

## PLAN D VIOLATES OTHER APPLICABLE NON-BANKRUPTCY LAW

By virtue of this Plan D, Terry's claim will be paid by one of two means: (1) continued management fees from the CLOs, which will only be generated if the investors in the CLOs are held hostage by the Plan injunction; or (ii) by litigation recoveries, including litigation against the investors in the CLOs. **The conflicts of interest are as stunning as they are obvious**. To force the investors in the CLOs to have their investments managed by an individual with such deep-seeded conflicts of interest against them is antithetical to the heighted fiduciary responsibilities that Congress viewed to be a "national concern" in passing the IAA in the first place.[34] Plan D irrefutably violates the IAA and is void pursuant to the terms of section 215 of the IAA.[35] The only evidence put on by the Trustee that could conceivably be considered as applicable to the fiduciary duties imposed under the IAA were the obsequious statements of Terry where he testified to the general alignment of incentives in a typical CLO structure.[36] Perhaps tellingly, the Trustee chose not to call Mr. Klein in his case in chief (or on rebuttal) to testify regarding whether it will be feasible to permit a portfolio manager to ignore contrary wishes of an investor. Rather, the objectors called Klein as an adverse witness and for good reason. Unlike Terry's indirect and self-serving testimony, the following exchange with Mr. Klein directly and succinctly addressed the issue:

> Q. [A]s you said, an investment advisor cannot solely do what it wants to do to earn additional fees for itself at the expense of clients, correct?
>
> A. **I stand by that statement, yes**.[37]

Plan D is specifically designed to enjoin HCLOF from taking actions as an investor that it believes is in its best interest. To support his position, the mantra conceived by the Trustee was

---

[34] Also, the violations of Guernsey law are elaborated on in the HCLOF Post-Trial Brief.
[35] App. 296.
[36] App. 075.
[37] App. 081 (emphasis added).

**PAGE 8**

that HCLOF is "economically irrational." Expert witness Dan Castro easily dispensed with such argument, testifying that:

> [T]he investor is the only party that has all the information to make the decision. They're the one that's impacted by every decision made by the portfolio manager and everybody else involved with the process. So, they're best suit[ed] to make that decision, only they know what's in their best interest and we don't know what alternatives they have. None of us do.[38]

By restricting the investors to a hostile portfolio manager, Plan D directly contravenes the IAA.

## PLAN D DOES NOT MEET THE REQUIREMENTS FOR CRAM DOWN

As extensively discussed in the Joint Objection and Neutra's Objection, Plan D does not meet the requirements of cram down. Terry is not impaired despite the perfunctory statements of the Trustee and his counsel to the contrary.[39] Terry is not impaired because he is receiving more than he is entitled to receive under the law.[40] If the Trustee were truly impartial, Terry would not have been deemed to have a secured claim, much less one in excess of what even he asserted in his proof of claim.[41] If the Trustee were truly impartial, Terry would not have been separately classified. If the Trustee were truly impartial, Terry would not have been gifted 100% of the equity in the Debtors in a negotiation-free, bid-free, valuation-free scenario and Neutra's equity would not have been expunged.[42] It is clear that the architects of Plan D (the Trustee and Terry) have

---

[38] App. 167.

[39] *See* App. 003 (Mr. Prostok: "With that impairment issue, Your Honor. I mean alternation of Mr. Terry's legal rights, you know, by debt for equity saying that he's not impaired, that argument's absurd."); *see also id.* at App. 011 ("Q: Do you think Terry's Class II is impaired? A: [the Trustee] Of course it's impaired. It's receiving the notes in stock. That's classic impairment.").

[40] *See* Joint Plan Objection at ¶ 117.

[41] There has been no dispute that Terry does not hold a legitimate secured claim. App. 034 (the Trustee acknowledged that Terry's garnishment occurred within 90 days of the petition date, stating: "Mr. Terry's claim he has filed as a partially secured creditor. We have not acknowledged that he is in fact that that would be a valid secured claim.").

[42] App. 026; App. 032-33; *See* also, Neutra's Objection. Contrary to the facts in the cases cited by the Trustee where the new value corollary touches on old equity retaining the new equity, in Plan D, old equity is shut out. Rather, the Trustee with a unique and close relationship to Terry, presented a Plan transferring exclusively to Terry the equity of the Reorganized Debtors with no market test nor a shred of evidence as to the value of such equity. "If only one party bids for the equity interests of the reorganized debtor, the court must determine whether the bid for the equity of the reorganized debtor is reasonably equivalent to the value of the equity interests." *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993). Terry did not even "bid" for the equity – the Trustee simply anointed it to him. App. at 026; App. 034.

**PAGE 9**

positioned Terry to receive much more than he would otherwise be entitled. That scenario can be summarized in one word: "windfall."

Moreover, even if Terry were considered impaired, Terry's votes should not be counted because Terry is a non-statutory insider as set forth in the Prior Submissions and not meaningfully refuted by the Trustee. Because of his status as such, the Trustee is prohibited by the plain language of section 1129(a)(10) from relying on Terry's votes to support the plan.

This leaves the three (3) ballots in Class 3, each of which should be ignored:[43]

> (1) <u>Jennifer Terry's IRA ballot:</u> This ballot is borne of a claim that is subject to a pending objection by Highland[44] and, as set forth in the record, was determined by the arbitrators in the Arbitration Award not to be a liability of the Debtors.[45]
>
> (ii) <u>Patrick Daugherty's ballot:</u> This is apparently based on a claim filed by an entity called "3621 Cornell Ave." The claim is patently flawed with no logical nexus to the Debtors. In fact, the Trustee testified, "Mr. Daugherty explained [his claim] to me a couple of times. I'm not sure I understand."[46]
>
> (iii) <u>David Langford ballot:</u> No proof of claim was filed by Mr. Langford and the Bar Date has long since expired.[47] According to the Trustee's Ballot Tally, this claim was otherwise scheduled for $550, and is therefore so *de minimus* as to not warrant the Court's consideration for purposes of supporting cram down.

Based on this record, this Court cannot find that the "Class 3" voting is sufficient to meet the requirements of section 1129(a)(10) either. For the Trustee to contend otherwise goes directly to the lack of good faith of Plan D, which is the final requirement for a cram down plan that it is fair and equitable and does not unfairly discriminate. Whether a plan is proposed in good faith is a critical element of this determination.[48] The Trustee is unable to establish that Plan D was

---

[43] In Highland's compromise with the Trustee related to estimating its claim for voting purposes (Doc. No. 698), Highland agreed not to seek disallowance of these claims for voting purposes; however, Highland did not agree not to challenge whether the ballots cast in Class 3 were legitimate to satisfy cram down under Section 1129(a)(10).
[44] *See* Doc. No. 521.
[45] *See* Arbitration Award (Exhibit 216) at p. 16; *see also* acknowledgement by the Trustee at App. 036. Jennifer Terry is also Mr. Terry's wife, and should therefore be considered an insider as well. See generally 11 U.S.C. § 101(31).
[46] App. 035.
[47] *See* Doc. No. 387 (order setting the August 1, 2018 bar date).
[48] *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247 (citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)).

**PAGE 10**

proposed in good faith, and that it is fair and equitable with respect to all stakeholders.[49] The facts simply do not support such a finding.

## PLAN D WAS NOT PROPOSED IN GOOD FAITH

In considering confirmation of a plan, one commentator recently said, "All roads lead to good faith."[50] In the Joint Plan Objection, the lack of good faith in proposing Plan D was extensively addressed.[51] By restricting the investors to a hostile portfolio manager, Plan D directly contravenes the IAA. In addition, Plan D seeks the imposition of overly broad release and injunction provisions. In the Joint Plan Objection, Highland and Neutra raised the issue of whether the intended effect of such provisions was to prevent the prosecution of currently-pending appeals and/or to deny the rights of parties to effectively defend themselves in pending adversary proceedings.[52] On cross examination, the Trustee refused to provide any clarity, flippantly stating that "[w]hatever legal effect the confirmation has it'll have that effect."[53] The Trustee (again, the party bearing the burden) provided no evidence that applying the release and injunction provisions in such a manner would be proper. As further set forth in HCLOF's post-trial brief as well as herein, this record simply does not support a good faith finding by the Court. With the dearth of evidence, this Court must reject Plan D. And, after four (4) failed plan endeavors and millions of dollars in administrative costs, it is time for the digging of the hole to cease. These cases should be (and "shall" be)[54] converted back to Chapter 7[55] and the injunction lifted.

---

[49] *See* the Neutra Objection related to the inappropriate treatment of the Debtors' equity. [Doc. No. 752]

[50] As presented by the panel at the annual Jay W. Westbrook Advanced Business Bankruptcy Course, November 15, 2018, "(Almost) Everything You Ever Wanted to Know about Chapter 11 Plans."

[51] Joint Plan Objection at IV.B.

[52] *See* Joint Objection at ¶¶ 92 and 93.

[53] App. 032.

[54] *See* the affirmative mandate set forth in Bankruptcy Code section 1112(b)(1) ("…*the court shall convert a case*…").

[55] Because of the pending appeal of the Orders for Relief, dismissal may run afoul of the divestiture doctrine. *See Neutra Objection* [Doc. No. 752].

**PAGE 11**

Dated:  December 31, 2018

Respectfully submitted,

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
A. Shonn Brown (TX 24007164)
Ruben A. Garcia (TX 2411787)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P. AND NETURA LTD.**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served electronically by the Court's PACER system on December 31, 2018.

*/s/Jason B. Binford*
Jason B. Binford

**Exhibit A**

**Updated Acis Admin. Insolvency Analysis[1]**

| Assets Available for Distribution (as of 11/30/18 Liquidation Analysis **and November MOR [App. 479-487])** | | | |
|---|---|---|---|
| Cash[2] | | $7,935,308.00 | |
| A/R | | $737,013.00 | **Feb. Waterfall Payment[11]** |
| Net Cash from Feb. Waterfall [12] | | $209,460.50 * | **$1,321,770.00** |
| **TOTAL ASSETS** | | **$8,881,781.50** | |

| Known Administrative/Priority Liabilities | | | Est. Liabilities 1/1/19 - 2/1/19 |
|---|---|---|---|
| Oaktree Expenses | | -$2,455,053.00 | |
| Brigade[3] (est. 12/1/18 - 12/31/18) | | -$100,452.00 | -$394,156.00 |
| Cortland Capital[4] (est. 12/1/18 - 12/31/18) | | -$24,500.00 | -$33,250.00 |
| Miller Buckfire | | -$1,000,000.00 | |
| Joshua Terry Admin Claim | | -$567,209.42 | |
| Mark Froeba[5] | | -$62,500.00 | |
| Babbe LLP[6] | | -$62,500.00 | |
| U.S. Trustee | | -$131,842.00 | |
| Ch. 7 Trustee | Diane Reed | -$34,905.00 | |
| Ch. 7 Trustee | Reed & Elmquist | -$59,856.00 | |
| Ch. 11 Trustee Amounts | | | |
| | Forshey & Prostok[7] (5/14/18 - 11/15/18) | -$1,835,847.04 | |
| | Forshey & Prostok[8] (est. of 11/16/18 - 12/31/18) | -$458,961.75 | -$305,974.50 |
| | Winstead[9] (5/14/18 - 9/30/18) | -$1,705,184.52 | |
| | Winstead[10] (est. of 10/1/18 - 12/31/18) | -$1,136,789.00 | -$378,929.00 |
| | Moss Adams (tax professional) | -$100,000.00 | |
| | Ch. 11 Trustee Commissions | -$418,775.00 | |
| | **Total liabilities excluding Highland amounts** | **-$10,154,374.73** | |
| | **Total liabilities for 1/1/19 - 2/1/19** | | **-$1,112,309.50** |
| | **Net Cash from Feb. Waterfall Payment** | | **$209,460.50** *Added to Total Assets above. |
| Highland Gap Claim | | -$2,049,564.00 | |
| Highland Post-Order for Relief | | -$3,551,224.00 | |
| **TOTAL LIABILITIES** | | **-$15,755,162.73** | |

1. Items in red reflect modifications from the prior Insolvency Analysis (App. 506).
2. Includes BVK revenue through November 30, 2018.
3. Estimate for 12/2018 payment to Brigade calculated by averaging the payments for 9/2018 ($408,672),
   10/2018 ($395, 434) and 11/2018 ($378,363), minus the overpayment credit ($293,704).
4. Estimate for 12/2018 payment to Cortland calculated by averaging the payments for 9/2018 ($34,000),
   10/2018 ($33,500) and 11/2018 ($32,250), minus the overpayment credit ($8,750).
5. See App. 039, estimated by Trustee as a combined $125,000.
6. See App. 039, estimated by Trustee as a combined $125,000.
7. Per Forshey & Prostok's First Interim Fee Application [Docket No. 708].
8. Estimate created by calculating the average amount of fees and expenses Forshey & Prostok accrued
   monthly based on their First Monthly Fee Application [Docket No. 708].
9. Per Winstead PC's First Interim Fee Application [Docket No. 705].
10. Estimate created by calculating the average amount of fees and expenses Winstead accrued
    monthly based on their First Monthly Fee Application [Docket No. 705].
11. Per the November 30, 2018 Liquidation Analysis at page 3 [Trial Exhibit 490].
12. Total of February Waterfall Payment minus the Total Liabilities for 1/1/19 - 2/1/19.