# Exhibit "5"

EXECUTION VERSION

PORTFOLIO MANAGEMENT AGREEMENT

between

ACIS CLO 2015-6 LTD.

and

ACIS CAPITAL MANAGEMENT, L.P.

Dated as of April 16, 2015

20736215.6.BUSINESS

Exhibit 10
Page 1 of 52

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Engagement | 4 |
| 3. | General Duties of the Portfolio Manager | 5 |
| 4. | Brokerage | 9 |
| 5. | Additional Activities of the Portfolio Manager | 10 |
| 6. | Conflicts of Interest | 13 |
| 7. | Records; Confidentiality | 14 |
| 8. | Obligations of Portfolio Manager | 15 |
| 9. | Compensation | 16 |
| 10. | Benefit of the Agreement | 18 |
| 11. | Limits of Portfolio Manager Responsibility | 18 |
| 12. | No Partnership or Joint Venture | 23 |
| 13. | Term; Termination | 23 |
| 14. | Delegation; Assignments | 25 |
| 15. | Termination by the Issuer for Cause | 26 |
| 16. | Action Upon Termination | 28 |
| 17. | Representations and Warranties | 29 |
| 18. | Notices | 33 |
| 19. | Binding Nature of Agreement; Successors and Assigns | 34 |
| 20. | Entire Agreement | 34 |
| 21. | Amendment | 34 |
| 22. | Conflict with the Indenture | 35 |
| 23. | Priority of Payments | 35 |
| 24. | Governing Law; Jury Trial | 35 |
| 25. | Indulgences Not Waivers | 35 |
| 26. | Titles Not to Affect Interpretation | 36 |
| 27. | Execution in Counterparts | 36 |
| 28. | Provisions Separable | 36 |
| 29. | Number and Gender | 36 |
| 30. | Jurisdiction and Venue | 36 |
| 31. | Third Party Beneficiaries | 37 |
| 32. | Miscellaneous | 37 |
| 33. | Power of Attorney | 38 |

## PORTFOLIO MANAGEMENT AGREEMENT

This Portfolio Management Agreement (this "Agreement"), dated as of April 16, 2015, is entered into by and between ACIS CLO 2015-6 Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at P.O. Box 1093, Queensgate House, Grand Cayman, KY1-1102, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and Acis Capital Management, L.P., with its principal offices located at 300 Crescent Court, Suite 700, Dallas, TX 75201, as portfolio manager (together with successors and assigns permitted hereunder, in such capacity, the "Portfolio Manager").

WITNESSETH:

WHEREAS, the Issuer intends to issue U.S.$300,000,000 Class A-1 Senior Secured Floating Rate Notes due 2027 (the "Class A-1 Notes"), U.S.$47,000,000 Class A-2 Senior Secured Fixed Rate Notes due 2027 (the "Class A-2 Notes" and together with the Class A-1 Notes, the "Class A Notes"), U.S.$75,000,000 Class B-1 Senior Secured Floating Rate Notes due 2027 (the "Class B-1 Notes"), U.S.$14,000,000 Class B-2 Senior Secured Fixed Rate Notes due 2027 (the "Class B-2 Notes" and together with the Class B-1 Notes, the "Class B Notes"), U.S.$31,500,000 Class C Secured Deferrable Floating Rate Notes due 2027 (the "Class C Notes"), U.S.$25,000,000 Class D Secured Deferrable Floating Rate Notes due 2027 (the "Class D Notes", U.S.$26,000,000 Class E Secured Deferrable Floating Rate Notes due 2027 (the "Class E Notes" and together with the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, the "Secured Notes") and U.S.$59,850,000 Subordinated Notes due 2027 (the "Subordinated Notes" and, together with the Secured Notes, the "Notes") pursuant to an indenture dated as of April 16, 2015 (as amended, supplemented or modified from time to time, the "Indenture"), among the Issuer, ACIS CLO 2015-6 LLC, as co-issuer of the Class A Notes, the Class B Notes, the Class C Notes, and the Class D Notes (the "Co-Issuer"), and U.S. Bank National Association, as trustee (together with any successor trustee permitted under the Indenture, the "Trustee");

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, certain Eligible Investments (each, as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Assets") to the Trustee as security for the Secured Notes;

WHEREAS, the Issuer wishes to enter into this Agreement, pursuant to which the Portfolio Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Assets securing the Secured Notes in the manner and on the terms set forth herein and to provide such additional services as are consistent with the terms of this Agreement and the Indenture; and

WHEREAS, the Portfolio Manager has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.     Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Actions" shall have the meaning provided in Section 11(a).

 "Affiliate" means, with respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, Officer, employee or general partner (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors of such Persons, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  For purposes of this definition, the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and no entity shall be deemed an Affiliate of the Issuer or the Co-Issuer solely because the Administrator or its Affiliates serve as administrator or share trustee for such entity.

"Affiliate Transaction" shall have the meaning set forth in Section 6(a).

"Agreement" shall mean this portfolio management agreement, as amended from time to time.

"Attorneys" shall have the meaning provided in Section 33.

"Board of Directors" shall mean the directors of the Issuer duly appointed pursuant to the Governing Instruments of the Issuer in accordance with Cayman Islands law or any subsequent directors who are duly appointed according to the Articles of Association.

"Confidential Information" shall have the meaning provided in Section 7.

"Exit Date" shall have the meaning provided in Section 9(d).

"Expenses" shall have the meaning provided in Section 11(a).

"Fee Election" shall have the meaning provided in Section 9(b).

"Fee Election Notice" shall mean notice from the Portfolio Manager to the Issuer, the Trustee and Collateral Administrator delivered no later than the Determination Date related to the Payment Date on which a Fee Election will apply, that specifies (x) the Payment Dates on which the Fee Election will apply, (y) the amount by which the

Portfolio Manager is electing to reduce the Senior Management Fee (and thus increase the Subordinated Management Fee), which will not be greater than the entire Senior Management Fee and (z) that the Fee Election is not revocable with respect to such Payment Date unless Acis Capital Management, L.P. is no longer the Portfolio Manager.

"Force Majeure Event" shall have the meaning assigned to such term in Section 11(l).

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation, the partnership agreement, in the case of a partnership, or the limited liability company agreement, in the case of a limited liability company.

"Indemnified Party" shall have the meaning set forth in Section 11(a) or (b), as applicable.

"Indemnifying Party" shall have the meaning set forth in Section 11(a) or (b), as applicable.

"Independent Review Party" shall have the meaning set forth in Section 6(b).

"Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

"Issuer Documents" shall have the meaning provided in Section 17(a)(i).

"Liabilities" shall have the meaning provided in Section 11(a).

"Manager Documents" shall have the meaning provided in Section 17(b).

"Manager Related Party" means each of the Portfolio Manager, its Affiliates and their respective shareholders, partners, members, managers, directors, officers, trustees, incorporators, employees, representatives and agents.

"OFAC" shall have the meaning provided in Section 17(a)(viii).

"OFAC Programs" shall have the meaning provided in Section 17(a)(viii).

"Offer" shall mean, with respect to any security, (i) any offer by the obligor or issuer of such security or by any other Person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for cash, securities or any other type of consideration or (ii) any solicitation by the obligor or issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"Offering Circular" shall have the meaning provided in Section 11(a).

"Person" means any individual, partnership, corporation, limited liability company, trust or other entity.

"Related Entities" shall mean, with respect to the Portfolio Manager, its clients, its partners, its members, funds or other investment accounts managed by it or any of its Affiliates, or their employees and their Affiliates.

"Responsible Officer" shall mean any officer, authorized person or employee of the Portfolio Manager set forth on the list provided by the Portfolio Manager to the Issuer and the Trustee which list shall include any portfolio manager having day-to-day responsibility for the performance of the Portfolio Manager under the Portfolio Management Agreement, as such list may be amended from time to time.

"Section 28(e)" shall have the meaning provided in Section 4(a).

"Service Agreements" shall mean, collectively, the Sub-Advisory Agreement and the Shared Services Agreement.

"Shared Services Agreement" shall mean that certain Shared Services Agreement dated January 1, 2011 between the Portfolio Manager and Highland Capital Management, L.P. (as amended, supplemented or modified from time to time).

"Sub-Advisory Agreement" shall mean that certain Sub-Advisory Agreement dated May 5, 2011 between the Portfolio Manager and Highland Capital Management, L.P. (as amended, supplemented or modified from time to time).

"Tax Advice" shall mean written advice from Dechert LLP or an opinion of other tax counsel of nationally recognized standing in the United States experienced in transactions of the type being addressed that (i) is based on knowledge by the person giving the advice of all relevant facts and circumstances of the Issuer and transaction (which are described in the advice or opinion, as applicable, or in a written description referred to in the advice or opinion, as applicable, which may be provided by the Issuer or Portfolio Manager), and (ii) is intended by the person rendering the advice to be relied upon by the Issuer in determining whether to enter into the transaction.

"Trading Restrictions" shall mean the Trading Restrictions set forth in Schedule 1.

2.      Engagement.

Commencing on the date hereof, the Issuer hereby engages and retains the Portfolio Manager to provide the investment advisory and related services described below, for the period and on the terms and conditions set forth herein.  The Portfolio Manager hereby accepts such engagement and agrees, for the period and on the terms and conditions set forth herein, to provide, or to make satisfactory arrangements for the provision of, the investment advisory and related services described below, for the period and on the terms and conditions set forth herein.

4

Exhibit 10
Page 6 of 52

3. <u>General Duties of the Portfolio Manager</u>.

The Portfolio Manager shall provide services to the Issuer as follows:

(a) Subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager agrees to supervise and direct the investment and reinvestment of the Assets, and shall perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager in this Agreement and in the Indenture (and the Portfolio Manager shall have no obligation to perform any other duties under this Agreement and the Indenture) and, to the extent necessary or appropriate to perform such duties, the Portfolio Manager shall have the power to execute and deliver all necessary and appropriate documents and instruments, and to take all other actions, on behalf of the Issuer with respect thereto, it being understood that the Portfolio Manager shall have no obligation to perform duties to be performed by third parties not under the control of the Portfolio Manager or its Affiliates.

(b) The Portfolio Manager shall comply with all the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder and (without in any way limiting <u>Section 11</u> of this Agreement) shall perform its obligations hereunder and thereunder in good faith and with reasonable care, using a degree of skill and attention no less than that which the Portfolio Manager (i) exercises with respect to comparable assets that it manages for itself and (ii) exercises with respect to comparable assets that it manages for others, and in a manner consistent with practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Assets, except as expressly provided otherwise in this Agreement and/or the Indenture. To the extent not inconsistent with the foregoing, the Portfolio Manager shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder (including those duties of the Issuer under the Indenture which the Portfolio Manager has agreed hereunder to perform on the Issuer's behalf). The Portfolio Manager shall not be bound to follow any amendment to the Indenture, however, until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; *provided* that with respect to any amendment to the Indenture which would (i) increase the duties or liabilities of the Portfolio Manager or adversely change the economic consequences to the Portfolio Manager, (ii) modify the restrictions on the purchases or sales of Collateral Obligations under Article 12 of the Indenture or the Investment Criteria, (iii) expand or restrict the Portfolio Manager's discretion or (iv) modify the restrictions on and procedures for resales and other transfers of Subordinated Notes, except as set forth in Section 8.1(vi) of the Indenture, the Portfolio Manager shall not be bound thereby unless the Portfolio Manager shall have consented thereto in writing, such consent to not be unreasonably withheld or delayed. The Issuer agrees that it will not permit any such amendment to the Indenture to become effective unless the Portfolio Manager has been given prior written notice of such amendment and consented thereto in writing and that it will give prior written notice of any other amendment to the Indenture to the Portfolio Manager.

(c)      The Portfolio Manager shall (i) determine consistent with the applicable provisions of the Indenture, when Principal Proceeds shall be applied to effect a Special Redemption of the Secured Notes, (ii) select all Collateral Obligations and Eligible Investments which shall be acquired by the Issuer and pledged to the Trustee pursuant to the Indenture and (iii) facilitate the acquisition, settlement and sale of Collateral Obligations by the Issuer. In providing services to the Issuer hereunder, the Portfolio Manager shall take into consideration the interests of the Holders as a whole. The Portfolio Manager shall have no obligation to perform any duties other than as expressly specified herein, or in the provisions of the Indenture applicable to the Portfolio Manager, and the Portfolio Manager shall be subject to no implicit obligations of any kind.

(d)      Subject to any applicable terms of the Collateral Administration Agreement, the Portfolio Manager shall monitor the Assets, on behalf of the Issuer, on an ongoing basis and provide (or cause to be provided) to the Issuer all reports, schedules and other data reasonably available to the Portfolio Manager that the Issuer is required to prepare, deliver or furnish, or cause to be prepared, delivered or furnished, under the Indenture, in the form and containing all information required thereby and in sufficient time for the Issuer to review such required reports, schedules and data and to deliver them to the parties entitled thereto under the Indenture. The Portfolio Manager shall, on behalf of the Issuer, be responsible for obtaining to the extent practicable any information concerning whether a Collateral Obligation has become a Defaulted Obligation. Pursuant to the terms of the Collateral Administration Agreement, the Collateral Administrator is required to provide drafts of certain reports, schedules and calculations to the Portfolio Manager regarding the Collateral Obligations. The obligation of the Portfolio Manager to furnish such information is subject to the Portfolio Manager's timely receipt of necessary reports and the appropriate information from the Person responsible for the delivery of or preparation of such reports and such information (including without limitation, the Obligors of the Collateral Obligations, the Rating Agency, the Trustee and the Collateral Administrator) and to any confidentiality restrictions with respect thereto. The Portfolio Manager shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing reasonably believed by it to be genuine and to have been signed or sent by a Person that the Portfolio Manager has no reason to believe is not duly authorized. The Portfolio Manager also may rely upon any statement made to it orally or by telephone and made by a Person the Portfolio Manager has no reason to believe is not duly authorized, and shall not incur any liability for relying thereon. The Portfolio Manager is entitled to rely on any other information furnished to it by third parties that it reasonably believes in good faith to be genuine.

(e)      At the direction of 66 2/3% of the Aggregate Outstanding Amount of the Subordinated Notes, the Portfolio Manager may direct an Optional Redemption (including a Refinancing) under the Indenture on behalf of the Issuer.

(f)      The Portfolio Manager may, in its sole discretion subject to and in accordance with the provisions of the Indenture and this Agreement, direct the Issuer

and/or the Trustee to take the following actions with respect to a Collateral Obligation, Eligible Investment or other Asset:

(i)  retain such Collateral Obligation, Eligible Investment or other Asset;

(ii)  dispose of such Collateral Obligation, Eligible Investment or other Asset in the open market or otherwise;

(iii)  acquire, as security for the Secured Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Assets, one or more additional Collateral Obligations or Eligible Investments;

(iv)  if applicable, tender such Collateral Obligation, Eligible Investment or other Asset pursuant to an Offer;

(v)  if applicable, consent to or refuse to consent to any proposed amendment, modification, restructuring, exchange or waiver pursuant to an Offer;

(vi)  retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer;

(vii)  waive any default with respect to any Defaulted Obligation or other Asset;

(viii)  vote to accelerate the maturity of any Defaulted Obligation or other Asset;

(ix)  participate in a committee or group formed by creditors of an issuer or a borrower under a Collateral Obligation, Eligible Investment, Equity Security or asset held by any ETB Subsidiary;

(x)  negotiate, modify or amend any loan for the Issuer as authorized by the Indenture in accordance with a Refinancing;

(xi)  exercise any other rights or remedies with respect to a Collateral Obligation, Eligible Investment or other Asset as provided in the related Underlying Instruments or take any other action consistent with the terms of the Indenture; and

(xii)  to make loans to ETB Subsidiaries.

(g)  Notwithstanding anything to the contrary in this Agreement, none of the services performed by the Portfolio Manager shall result in or be construed as resulting in an obligation to perform any of the following:

(i)     the Portfolio Manager acting repeatedly or continuously as an intermediary in securities for the Issuer;

(ii)     the Portfolio Manager providing investment banking services to the Issuer; or

(iii)     the Portfolio Manager having direct contact with, or actively soliciting or finding, outside investors to (x) invest in the Issuer or (y) make co-investments in securities of portfolio companies with the Issuer.

(h)     The Portfolio Manager hereby agrees to the following:

(i)     The Portfolio Manager agrees not to institute against the Issuer, the Co-Issuer or any ETB Subsidiary any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under U.S. federal or state bankruptcy or similar laws, or the similar laws of the Cayman Islands or other applicable jurisdiction until the payment in full of all Notes issued under the Indenture and the expiration of a period equal to one year, or, if longer, the applicable preference period, and a day following such payment. Nothing in this Section 3(h)(i) shall preclude, or be deemed to stop, the Portfolio Manager (i) from taking any action prior to the expiration of the aforementioned period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer, the Co-Issuer or any ETB Subsidiary or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than the Portfolio Manager, or (ii) from commencing against the Issuer, the Co-Issuer, any ETB Subsidiary or any of their respective properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding. The provisions of this Section 3(h)(i) shall survive termination of this Agreement.

(ii)     The Portfolio Manager shall cause any purchase or sale of any Collateral Obligation to be conducted on arm's length terms or in the manner contemplated by Section 6, if applicable.

(iii)     In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; *provided* that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties. Notwithstanding the foregoing, this Agreement, and any obligations or duties of the Portfolio Manager under this Agreement, can be delegated by the Portfolio Manager, in whole or in part, to any entity that (i) is controlled by any of James Dondero, Mark Okada or Josh Terry and (ii) is one in which any of James Dondero, Mark Okada or Josh Terry is involved in the day-to-day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), with the

prior written consent of the Issuer and, notwithstanding any such consent, no delegation of obligations or duties by the Portfolio Manager (including, without limitation, to an entity described above) shall relieve the Portfolio Manager from any of its duties or any liability under this Agreement.

(i)     From and after the occurrence and continuance of an Event of Default, the Portfolio Manager will continue to perform and be bound by the provisions of this Agreement and the Indenture. Subject to the terms and conditions of the Indenture, the Trustee will be entitled to rely and be protected in relying upon all actions and omissions to act of the Portfolio Manager thereafter as fully as if no Event of Default had occurred.

4.     <u>Brokerage</u>.

(a)     The Portfolio Manager will seek to obtain the best execution (but shall have no obligation to obtain the best prices and execution) for all orders placed with respect to the Assets, in a manner permitted by law and in a manner it believes to be in the best interests of the Issuer.  Subject to the preceding sentence, the Portfolio Manager may, in the allocation of business, select brokers and/or dealers with whom to effect trades on behalf of the Issuer and may open cash trading accounts with such brokers and dealers (*provided* that none of the Assets may be credited to, held in or subject to the lien of the broker or dealer with respect to any such account).  In addition, subject to the first sentence of this paragraph, the Portfolio Manager may, in the allocation of business, take into consideration research and other brokerage services furnished to the Portfolio Manager or its Affiliates by brokers and dealers which are not Affiliates of the Portfolio Manager; *provided* that the Portfolio Manager in good faith believes that the compensation for such services rendered by such brokers and dealers complies with the requirements of Section 28(e) of the Securities Exchange Act of 1934, as amended ("<u>Section 28(e)</u>"), or in the case of principal or fixed income transactions for which the "safe harbor" of Section 28(e) is not available, the amount of the spread charged is reasonable in relation to the value of the research and other brokerage services provided. Such services may be used by the Portfolio Manager or its Affiliates in connection with its other advisory activities or investment operations.  The Portfolio Manager may aggregate sales and purchase orders of securities placed with respect to the Assets with similar orders being made simultaneously for other accounts managed by the Portfolio Manager or with accounts of the Affiliates of the Portfolio Manager, if in the Portfolio Manager's reasonable business judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission or other expenses, as well as the availability of such securities on any other basis.  In accounting for such aggregated order price, commissions and other expenses may be apportioned on a weighted average basis.  When a transaction with respect to the Assets occurs as part of any aggregate sales or purchase orders, the objective of the Portfolio Manager shall be to allocate the executions among the accounts in an equitable manner the Portfolio Manager believes, in its reasonable business judgment, to be appropriate and in accordance with (x) its internal conflicts of interest and allocation policies and (y) any applicable requirements of the Investment Advisers Act.

(b)　　　The Issuer acknowledges and agrees that (i) the determination by the Portfolio Manager of any benefit to the Issuer will be subjective and will represent the Portfolio Manager's evaluation at the time that the Issuer will be benefited by relatively better purchase or sales prices, lower brokerage commissions, lower transaction costs and expenses and beneficial timing of transactions or any combination of any of these and/or other factors and (ii) the Portfolio Manager shall be fully protected with respect to any such determination to the extent the Portfolio Manager acts in accordance with Section 3(b).

(c)　　　Subject to the Portfolio Manager's execution obligations described in Sections 4(a) and (d) and the covenants set forth in Section 6, the Portfolio Manager is hereby authorized to effect client cross-transactions where the Portfolio Manager causes a transaction with respect to the Assets to be effected between the Issuer and another account advised by it or any of its Affiliates; *provided* that, if and to the extent required by the Investment Advisers Act, such authorization is terminable prior to the initiation of such cross-transaction at the Issuer's option without penalty.  Such termination shall be effective upon receipt by the Portfolio Manager of written notice from the Issuer.  Subject to the Portfolio Manager's execution obligations described in Sections 4(a) and (d) and the covenants set forth in Section 6, the Portfolio Manager is hereby authorized to effect transactions, including principal transactions, where the Issuer may invest in securities of obligors or issuers in which the Portfolio Manager and/or its Affiliates have a debt, equity or participation interest, in each case in accordance with applicable law.

(d)　　　The Issuer acknowledges and agrees that the Portfolio Manager or any of its Affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of the Issuer.  Such investments may be the same or different from those made on behalf of the Issuer.  If, in light of market conditions and investment objectives, the Portfolio Manager determines that it would be advisable to purchase the same item of Collateral Obligation both for the Issuer, and either the proprietary account of the Portfolio Manager or any Affiliate of the Portfolio Manager or another client of the Portfolio Manager, the Portfolio Manager shall allocate such investment opportunities across such entities for which such opportunities are appropriate, consistent with (i) its internal conflicts of interest and allocation policies and (ii) any applicable requirements of the Investment Advisers Act.  The Issuer agrees that, in the course of managing the Collateral Obligations held by the Issuer, the Portfolio Manager may consider its relationships with other clients (including obligors and issuers) and its Affiliates.  The Portfolio Manager may decline to make a particular investment for the Issuer in view of such relationships.

5.　　　Additional Activities of the Portfolio Manager.

(a)　　　Nothing herein shall prevent the Portfolio Manager or any of its Related Entities from engaging in other businesses, or from rendering services of any kind to the Issuer and its Affiliates (other than those services that would violate the Portfolio Manager's covenants under this Agreement), the Trustee, the Holders, the Initial Purchaser or any other Person to the extent permitted by applicable law, regardless

of whether such business is in competition with the Issuer or otherwise. Without limiting the generality of the foregoing, the Portfolio Manager, its Related Entities and the directors, officers, employees and agents of the Portfolio Manager and its Related Entities may, subject to any limits specified in the Indenture:

(i) serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Issuer or its Affiliates, or for any obligor or issuer in respect of the Collateral Obligations, Equity Securities or Eligible Investments or any affiliate thereof, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any obligor or issuer in respect of any of the Collateral Obligations, Eligible Investments or Equity Securities (or any Affiliate thereof) pursuant to their respective Governing Instruments, and neither the Holders of the Notes nor the Issuer shall have the right to any such fees; *provided* that, in the reasonable business judgment of the Portfolio Manager, such activity will not have a material adverse effect on any item of the Assets;

(ii) receive fees or other compensation from third parties (including Persons in which the Issuer has made or proposes to make an investment) in connection with any business activities of the Portfolio Manager and its Affiliates and which are not related to the use of the Issuer's capital (which fees or other compensation shall be for the benefit of the Portfolio Manager's own account); *provided* that, in the reasonable business judgment of the Portfolio Manager, such activities will not have a material adverse effect on any item of the Assets; and

(iii) be a secured or unsecured creditor of, or hold an equity interest in, or own or hold notes issued by, the Issuer, its Affiliates or any obligor or issuer of any obligation included in the Assets, subject to the Portfolio Manager's obligations in <u>Section 8</u> hereof.

As a result, such individuals may possess information relating to obligors and issuers of Collateral Obligations that is (a) not known to or (b) known but restricted as to its use by the individuals at the Portfolio Manager responsible for monitoring the Collateral Obligations and performing the other obligations of the Portfolio Manager under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Issuer and otherwise create conflicts of interest for the Issuer. The Issuer acknowledges and agrees that, in all such instances, the Portfolio Manager and its Affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Issuer's investments and they have no duty, in making or managing such investments, to act in a way that is favorable to the Issuer.

The Issuer acknowledges that there are generally no ethical screens or information barriers among the Portfolio Manager and certain of its Affiliates of the type that many firms implement to separate Persons who make investment decisions from others who

might possess material, non-public information that could influence such decisions. The officers or Affiliates of the Portfolio Manager may possess information relating to obligors or issuers of Collateral Obligations that is not known to the individuals at the Portfolio Manager responsible for monitoring the Collateral Obligations and performing the other obligations under this Agreement. As a result, the Portfolio Manager may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to effect a transaction for the Issuer, and the Issuer's investments may be constrained as a consequence of the Portfolio Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Issuer.

(b)     It is understood that the Portfolio Manager and any of its Affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Portfolio Manager with respect to the Assets and which may own securities or obligations of the same class, or which are of the same type, as the Collateral Obligations or the Eligible Investments or other securities or obligations of the obligors or issuers of the Collateral Obligations or the Eligible Investments. The Portfolio Manager will be free, in its sole discretion, to make recommendations to others or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Assets. Nothing in the Indenture and this Agreement shall prevent the Portfolio Manager or any of its Affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Portfolio Manager to be purchased or sold on behalf of the Issuer. It is understood that, to the extent permitted by applicable law, the Portfolio Manager, its Affiliates or Related Entities, or any of their directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or any member of their families or a Person or entity advised by the Portfolio Manager may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those whose purchase or sale the Portfolio Manager may direct hereunder.

(c)     The Portfolio Manager shall not be obligated to pursue any particular investment strategy or opportunity with respect to the Assets.

(d)     The Issuer acknowledges that the Portfolio Manager and its Affiliates may make and/or hold an investment in an obligor's or issuer's securities that may be pari passu, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Issuer or in which partners, security holders, members, officers, directors, agents or employees of the Portfolio Manager and its Affiliates serve on boards of directors or otherwise have ongoing relationships.

6.    Conflicts of Interest.

(a)    Subject to compliance with applicable laws and regulations and subject to this Agreement and the Indenture, the Portfolio Manager may direct the Trustee to acquire a Collateral Obligation from, or sell a Collateral Obligation, Equity Security, Eligible Investment or asset held by an ETB Subsidiary to, the Portfolio Manager, any of its Affiliates or any account or portfolio for which the Portfolio Manager or any of its Affiliates serve as investment advisor for fair market value.  The Portfolio Manager may obtain the Issuer's written consent through the Independent Review Party as provided herein if any such transaction requires the consent of the Issuer under Section 206(3) of the Investment Advisers Act (any such transaction, an "Affiliate Transaction"). The Issuer hereby acknowledges that the Portfolio Manager, its Affiliates or accounts advised or sub-advised by the Portfolio Manager or its Affiliates or their respective advised accounts (collectively, the "Portfolio Manager Affiliates") will purchase on the Closing Date U.S.$32,000,000 of the Class A-1 Notes, U.S.$2,000,000 of the Class D Notes, U.S.$5,500,000 of the Class E Notes and U.S.$51,850,000 of the Subordinated Notes (the "Portfolio Manager Notes").  The Issuer further acknowledges and agrees that no Portfolio Manager Affiliate is under any obligation to retain any Portfolio Manager Notes, and may sell all or a portion of such Portfolio Manager Notes at any time.  In addition, the Issuer acknowledges that the Portfolio Manager Affiliates may acquire and subsequently sell other Notes after the Closing Date.  In certain circumstances, the interests of the Issuer and/or the Holders or beneficial owners of the Notes with respect to matters as to which the Portfolio Manager is advising the Issuer may conflict with the interests of the Portfolio Manager Affiliates or its Related Entities.  The Issuer hereby acknowledges that various potential and actual conflicts of interest may exist with respect to the Portfolio Manager as described above and as described in the final offering circular relating to the Notes; *provided* that nothing in this Section 6 shall be construed as altering the duties of the Portfolio Manager referred to herein.

(b)    At the written request of the Portfolio Manager, the Issuer shall establish a conflicts review board or appoint an independent third party to act on behalf of the Issuer (such board or party, an "Independent Review Party") with respect to Affiliate Transactions.  Decisions of any Independent Review Party shall be binding on the Portfolio Manager, the Issuer, and Holders of the Notes.

(c)    Any Independent Review Party (i) shall either (A) be the Issuer's Board of Directors, (B) be an established financial institution or other financial company with experience in assessing the merits of transactions similar to the Affiliate Transactions or (C) be a review board comprised of one or more individuals selected by the Issuer (or at the request of the Issuer, selected by the Portfolio Manager), (ii) shall be required to assess the merits of the Affiliate Transaction and either grant or withhold consent to such transaction in its sole judgment and (iii) shall not be (A) affiliated with the Portfolio Manager (other than as a Holder or as a passive investor in the Issuer or an Affiliate of the Issuer) or (B) (other than the Issuer's Board of Directors) involved in the daily management and control of the Issuer.

(d)     The Issuer (i) shall be responsible for any fees relating to the services provided by any Independent Review Party and shall reimburse members of any Independent Review Party for their out-of-pocket expenses and (ii) may indemnify members of such Independent Review Party to the maximum extent permitted by law, subject to terms and conditions satisfactory to the Portfolio Manager.

      7.     <u>Records; Confidentiality</u>.

The Portfolio Manager shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Issuer, the Trustee, the Holders, and the Independent accountants appointed by the Portfolio Manager on behalf of the Issuer pursuant to Article 10 of the Indenture at any time during normal business hours and upon not less than three Business Days' prior notice. The Portfolio Manager shall keep confidential any and all information that is either (i) of a type that would ordinarily be considered proprietary or confidential or (ii) designated as confidential (collectively "<u>Confidential Information</u>") obtained in connection with the services rendered hereunder and shall not disclose any such Confidential Information to non-affiliated third parties (excluding any Holders and beneficial owners of Notes to the extent required by the terms of the Indenture) except (a) with the prior written consent of the Issuer, (b) such Confidential Information as the Rating Agency shall reasonably request in connection with its rating of the Secured Notes or supplying credit estimates on any obligation included in the Assets, (c) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions with respect to the Assets on behalf of the Issuer, (d) as required by (i) applicable law, regulation, court order, or a request by a governmental regulatory agency with jurisdiction over the Portfolio Manager or any of its Affiliates, (ii) the rules or regulations of any stock exchange or self-regulating organization, body or official having jurisdiction over the Portfolio Manager or any of its Affiliates or (iii) the Irish Stock Exchange, (e) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (f) such Confidential Information as shall have been publicly available or disclosed other than in known violation of this Agreement or the provisions of the Indenture or shall have been obtained by the Portfolio Manager on a non-confidential basis, (g) such Confidential Information as is necessary or appropriate to disclose so that the Portfolio Manager may perform its duties hereunder, under the Indenture or the related documents or (h) general performance information which may be used by the Portfolio Manager or its Affiliates in connection with their marketing activities. Notwithstanding the foregoing, it is agreed that the Portfolio Manager may disclose (a) that it is serving as portfolio manager of the Issuer, (b) the nature, aggregate principal amount and overall performance of the Issuer's assets, (c) the amount of earnings on the Assets, (d) such other Confidential Information about the Issuer, the Assets and the Notes as is customarily disclosed by managers of collateralized loan obligations and (e) each of its respective employees, representatives or other agents may disclose to any and all Persons, without limitation of any kind, the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by the Indenture, this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and

United States income tax structure. For purposes of this <u>Section 7</u>, the Holders and beneficial owners of the Notes shall not be considered "non-affiliated third parties."

8. <u>Obligations of Portfolio Manager</u>.

In accordance with the performance standard set forth in <u>Section 3(b)</u>, the Portfolio Manager shall use commercially reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially and adversely affect the status of the Issuer for purposes of Cayman Islands law, United States federal or state law, or other law known to the Portfolio Manager to be applicable to the Issuer, (b) not be permitted by the Issuer's Governing Instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer, including, without limitation, actions which would violate any Cayman Islands law, United States federal, state or other applicable securities law that is known by the Portfolio Manager to be applicable to it and, in each case, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer or have a material adverse effect on the ability of the Portfolio Manager to perform its obligations hereunder or under the Indenture, (d) require registration of the Issuer, the Co-Issuer or the pool of Assets as an "investment company" under Section 8 of the Investment Company Act, (e) cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise cause the Issuer to be subject to U.S. federal or state income tax on a net basis; *provided* that it shall not be a violation of this clause (e) for the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis as a result of an action taken either (i) in compliance with the Trading Restrictions attached hereto as <u>Schedule 1</u> or (ii) in reliance upon Tax Advice to the effect that, under the relevant facts and circumstances with respect to such action, the Issuer's contemplated action "will" not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes or otherwise to be subject to U.S. federal income tax on a net basis, so long as (in respect of either (i) or (ii)) (x) there has been no material change in U.S. federal income tax law or the interpretation thereof that is relevant to such action since the date of such Tax Advice or the date hereof, as applicable; and (y) the Portfolio Manager does not have actual knowledge that such action, when considered in the light of the other activities of the Issuer, would cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes; or (f) knowingly and willfully adversely affect the interests of the Holders in the Assets in any material respect (other than (i) as expressly permitted hereunder or under the Indenture or (ii) in connection with any action taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its clients). In furtherance of the foregoing clause (e), the Portfolio Manager shall at all times comply with the Trading Restrictions set forth in <u>Schedule 1</u>, except with respect to actions taken in compliance with clause (e)(ii). If the Portfolio Manager is ordered by the Board of Directors of the Issuer or the requisite Holders or beneficial owners of Notes to take any action which would, or could reasonably be expected to, in each case in its reasonable business judgment, have any such consequences, the Portfolio Manager shall promptly notify the Issuer that such

action would, or could reasonably be expected to, in each case in its reasonable business judgment, have one or more of the consequences set forth above and shall not take such action unless the Board of Directors of the Issuer then request the Portfolio Manager to do so and at least a Majority of both the Controlling Class and the Subordinated Notes (voting separately by Class) have consented thereto in writing. Notwithstanding any such request, the Portfolio Manager shall not take such action unless (1) arrangements satisfactory to it are made to insure or indemnify the Portfolio Manager, Affiliates of the Portfolio Manager and members, shareholders, partners, directors, managers, officers or employees of the Portfolio Manager or such Affiliates from any liability and expense it may incur as a result of such action and (2) if the Portfolio Manager so requests in respect of a question of law, the Issuer delivers to the Portfolio Manager an opinion of a nationally recognized law firm (from outside counsel satisfactory to the Portfolio Manager) that the action so requested does not violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or over the Portfolio Manager. Neither the Portfolio Manager nor its Affiliates, shareholders, partners, directors, members, managers, officers or employees shall be liable to the Issuer or any other Person, except as provided in <u>Section 11</u>. Notwithstanding anything contained in this Agreement to the contrary, any indemnification or insurance by the Issuer provided for in this <u>Section 8</u> or <u>Section 11</u> shall be payable out of the Assets in accordance with the Priority of Payments, and the Portfolio Manager may take into account such Priority of Payments in determining whether any proposed indemnity arrangements contemplated by this <u>Section 8</u> are satisfactory.

9.   <u>Compensation</u>.

(a)   The Issuer shall pay to the Portfolio Manager, for services rendered under this Agreement, on each Payment Date, the Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee. Accrued and unpaid Management Fees shall be paid as set forth in Article 11 of the Indenture. To the extent any of the Subordinated Management Fee is not paid on any Payment Date, such payment will be deferred and will accrue interest at LIBOR (as determined for the applicable Interest Accrual Period with respect to the Secured Notes), compounded quarterly, as set forth in the Indenture.

(b)   The Portfolio Manager may (but shall not be obligated to), at its election upon notice to the Issuer, the Trustee and the Collateral Administrator (the "<u>Fee Election Notice</u>"), reduce for a predetermined period of time, as specified in the Fee Election Notice, the amount which is due to it as Senior Management Fee, in which case the Subordinated Management Fee shall automatically be increased by the same amount (the "<u>Fee Election</u>"). Any Fee Election must be made on or before the Determination Date for the first Collection Period in respect of which the Fee Election will apply and shall not be revocable during the period of the Fee Election; <u>except</u> that, in the event that the Portfolio Manager is removed, resigns or assigns its rights to any Persons, as contemplated by <u>Sections 13</u>, <u>14</u> and <u>15</u> of this Agreement, the replacement Portfolio Manager shall be bound initially by the terms set forth under <u>Section 9(a)</u> and the Fee Election will not apply to such replacement Portfolio Manager.

(c)     The Portfolio Manager shall pay (without reimbursement by the Issuer) its general overhead expenses, including (i) all costs and expenses on account of salaries, wages, bonuses and other employee benefits of the Portfolio Manager and (ii) all occupational expenses, including rent, taxes and utilities, of the Portfolio Manager. The Issuer shall pay or reimburse the Portfolio Manager (at closing in the case of clause (i) below) for its payment of any and all reasonable costs and expenses incurred on behalf of the Issuer, including, without limitation:  (i) the costs and expenses of the Portfolio Manager incurred in connection with the negotiation and preparation of this Agreement and all other agreements and matters related to the issuance of the Notes; (ii) any transfer fees necessary to register any Collateral Obligation in accordance with the Indenture; (iii) any costs, fees and expenses in connection with the acquisition, management or disposition of Assets or otherwise in connection with the Notes or the Issuer (including (a) investment related travel, communications and related expenses, (b) loan processing fees, legal fees and expenses and other expenses of professionals retained by the Portfolio Manager on behalf of the Issuer and (c) amounts in connection with the termination, cancellation or abandonment of a potential acquisition or disposition of any Assets that is not consummated); (iv) any and all costs and expenses incurred in connection with the carrying or management of the Assets; (v) any and all costs and expenses incurred in connection with the Notes and other indebtedness of the Issuer; (vi) any and all attorneys', accountants', rating agencies', consultants', brokers' and other professionals' fees and disbursements relating to Issuer matters (including in house attorneys' and accountants' services provided by or on behalf of the Portfolio Manager to the Issuer as may be reasonably allocated to the Issuer); (vii) any and all taxes and governmental charges that may be incurred or payable by the Issuer or any ETB Subsidiary; (viii) any and all insurance premiums or expenses incurred in connection with the activities of the Issuer by the Portfolio Manager; (ix) any and all costs, fees and expenses incurred in connection with the rating of the Notes or obtaining ratings or credit estimates on Collateral Obligations, and communications with the Rating Agency (including (a) any expenses related to compliance with Rule 17g-5 of the Securities Exchange Act of 1934, as amended, and (b) any fees, expenses or other amounts payable to the Rating Agency); (x) any and all costs, fees and expenses incurred in connection with the Portfolio Manager's communications with the Holders (including charges related to annual meetings) and costs and expenses for services to the Issuer in respect of the Assets relating to asset pricing and rating services and specialty database software licensing and development fees; (xi) any and all costs and expenses incurred by the Portfolio Manager in connection with the establishment of any ETB Subsidiary (*provided* that such costs and expenses are directly attributable to the establishment of such ETB Subsidiary), and (xii) any and all expenses incurred to comply with any law or regulation related to the activities of the Issuer, any ETB Subsidiary and the Portfolio Manager. Other than as stated above, the Issuer will bear, and will pay directly in accordance with the Indenture, all other costs and expenses incurred by it or on its behalf in connection with the organization, operation or liquidation of the Issuer.

(d)     Upon the effectiveness of any termination of this Agreement or any removal or resignation of the Portfolio Manager hereunder, (i) all Management Fees accrued but not paid prior to the effective date of such termination, removal, resignation or assignment, as the case may be (the "Exit Date"), shall continue to be payable to the

exiting Portfolio Manager on Payment Dates occurring after the Exit Date and (ii) (a) in the case of removal for cause pursuant to Section 15, the Incentive Management Fee, if any, will be due and payable on each Payment Date after such removal for cause to the former Portfolio Manager and the successor Portfolio Manager *pro rata* based on the duration of service as portfolio manager for the Issuer during the period from the Closing Date to (and including) such Payment Date and (b) in the case of termination, resignation or assignment, as the case may be, for any reason other than cause, the Incentive Management Fee that is due and payable will be payable to the former Portfolio Manager and the successor Portfolio Manager based upon the former Portfolio Manager's reasonable determination of each portfolio manager's proportional participation and engagement in providing services to the Issuer in connection with the management of the Issuer's portfolio and carrying out the duties and obligations set forth in the Portfolio Management Agreement.

(e)     Notwithstanding anything contained herein to the contrary, the obligations of the Issuer are limited recourse obligations payable solely from Assets granted to the Trustee pursuant to the Granting Clauses of the Indenture in accordance with the Priority of Payments and, following realization of the Assets and reduction thereof to zero, all obligations of the Issuer and any claims against the Issuer under this Agreement shall be extinguished and shall not thereafter revive. No recourse shall be had for the payment of any amount owing in respect of this Agreement against any other asset of the Issuer or against any officer, director, employee, shareholder or incorporator of the Issuer. The provisions of this Section 9(e) shall survive termination of this Agreement.

10.     Benefit of the Agreement.

The Portfolio Manager agrees that its obligations hereunder in accordance with the terms of this Agreement and the terms of the Indenture applicable to it shall be enforceable by the Issuer and by the Trustee on behalf of the Holders, as provided in the Indenture. The Portfolio Manager agrees and consents to the provisions contained in Section 15.1 of the Indenture.

11.     Limits of Portfolio Manager Responsibility.

(a)     Subject to Section 8, the Portfolio Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it and affecting the duties and functions that have been delegated to it thereunder and hereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager shall not be responsible for any action or inaction of the Co-Issuers or the Trustee in declining to follow any advice, recommendation or direction of the Portfolio Manager including as set forth in Section 8. Neither the Portfolio Manager nor any of its directors, managers, officers, stockholders, members, partners, partnership committee members, personnel, employees, agents or Affiliates will be liable to the Co-Issuers, the Trustee, the Holders of the Notes, the Initial Purchaser or any other Person for any act, omission, error of judgment, mistake of law, or for any claim, loss, liability, damage, judgments, assessments, settlement, cost, or other expense (including attorneys'

fees and expenses and court costs) arising out of any investment, or for any other act taken by or recommended by or omission arising out of or in connection with the performance by the Portfolio Manager, its directors, managers, officers, stockholders, members, personnel, partners, partnership committee members, employees, agents or Affiliates under this Agreement or the terms of the Indenture applicable to the Portfolio Manager, incurred as a result of actions taken or recommended or for any omissions of the Portfolio Manager, or for any decrease in the value of the Collateral Obligations, except that the Portfolio Manager shall be liable (i) by reason of acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations hereunder or the terms of the Indenture applicable to the Portfolio Manager or, (ii) with respect to the information concerning the Portfolio Manager included in the Offering Circular dated April 14, 2015 (the "*Offering Circular*") under the headings "*Risk Factors—Risks Relating to the Portfolio Manager*" and the sub-headings thereunder, "*Risk Factors— Risks Relating to Certain Conflicts of Interest — The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" and "*The Portfolio Manager,*" as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Portfolio Manager shall not be liable for any consequential, punitive, exemplary or treble damages or lost profits hereunder or under the Indenture. The Issuer (the Issuer in such case, the "*Indemnifying Party*") shall indemnify and hold harmless the Portfolio Manager, its directors, managers, officers, stockholders, members, partners, partnership committee members, agents, personnel and employees and its Affiliates and their directors, managers, officers, stockholders, members, partners, partnership committee members, agents, personnel and employees (each, an "*Indemnified Party*") from and against any and all losses, claims, damages, judgments, assessments, costs or other liabilities (other than losses in the value of a Collateral Obligation or Eligible Investment incurred by the Portfolio Manager or any of its Affiliates in connection with a transaction in which it elects to acquire a Collateral Obligation or an Eligible Investment from the Issuer as principal) (collectively, "*Liabilities*"), and will promptly reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) as such fees and expenses (collectively, the "*Expenses*") are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "*Actions*"), caused by, or arising out of or in connection with the Assets or business of the Issuer or any ETB Subsidiary or otherwise relating to the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; *provided* that the Portfolio Manager shall not be indemnified for any Liabilities or Expenses (x) it incurs as a result of any acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance by the Portfolio Manager of its obligations hereunder or the terms of the Indenture applicable to the Portfolio Manager, or (y) it incurs with respect to the information concerning the Portfolio Manager included in the Offering Circular under the headings "*Risk Factors—Risks Relating to the Portfolio Manager*" and the sub-headings thereunder, "*Risk Factors— Risks Relating to Certain Conflicts of Interest—The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and*

*its affiliates*" and "*The Portfolio Manager*," as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this <u>Section 11</u> are limited recourse obligations of the Issuer payable solely out of the Assets in accordance with the Priority of Payments. The Indemnified Parties are not required to consult with, or obtain the consent of, the Issuer with respect to any settlement, negotiation or other act of the Indemnified Parties in connection with any Action.

(b)     The Portfolio Manager shall indemnify and hold harmless (the Portfolio Manager in such case, the "<u>Indemnifying Party</u>") the Issuer (the Issuer in such case, the "<u>Indemnified Party</u>") from and against any and all expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) arising directly out of any information described in <u>Section 11(a)(ii)</u> above, as of the date of such information, to the extent that such information contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that the Portfolio Manager shall not be liable for any special, indirect, consequential, punitive, exemplary or treble damages or lost profits.

(c)     The Indemnified Party shall promptly notify the Indemnifying Party if the Indemnified Party receives a complaint, claim, compulsory process or other notice of any losses or damages giving rise to a claim for indemnification under this <u>Section 11</u>, but failure so to notify the Indemnifying Party or to comply with paragraph (d) below shall not relieve such Indemnifying Party from its obligations under this <u>Section 11</u> unless and to the extent that such Indemnifying Party did not otherwise learn of such action or proceeding and to the extent such failure results in the forfeiture by the Indemnifying Party of material rights and defenses.

(d)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request served upon such Indemnified Party for which such Indemnified Party is or may be entitled to indemnification under this <u>Section 11</u>, such Indemnified Party shall:

(i)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(ii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iii)     in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the

Indemnifying Party may exercise in its sole discretion and at its expense, (A) to participate in the investigation, defense and settlement of such claim, and, (B) to the extent that it shall wish, to assume the defense thereof, with counsel satisfactory to such Indemnified Party (who shall not, except with the consent of the Indemnified Party, be counsel to the Indemnifying Party), and, after notice from the Indemnifying Party to such Indemnified Party of its election so to assume the defense thereof, the Indemnifying Party shall not be liable to such Indemnified Party under such subsection for any legal fees and expenses of other counsel or any other expenses, in each case subsequently incurred by such Indemnified Party, in connection with the defense thereof other than reasonable costs of investigation, except that, if such Indemnified Party reasonably determines that counsel selected by the Indemnifying Party has a conflict of interest, such Indemnifying Party shall pay the reasonable fees and disbursements of one additional counsel selected by the Indemnified Party (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

(iv)     neither incur any material expense to defend against nor make any admission with respect thereto, nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; *provided* that the Indemnifying Party shall have advised such Indemnified Party that such Indemnified Party is entitled to be indemnified hereunder with respect to such claim.

(e)     No Indemnified Party shall, without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, settle or compromise any claim giving rise to a claim for indemnity hereunder, or permit a default or consent to the entry of any judgment in respect thereof; *provided* that if the Indemnified Party is the Portfolio Manager or an Affiliate or a Related Entity of the Portfolio Manager or of an Affiliate thereof, such Indemnified Party shall not be required to seek or obtain such consent if it determines in good faith that the Indemnifying Party is unlikely to have sufficient funds available to indemnify it in full, taking into account the Priority of Payments.

(f)     No Indemnifying Party shall, without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, settle or compromise or consent to the entry of any judgment with respect to any claim giving rise to a claim for indemnity hereunder if such settlement includes a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

(g)     If the indemnification provided for in this <u>Section 11</u> is unavailable to an Indemnified Party in respect of any claims or liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such claims or liabilities in such proportion as is appropriate to reflect the relative benefits received by, and the relative fault of, the Indemnifying Party, on the one hand, and the

Indemnified Parties, on the other hand, as well as any other relevant equitable considerations.

(h)    The required indemnification provided by this <u>Section 11</u> shall be in addition to any rights to which an Indemnified Party may otherwise be entitled by contract or as a matter of law, and shall extend to each of its or his or her heirs, successors and assigns.  The provisions of this <u>Section 11</u> shall continue to afford protection to each Indemnified Party regardless of whether such Indemnified Party remains in the position or capacity pursuant to which such Indemnified Party became entitled to indemnification under this <u>Section 11</u>.

(i)    United States federal securities laws impose liabilities under certain circumstances on persons who act in good faith and nothing herein shall constitute a waiver or limitation of any rights which the Issuer or any Holder of Notes may have under any applicable federal securities laws.

(j)    Notwithstanding anything in this Agreement to the contrary, the Portfolio Manager's obligations hereunder will be solely the obligations of the Portfolio Manager, and the Issuer will not have any recourse to any Manager Related Party other than the Portfolio Manager, with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.

(k)    The Portfolio Manager shall not be liable for any act or omission of the custodian, any sub-custodian, prime broker or other Person appointed by the Issuer. Any compensation to any such Person for its services to the Issuer shall be the obligation of the Issuer and not the Portfolio Manager.

(l)    The Portfolio Manager shall not be responsible for any liability resulting from any failure by the Portfolio Manager to fulfill its duties under this Agreement if such liability or failure shall be caused by or directly or indirectly due to a Force Majeure Event, *provided* that the Portfolio Manager shall use commercially reasonable efforts to minimize the effect of the same. As used herein, the term "<u>Force Majeure Event</u>" means such an operation of the forces of nature as reasonable foresight and ability could not foresee or reasonably provide against including but not limited to, acts of god, flood, war (whether declared or undeclared), terrorism, fire, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Agreement, inability to obtain material, equipment, or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, and other causes beyond a party's control whether or not of the same class or kind as specifically named above.

(m)    The Portfolio Manager shall be entitled to conclusively rely in good faith, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, facsimile, email, telex or teletype message, statement (which may be made orally or by telephone), order or other

document or communication reasonably believed by it to be genuine and correct and to have been signed, sent or made by a Person that the Portfolio Manager has no reason to believe is not duly authorized and upon the advice and statements of independent accountants.

(n)     The Portfolio Manager may consult with outside legal counsel of nationally recognized standing in the United States experienced in such matters as to questions of law pertaining to the performance of its duties hereunder and the advice or opinion of such counsel on any such question shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with the advice or opinion of such counsel; *provided* that the Portfolio Manager may take actions not permitted by the Trading Restrictions only in compliance with Section 8.

12.     No Partnership or Joint Venture.

The Issuer and the Portfolio Manager are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them.  The Portfolio Manager's relation to the Issuer shall be deemed to be that of an independent contractor.

13.     Term; Termination.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes and the termination of the Indenture in accordance with its terms; (ii) the liquidation of the Assets and the final distribution of the proceeds of such liquidation to the Holders; or (iii) the termination of this Agreement in accordance with subsections (b) of this Section 13 or Section 15 of this Agreement.

(b)     Notwithstanding any other provision hereof to the contrary but subject to the provisions of clause (e) below, this Agreement may be terminated without cause by the Portfolio Manager, and the Portfolio Manager may resign, upon 90 days' (or such shorter notice as is acceptable to the Issuer) written notice to the Issuer; *provided* that the Portfolio Manager shall have the right to resign immediately upon the effectiveness of any material change in applicable law or regulations which renders the performance by the Portfolio Manager of its duties hereunder or under the Indenture to be a violation of such law or regulation.

(c)     Notwithstanding the provisions of clause (b) above, no resignation or removal of the Portfolio Manager or termination of this Agreement pursuant to such clause shall be effective until the date as of which a successor Portfolio Manager shall have been appointed and approved in accordance with Section 13(e) and has accepted all of the Portfolio Manager's duties and obligations pursuant to this Agreement in writing and has assumed such duties and obligations.

(d)  If this Agreement is terminated pursuant to this <u>Section 13</u>, neither party shall have any further liability or obligation to the other, except as provided in <u>Section 3(h)(i)</u>, <u>Sections 9(d)</u> and <u>(e)</u> and <u>Sections 11</u> and <u>16</u> of this Agreement.

(e)  Any termination, removal or resignation of the Portfolio Manager while any Notes are Outstanding will be effective only upon (a) the appointment by the Issuer, at the direction of at least a Majority of the Subordinated Notes, with the consent of at least a Majority of the Controlling Class, of a successor Portfolio Manager that is an established institution which (i) has demonstrated an ability to professionally and competently perform duties reasonably comparable to those imposed upon the Portfolio Manager hereunder, (ii) is legally qualified and has the capacity to act as successor to the Portfolio Manager under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager hereunder and under the terms of the Indenture applicable to the Portfolio Manager, (iii) satisfies the S&P Rating Condition, (iv) shall not cause the Issuer or the Co-Issuer or the pool of collateral to become required to register under the provisions of the Investment Company Act and (v) shall not result in the imposition of any entity-level or withholding tax on the Issuer or the payments to the Holders or cause any other material adverse tax consequences to the Issuer and (b) written acceptance of appointment by such successor Portfolio Manager.  The Issuer shall use its commercially reasonable efforts to appoint a successor Portfolio Manager to assume the duties and obligations of the removed or resigning Portfolio Manager.  The Issuer, the Trustee and the successor Portfolio Manager shall take such action (or cause the outgoing Portfolio Manager to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Portfolio Manager, as shall be necessary to effectuate any such succession.  In the event that the successor manager has not been appointed or has not assumed the duties of the Portfolio Manager in writing within a 60-day period, any of the Portfolio Manager, a Majority of the Controlling Class or a Majority of the Subordinated Notes may petition a court of competent jurisdiction for the appointment of a successor Portfolio Manager, which appointment will not require the consent of, or be subject to the approval or disapproval of, the Issuer or any Holder (so long as such court appointed successor meets the requirements of clauses (a)(i) through (v) above).

(f)  In the event of removal of the Portfolio Manager pursuant to this Agreement by the Issuer or, to the extent so provided in the Indenture, by the Trustee, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Portfolio Manager as provided under this Agreement terminate all the rights and obligations of the Portfolio Manager under this Agreement (except those that survive termination pursuant to <u>Section 13(d)</u> above).  Upon resignation or removal of the Portfolio Manager in accordance with this <u>Section 13</u> or <u>Section 15</u> of this Agreement, as applicable, and upon acceptance by a successor Portfolio Manager of appointment, all authority and power of the Portfolio Manager under this Agreement and the Indenture, whether with respect to the Assets or otherwise, shall automatically and without further action by any Person pass to and be vested in the successor Portfolio Manager.

(g)     For so long as Acis Capital Management, L.P. or an Affiliate of Acis Capital Management, L.P. is the Portfolio Manager, the Issuer and the Co-Issuer will be permitted to use the "Acis" name; *provided* that, if the Portfolio Manager ceases to be Acis Capital Management, L.P. or an Affiliate of Acis Capital Management, L.P., the Issuer shall use commercially reasonable efforts to change its name to remove all reference to the name "Acis" therefrom.  In addition, the Portfolio Manager, without the consent of the Issuer, may change the name of the Portfolio Manager.

14.     Delegation; Assignments.

(a)     Except as provided herein, the Portfolio Manager may not assign its rights or responsibilities hereunder without the written consent of the Issuer, at least a Majority of the Subordinated Notes (*provided* that failure to object within 45 days of written notice of assignment will constitute consent) and at least a Majority of the Controlling Class and satisfaction of the S&P Rating Condition.  Notwithstanding the foregoing, the Portfolio Manager may, (i) with the consent of a Majority of the Controlling Class and without satisfaction of the S&P Rating Condition or the consent of any other Class, assign any of its rights or obligations hereunder to an Affiliate; *provided* that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement, (B)  has the legal right and capacity to act as Portfolio Manager hereunder and (C) shall not cause the Issuer or the pool of collateral to become required to register under the provisions of the Investment Company Act, or (ii) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity and, (A) at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Portfolio Manager hereunder generally and the other entity is solely a continuation of the Portfolio Manager in another corporate or similar form and has substantially the same staff and (B) such action does not cause the Issuer to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation; *provided* that the Portfolio Manager shall deliver prior notice to the Rating Agency of any assignment, delegation or combination made pursuant to this sentence.

(b)     Notwithstanding the foregoing to the extent that applicable law requires the consent of the Issuer to any "assignment" (as defined in the Investment Advisers Act) of this Agreement to any Person, in whole or in part, by the Portfolio Manager, such requirement may be satisfied with respect to the Issuer and all holders (i) by obtaining consent to such assignment on behalf of the Issuer from any of the following persons as determined by the Portfolio Manager: (A) one or more directors of the Issuer independent from the Portfolio Manager, (B) the Independent Review Party, or (C) an advisory committee established by the Portfolio Manager; or (ii) in any other manner that is permitted pursuant to the applicable law.  Any assignment consented to by the Issuer and such Holders shall bind the assignee hereunder in the same manner as the Portfolio Manager is bound.  In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Portfolio Manager. Upon the execution and delivery of such a counterpart by the assignee, the Portfolio

Manager shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 11 of this Agreement prior to such assignment and except with respect to its obligations under Section 3(h)(i) and Section 16 hereof.

(c)     This Agreement shall not be assigned by the Issuer without the prior written consent of the Portfolio Manager, and unless the S&P Rating Condition has been satisfied in connection with such assignment, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Granting Clause of the Indenture.  In the event of any assignment by the Issuer, the Issuer shall use its commercially reasonable efforts to cause its successor to execute and deliver to the Portfolio Manager such documents as the Portfolio Manager shall consider reasonably necessary to effect fully such assignment.

15.     Termination by the Issuer for Cause.

This Agreement may be terminated, and the Portfolio Manager may be removed for cause by at least a Majority of the Controlling Class of Notes upon 30 days' prior written notice to the Portfolio Manager.  For purposes of determining whether the holders of the required percentage of relevant principal amount of the Notes have given notice of removal of the Portfolio Manager for cause, Notes owned or controlled by the Portfolio Manager or any affiliate thereof or an account or fund managed on a discretionary basis by the Portfolio Manager or its affiliates will be disregarded and deemed to be not outstanding.  No such termination or removal shall be effective until the date as of which a successor Portfolio Manager shall have agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to this Agreement and as specified in the Indenture.  For purposes of determining "cause" with respect to any such termination of this Agreement or removal of the Portfolio Manager, such term includes any one of the following events:

(a)     the Portfolio Manager willfully violates, or takes any action that it knows breaches, any material provision of this Agreement or the Indenture applicable to it in bad faith (not including a willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions);

(b)     the Portfolio Manager breaches in any respect any provision of this Agreement or any terms of the Indenture applicable to it (other than as covered by clause (a) and it being understood that failure to meet any Coverage Test, any Concentration Limitation, Interest Reinvestment Test or the Collateral Quality Test is not such a violation) (except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Issuer) and fails to cure such breach within 30 days of a Responsible Officer receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy

such breach, and such action does remedy such breach, within 60 days after a Responsible Officer receives notice thereof;

(c)     the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)     the occurrence of an Event of Default under the Indenture that consists of a default in the payment of principal or interest on the Secured Notes when due and payable and results primarily from any material breach by the Portfolio Manager of its duties hereunder or under the Indenture, which breach or default is not cured within any applicable cure period;

(e)     the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services;

(f)     any senior executive officer of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of 10 days after such conviction; or

(g)     the inability of the Portfolio Manager to perform its duties hereunder in accordance with the standard of care specified herein due to the termination of the Service Agreements, unless the Portfolio Manager believes in good faith that it will be able to either (i) secure reasonably equivalent substitute services to those that were performed for the Portfolio Manager under the Service Agreements or (ii) perform its

duties hereunder in accordance with the applicable standard of care without engaging a third-party service provider, in each case, within 30 days, and the Portfolio Manager is in fact able to secure such services or perform such duties within such 30-day period.

If any of the events specified in the definition of "cause" in this <u>Section 15</u> shall occur, the Portfolio Manager shall give prompt written notice thereof to the Issuer, the Rating Agency, each Holder of Notes and the Trustee upon the Portfolio Manager's becoming aware of the occurrence of such event. A Majority of the Controlling Class may waive any event described in (a), (b), (d), (e), (f) or (g) above as a basis for termination of this Agreement and removal of the Portfolio Manager under this <u>Section 15</u>.

16.     <u>Action Upon Termination</u>.

(a)     From and after the effective date of the termination of the Portfolio Manager's duties and obligations pursuant to this Agreement or resignation or removal of the Portfolio Manager hereunder, the Portfolio Manager shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in <u>Section 9</u> hereof (including any accrued and unpaid Subordinated Management Fee), and shall be entitled to receive any amounts owing under <u>Section 11</u> hereof. Upon such termination, resignation or removal, the Portfolio Manager shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Assets then in the custody of the Portfolio Manager; and

(ii)     deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Portfolio Manager appointed pursuant to <u>Section 13(e)</u> hereof.

Notwithstanding such termination, resignation or removal, the Portfolio Manager shall remain liable to the extent set forth herein (but subject to <u>Section 11</u> hereof) for its liabilities hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Portfolio Manager in <u>Section 17(b)</u> hereof or from any failure of the Portfolio Manager to comply with the provisions of this <u>Section 16</u>.

(b)     The Portfolio Manager agrees that, notwithstanding any termination, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Assets (excluding any such Proceeding in which claims are asserted against the Portfolio Manager or any Affiliate of the Portfolio Manager) upon receipt of appropriate indemnification and expense reimbursement.

17.     Representations and Warranties.

(a)     The Issuer hereby represents and warrants to the Portfolio Manager as follows:

(i)     The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has the full corporate power and authority to own its assets and the securities proposed to be owned by it and included in the Assets and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture, the Collateral Administration Agreement or the Notes (collectively, the "Issuer Documents") would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)     The Issuer has the necessary corporate power and authority to execute, deliver and perform each of the Issuer Documents and all obligations required thereunder, and has taken all necessary action to authorize each of the Issuer Documents on the terms and conditions hereof and thereof and the execution, delivery and performance of each of the Issuer Documents and the performance of all obligations imposed upon it hereunder and thereunder. No consent of any other Person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the Indenture and the issuance of the Notes, is required by the Issuer in connection with the Issuer Documents or the execution, delivery, performance, validity or enforceability of the Issuer Documents or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject, as to enforcement, to (a) the effect of bankruptcy, insolvency, or similar laws affecting generally the enforcement of creditors' rights, as such laws would apply in the event of any bankruptcy, receivership, insolvency or similar event applicable to the Issuer and (b) general equitable principles (whether enforceability of such principles is considered in a proceeding at law or in equity).

(iii)     The execution, delivery and performance of this Agreement and the Collateral Administration Agreement and the documents and instruments required hereunder and thereunder do not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any

mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and do not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)     The Issuer is not required to register as an "investment company" under the Investment Company Act.

(v)     The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any other contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order (including, without limitation, any anti-money laundering statute or related rule, regulation or order) of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder or under the Collateral Administration Agreement.

(vi)     True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Portfolio Manager.

(vii)     The Issuer is a "qualified client" as such term is defined under the Investment Advisers Act.

(viii)     The Issuer understands that the rules and regulations administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/ofac>. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists. To the best of its knowledge, none of: (1) the Issuer; (2) any person controlling or controlled by the Issuer; (3) any person having a beneficial interest in the Issuer; or (4) any person for whom the Issuer is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or is a person or entity prohibited under the OFAC Programs.

(ix)     The Issuer has received and had an opportunity to review a current copy of Part 2 of the Form ADV of Acis Capital Management, L.P., at least forty-eight hours prior to its entering into this Agreement.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in <u>Section 17(a)(v)</u> above to the Portfolio Manager as promptly as practicable after its adoption or execution.

(b)     The Portfolio Manager hereby represents and warrants to the Issuer as follows:

(i)     The Portfolio Manager is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware and has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement or the Collateral Administration Agreement (together with this Agreement, the "<u>Manager Documents</u>") would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or on the ability of the Portfolio Manager to perform its obligations under, or on the validity or enforceability of, the Manager Documents and the provisions of the Indenture applicable to the Portfolio Manager; the Portfolio Manager is registered as an investment adviser under the Investment Advisers Act.

(ii)     The Portfolio Manager has full power and authority to execute, deliver and perform each of the Manager Documents and all obligations required hereunder and under the provisions of the Indenture applicable to the Portfolio Manager, and has taken all necessary action to authorize each of the Manager Documents on the terms and conditions hereof and thereof and the execution, delivery and performance of each of the Manager Documents and all obligations required hereunder and thereunder and under the terms of the Indenture applicable to the Portfolio Manager.  No consent of any other Person, including, without limitation, creditors of the Portfolio Manager, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Portfolio Manager in connection with the Manager Documents or the execution, delivery, performance, validity or enforceability of the Manager Documents or the obligations required hereunder and thereunder or under the terms of the Indenture applicable to the Portfolio Manager.  Each of the Manager Documents has been, and each instrument and document required hereunder and thereunder or under the terms of the Indenture shall be, executed and delivered by a duly authorized officer of the Portfolio Manager, and each of the Manager Documents constitutes, and each instrument and document required hereunder and thereunder or under the terms of the Indenture when executed and delivered by the Portfolio Manager hereunder or thereunder or under the terms of the Indenture shall constitute, the valid and legally binding obligations of the Portfolio Manager enforceable against the Portfolio Manager in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws

affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii) The execution, delivery and performance of the Manager Documents and the terms of the Indenture applicable to the Portfolio Manager and the documents and instruments required hereunder or thereunder or under the terms of the Indenture shall not violate any provision of any existing law or regulation binding on the Portfolio Manager, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Portfolio Manager, or the Governing Instruments of, or any securities issued by the Portfolio Manager or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Portfolio Manager is a party or by which the Portfolio Manager or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or its ability to perform its obligations under the Manager Documents, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking, the existence of which would have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or its ability to perform its obligations under the Manager Documents.

(iv) There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Portfolio Manager, threatened that, if determined adversely to the Portfolio Manager, would have a material adverse effect upon the performance by the Portfolio Manager of its duties under, or on the validity or enforceability of, the Manager Documents and the provisions of the Indenture applicable to the Portfolio Manager hereunder.

(v) The Portfolio Manager is authorized to carry on its business in the United States and in all other jurisdictions necessary to the performance of its obligations under the Manager Documents and the Indenture applicable to the Portfolio Manager.

(vi) The Portfolio Manager is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Portfolio Manager or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of the Manager Documents or the provisions of the Indenture applicable to the Portfolio Manager, or the performance by the Portfolio Manager of its duties hereunder or thereunder.

(vii)    The information concerning the Portfolio Manager contained under the headings entitled "*Risk Factors—Risks Relating to the Portfolio Manager,*" "*Risk Factors—Risks Relating to Certain Conflicts of Interest —The Issuer will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" and "*The Portfolio Manager,*" in the Offering Circular, as of the respective dates of the Offering Circular and as of the Closing Date, is true in all material respects and does not omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

18.    <u>Notices</u>.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by facsimile) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of facsimile notice, when received in legible form, addressed as set forth below:

(a)    If to the Issuer:

ACIS CLO 2015-6 Ltd.
c/o MaplesFS Limited
P.O. Box 1093
Boundary Hall, Cricket Square
Grand Cayman, KY1-1102
Cayman Islands
Attention: The Directors


with a copy to:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201
Facsimile: 972-628-4155

(b)    If to the Portfolio Manager:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201
Facsimile: 972-628-4155

(c)      If to the Trustee:

U.S. Bank National Association
190 S. LaSalle Street, 8th Floor
Chicago, IL 60603
Re: ACIS CLO 2015-6 LTD.
Email: ACIS.CLO.2015.06@USBANK.COM

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this <u>Section 18</u> for the giving of notice.

19.     <u>Binding Nature of Agreement; Successors and Assigns</u>.

Subject to <u>Section 14</u> hereof, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein.

20.     <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

21.     <u>Amendment</u>.

This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and (other than in respect of a modification or amendment of the type that may be made to the Indenture without Holder consent) (i) the consent of a Majority of the Subordinated Notes, (ii) the consent of a Majority of the Controlling Class and (iii) notice to the Rating Agency. Notwithstanding the foregoing, the parties hereto, without the consent of any Holders, may amend or modify any provision of this agreement to (i) reflect a change that is of an inconsequential nature, (ii) correct inconsistencies, typographical or other errors, defects or ambiguities, (iii) conform this Agreement to the Offering Circular or the Indenture (as it may be amended from time to time) or (iv) reflect a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation (including ERISA, the Code, the Investment Advisers Act and the Investment Company Act) of any U.S. federal or state agency or contained in any U.S. federal or state statute. In addition, <u>Schedule 1</u> may be amended or modified by the parties hereto without the consent of any Holder in accordance with Tax Advice.

22.     Conflict with the Indenture.

In the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture (as in effect on the date hereof or as amended or supplemented, with the consent of the Portfolio Manager if such consent is required by Section 3(b)) in respect thereof shall control.

23.     Priority of Payments.

The Portfolio Manager agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be subordinated to the extent set forth in, and the Portfolio Manager agrees to be bound by the provisions of, Article 11 and Section 15.1 of the Indenture as if the Portfolio Manager were a party to the Indenture and each of the Portfolio Manager and Issuer hereby consents to the assignment of this Agreement as provided in Section 15.1 of the Indenture.

24.     Governing Law; Jury Trial.

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF). EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUCH PARTIES ENTERING INTO THIS AGREEMENT.**

25.     Indulgences Not Waivers.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

26.     Titles Not to Affect Interpretation.

The titles of Sections and subsections of this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

27.     Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

28.     Provisions Separable.

To the fullest extent permitted by law, in case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; *provided* that, if there is no basis for such a construction, to the fullest extent permitted by law, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

29.     Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

30.     Jurisdiction and Venue.

The parties to this Agreement irrevocably submit to the non-exclusive jurisdiction of any New York state or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to this Agreement, the Notes or the Indenture, and the parties irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court. The parties to this Agreement irrevocably waive, to the fullest extent they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The parties to this Agreement irrevocably consent to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it in accordance with Section 18. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

31.    <u>Third Party Beneficiaries</u>.

Other than as provided below, no party, including any Holder of Notes, is a third party beneficiary of this Agreement. The parties hereby acknowledges and agrees that the Trustee will be a third-party beneficiary of this Agreement.

32.    <u>Miscellaneous</u>.

(a)    With respect to any Defaulted Obligation, the Portfolio Manager, on behalf of the Issuer, may instruct the agent or the trustee for such Defaulted Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Obligation and under any applicable law, rule or regulation in any manner permitted under the Indenture that the Portfolio Manager has determined in its reasonable business judgment will be in the best interests of the Issuer.  In the event any Offer is made with respect to any Collateral Obligation or Equity Security, the Portfolio Manager, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Portfolio Manager has determined in its reasonable business judgment will be in the best interests of the Issuer.

(b)    Without prejudice to <u>Section 15(f)</u> hereof, any corporation, partnership or limited liability company into which the Portfolio Manager may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Portfolio Manager shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Portfolio Manager, shall be the successor to the Portfolio Manager without any further action by the Portfolio Manager, the Co-Issuers, the Trustee, the Holders or any other Person or entity; *provided* that the Portfolio Manager shall give prompt written notice to the Rating Agency upon any such occurrence.

(c)    Notwithstanding anything herein or in the Indenture to the contrary, with respect to any report, information, communication, request, demand, authorization, direction, notice, consent or waiver to be given to the Rating Agency by the Issuer, the Issuer shall instead provide such information to the Portfolio Manager, and the Portfolio Manager shall then provide such information as well as any information related to the transaction requested by the Rating Agency directly from the Portfolio Manager to the Rating Agency via the website established on behalf of the Issuer for purposes of Rule 17g-5 under the Exchange Act.

(d)    If the Issuer shall receive any written or oral communication from the Rating Agency (or any of its respective officers, directors or employees) with respect to the transactions contemplated hereby or in any way relating to the Notes, the Issuer agrees to refrain from communicating with the Rating Agency and to promptly (and, in any event, within one Business Day) notify the Portfolio Manager of such communication.  The Issuer agrees to coordinate with the Portfolio Manager with respect to any communication to the Rating Agency and further agrees that in no event shall it engage in any oral or written communication with respect to the transactions

contemplated hereby or in any way relating to the Notes with the Rating Agency (or any of its respective officers, directors or employees) without the participation of the Portfolio Manager.

        33.     Power of Attorney.

        The Issuer hereby makes, constitutes and appoints each of Josh Terry, Hunter Covitz and Philip Braner, with full power of substitution, as its true and lawful agent and attorney-in-fact (each an "Attorney" and together the "Attorneys"), jointly and severally with full power and authority in its name, place and stead, in accordance with the terms of this Agreement and the Indenture (a) to prepare, sign and deliver tax documentation, transfer documentation and all other documentation in connection with the acquisition and sale by the Issuer of Collateral Obligations and (b) to (i) vote in its discretion any securities, instruments or obligations included in the Assets, (ii) execute proxies, waivers, consents and other instruments with respect to such Collateral Obligations, (iii) endorse, transfer or deliver such securities, instruments and obligations, (iv) participate in or consent (or decline to consent) to any modification, work-out, restructuring, bankruptcy proceeding, class action, plan of reorganization, merger, combination, consolidation, liquidation or similar plan or transaction with regard to such Collateral Obligations and (v) take any other action specified in Section 3 of this Agreement. This grant of power of attorney will expire (a), with respect to each Attorney (and to each substitute appointed by such Attorney), when such Attorney ceases to be an officer or employee of Acis Capital Management, L.P. or an Affiliate thereof, acting on behalf of Acis Capital Management, L.P. or (b) upon (x) termination of this Agreement in accordance with its terms or (y) any assignment by the Portfolio Manager of its obligations under this Agreement in accordance with Section 14 hereof.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**<u>Portfolio Manager:</u>**
ACIS CAPITAL MANAGEMENT, L.P.
By: Acis Capital Management GP, LLC

By: _____
Name: JAMES DONDERO
Title: President

*Signatures Continue on Next Page*

*Signatures Continued from Previous Page*

**Issuer:**
ACIS CLO 2015-6 LTD.

Executed as a Deed

By: _____

    Name:    **Wendy Ebanks**
    Title:    **Director**

Witness: _____

SCHEDULE 1

## TRADING RESTRICTIONS

The Issuer (and the Portfolio Manager and the Independent Investment Professional acting on behalf of the Issuer) and any other person acting on behalf or at the direction of the Issuer, and any Affiliate of the Issuer, will comply with all of the provisions set forth in this Schedule 1 (the "Trading Restrictions") unless, with respect to a particular transaction, the Portfolio Manager shall have received Tax Advice in compliance with Section 8 of this Agreement.  For purposes of these Trading Restrictions, a "Collateral Obligation" shall include any "Assets" as defined in the Indenture.

The Issuer shall acquire, hold, lend and dispose of Collateral Obligations only for its own account, and shall acquire and hold its Collateral Obligations solely for investment with the expectation and intention of realizing a profit from income earned on the Collateral Obligations and/or any increase in their value during the interval of time between acquisition and disposition thereof.

Notwithstanding any other provision of these Trading Restrictions, the Issuer shall not (each of the following, a "Prohibited Activity"):

     (i)    act as, or engage in any activities customarily undertaken by, an agent, arranger, or structuring agent with respect to, or negotiate the terms of, any Collateral Obligation or otherwise; *provided* that, notwithstanding the foregoing, after the date on which the Issuer has acquired a Collateral Obligation, the Issuer may exercise any voting or other rights available to a holder of a Collateral Obligation under the terms of the Collateral Obligation, and may accept or reject any amendment or modification of the terms of that Collateral Obligation if (w) the amendment or modification is proposed by the obligor under that Collateral Obligation and does not require or provide for any advance of additional funds, the Collateral Obligation is not an Affiliate Collateral Obligation (as defined below), neither the Issuer nor the Portfolio Manager, nor any Affiliate of either, has participated directly or indirectly in the negotiation of the amendment or modification, and the Issuer is not the largest holder of the Collateral Obligation, or (x) the modification would not constitute a Significant Modification (for purposes of this clause, "Significant Modification" means any amendment, supplement or modification that involves (1) a change in interest rate or yield of the Collateral Obligation, (2) a change in the stated maturity or the timing of any material payment on the Collateral Obligation (including deferral of an interest payment), (3) a change in the obligor of the Collateral Obligation or (4) a change in the collateral or security for the Collateral Obligation, including the addition or deletion of a co-obligor or guarantor, all within the meaning of United States Department of the Treasury regulation section 1.1001-3), or (y) in the reasonable judgment of the Portfolio Manager, the obligor is in financial distress, the obligor was not in financial distress on the date on which the Issuer acquired such Collateral Obligation and such change in terms is desirable to protect the Issuer's investment, or (z) the Issuer has received Tax Advice that the Issuer's involvement in such amendment, supplement or modification of the terms of that

Collateral Obligation will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes;

(ii)     act as, hold itself out as, represent to others that it is, or engage in any activities customarily undertaken by, a dealer, middleman, market maker, retailer or wholesaler in any Collateral Obligations, reference obligations or hedging or derivative instruments, or hold as inventory for purposes of resale to customers, any Collateral Obligations owned by the Issuer;

(iii)    perform services, or hold itself out as willing to perform services, for any person, or have or seek customers;

(iv)    register as a broker-dealer under the laws of any country or political subdivision thereof, or register as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a bank, insurance company, loan originator, finance company or other institution engaged in a similar loan origination or insurance business;

(v)     take any action causing it to be treated as a bank, insurance company, loan originator, finance company or other institution engaged in a similar loan origination or insurance business for purposes of any tax, securities law or other filing or submission made to any governmental authority, any application made to a rating agency, or qualification for any exemption from tax, securities law or any other legal requirements;

(vi)    hold itself out to the public as a bank, insurance company, loan originator, finance company or other institution engaged in a similar loan origination or insurance business, or hold itself out to the public, through advertising or otherwise, as originating loans or making a market in loans or other assets;

(vii)   establish a branch, agency or other place of business within the United States; provided, that entering into this Agreement and the appointment of the Portfolio Manager as described herein shall not be construed as a violation of this clause (vii);

(viii)  make any tax election which would cause it to be subject to United States federal, state or local income or franchise tax;

(ix)    buy any security in order to earn a dealer spread or dealer mark-up over its cost; or

(x)     buy any security with an expectation or intention of restructuring or entering into a workout of such security.

For purposes of this Schedule 1, "dealer" means: (a) a merchant of securities with an established place of business who in the ordinary course of business is engaged as a merchant in purchasing securities and selling them to customers with a view to the gains and profits that may be derived therefrom, and (b) a person that regularly offers to enter into, assume, offset, assign or otherwise terminate positions in derivatives with customers in the ordinary course of a trade or business, including regularly holding itself out, in the

ordinary course of its trade or business, as being willing and able to enter into either side of a derivative transaction.

<u>Requirements With Respect to Collateral Obligations</u>.

The Issuer may acquire Collateral Obligations only by assignment or participation, and may not execute any credit agreement whereby Collateral Obligations are issued.  The Issuer shall not acquire any Collateral Obligation, or enter into any understanding, arrangement, forward sale agreement or commitment with any person to acquire any Collateral Obligation (a "<u>Commitment</u>"), in each case (i) prior to 48 hours after the completion of the issuance and funding of such Collateral Obligation, other than as otherwise permitted under "Forward Purchase Commitments" below, or (ii) if the Issuer would own more than 50 percent of the loan, obligation, issue, class or tranche that includes the Collateral Obligation or, if the loan, obligation, issue, class or tranche that includes that Collateral Obligation is part of a larger credit facility, more than 25 percent of that entire credit facility. In the case of any Collateral Obligation that is amended or modified in a manner that constitutes a Significant Modification after issuance and funding of such Collateral Obligation and before acquisition by the Issuer of such Collateral Obligation, any seasoning requirement set forth herein shall be computed and applied with respect to the date of such Significant Modification.

The Issuer shall not have any contractual relationship with the borrower or issuer with respect to a Collateral Obligation until the Issuer actually closes the acquisition of that Collateral Obligation.  On the funding date of the Collateral Obligation, the documents relating to the Collateral Obligation shall not list the Issuer as a lender or otherwise as a party to any document relating to the issuance of the Collateral Obligation.  The Issuer shall not be a signatory on any lending agreement or any other document relating to the issuance of the Collateral Obligation.

The Issuer shall not have any communications or negotiations with the borrower or issuer of any Collateral Obligation (directly or indirectly through the seller of such Collateral Obligation, the agent, negotiator, originator or structuror thereof, or any other person) prior to the completion of the issuance and funding thereof, in connection with the issuance or funding of such Collateral Obligation or commitments with respect thereto, or the Issuer's acquisition of such Collateral Obligation or the Issuer's Commitment with respect thereto, in each case, except as otherwise permitted under "Forward Purchase Commitments" below.  For the avoidance of doubt, (i) the Issuer, or the Portfolio Manager or the Independent Investment Professional acting on its behalf, may, however, undertake customary due diligence communications with an issuer or obligor of any Collateral Obligation that would be reasonably necessary in order for an investor or trader to make a reasonably informed decision to acquire any such Collateral Obligation for its own account, and (ii) nothing contained herein shall prohibit expressions of interest or providing comments as to mistakes or inconsistencies in documents relating to any Collateral Obligation by the Issuer, or by the Portfolio Manager or the Independent Investment Professional acting on its behalf.

The Issuer shall not be entitled to earn or receive from any person any premium, fee, commission or other compensation for services, whether or not denominated as received for services, in connection with acquiring or disposing of a Collateral Obligation, or entering into a commitment to acquire or dispose of a Collateral Obligation, including without limitation, in each case, any amount that is attributable or otherwise determined by reference to the amount of any origination, underwriting or similar profit or related or similar fees for services earned by an underwriter, placement agent, lender, arranger, agent or other similar person in connection with the issuance or funding of a Collateral Obligation. In furtherance and not in limitation of the immediately preceding sentence, the Issuer shall not be entitled to earn or receive directly from any person any separately stated premium, fee or commission that is compensation for services or that is based upon or otherwise determined by reference to the amount of any such services. For the avoidance of doubt, the foregoing prohibition against earning or receiving fees and similar amounts shall not apply to (i) any compensation paid other than for a Prohibited Activity pursuant to the terms of any Collateral Obligation (e.g., a prepayment fee or commitment fee), (ii) any amendment or waiver fee, or (iii) any discount in the price paid by the Issuer for a Collateral Obligation from the price paid by the seller of the Collateral Obligation where such discount is attributable to the time value of money, credit quality of the related borrower, market conditions, or terms and conditions of the Collateral Obligation.

<u>Additional Requirements With Respect to Affiliate Collateral Obligations and Transfers to Affiliates</u>.

Except as provided below, the Portfolio Manager shall not cause the Issuer to purchase any Collateral Obligation of any borrower or issuer with respect to which the Issuer, Portfolio Manager or any of their Affiliates:

(i)     acted as an underwriter, financial advisory, placement or other agent, arranger, negotiator or structuror in connection with the issuance or origination of such Collateral Obligation,

(ii)     was an agent, negotiator, structuring agent, bridge loan provider (where a bridge loan is repaid by any Collateral Obligation) or member of the original lending syndicate with respect to such Collateral Obligation, or

(iii)     earned or received any compensation relating to the origination of such Collateral Obligation (each such Collateral Obligation, an "<u>Affiliate Collateral Obligation</u>").

The Portfolio Manager on behalf of the Issuer shall be permitted to cause the Issuer to purchase Affiliate Collateral Obligations, *provided* that the following conditions are met:

(I)     at least 30 days shall have passed since the issuance and funding of such Affiliate Collateral Obligation and the holder of the Collateral Obligation did not identify the obligation or security as intended for sale to the Issuer within 30 days of its issuance;

(II)     following such 30-day period, the Independent Investment Professional shall have approved the purchase by the Issuer of such Affiliate Collateral Obligation after a review of the terms and conditions thereof and a determination that such transaction shall be effected on an arm's length basis and that the purchase price represents fair market value (x) by reference to dealer quotes or the price paid by an unrelated secondary buyer in a material contemporaneous sale on substantially the same terms, or (y) to the extent there is no independent sale or the price paid in such sale is not readily ascertainable, by reference to the fair market value price at which an unrelated independent secondary market acquirer would acquire such Affiliate Collateral Obligation in an arm's length transaction;

(III)     the Portfolio Manager or its Affiliate, as the case may be, originated the Collateral Obligation in the ordinary course of its business and not in contemplation of its acquisition by the Issuer; and

(IV)     the Issuer may not purchase any Affiliate Collateral Obligation having a greater principal amount than the principal amount of such Affiliate Collateral Obligation held following such purchase by the Portfolio Manager and its Affiliates (excluding the Issuer).

In addition, the Portfolio Manager shall not cause the Issuer to sell or assign any Collateral Obligation to the Portfolio Manager or any of its Affiliates in a transaction in which the Portfolio Manager is acting as principal for its own account or has discretionary authority to invest for the account of such Affiliate, unless such sale or assignment is consented to by the Independent Investment Professional, which consent shall not be unreasonably withheld or delayed so long as such sale or assignment is effected at the fair market value price that an unrelated independent secondary market acquirer would acquire such Collateral Obligation in an arm's length transaction. It is understood and agreed that the consent requirement of the immediately preceding sentence shall not apply to any sale or assignment of any Collateral Obligation by the Issuer to any Person whose equity is at least majority owned by the Issuer (e.g., a special purpose financing subsidiary).

<u>Maintenance of Separate and Independent Status</u>.

At the written request of the Portfolio Manager, the Issuer shall establish a conflicts review board or appoint an independent third party to act on behalf of the Issuer (such board or party, an "<u>Independent Investment Professional</u>") with respect to transactions involving any Affiliate Collateral Obligation. Any Independent Investment Professional (i) shall either (A) be an established financial institution or other financial company with experience in assessing the merits of transactions similar to the transactions involving any Affiliate Collateral Obligation or (B) be a review board comprised of one or more individuals selected by the Issuer (or at the request of the Issuer, selected by the Portfolio Manager), (ii) shall be required to assess the merits of the transaction involving any Affiliate Collateral Obligation and either grant or withhold consent to such transaction in its sole judgment and (iii) shall not be (A) affiliated with the Portfolio Manager (other

Exhibit 10
Page 47 of 52

than as a holder or as a passive investor in the Issuer or an Affiliate of the Issuer) or (B) involved in the daily management and control of the Issuer.

Neither the Independent Investment Professional nor any of the employees or personnel performing duties of the Portfolio Manager on behalf of the Issuer relating to the purchase of Affiliate Collateral Obligations shall be directly or indirectly involved in any origination or underwriting activities with respect to any Collateral Obligation, or have access to any files, records, or other information that is not available to independent unrelated secondary market acquirers concerning the origination or underwriting of any such Collateral Obligation. In addition, neither the Independent Investment Professional nor any of the employees or personnel performing duties of the Portfolio Manager on behalf of the Issuer relating to the purchase of Affiliate Collateral Obligations shall be a party to any discussions or meetings relating to origination or underwriting activities with respect to any Affiliate Collateral Obligation. No employee or personnel of the Portfolio Manager who is involved in any origination or underwriting activities with respect to any Affiliate Collateral Obligation shall have any direct or indirect influence over the decision making process of the Issuer or the Independent Investment Professional with respect to the acquisition or disposition of any Affiliate Collateral Obligation on behalf of the Issuer, but no such employee or personnel shall be prohibited from making recommendations to the Independent Investment Professional. However, in all cases the decision whether to invest in an Affiliate Collateral Obligation or to sell a Collateral Obligation to the Portfolio Manager or one of its Affiliates shall be an independent decision by the Independent Investment Professional.

<u>Revolving Collateral Obligations, Delayed Drawdown Collateral Obligations and Letter of Credit Facilities</u>.

Neither the Issuer nor the Portfolio Manager acting on the Issuer's behalf shall acquire an interest (including by means of participation) in a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation or a letter of credit facility unless:

(i) such interest is acquired in the secondary market, the acquisition of such interest will not cause the Issuer to hold more than 25 percent of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation or letter of credit facility, and taken together with the aggregate principal amount of other such interests held by the Issuer does not exceed 15% of the aggregate principal amount of all Collateral Obligations held by the Issuer;

(ii) with respect to any Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation:

(a) neither the Issuer, the Portfolio Manager acting on behalf of the Issuer, nor the Independent Investment Professional acting on behalf of the Issuer has participated in the negotiation of the terms of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation;

(b)     the terms of such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation are fixed as of the date of the Issuer's acquisition thereof and do not provide the Issuer any discretion as to whether to make advances under such Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation;

(c)     more than a *de minimis* amount of such Collateral Obligation has been funded, or such loan is associated with a term loan to such borrower which has been fully funded; and

(d)     the Issuer does not acquire any interest in a Revolving Collateral Obligation or Delayed Drawdown Collateral Obligation which is not associated with a term loan prior to 60 days after the issuance thereof, and all such interests combined shall not exceed 10% of the aggregate principal amount of all assets held by the Issuer; and

(iii)     with respect to any letter of credit facility:

(a)     (I)     such letter of credit facility has been fully funded by the original lender, and such lender has completed all of its obligations with respect to that letter of credit facility (such that the letter of credit facility does not constitute to any extent a Delayed Drawdown Collateral Obligation), at least 48 hours before the Issuer committed to acquire such letter of credit facility; and

(II)     the lead or agent lender or bank or other withholding agent with respect to such letter of credit will deduct and withhold all applicable withholding taxes on all payments made to the Issuer with respect to such letter of credit facility that are subject to withholding tax imposed by the United States; or

(b)     (I)     such letter of credit facility is associated with a term loan to such borrower which has been fully funded;

(II)     all terms of such letter of credit facility were fully negotiated and final no later than the time at which the terms of the related loan were fully negotiated and final;

(III)     the Issuer, or the Portfolio Manager acting on behalf of the Issuer, holds the same proportionate interest in such letter of credit facility as the proportionate interest it holds in the term loan(s) associated with such letter of credit facility; and

(IV)     the lead or agent lender or bank or other withholding agent with respect to such letter of credit will deduct and withhold all applicable withholding taxes on all payments made to the Issuer with respect to such letter of credit facility that are subject to withholding tax imposed by the United States.

<u>Forward Purchase Commitments</u>.

20736215.6.BUSINESS

Exhibit 10
Page 49 of 52

The Issuer shall not have nor make any Commitment to acquire a Collateral Obligation from a seller before completion of the closing, full funding and seasoning (except, with respect to funding, in the case of a Revolving Collateral Obligation or a Delayed Drawdown Collateral Obligation) of the Collateral Obligation, except as permitted in the following provisions.

If a Commitment is made to acquire a Collateral Obligation, other than an Affiliate Collateral Obligation, from a seller before completion of the closing and full funding of the Collateral Obligation by such seller (the "Original Lender"), such commitment shall only be made pursuant to a forward sale agreement at an agreed price (a "Forward Purchase Commitment"). Any Forward Purchase Commitment with any Original Lender in respect of a Collateral Obligation may only be made after such Original Lender has delivered its own commitment to acquire its own interest in that Collateral Obligation and after all material terms of the Collateral Obligation have been agreed to.

In the process of making or negotiating to make a Forward Purchase Commitment, the Issuer shall not negotiate with respect to any term of the Collateral Obligation to which the Forward Purchase Commitment relates. The Issuer is not prevented from negotiating the terms of the Forward Purchase Commitment, including the price at which the Issuer shall acquire the Collateral Obligation to which the Forward Purchase Commitment relates.

If the Issuer enters into a Forward Purchase Commitment to acquire a Collateral Obligation, the Issuer's obligation under the Forward Purchase Commitment shall be conditioned on there being, as of the time the Issuer is to acquire the Collateral Obligation, no material adverse change in the condition of the borrower or issuer, the Collateral Obligation or the financial markets, and in all other respects, the Forward Purchase Commitment may only be conditional to the extent the related counterparty's own commitment in the origination process and funding of the Collateral Obligation is delayed, reduced or eliminated; *provided* that, notwithstanding the foregoing, a Forward Purchase Commitment shall not be required to be conditioned on the absence of a material adverse change if (y) the Issuer enters into the Forward Purchase Commitment no sooner than 48 hours after the Original Lender has delivered its own commitment with respect to the related Collateral Obligation and after all material terms of the Collateral Obligation have been agreed to, and (z) the Issuer's Commitment is documented in a form for secondary market purchases that is substantially similar to that used for commitments given by all other persons who will acquire an interest in the Collateral Obligation from the Original Lender (including as to the absence of a material adverse change condition). In the event of any delayed, reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment, other than commitment fees or fees in the nature of commitment fees that are customarily paid in connection with such delays, reductions or eliminations of funding of Collateral Obligations of the type permitted to be purchased by the Issuer.

The Issuer shall not have any contractual relationship with the borrower or issuer with respect to a Collateral Obligation that will be subject to a Forward Purchase Commitment

until the Issuer actually closes the acquisition of that Collateral Obligation. On the funding date of the Collateral Obligation, the documents relating to the Collateral Obligation shall not list the Issuer as a lender or otherwise as a party to any document relating to the issuance of the Collateral Obligation. The Issuer shall not be a signatory on any lending agreement or any other document relating to the issuance of the Collateral Obligation.

The Issuer shall not enter into any Forward Purchase Commitment in respect of any Affiliate Collateral Obligation. The Issuer, or Portfolio Manager or the Independent Investment Professional acting on its behalf, may, however, undertake customary due diligence communications with an issuer or obligor of an Affiliate Collateral Obligation or any other Collateral Obligation that would be reasonably necessary in order for an investor or trader to make a reasonably informed decision to acquire any such Collateral Obligation for its own account.

For the avoidance of doubt, except as provided above with respect to Forward Purchase Commitments, the Issuer may enter into a Commitment with respect to a Collateral Obligation only when the Collateral Obligation is funded and at least 48 hours have thereafter elapsed.

Equity Restrictions.

The Issuer shall not acquire (whether as part of a "unit" with a Collateral Obligation, in exchange for a Collateral Obligation, or otherwise) any asset that is treated for U.S. federal income tax purposes as:

(i)     an equity interest in a partnership, a trust or a disregarded entity (unless all of the assets of such trust or disregarded entity would otherwise qualify either as Collateral Obligations hereunder or as equity interests in entities taxable as corporations for U.S. federal income tax purposes that are not ineligible to be acquired by the Issuer under clause (iv) below);

(ii)    a residual interest in a "REMIC" (as such term is defined in the Code);

(iii)   an ownership interest in a "FASIT" (as such term is defined in the Code); or

(iv)    any asset that constitutes a "United States real property interest" ("USRPI"), including certain interests in a "United States real property holding corporation" ("USRPHC") (as such terms are defined in the Code), except that, if otherwise permitted under the Indenture, the Issuer may acquire and/or hold an interest in a USRPHC under circumstances where the USRPHC may not be liquidated, and stock of the USRPHC may not be sold, unless prior to such liquidation or sale all USRPI held by the USRPHC have been sold and all U.S. federal income taxes payable by the USRPHC have been paid, and the Issuer reasonably believes, at the time of the acquisition of the interest in the USRPHC, that the USRPHC will be liquidated or the stock of the

USRPHC will be sold (in each case, in accordance with the restrictions in this clause (iv)) prior to the liquidation of the Issuer.

<u>Synthetic Securities</u>.

The Issuer shall not acquire or enter into any swap transaction or security, which swap transaction or security provides for payments associated with either (i) payments of interest and/or principal on a reference obligation or (ii) the credit performance of a reference obligation.