# Exhibit "8"

| | | | |
|---|---|---|---|
| **18-30264-sgj11 Acis Capital Management, L.P. - Court's Ruling on Plan Confirmation** | | | |
| Traci Ellison | to: | jbinford, honeil, emcgee, mbales, BBarnes, srosen, jprostok, rpatel, jwielebinski, achiarello, robin, jenright, mkleinsasser, MHurst, mmaloney, PBessette, RMatsumura, | 08/30/2018 09:24 PM |
| From: | | Traci Ellison/TXNB/05/USCOURTS | |
| To: | | jbinford@foley.com, honeil@foley.com, emcgee@foley.com, mbales@foley.com, BBarnes@lynnllp.com, srosen@forsheyprostok.com, jprostok@forsheyprostok.com, rpatel@winstead.com, jwielebinski@winstead.com, achiarello@winstead.com, | |

Dear Counsel:

The following is the court's ruling on the request of the Chapter 11 Trustee ("Acis Trustee") of Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC (collectively, the "Debtors") to confirm the *First Amended Joint Plan for the Debtors (the "Plan")*, as modified, which contains therein alternatives Plan A, Plan B, and Plan C.
The court will deny confirmation of Plans A, B, and C. Below is some of the court's reasoning.

## Plans B and C

First, Plans B and C are unconfirmable because they contemplate the amendment of the various CLO Indentures to which Acis is not a party. Specifically, Section 3.24 (for Plan B) and Section 4.24 (for Plan C) each provide as follows:

"Amendment of Indentures. The Indentures shall be amended pursuant to section 1123(a)(5)(F) of the Bankruptcy Code to provide that the Acis CLOs cannot be called for redemption until the later of (a) the date on which all Allowed Claims against the Debtors have been paid in full, or (b) three (3) years after the Effective Date. In the event that the Acis CLOs are reset, any new indenture with respect to a reset CLO shall provide the reorganized Acis will continue as the portfolio manager and that the reset CLO cannot be called for redemption until the later of (y) the date on which all Allowed Claims against the Debtors have been paid in full, or (z) three (3) years after the Effective Date."

The court recognizes that section 1123(a)(5)(F) of the Bankruptcy Code provides that a Chapter 11 plan may provide for adequate means for the plan's implementation, *such as cancellation or modification of any indenture* or similar instrument. However, the court concludes that section 1123(a)(5)(F) applies only to an indenture on which the debtor is a party–namely the issuer. While the court understands that oftentimes multiple, intertwined agreements are sometimes read together and treated in many respects as one integrated document, and while the court recognizes that, in this case, the CLO Indentures and CLO PMAs (the latter of which Acis is party to) are very interrelated, the court does not believe that this gives Acis the right to amend the Indentures without every single party thereto otherwise agreeing. For this simple reason, the current Plans B and C will not be confirmed.

## Plan A

Next, with regard to Plan A, the issues are much more complicated. But the court finds Plan A unconfirmable because–while HCLOF has repeatedly asked the Bankruptcy Court for relief, and has also made certain demands upon the CLO Issuers, the Indenture Trustee and the Acis Trustee with regard to optional redemptions–HCLOF is *not the holder of a claim* against Acis, as defined in Section 101(5) of the Bankruptcy Code, to which the doctrine of equitable subrogation

can be applied.

Plan A, distilled to its essence, is premised upon: (1) treating HCLOF as an entity with a "claim" against Acis, pursuant to the Bankruptcy Code's definition in section 101(5)(B), that can be provided for in an Acis plan as an unsecured claim (Class 2); (2) monetizing or liquidating that claim–by calculating the amount HCLOF would realize if HCLOF received exactly what it has demanded from the CLO Issuers, the Indenture Trustee, and the Acis Trustee; (3) paying the monetized/liquidated claim of HCLOF in cash in full on the Effective Date of the Plan, with cash that the Acis Trustee would receive from Plan funder Oaktree; (4) after payment of HCLOF on its liquidated/monetized claim, the Acis Trustee would be entitled to step into the shoes of HCLOF, and be the new holder of HCLOF's Sub Notes, via the court's application of the common law doctrine of equitable subrogation to the Acis Trustee–it is argued that this would be equitable, since the Acis Trustee would essentially be paying the CLO Issuers' (a debtor's) obligations on the Sub Notes to HCLOF (a creditor) and, thus, should be able to step into that creditor's shoes to avert HCLOF's double recovery; and (5) the Acis Trustee, after acquiring the Sub Notes through equitable subrogation, would convey those Sub Notes to Oaktree, the plan funder.

HCLOF, Highland Capital Management ("Highland"), and the CLO Issuers object to this use of equitable subrogation–essentially arguing that, no matter what one calls it, this is forcing a non-debtor party to sell its property that is not property of the estate. The court does not find this to be an easy analysis at all. To be sure, this is a novel proposed application of the equitable subrogation doctrine. To be sure, the Acis Trustee's proposal, at first blush–and even after a second or third turn–looks a little like an effort to force a sale of non-debtor property. This would be a novel application of the equitable subrogation doctrine–which, admittedly, has grown from a somewhat narrow to a much broader doctrine over time, with the historical purpose always being to serve the interests of fairness and justice. It is worth noting that, initially, courts in New York attempted to limit the scope of equitable subrogation to apply only to persons standing directly in the place of a surety. Then, as courts in other states expanded the concept of equitable subrogation, so did the courts of New York, eventually expanding the concept to cover third party guarantors. It was further expanded to parties who pay off a mortgage and in the case of refinancing mortgagees. The doctrine essentially went from a narrow remedy only available to sureties, to a broad doctrine available to almost any party regardless of his legal interest.

But the court believes there are at least a couple of reasons the doctrine should not be applied here. First, the court does not believe HCLOF can be construed to have a "claim" against Acis, pursuant to section 101(5)(B) of the Bankruptcy Code.

The evidence (Exh. 38) was that HCLOF made statements in correspondence dated May 4, 2018, from HCLOF to U.S. Bank, the indenture trustee for all five Acis CLOs, arguing that Acis, as portfolio manager under the CLO-PMAs, was breaching its duties, and stating that both the CLO Issuer "and the Subordinated Noteholders have a claim for the losses caused by the actions of the Portfolio Manager and the Chapter 11 Trustee" and claiming setoff right against funds held by the indenture trustee belonging to the Debtors.

Additionally, the evidence was also that HCLOF has twice during the bankruptcy case purported to direct the CLO Issuers, the Indenture Trustee, and Acis "to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full." Exhs. 20 & 21. In the second notice, HCLOF added language that this would be "for the express purpose of placement of a portion of the portfolio assets held by the Co-issuers into a warehouse arrangement or a total return swap or other derivatives arrangement with Highland Capital Management, L.P." The end result of

this, of course, would be that the Debtor Acis would no longer have any assets to manage and no revenue stream to potentially pay its creditors.

Then, after the Trustee refused to effectuate an optional redemption, both HCLOF and Highland filed, on May 30, 2018, an adversary proceeding against the Acis Trustee, demanding that the Acis Trustee specifically perform and effectuate an optional redemption (the "Adversary"-- Adversary No. 18-03078-sgj). The Adversary Complaint states: *"Under the [CLO] funds' governing documents, the investors [e.g. HCLOF] have the right to have their money returned upon demand. Consequently, to mitigate their on-going losses, the investors have instructed the Indenture Trustee and Acis LP, as the putative portfolio manager of the funds, to sell the funds' assets through a redemption process provided for in the Indenture, and return the investors' money to be invested elsewhere with higher yields . . . . The Debtors, which are controlled by a Chapter 11 Trustee, have refused to authorize the necessary processes to effectuate a redemption of the funds to allow the return of the investors' money . . . . The investors are suffering daily losses because of the Chapter 11 Trustee's inaction. . . . The Plaintiffs file this Complaint to protect their interests and urge the Court to promptly enter a preliminary injunction enjoining the Chapter 11 Trustee from interfering with the redemption process and allowing the investors to have their money returned before they incur further losses."* Para. 2.

The Original Complaint went on to state that the ACIS CLO PMAs are valid and enforceable contracts between the CLOs and Acis LP. Under the PMAs, Acis LP provides investment advisory services to the CLOs. "Plaintiff HCLOF, who holds an equity position in the CLO, *is a third-party beneficiary of the PMA*. The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA. The Chapter 11 Trustee's breach has caused damage to HCLOF." Paragraphs 67-70. See also paras. 74-77; 81-84; 88-91; 95-98.

Subsequently, HCLOF withdrew its two sets of redemption notices and on August 10, 2018 (after appealing a bankruptcy court preliminary injunction in the Adversary and after also moving to withdraw the reference in the Adversary), moved to amend the Adversary to ask for only the following: *"Pursuant to 28 U.S.C. § 2201, HCLOF seeks a declaration that the Chapter 11 Trustee has no authority to sell or transfer HCLOF's property without HCLOF's consent. HCLOF seeks no money damages or other relief not sought in this Amended Complaint."*

Is this all enough for HCLOF to have a "claim" against the Debtor, pursuant to section 101(5)–in other words, does it amount to an assertion of a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment"–particularly when HCLOF has now withdrawn its two notices requesting the Indenture Trustee and Debtor commence an optional redemption process and has also sought to amend the Original Complaint to specify that it is not seeking any damages?

*The court believes no*. The five CLO PMAs specifically provide that there are *no third party beneficiaries* (except that four of the five CLO PMAs carve out the Indenture Trustee as a third party beneficiary). Thus, HCLOF–although it alleged in the Original Complaint–that it was an alleged "third party beneficiary," never had any basis to state that or to complain of Acis's alleged "anticipatory breach" of the CLO PMAs, as it purported to do in the Original Complaint. Moreover, there is, of course, no longer a PMA between Acis and HCLOF (f/k/a/ as ALF), as of October 27, 2017, as a result of the series of transactions that "the Highlands" apparently

orchestrated after the Josh Terry arbitration award and judgment.  Thus, HCLOF cannot claim any breach of contract between Acis and HCLOF.  Acis is technically not a party to the Indentures.  Thus, as far as the court is aware, *there is no contract between HCLOF and Acis whatsoever. If there is some theory under which HCLOF can assert liability against Acis , it has not been articulated.*

In summary, the court does not believe HCLOF (though it has made many threats and demands and filed an Adversary) has ever articulated a viable claim against Acis.  Without a viable claim, the court does not believe the equitable subrogation doctrine asserted by the Acis Trustee works.  And, without some sort of claim being validly asserted against Acis, any payment by it on account of the Sub Notes would appear to be voluntary.

The court recognizes that some courts have applied the equitable subrogation doctrine where a party paid a debt on which it had no liability and seemed to do it somewhat voluntarily–despite there being a long-standing exception to the doctrine for "voluntary payment."  The strongest example of this is the case of NY Stock Exchange v, Sloan, 1980 U.S. Dist. LEXIS 13316 (S.D.N.Y. Aug. 15. 2018).  But it appears to this court that, in any case where a court has allowed equitable subrogation where "voluntariness" was somewhat in existence, *there was a situation where there was a primary obligor who wasn't paying its obligation* .  Here, the CLO Issuers are perfectly willing and able to perform their obligations.  Thus, applying equitable subrogation here seems a bridge too far.  The Acis Trustee would appear to an "officious meddler" (although with good motives) and–with no real exposure to HCLOF, in the court's view–the payment of the Sub Notes obligations would be purely voluntary.  The court recognizes that the Acis Trustee would be attempting to  protect an interest of its own (the Acis PMA revenue stream) somewhat like the property developer in the Hamlet case.  Hamlet v. Northeast, 64 A.D.3d 85 (N.Y App. Div. Second Dept. 2009).  But, in Hamlet, the property developer who paid the Environmental fees to the town of Brookhaven, that the subcontractor had bonded and agreed to pay, was itself primarily liable on the Environmental fees (in other words, the Town had a claim against Hamlet).  Again, equitable subrogation under the exact facts and circumstances of this case seems a bridge too far.

### Miscellaneous Rulings

The court rules on a few miscellaneous matters that were contested, although it is denying confirmation.  This may be useful for any future appeals or for any future proposed plans.

### Assumption and Assignment of the PMAs would not violate section  365 of the Bankruptcy Code.

The court believes that the assumption of the CLO PMAs by the Acis Trustee and the assignment of the CLO PMAs to a third party (either Oaktree or Brigade or Cortland) would be permissible under section 365 of the Code.   Section 365 of the Bankruptcy Code does not prohibit the Trustee from assigning its rights under the PMAs without the written consent of the CLOs, the Subordinated Noteholders, and others. Section 365(c)(1) of the Bankruptcy Code provides:

"The trustee may not assume or assign any executory contract . . . if . . . applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract . . . prohibits or restricts assignment of rights; and . . . such party does not consent to such assumption or assignment[.]"

11 U.S.C. § 365(c)(1).

The court overrules any objection that there is some applicable law that excuses the

counterparties to the PMAs (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. Assessing whether a contract is a personal service contract "depends upon the subject of the contract, the circumstances of the case and the intent of the parties to the contract." Leonard v. Gen. Motors Corp. (In re Headquarters Dodge), 13 F.3d 674, 682-83 (3d Cir. 1993) (internal quotation marks omitted); see also In re Compass Van & Storage Corp., 65 B.R. 1007, 1011-12 (Bankr. E.D.N.Y. 1986) ("Ascertaining whether a contract is personal posits on close distinctions, e.g., the nature and subject matter of the contract, the circumstances of the case placed in juxtaposition with the intention of the parties."). Even "clauses in the contract . . . attesting to a personal relationship will not be dispositive." Leonard, 13 F.3d at 683. Ultimately, if "the identity of that person or entity [rendering performance under the contract] is an essential element of the contract, and if the contract is non-assignable under applicable non-bankruptcy law then the estate cannot assign the contract." Grove Rich Realty, 200 B.R. at 507. Accordingly, in order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule—any prudent party contracting for another's services considers the other party's skill, expertise, and reputation—and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party providing services is skilled and reputable—it is whether such services are unique in nature. See Compass Van & Storage Corp., 65 B.R. at 1011. To support its contention, Highland cites New York cases under which hotel management contracts or consulting contracts were found to be personal service contracts. In the Marriott case cited by Highland, in which the court found the hotel management to be a personal service contract, the court observed that the hotel manager had "full discretion . . . to manage virtually every aspect of the hotel." Marriott Int'l, Inc. v. Eden Roc, LLLP, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013). Marriott is distinguishable. Here, Acis did not manage virtually every aspect of the CLOs. Pursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique—as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers. Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii). And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." Id. § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." See Compass Van & Storage, 65 B.R. at 1011 (citing RESTATEMENT (SECOND) OF CONTRACTS § 318(2) (1981)). As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." Compass

Van & Storage, 65 B.R. at 1011. Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2). Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision–the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

"Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an investment adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC, 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent. Accordingly, the assignment of the PMAs to Oaktree does not violate the IAA or section 365(c)(1) of the Bankruptcy Code.

Preliminary Injunction

The preliminary injunction in place preventing HCLOF from pursuing optional redemptions will remain in place for now. The court believes there are automatic stay implications (section 362(a)(3)) with regard to HCLOF pursuing optional redemptions. The effect of an optional redemption is to *exercise control over the Acis PMAs and revenue stream* (property of the estate–see, e.g., Hometown Valley View v. Prime, 847 F.3d 302 (5th Cir. 2017)). While HCLOF is not itself a creditor (and while "the Highlands" entity separateness is not being challenged, and is not being disregarded be either the Acis Trustee, the court, or anyone else at this juncture), the court notes that HCLOF, Highland, and other Highland-related parties seem to work in tandem. Highland asserts a claim against Acis. Actions taken by HCLOF could be construed to be actions of Highland, an actual creditor. There is also a basis for keeping the preliminary injunction in place pending determination of the Acis Trustee's fraudulent transfer lawsuits. The evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value–perhaps even the ability to control its own destiny when the ALF PMA was essentially terminated without cause and Acis was made to sell its shares in ALF/HCLOF back to ALF/HCLOF. In the face of these facts, the court will be reluctant to terminate the preliminary injunction until this litigation is fully resolved.

End of Ruling



Traci A. Ellison, Courtroom Deputy
to the Honorable Stacey G. C. Jernigan
U.S. Bankruptcy Court, Northern District of Texas
(214)753-2046
sgj_settings@txnb.uscourts.gov